## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

CASEY CUNNINGHAM individually and as representative of a class of participants and beneficiaries on behalf of the Cornell University Retirement Plan for the Employees of the Endowed Colleges at Ithaca and the Cornell University Tax Deferred Annuity Plan,

*Plaintiff*,

v.

CORNELL UNIVERSITY AND THE RETIREMENT PLAN OVERSIGHT COMMITTEE,

*Defendants*.

Civil Action No. 16-cv-6525

COMPLAINT—CLASS ACTION

JURY TRIAL DEMANDED

1.    Plaintiff Casey Cunningham, individually and as representative of a class of participants and beneficiaries of the Cornell University Retirement Plan for the Employees of the Endowed Colleges at Ithaca and the Cornell University Tax Deferred Annuity Plan (collectively referred to as the "Plan" or "Plans"), brings this action under 29 U.S.C. §1132(a)(2) and (3) on behalf of the Plans against Defendants Cornell University and the Retirement Plan Oversight Committee for breach of fiduciary duties under ERISA.[1]

2.    The duties of loyalty and prudence are the "highest known to the law" and require fiduciaries to have "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth,* 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982). As

---

[1] The Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461.

fiduciaries to the Plans, Defendants are obligated to act for the exclusive benefit of participants and beneficiaries and to ensure that Plan expenses are reasonable and the Plans' investments are prudent. The marketplace for retirement plan services is established and competitive. Billion-dollar defined contribution plans, like the Plans, have tremendous bargaining power to demand low-cost administrative and investment management services. Instead of using the Plans' bargaining power to benefit participants and beneficiaries, Defendants allowed unreasonable expenses to be charged to participants for administration of the Plans, and retained high-cost and poor-performing investments compared to available alternatives.

3.     To remedy these fiduciary breaches, Plaintiff, individually and as representative of a class of participants and beneficiaries of the Plans, brings this action on behalf of the Plans under 29 U.S.C. §1132(a)(2) and (3) to enforce Defendants' personal liability under 29 U.S.C. §1109(a) to make good to the Plans all losses resulting from each breach of fiduciary duty and to restore to the Plans any profits made through Defendants' use of the Plans' assets. In addition, Plaintiff seeks such other equitable or remedial relief for the Plans as the Court may deem appropriate.

## JURISDICTION AND VENUE

4.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

5.      This District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is a district where the Defendants reside.

## PARTIES

### The Cornell University Retirement Plan for the Employees of the Endowed Colleges at Ithaca

6.      The Cornell University Retirement Plan for the Employees of the Endowed Colleges at Ithaca ("Retirement Plan") is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34).

7.      The Retirement Plan is established and maintained under a written document in accordance with 29 U.S.C. §1102(a)(1).

8.      The Retirement Plan provides for retirement income for certain employees of Cornell University. That retirement income depends upon contributions made on behalf of each employee by his or her employer, deferrals of employee compensation and employer matching contributions, and performance of investment options net of fees and expenses.

9.      As of December 31, 2014, the Retirement Plan had $1.9 billion in net assets and 18,470 participants with account balances. It is one of the largest defined contribution plans in the United States. Plans of such great size are commonly referred to as "jumbo plans".

3

## Cornell University Tax Deferred Annuity Plan

10.     The Cornell University Tax Deferred Annuity Plan ("TDA Plan") is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34).

11.     The TDA Plan is established and maintained under a written document in accordance with 29 U.S.C. §1102(a)(1).

12.     The TDA Plan provides for retirement income for certain employees of Cornell University. That retirement income depends upon contributions made on behalf of each employee by his or her employer, deferrals of employee compensation and employer matching contributions, and performance of investment options net of fees and expenses.

13.     As of December 31, 2014, the TDA Plan had $1.2 billion in net assets and 10,982 participants with account balances. This "jumbo plan" is also one of the largest defined contribution plans in the United States.

14.     With assets well over $1 billion each, the Retirement Plan and the TDA Plan are in the top 1% of all defined contribution plans in the United States based on total assets that filed a Form 5500 with the Department of Labor.

15.     Under the terms of both the Retirement Plan and the TDA Plan, participants are eligible to contribute a discretionary amount of their annual compensation to the Plans and Cornell makes a matching contribution.

16.     The Plans allow participants to designate investment options into which their individual accounts are invested. Defendants exercise exclusive and

discretionary authority and control over the investment options that are included in the Plans.

## Plaintiff

17.    Casey Cunningham resides in Ithaca, New York, and is a participant in the Retirement Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

## Defendants

18.    Cornell University ("Cornell") is a non-profit corporation organized under New York law, which has campuses in Ithica and New York City, New York. Cornell is the fiduciary responsible for the control, management and administration of the Plans, in accordance with 29 U.S.C. §1102(a). Cornell is the Plan Administrator under 29 U.S.C. §1002(16)(A)(i) with exclusive responsibility and complete discretionary authority to control the operation, management and administration of the Plans, with all powers necessary to enable Cornell to properly carry out such responsibilities, including the selection and compensation of the providers of administrative services to the Plans and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

19.    Cornell is a fiduciary to the Plans because it exercised discretionary authority or discretionary control respecting the management of the Plans or exercised authority or control respecting the management or disposition of its assets, and has discretionary authority or discretionary responsibility in the administration of the Plans. 29 U.S.C. §1002(21)(A)(i) and (iii).

5

20.     Cornell formed the Retirement Plan Oversight Committee ("Committee") to assist with the administration of the Plans. The named fiduciary and Plan Administrator under 29 U.S.C. §1002(16)(A)(i), however, remains Cornell. The Plan Administrator is responsible for all matters relating to the Plan, including, but not limited to: resolving questions about eligibility to participate in the Plan, making decisions about claims for benefits, and resolving questions that arise regarding the Plan's administration and operation. The Plan Administrator may delegate responsibility for any aspect of the Plan's administration to other individuals or entities.

21.     The Committee is a fiduciary to the Plans because it exercised discretionary authority or discretionary control respecting the management of the Plan or exercised authority or control respecting the management or disposition of its assets, and has discretionary authority or discretionary responsibility in the administration of the Plan. 29 U.S.C. §1002(21)(A)(i) and (iii).

22.     Because the Committee and its delegates have acted as alleged herein as the agents of Cornell University, all of them are collectively referred to as Defendants.

## FACTS APPLICABLE TO ALL COUNTS

### I.     Plan investments

23.     Under the terms of both the Retirement and TDA Plans, participants are eligible to contribute a discretionary amount of their annual compensation to the Plans and Cornell makes a matching contribution.

6

24.     Defendants exercise exclusive and discretionary authority and control over the investment options that are included in the Plans.

25.     For both Plans, Defendants provided mutual funds and insurance company variable annuity products as investment options.  The investment options are offered by the Teachers Insurance and Annuity Association of America and College Retirement Equities Fund ("TIAA-CREF") and Fidelity Management Trust Company and its affiliates ("Fidelity"). Cornell selects investment options into which participants' investments are directed, including those investment options that are removed from the Retirement Plan and the TDA Plan.

26.     As of December 31, 2014, Defendants offered a total of 299 investment options to Retirement Plan participants. In particular, the Retirement Plan offered 68 TIAA-CREF investments and 231 Fidelity investments. These investments included retail and institutional share class mutual funds, an insurance separate account, variable annuity options, and a fixed annuity option. The retail share class mutual funds are designed for small individual investors and are identical in every respect to institutional share class funds, except for much higher fees.

27.     These investments are designated by Defendants as available investment alternatives offered under the Retirement Plan.

28.     As of December 31, 2014, Defendants offered a total of 301 investment options to TDA Plan participants. In particular, the TDA Plan offered 70 TIAA-CREF investments and 231 Fidelity investments. These investments included retail and institutional share class mutual funds, an insurance separate account, variable

7

annuity options, and a fixed annuity option. The retail share class mutual funds are designed for small individual investors, not jumbo retirement plans such as Cornell's Plans.  These retail share classes are identical in every respect to institutional share classes, except for much higher fees.

29.     These investments are designated by Defendants as available investment alternatives offered under the TDA Plan.

30.     The TIAA Traditional Annuity offered in both Plans is a fixed annuity contract that returns a contractually specified minimum interest rate. Assets invested in the TIAA Traditional Annuity are held in the general account of Teachers Insurance and Annuity Association of America and are dependent on the claims-paying ability of Teachers Insurance and Annuity Association of America.

31.     The TIAA Traditional Annuity has severe restrictions and penalties for withdrawal if participants wish to change their investments in the Plans. For example, some participants who invest in the TIAA Traditional Annuity must pay a 2.5% surrender charge if they withdraw their investment in a single lump sum within 120 days of termination of employment. Rather than being available to participants if they wish to liquidate their funds earlier, the only way for participants to withdraw or change their investment in the TIAA Traditional Annuity is to spread the withdrawal over a *ten-year period,* unless a substantial penalty is paid. Thus, participants who wish to withdraw their savings without penalty can only do so over ten years.

32.     Both Plans include the CREF Stock Account, CREF Global Equities Account, CREF Equity Index Account, CREF Growth Account, CREF Social Choice Account, CREF Money Market Account, CREF Inflation-Linked Bond Account, and CREF Bond Market Account, which are variable annuities that invest in underlying securities for a given investment style. The value of the Plans' investment in these variable annuities changes over time based on investment performance and the expenses of the accounts.

33.     The expense ratio of the CREF variable annuity accounts is made up of multiple layers of expense charges consisting of the following:

a.  "administrative expense" charge (24 bps);[2]

b.  "distribution expense" charge (9.5 bps);

c.  "mortality and expense risk" charge (0.5 bps); and

d.  "investment advisory expense" charge (ranging from 4 to 12.5 bps).

34.     The TIAA Real Estate Account is an insurance separate account maintained by TIAA-CREF. An insurance separate account is an investment vehicle that aggregates assets from more than one retirement plan for a given investment strategy, but those assets are segregated from the insurance company's general account assets. Similar to the CREF variable annuity accounts, the expense ratio of the TIAA Real Estate Account is made up of multiple layers of expense charges. As of May 1, 2013, these charges consisted of the following:

a.  "administrative expense" charge (26.5 bps);

---

[2] One basis point is equal to 1/100th of one percent (or 0.01%). Expenses stated as of May 1, 2014.

9

b. "distribution expense" charge (8 bps);

c. "mortality and expense risk" charge (0.5 bps);

d. "liquidity guarantee" (18 bps); and

e. "investment management expense" charge (36.5 bps).

35. The remaining TIAA-CREF funds are registered investment companies under the Investment Company Act of 1940, known as mutual funds. The TIAA-CREF mutual funds charge varying amounts for investment management, but also charge distribution, marketing, and other expenses, depending on the type of investment and share class.

36. The Fidelity investment options offered to Plan participants are exclusively mutual funds that charge varying amounts for investment management, but also charge for distribution, marketing, and other expenses, depending on the type of investment and share class.

37. Mutual funds have shareholders who are not participants in either Cornell Plan, or any retirement plan, and who purchase shares as a result of the funds' marketing efforts. However, all shareholders in the mutual funds, including the participants in the Cornell Plans, pay the expenses set forth above.

38. As of December 31, 2014, of the Retirement Plan's $1.9 billion in net assets, TIAA-CREF funds accounted for over $1.4 billion and Fidelity funds accounted for over $442 million. As of December 31, 2014, of the TDA Plan's $1.2 billion in net assets, TIAA-CREF funds accounted for over $811 million and Fidelity funds accounted for over $404 million.

## II.   Defendants' actions caused participants in the Plans to pay excessive administrative and recordkeeping fees in violation of ERISA's requirement that fees be reasonable

39.   Recordkeeping is a service necessary for every defined contribution plan. The market for recordkeeping services is highly competitive. There are numerous recordkeepers in the marketplace who are equally capable of providing a high level of service to large defined contribution plans like the Retirement Plan and the TDA Plan. These recordkeepers primarily differentiate themselves based on price and vigorously compete for business by offering the best price.

40.   To ensure that plan administrative and recordkeeping expenses are and remain reasonable for the services provided, prudent fiduciaries of large defined contribution plans put the plan's recordkeeping and administrative services out for competitive bidding at regular intervals of approximately three years.

41.   The cost of recordkeeping services depends on the number of participants, not on the amount of assets in the participant's account. Thus, the cost of providing recordkeeping services to a participant with a $75,000 account balance is the same for a participant with $7,500 in her retirement account. For this reason, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees on the basis of a fixed dollar amount that is based on the total number of participants in the plan rather than as a percentage of plan assets. Otherwise, as plan assets increase through participant contributions or investment gains, the recordkeeping revenue increases without any change in the services provided.

42.   Jumbo defined contribution plans, like the Retirement and TDA Plans, possess tremendous economies of scale for recordkeeping and administrative

11

services. As the number of participants in a plan increases, the per-participant fee charged for recordkeeping and administrative services declines. These lower administrative expenses are readily available for plans with a large number of participants.

43.     Some investments engage in a practice known as revenue sharing. In a revenue sharing arrangement, a mutual fund or other investment vehicle directs a portion of the expense ratio—the asset-based fees it charges to investors—to the plan's recordkeeper, putatively for providing recordkeeping and administrative services for the investment. Because revenue sharing arrangements provide asset-based fees, if prudent fiduciaries use revenue sharing (or asset-based charges) to pay for recordkeeping, they must monitor the total amount of revenue received by the recordkeeper to ensure that the recordkeeper is not receiving unreasonable compensation. A prudent fiduciary ensures that the recordkeeper rebates to the plan all revenue it receives that exceeds a reasonable recordkeeping fee. Because revenue sharing payments are asset-based, they often bear no relation to a reasonable recordkeeping fee and can quickly result in excessive compensation. Funds that revenue share may use these payments as kickbacks to induce recordkeepers to use higher-cost share classes as plan investment options.

44.     Prudent fiduciaries of similarly sized defined contribution plans use a single recordkeeper rather than hiring multiple recordkeepers and custodians or trustees. This leverages plan assets to provide economies of scale and ensures that plan participants pay only reasonable recordkeeping fees, while also simplifying

personnel and payroll data feeds, reducing electronic fund transfers, and avoiding

duplication of services when more than one recordkeeper is used.

45.     According to a 2013 survey of 403(b) plans, more than 90% of plans use

a single recordkeeper to provide administrative and recordkeeping services to

participants. See LIMRA Retirement Research, *403(b) Plan Sponsor Research*

(2013).[3]

46.     It is well known in the defined contribution industry that plans with

dozens of choices and multiple recordkeepers "fail" based on two primary flaws:

> **1. The choices are overwhelming**. Numerous studies have
> demonstrated that when people are given too many choices of
> anything, they lose confidence or make no decision.
> **2. The multi-recordkeeper platform is inefficient**. It does not
> allow sponsors to leverage total plan assets and receive appropriate
> pricing based on aggregate assets.

The Standard Retirement Services, Inc., *Fixing Your 403(b) Plan: Adopting a Best*

*Practices Approach,* at 2 (Nov. 2009)(emphasis in original).[4]

47.     The benefits of using a single recordkeeper are clear:

> By selecting a single recordkeeper, plan sponsors can enhance their
> purchasing power and negotiate lower, transparent investment fees for
> participants. Participants will benefit from a more manageable
> number of institutional-quality investment options to choose from.
> Participants will also benefit from customized and consistent
> enrollment, education and ongoing communication materials.[5]

---

[3] Available at
http://www.limra.com/uploadedFiles/limracom/LIMRA_Root/Secure_Retirement_Institute/
News_Center/Reports/130329-01exec.pdf.

[4] Available at https://www.standard.com/pensions/publications/14883_1109.pdf.

[5] *Id.*

48. In a study titled "How 403(b) Plans Are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It", AonHewitt, an independent investment consultant, similarly recognized:

> 403(b) plan sponsors can dramatically reduce participant-borne costs while improving employees' retirement readiness by:
>
> – Reducing the number of investment options, utilizing an "open architecture" investment menu, and packaging the options within a "tiered" structure.
>
> – Consolidating recordkeepers to improve efficiencies and reduce compliance-related risks.
>
> – Leveraging aggregate plan size and scale to negotiate competitive pricing.

AonHewitt, *How 403(b) Plans Are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It* (Jan. 2016).[6]

49. Another independent investment consultant, Towers Watson, also recognized that using multiple recordkeepers has caused:

> high investment and administrative costs, and complex choices for plan participants in terms of the number of vendors and the array of investment options. Additionally, this complexity has made it difficult for employers to monitor available choices and provide ongoing oversight…Such designs typically are expensive and fail to leverage plan size. They can also be confusing to the average plan participant, who is likely to fall short of achieving retirement readiness and would benefit from more guidance.

Peter Grant and Gary Kilpatrick, *Higher Education's Response to a New Defined Contribution Environment*, TOWERS WATSON VIEWPOINTS, at 2 (2012).[7]

---

[6] Available at https://retirementandinvestmentblog.aon.com/getattachment/36ff81a4-db35-4bc0-aac1-1685d2a64078/How_403(b)_Plans_are_Wasting_Nearly_$10_Billion_Annually_Whitepaper_FINAL.pdf.aspx.

14

50.     Other industry literature makes the same points. See, e.g., Kristen Heinzinger, *Paring Down Providers: A 403(b) Sponsor's Experience,* PLANSPONSOR (Dec. 6, 2012)("One advantage of consolidating to a single provider was an overall drop in administrative fees and expenses. Recordkeeping basis points returned to the plan sponsors rather than to the vendor. All plan money aggregated into a single platform, and participants were able to save on fee structure. This also eliminated the complications and confusion of having three different recordkeepers.");[8] Paul B. Lasiter, *Single Provider, Multiple Choices*, BUSINESS OFFICER (Mar. 2010)(identifying, among other things, the key disadvantages of maintaining a multi-provider platform including the fact that it is "cumbersome and costly to continue overseeing multiple vendors.").[9]

51.     Use of a single recordkeeper is also less confusing to participants and results in their avoiding paying excessive recordkeeping fees. *Vendor Consolidation in Higher Education: Getting More from Less*, PLANSPONSOR (July 29, 2010)(recognizing the following benefits, among others: "The plan participant experience is better" because "employees are benefiting from less confusion as a result of fewer vendors in the mix"; "Administrative burden is lessened" by "bringing new efficiencies to the payroll"; and "Costs can be reduced" because

---

[7] Available at https://www.towerswatson.com/DownloadMedia.aspx?media=%7B08A2F366-14E3-4C52-BB78-8930F598FD26%7D.

[8] Available at http://www.plansponsor.com/paring-down-providers-a-403b-sponsors-experience/?fullstory=true.

[9] Available at http://www.nacubo.org/Business_Officer_Magazine/Magazine_Archives/March_2010/Single_Provider_Multiple_Choices.html.

"[w]ith a reduced number of vendors in the equation, plan sponsors are better able to negotiate fees" and many are "reporting lower overall cost resulting in an improved cost-per-participant ratio").[10]

52.     Despite the long-recognized benefits of a single recordkeeper for a defined contribution plan, Defendants continued to contract with two separate recordkeepers (TIAA-CREF and Fidelity) for the Retirement Plan and the TDA Plan. There was no loyal or prudent reason that Defendants failed to engage in such process for the TDA Plan long before both 2012 and 2009. In addition to the uncapped revenue sharing received as payment for these administrative services, the inefficient and costly structure of multiple recordkeepers has caused both Plans' participants to pay excessive and unreasonable fees for recordkeeping and administrative services.

53.     The Retirement and the TDA Plans' recordkeepers receive compensation for providing such services through per-participant fees and revenue sharing payments from the Plans' investments.

54.     Upon information and belief and industry experts, the amounts of revenue sharing kicked back to the TIAA-CREF recordkeeping entity for the Plans' TIAA-CREF investments are set forth below.

| TIAA-CREF Investment | Revenue Share |
|---|---|
| CREF variable annuity contracts | 24 bps |
| Premier share class of TIAA-CREF mutual funds | 15 bps |

---

[10] Available at http://www.plansponsor.com/vendor-consolidation-in-higher-education/?fullstory=true.

| TIAA-CREF Investment | Revenue Share |
|---|---|
| Retirement share class of TIAA-CREF mutual funds | 25 bps |
| TIAA Real Estate Account | 24–26.5 bps |
| TIAA Traditional Annuity | 15 bps |

55.     Upon information and belief, Fidelity was and/or is compensated for recordkeeping services based on internal revenue sharing it receives from using higher-cost share classes of Fidelity's mutual funds as opposed to the institutional classes readily available to jumbo plans such as the Plans.

56.     In addition, TIAA-CREF and Fidelity also receive and/or received additional indirect compensation, including float, revenue derived from securities lending, distribution fees, mortality and expense charges, surrender charges, spread, and redemption fees.

57.     Based on the Plans' features, the nature of the administrative services provided by the Plans' recordkeepers, the Plans' combined participant level (roughly 30,000), and the recordkeeping market, a reasonable recordkeeping fee for the Plans would be approximately $1,050,000 in the aggregate for both Plans combined (or a flat fee based on $35 per participant). Even if Defendants had negotiated a reasonable recordkeeping fee for the Retirement and TDA Plans separately, the Plans would have paid dramatically less for recordkeeping services.

58.     Based on the direct and indirect compensation levels shown on the Retirement Plan's Form 5500s filed with the Department of Labor and upon information and belief regarding the internal revenue share allocated to each of the Plan's recordkeepers from their proprietary investment options, the Retirement

17

Plan paid between $2.9 and $3.4 million (or approximately $115 to $183 per participant) per year from 2010 to 2014, over 420% higher than a reasonable fee for these services, resulting in millions of dollars in excessive recordkeeping fees each year.

59.    Based on the direct and indirect compensation levels shown on the TDA Plan's Form 5500s filed with the Department of Labor and upon information and belief regarding the internal revenue share allocated to each of the Plan's recordkeepers from their proprietary investment options, the TDA Plan paid between $1.8 and $2.2 million (or approximately $145 to $200 per participant) per year from 2010 to 2014, over 470% higher than a reasonable fee for these services, resulting in millions of dollars in excessive recordkeeping fees each year.

60.    The impact of excessive fees on employees' and retirees' retirement assets is dramatic. The U.S. Department of Labor has noted that just a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career. U.S. Dep't of Labor, *A Look at 401(k) Plan Fees,* at 1–2 (Aug. 2013).[11]

61.    Upon information and belief, Defendants also failed to conduct a competitive bidding process for the Plans' recordkeeping services. A competitive bidding process for recordkeeping services would have produced a reasonable recordkeeping fee. This competitive bidding process would have enabled Defendants to select a recordkeeper charging reasonable fees, negotiate a reduction in

---

[11] Available at http://www.dol.gov/ebsa/pdf/401kfeesemployee.pdf.

recordkeeping fees, and rebate any excess expenses paid by participants for recordkeeping services.

62. Defendants failed to prudently monitor and control the compensation paid for recordkeeping and administrative services, particularly the asset-based revenue sharing received by TIAA-CREF and Fidelity. Therefore, Defendants caused the participants in both Plans to pay unreasonable expenses for administration. Had Defendants ensured that participants only paid reasonable fees for administrative and recordkeeping services, Retirement and TDA Plan participants would not have lost in excess of $28 million of their retirement savings.[12]

### III. Defendants failed to prudently consider or offer dramatically lower-cost investments that were available to the Plans, including identical mutual funds in lower-cost share classes.

63. Nobel Prize winners in economics have concluded that virtually no investment manager consistently beats the market over time after fees are taken into account. "Properly measured, the average actively managed dollar must underperform the average passively managed dollar, net of costs." William F. Sharpe, *The Arithmetic of Active Management,* 47 FIN. ANALYSTS J. 7, 8 (Jan./Feb. 1991);[13] Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-*

---

[12] The Plans' losses have been brought forward to the present value using the investment returns of the S&P 500 index to compensate participants who have not been reimbursed for their losses. This is because the excessive fees participants paid would have remained in the Plans' investments growing with the market.

[13] Available at http://www.cfapubs.org/doi/pdf/10.2469/faj.v47.n1.7.

*Section of Mutual Fund Returns*, 65 J. FIN. 1915, 1915 (2010)("After costs…in terms of net returns to investors, active investment must be a negative sum game.").

64.     To the extent managers show any sustainable ability to beat the market, the outperformance is nearly always dwarfed by mutual fund expenses. Fama & French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, at 1931–34; see also Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55 J. FIN. 1655, 1690 (2000)("on a net-return level, the funds underperform broad market indexes by one percent per year").

65.     If an individual high-cost mutual fund exhibits market-beating performance over a short period of time, studies demonstrate that outperformance during a particular period is not predictive of whether a mutual fund will perform well in the future. Laurent Barras et al., *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. FIN. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, 52 J. FIN. 57, 57, 59 (1997)(measuring thirty-one years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns"). However, the *worst-performing* mutual funds show a strong, persistent tendency to continue their poor performance. Carhart, *On Persistence in Mutual Fund Performance*, at 57.

66.     Accordingly, investment costs are of paramount importance to prudent investment selection, and a prudent investor will not select higher-cost actively

managed funds without a documented process to realistically conclude that the fund is likely to be that extremely rare exception, if one even exists, that will outperform its benchmark index over time, net of investment expenses.

67.    Moreover, jumbo retirement plans have massive bargaining power to negotiate low fees for investment management services.

> The fiduciaries also must consider the size and purchasing power of their plan and select the share classes (or alternative investments) that a fiduciary who is knowledgeable about such matters would select under the circumstances. In other words, the "prevailing circumstances"—such as the size of the plan—are a part of a prudent decisionmaking process. The failure to understand the concepts and to know about the alternatives could be a costly fiduciary breach.

Fred Reish, *Class–ifying Mutual Funds*, PLANSPONSOR (Jan. 2011).[14]

68.    Apart from the fact that a prudent fiduciary will carefully weigh whether an actively managed fund is likely to outperform an index over time, net of fees, academic and financial industry literature demonstrates that high expenses are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds even on a *pre-fee basis*. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. ECON. BEHAV. & ORG. 871, 873 (2008); see also Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. PA. L. REV. 1961, 1993 (2010)(summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

> [T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that

---

[14] Available at http://www.plansponsor.com/MagazineArticle.aspx?id=6442476537.

the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed mutual funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

69.     Lower-cost institutional share classes of mutual funds compared to retail shares are available to institutional investors, and far lower-cost share classes are available to jumbo investors like the Retirement and TDA Plans. In addition, insurance company pooled separate accounts are available that can significantly reduce investment fees charged on mutual fund investments to defined contribution plans.

70.     Minimum investment thresholds for institutional share classes are routinely waived by the investment provider if not reached by a single fund based on the retirement plan's total investment in the provider's platform. Therefore, it is commonly understood by investment managers of large pools of assets that, for retirement plans of the Plans' size, if requested, the investment provider would make available lower-cost share classes for the Plans, if there were any fund that did not individually reach the threshold.

71.     Despite these far lower-cost options, Defendants selected and continue to retain investment options in both the Retirement and TDA Plans with far higher costs than were and are available to the Plans based on their size. Moreover, for the *exact same mutual fund option*, Defendants selected and continue to offer far higher-cost share classes of identical mutual funds than were available to the Plans.

72.    In the Retirement and TDA Plans, lower-cost mutual funds *identical* to the Plans' mutual funds include and have included the following:

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Fidelity Stock Selector Small Cap (FDSCX) | 75 bps | Fidelity Stock Selector Small Cap (I) (FCDIX) | 62 bps | 20.97% |
| American Beacon International Equity (Inv) (AAIPX) | 105 bps | American Beacon International Equity (AMR) (AAIAX) | 48 bps | 118.75% |
| Domini Social Equity (Inv) (DSEFX) | 118 bps | Domini Social Equity (Inst) (DIEQX) | 65 bps | 81.54% |
| Fidelity Large Cap Growth (FSLGX) | 80 bps | Fidelity Large Cap Growth (Inst) (FLNOX) | 68 bps | 17.65% |
| Fidelity Mid Cap Growth (FSMGX) | 67 bps | Fidelity Mid Cap Growth (Inst) (FGCOX) | 59 bps | 13.56% |
| Fidelity Spartan 500 Index (Inv) (FSMKX) | 10 bps | Fidelity Spartan 500 Index (Adv) (FSMAX) | 7 bps | 42.86% |
| TIAA-CREF Lifecycle 2010 (Retire) (TCLEX) | 47 bps | TIAA-CREF Lifecycle 2010 (Inst) (TCTIX) | 22 bps | 113.64% |
| TIAA-CREF Lifecycle 2015 (Retire) (TCLIX) | 46 bps | TIAA-CREF Lifecycle 2015 (Inst)  (TCNIX) | 42 bps | 9.52% |
| TIAA-CREF Lifecycle 2020 (Retire) (TCLTX) | 45 bps | TIAA-CREF Lifecycle 2020 (Inst)  (TCWIX) | 42 bps | 7.14% |
| TIAA-CREF Lifecycle 2025 (Retire) (TCLFX) | 44 bps | TIAA-CREF Lifecycle 2025 (Inst)  (TCYIX) | 42 bps | 4.76% |
| TIAA-CREF Lifecycle 2030 (Retire) (TCLNX) | 44 bps | TIAA-CREF Lifecycle 2030 (Inst)  (TCRIX) | 19 bps | 131.58% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| TIAA-CREF Lifecycle 2035 (Retire) (TCLRX) | 44 bps | TIAA-CREF Lifecycle 2035 (Inst) (TCIIX) | 19 bps | 131.58% |
| TIAA-CREF Lifecycle 2040 (Retire) (TCLOX) | 44 bps | TIAA-CREF Lifecycle 2040 (Inst) (TCOIX) | 19 bps | 131.58% |
| TIAA-CREF Lifecycle 2045 (Retire) (TTFRX) | 44 bps | TIAA-CREF Lifecycle 2045 (Inst) (TTFIX) | 19 bps | 131.58% |
| TIAA-CREF Lifecycle 2050 (Retire) (TLFRX) | 44 bps | TIAA-CREF Lifecycle 2050 (Inst) (TFTIX) | 19 bps | 131.58% |
| TIAA-CREF Managed Allocation (Retire) (TITRX) | 71 bps | TIAA-CREF Managed Allocation (Inst) (TIMIX) | 46 bps | 54.35% |
| TIAA-CREF Small-Cap Blend Index (Retire) (TRBIX) | 35 bps | TIAA-CREF Small-Cap Blend Index (Inst) (TISBX) | 10 bps | 250.00% |
| TIAA-CREF Small-Cap Equity (Retire) (TRSEX) | 78 bps | TIAA-CREF Small-Cap Equity (Inst) (TISEX) | 53 bps | 47.17% |
| TIAA-CREF Social Choice Equity (Retire) (TRSCX) | 47 bps | TIAA-CREF Social Choice Equity (Inst) (TISCX) | 22 bps | 113.64% |
| Vanguard Balanced Index (Inv) (VBINX) | 25 bps | Vanguard Balanced Index (Inst) (VBAIX) | 8 bps | 212.50% |
| Vanguard Growth Index (Inv) (VIGRX) | 28 bps | Vanguard Growth Index (Inst) (VIGIX) | 8 bps | 250.00% |
| Fidelity Spartan International Index (Inv) (FSIIX) | 10 bps | Fidelity Spartan International Index (Adv) (FSIVX) | 7 bps | 42.86% |
| Fidelity Spartan US Bond Index (Inv) (FBIDX) | 32 bps | Fidelity Spartan US Bond Index (F) (FUBFX) | 22 bps | 45.45% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| American Funds EuroPacific Growth (R5) (RERFX) | 56 bps | American Funds EuroPacific Growth (R6) (RERGX) | 52 bps | 7.69% |
| American Funds Washington Mutual (R5) (RWMFX) | 42 bps | American Funds Washington Mutual (R6) (RWMGX) | 37 bps | 13.51% |
| Baron Asset (Retail) (BARAX) | 132 bps | Baron Asset (Inst) (BARIX) | 106 bps | 24.53% |
| Fidelity Real Estate Income (FRIFX) | 92 bps | Fidelity Real Estate Income (I) (FRIRX) | 89 bps | 3.37% |
| Fidelity Spartan International Index (Inv) (FSIIX) | 10 bps | Fidelity Spartan International Index (Adv) (FSIVX) | 7 bps | 42.86% |
| Vanguard Institutional Index (Inst) (VINIX) | 4 bps | Vanguard Institutional Index (Inst Plus) (VIIIX) | 2 bps | 100.00% |
| American Beacon International Equity (Inst) (AAIEX) | 70 bps | American Beacon International Equity (AMR) (AAIAX) | 45 bps | 55.56% |
| Domini Social Equity (R) (DSFRX) | 85 bps | Domini Social Equity (Inst) (DIEQX ) | 80 bps | 6.25% |
| Fidelity Emerging Europe, Middle East, Africa (EMEA) (FEMEX ) | 125 bps | Fidelity Emerging Europe, Middle East, Africa (EMEA) (I) (FIEMX) | 119 bps | 5.04% |
| Fidelity Japan (FJPNX) | 80 bps | Fidelity Japan (I) (FJPIX) | 75 bps | 6.67% |
| Fidelity Latin America  (FLATX) | 103 bps | Fidelity Latin America (Inst) (FLFIX) | 101 bps | 1.98% |
| Franklin Small Mid Cap Growth (A) (FRSGX) | 99 bps | Franklin Small Mid Cap Growth (Adv) (FSGAX) | 74 bps | 33.78% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| JHancock Small Company (A) (JCSAX) | 134 bps | JHancock Small Company (R5) (JCSVX) | 110 bps | 21.82% |
| Templeton Developing Markets (A) (TEDMX) | 176 bps | Templeton Developing Markets (Adv) (TDADX) | 147 bps | 19.73% |
| TIAA-CREF Bond Plus (Retire) (TCBRX) | 60 bps | TIAA-CREF Bond Plus (Inst) (TIBFX) | 35 bps | 71.43% |
| TIAA-CREF Equity Index (Retire) (TIQRX) | 32 bps | TIAA-CREF Equity Index (Inst) (TIEIX) | 7 bps | 357.14% |
| TIAA-CREF High-Yield (Retire) (TIHRX) | 65 bps | TIAA-CREF High-Yield (Inst) (TIHYX) | 40 bps | 62.50% |
| TIAA-CREF International Equity Index (Retire) (TRIEX) | 34 bps | TIAA-CREF International Equity Index (Inst) (TCIEX) | 9 bps | 277.78% |
| TIAA-CREF Large-Cap Growth (Retire) (TILRX) | 73 bps | TIAA-CREF Large-Cap Growth (Inst) (TILGX) | 48 bps | 52.08% |
| TIAA-CREF Large-Cap Growth Index (Retire) (TRIRX) | 33 bps | TIAA-CREF Large-Cap Growth Index (Inst) (TILIX) | 8 bps | 312.50% |
| TIAA-CREF Large-Cap Value (Retire) (TRLCX) | 72 bps | TIAA-CREF Large-Cap Value (Inst) (TRLIX) | 47 bps | 53.19% |
| TIAA-CREF Large-Cap Value Index (Retire) (TRCVX) | 33 bps | TIAA-CREF Large-Cap Value Index (Inst) (TILVX) | 8 bps | 312.50% |
| TIAA-CREF Lifecycle Retirement Income (Retire) (TLIRX) | 63 bps | TIAA-CREF Lifecycle Retirement Income (Inst) (TLRIX) | 38 bps | 65.79% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| TIAA-CREF Mid-Cap Growth (Retire) (TRGMX) | 74 bps | TIAA-CREF Mid-Cap Growth (Inst) (TRPWX) | 49 bps | 51.02% |
| TIAA-CREF Mid-Cap Value (Retire) (TRVRX) | 71 bps | TIAA-CREF Mid-Cap Value (Inst)  (TIMVX) | 46 bps | 54.35% |
| TIAA-CREF Money Market (Retire) (TIEXX) | 23 bps | TIAA-CREF Money Market (Inst) (TCIXX) | 15 bps | 53.33% |
| TIAA-CREF Real Estate Securities (Retire)  (TRRSX) | 82 bps | TIAA-CREF Real Estate Securities (Inst)  (TIREX) | 57 bps | 43.86% |
| TIAA-CREF S&P 500 Index (Retire) (TRSPX) | 32 bps | TIAA-CREF S&P 500 Index (Inst)  (TISPX) | 7 bps | 357.14% |
| TIAA-CREF Short-Term Bond (Retire) (TISRX) | 55 bps | TIAA-CREF Short-Term Bond (Inst) (TISIX) | 30 bps | 83.33% |
| Vanguard Balanced Index (Signal) (VBASX) | 10 bps | Vanguard Balanced Index (Inst) (VBAIX) | 8 bps | 25.00% |
| Vanguard Growth Index (Signal) (VIGSX) | 10 bps | Vanguard Growth Index (Inst) (VIGIX) | 8 bps | 25.00% |
| Fidelity Spartan 500 Index (Inst) (FXSIX) | 5 bps | Fidelity Spartan 500 Index (Adv) (FXAIX) | 3 bps | 66.67% |
| Fidelity Spartan US Bond Index (Inst) (FXSTX) | 7 bps | Fidelity Spartan US Bond Index (Adv Inst) (FXNAX) | 5 bps | 40.00% |
| Ariel Appreciation (Inv) (CAAPX) | 117 bps | Ariel Appreciation (Inst) (CAAIX) | 99 bps | 18.18% |
| Ariel Fund (Inv) (ARGFX) | 106 bps | Ariel Fund (Inst) (ARAIX) | 68 bps | 55.88% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Fidelity Conservative Income Bond (FCONX) | 40 bps | Fidelity Conservative Income Bond (Inst) (FCNVX) | 30 bps | 33.33% |
| Fidelity Spartan Emerging Markets Index (Adv) (FPMAX) | 22 bps | Fidelity Spartan Emerging Markets Index (Adv Inst) (FPADX) | 12 bps | 83.33% |
| Fidelity Spartan Extended Market Index (Adv) (FSEVX) | 7 bps | Fidelity Spartan Extended Market Index (Adv Inst) (FSMAX) | 6 bps | 16.67% |
| Fidelity Spartan Global ex-US Index (Adv) (FSGDX) | 18 bps | Fidelity Spartan Global ex-US Index (Adv Inst) (FSGGX) | 10 bps | 80.00% |
| Fidelity Spartan International Index (Adv) (FSIVX) | 7 bps | Fidelity Spartan International Index (Adv Inst) (FSPSX) | 6 bps | 16.67% |
| Fidelity Spartan Mid Cap Index (Adv) (FSCKX) | 12 bps | Fidelity Spartan Mid Cap Index (Adv Inst) (FSMDX) | 6 bps | 100.00% |
| Fidelity Spartan Real Estate Index (Adv) (FSRVX) | 9 bps | Fidelity Spartan Real Estate Index (Inst) (FSRNX) | 7 bps | 28.57% |
| Fidelity Spartan Small Cap Index (Adv) (FSSVX) | 17 bps | Fidelity Spartan Small Cap Index (Adv Inst) (FSSNX) | 11 bps | 54.55% |
| Fidelity Spartan Total Market Index (Inst) (FSKTX) | 6 bps | Fidelity Spartan Total Market Index (Adv Inst) (FSKAX) | 5 bps | 20.00% |
| Franklin Small Mid Cap Growth (A) (FRSGX) | 99 bps | Franklin Small Mid Cap Growth (Adv) (FSGAX) | 74 bps | 33.78% |
| JHancock Small Company (A) (JCSAX) | 144 bps | JHancock Small Company (R6) (JCSWX) | 104 bps | 38.46% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Templeton Developing Markets (A) (TEDMX) | 170 bps | Templeton Developing Markets (Adv) (TDADX) | 143 bps | 18.88% |
| Janus Balanced (I) (JBALX) | 69 bps | Janus Balanced (N) (JABNX) | 58 bps | 18.97% |
| Strategic Advisers Core Multi-Manager (FLAUX) | 96 bps | Strategic Advisers Core Multi-Manager (F) (FHJSX) | 86 bps | 11.63% |
| BlackRock Investment Grade Bond (Inst) (BLDIX) | 55 bps | BlackRock Investment Grade Bond (K) (BLDRX) | 45 bps | 22.22% |
| Federated Short-Term Income (Inst) (FSTIX) | 52 bps | Federated Short-Term Income (Y) (FSTYX) | 35 bps | 48.57% |
| Vanguard Institutional Index (Inst) (VINIX) | 4 bps | Vanguard Institutional Index (Inst Plus) (VIIIX) | 2 bps | 100.00% |
| Vanguard Mid Cap Index (Inst) (VMCIX) | 8 bps | Vanguard Mid Cap Index (Inst Plus) (VMCPX) | 6 bps | 33.33% |
| Vanguard Mid Cap Index (Inst) (VMCIX) | 8 bps | Vanguard Mid Cap Index (Inst Plus) (VMCPX) | 6 bps | 33.33% |
| Vanguard Small Cap Index (Inst) (VSCIX) | 8 bps | Vanguard Small Cap Index (Inst Plus) (VSCPX) | 6 bps | 33.33% |
| Vanguard Small Cap Index (Inst) (VSCIX) | 8 bps | Vanguard Small Cap Index (Inst Plus) (VSCPX) | 6 bps | 33.33% |
| Vanguard Total Bond Market Index (Inst) (VBTIX) | 6 bps | Vanguard Total Bond Market Index (Inst Plus) (VBMPX) | 5 bps | 20.00% |
| Vanguard Total Bond Market Index (Inst) (VBTIX) | 6 bps | Vanguard Total Bond Market Index (Inst Plus) (VBMPX) | 5 bps | 20.00% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Total International Stock Index (Adm) (VTIAX) | 14 bps | Vanguard Total International Stock Index (Inst Plus) (VTPSX) | 10 bps | 40.00% |
| Vanguard Total International Stock Index (Adm) (VTIAX) | 14 bps | Vanguard Total International Stock Index (Inst Plus) (VTPSX) | 10 bps | 40.00% |
| BlackRock Investment Grade Bond (Inst) (BLDIX) | 55 bps | BlackRock Investment Grade Bond (K) (BLDRX) | 45 bps | 22.22% |
| Federated Short-Term Income (Inst) (FSTIX) | 52 bps | Federated Short-Term Income (Y) (FSTYX) | 35 bps | 48.57% |
| Fidelity China Region (FHKCX) | 101 bps | Fidelity China Region (I) (FHKIX) | 98 bps | 3.06% |
| Fidelity International Growth (FIGFX) | 104 bps | Fidelity International Growth (Z) (FZAJX) | 88 bps | 18.18% |
| Fidelity Mega Cap Stock (FGRTX) | 68 bps | Fidelity Mega Cap Stock (Z) (FZALX) | 54 bps | 25.93% |
| Fidelity Spartan Inflation-Protected Index (Adv) (FSIYX) | 10 bps | Fidelity Spartan Inflation-Protected Index (Adv Inst) (FIPDX) | 5 bps | 100.00% |
| Franklin Small Mid Cap Growth (A) (FRSGX) | 96 bps | Franklin Small Mid Cap Growth (R6) (FMGGX) | 47 bps | 104.26% |
| Morgan Stanley Institutional Capital Growth (I) (MSEQX) | 69 bps | Morgan Stanley Institutional Capital Growth (IS) (MGRPX) | 54 bps | 27.78% |
| Morgan Stanley Institutional Mid Cap Growth (I) (MPEGX) | 75 bps | Morgan Stanley Institutional Mid Cap Growth (IS) (MMCGX) | 61 bps | 22.95% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Neuberger Berman Socially Responsive (Inst) (NBSLX) | 68 bps | Neuberger Berman Socially Responsive (R6) (NRSRX) | 60 bps | 13.33% |
| Templeton Developing Markets (A) (TEDMX) | 172 bps | Templeton Developing Markets (R6) (FDEVX) | 126 bps | 36.51% |
| Vanguard Balanced Index (Adm) (VBIAX) | 9 bps | Vanguard Balanced Index (Inst) (VBAIX) | 8 bps | 12.50% |
| Vanguard Growth Index (Adm) (VIGAX) | 9 bps | Vanguard Growth Index (Inst) (VIGIX) | 8 bps | 12.50% |

73.    These lower-cost share classes of the identical mutual funds for the Retirement Plan and TDA Plan have been available for years, some dating back to the early 2000's or before.

74.    The failure to select far lower-cost share classes for the Plans' mutual fund options that are identical in all respects (portfolio manager, underlying investments, and asset allocation), except for cost, demonstrates that Defendants failed to consider the size and purchasing power of the Plans when selecting share classes and failed to engage in a prudent process for the selection, monitoring, and retention of those mutual funds.

75.    Had the amounts invested in the higher-cost share class mutual fund options instead been invested in the lower-cost share class mutual fund options, the Plans' participants would not have lost millions of dollars of their retirement savings.

IV.    **Defendants selected and retained a large number of duplicative investment options, diluting the Plans' ability to pay lower fees and confusing participants.**

76.    Defendants provided a dizzying array of duplicative funds in the same investment style, thereby losing the bargaining power associated with offering a single option in each investment style, which significantly reduces investment fees, and causing "decision paralysis" for participants. For each Plan, Defendants placed over 70 investment options in the core lineup for the following asset classes: target date and asset allocation funds, large cap domestic equities, mid cap domestic equities, small cap domestic equities, international equities, fixed income, money market, real estate, and fixed guaranteed annuity.

77.    In comparison, according to Callan Investments Institute's 2015 Defined Contribution Trends survey, defined contribution plans in 2014 had on average 15 investment options, excluding target date funds. Callan Investments Institute, *2015 Defined Contribution Trends,* at 28 (2015).[15] This reasonable number of options provides choice of investment style to participants while maintaining a larger pool of assets in each investment style and avoiding confusion.

78.    A larger pool of assets in each investment style significantly reduces fees paid by participants. By consolidating duplicative investments of the same investment style into a single investment option, the Plans would then have the ability to command lower-cost investments, such as a low-cost institutional share class of the selected mutual fund option.

---

[15] Available at https://www.callan.com/research/files/990.pdf.

79.     Prudent fiduciaries of large defined contribution plans engage in a detailed due diligence process to select and retain investments for a plan based on the risk, investment return, and expenses of available investment alternatives. Overall, the investment lineup should provide participants with the ability to diversify their portfolio appropriately while benefiting from the size of the pooled assets of other employees and retirees.

80.     Within each asset class and investment style deemed appropriate for the participant-directed retirement plan, prudent fiduciaries must make a reasoned determination and select a prudent investment option. Unlike Defendants, prudent fiduciaries do not select and retain numerous duplicative investment options for a single asset class and investment style. When many investment options in a single investment style are made plan options, fiduciaries lose the bargaining power to obtain lower investment management expenses for that style.

81.     In addition, providing multiple options in a single investment style adds unnecessary complexity to the investment lineup and leads to participant confusion. See The Standard, *Fixing Your 403(b) Plan: Adopting a Best Practices Approach,* at 2 ("Numerous studies have demonstrated that when people are given too many choices of anything, they lose confidence or make no decision."); Michael Liersch, *Choice in Retirement Plans: How Participant Behavior Differs in Plans Offering Advice, Managed Accounts, and Target-Date Investments,* T. ROWE PRICE

RETIREMENT RESEARCH, at 2 (Apr. 2009)("Offering too many choices to consumers can lead to decision paralysis, preventing consumers from making decisions.").[16]

82.     Moreover, having many actively managed funds in the Plans within the same investment style results in the Plans effectively having an index fund return, while paying much higher fees for active management than the fees of a passive index fund, which has much lower fees because there is no need for active management and its higher fees.

83.     From 2010 to date, the Retirement and TDA Plans included and continue to include duplicative investments in every major asset class and investment style, including balanced/asset allocation (16-17 options in each Plan), fixed income and high yield bond (31-42 options in each Plan), international (34-44 options in each Plan), large cap domestic equities (52-55 options in each Plan), mid cap domestic equities (18-25 options in each Plan), small cap domestic equities (9-17 options in each Plan), real estate (5-7 options in each Plan), money market (10 options in each Plan), and target date investments (2 fund families in each Plan). Such a dizzying array of duplicative funds in a single investment style violates the well-recognized industry principle that too many choices harm participants, and leads to "decision paralysis".

84.     For illustration purposes, Defendants included up to 15 large cap domestic blend investments for the Retirement Plan and TDA Plan as of December 31, 2014. These investments are summarized below and compared to a far lower-

---

[16] Available at
http://www.behavioralresearch.com/Publications/Choice_in_Retirement_Plans_April_2009.pdf.

cost alternative that was available to the Plans, the Vanguard Institutional Index Fund (Instl Plus).  The Vanguard Institutional Index Fund (Instl Plus) (VIIIX), by definition, mirrors the market, and has an expense ratio of 2 bps.

| Large Cap Blend Investments | Assets as of 12/31/2014 | Fee | Institutional Index Fund (VIIIX) | Plan's Excess Cost |
|---|---|---|---|---|
| CREF Equity Index | $56,657,429 | 37 bps | 2 bps | 1750.00% |
| CREF Stock | $603,581,098 | 46 bps | 2 bps | 2200.00% |
| Domini Social Equity (R) (DSFRX) | $3,016,430 | 90 bps | 2 bps | 4400.00% |
| Fidelity Disciplined Equity (K) (FDEKX) | $1,648,001 | 39 bps | 2 bps | 1850.00% |
| Fidelity Growth & Income (K) (FGIKX) | $9,779,595 | 52 bps | 2 bps | 2500.00% |
| Fidelity Large Cap Core Enhanced Index (FLCEX) | $300,343 | 45 bps | 2 bps | 2150.00% |
| Fidelity Large Cap Stock (FLCSX) | $2,366,152 | 88 bps | 2 bps | 4300.00% |
| Fidelity Mega Cap Stock (FGRTX) | $1,030,933 | 68 bps | 2 bps | 3300.00% |
| Fidelity Spartan 500 Index (Inst) (FXSIX) | $20,363,226 | 4 bps | 2 bps | 100.00% |
| Fidelity Spartan Total Market Index (Inst) (FSKTX) | $10,581,656 | 5 bps | 2 bps | 150.00% |
| Janus Growth & Income (I) (JGINX) | $1,849,954 | 73 bps | 2 bps | 3550.00% |
| TIAA-CREF Equity Index (Inst) (TIEIX) | $5,903,966 | 5 bps | 2 bps | 150.00% |
| TIAA-CREF S&P 500 Index (Inst) (TISPX) | $6,390,115 | 6 bps | 2 bps | 200.00% |
| Vanguard Growth & Income (Adm) (VGIAX) | $2,890,174 | 26 bps | 2 bps | 1200.00% |
| Vanguard Institutional Index (Inst) (VINIX) | $17,813,084 | 4 bps | 2 bps | 100.00% |
| Total Assets | $687,514,727 | | | |

85.     With over *$650 million* held in the CREF Stock Account and the CREF

Equity Index Account, these large cap blend options were *23 and 18 times* more

expensive than the lower-cost Vanguard option with an expense ratio of 2 bps.



86.     Many other large cap index funds are also available at far lower costs

than the Plans' large cap blend funds. Had the amounts invested in the Plans' large

cap blend options been consolidated into a single large cap blend investment such as

the Vanguard Institutional Index Fund (Instl Plus), Plan participants would have

avoided losing well in excess of $4 million dollars in fees for 2014 alone, and many

more millions since 2010.

87.     In addition, Defendants selected and continue to retain multiple

passively managed index options in the same investment style. Rather than a fund

whose investment manager actively selects stocks or bonds to generate investment

returns in excess of its benchmark, passively managed index funds hold all or a representative sample of securities in a specific index, such as the S&P 500 index. The passively managed index funds have no need for stock selection because the sole investment strategy of an index fund is to mimic the index.  The investment strategy of an index fund is to track the performance of a specific market benchmark net of fees. No stock selection or research is needed, unlike investing in actively managed funds. Thus, index fund fees are substantially lower.

88.    For example, in the large cap blend investment style, Defendants provided 7-8 separate index funds in each Plan that have similar investment strategies designed to generate investment results that correspond to the return of the U.S. equity market and do not involve stock selection. As another example, Defendants retained four separate index funds for the fixed income and intermediate-term bond investment style.

89.    Since index funds merely hold the same securities in the same proportions as the index,[17] having multiple index funds in the Plans provides no benefit to participants. Instead, it hurts participants by diluting the Plans' ability to obtain lower rates for a single index fund of that style because the amount of assets in any one such fund is smaller than the aggregate would be in that investment style. Moreover, multiple managers holding stocks which mimic the S&P 500 or a similar index would pick the same stocks in the same proportions as the index. Thus, there is no value in offering separate index funds in the same investment style.

---

[17] Another example of an index is the Dow Jones Industrial Average.

90.     Had Defendants combined hundreds of millions of dollars in Plan assets from duplicative index funds into a single index fund, the Plans would have generated higher investment returns, net of fees, and participants would not have lost significant retirement assets.

91.     Overall, Defendants failed to pool the assets invested in duplicative investment options for the same investment style into a single investment option, which caused Plan participants to pay millions of dollars in unreasonable investment expenses, thereby depleting their retirement assets.

## V.     Defendants imprudently retained historically underperforming Plan investments.

92.     Given the overlap in investment options in asset classes and investment styles based on Defendants' failure to conduct appropriate due diligence in selecting and retaining the Plans' investments, numerous investment options historically underperformed for years lower-cost alternatives that were available to the Plans.

### A.     Defendants imprudently retained the CREF Stock Account.

93.     The CREF Stock Account is one of the largest, by asset size, investment options in the Plans with over $850 million in total assets, and has been offered to participants throughout the period from 2010 to date. In its fund fact sheets and participant disclosures, TIAA-CREF classifies the CREF Stock Account as a domestic equity investment in the large cap blend Morningstar category. This option has consistently underperformed over years, and continues to underperform

its benchmark and lower-cost actively and passively managed investments that were available to the Plans.

94.     TIAA-CREF imposed restrictive provisions on the specific annuities that *must* be provided in the Plans. Under these terms, TIAA-CREF required that the CREF Stock Account be offered to Plan participants, in addition to the TIAA Traditional and the CREF Money Market Account. Plan fiduciaries provided these mandatory offerings in the Plans without a prudent process to determine whether they were prudent alternatives and in the exclusive best interest of Plan participants and beneficiaries. TIAA-CREF required the CREF Stock Account to be included in the Plans to drive very substantial amounts of revenue sharing payments to TIAA-CREF for recordkeeping services. The CREF Stock Account paid 24 bps for revenue sharing, which exceeded other TIAA-CREF investments by over 50% (15 bps).

95.     As generally understood in the investment community, passively managed investment options should be used or, at a minimum, thoroughly analyzed and considered in efficient markets such as large capitalization U.S. stocks. This is because it is difficult and either unheard of, or extremely unlikely, to find actively managed mutual funds that outperform a passive index, net of fees, particularly on a persistent basis, as set forth in paragraphs ¶¶63–65. This extreme unlikelihood is even greater in the large cap market because such big companies are the subject of many analysts' coverage, unlike smaller stocks, which are not covered by many analysts leading to potential inefficiencies in pricing.

96.     The efficiencies of the large cap market hinder an active manager's

ability to achieve excess returns for investors.

> [T]his study of mutual funds does not provide any reason to abandon a belief that securities markets are remarkably efficient. Most investors would be considerably better off by purchasing a low expense index fund, than by trying to select an active fund manager who appears to possess a "hot hand." Since active management generally fails to provide excess returns and tends to generate greater tax burdens for investors, the advantage of passive management holds, a fortiori.

Burton G. Malkiel, *Returns from Investing in Equity Mutual Funds 1971 to 1991*, 50

J. FIN. 549, 571 (1995).[18]

97.     Academic literature overwhelmingly concludes that active managers

consistently underperform the S&P 500 index.

> Active managers themselves provide perhaps the most persuasive case for passive investing. Dozens of studies have examined the performance of mutual funds and other professional-managed assets, and virtually all of them have concluded that, on average, active managers underperform passive benchmarks…The median active fund underperformed the passive index in 12 out of 18 years [for the large-cap fund universe]…The bottom line is that, over most periods, the majority of mutual fund investors would have been better off investing in an S&P 500 Index fund.
>
> ****
>
> Most of the dismal comparisons for active managers are for large-cap domestic managers versus the S&P 500 Index.

Robert C. Jones, *The Active Versus Passive Debate: Perspectives of an Active Quant*,

ACTIVE EQUITY PORTFOLIO MANAGEMENT, at 37, 40, 53 (Frank J. Fabozzi ed.,1998).

98.     Prudent fiduciaries of large defined contribution plans must conduct

an analysis to determine whether actively managed funds, particularly large cap,

will outperform their benchmark net of fees. Prudent fiduciaries then make a

---

[18] Available at http://indeksirahastot.fi/resource/malkiel.pdf.

reasoned decision as to whether it would be in the participants' best interest to offer an actively managed large cap option for the particular investment style and asset class.

99.     Defendants failed to undertake such analysis when it selected and retained the actively managed CREF Stock Account, particularly due to TIAA-CREF's requirement that the CREF Stock Account be provided in the Plans in order to drive revenue to TIAA-CREF. Defendants also selected and retained that fund option without conducting a prudent analysis despite the acceptance within the investment industry that the large cap domestic equity market is the most efficient market and that active managers do not outperform passive managers net of fees in this investment style.

100.     Had such an analysis been conducted by Defendants, it would have determined that the CREF Stock Account would not be expected to outperform the large cap index after fees. That is in fact what occurred.

101.     Rather than poor performance in a single year or two, historical performance of the CREF Stock Account has been persistently poor for many years compared to both available lower-cost index funds and the index benchmark. In participant communications, Defendants and TIAA-CREF identified the Russell 3000 index as the appropriate benchmark to evaluate the fund's investment results. The following performance chart compares the investment returns of the CREF Stock Account to its benchmark and two other passively managed index funds in the same investment style and its benchmark for the one-, five-, and ten-year

41

periods ending December 31, 2014.[19] For each comparison, the CREF Stock Account dramatically underperformed the benchmark and index alternatives. The passively managed index funds used for comparison purposes are the Vanguard Total Stock Market Index Fund (Instl Plus) (VITPX) and the Vanguard Institutional Index (Instl Plus) (VIIIX). Like the CREF Stock Account, these options are large cap blend investments.



102.   The CREF Stock Account, with an expense ratio of 46 bps as of December 31, 2014, was and is dramatically more expensive than far better

---

[19] Performance data provided as of December 31, 2014 to correspond to the most recent filing of the Plans' Form 5500s with the Department of Labor.

performing index alternatives: the Vanguard Total Stock Market Index Fund (Instl Plus) (2 bps) and the Vanguard Institutional Index (Instl Plus) (2 bps).

103.    Apart from underperforming passively managed index funds, the fund also significantly underperformed comparable actively managed funds over the one-, five-, and ten-year periods ending December 31, 2014. These large cap alternatives with similar underlying asset allocations to the CREF Stock Account include the Vanguard Diversified Equity (Inv) (VDEQX), Vanguard PRIMECAP (Adm) (VPMAX), and Vanguard Capital Opp. (Adm) (VHCAX).



104.  The CREF Stock Account also had a long history of substantial underperformance compared to these actively managed alternatives over the one-, five-, and ten-year periods ending December 31, 2009.[20]



---

[20] Because the Vanguard Diversified Equity Fund's inception date was June 10, 2006, it was excluded from the five- and ten-year periods. For the Vanguard PRIMECAP (Adm) and Vanguard Capital Opportunity Fund (Adm), the investment returns of the investor share class for ten-year performance were used because the admiral share class for each of these funds was not offered until November 12, 2001. The return since inception for the Vanguard PRIMECAP (Adm) was 3.23%, and for the Vanguard Capital Opportunity Fund (Adm), 5.89%.





105.    Despite the consistent underperformance, the CREF Stock Account, with an expense ratio of 46 bps as of December 31, 2014, was more expensive than better performing actively managed alternatives: the Vanguard Diversified Equity (Inv) (40 bps), the Vanguard PRIMECAP (Adm) (35 bps), and the Vanguard Capital Opp. (Adm) (40 bps).

106.    Besides this abysmal long-term underperformance of the CREF Stock Account compared to both index funds and actively managed funds, the fund was recognized as imprudent in the industry. In March 2012, an independent investment consultant, AonHewitt, recognized the imprudence of the CREF Stock Account and recommended to its clients that they remove this fund from their retirement plans. AonHewitt, *TIAA-CREF Asset Management*, INBRIEF, at 3 (July 2012).[21] This recommendation was made due to numerous factors, including the historical underperformance, high turnover of asset management executives and portfolio managers, and the over 60 separate underlying investment strategies, greatly reducing the fund's ability to generate excess returns over any substantial length of time.  *Id*. at 4–5.

107.    The Supreme Court has recently and unanimously ruled that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015). In contrast to the conduct of prudent fiduciaries, Defendants failed to conduct a prudent process to monitor the CREF Stock Account and continue to retain the fund despite its

---

[21] Available at http://system.nevada.edu/Nshe/?LinkServID=82B25D1E-9128-6E45-1094320FC2037740.

continuing to underperform lower-cost investment alternatives that were readily available to the Plans.

108.   Prudent fiduciaries of defined contribution plans continuously monitor the investment performance of plan options against applicable benchmarks and peer groups to identify underperforming investments. Based on this process, prudent fiduciaries replace those imprudent investments with better-performing and reasonably priced options. Under the standards used by prudent independent fiduciaries, the CREF Stock Account would have been removed from the Plans.

109.   Had Defendants removed the CREF Stock Account and the amounts been invested in any of the actively or passively managed lower-cost alternatives identified in ¶¶101 and 103, participants in the Plans would not have lost in excess of $160 million of their retirement savings from the fund being retained in the Plans.[22]

## B.   Defendants imprudently retained the TIAA Real Estate Account.

110.   Defendants selected and continue to include the TIAA Real Estate Account as one of the real estate investment options in the Plans. The fund has far greater fees than are reasonable, has historically underperformed, and continues to consistently underperform comparable real estate investment alternatives, including the Vanguard REIT Index (Instl) (VGSNX).

---

[22] Plan losses have been brought forward to the present value using the investment returns of the lower-cost alternatives to compensate participants who have not been reimbursed for their losses.

111.    With an expense ratio of 87 bps as of December 31, 2014, the TIAA

Real Estate Account is also over *10 times more expensive* than the Vanguard REIT

Index (Instl) with an expense ratio of 8 bps.



112.    The TIAA Real Estate Account had a long history of substantial

underperformance relative to the Vanguard REIT Index over the one-, five-, and

ten-year periods ending December 31, 2009.[23] Despite this, Defendants selected and

to this date retained it in the Plans.

---

[23] The return of the investor share class was used for ten-year performance because the institutional share class was not offered until December 2, 2003. The return since inception for the Vanguard REIT Index (Instl) was 5.49%.







113.    This underperformance continued for years before 2009 and has

continued after 2009. The TIAA Real Estate Account significantly underperformed

the Vanguard REIT Index (Instl) over the one-, five-, and ten-year periods ending

December 31, 2014.[24]

---

[24] Performance data provided as of December 31, 2014 to correspond to the most recent
filing of the Plans' Form 5500s with the Department of Labor.



114.   As the Supreme Court unanimously ruled in *Tibble*, prudent fiduciaries of defined contribution plans continuously monitor plan investment options and replace imprudent investments. *Tibble*, 135 S. Ct. at 1829. In contrast, Defendants failed to conduct such a process and continue to retain the TIAA Real Estate Account as an investment option in the Plans, despite its continued dramatic underperformance and far higher cost compared to available investment alternatives.

115.   Had the amounts invested in the TIAA Real Estate Account instead been invested in the lower-cost and better-performing Vanguard REIT Index (Instl), Plan participants would not have lost millions of dollars of their retirement savings.

## ERISA'S FIDUCIARY STANDARDS

116.   ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants as the fiduciary of the Plans. 29 U.S.C. §1104(a)(1), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A)    for the exclusive purpose of:
>
> (i) providing benefits to participants and their beneficiaries; and
> (ii) defraying reasonable expenses of administering the plan; [and]
>
> (B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

117.   Under 29 U.S.C. §1103(c)(1), with certain exceptions not relevant here,

> the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

118.    Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and solely in the interest of participants in the plan.

119.    ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]
>
> (2)    if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

120.    29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109. Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who
> breaches any of the responsibilities, obligations, or duties
> imposed upon fiduciaries by this subchapter shall be personally
> liable to make good to such plan any losses to the plan resulting
> from each such breach, and to restore to such plan any profits of
> such fiduciary which have been made through use of assets of
> the plan by the fiduciary, and shall be subject to such other
> equitable or remedial relief as the court may deem appropriate,
> including removal of such fiduciary.

## CLASS ACTION ALLEGATIONS

121.    29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plans to bring an action individually on behalf of the Plans to enforce a breaching fiduciary's liability to the Plans under 29 U.S.C. §1109(a).

122.    In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plans, as an alternative to direct individual actions on behalf of the Plans under 29 U.S.C. §1132(a)(2) and (3), Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plans. Plaintiff seeks to certify, and to be appointed as representative of, the following class:

> All participants and beneficiaries of the Cornell University Retirement
> Plan for the Employees of the Endowed Colleges at Ithaca and the
> Cornell University Tax Deferred Annuity Plan from August 17, 2010,
> through the date of judgment, excluding the Defendants and any
> participant who is a fiduciary to the Plans.

123.    This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

   a.    The Class includes over 20,000 members and is so large that joinder of all its members is impracticable.

54

b.      There are questions of law and fact common to this Class because Defendants owed fiduciary duties to the Plans and to all participants and beneficiaries and took the actions and omissions alleged herein as to the Plans and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plans breached their fiduciary duties to the Plans; what are the losses to the Plans resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the court should impose in light of Defendants' breach of duty.

c.      Plaintiff's claims are typical of the claims of the Class because Plaintiff was a participant during the time period at issue in this action and all participants in the Plans were harmed by Defendants' misconduct.

d.      Plaintiff is adequate representative of the Class because he was a participant in the Plan during the Class period, has no interest that is in conflict with the Class, is committed to the vigorous representation of the Class, and has engaged experienced and competent attorneys to represent the Class.

e.      Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of its

fiduciary duties to the Plans and personal liability to the Plans under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plans would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

124.   A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small, it would be impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiff is aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

125.   Plaintiff's counsel, Schlichter, Bogard & Denton LLP, will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

a.      Schlichter, Bogard & Denton has been appointed as class

counsel in 15 other ERISA class actions regarding excessive fees in large

defined contribution plans. As a district court in one of those cases recently

observed: "the firm of Schlichter, Bogard & Denton ha[s] demonstrated its

well-earned reputation as a pioneer and the leader in the field". *Abbott v.*

*Lockheed Martin Corp.*, No. 06-701, 2015 U.S.Dist.LEXIS 93206 at 4 (S.D. Ill.

July 17, 2015). Other courts have made similar findings: "It is clear to the

Court that the firm of Schlichter, Bogard & Denton is preeminent in the

field" "and is the only firm which has invested such massive resources in this

area." *George v. Kraft Foods Global, Inc.*, No. 08-3799, 2012 U.S.Dist.LEXIS

166816 at 8 (N.D. Ill. June 26, 2012). "As the preeminent firm in 401(k) fee

litigation, Schlichter, Bogard & Denton has achieved unparalleled results on

behalf of its clients." *Nolte v. Cigna Corp.*, No. 07-2046, 2013 U.S.Dist.LEXIS

184622 at 8 (C.D. Ill. Oct. 15, 2013). "Litigating this case against formidable

defendants and their sophisticated attorneys required Class Counsel to

demonstrate extraordinary skill and determination." *Beesley v. Int'l Paper*

*Co.*, No. 06-703, 2014 U.S.Dist.LEXIS 12037 at 8 (S.D. Ill. Jan. 31, 2014).

b.      The U.S. District Court Judge G. Patrick Murphy recognized the

work of Schlichter, Bogard & Denton as exceptional:

> Schlichter, Bogard & Denton's work throughout this litigation
> illustrates an exceptional example of a private attorney general
> risking large sums of money and investing many thousands of
> hours for the benefit of employees and retirees. No case had
> previously been brought by either the Department of Labor or
> private attorneys against large employers for excessive fees in a

> 401(k) plan. Class Counsel performed substantial work[,]
> investigating the facts, examining documents, and consulting
> and paying experts to determine whether it was viable. This
> case has been pending since September 11, 2006. Litigating the
> case required Class Counsel to be of the highest caliber and
> committed to the interests of the participants and beneficiaries
> of the General Dynamics 401(k) Plans.

*Will v. General Dynamics Corp.*, No. 06-698, 2010 U.S.Dist.LEXIS 123349 at

8–9 (S.D.Ill. Nov. 22, 2010).

      c.     Schlichter, Bogard & Denton handled the only full trial of an

ERISA excessive fee case, resulting in a $36.9 million judgment for the

plaintiffs that was affirmed in part by the Eighth Circuit. *Tussey v. ABB,*

*Inc.*, 746 F.3d 327 (8th Cir. 2014). In awarding attorney's fees after trial, the

district court concluded that "Plaintiffs' attorneys are clearly experts in

ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S.Dist.LEXIS

157428 at 10 (W.D. Mo. Nov. 2, 2012). Following remand, the district court

again awarded Plaintiffs' attorney's fees, emphasizing the significant

contribution Plaintiffs' attorneys have made to ERISA litigation, including

educating the Department of Labor and federal courts about the importance

of monitoring fees in retirement plans.

> Of special importance is the significant, national contribution
> made by the Plaintiffs whose litigation clarified ERISA
> standards in the context of investment fees. The litigation
> educated plan administrators, the Department of Labor, the
> courts and retirement plan participants about the importance of
> monitoring recordkeeping fees and separating a fiduciary's
> corporate interest from its fiduciary obligations.

*Tussey v. ABB, Inc.,* 2015 U.S.Dist.LEXIS 164818 at 7–8 (W.D. Mo. Dec. 9, 2015).

d.      Schlichter, Bogard & Denton is also class counsel in and handled *Tibble v. Edison Int'l,* in which the Supreme Court held in a unanimous 9–0 decision that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" Schlichter, Bogard & Denton successfully petitioned for a writ of certiorari, and obtained amicus support from the United States Solicitor General and AARP, among others. Given the Court's broad recognition of an ongoing fiduciary duty, the *Tibble* decision will affect all ERISA defined contribution plans.

e.      The firm's work in ERISA excessive fee class actions has been featured in the New York Times, Wall Street Journal, NPR, Reuters, and Bloomberg, among other media outlets. See, e.g., Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, WALL ST. J. (May 15, 2016);[25] Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. TIMES (Mar. 29, 2014);[26] Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, WALL ST. J. (Feb. 23, 2015);[27] Floyd Norris, *What a 401(k) Plan Really Owes Employees,* N.Y. TIMES (Oct. 16, 2014);[28] Sara Randazzo, *Plaintiffs' Lawyer Takes on*

---

[25] Available at http://www.wsj.com/articles/401-k-fees-already-low-are-heading-lower-1463304601.

[26] Available at http://www.nytimes.com/2014/03/30/business/a-lone-ranger-of-the-401-k-s.html?_r=0.

[27] Available at http://www.wsj.com/articles/high-court-spotlight-put-on-401-k-plans-1424716527.

[28] Available at http://www.nytimes.com/2014/10/17/business/what-a-401-k-plan-really-owes-employees.html?_r=0.

*Retirement Plans*, WALL ST. J. (Aug. 25, 2015);[29] Jess Bravin and Liz Moyer, *High Court Ruling Adds Protections for Investors in 401(k) Plans*, WALL ST. J. (May 18, 2015); [30] Jim Zarroli, *Lockheed Martin Case Puts 401(k) Plans on Trial*, NPR (Dec. 15, 2014);[31] Mark Miller*, Are 401(k) Fees Too High? The High-Court May Have an Opinion*, REUTERS (May 1, 2014);[32] Greg Stohr, *401(k) Fees at Issue as Court Takes Edison Worker Appeal*, BLOOMBERG (Oct. 2, 2014).[33]

# COUNT I

## Breach of Duties of Loyalty and Prudence

## Unreasonable Administrative Fees

126.   Plaintiff restates and incorporates the allegations in the preceding paragraphs.

127.   The scope of the fiduciary duties and responsibilities of Defendants includes discharging its duties with respect to the Plans solely in the interest of, and for the exclusive purpose of providing benefits to, Plan participants and beneficiaries, defraying reasonable expenses of administering the Plans, and acting with the care, skill, prudence, and diligence required by ERISA.

---

[29] Available at http://blogs.wsj.com/law/2015/08/25/plaintiffs-lawyer-takes-on-retirement-plans/.

[30] Available at http://www.wsj.com/articles/high-court-ruling-adds-protections-for-investors-in-401-k-plans-1431974139.

[31] Available at http://www.npr.org/2014/12/15/370794942/lockheed-martin-case-puts-401-k-plans-on-trial.

[32] Available at http://www.reuters.com/article/us-column-miller-401fees-idUSBREA400J220140501.

[33] Available at http://www.bloomberg.com/news/articles/2014-10-02/401-k-fees-at-issue-as-court-takes-edison-worker-appeal.

128.    If a defined contribution plan overpays for recordkeeping services due
to the fiduciaries' "failure to solicit bids" from other recordkeepers, the fiduciaries
have breached their duty of prudence. See *George v. Kraft Foods Global, Inc*., 641
F.3d 786, 798–99 (7th Cir. 2011). Similarly, "us[ing] revenue sharing to benefit [the
plan sponsor and recordkeeper] at the Plan's expense" while "failing to monitor and
control recordkeeping fees" and "paying excessive revenue sharing" is a breach of
fiduciary duties. *Tussey,* 746 F.3d at 336.

129.    Defendants failed to engage in a prudent and loyal process for selecting
a recordkeeper. Rather than consolidating the Plans' administrative and
recordkeeping services under a single service provider, Defendants retained two
recordkeepers to provide recordkeeping services. This failure to consolidate the
recordkeeping services eliminated the Plans' ability to obtain the same services at a
lower cost with a single recordkeeper. This conduct was a breach of the duties of
loyalty and prudence.

130.    Moreover, Defendants failed to solicit competitive bids from vendors on
a flat per-participant fee. Defendants allowed the Plans' recordkeepers to receive
asset-based revenue sharing and hard dollar fees, but failed to monitor those
payments to ensure that only reasonable compensation was received for the services
provided to the Plans. As the amount of assets grew, the revenue sharing payments
to the Plans' recordkeepers grew, even though the services provided by the
recordkeepers remained the same. This caused the recordkeeping compensation

paid to the recordkeepers to exceed a reasonable fee for the services provided. This conduct was a breach of the duties of loyalty and prudence.

131.    Total losses to the Plans will be determined after complete discovery in this case and are continuing.

132.    Defendants are personally liable under 29 U.S.C. §1109(a) to make good to the Plans any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

## COUNT II

### Breach of Duties of Loyalty and Prudence

### Unreasonable Investment Management Fees and Performance Losses

133.    Plaintiff restates and incorporates the allegations contained in the preceding paragraphs.

134.    The scope of the fiduciary duties and responsibilities of Defendants includes managing the assets of the Plans for the sole and exclusive benefit of participants and beneficiaries of the Plans, defraying reasonable expenses of administering the Plans, and acting with the care, skill, diligence, and prudence required by ERISA. Defendants are responsible for ensuring that the Plans' fees are reasonable, selecting prudent investment options, evaluating and monitoring the Plans' investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plans' assets are invested prudently.

135. As the Supreme Court recently confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble,* 135 S. Ct. at 1829.

136. Defendants selected and retained for years as Plan investment options mutual funds and insurance company variable annuities with high expenses and poor performance relative to other investment options that were readily available to the Plans at all relevant times.

137. Rather than consolidating the Plans' over 70 investment options into a core investment lineup in which prudent investments were selected for a given asset class and investment style, as is the case with most defined contribution plans, Defendants retained multiple investment options in each asset class and investment style, thereby depriving the Plans of their ability to qualify for lower cost share classes of certain investments, while violating the well-known principle for fiduciaries that such a high number of investment options causes participant confusion. In addition, Defendants as the fiduciary charged with operating as a prudent financial expert, *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984), knew or should have known that providing numerous actively managed duplicative funds in the same investment style would produce a "shadow index" return before accounting for much higher fees than index fund fees, thereby resulting in significant underperformance. The Plans' investment offerings included the use of mutual funds and variable annuities with expense ratios far in excess of other lower-cost options available to the Plans. These lower-cost options included lower-

cost share class mutual funds with the identical investment manager and investments, lower-cost insurance company variable annuities and insurance company pooled separate accounts. In so doing, Defendants failed to make investment decisions based solely on the merits of the investment funds and what was in the interest of participants. Defendants therefore failed to discharge its duties with respect to the Plans solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plans. Therefore, Defendants breached its fiduciary duty of loyalty under 29 U.S.C. §1104(a)(1)(A).

138.   The same conduct by Defendants shows a failure to discharge its duties with respect to the Plans with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims. Defendants therefore breached its fiduciary duty of prudence under 29 U.S.C. §1104(a)(1)(B).

139.   Defendants failed to engage in a prudent process for the selection and retention of investment options for the Plans. Rather, Defendants used more expensive funds with inferior historical performance than investments that were available to the Plans.

140.   CREF Stock Account: Defendants selected and retained the CREF Stock Account despite its excessive cost and historical underperformance compared

to both passively managed investments and actively managed investments with similar underlying asset allocations.

141.   <u>TIAA Real Estate Account</u>: Defendants selected and retained the TIAA Real Estate Account for the real estate investment in the Plans despite its excessive fees and historical underperformance compared to lower-cost real estate investments.

142.   Had a prudent and loyal fiduciary conducted a prudent process for the retention of investment options, it would have concluded that the Plans' investment options were retained for reasons other than the best interest of the Plans and their participants and were causing the Plans to lose tens of millions of dollars of participants' retirement savings in excessive and unreasonable fees and underperformance relative to prudent investment options available to the Plans.

143.   Total losses to the Plans will be determined after complete discovery in this case and are continuing.

144.   Defendants are personally liable under 29 U.S.C. §1109(a) to make good to the Plans any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

## COUNT III

### Failure to Monitor Fiduciaries

145.   Plaintiff restates and incorporates the allegations contained in the preceding paragraphs.

146.    Defendants have the responsibility to control and manage the operation and administration of the Plans, including the selection of service providers for the Plans, with all powers necessary to enable it to properly carry out such responsibilities.

147.    A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

148.    To the extent any of the Defendants' fiduciary responsibilities were delegated to another fiduciary, its monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

149.    Defendants breached its fiduciary monitoring duties by, among other things:

a.    Failing to monitor its appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plans suffered enormous losses as a result of its appointees' imprudent actions and omissions with respect to the Plans;

b.    Failing to monitor its appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the excessive administrative and investment management fees and consistent underperforming Plan investments in violation of ERISA;

c.    Failing to ensure that the monitored fiduciaries had a prudent

process in place for evaluating the Plans' administrative fees and ensuring that the fees were competitive, including a process to identify and determine the amount of all sources of compensation to the Plans' recordkeepers and the amount of any revenue sharing payments; a process to prevent the recordkeepers from receiving revenue sharing that would increase the recordkeepers' compensation to unreasonable levels even though the services provided remained the same; and a process to periodically obtain competitive bids to determine the market rate for the services provided to the Plans;

   d. Failing to ensure that the monitored fiduciaries considered the ready availability of comparable and better performing investment options that charged significantly lower fees and expenses than the Plans' investments; and

   e. Failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments, all to the detriment of Plan participants' retirement savings.

150. Had Defendants discharged its fiduciary monitoring duties prudently as described above, the Plans would not have suffered these losses. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plans, the Plaintiff, and the other Class members, lost tens of millions of dollars of retirement savings.

## JURY TRIAL DEMANDED

151.   Pursuant to Fed.R.Civ.P. 38 and the Constitution of the United States, Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

For these reasons, Plaintiff, on behalf of the Plans and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- Find and declare that Defendants have breached its fiduciary duties as described above;

- Find and adjudge that Defendants are personally liable to make good to the Plans all losses to the Plans resulting from each breach of fiduciary duty, and to otherwise restore the Plans to the position they would have occupied but for the breaches of fiduciary duty;

- Determine the method by which losses to the Plans under 29 U.S.C. §1109(a) should be calculated;

- Order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plans under §1109(a);

- Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

- Surcharge against Defendants and in favor of the Plans all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

- Reform the Plans to include only prudent investments;

- Reform the Plans to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

- Certify the Class, appoint the Plaintiff as a class representative, and appoint Schlichter, Bogard & Denton LLP as Class Counsel;

- Award to the Plaintiff and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

- Order the payment of interest to the extent it is allowed by law; and

- Grant other equitable or remedial relief as the Court deems appropriate.

August 17, 2016                          Respectfully submitted,

/s/ Andrew D. Schlichter
SCHLICHTER, BOGARD & DENTON LLP
Andrew D. Schlichter, Bar No. 4403267
Jerome J. Schlichter*
Michael A. Wolff*
Troy A. Doles*
Heather Lea*
100 South Fourth Street, Suite 1200
St. Louis, Missouri 63102
Telephone: (314) 621-6115
Facsimile: (314) 621-5934
aschlichter@uselaws.com
jschlichter@uselaws.com
mwolff@uselaws.com
tdoles@uselaws.com
hlea@uselaws.com
*Pro Hac Vice forthcoming