# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

CASEY CUNNINGHAM et al.,

          *Plaintiffs*,

    v.

CORNELL UNIVERSITY et al.,

          *Defendants*.

Civil Action No. 16-cv-6525

Hon. P. Kevin Castel

## MEMORANDUM OF LAW IN SUPPORT OF CORNELL DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' EXPERTS WENDY DOMINGUEZ AND GERALD BUETOW

Nancy G. Ross
Samuel P. Myler
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637
Telephone: (312) 782-0600

Jean-Marie L. Atamian
MAYER BROWN LLP
1221 Avenue of the Americas
New York, New York 10020-1001
Telephone: (212) 506-2500

Brian D. Netter
  bnetter@mayerbrown.com
Michelle N. Webster
Matthew A. Waring
Ankur Mandhania
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006-1101
Telephone: (202) 263-3000
Facsimile: (202) 263-3300

*Attorneys for Cornell Defendants*

TABLE OF AUTHORITIES ...........................................................................................II

INTRODUCTION ........................................................................................................ 1

BACKGROUND .......................................................................................................... 2

    A.    Plaintiffs' Claims ................................................................................. 2

    B.    Plaintiffs Narrow Their Claims............................................................ 4

    C.    Plaintiffs Disclose Their Experts ........................................................ 5

    D.    Plaintiffs Attempt To Expand Their Claims After Discovery .............. 6

ARGUMENT ............................................................................................................... 7

I.    DOMINGUEZ'S REPORT SHOULD BE STRICKEN ................................... 7

    A.    Dominguez failed to follow a reliable methodology in evaluating CREF Stock and TIAA Real Estate ................................................... 7

    B.    Dominguez failed to follow a reliable methodology in evaluating mutual fund share classes.................................................................. 19

    C.    Dominguez should not be permitted to testify as to the supposed desirability of consolidated plan lineups............................................ 20

    D.    Dominguez should not be permitted to testify as to the supposed defects with funds other than CREF Stock or TIAA Real Estate .................... 21

II.    BUETOW'S OPINIONS SHOULD LIKEWISE BE EXCLUDED .............................. 23

CONCLUSION........................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Comm'ns Assoc. v. Ret. Plan*,
 488 F. Supp. 479 (S.D.N.Y. 1980) ...................................................21

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
 303 F.3d 256 (2d Cir. 2002)...............................................................9

*Browe v. CTC Corp.*,
 2017 WL 5992333 (D. Vt. 2017)........................................................18

*Chill v. Calamos Advisors LLC*,
 2018 WL 4778912 (S.D.N.Y. 2018)....................................................8

*Daubert v. Merrell Dow Pharm., Inc.*,
 43 F.3d 1311 (9th Cir. 1995), *aff'd*, 509 U.S. 579....................................9

*Daubert v. Merrell Dow Pharm., Inc.*,
 509 U.S. 579 (1993)............................................................... *passim*

*Hygh v. Jacobs*,
 961 F.2d 359 (2d Cir. 1992)...............................................................18

*Jones v. O'Higgins*,
 1989 WL 103035 (N.D.N.Y. 1989) ...................................................18

*Katsaros v. Cody*,
 744 F.2d 270 (2d Cir. 1984)...............................................................21

*Kumho Tire Co. v. Carmichael*,
 526 U.S. 137 (1999).............................................................................8

*LaSalle Bank Nat'l Ass'n v. CIBC Inc.*,
 2012 WL 466785 (S.D.N.Y. 2012)....................................................24

*Levinson v. Westport Nat'l Bank*,
 2012 WL 4489260 (D. Conn. 2012) ..................................................18

*Lippe v. Bairnco Corp.*,
 288 B.R. 678 (S.D.N.Y. 2003)...........................................................25

*Lynch v. J.P. Stevens & Co.*,
 758 F. Supp. 976 (D.N.J. 1991) .........................................................18

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Marini v. Adamo*,
  995 F. Supp. 2d 155 (E.D.N.Y. 2014), *aff'd*, 644 F. App'x 33 (2d Cir. 2016)..........................8

*Meineker v. Hoyts Cinemas Corp.*,
  154 F. Supp. 2d 376 (N.D.N.Y. 2001) ...................................................................................9

*Meiners v. Wells Fargo & Co.*,
  898 F.3d 820 (8th Cir. 2018) .................................................................................................14

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*,
  -- F. Supp. 3d --, 2018 WL 5276431 (S.D.N.Y. 2018) ....................................................9, 17

*Nimely v. City of New York*,
  414 F.3d 381 (2d Cir. 2005).............................................................................................8, 18

*Passlogix Inc. v. 2FA Tech., LLC*,
  708 F. Supp. 2d 378 (S.D.N.Y. 2010) ....................................................................................8

*In re Rezulin Prods. Liab. Litig.*,
  369 F. Supp. 2d 398 (S.D.N.Y. 2005) ....................................................................................9

*Sacerdote v. New York Univ.*,
  328 F. Supp. 3d 273 (S.D.N.Y. 2018)............................................................................ *passim*

*Soldo v. Sandoz Pharm. Corp.*,
  244 F. Supp. 2d 434 (W.D. Pa. 2003) ....................................................................................9

*PBGC ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv.
  Mgmt. Inc.*,
  712 F.3d 705 (2d Cir. 2013)..................................................................................................17

*Tomaselli v. Zimmer, Inc.*,
  2017 WL 2820065 (S.D.N.Y. 2017)......................................................................................24

*United States v. Duncan*,
  42 F.3d 97 (2d Cir. 1994)......................................................................................................18

*United States v. Ulbricht*,
  858 F.3d 71 (2d Cir. 2017)....................................................................................................24

*United States v. Williams*,
  506 F.3d 151 (2d Cir. 2007)....................................................................................................8

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Water Pollution Control Auth. of City of Norwalk v. Flowserv US Inc.*,
  2018 WL 1525709 (D. Conn. 2018) .........................................................................24

*Zollinger v. Owens-Brockway Glass Container, Inc.*,
  233 F. Supp. 2d 349 (N.D.N.Y. 2002) ....................................................................19

**Statutes**

Employee Retirement Income Security Act of 1974 ......................................................2

Internal Revenue Code section 403(b) .........................................................................2

**Other Authorities**

CREF Form N-CSR (Aug. 31, 2010),
  http://pdf.secdatabase.com/51/0000930413-10-004679.pdf ...................................13

CREF Form N-CSR (Dec. 31, 2013),
  https://www.sec.gov/Archives/edgar/data/
  777535/000093041314000983/c76098_ncsr.htm ....................................................12

Fed. R. Civ. P. 26 ........................................................................................................24

Fed. R. Civ. P. 26(a)(1) .......................................................................................4, 5, 6, 21

Fed. R. Civ. P. 26(a)(1)(iii) ...........................................................................................4

Fed. R. Civ. P. 26(a)(2)(B) ...........................................................................................24

Fed. R. Evid. 104(a) ......................................................................................................8

Fed. R. Evid. 402 ........................................................................................................20

Fed. R. Evid. 702 ..........................................................................................................8

Fed. R. Evid. 702(a) ...............................................................................................20, 21

TIAA Real Estate Quarterly Analysis (Dec. 31, 2009),
  https://www.sec.gov/Archives/edgar/data/
  946155/000093041310001296/c60587_ex99-1.htm .................................................16

## <u>INTRODUCTION</u>

The search for truth is not served by an expert witness who flexibly contorts her standard of analysis to suit the interests of the party paying her. Plaintiffs' attempt to rely on such experts to prop up their speculative claims with some measure of "expert" testimony should be rejected by this Court, and the Cornell Defendants' motion to exclude should be granted.

To support their claim that Cornell should have removed the CREF Stock Account and the TIAA Real Estate Account from the Plans' investment lineup, Plaintiffs have disclosed proposed expert testimony from Wendy Dominguez. Outside of the litigation context, Dominguez serves as a fiduciary to a university 403(b) retirement plan that offers both CREF Stock and TIAA Real Estate as investment options; she authored a 2014 study detailing the ubiquity of these investment options; and she has assisted a university 403(b) retirement plan in *adding* TIAA Real Estate to its investment lineup. In the litigation context, however, Dominguez intends to testify that CREF Stock and TIAA Real Estate are imprudent offerings.

Expert testimony is supposed to assist the trier of fact by supplying specialized knowledge developed outside the context of litigation. Dominguez developed a process for evaluating investment funds outside the context of litigation, using that process when serving as a fiduciary herself—but she chose not to follow that process when opining for Plaintiffs in this case.

Perhaps Lewis Carroll would appreciate the irony of a witness testifying that no "reasonable" individual would do what she herself does. But *Daubert* does not permit Plaintiffs to litigate their case through the looking glass; rather, Dominguez's opinion (and the separate expert opinion of Dr. Gerald Buetow, which is offered to compute "damages" based on Dominguez's opinion) must be stricken from the record and excluded at any trial on the merits.

1

## BACKGROUND

### A.     Plaintiffs' Claims

Two defined contribution retirement plans are at issue in this case: the Cornell University Retirement Plan for Employees of the Endowed Colleges at Ithaca and the Cornell University Tax-Deferred Annuity Plan (the "Plans"). The Plans are individual-account, defined-contribution retirement plans organized under section 403(b) of the Internal Revenue Code. In such plans, fiduciaries select a menu of investment options; plan participants then elect how to invest their accounts among the available options. Reflecting the diversity of its participant population, Cornell offers a wide array of annuities and mutual funds to Plan participants. *See* Dkt. 107 at 3 (noting variety of investment options available to participants).

In 2016, five individual participants in the Plans ("Plaintiffs") filed suit on behalf of a putative class of Plan participants. As amended, their complaint alleges that the Cornell Defendants and the retirement plan consultant Cornell retained, defendant Capfinancial Partners LLC ("CAPTRUST"), violated various provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"). Although the majority of Plaintiffs' claims were dismissed with prejudice for failure to state a claim, the Court allowed Plaintiffs to proceed to discovery on two claims alleging breach of fiduciary duty: one related to allegedly excessive administrative fees (Count III) and one related to the inclusion of allegedly imprudent investment options (Count V). Dkt. 107 at 26 (also allowing Count VII to proceed to the extent the Plan Administrator allegedly failed to monitor fiduciaries regarding the allegations in Counts III and V) . The expert opinions at issue in this Motion relate only to Count V.

Count V focuses on two of the Plans' most popular investment options: the CREF Stock Account and the TIAA Real Estate Account, both variable annuities. In their complaint, Plaintiffs allege that the CREF Stock Account failed to live up to its billing as "a domestic equity

investment in the large cap blend Morningstar category." Dkt. 81, at 96 ¶ 173.[1] Plaintiffs allege

that "[h]ad Defendants engaged in a prudent investment review and monitoring process, it [sic]

would have determined that the CREF Stock Account would not be expected to outperform the

large cap index after fees." *Id.* ¶ 185.

With respect to TIAA Real Estate, Plaintiffs' complaint alleges that it was an imprudent

investment offering because it supposedly does not compare favorably to the Vanguard REIT

Index. Plaintiffs allege that "Defendants failed to conduct such a [monitoring] process and

continue to retain the TIAA Real Estate Account as an investment option in the Plans, despite its

continued dramatic underperformance and far higher cost compared to available investment

alternatives." Dkt. 81, ¶ 201.

Plaintiffs' complaint also includes three other relevant theories, that Defendants breached

their fiduciary duties by:

> (2) selecting and retaining investment options, including actively
> managed funds, with high fees and poor performance relative to
> other investment options that were readily available to the Plans;
>
> (3) selecting and retaining high-cost retail mutual funds instead of
> materially identical lower cost institutional mutual funds;
>
> …
>
> (5) failing to consolidate the Plans' investment options into a "core
> lineup," depriving the Plans of their ability to qualify for lower
> cost share classes of certain investments and causing confusion
> among plan participants; [and]
>
> (6) failing to monitor any of the Plans' options until October 1,
> 2014, and monitoring only "core" investment options after that
> date.

Dkt. 107, at 13–14 (summarizing ¶¶ 131–34 of the complaint).

---

[1] The paragraphs in Plaintiffs' operative complaint are not properly numbered; this citation refers to the paragraph numbered 173 that appears on page 96.

The Court granted in part and denied in part the Cornell Defendants' motion to dismiss. As relevant, the Court permitted Plaintiffs to proceed on their "allegations that specific funds underperformed over one, five and ten year periods and that lower-cost, higher performing investments were available." *Id.* at 14. The Court also permitted Plaintiffs' mutual-fund share class claim to proceed. *Id.* at 16–17. But the Court dismissed with prejudice the failure-to-consolidate and failure-to-monitor claims. *Id.* at 14, 18. Subsequently, the Court ruled that some of Plaintiffs' claims, including part of their claim for damages arising from the share class of certain investment options offered by the Plans, would be tried to a jury. Dkt. 198, at 4, 8.

B.      **Plaintiffs Narrow Their Claims**

After the motion to dismiss was resolved, the case proceeded into discovery. The parties began by exchanging Rule 26(a)(1) disclosures. Among the required disclosures is "a computation of each category of damages claimed by the disclosing party." Fed. R. Civ. P. 26(a)(1)(iii). Plaintiffs disclosed "approximately $192 million to $250.1 million" in damages stemming from their CREF Stock claim and "approximately $10.7 million" in damages stemming from their TIAA Real Estate claim. They also disclosed approximately $1.4 million in damages resulting from the supposed selection of undesirable share classes. Dkt. 167–7, at 7.  As the Court has recognized, they did not disclose any damages related to claims involving any other funds. Dkt. 209 at 18.

Throughout fact discovery, Plaintiffs pursued the claims reflected in their Rule 26(a)(1) disclosures. At no point during the fact discovery period did Plaintiffs supplement their disclosures. In July 2018, less than a month before the close of fact discovery, Plaintiffs recognized the limitations on the claims that they had pursued: "At present, Plaintiffs have asserted claims for underperformance damages arising from two options: the CREF Stock Account and TIAA Real Estate Account." Dkt. 189, at 6. Plaintiffs then purported to reserve the

4

right to "supplement their initial disclosures" "[t]o the extent additional discovery and expert analysis reveals further underperformance losses related to other imprudent options." *Id.* Such reservation contradicts the "duty to disclose" set forth in Rule 26(a)(1), as well as this Court's Civil Case Management Plan and Scheduling Order dated December 4, 2017 (Dkt. 116), which required all fact discovery to be completed by August 3, 2018. Given the detailed allegations Plaintiffs included in 257 paragraphs of the amended complaint (Dkt. 81), and the nearly two years Plaintiffs had from the original date of filing (Dkt. 1) to plan and complete discovery, there is no justifiable reason for failing to disclose aspects of their damage claims that Plaintiffs allegedly intended but failed to pursue before the close of fact discovery.

**C.    Plaintiffs Disclose Their Experts**

Plaintiffs served four expert reports on August 24, 2018, including the two at issue here.

**1.**    Wendy Dominguez is the president of Innovest Portfolio Solutions, which provides investment counseling services to retirement plans in and around Colorado. She was engaged by Plaintiffs in August 2018 and served a 45-page report later that same month. Deposition of Wendy Dominguez (Oct. 14, 2018) 19:6–10 (Ex. A). She does not claim to have written the report; rather, she acknowledged that she "worked together with counsel in putting together the first draft." *Id.* at 212:13–15. The final product purported "to provide expert analysis and opinions related to the investment decisions and related matters relative to" the Plans. Expert Report of Wendy Dominguez ¶ 1 (Ex. B).

In particular, her opinion covers five topics: (a) whether Cornell should have offered CREF Stock and TIAA Real Estate; (b) whether Cornell should have moved to a "single best of class line up"; (c) whether Cornell conducted appropriate monitoring of its investment lineup; (d) whether Cornell appropriately responded to information provided by CAPTRUST on July 31, 2013; and (e) whether Cornell offered the appropriate mutual fund share classes from August

2010 through December 2011.

    **2.**    Gerald Buetow was retained by Plaintiffs to compute damages based on Dominguez's opinion. That assignment is markedly different from his engagement by the same counsel in *Sacerdote v. New York Univ.*, 328 F. Supp. 3d 273, 311 n.110 (S.D.N.Y. 2018), in which Buetow "was retained by plaintiffs to opine on the fiduciary process and investment decisions made by NYU and its officers and trustees." In *Sacerdote*, Judge Forrest "discount[ed] Buetow's testimony" because "his analysis of fund performance did not account for a number of important factors and the Court [was] not persuaded that he compared the funds in question to appropriate benchmarks." *Id.* Buetow purports only to be computing "damages"—not to be lending any expertise; as demonstrated herein, however, even if Dominguez's opinions had any basis, Buetow's calculations rely on unsupported and unsupportable additional assumptions.

**D.**    **Plaintiffs Attempt To Expand Their Claims After Discovery**

    On October 18, 2018, the day expert discovery was complete, Plaintiffs served a supplement to their Rule 26(a)(1) disclosures. Through the supplement, Plaintiffs amended their computation of damages to "incorporate the Confidential Expert Reports of Dr. Gerald Buetow and Wendy Dominguez issued on August 24, 2018 and Confidential Expert Rebuttal Reports of Wendy Dominguez and Dr. Gerald Buetow issued on September 26, 2018 providing a computation of damages claimed by Plaintiffs." Pls.' Supp. Rule 26(a)(1) Disclosures at 4 (Oct. 18, 2018) (Ex. C). Although characterized as a "computation of damages," in truth, Plaintiffs' supplement was an expansion of their claims after fact discovery had ended.

    More specifically, on the day of the close of all discovery, Plaintiffs supplemented their damages computation to include losses on hundreds of funds, not just the two funds initially disclosed that had been the focus of factual discovery. Neither the computations, nor the expert analysis upon which those computations are based, should be in the record before this Court.

**ARGUMENT**

None of the opinions offered by Dominguez or Buetow is admissible. This Court should therefore exercise its gatekeeping function under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), to exclude their reports. In particular, Dominguez has followed a strikingly unreliable course in offering opinions on CREF Stock and TIAA Real Estate that deviate dramatically from her professional practices, contravening the requirement that a testifying expert apply the same methodology, and the same level of rigor, to generate litigation-related opinions as she does in her normal work. She has likewise violated her customary practices in assessing the share classes of mutual funds offered by the Plans. The rest of her report should be stricken because it covers topics that this Court has already dismissed or that Plaintiffs have forfeited.

Buetow's report should also be stricken. He claims that his report is derivative of Dominguez's, so the failure of her report cripples his; in any event, despite his claims that he is merely engaging in computations dictated by Dominguez's report, Buetow actually makes a series of substantive determinations for which he has failed to disclose any reliable basis.

I.   **DOMINGUEZ'S REPORT SHOULD BE STRICKEN.**

   A.   **Dominguez failed to follow a reliable methodology in evaluating CREF Stock and TIAA Real Estate.**

Dominguez is the president of an investment advisory firm with an established methodology for assessing the appropriateness of investment options. Ex. A, at 40–45. If Dominguez had followed that methodology, she would have concluded—as virtually all university fiduciaries did during the relevant time period—that CREF Stock and TIAA Real Estate were prudent investment options. So Dominguez skipped the rigor that she offers to her professional clients and developed a superficial justification, paid for by Plaintiffs' counsel, to

support the theories in Plaintiffs' complaint.

The trial court must ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597 (1993). Accordingly, when parties seek to introduce expert testimony, "the district court is the ultimate 'gatekeeper.'" *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (citing Fed. R. Evid. 104(a)). In carrying out this gatekeeping duty, the district court should focus its inquiry on the indicia of reliability identified in Federal Rule of Evidence 702: "(1) whether the witness is qualified to be an expert; (2) whether the opinion is based upon reliable data and methodology; and (3) whether the expert's testimony on a particular issue will assist the trier of fact." *Marini v. Adamo*, 995 F. Supp. 2d 155, 179 (E.D.N.Y. 2014), *aff'd*, 644 F. App'x 33 (2d Cir. 2016) (citing *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005)). That standard is applied more strictly, and the burden of proving the expert should be permitted to testify is higher, when (as here) the expert's testimony is to be presented to a jury, rather than at a bench trial. *See, e.g.*, *Chill v. Calamos Advisors LLC*, 2018 WL 4778912, at *6 (S.D.N.Y. 2018) (noting that, in a jury trial, judges must "serve in a gatekeeping role" in order "to help the *jury* evaluate [the expert's] foreign experience") (citation omitted); *Passlogix Inc. v. 2FA Tech., LLC*, 708 F. Supp. 2d 378, 396 (S.D.N.Y. 2010) (articulating different standards for admissibility of expert testimony in bench and jury trials).

As relevant here, a trial judge must "make certain that an expert … employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Thus, for example, courts ask whether the expert's testimony "is based directly on legitimate, preexisting research unrelated to the litigation," because the presence (or absence) of such a basis "provides the most persuasive basis for concluding that the opinions [the expert] expresses were 'derived by the

scientific method.'" *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995), *aff'd*, 509 U.S. 579; *see also, e.g.*, *Meineker v. Hoyts Cinemas Corp.*, 154 F. Supp. 2d 376, 380 (N.D.N.Y. 2001) (rejecting expert testimony because expert had not "based his opinion on existing, independent research," and there was no other evidence "that 'the testimony is based on scientifically valid principles'" (internal citation omitted)). Here, the surest indication of the defects in Dominguez's report are the disparities between her methodology for Innovest clients and her methodology for Plaintiffs' counsel. *See Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 269 (2d Cir. 2002) (affirming exclusion of expert "due to his failure to apply his stated methodology"); *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, -- F. Supp. 3d --, 2018 WL 5276431, at *21–22 (S.D.N.Y. 2018) (citing *In re Rezulin Prods. Liab. Litig.*, 369 F. Supp. 2d 398, 420 (S.D.N.Y. 2005)) (excluding expert opinions that were "developed for the purposes of litigation" without use of expert's outside-of-litigation methodology); *Soldo v. Sandoz Pharm. Corp.*, 244 F. Supp. 2d 434, 561 (W.D. Pa. 2003) ("Because consistency is a hallmark of the scientific method, plaintiff's experts must be required to satisfy their own standards of reliability.").

In her deposition testimony regarding her expert report, Dominguez did not follow the method she has formulated for her clients. Dominguez has worked at Innovest since its founding in 1996, and was named president of the firm in 2011. Innovest provides advisory services to a clientele of public-sector and private-sector employers that sponsor retirement plans. Ex. A, at 27:23–28:4. As president of the firm, Dominguez is responsible for formulating and enforcing Innovest's policies and practices. *See* Curriculum Vitae of Wendy Dominguez, Ex. 2 to Ex. B.

Foremost among Innovest's practices is its belief that an investment fund cannot be properly evaluated by looking simply at its quantitative performance history. **REDACTED**

9

**REDACTED**

Dominguez describes the "ongoing review of qualitative factors [as] paramount." *Id.* at 42:4–6. As a matter of firm practice, Innovest prepares investment scorecards for its clients that include evaluations of each fund across a range of criteria: Organization, People, Philosophy & Process, Style Consistency, Asset Base, Performance, Expenses, and Overall. *See, e.g.*, Ex. D. Even on a seemingly quantitative metric like performance, Innovest has an internal process for "adjust[ing] … the performance score for a particular fund based on [analysts'] qualitative review of the fund." Ex. A, at 207:12–19.

Neither Dominguez nor anybody at Innovest was evaluating CREF Stock or TIAA Real Estate as of 2010, because they did not have any university clients at that juncture. Rather, Innovest's first exposure to CREF Stock and TIAA Real Estate came in 2014, when the firm was commissioned by Colorado's public university systems to perform an analysis of their optional retirement plans.                 **REDACTED**                 . Innovest's 2014 report showed that all seven of Colorado's public university systems offered CREF Stock as an investment option in their optional retirement plans, and all seven university systems offered TIAA Real Estate as an investment option.                 **REDACTED**

In 2016, Dominguez was named Trustee of Metropolitan State College of Denver. Ex. B, ¶ 20. Under Colorado law, the Board of Trustees has fiduciary responsibility to oversee the university's optional retirement plan. Ex. F; Ex. A, at 160:19–161:9. Metropolitan State offers

both CREF Stock and TIAA Real Estate on its investment lineup. Ex. G; Ex. A, at 165:24–166:9.

**REDACTED**

Meanwhile, Innovest has taken on two relevant clients.        **REDACTED**

                        The University of Colorado did not initially offer the

TIAA Real Estate Account but *added* it to its lineup in 2018. At the time, Innovest's analysis

showed that the Real Estate Account ranked in the bottom percentile of a peer group that

consisted of Real Estate Investment Trusts. For the University of Colorado, Dominguez

dismissed the performance comparison, concluding that she had "No/Minimum Concerns" about

offering a "unique option for participants, providing liquid access to core private real estate." Ex.

H, at 44; Ex. I, at 27–28.        **REDACTED**

1.       **Dominguez's process for evaluating CREF Stock deviates
          irretrievably from the process she developed for Innovest.**

For her report, Dominguez abandoned the methodology that she requires as President of

Innovest. She did not consider any qualitative considerations (or even consider any of Innovest's

prior research on CREF Stock). Instead, she grounds her opinion that CREF Stock was

imprudent on a cursory review of quantitative performance data.

Dominguez looked at only three data points for CREF Stock. Those data points

demonstrate the hopeless superficiality of Dominguez's so-called analysis:

*First*, Dominguez opines that CREF Stock was an underperformer because, "[a]s of the end of 2013 the Stock Account had underperformed [TIAA's] benchmark for the past 5 and 10 years." Ex. B, ¶ 95 (citing CREF Form N-CSR (Dec. 31, 2013)). But the document that she cites to impugn CREF Stock's performance speaks volumes:[2]

**CREF Stock Account**

**Performance as of December 31, 2013**

| | Inception date | Total return 1 year | Average annual total return | |
|---|---|---|---|---|
| | | | 5 years | 10 years |
| **CREF Stock Account** | 7/31/1952 | 27.83% | 16.84% | 7.28% |
| CREF Stock Composite Benchmark* | — | 28.07 | 16.89 | 7.47 |

For her real-world clients, Dominguez followed a process that would not have required jettisoning an investment option based on a minor variance from its benchmark—0.05% over five years and 0.19% over ten years.

One of Innovest's clients who publishes its quarterly reports online illustrates this fact. In a 2016 report, Dominguez gave an overall rating of "Little/No Concern" to a fund that had underperformed its benchmark by an average of 3.02% per year over a five-year period—*60 times* the underperformance that she opined required the Cornell Defendants to remove CREF Stock in order to fit Plaintiffs' theory of the case. Ex. A, at 198–99 & Ex. D.

Similarly, Dominguez serves as one of two trustees for her company's 401(k) plan. When one of the funds in the Innovest 401(k) plan underperformed its benchmark by 3.48% per year over a three-year period,                    **REDACTED**

                                        Ex. A, at 140–41 & Ex. J; *cf., e.g.*, page 11, *supra* (blessing TIAA Real Estate performance in out-of-litigation context).

---

[2] CREF Form N-CSR at 8 (Dec. 31, 2013), https://www.sec.gov/Archives/edgar/data/777535/000093041314000983/c76098_ncsr.htm.

Moreover, for Innovest clients, Dominguez would have deemed CREF Stock to have *outperformed* its benchmark. At Innovest, Dominguez's practice is to net out the expenses of an investment fund that are rebated to the Plan. Ex. A, at 48:14–20. During the relevant timeframe, CREF Stock contributed 0.24% of its assets annually toward the Plans' recordkeeping (and toward generating rebates for Plan participants). *See* Ex. K, at 40 (listing CREF Stock Expense Ratio of 0.24%); Ex. L, at 14 (noting Plans' receipt of $514,747 revenue credit from TIAA in 2011). Reincorporating that 0.24% recovery would immediately make the supposed "underperformance" disappear.

The disparity between Dominguez-as-consultant and Dominguez-as-expert is dramatic, and it warrants exercise of the Court's gatekeeping function to carefully consider whether this expert satisfies the *Daubert* standard.

***Second***, Dominguez prepared a chart of CREF Stock's performance from year-end 2000 to mid-year 2010 for her report. During that less-than-customary 9½-year period, Dominguez compared the performance of the CREF Stock Account to a benchmark that she constructed out of whole cloth—which differs meaningfully from CREF Stock's *actual* benchmark:

| | CREF Stock Benchmark[3] | Dominguez's Benchmark[4] |
|---|---|---|
| **Russell 3000** (U.S. Stocks) | 70.1% | 70.0% |
| **MSCI EAFE+Canada** (Stocks from Europe, Australasia, Far East, and Canada) | 21.9% | 0.0% |
| **MSCI Emerging Markets** (Stocks from emerging markets) | 5.4% | 7.0% |
| **MSCI EAFE+Canada Small Cap** (Small-cap stocks from Europe, Australasia, Far East, and Canada) | 2.6% | 0.0% |
| **MSCI EAFE** (Stocks from Europe, Australasia, and Far East) | 0.0% | 23.0% |

---

[3] CREF Form N-CSR at 7 (Aug. 31, 2010), http://pdf.secdatabase.com/51/0000930413-10-004679.pdf.
[4] Ex. B, at Ex. 5.

Dominguez's analysis materially misstates CREF Stock's exposure to emerging markets, Canadian stocks, and small-cap international stocks. An analysis comparing a fund to the wrong benchmark is not reliable; indeed, in *Sacerdote*, Judge Forrest invoked *Daubert* to exclude Buetow's expert testimony because he had compared funds to invalid benchmarks (328 F. Supp. 3d at 282 n.20)—*i.e.*, precisely what Dominguez has done here.

CREF Stock's performance against its actual benchmark demonstrates why it is fundamentally unreliable for an expert to cherry-pick a different benchmark. During the 10-year period ending mid-year 2010, the performance of CREF Stock was within 0.07% of its prospectus benchmark over the preceding five-year period and 0.25% over the preceding ten-year period—before accounting for the 0.24% allocation to recordkeeping fees.[5] Unreliable testimony does nothing to aid the trier of fact, and should be excluded.

***Third***, Dominguez asserts that, as of 2013, CREF Stock was in the "bottom 50th percentile" for performance relative to peers. Ex. B, ¶ 95. But the peer group that she considered was for large-cap blend funds, which, as she elsewhere explained, "typically invest in domestic securities only." *Id.* ¶ 94 n.99. Given that CREF Stock targeted a 30% allocation to foreign securities, the performance of CREF Stock relative to U.S.-only alternatives is a meaningless apples-to-oranges comparison. *See Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir. 2018) (explaining that "[t]he fact that one fund with a different investment strategy ultimately performed better does not establish anything about whether the Wells Fargo TDFs were an imprudent choice at the outset"). In the reports that she has issued to the University of Colorado, Dominguez characterizes CREF Stock as a "Global Equity" fund and compared it to a peer group of global funds. Ex. H, at 40. Her meaningless comparison to domestic funds here should

---

[5] CREF Form N-CSR, *supra* note 3, at 7.

be excluded.

### 2.    Dominguez's process for evaluating TIAA Real Estate is similarly flawed.

Dominguez's assessment of TIAA Real Estate is equally unsupported. Even though Innovest obviously has analyzed the Real Estate Account for its clients—concluding that it was suitable for their 403(b) retirement plans—Dominguez did not consult any of her company's research in preparing her opinion on TIAA Real Estate. Ex. A, at 127:12–15. Nor did she follow the same evaluative process that she uses for her Innovest clients; rather, she ignored the very factors that establish her qualifications as an expert and formulated an opinion for purposes of this litigation based on cherry-picked quantitative data-points outside of their proper context. In other words, she performed expert analysis for this litigation in direct conflict with her own standard that includes review of qualitative factors as a "paramount" feature. Ex. A, at 42:4–6.

*First*, Dominguez invokes a quarterly investment review prepared by Cammack LaRhette Consulting (which had been used as a trial exhibit in *Sacerdote*) to support her proposition that TIAA Real Estate underperformed its peer group as of 2010. This is a classic example of exalting raw, quantitative data in a manner that would never pass muster for Innovest's clients.

When Cammack issued the report in 2010, it conducted a holistic assessment of the Real Estate Account, concluding that it was a fund worth keeping: "After steep losses in 2009, fund is predicted to recover with commercial real estate market." *Sacerdote*, ECF No. 253–106, at 48. But Dominguez did not review Cammack's complete assessment; she looked only at a page that purported to rank TIAA Real Estate at the bottom of a peer group. And. Dominguez herself green-lighted the *exact same fund* under the *exact same circumstances*. For the University of Colorado, Dominguez dismissed an assessment that ranked the Real Estate Account in the bottom percentile, explaining that the fund was not supposed to replicate those peers—it was,

instead, a "unique option for participants, providing liquid access to core private real estate." Ex. H, at 44; Ex. I, at 27–28. Like Innovest, Cammack determined that the peer group was inapt and did not meaningfully measure the performance of the Real Estate Account. Ex. A, at 126:23–127:4; Trial Tr. 1269–70, *Sacerdote*, ECF No. 334.

**Second**, Dominguez repeats the errors that Buetow made, leading Judge Forrest to strike Buetow's testimony in *Sacerdote*. She asserts that, "[a]s of the end of 2009, the TIAA Real Estate Account consistently underperformed its own benchmarks for the preceding 3 and 5 years." Ex. B, ¶ 102. But that is just a flat-out mischaracterization of the document she cites. TIAA's December 2009 quarterly analysis for the Real Estate Account explains that there are differences between TIAA's standard methods for pricing its real estate portfolio and the benchmark's methodology for pricing real estate. Accordingly, TIAA provides both the returns under its typical pricing methodology and the returns under the benchmark's pricing methodology, explaining that "[i]n order to compare the performance of the TIAA Real Estate Account with the returns of the REA Composite Index, the Account's direct real estate property returns must first be calculated using NCREIF's methodology."[6] As TIAA's quarterly analysis reflects, following that methodology shows that the Real Estate Account *outperforms* its benchmark on a 3-year, 5-year, and 10-year basis, and since inception.[7] Dominguez considered only the apples-to-oranges comparison that TIAA deemed inaccurate, without providing any justification for doing so.

In *Sacerdote*, Judge Forrest excluded Buetow's testimony on TIAA Real Estate because he did not evaluate the Real Estate Account against the benchmark established by TIAA, 328 F.

---

[6] TIAA Real Estate Quarterly Analysis 2 (Dec. 31, 2009), https://www.sec.gov/Archives/edgar/data/946155/000093041310001296/c60587_ex99-1.htm.
[7] *Id.* at 3.

Supp. 3d at 311–12; Dominguez replicates those errors without any justification for her sleight of hand, and such testimony should be similarly excluded by this Court.

**Third**, Dominguez makes a series of absolute statements that cannot possibly be reconciled with her acknowledgment that TIAA Real Estate is appropriate for her client, the University of Colorado. She says that she generally advises against "real estate sector investments." Ex. B, ¶ 108. She says that the Real Estate Account cannot be prudent because it "offers no benchmark." *Id.* ¶ 105. And she says that the Real Estate Account is imprudent because it has "large cash holdings." *Id.* ¶ 107. If Dominguez actually employed any of these absolute rules in her work at Innovest, then she could not have permitted Innovest to approve TIAA Real Estate for its clients, or allow a university she serves as a trustee to offer TIAA Real Estate to its plan participants. Her actions outside of the litigation context preclude her from offering contrary testimony as a supposed expert to fulfill Plaintiffs' needs in this case. *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 2018 WL 5276431, at *21–22.

### 3. Dominguez cannot, in any event, offer an opinion on a pure question of law.

Plaintiffs seek to use Dominguez to tell the jury that Plaintiffs are entitled to hundreds of millions of dollars of damages. The superficial faux-analysis that led her to that opinion should be disqualifying in full. In any event, Dominguez's opinion must also be excluded to the extent Dominguez reaches the ultimate legal question that is reserved for this Court.

Specifically, Dominguez impermissibly opines on the legal question whether the Cornell Defendants acted prudently. Whether a plan fiduciary acted prudently "is measured according to the objective prudent person standard." *PBGC ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 716 (2d Cir. 2013) (citations omitted). Application of that standard presents a legal question, which is why expert opinion on that topic

17

is often excluded. *See, e.g.*, Order at 2, *Sacerdote*, ECF No. 270 (excluding expert testimony on "the ultimate legal conclusion regarding prudence"); *Lynch v. J.P. Stevens & Co.*, 758 F. Supp. 976, 1014 (D.N.J. 1991) (rejecting expert opinion regarding compliance with ERISA "exclusive benefit rule" because such testimony "constitutes a legal conclusion"); *Jones v. O'Higgins*, 1989 WL 103035, at *7–8 (N.D.N.Y. 1989) (dismissing opinion regarding whether investment strategy "comport[ed] with fiduciary standards" because expert "really testified to a legal opinion"); *see also Browe v. CTC Corp.,* 2017 WL 5992333, at *3 (D. Vt. 2017) (excluding testimony regarding characterization of plan under ERISA as "legal opinions" which "seek to advise the court how to interpret the pleadings and deposition testimony in this case"); *Levinson v. Westport Nat'l Bank*, 2012 WL 4489260, at *5–6 (D. Conn. 2012) (excluding expert opinion concluding that defendant "breached its fiduciary duties to the Plaintiffs" as "an inadmissible legal conclusion").

It is well-settled in the Second Circuit that experts may not express legal conclusions that invade the province of the court. *See United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) ("this Court requires the exclusion of testimony which states a legal conclusion"); *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992) ("This circuit is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion."). The exclusion of legal conclusions extends to expert testimony that "usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *Duncan*, 42 F.3d at 101 (citations omitted). Impermissible legal opinions "tell [the] jury what result to reach" and "attempt[] to substitute the expert's judgment for the jury's." *Nimely*, 414 F.3d at 397.

Thus, Dominguez's analysis of "prudence" amounts to an impermissible legal opinion

that would need to be stricken irrespective of the quality of her analysis. *See Zollinger v. Owens-Brockway Glass Container, Inc.*, 233 F. Supp. 2d 349, 354 (N.D.N.Y. 2002) (permitting causation testimony but excluding testimony "on the ultimate issue" of prudence because "[t]he trier of fact is perfectly capable of evaluating the totality of the evidence in this regard").

      **B.**      **Dominguez failed to follow a reliable methodology in evaluating mutual fund share classes.**

Dominguez's share-class opinions similarly fall short of professional standards. By way of background, since 2011, Cornell has negotiated rebates from TIAA: TIAA collects administrative revenues from the expense ratios of the Plans' investment options; if TIAA's collections exceed the negotiated rate, the excess is rebated. *See, e.g.*, Ex. M, at 2; Ex. N, at 1–2; Ex. O.

The amount that TIAA collects, in turn, is affected by the share classes offered to Plan participants. Certain share classes generate more administrative-fee revenue than others. But under Cornell's negotiated agreement with TIAA, every additional dollar collected in administrative-fee revenue yields an additional dollar in rebates. *Id.*; *see also* Ex. P, ¶¶ 75–79 & Ex. 2 (summarizing TIAA's agreement with Cornell).

When she is working for Innovest's clients, Dominguez nets out those rebates when assessing whether a fund has a reasonable expense ratio. Ex. A, at 46:14–24. Here, by contrast, Dominguez just ignored the rebates without any justification. *Id.* at 50:13–18.

Dominguez's opinion covers the period August 2010 – December 2011. For calendar year 2011, the supposed "damages" sustained by investing in the "wrong" share class are exactly equal to the rebates that the Plans would have lost by moving to a different share class—*i.e.*, her "damages" are entirely attributable to ignoring the rebates. *Compare* Ex. A, at 52:13–15 (claiming 25 basis points, or 0.25%, of damages arising from share class cost difference), *with*

Ex. Q (showing that each of these funds included a 0.25% allowance to offset plan services expenses).

This inexcusable oversight, or calculated decision to create the appearance of damages where none exist, demonstrates that Dominguez is not following any kind of valid, rigorous process of analysis, and her opinion on share classes should be excluded.

### C.   <u>Dominguez should not be permitted to testify as to the supposed desirability of consolidated plan lineups.</u>

Plaintiffs also seek to have Dominguez tell the jury that Cornell should have consolidated the funds on the Plans to a best-in-class lineup in 2010. At the motion-to-dismiss stage, this Court rejected Plaintiffs' claim that Cornell "fail[ed] to consolidate the Plans' investment options into a 'core lineup,'" as Plaintiffs had failed to "allege that any plan participant was actually harmed by defendants' failure to reduce the number of options available." Dkt. 107, at 13–14.

Dominguez's opinion that Cornell should have consolidated to a best-in-class lineup pertains to a dismissed claim. Accordingly, Dominguez's testimony on this question should be excluded as irrelevant. *See* Fed. R. Evid. 402, 702(a) (requiring that expert opinion address "a fact in issue" in the case).

Even if Plaintiffs' too-many-funds claim remained in the case, Dominguez's opinion on this issue is as flawed as her other opinions. Dominguez posits that Cornell should have adopted in 2010 a best-in-class fund lineup that was proposed in 2014. *See* Ex. B, ¶ 86. But, as Dominguez concedes, funds "that had performance issues" in the years leading up to 2014 would not have been recommended for a consolidated lineup in 2014. Ex. A, at 92:5–10. The logical flaw of her analysis is glaring. Sitting in 2010—without the benefit of subsequent performance history—a fiduciary could not have known which funds would have "performance issues."

Fiduciary actions must be evaluated "from the perspective of the 'time of the investment

20

decision,' rather than from 'the vantage point of hindsight.'" *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984) (quoting *Am. Comm'ns Assoc. v. Ret. Plan*, 488 F. Supp. 479, 483 (S.D.N.Y. 1980)). Using 2014 performance data to surmise what would have been the best choices in 2010 is the quintessence of hindsight bias. Dominguez did not examine the universe of funds available in 2010, and did not determine whether the 2014 funds could have been identified as best-in-class as of 2010. Ex. A, at 91:17–92:1. As such, Dominguez's opinions on consolidation are not the product of a methodology likely to be helpful to the finder of fact, and should be excluded.[8]

> **D.**     **Dominguez should not be permitted to testify as to the supposed defects with funds other than CREF Stock or TIAA Real Estate.**

As noted above, Plaintiffs acknowledged in July 2018 that they had been prosecuting claims involving only two investment funds: "At present, Plaintiffs have asserted claims for underperformance damages arising from two options: the CREF Stock Account and TIAA Real Estate Account." Dkt. 189 at 6.

Defendants were entitled to disclosure of the scope of Plaintiffs' claims at the start and throughout fact discovery; that is why Rule 26(a)(1) mandates initial disclosures. Having defined the scope of their claims in fact discovery, Plaintiffs cannot use Dominguez's report—which she admits she wrote jointly with Plaintiffs' counsel—as a mechanism for introducing claims about additional funds. Accordingly, any opinions Dominguez may have regarding funds other than TIAA Real Estate Account and CREF Stock Account are not directed at a "fact in issue" in the case and should be excluded on that basis. Fed. R. Evid. 702(a).

These opinions would be excluded regardless. Dominguez provides three justifications

---

[8] Indeed, Dominguez's opinions on consolidation are, by her own characterization, predicated on the "arbitrary selection" of one of the two consolidated lineups that was proposed by CAPTRUST in 2014—the TIAA lineup, rather than the Vanguard one. Ex. A, at 100:6–18. Expert testimony that is premised on confessedly irrational decision making cannot be helpful to the finder of fact.

for requiring removal of these funds: they do not appear in the best-in-class lineup, they are sector funds, and/or they failed CAPTRUST's criteria, as evinced by a 2013 CAPTRUST report. None of these opinions pass muster.

First, Dominguez asserts that any fund which is not listed in her best-in-class lineup necessarily was imprudent. As explained above, this opinion is flawed and should be excluded because it rests on Dominguez's unexplained, and inexplicable, contention that Cornell should have predicted in 2010 which funds would be best-in-class as of 2014. *See supra* Part I.C.

Second, Dominguez's opinions regarding so-called "sector funds" would be subject to exclusion even if they related to a claim Plaintiffs had kept alive. Dominguez claims that sector funds are *per se* imprudent investment options because of their volatility. *See* Ex. B, ¶ 42. In her day job, though, Dominguez tells clients that "alternative investments," such as sector funds, are an important part of investors' portfolios because they ensure that the entire portfolio does not move with the market. Ex. A, at 39:6–24. Similarly, Dominguez testified that **REDACTED**

indeed, one of the sector funds in question has an expense ratio **REDACTED** far higher than the expense ratios of the sector funds she testified about for Plaintiffs in this case. *Id.* at 141:13–142:5. Thus, the opinions Dominguez presents regarding sector funds cannot be squared with her preexisting, non-litigation analysis and should be excluded on that additional basis.

Third, Dominguez claims that Cornell should have excluded 138 investments based on a CAPTRUST presentation dated July 31, 2013 because they were "failing quantitative criteria." Report ¶ 69. The CAPTRUST presentation in question, however, identified only 16 of these funds as failing the quantitative criteria; the remaining were characterized by CAPTRUST as meeting the relevant criteria. *See* CORNELL020122 (CAPTRUST Presentation to RPOC, July

31, 2013). Moreover, it is not Dominguez's practice at Innovest to eliminate funds based only on quantitative data—but Dominguez did not conduct any of the qualitative analysis that she conducts for Innovest clients.

## II.   BUETOW'S OPINIONS SHOULD LIKEWISE BE EXCLUDED

Dr. Buetow's opinions should also be excluded in this case. By Buetow's own account, his opinions are entirely derivative of Dominguez's analysis (Ex. R, ¶¶ 22–25); if her opinions are excluded, then, his report and testimony must be excluded as well. Indeed, Dr. Buetow claimed not to be offering opinions at all, explaining that his role was simply to calculate damages based on the fund mapping opinions provided by Ms. Dominguez. Ex. S, at 24:15–21. And Buetow further testified that he was not opining that the mapping he used to generate damage calculations, which was provided to him by Plaintiffs' counsel, was an appropriate mapping for the funds in this case. *Id.* at 47:16–48:2 (explaining that he was "provided by counsel" the "best in class" lineup), 49:23–50:3 (disclaiming any opinion that the mapping used "to generate those damages is an appropriate mapping for assets in the fund"). Thus, the material in Buetow's report is relevant—if at all—only if the fund mapping opinions provided by Dominguez are admissible; since they are not, for the reasons provided above (*see* Part I, *supra*), Buetow's report should also be excluded.

Even if Dominguez's report and testimony were not excluded, however, Buetow's opinions would be inadmissible. First, despite his representations, Buetow actually offers a key substantive opinion. Without any guidance from Dominguez, *Buetow* decided which legacy funds should be mapped to which of the funds in Dominguez's culled lineup.

Buetow did not disclose his methodology for the mapping exercise, so the finder of fact cannot rely on it to understand how to evaluate his opinions.        **REDACTED**

**REDACTED**

Buetow was not "merely a human calculator," as he put it, which makes it impossible for the finder of fact to know exactly how he obtained the damages results proffered in his report. *Id.* at 41:15. Thus, these opinions must be stricken. *See* Fed. R. Civ. P. 26(a)(2)(B) ("The [expert] report must contain ... a complete statement of all opinions the witness will express and the basis and reasons for them"); *see also United States v. Ulbricht*, 858 F.3d 71, 116 (2d Cir. 2017) ("The district court cannot perform that complex evaluation of an expert's proposed methodology without a clear articulation of what the expert's opinions are and, even more importantly, of the bases for those opinions."); *Water Pollution Control Auth. of City of Norwalk v. Flowserv US Inc.*, 2018 WL 1525709, at *17 (D. Conn. 2018) (excluding expert report lacking calculations and data upon which opinion was based because "the Court cannot determine" whether expert report was reliable); *Tomaselli v. Zimmer, Inc.*, 2017 WL 2820065, at *8 (S.D.N.Y. 2017) (collecting cases and noting that "[c]ourts therefore routinely preclude an expert from testifying about matters that exceed those topics addressed in his Rule 26 report,"); *LaSalle Bank Nat'l Ass'n v. CIBC Inc.*, 2012 WL 466785, at *9 (S.D.N.Y. 2012) ("Opinions that are not disclosed in the expert's report cannot be offered.").

Second, Buetow's undisclosed mapping opinions do not follow his outside-of-litigation practices, providing further reason to reject them. In his non-litigation work, Buetow develops fund mappings by crafting a mapping algorithm, evaluating its output, and adjusting the

algorithm until it makes sense. Ex. S, at 64:18–24; 65:13–17. By doing so, Buetow is able to identify flaws in his reasoning and correct them; for example, he can identify situations in which the algorithm's output leads him to believe that the "asset classes that we're defining need to be broadened or added to." *Id.* at 64:8–14. Here, by contrast, Buetow used no algorithm to construct his mapping, relying instead on his intuition. *Id.* at 65:18–23. And after generating a mapping, Buetow did nothing to verify that the mapping was appropriate. *Id.* at 88:13–89:6. Unlike his normal iterative approach, then, which finds and corrects errors that may have infected his analysis, the work Buetow did in this case was off-the-cuff and lacked any verification that it was generating accurate results.

Unsurprisingly, then, Buetow himself identified a number of errors in his calculations, from using the wrong month's numbers in his figures (Ex. S, at 113:20–114:8) to pulling the wrong numbers from spreadsheets to identify as damages (*Id.* at 124:7–9) to overrides of his analysis caused by mistaken copy-and-paste of numbers in his Excel workbooks (*Id.* at 19:5–7). Buetow put it best by admitting: "This was sloppy on my part." *Id.* at 114:3. The opinions of an expert who commits "many errors in his analyses" lack "sufficient indicia of reliability" to be of use. *Lippe v. Bairnco Corp.*, 288 B.R. 678, 694 (S.D.N.Y. 2003). Thus, they should be excluded.

In short, Buetow's opinions are irrelevant in light of the exclusion that should be granted for Dominguez's opinions and also unreliable because they are derived from a methodology not disclosed in his report, inconsistent with his non-litigation methods, and admittedly riddled with errors. They should be excluded whether or not Dominguez is permitted to testify on any issue.

## CONCLUSION

For the foregoing reasons, the Court should exclude the expert opinions of Wendy Dominguez and Gerald Buetow and order that neither may testify at trial.

Dated: January 25, 2019                          Respectfully submitted,

Nancy G. Ross                                    */s/ Brian D. Netter*
Samuel P. Myler                                  Brian D. Netter
MAYER BROWN LLP                                    bnetter@mayerbrown.com
71 South Wacker Drive                            Michelle N. Webster
Chicago, Illinois 60606-4637                     Matthew A. Waring
Telephone: (312) 782-0600                        Ankur Mandhania
                                                 MAYER BROWN LLP
Jean-Marie L. Atamian                            1999 K Street NW
MAYER BROWN LLP                                  Washington, DC 20006-1101
1221 Avenue of the Americas                      Telephone: (202) 263-3000
New York, New York 10020-1001                    Facsimile: (202) 263-3300
Telephone: (212) 506-2500

                          *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that, on January 25, 2019, a copy of the foregoing was filed electronically using the Court's CM/ECF system, which will provide notice of the filing to all counsel of record.

By:   /s/ *Brian D. Netter*
      Brian D. Netter