**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| CASEY CUNNINGHAM, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> CORNELL UNIVERSITY, et al., <br><br> *Defendants*. | Civil Action No. 16-cv-6525 <br><br><br> Hon. P. Kevin Castel |

**CORNELL DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' EXPERTS
AL OTTO AND TY MINNICH**

Nancy G. Ross
Samuel P. Myler
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637
Telephone: (312) 782-0600

Jean-Marie L. Atamian
MAYER BROWN LLP
1221 Avenue of the Americas
New York, New York 10020-1001
Telephone: (212) 506-2500

Brian D. Netter
  bnetter@mayerbrown.com
Michelle N. Webster
Matthew A. Waring
Ankur Mandhania
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006-1101
Telephone: (202) 263-3000
Facsimile: (202) 263-3300

*Attorneys for Cornell Defendants*

## **TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS ............................................................................................... i

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION ...................................................................................................... 1

BACKGROUND ........................................................................................................ 2

     A.     Plaintiffs' Claims ................................................................................ 2

     B.     Plaintiffs' Recordkeeping Experts ..................................................... 4

ARGUMENT .............................................................................................................. 6

I.     Otto and Minnich Do Not Offer Opinions Grounded In Expertise ................... 7

II.     Otto and Minnich Do Not Offer Opinions Grounded In A Reliable
Analytical Method .............................................................................................. 11

     A.     Otto and Minnich do not employ a reliable methodology ................... 11

     B.     Otto and Minnich do not use reliable data ........................................... 13

     C.     Otto and Minnich depend on erroneous assumptions .......................... 20

III.     Otto's and Minnich's Opinions Are Duplicative ............................................. 21

CONCLUSION ........................................................................................................... 22

# <u>TABLE OF AUTHORITIES</u>

**Page**

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002)..........................................................................................9, 11

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993)........................................................................................................2, 7

*Kumho Tire Co., Ltd. v. Carmichael*,
  526 U.S. 137 (1999)...........................................................................................................11

*Lidle v. Cirrus Design Corp.*,
  2009 WL 4907201 (S.D.N.Y. Dec. 18, 2009) .......................................................14

*Marini v. Adamo*,
  995 F. Supp. 2d 155 (E.D.N.Y. 2014), *aff'd*, 644 F. App'x 33 (2d Cir. 2016).........................7

*MF Global Holdings Ltd. v. PricewaterhouseCoopers LLP*,
  232 F. Supp. 3d 558 (S.D.N.Y. 2017)........................................................................21

*Colon ex rel. Molina v. BIC USA, Inc.*,
  199 F. Supp. 2d 53 (S.D.N.Y. 2001)..........................................................................21

*New York v. United Parcel Serv., Inc.*,
  2016 WL 4735368 (S.D.N.Y. Sept. 10, 2016)...........................................................7, 8, 9

*Nimely v. City of New York*,
  414 F.3d 381 (2d Cir. 2005).............................................................................................7

*Sacerdote v. New York Univ.*,
  328 F. Supp. 3d 273 (S.D.N.Y. 2018).......................................................... *passim*

*Sandata Techs., Inc. v. Infocrossing, Inc.*,
  2007 WL 4157163 (S.D.N.Y. Nov. 16, 2007).......................................................14

*SLSJ, LLC v. Kleban*,
  277 F. Supp. 3d 258 (D. Conn. 2017).......................................................................20

*United States v. Williams*,
  506 F.3d 151 (2d Cir. 2007)...............................................................................................7

*Wilcox v. Georgetown Univ.*,
  No. 1:18-cv-00422-RMC (D.D.C. Jan. 8, 2019), ECF No. 35 ...........................................8, 13

*In re Zyprexa Prods. Liab. Litig.*,
    489 F. Supp. 2d 230 (E.D.N.Y. 2007) ...................................................................11

**Statutes and Rules**

Employee Retirement Income Security Act of 1974 .........................................1, 3, 5, 10

I.R.C. § 403(b) ................................................................................................................2

Fed. R. Civ. P.:
    Rule 12(b)(6).............................................................................................................8
    Rule 26(a)(2)(B)(ii)..................................................................................................14

Fed. R. Evid. 702 ....................................................................................................2, 7, 9

**Other Authorities**

N. Carolina Dep't. of State Treasurer, NC 403(b) Program,
    https://www.nctreasurer.com/Retirement-and-Savings/Managing-My-
    Retirement/Pages/NC-403b-Program.aspx ...........................................................18

Nevada System of Higher Education, Total Plan Cost Benchmarking 13 (Nov. 14,
    2014), https://nshe.nevada.edu/tasks/sites/Nshe/assets/File/HR/retirement/
    Performance%20Reports/2014/2014_11_%2014%20Total%20Plan%20Cost%
    20Analysis.pdf .................................................................................................15, 16

Univ. of N. Carolina, UNC System Voluntary 403(b),
    https://hr.unc.edu/benefits/plans/retirement/voluntary-403b ...............................18

UPMC Benefits, UPMC Savings Plan Quarterly Statement Notice,
    https://cache.hacontent.com/ybr/R516/07825_ybr_ybrfndt/downloads/
    StatementSupplement.pdf .....................................................................................14

## INTRODUCTION

As the Court is aware, this case is one of a large number of ERISA cases filed in recent years against the fiduciaries of private university retirement plans.  A core allegation in these cases is that the fiduciaries violated their duties under ERISA by failing to negotiate a recordkeeping fee of $35–40 per participant per year, depending on the year.

That claim was soundly rejected by Judge Forrest in the only university case to date to reach trial.  *Sacerdote v. New York Univ.*, 328 F. Supp. 3d 273 (S.D.N.Y. 2018).  During the *Sacerdote* trial, Judge Forrest characterized the testimony of plaintiffs' recordkeeping expert as "entirely hypothetical" (Trial Tr. 908:10–11, *Sacerdote*, ECF No. 332), and questioned how the expert could claim that NYU ought to have obtained a $35–40 per-participant fee if "nobody in the history of time ha[d] ever gotten that fee."  Trial Tr. 904:25–905:1, *Sacerdote*, ECF No. 332; *accord id.* at 906:14–17 ("THE COURT: So then this fee never happened. This fee, you developed a hypothetical fee that could happen, where there's no basis of that $31 ever happening in the history of time.").  She ultimately ruled that the expert could not "provide useful opinions to the Court," because he could not testify credibly to "(1) the type of plans at issue here (403(b) plans); (2) participants heavily invested in TIAA annuities; or (3) transitioning large plans from multiple to single recordkeepers."  *Sacerdote*, 328 F. Supp. 3d at 282 n.19.

Just 24 days after Judge Forrest's ruling disregarding the recordkeeping expert's testimony in *Sacerdote* because he "lacked the particular expertise necessary to provide useful opinions to the Court" (328 F. Supp. 3d at 282 n.19), the Plaintiffs in this case disclosed Al Otto and Ty Minnich as purported experts to testify that Cornell violated its fiduciary duties by failing to negotiate a per-participant recordkeeping fee of $35–$40.  But both experts' testimony suffers from the same manifest deficiencies as the rejected testimony in *Sacerdote*.

Like the expert in *Sacerdote*, Otto lacks any meaningful experience with university retirement plans, has never interacted with TIAA on recordkeeping issues, and has never been involved in transitioning a large plan from multiple recordkeepers to a single recordkeeper. Minnich, by contrast, has some experience in the industry—he worked in a business development role for one of TIAA's competitors—but his opinion regarding Cornell's recordkeeping fees is not grounded in any of that experience. Indeed, Minnich's opinion directly contradicts his own experience, given that his clients paid *multiples* of what he now insists was the maximum reasonable recordkeeping fee.

Rather than relying on actual, relevant experience in the industry for their conclusions, Otto and Minnich claim to have conducted a quantitative analysis. But it is plain that their "analysis" consisted of nothing more than cherry-picking data from the Internet and assuming, without any factual justification, that those data are representative of the university recordkeeping market. And even if the cherry-picked plans *were* representative of the experiences of university 403(b) plans generally, Otto and Minnich have misinterpreted the data, in obvious and egregious ways. In short, their hastily prepared and speculative analyses are the antithesis of the reliable methodology that *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Federal Rule of Evidence 702 demands. Neither Otto nor Minnich should be permitted to offer any expert opinions to the jury.

## BACKGROUND

### A. Plaintiffs' Claims

This case involves two defined contribution retirement plans at Cornell: the Cornell University Retirement Plan for Employees of the Endowed Colleges at Ithaca and the Cornell University Tax-Deferred Annuity Plan (the "Plans"). The Plans are individual-account, defined-contribution retirement plans organized under section 403(b) of the Internal Revenue Code. In

2

such a plan, fiduciaries select a menu of investment options; plan participants then elect how to invest their accounts among the available options.  Reflecting the diversity of its participant population, Cornell offers a wide array of annuities and mutual funds to Plan participants.  *See* Dkt. 107 at 3 (noting variety of investment options available to participants).

In 2016, five individual participants in the Plans ("Plaintiffs") filed suit on behalf of a putative class alleging that Cornell and the retirement plan consultant it retained, Defendant CapFinancial Partners, LLC ("CAPTRUST"), violated various provisions of the Employee Retirement Income Security Act of 1974 ("ERISA").  Although the majority of Plaintiffs' claims were dismissed with prejudice for failure to state a claim, the Court allowed Plaintiffs to proceed to discovery on two main claims for breach of fiduciary duty: one related to allegedly excessive administrative fees (Count III) and one related to the inclusion of allegedly imprudent investment options (Count V).  The expert opinions at issue in this Motion relate only to Count III.[1]

Count III focuses on the Cornell Defendants' choice of recordkeepers and the amount paid in recordkeeping fees. During the relevant time period, Cornell engaged two recordkeepers for the Plans— the Teachers Insurance and Annuity Association of America-College Retirement Equities Fund (hereinafter "TIAA") and Fidelity.  Cornell used two recordkeepers because neither TIAA nor Fidelity was willing and able to recordkeep the other's funds, and no other vendor could recordkeep both TIAA's and Fidelity's funds.  *See, e.g.*,   **REDACTED**

Thus, the Plans' fiduciaries rejected a one-vendor

---

[1] A separate motion pertaining to the expert opinions respecting Count V is being filed contemporaneously.

setup to avoid disrupting the retirement planning of thousands of Plan participants.  *See* Ex. C, at 148:16–151:2 (Cornell's Senior Director of Benefits Services explaining that there was no way to preserve the investment choices made by individual Plan participant without retaining separate recordkeepers).

Plaintiffs nevertheless allege that Cornell "failed to engage in a timely and reasoned decision-making process to determine whether the Plans would benefit from consolidating the Plans' administrative and recordkeeping services under a single provider."  Corrected Amended Complaint ("Compl.") ¶ 225, Dkt. 81.  They contend that the only possible outcome of a prudent fiduciary decision-making process would have been to abandon the two-vendor structure and to transition all assets to a single vendor.  By doing so, Plaintiffs contend, Cornell would have achieved a per-participant recordkeeping fee of $35 per participant per year.  Compl. ¶ 135.

**B.**   **Plaintiffs' Recordkeeping Experts**

In support of these allegations, Plaintiffs seek to introduce expert testimony from Otto and Minnich.  Both purport to be experts on recordkeeping fees and practices of 403(b) plans.

**1.**   Otto is the CEO of Veriphy Analytics, Inc., a company that provides benchmarking reports to fiduciaries of 401(k) plans.  Ex. D, ¶ 5.  His service does not measure recordkeeping fees; it focuses on total plan performance net of all fees.  Ex. E, at 30:16–24. From 2010 to 2016, Otto was employed by Shepherd Kaplan LLC, a registered investment advisor.  *See* Curriculum Vitae of Albert J. Otto, Ex. 2 to Ex. D.  At Shepherd Kaplan, Otto served on the investment committee; although colleagues worked on recordkeeping issues, Otto did not.  Ex. E, at 22:13–18.  Prior to working at Shepherd Kaplan, from 2008 to 2010, Otto operated OneFiduciary Group, where he performed a similar investment-related function.  *Id.* at 23:17–23.  Thus, during the time period covered by this case, from August 2010 to present, Otto did not do any documented consulting on recordkeeping issues.

4

Otto's only recordkeeping experience dates to his employment by White Horse Advisors, LLC, from 2001 to 2008.  *See* Curriculum Vitae at 1.  At White Horse, Otto provided investment and fiduciary consulting services to plans with fewer than 1,000 employees. Ex. E, at 18:8–18. Otto has never advised a university 403(b) retirement plan or given any recordkeeping advice to a plan with TIAA annuities (*id.* at 23:3–9), and he never worked with a plan that has retained multiple recordkeepers outside the context of plans merging after a corporate transaction.  *Id.* at 58:21–59:15.

Otto, who had been retained by Plaintiffs' counsel as an expert witness in seven different cases before the first of the copycat university cases were filed (Ex. E, at 18:1–5), was retained by Plaintiffs' counsel in this case in August 2018 and has prepared an expert report in which he opines that Cornell could have obtained recordkeeping services at a per-participant rate ranging from $35 to $40.  Ex. D, ¶¶ 11–12.

**2.**     Minnich is a former business development professional for Transamerica Retirement Solutions (2013–17) and Metropolitan Life Insurance Company ("MetLife") (2005–12).  MetLife is an insurance company that markets annuities to a small number of higher-education retirement plans.                     **REDACTED**

After his position at MetLife was eliminated, Minnich took on a business generation position for Transamerica Retirement Solutions, LLC.  While Minnich was employed by Transamerica, he was familiar with three Transamerica university clients with plans that had 5,000 or more participants:                     **REDACTED**

**REDACTED**

Minnich was retained one week before he signed his 39-page report, which concludes that the ceiling on the reasonable recordkeeping fee for Cornell's Plans was $40 per participant from 2010–12; $38 per participant from 2013–15; and $36 per participant since 2016. Ex. F, ¶ 157.  Minnich's opinion is avowedly not based on the experiences of Transamerica's university clients: He testified that he did not know how much his former Transamerica clients paid for recordkeeping and could not use his experience to hazard a guess.  *See, e.g.*, Ex. A, at 128:9–14. After he was presented with public disclosures, Minnich acknowledged   **REDACTED**

Minnich had no familiarity with how much TIAA was paid to recordkeep legacy annuities; but Otto acknowledged, based on a public disclosure,   **REDACTED**

## ARGUMENT

When a party seeks to introduce expert testimony, the trial court must act as the "gatekeeper" and ensure "that an expert's testimony both rests on a reliable foundation and is

relevant to the task at hand." *Daubert*, 509 U.S. at 597; *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).  In evaluating the offered expert testimony, the court should consider the indicia of reliability identified in Federal Rule of Evidence 702: "(1) whether the witness is qualified to be an expert; (2) whether the opinion is based upon reliable data and methodology; and (3) whether the expert's testimony on a particular issue will assist the trier of fact." *Marini v. Adamo*, 995 F. Supp. 2d 155, 179 (E.D.N.Y. 2014), *aff'd*, 644 F. App'x 33 (2d Cir. 2016) (citing *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005)).  Neither Otto nor Minnich seeks to offer testimony grounded in expertise, and neither offers an analytical approach based upon reliable data or methodology.  Thus, neither of the two can provide testimony that would assist the trier of fact.  Their opinions should accordingly be excluded in its entirety.  Even if one of the opinions could be considered reliable despite the limited experience of both experts and the flaws in their methodologies, it would be improper to admit both and to allow Plaintiffs to present cumulative testimony.

## I.    Otto And Minnich Do Not Offer Opinions Grounded In Expertise.

The Court's first task under *Daubert* is to "determine whether the proposed expert is, in fact, an expert in the area in which he or she intends to testify."  *New York v. United Parcel Serv., Inc.*, 2016 WL 4735368, at *3 (S.D.N.Y. Sept. 10, 2016).  Otto and Minnich both flunk that test.  Although both seek to offer testimony about the pricing that Cornell could have obtained had it restructured the Plans to abandon the two-recordkeeper model, neither offers an opinion grounded in material expertise.

In Otto's case, the lack of expertise is glaring.  Otto never,    **REDACTED**

**REDACTED**

Mindful that his experience has not involved any plans like Cornell's, Otto assumes in his opinion that 403(b) plans like Cornell's are no different from the corporate 401(k) plans he has worked with. *See, e.g.*, Ex. E, at 203:7–8. He likewise assumes that recordkeeping annuities like TIAA's is no different than recordkeeping mutual funds. *See, e.g.*, Ex. D, ¶ 18; *see also* Ex. E, at 71:11–18. And he assumes that TIAA is no different than any other recordkeeper. *See* Ex. E, at 23:3–9, 83:19–23. But there is considerable, undisputed evidence that these assumptions are false. As Judge Forrest recognized on a full-trial record in *Sacerdote*, universities with TIAA annuities have unique recordkeeping needs, because "no other vendor has *any* experience recordkeeping TIAA annuities." *Sacerdote*, 328 F. Supp. 3d at 302.   (emphasis added). Another court presiding over a parallel case against Georgetown agreed, dismissing the recordkeeping claim under Rule 12(b)(6) because the plaintiffs had not cited any example of "any non-TIAA entity performing recordkeeping for TIAA annuities." Mem. Op. at 26, *Wilcox v. Georgetown Univ.*, No. 1:18-cv-00422-RMC (D.D.C. Jan. 8, 2019), ECF No. 35. In any event, as in *Sacerdote*, Otto is not "a true expert" because he does not "possess[] the requisite qualifications to present reliable opinions on … reasonable recordkeeping fees." *Sacerdote*, 328 F. Supp. 3d at 282 n.19. His testimony is based on speculative assumptions about what might be

possible, rather than bona fide expertise involving actual clients, and must therefore be excluded. *See, e.g.*, *United Parcel Serv., Inc.*, 2016 WL 4735368, at *4 ("[A]n opinion that is speculative or conjectural does not satisfy Rule 702 and should be excluded."); *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) ("[I]t is critical that an expert's analysis be reliable at every step.").

Minnich likewise has gaps in his experience—    **REDACTED**

But he has apparently chosen not to rely on any of his actual experience, because none of it supports the conclusions of his report.

In Minnich's actual experience, for example,    **REDACTED**

Minnich agreed that    REDA

But contrary to that experience, Minnich's report assumes that Cornell could have paid a fee only for its active participants, and that the Plans' 6,000-plus terminated employees would have paid nothing. RK Damage Calculations, Ex. 3 to Ex. F (calculating fees based only on active participant numbers).

---

[2] Minnich's early employers,    **REDACTED**    During Minnich's tenure with MetLife,    **REDACTED**    Minnich's only experience with private universities stems from his four-year stint at Transamerica,    **REDACTED**    *Id.* at 44:19–45:6.

Likewise, in Minnich's actual experience,　　　　　**REDACTED**

But in his report, Minnich assumes that all of the Plan assets would have been moved out of TIAA immediately, and that TIAA would have been paid nothing thereafter.　　**REDACTED**

Even the process by which Minnich prepared his report contradicts his own experience. In Minnich's actual experience,　　　　　**REDACTED**

Here, however, Minnich prepared his opinion in one week—allegedly by himself—and conducted no meaningful review of Form 5500 data.  *See, e.g.*, *id.* at 133:21–134:1.

More troublingly, Minnich testified that he could not remember any actual pricing data for particular clients from his time at Transamerica.  *See, e.g.*, Ex. A, at 128:9–14.  He had no information on any of his university clients and could not recall pursuing work from any clients larger than　　**REDACTED**　　If Minnich's experience did not teach him how

much his *actual* clients paid for recordkeeping services, Minnich cannot invoke "experience" to opine as to the appropriate pricing for plans that he never thoroughly evaluated.

II.   **Otto And Minnich Do Not Offer Opinions Grounded In A Reliable Analytical Method**.

At the core of their reports, Otto and Minnich are seeking to offer a quantitative opinion on an empirical question—how much a university like Cornell should have paid for recordkeeping services during the class period.  In analyzing the soundness of an expert's methods, the trial court must exclude testimony that "is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached." *Amorgianos*, 303 F.3d at 266 (citations omitted).  The methodology employed by Otto and Minnich falls well short of satisfying the requisite standard.  *See also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) (the court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."); *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 284 (E.D.N.Y. 2007) ("Of primary importance in determining reliability of expert testimony is the methodological soundness of the expert's study.").  Otto and Minnich both followed the same basic approach: identify a "reasonable" recordkeeping fee, based on their supposed experience and a cherry-picked selection of data points from other 403(b) retirement plans that support the endpoint they have chosen, and then compare the putative "reasonable" fee to the fee actually paid by Cornell.  Every step of that process is riddled with errors.

A.   **Otto and Minnich do not employ a reliable methodology**.

Neither Otto nor Minnich testified about any methodology for selecting the comparator plans against which they compared Cornell's Plans.  Otto considered data from five plan

11

sponsors: Harvard University, Caltech, the University of Pittsburgh Medical Center, North

Carolina's statewide 403(b) program for K-12 and community college teachers, and the Nevada

System of Higher Education.  Minnich considered data from the same sponsors, except for the

University of Pittsburgh Medical Center, and also considered Stanford University and New York

University.  Although Otto and Minnich testified that the two primary drivers of a per-participant

recordkeeping fee are the number of participants in the plan and the services it requires (*see, e.g.*,

Ex. E, 37:19–39:13; Ex. A, 46:14–22).  Neither made any effort to choose comparator plans that

were similar to Cornell's in size or services.  For example, both sought to compare Cornell's

11,000-to-20,000-participant Plans to North Carolina's 272,000-participant plan. *See, e.g.*, Ex. D,

¶ 8; Ex. F, ¶¶ 154–156.  And neither identified plans with services similar to the on-site support

services offered to Cornell participants.[3]  Indeed, Otto and Minnich did not account for or

examine the services used by *any* of the institutions they rely upon in forming their opinions.

*See, e.g.*, Ex. E, at 87:14–23 (unable to name a single service included in the University of

Pittsburgh Medical Center recordkeeping fee); 94:18–23 (unable to name a single service

included in the Nevada System of Higher Education recordkeeping fee); 123:9–21 (unable to

name a single service provided by Vanguard to Harvard University); *see also* Ex. A, at 148:18–

149:6 (admitting to not considering what services were offered to CalTech by its recordkeeper);

156:14–18 (admitting no knowledge of what services were offered to Stanford by its

recordkeeper).  Nor did they account for any changes to services provided over time. *Id.* at

121:7–122:2 (admitting that he only accounted for Cornell's services at the present time.).

---

[3] *See, e.g.*, Ex. E, at 78:3–17 (admitting to excluding from his analysis all participant contact services without giving any justification for such exclusion); 166:6–16 (admitting that Cornell had contracted for participant-focused services that were not "reflected in [his] reasonable fee.").

Comparing similar plans with similar services is crucial, because Plaintiffs' case depends on showing that Cornell "could continue to offer the same Plans and the same associated services for $35/year." *Wilcox*, *supra*, at 27. Yet Otto offered no explanation for his choice of examples; Minnich admitted that he chose the institutions he referenced because he thought that they supported the opinion he was seeking to offer. Ex. A, at 116:5–24. That problem alone casts serious doubt on the validity of both opinions: as several courts have concluded, it is insufficient simply to assert that particular flat recordkeeping fees were feasible for university 403(b) plans to achieve without providing evidence that that is so. *See Sacerdote*, 328 F. Supp. 3d at 307 (rejecting claim that NYU should have achieved a particular flat, per-participant recordkeeping fee given the lack of evidence that "any comparable Plan has ever charged within that range"); *Wilcox*, *supra*, at 27 (concluding that, in light of plaintiffs' failure to cite similar plans that offered similar services for $35 per participant per year, the allegation that Georgetown should have done so "has no factual support, is entirely speculative, contrary to case law and common sense, and does not warrant discovery").

Beyond their arbitrary selection of comparator institutions, Otto and Minnich had no methodology for looking at data at different time periods. Both Otto and Minnich testified that pricing for recordkeeping trended downward during the class period, but both also looked at just one data point for each school—almost always the most recent data point. Otto and Minnich purported to divine the rate at which prices were falling, but there was certainly no data on that point—underscoring their lack of any reliable methodology.

## B. **Otto and Minnich do not use reliable data**.

Even more troubling than the fact that Otto and Minnich cherry-picked particular institutions in order to support their conclusions is that they egregiously misinterpreted or

misrepresented the data on recordkeeping costs for *every single institution* that they chose to consider.  These errors render their testimony about the "reasonableness" of Cornell's recordkeeping fees worthless.

> 1.  <u>University of Pittsburgh Medical Center</u>.  Otto's opinion states that "[t]he University of Pittsburg [sic] Medical Center has negotiated a per-participant fee cap of \$35.75/*year*."  Ex. D, ¶ 86 (emphasis added).  But the document that he cites for this proposition *actually* says: "The administrative fee is 0.11% annually; however the minimum ***monthly*** amount your account may be assessed will be \$1.00 and the maximum amount will be \$35.75, regardless of your Savings Plan account balance."  UPMC Savings Plan Quarterly Statement Notice (emphasis added);[4] *cf.* Ex. D, ¶ 86 n.94.  Otto acknowledged that, on this score, his report
>
> <div align="center">**REDACTED**</div>                              Nevertheless, *after* this error was
>
> identified, Otto insisted that the University of Pittsburgh Medical Center was  **REDACTED**
>
> <div align="center">5</div>

---

[4] UPMC Benefits, UPMC Savings Plan Quarterly Statement Notice, https://cache.hacontent.com/ybr/R516/07825_ybr_ybrfndt/downloads/StatementSupplement.pdf.

[5] Otto testified at his deposition that he had done additional research into the University of Pittsburgh Medical Center in preparation for his deposition, well after his report and his rebuttal report had been disclosed.  Ex. E, at 89:15–23.  Otto may not use undisclosed evidence as support for his opinions.  *See* Fed. R. Civ. P. 26(a)(2)(B)(ii) (requiring the disclosure of all facts or data considered); *Sandata Techs., Inc. v. Infocrossing, Inc.*, 2007 WL 4157163, at *6 (S.D.N.Y. Nov. 16, 2007) ("[E]xperts are not free to continually bolster, strengthen, or improve their reports by endlessly researching the issues they already opined upon, or to continually supplement their opinions."); *Lidle v. Cirrus Design Corp.*, 2009 WL 4907201, at *5 (S.D.N.Y. Dec. 18, 2009) (an expert may not file a "deficient opening report and then remedy the deficiency" through a supplemental analysis conducted afterwards).  In any event, Otto's second attempt to compute a recordkeeping fee for the University of Pittsburgh Medical Center was based on the assumption that "nobody other than Hewitt is receiving compensation for recordkeeping," when, in fact, Vanguard and TIAA are being separately compensated for providing recordkeeping services to that plan.  Ex. E, at 205:24–207:16.  Otto had not considered

2.      <u>Nevada System of Higher Education</u>.  Both Otto and Minnich sought to rely on

the Nevada System of Higher Education for the proposition that TIAA was "willing to work for

$31 per participant."  Ex. E, at 96:19–97:22; *see* Ex. F, ¶ 151.  Both relied exclusively on a 2014

report that included the following chart:[6]

| | | | Nevada System of Higher Education | | |
| | $ | % | # of participants | $ per participant | Best Fit Universe Comparison* |
|---|---|---|---|---|---|
| **TIAA-CREF (Active)** | **$967,300** | **0.24%** | | **$128** | **Below** |
| Investment Management Fees | $734,311 | 0.19% | 7,564 | $97 | Below |
| Administrative Costs | $232,990 | 0.06% | | $31 | Below |
| **Fidelity (Frozen)** | **$1,032,543** | **0.54%** | | **$392** | **Below** |
| Investment Management Fees | $787,032 | 0.35% | 2,633 | $299 | Below |
| Administrative Costs | $245,511 | 0.11% | | $93 | Below |
| **TIAA-CREF (Frozen)** | **$6,006,214** | **0.39%** | | **$910** | **Above** |
| Investment Management Fees | $4,938,393 | 0.32% | 6,601 | $748 | Equivalent |
| Administrative Costs | $1,067,821 | 0.07% | | $162 | Above |
| **VALIC (Frozen)** | **$1,695,777** | **1.00%** | | **$630** | **Above** |
| Investment Management Fees | $814,837 | 0.48% | 2,691 | $303 | Above |
| Administrative Costs | $880,940 | 0.52% | | $327 | Above |

Otto and Minnich took the $31 figure from the row for Administrative Costs for "TIAA-

CREF (Active)."  Neither addressed the $162 figure from the row for Administrative Costs for

"TIAA-CREF (Frozen)."  They assumed that NSHE had agreed (supposedly) to overpay on

"frozen" assets in order to get the right deal on "active" assets.  But NSHE's website disproves

their speculation.  NSHE negotiated a common rate *percentage* to apply to all assets, active or

frozen.  Ex. G, at 7 of 20.  In 2014, when the Active lineup was new, it had limited assets, so

when the common percentage was applied only to the Active lineup, the per-participant rate

appeared lower.  In reality, NSHE had agreed to pay TIAA between $91–$172 per participant,

the fees paid to TIAA and conceded that he could not compute them even from the materials he
consulted after his report was issued.  *Id.* at 211:21–24.

[6] Nevada System of Higher Education, Total Plan Cost Benchmarking 13 (Nov. 14, 2014),
https://nshe.nevada.edu/tasks/sites/Nshe/assets/File/HR/retirement/
Performance%20Reports/2014/2014_11_%2014%20Total%20Plan%20Cost%20Analysis.pdf
(highlighting added); *cf.* Ex. D, ¶ 88 n.100; Ex. F, at ¶ 151 n.98.

depending on how many of the TIAA Active participants also had TIAA Frozen assets.[7]  That

pricing obviously does not support Otto's and Minnich's conclusions.

      3.    <u>Caltech</u>.  Otto and Minnich make similar errors in asserting that **REDACTED**

      Both computed their Caltech figures by reviewing the auditors' notes to Form

5500,[8] which annually disclose the amount of excess revenue collected by Caltech's plan that

TIAA then rebates to the plan.  Otto and Minnich assumed that the amount of the rebate that is

used to pay for *other* administrative services (like the plan's auditor and investment consultant)

was actually the amount paid to TIAA.  Ex. H, ¶¶ 107–108.  After Cornell's recordkeeping

expert, Glenn Poehler, who negotiated Caltech's contract, pointed out the error, **REDACTED**

[9]

**REDACTED**

---

[7] The "minimum" fee is computed by assuming that all participants in TIAA Active and TIAA
Frozen are distinct, which Minnich described as an "irrational" assumption. Ex. A, at 170:2–
171:17.  The "maximum" fee is computed by dividing TIAA's total compensation ($1.3 million,
*id.* 168:6–19) by the number of participants in the TIAA Active lineup (7,564), thereby assuming
that all of the participants with TIAA Frozen assets also had TIAA Active assets.

[8] Ex. E, at 114:9–21; Ex. A 130:4–9.

[9] Ex. E, at 119:4–12.

Both Otto and Minnich also acknowledged that they had made a computational error in evaluating Caltech's plan.  The computational error caused them to overstate Caltech's rebate by $104 per participant per year—an error that swamps their assertion that Caltech validates the availability of a $35 fee.  Ex. A, at 148:1–12; *accord* Ex. E, at 119:18–120:14.

       4.    <u>Harvard</u>.  Perhaps most revealing is Otto's and Minnich's analysis of Harvard's plans.  Despite insisting that they had formulated their opinions independently, Otto and Minnich mysteriously made the same error in evaluating Harvard's fees.  Both relied on a disclosure announcing that, effective 2018, Harvard would be paying an asset-based fee to TIAA of 3.8 bps, and both asserted that the fee "equate[d] to approximately $18/participant."  Ex. F, ¶ 147; *accord* Ex. D, ¶ 85 n. 91.  But the disclosure that each expert cited applied to four different 403(b) retirement plans sponsored by Harvard.  Otto and Minnich looked only at one of Harvard's four 403(b) plans—the one listed third on the disclosure.  *See,* Ex. E, at 124:19–125:19; Ex. A, at 158:8–20; s*ee also* Ex. I.  (Asked why he had chosen that plan to evaluate, Otto testified: "<sup>RE</sup>

. Applying the same fee level to one of Harvard's larger plans yields a very different fee level of $64 per participant per year in 2018 (Ex. A, at 160:20–162:13)—nearly four times the amount that Otto and Minnich had computed.

       5.    <u>Stanford</u>.  Minnich relied upon an August 2016 disclosure that he interpreted to show that Stanford's 403(b) plan paid a $44 per participant fee for recordkeeping.  Ex. F, ¶ 144.  But even though Minnich knew, from his experience,         **REDACTED**

And even though Minnich knew, from his experience,       **REDACTED**

**REDACTED**

6.      <u>NYU</u>.  Minnich relied on the $42 per participant fee that NYU negotiated in 2016. Ex. F, ¶ 149.  The data for NYU came from the *Sacerdote* trial.  But the *Sacerdote* record also included data from earlier years.  As Otto acknowledged, NYU conducted a competitive bidding process in 2009 for which the best bid was $224.80 per participant.  Ex. E, at 142:6–143:3. Minnich's failure to consider the other NYU data—to which Plaintiffs' counsel has ready access—is obvious evidence that Minnich was not following a sound process.

7.      <u>North Carolina 403(b) Program</u>.  Finally, both Minnich and Otto relied on the North Carolina 403(b) Program.  Otto thought that the program covered  **REDACTED**

            Ex. E, at 126:23–127:6.  In reality, the University of North Carolina System has a two-recordkeeper plan with TIAA and Fidelity, just like Cornell.[10]

The North Carolina 403(b) Program, by contrast, is for "[K-12] public school and community college teachers and staff."[11]  When coupled with its associated 401(k) and 457 plans, North Carolina has more than 270,000 participants.  Ex. A, at 177:10–15.  For the 403(b) Program, the median balance is $4,000—one-twentieth of Cornell's.  *Id.* at 177:22–178:3.  The North Carolina Program has no annuities.  Ex. E, at 127:15–19.  It is difficult to see how this non-ERISA plan for public school teachers with small balances (because they also get state pensions) could conceivably have any relevance to Cornell's plan.

*      *      *

_____

[10] Univ. of N. Carolina, UNC System Voluntary 403(b), https://hr.unc.edu/benefits/plans/retirement/voluntary-403b.

[11] N. Carolina Dep't. of State Treasurer, NC 403(b) Program, https://www.nctreasurer.com/Retirement-and-Savings/Managing-My-Retirement/Pages/NC-403b-Program.aspx.

In addition to misinterpreting the data on the schools they selectively chose to analyze, Minnich and Otto avoided looking at any of the data that contradicted their conclusions. Transamerica's fee disclosures are available from the public websites that Transamerica runs for participants in those plans, but Minnich—who worked there until 2017—did not consult any of those disclosures.  Had he done so, he would have discovered that               **REDACTED**

Other Transamerica clients pay even more.          **REDACTED**

Even Transamerica's non-university clients undermine Minnich's claims about the appropriate fee level.  Minnich acknowledged that he was familiar with the Northwell Health 403(b) Plan, which is far larger than Cornell's with more than 50,000 participants.  Ex. A, at 207:12–14, 208:19–209:2.  In 2018, Northwell Health paid a base fee of $60 per participant, not including surcharges for services that are included in Cornell's base rate.  *Id.* at 208:2–9, 209:10–18; Ex. K.

For his part, Otto testified that he looked at Caltech's data because Caltech **REDACTED** As discussed above, Otto consulted Caltech data that did *not* contain its recordkeeping fee levels.  But if Otto believed that it was appropriate to consult the schools referenced in the complaint, then he could have consulted the several schools listed in the complaint that publish actual fee levels, although their published fee levels are irreconcilable with Otto's and Minnich's reports. Even though public universities are subject to a less onerous

19

regulatory environment (Ex. E, at 55:14–56:14), Purdue University was paying $76 per participant per year to Fidelity, as of 2017, before negotiating a new fee of $68 per participant (*id.*, 158:8–18)—and those figures do not account for fees paid to recordkeep TIAA's frozen annuities.  Loyola Marymount (Compl. ¶ 83) pays $135.71 per participant.  Ex. E, at 162:9–163:3.

"[O]pinions[] based on untrue facts are useless—'Garbage in; garbage out.'"  *SLSJ, LLC v. Kleban*, 277 F. Supp. 3d 258, 281 (D. Conn. 2017) (excluding expert testimony).  Otto's and Minnich's reports are based on data that are both cherry-picked and misinterpreted, and their conclusions are contradicted by copious evidence from other universities that they chose to ignore.  Their opinions accordingly cannot be considered reliable.

### C.   Otto and Minnich depend on erroneous assumptions.

Even if Otto and Minnich had some legitimate basis for their calculation of what Cornell purportedly should have been paying for recordkeeping services, their opinions contain other errors that would independently warrant exclusion.  As alluded to above, both Minnich and Otto compute damages based on the assumption that recordkeeping fees would be charged only to the Plans' "active" participants—*i.e.*, participants who are "currently employed" and making "active contributions to the program" (Ex. A, at 37:20–24)  But Minnich disavowed that assumption at his deposition.  *Id.*, 38:1–19 (admitting that "it wouldn't make any sense to provide recordkeeping to inactive participants for free" because nobody "record keeps (sic) for free.").  Otto initially agreed that he, too, had "abandoned" his original calculation.  Ex. E, at 12:12–22.  But after conferring with counsel during a break, Otto revised his testimony; although he acknowledged that "                                    **REDACTED**

# REDACTED

Likewise, both Otto and Minnich assumed that Cornell could have transferred all money in TIAA annuities to a replacement recordkeeper immediately after consolidating recordkeepers. *See* Ex. E, at 79:18–80:1; Ex. A, at 222:16–223:2  But as explained above, plan sponsors lack the ability to move assets out of TIAA annuities governed by individual contracts with plan participants.  *Sacerdote*, 328 F. Supp. 3d at 301–02; *see also* Ex. H, ¶¶ 43, 128.  Both Otto and Minnich acknowledged that they were aware of this issue and that neither knew of a single circumstance in which a plan sponsor had succeeded in transferring such assets without the consent of each individual plan participant.  *See*, *e.g.*, Ex. E, at 77:7–12; Ex. A, at 98:18–99:9.  But rather than account for this problem, Otto and Minnich simply ignored it.  That faulty reasoning confirms that the proffered expert opinions are merely theoretical, have no basis in reality, and cannot assist the trier of fact.

## III.   Otto's And Minnich's Opinions Are Duplicative.

 "A district judge has discretion to exclude evidence if it is cumulative of evidence already in the record.  Expert testimony presents no exception to this general rule."  *Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 96 (S.D.N.Y. 2001).  Courts in this district routinely exclude expert testimony that serves no purpose other than reaffirming and repeating what another proposed expert has already opined upon.  *See id.*; *see also MF Global Holdings Ltd. v. PricewaterhouseCoopers LLP*, 232 F. Supp. 3d 558, 571 (S.D.N.Y. 2017).

Minnich and Otto purport to opine on identical issues—namely, the range of recordkeeping fees a reasonable plan fiduciary would have paid and whether a reasonable plan fiduciary would have used a single or multiple recordkeepers.  *Compare* Ex. D, ¶¶ 2, 11–13, *with* Ex. F, ¶¶ 2, 13, 18.  They also use nearly identical data as comparison points and reach nearly

identical conclusions.  *Compare* Ex. D, ¶13, *with* Ex. F, ¶ 18; *compare* Ex. F, Table of Contents, *with* Ex. D, ¶¶ 85–88.  And most tellingly of all, portions of Otto's and Minnich's reports are identical *to each other*, down to the same citations and calculation errors.  *See* Ex. E, at 181:11–190:9 (listing a series of identical quotations and citations between the reports of Otto and Minnich).  Indeed, Minnich and Otto's insistence that they wrote their own reports independently (*see, e.g.*, Ex. A, at 14:21–22, 210:22–211:1; Ex. E, at 86:17–87:2, 180:12–22) is dubious, to say the least.  At a minimum, therefore, the Court should not admit both of these overlapping and duplicative reports.

## CONCLUSION

For the foregoing reasons, the Court should exclude the expert opinions of Al Otto and Ty Minnich and order that neither may testify at trial.


Dated: January 25, 2019

Nancy G. Ross
Samuel P. Myler
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637
Telephone: (312) 782-0600

Jean-Marie L. Atamian
MAYER BROWN LLP
1221 Avenue of the Americas
New York, New York 10020-1001
Telephone: (212) 506-2500

Respectfully submitted,

*/s/ Brian D. Netter*
Brian D. Netter
  bnetter@mayerbrown.com
Michelle N. Webster
Matthew A. Waring
Ankur Mandhania
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006-1101
Telephone: (202) 263-3000
Facsimile: (202) 263-3300

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that, on January 25, 2019, a copy of the foregoing was filed electronically using the Court's CM/ECF system, which will provide notice of the filing to all counsel of record.

By:   /s/ *Brian D. Netter*
      Brian D. Netter