# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

CASEY CUNNINGHAM et al.,

          *Plaintiffs*,

   v.

CORNELL UNIVERSITY et al.,

          *Defendants*.

Civil Action No. 16-cv-6525

Hon. P. Kevin Castel

**PLAINTIFF'S RESPONSE TO THE CORNELL DEFENDANTS' RULE 56.1
STATEMENT AND COUNTERSTATEMENT OF UNDISPUTED MATERIAL FACTS**

## PLAINTIFFS' RESPONSE TO THE CORNELL DEFENDANTS' RULE 56.1 STATEMENT

1.      Plaintiffs are five employees or former employees of Cornell University ("Cornell") and are participants in two defined contribution participant directed retirement plans sponsored by Cornell: the Cornell University Retirement Plan for Employees of the Endowed Colleges at Ithaca; and the Cornell University Tax-Deferred Annuity Plan ("the Plans").[1]

**RESPONSE:** Plaintiffs do not dispute that they are employees or former employees and participants in the Plans. Paragraph 1 is disputed in that it fails to present any facts that are material to the Cornell Defendants' Motion for Summary Judgment as required by Local Rule 56.1.[2]

2.      Plaintiffs filed suit in August 2016. As amended, Plaintiffs allege that Cornell, the Retirement Plans Oversight Committee ("RPOC"), Mary G. Opperman, and the Plans' consultant, Capfinancial Partners LLC ("CAPTRUST") (collectively "Defendants") violated various provisions of the Employee Retirement Income Security Act of 1974 ("ERISA").[3]

**RESPONSE:** Plaintiffs dispute paragraph 2 because it is a characterization of Plaintiffs' allegations and is therefore not a material "fact" as required by Local Rule 56.1.

3.      Although the operative complaint identifies seven separate counts, each containing multiple claims, the Court has dismissed the majority of these counts in their entirety and narrowed the scope of those it has allowed to proceed.[4]  At present, the only claims remaining in the case are Plaintiffs' claims that Defendants breached ERISA's fiduciary duty of prudence by: (a) allegedly failing to monitor and reduce the administrative fees paid by the Plans

---

[1] Doc.  250-1, Ex. 1, Am. Compl., Doc.  81, at ¶¶ 19-26.
[2] Defendant's assertions throughout contain many items which are not statements of fact, others which are immaterial to the issues in this case, and still others which are not admissible.  Each category of assertions is inappropriate for consideration in a Rule 56.1 statement.
[3] Doc.  250-1, Ex. 1, Am. Compl., Doc.  81, at ¶¶ 1-5.
[4] Doc.  250-2, Ex. 2, Order Granting Motion to Dismiss, Doc.  107, at 26.

(Count III); and (b) failing to monitor and remove two allegedly imprudent invest options—the CREF Stock Fund ("CREF Stock") and the TIAA Real Estate Account ("TIAA Real Estate") (Count V).[5]

**RESPONSE**: Paragraph 3 is disputed because it is an attempted characterization of the Court's ruling and not material "facts" as required by Local Rule 56.1. Plaintiffs further state that Plaintiffs' Amended Complaint and the Court's order speak for themselves. Specifically, the Court denied the Cornell Defendants' motion to dismiss allegations under Count III that "defendants breached their fiduciary duties by: (1) failing to monitor and control the Plans' recordkeeping fees by (a) failing to monitor the amount of revenue sharing received by the Plans' recordkeepers, (b) failing to determine if the amount of revenue sharing paid to the recordkeepers was competitive or reasonable, and (c) failing to use the Plans' size to reduce fees or obtain sufficient rebates to the Plans for excessive fees paid by participants; (2) failing to solicit bids from competing recordkeeping providers on a flat per-participant fee basis; and (3) failing to engage in a timely and reasoned decision-making process to determine whether the Plans would benefit from moving to a single recordkeeper."[6] The Court also denied Defendants' motion to dismiss Count alleging that "defendants breached their fiduciary duties by: (1) continuing to offer the CREF Stock Account and TIAA Real Estate Account despite their high fees and poor performance; (2) selecting and retaining investment options, including actively managed funds, with high fees and poor performance relative to other investment options that were readily available to the Plans; (3) selecting and retaining high-cost retail mutual funds

---

[5] Doc.  250-2, Ex. 2, Order Granting Motion to Dismiss, Doc.  107, at 12-18.  Although the Court has allowed Plaintiffs' "duty to monitor" claims to proceed, these claims are entirely derivative of the two administrative fee and investment claims that remain in the case. *See* Ex. 2, Order Granting Motion to Dismiss, Doc.  107, at 23-24.
[6] Doc. 107 at 14.

instead of materially identical lower cost institutional mutual funds."[7] The Court also denied

dismissal of the duty to monitor claims in Count VII against Cornell and Mary Opperman.[8]

 4. The Cornell University Retirement Plan for Employees of the Endowed

Colleges at Ithaca (the "CURP") and the Cornell University Tax-Deferred Annuity Plan (the

"TDA Plan") are employee benefit plans established pursuant to Section 403(b) of the Internal

Revenue Code (the "Code").[9]

 **RESPONSE:** Plaintiffs do not dispute paragraph 4 to the extent it alleges the Plans are

defined contribution Plans organized under section 403(b) and subject to ERISA.

 5. Until recently, an employer's role in a 403(b) plan was limited: individual

participants had exclusive control over their investments, typically annuity contracts, and

interacted with the insurer underwriting their annuity directly. [10]

 **RESPONSE**: Paragraph 5 attempts to describe laws and regulations and is not a

statement of material facts as required by Local Rule 56.1. To the extent it is a statement of fact,

the Corrected Amended Complaint and Department of Labor publications cited speak for

themselves.

 6. In 2009, the Internal Revenue Service ("IRS") issued a "comprehensive

update" to the regulations governing Section 403(b) plans ("the 2009 regulations").  The effect

---

[7] *Id.* at 14-18

[8] *Id.* at 23

[9] Doc.  250-3, Ex. 3, 2008 CURP Adoption Agreement (CORNELL015512); Doc.  250-4, Ex. 4, 2008 CURP Plan Document (CORNELL015526); Doc.  250-5, Ex. 5, 2008 TDA Plan Adoption Agreement (CORNELL015527); Doc.  250-6, Ex. 6, 2008 TDA Plan Document (CORNELL015535).

[10] Doc.  250-1, Ex. 1, Am. Compl. Doc.  81, at ¶¶ 65, 66, 68; Doc.  250-7, Ex. 7, 2011 Advisory Council on Employee Welfare and Pension Benefit Plans Report to the Honorable Hilda L. Solis, United States Secretary of Labor, *Current Challenges and Best Practices for ERISA Compliance for 403(b) Plan Sponsors* (Nov. 2011), at 5; Doc.  250-8, Ex. 8, Department of Labor Field Assistance Bulletin 2009-02, at 2 (discussing plan administrator concerns related to "the historical treatment of 403(b) plans as a collection of individual contracts with respect to which employees could engage in a range of actions without the consent or involvement of an employer or plan administrator").

of the 2009 regulations was to diminish the extent to which the rules governing Section 403(b)

plans differed from the rules governing other tax-favored retirement plans, such as Section

401(k) plans. The 2009 regulations were interpreted by plan sponsors as requiring them to take a

more active role in the administration of their Section 403(b) plans.[11]  There nevertheless remain

significant differences between the two types of plans.[12]

     **RESPONSE:** Paragraph 6 is not a statement of fact but a description of law and thus is

improper under Local Rule 56.1. Cornell fails to support paragraph 6 by citations to record

evidence as required by Local Rule 56.1(d) and thus it is improper. Plaintiffs do not dispute that

"[t]he 2009 regulations were interpreted by plan sponsors as requiring them to take a more active

role in the administration of their Section 403(b) plans." The regulations were issued in July

2007, to provide time for employers to comply who had not had to comply before. Prior to these

403(b) regulations, retirement plans sponsored by tax-exempt organizations such as Cornell were

subject to Title I of ERISA and its fiduciary requirements, unless a plan qualified under a 1979

"safe harbor" regulation based on the employer having limited involvement in operating the

plan.[13] The Plans have never qualified for that safe harbor, and thus have been subject to

ERISA's fiduciary requirements long before the IRS published its 403(b) regulations in 2007.[14]

---

[11] Doc.  250-1, Ex. 1, Am. Compl., Doc.  81, at ¶ 65; Doc.  250-7, Ex. 7, Advisory Council on Employee Welfare and Pension Benefit Plans, Report to the Honorable Hilda L. Solis, United States Secretary of Labor, *Current Challenges and Best Practices for ERISA Compliance for 403(b) Plan Sponsors* (Nov. 2011), at 6; Doc.  250-8, Ex. 8, Department of Labor Field Assistance Bulletin 2009-02, at 2 (discussing plan administrator concerns related to "the historical treatment of 403(b) plans as a collection of individual contracts with respect to which employees could engage in a range of actions without the consent or involvement of an employer or plan administrator").
[12] Doc.  250-7, Ex. 7, Advisory Council on Employee Welfare and Pension Benefit Plans, Report to the Honorable Hilda L. Solis, United States Secretary of Labor, *Current Challenges and Best Practices for ERISA Compliance for 403(b) Plan Sponsors* (Nov. 2011), at 6 (noting that despite regulatory changes that have diminished the differences between 401(k) and 403(b) plans, "the differences far exceed the similarities, including the key difference that the sponsors of 403(b) plans are public educational institutions and U.S. tax-exempt organizations").
[13] 29 C.F.R.§ 2510.3-2(f).
[14] Ex. P1, Jan. 1, 2004 CURP Summary Plan Document (CORNELL0000725) at 736-737 (As a Participant in [CURP], you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA) . . . ERISA imposes duties upon the people who are responsible for the operation of the employee

Once these 403(b) regulations were published, many non-profit plan sponsors whose 403(b) programs previously qualified for the safe-harbor determined that they would have to comply with ERISA's fiduciary requirements by the regulations' effective date of January 1, 2009.[15] In contrast, the Plans had long been subject to ERISA's strict fiduciary requirements.

7.       Prior to 1974, 403(b) plans could invest only in insurer-issued annuity contracts.[16]  As a result, such plans have a comparatively high percentage of their assets invested in annuity contracts. According to industry surveys, as of 2013, 87% of 403(b) plans offered fixed annuities as an investment option, and of the nearly $1 trillion in total assets invested in 403(b) plans, over 23% were invested in fixed annuities.[17]

**RESPONSE:** The first sentence of Paragraph 7 is not a statement of fact but a description of law and thus is improper under Local Rule 56.1. Plaintiffs dispute the second sentence of paragraph 7. The Cornell Defendants do not cite to admissible evidence to support the purported fact in the second sentence of paragraph 7, but cite to a purported 2013 Brightscope Survey, which is hearsay and has not been authenticated. *See* Fed. R. Evid. 801, 802, 901. To the extent the survey itself is not hearsay the responses contained within it are hearsay within hearsay and not admissible. Fed. R. of Evid, 801, 805. To the extent it is admissible (which it is not) the 2013 Brightscope survey speaks for itself. For example, the same portions of the survey cited by the Cornell Defendants notes that the percentage of assets in

---

benefit plan. The people who operate your plan, called "fiduciaries" of the plan, have a duty to do so prudently and in the interest of you and other plan participants and beneficiaries.").

[15] *See e.g.*, Ex. P2, Poehler Dep. at 133:18-20 (testifying that his client California Institute of Technology had consolidated to a single recordkeeper by January 1, 2010); Ex. P3, May 16, 2011 Hewitt ennisknupp Response to Request for Proposal (CORNELL024180), at 11, 16, 25; Ex. P4, May 13, 2011 Mercer Response to Request for Proposal (CORNELL015325), at 26-27..

[16] Doc.  250-1, Ex. 1, Am. Compl., Doc.  81, at ¶ 66.

[17] Doc.  250-9, Ex. 9, 2013 Brightscope 403(b) Plan Profile, at 31, 35.

annuities is only 22 percent for plans with over one-billion dollars of assets and fifty-four percent of the assets for 403(b) plans over one billion in assets are invested in mutual funds.

8.　　The CURP was originally established in 1937 to provide retirement benefits to Cornell employees.[18]  It is funded entirely through employer contributions equal to 10% of each participant's base pay up to $275,000.[19]  Employees cannot make their own contributions to the CURP.  As of December 31, 2016, the CURP had 19,191 participants and $1.97 billion in net assets.[20]

**RESPONSE:** Plaintiffs do not dispute that Cornell established CURP in 1937 or that it is funded through employer contributions of up to 10% of each participant's base pay up to $275,000 from 2008 forward. Plaintiffs do not dispute that CURP had 19,919 participants with account balances and $1.97 billion in net assets as of December 31, 2016.

9.　　The TDA Plan was established in 1984 to provide Cornell employees the option to save on their own for retirement on a tax-deferred basis.[21]  Unlike the CURP, the TDA Plan is funded entirely through employee contributions; Cornell does not contribute to the TDA Plan or match employee contributions.[22]  As of December 31, 2016, the TDA Plan had 11,778 participants and $1.34 billion in net assets.[23]

**RESPONSE:** Plaintiffs do not dispute that Cornell established the TDA Plan in 1984 or that it is funded through employee contributions from 2008 forward. Plaintiffs do not dispute that the TDA Plan had 11,778 participants with account balances and $1.34 billion in net assets as of December 31, 2016.

---

[18] Doc.  250-3, Ex. 3, 2008 CURP Adoption Agreement (CORNELL015512).
[19] Doc.  250-3, Ex. 3, 2008 CURP Adoption Agreement, at § 25 (CORNELL015512).
[20] Doc.  250-10, Ex. 10, 2016 CURP Form 5500, at 2 (participants), Schedule H (assets).
[21] Doc.  250-5, Ex. 5, 2008 TDA Plan Adoption Agreement (CORNELL015527).
[22] Doc.  250-5, Ex. 5, 2008 TDA Plan Adoption Agreement (CORNELL015527).
[23] Doc.  250-11, Ex. 11, 2016 TDA Plan Form 5500, at 2 (participants), Schedule H (assets).

10.     Both the CURP and the TDA Plan provide participants the opportunity to invest in a variety of investment options offered by Teachers Insurance and Annuity Association of America ("TIAA") and Fidelity Investments Inc. ("Fidelity").[24]   The available investment options include actively and passively managed index funds, fixed and variable annuities, and mutual funds.[25]   The Plans also offer a brokerage window that allows participants to invest in any publicly-traded investment option, including individuals stocks, bonds, and exchange traded funds.[26]

**RESPONSE:** Plaintiffs do not dispute that the recordkeepers for the Plans are TIAA and Fidelity and that throughout the statutory period they have offered hundreds of their own proprietary investment options in the Plans.[27] Plaintiffs do not dispute that these options "include actively and passively managed index funds, fixed and variable annuities and mutual funds," Plaintiffs note "significant asset class overlap" within these lines with Fidelity alone offering 21 large cap growth funds.[28] Plaintiffs do not dispute that the Plans added two brokerage windows, one through Fidelity and one through TIAA, to the Plans' investment lineups in 2014.[29] Plaintiffs dispute this sentence to the extent the Cornell Defendants state that the Plans provided a brokerage window prior to 2014.[30]

---

[24] Doc.  250-1, Ex. 1, Am. Compl. ¶¶ 101.

[25] Doc.  250-14, Ex. 14, July 2017 TDA Plan Summary and Investment Notice (TIAA_CORNELL_00020211); Doc.  250-15, Ex. 15, July 2017 CURP Plan Summary and Investment Notice (TIAA_CORNELL_00044502).

[26] Doc.  250-14, Ex. 14, July 2017 TDA Plan and Investment Notice (TIAA_CORNELL_00020211); Doc.  250-15, Ex. 15, July 2017 CURP Plan and Investment Notice (TIAA_CORNELL_00044502).

[27] *See, e.g.*, Ex. P5, Dec. 31, 2011 CURP Participant Fee Disclosure (CORNELL024854) (listing over 30 TIAA proprietary investment options and over 170 Fidelity propriety investment options; Ex. P6, Dec. 31, 2011 TDA Plan Participant Fee Disclosure (CORNELL024856) (similar for the TDA Plan); *see also* Doc.  248-3, Jan. 10, 2012 Meeting Materials, at 30-31 (noting the TIAA platform was "[a]lmost 100% proprietary with 40 funds offered and the Fidelity platform for "[a]lmost 100% proprietary with 182 funds)

[28] Doc.  248-3, Jan. 10, 2012 Meeting Materials, at 30-31

[29] Doc. 246-5, TIAA Recordkeeping Agreements (Part I), at 44 (adding a brokerage window part of Amendment No. 7 ion September 30, 2014); Doc. 246-7, Fidelity Custodial and Recordkeeping Agreements, at 74 (adding a brokerage window as part of the Second Amendment dated October 1, 2014.)

[30] *See supra* n. 29.

11.     Participants have the right to direct all contributions made on their behalf into one or more of the investment options available on either TIAA's or Fidelity's platform.[31]  Both plans expressly provide that they are designed to comply with Section 404(c) of ERISA and the associated requirements related to diversification of investments and participant control over investment decisions.[32]

**RESPONSE:** Whether participants have the right to direct all contributions to investment options on TIAA's or Fidelity's platform is not material to whether the Cornell Defendants complied with its fiduciary duties to ensure participants paid reasonable recordkeeping fees or to monitor the investments in the Plans and should not be considered by the Court. To the extent to which a response is required Plaintiffs dispute that the participants have "the right" to invest in any particular investment option. The cited portion of the plan documents state that a "[p]articipant generally has the responsibility to invest his/her Plan Account unless the Plan Administrator or Participant appoint[s] an investment manager to investment the Plan Account."[33] Elsewhere the plan documents explicitly state: "[t]he Employer in its sole discretion will designate from time to time the specific Funding Vehicles which are available as Plan investments. The Employer may change such designation at anytime."[34] Whether the Plans are "designed to comply with Section 404(c) of ERISA and the associated requirements related to diversification of investments and participant control over investment decisions" is not material to whether the Cornell Defendants complied with their fiduciary duties to ensure participants

---

[31] Doc. 250-4, Ex. 4 CURP Plan Document, at § 7.03 (CORNELL015526); Doc. 250-6, Ex. 6, TDA Plan Document (CORNELL015535), at § 7.03.
[32] Doc. 250-4, Ex. 4 CURP Plan Document, at § 7.03(B)(2) (CORNELL015526); Doc. 250-5, Ex. 5, TDA Plan Document (CORNELL015535), at § 7.03(B)(2).
[33] Doc. 250-4. 2008 CURP Plan Document (CORNELL015526), at § 7.03(B); Doc. 250-5, 2008 TDA Plan Document (CORNELL015535), at §703(B).
[34] Doc. 250-4, 2008 CURP Plan Document (CORNELL015526), at 100; Doc. 250-6, 2008 TDA Plan Document (CORNELL015535), at 100.

paid reasonable recordkeeping fees or to monitor the investments in the Plans and should not be considered by the Court. To the extent a response is required, Plaintiffs dispute these allegations; the Cornell Defendants' evidence merely states the Cornell Defendants' intention to comply with Section 404(c) and does not demonstrate compliance with the safe harbor provision.[35] Plaintiffs also state whether the Plans are compliant with any safe-harbor is a question of law and not fact.

12.     Administrative responsibilities necessary to maintain and operate the Plans were delegated to and shared by a number of individuals and groups both within and outside of Cornell.

**RESPONSE:** Plaintiffs dispute this statement. The Cornell Defendants cite no record evidence to support this fact so it is inappropriate under Rule 56.1

13.     In accordance with the relevant plan documents and pursuant to 29 C.F.R. § 2510.3-16, Cornell is the named plan administrator for the Plans.[36] Cornell has delegated its administrative responsibilities to Cornell's Vice President for Human Resources and the personnel in Cornell's Benefits Department.[37]

**RESPONSE:** Plaintiffs do not dispute the plan documents for the Plans name Cornell as the plan administrator and named fiduciary. Plaintiffs dispute that the naming of Cornell and plan administrator is compliant with Rule 29 C.F.R. 2510.3-16 which is a question of law and not of fact. Plaintiffs dispute that Cornell has "delegated its administrative responsibilities to Cornell's Vice President for Human Resources and the personnel in Cornell's Benefits Department." Whether Cornell delegated its fiduciary duties under ERISA is a question of law

---

[35] Doc. 250-4. 2008 CURP Plan Document (CORNELL015526), at § 7.03(B); Doc. 250-5, 2008 TDA Plan Document (CORNELL015535), at §703(B).
[36] Doc. 250-3, Ex. 3, 2008 CURP Adoption Agreement (CORNELL015512); Doc. 250-4, Ex. 4, 2008 TDA Plan Adoption Agreement (CORNELL015527).
[37] Doc. 250-16, Ex. 16, Bursic Decl. ¶¶ 1-2.

and not of fact. Plaintiffs do not dispute this statement as the Benefits Department[38] did not

conduct any monitoring of recordkeeping and administrative fees or investments prior to 2012.[39]

14.      At all relevant times, Mary G. Opperman has served as Vice President for

Human Resources.  Opperman is supported by personnel employed by Cornell's Benefits

Services and Administration Department ("Benefits Services").[40] Over the relevant time period,

Paul Bursic served as Director of Benefits Services and Administration.[41]

**RESPONSE:** Plaintiffs do not dispute that Ms. Opperman served as Vice President for

Human Resources for the relevant period or that personnel employed by the Benefits Services

supported her in that position. Plaintiffs do not dispute that from the beginning of the statutory

period until November 2016 Mr. Bursic served as Director or Senior Director of Benefit Services

and Administration.[42]

15.      In addition to its delegations to Opperman and Benefits Services, in 2010

Cornell delegated responsibility for plan oversight and investment monitoring to a joint

retirement plan oversight committee ("RPOC").[43] According to its charter, RPOC was

responsible for *inter alia* providing policy oversight, developing an investment policy statement,

and managing the Plans' investment menu.[44]

**RESPONSE:** Plaintiffs dispute that "in 2010 Cornell delegated responsibility for plan

oversight and investment monitoring to a joint retirement plan oversight committee ("RPOC")."

Whether Cornell delegated its fiduciary duties under ERISA is a question of law and not of fact.

---

[38] The Cornell Defendants' Rule 56.1 Statement appears to use the terms "Benefits Department" and "Benefits Services" interchangeably. Plaintiffs follow this practice as well for consistency.
[39] Ex. P7, Opperman Dep., at 32:23-33:13, 53:19–55:1.
[40] Doc. 250-16, Ex. 16, Bursic Decl. ¶ 1-2.
[41] Doc. 250-16, Ex. 16, Bursic Decl. ¶ 2.
[42] Ex. P8, Bursic Tr.at 24:12-25:1.
[43] Doc. 250-17, Ex. 17, April 2011 RPOC Charter (CORNELL015812).
[44] Doc. 250-17, Ex. 17, April 2011 RPOC Charter (CORNELL015812).

Moreover, the date of the Charter cited by Cornell is April 2011 and not 2010.[45] Plaintiffs do not dispute that on April 7, 2011 a Charter creating RPOC was approved by the Board of Trustees of Cornell University.[46] Plaintiffs dispute the Cornell Defendants' characterizations of the RPOC charter. The RPOC Charter provides "[t]he primary duties and responsibilities of the RPOC shall be to provide policy oversight for the selection of investment options for the Plans by means of the IPS, and establish criteria to review and monitor the investment performance of the investment options and update the IPS as required."[47]

16.     RPOC's charter provided that it would be chaired by the Vice President for Human Resources, who at all relevant times was Mary Opperman.[48] The charter further provided that the committee chair is responsible for selecting its members.[49] The appointed committee members include a cross-section of participants, stakeholders, and subject-matter experts, including faculty and administrators with substantial investment experience.[50]  All committee members participate in an onboarding process, in which they receive training regarding the Plans, the administrative environment, RPOC's charter and responsibilities, and each member's role as an ERISA fiduciary.[51]

**RESPONSE:** Plaintiffs do not dispute that the RPOC charter provides that the Vice President of Human Resources, Mary Opperman, is the Chair of RPOC. Plaintiffs do not dispute that the Chair is responsible for selecting its members. Plaintiffs dispute "[t]he appointed committee members include a cross-section of participants, stakeholders, and subject-matter

---

[45] Doc. 250-15, April 2011 RPOC Charter (CORNELL015812).
[46] *Id.*
[47] *Id.* at 2.
[48] Doc. 250-17, Ex. 17, April 2011 RPOC Charter (CORNELL015812).
[49] Doc. 250-17, Ex. 17, April 2011 RPOC Charter (CORNELL015812).
[50] Dc. 250-18, Ex. 18, Opperman Dep. 100:22-101:23.
[51] Doc. 250-19, Ex. 19, November 2010 RPOC Meeting Minutes, at 3 (CORNELL021932) (discussing fiduciary training).

experts, including faculty and administrators with substantial investment experience." The cited

deposition testimony says nothing about the committee including "a cross-section of participants,

stakeholders and subject matter experts."[52] Ms. Opperman does testify that she would rely upon

A.J. Edwards, Dan Schwarz, Paul Bursic and Patrick Gallagher for their "investment expertise"

but does not state that they have substantial investment expertise or detail their expertise in any

way.[53] Mr. Bursic and Mr. Gallagher explicitly testified that they did not have expertise in

investments.[54] Moreover, Ms. Opperman lists four members of RPOC with "investment

expertise" out of the 15 listed in the document she was viewing.[55] Plaintiffs dispute "[a]ll

committee members participate in an onboarding process, in which they receive training

regarding the Plans, the administrative environment, RPOC's charter and responsibilities, and

each member's role as an ERISA fiduciary." The cited document only mentions fiduciary

training in November 2010 that "included defining the four retirement plans that the committee

will oversee; the legal framework of the governing federal regulations; the 2007 regulations for

403(b) plans and current events that are affecting litigation; ERISA definition of Fiduciary,

including affirmative fiduciary responsibilities (with focus on the "prudent expert" rule);

fiduciary prohibitions; fiduciary liability; and steps to minimize fiduciary exposure."[56] The

meeting minutes mention no additional training or training for new members until five and a half

years later in March 2016.[57]

---

[52] Doc. 250-18, Opperman Dep., at 100:22-101:23.

[53] *Id.*

[54] Ex. P8, Bursic Tr.at 79:18-80:11 (testifying that the Benefits Department "had no experience or expertise on staff to" conduct investment performance analysis prior to the retention of CAPTRUST); Ex. P9, Gallagher Dep. at 16:3–20:22 (testifying that he had no experience in investment management or selecting investments for a defined contribution plan prior to joining Weill Cornell in 2011).

[55] Doc. 250-18, Opperman Dep., at 100:22-101:23.*; Doc. 241-3, Ex. 92, September 17, 2014 RPOC Meeting Materials (CORNELL013567) at 3.

[56] Doc. 250-19, November 29. 2010 RPOC Meeting Minutes (CORNELL021932)

[57] Doc. 250-19, November 29, 2010, CURP Meeting Minutes (CORNELL0021932); Ex. P10, February 3, 2011 CURP Meeting Minutes (CORNELL021930); Ex. P11, June 23, 2011 CURP Meeting Minutes

17.     Pursuant to its charter, RPOC is authorized to engage consultants and advisers to assist with plan administration, oversight, and policy development.[58]  The RPOC began preparing a request for proposals ("RFP") to serve as the committee's consultant in December 2010 and sent the RFP to multiple vendors in April 2011.[59]  The RFP stated that "[g]iven the current regulatory environments for § 403(b) plans, Cornell [sought] a consulting partner to assist it in building a fully compliant retirement plan operation."[60]  Cornell specifically noted in the RFP that it needed assistance and advice with respect to constructing the Plans' investment line-up and designing a compliant plan administration/recordkeeping arrangement.[61]

**RESPONSE:** Plaintiffs do not dispute that the RPOC Charter provides that "RPOC is authorized to engage consultants and adviser to assist the RPOC in its duties and responsibilities." Plaintiffs dispute that "RPOC began preparing a request for proposals ("RFP") to serve as the committee's consultant in December 2010" to the extent it claims that RPOC was formed prior to April 7, 2011.[62] Additionally, the cited document, November 29, 2010 Meeting Minutes, merely state that a "Next Step" is that "Benefits" will prepare the RFP" and does not

---

(CORNELL021931); Doc. 248-8, January 11, 2012 RPOC Meeting Minutes (CAPTR_0047903); Doc 248-14, April 13, 2012 RPOC Meeting Minutes (CAPTR_0047907); Doc. 248-9, July 24, 2012 RPOC Meeting Minutes (CAPTR_0047911); Doc. 252-5, November 19, 2012 RPOC Meeting Minutes (CAPTR_0047924); Ex. P12, July 31, 2013 RPOC Meeting Minutes (CAPTR_0047921); Doc. 252-8, September 30, 2013 RPOC Meeting Minutes (CAPTR_0047918); Ex. P13, December 4, 2013 RPOC Meeting Minutes (CAPTR_0047915); Ex. P14, March 21, 2014 RPOC Meeting Minutes (CAPTR_0004284); Ex. P15, September 17, 2014 RPOC Meeting Minutes (CAPTR_0004286); Ex. 63, Doc. 239-4, December 3, 2014 RPOC Meeting Minutes (CAPTR_00013586); Ex. P16, June 2, 2015 RPOC Meeting Minutes (CAPTR_0013598); Ex. P17, September 9, 2015 RPOC Meeting Minutes (CAPTR_0013573); Ex. P18, December 16, 2015 RPOC Meeting Minutes (CAPTR_0013594); Doc. 238-9, March 31, 2016 RPOC Meeting Minutes (CAPTR_0013568); Ex. P19, June 29, 2016 RPOC Meeting Minutes (CAPTR_0013565); Ex. P20, September 28, 2016 RPOC Meeting Minutes (CAPTR_0013580); Doc. 252-10, December 12, 2016 RPOC Meeting Minutes, (CAPTR_0013590).
[58] Doc. 250-17, Ex. 17, April 2011 RPOC Charter, at 1 (CORNELL015812)
[59] Doc. 250-19, Ex. 19, November 2010 RPOC Meeting Minutes, at 3 (CORNELL021932).
[60] Doc. 246-1, Ex. 20, April 2011 Consultant RFP, at 1, 6 (CORNELL024129).
[61] Doc. 246-1, Ex. 20, April 2011 Consultant RFP, at 1, 6 (CORNELL024129) ("Cornell needs professional assistance to determine the proper investment vehicles for plan participants to select among when investing in self-directed accounts.  In addition, the University needs a consulting partner with proven expertise in advising plan sponsors on the administrative set up of custodial accounts, recordkeeping, retail-level customer service for plan participants and reporting capabilities for compliance and proper management of the plans.").
[62] Doc. 250-15, April 2011 RPOC Charter (CORNELL015812).

13

provide any evidence that the RFP was prepared in December 2010.[63] Plaintiffs do not dispute

that Cornell sent an RFP to potential investment advisors in April 2011. The RFP speaks for

itself.[64]

       18.      After identifying finalists and conducting in-person interviews in December

2011, the RPOC agreed to retain defendant Capfinancial Partners LLP ("CAPTRUST") as the

Plans' investment advisor and plan administration consultant.  The services CAPTRUST agreed

to provide included investment advisory consulting, vendor analysis, and documents/process

management.[65] CAPTRUST further agreed to "serve as a fiduciary as defined by ERISA §

3(21)(A)(ii) with regard to the selection of investment manager(s) or mutual fund(s) available to

the Plans within the platforms [maintained by TIAA and Fidelity]."[66]

    **RESPONSE:** Plaintiffs dispute that "[a]fter identifying finalists and conducting in-

person interviews in December 2011, the RPOC agreed to retain defendant Capfinancial Partners

LLP ("CAPTRUST") as the Plans' investment advisor and plan administration consultant"

because the Cornell Defendants cite no evidence to support this sentence and it is not a fact that

is material to the Cornell Defendants' Motion for Summary Judgment as required by Local Rule

56.1. Plaintiffs do not dispute that "[t]he CAPTRUST agreed to provide included investment

advisory consulting, vendor analysis, and documents/process management." Plaintiffs further

state that the "Investment Advisory Consulting" services included: "Plan Level Advice;"

"Investment Menu Development;" and "Ongoing Investment Due Diligence."[67] The "Vendor

Analysis" services included: "Vendor Analysis, Benchmarking, & Scoring;" "Plan

---

[63] Doc. 250-19, Nov. 29, 2010 Meeting Minutes (CORNELL021932) at 3.
[64] Doc. 246-1, April 1, 2010 RFP (CORNELL024129).
[65] Doc. 246-2, Ex. 21, April 2011 Retirement Plan Advisory Services Agreement between Capfinancial Partners, LLC ("CAPTRUST") and Cornell University, at 1 (CORNELL021910).
[66] Doc. 246-2, Ex. 21, April 2011 Retirement Plan Advisory Services Agreement between Capfinancial Partners, LLC ("CAPTRUST") and Cornell University, at 1 (CORNELL021910).
[67] Doc. 246-2 December 2011 CAPTRUST Contract (CORNELL0021910), at 3.

Administration & Investment Cost Comparison;" and "Overall Recommendation & Ongoing Due Diligence."[68] The "Documentation/Process Management" services included: "Real-Time Access to Industry Research;" and "Electronic Repository of Key Plan Documents."[69] Plaintiffs dispute the sentence "CAPTRUST further agreed to 'serve as a fiduciary as defined by ERISA § 3(21)(A)(ii) with regard to the selection of investment manager(s) or mutual fund(s) available to the Plans within the platforms [maintained by TIAA and Fidelity].'" Nothing in the contract limits the advice CAPTRUST could give to platforms "maintained by TIAA and Fidelity" versus platforms maintained by any other recordkeeper or investment provider.[70]

19.     The ongoing operation of a defined contribution plan involves a wide range of administrative work.  Accordingly, the plan's fiduciaries typically retain a third-party administrator.  This third-party administrator, or "recordkeeper," performs both complex administrative tasks with which they have experience as well as the high-volume routine tasks necessary to ensure continued operation of the plan on a day-to-day basis. In the defined contribution arena, recordkeeping services are typically provided by banks, brokerage houses, and other types of financial institutions, such as Charles Schwab, Vanguard, Voya Financial Inc., Empower Retirement, T. Rowe Price, TIAA (formerly TIAA-CREF), and Fidelity Investments.[71]

**RESPONSE:** Plaintiffs dispute the first three sentences of paragraph 19 because the Cornell Defendants cite no record evidence supporting these facts and are therefore inappropriate under Rule 56.1. In fact, even the Cornell Defendants' expert admitted that recordkeeping and administrative services are commoditized services with "economies of scale in providing

---

[68] *Id.*
[69] *Id.*
[70] *Id.*
[71] Doc. 246-3, Ex. 22, 2016 Plan Sponsor 403(b) Recordkeeping Survey, at 1-2.

recordkeeping and administrative services" based on the number of participants.[72] Based on these economies of scale, generally plans with more participants pay a lower fee on a per-participant basis than plans with fewer participants.[73] Similarly, Plaintiffs' experts, Al Otto and Ty Minnich, opine that rather than being "complex," recordkeeping and administrative services are commoditized services with economies of scales based on the number of participants.[74] Plaintiffs dispute the fourth sentence of paragraph 19. The Cornell Defendants do not cite to admissible evidence to support the purported fact in the fourth sentence of paragraph 19, but cite to a purported 2016 Plan Sponsor 403(b) Recordkeeping Survey which is hearsay and has not been authenticated. *See* Fed. R. Evid. 801, 802, 901. Plaintiffs do not dispute the fourth sentence of paragraph 19 to the extent that it provides that there are numerous recordkeepers on the market capable of providing the recordkeeping and administrative services that TIAA and Fidelity provided to the Plans.[75]

20.     During the time period at issue, two different vendors provided participant recordkeeping and administrative services to the Plans: TIAA and Fidelity.[76] As of 2016, TIAA and Fidelity were the two largest 403(b) plan recordkeepers in the world based on the total amount of assets under administration.[77]  Historically, the higher education defined contribution recordkeeping market has been dominated by TIAA, with TIAA having provided recordkeeping services to each of the top-30 private colleges and universities as ranked by U.S. News & World

---

[72] Ex. P2, Poehler Dep., at 51:23-54:22.
[73] *Id.*
[74] Doc. 249-19, Expert Report of Al Otto, ¶¶20–25; Doc. 249-20, Expert Report of Ty Minnich, ¶¶22–29
[75] Doc. 249-20., Expert Repot of Ty Minnich, ¶24; Ex. P21, Expert Rebuttal Report of Al Otto ¶7.
[76] Doc. 250-1, Ex. 1, Am. Compl. ¶ 101.
[77] Doc. 246-3, Ex. 22, 2016 Plan Sponsor 403(b) Recordkeeping Survey, at 1-2.

Report with plan assets in excess of $1 billion.[78]  Cornell's relationship with TIAA spans over 80 years: TIAA was first retained to provided annuities to Cornell's employees in 1937.[79]

**RESPONSE:** Plaintiffs do not dispute that TIAA and Fidelity both provided recordkeeping and administrative services to the Plans during the relevant period. Plaintiffs dispute the second sentence of paragraph 20. The Cornell Defendants do not cite to admissible evidence supporting the purported fact in the second sentence of paragraph 20, but cite to a purported 2016 Plan Sponsor 403(b) Recordkeeping Survey which is hearsay and has not been authenticated. *See* Fed. R. Evid. 801, 802, 901. Moreover, whether "TIAA and Fidelity were the two largest 403(b) plan recordkeepers in the world" is not material to the Cornell Defendants' Motion for Summary Judgment as required by Local Rule 56.1, because the provision of recordkeeping and administrative services is a competitive market with numerous recordkeepers capable of providing services to the Plans.[80] Plaintiffs dispute the third sentence of paragraph 20. No record evidence is cited to support the proposition that "the higher education defined contribution recordkeeping market has been dominated by TIAA." The sole document cited to support that proposition is paragraph 29 of the Poehler Report which says nothing about TIAA "dominating the higher education defined contribution recordkeeping market." Moreover, Mr. Poehler testified at his deposition that the industry sector of a plan sponsor was not a factor he considered in evaluating the reasonableness of a Plans' recordkeeping fees while he was advising clients.[81] Additionally, the cited portion of Poehler's Report, even if admissible, does not support that each of the top 30 private colleges and universities use TIAA as a recordkeeper. Mr. Poehler

---

[78] Doc. 246-4, Ex. 23, Poehler Rpt. ¶ 29 (relying on 2017 U.S. News National University rankings to identify the top 30 private U.S. Universities).
[79] Doc. 249-24, Ex. 112, TIAA Decl. ¶ 25.
[80] Doc. 249-20., Expert Repot of Ty Minnich, ¶24.
[81] Ex. P2, Poehler Dep., at 37:5-23

excluded from his analysis MIT, Boston College, and Princeton because of the tax section under which they offered their Plans and provides no evidence as to which entities provide recordkeeping and administrative services for those Plans.[82] In fact, MIT does not use TIAA but solely Fidelity as a recordkeeper for its Plans.[83] Additionally, Mr. Poehler admitted in his deposition that a number of those universities have consolidated to a single recordkeeper other than TIAA.[84] Moreover, the recordkeeping provider for the top 30 private universities is not material to the Cornell Defendants' motion. Plaintiffs dispute the third sentence of paragraph twenty because the length of the relationship between TIAA and Cornell it is not a fact that is material to the Cornell Defendants' Motion for Summary Judgment as required by Local Rule 56.1.

21.     While TIAA was initially retained as the exclusive recordkeeper for the Plans, Cornell retained Fidelity as a second recordkeeper in the mid-1990s to provide participants a broader array of service and investment options. In particular, Cornell retained Fidelity in order to provide participants the opportunity to invest in mutual funds because at the time of its retention, TIAA's investment offerings were limited to annuities.[85]

**RESPONSE:** Plaintiffs dispute the first sentence of paragraph 21. When Cornell retained Fidelity and TIAA is not material to whether the Cornell Defendants breached their fiduciary duties to Plans participants to ensure the Plans paid reasonable fees or to monitor the investments in the Plans. Additionally, the Cornell Defendants do not cite to admissible evidence to support paragraph 20. The Cornell Defendants cite only to the Declaration of Paul Bursic who states in

---

[82] Doc. 246-4, Expert Report of Glenn Poehler, at n.81.
[83] Ex. P22, Answer to Amended Complaint (Doc. 80), *Tracey, et al, v. Massachusetts Institute of Technology, et al.*, 16-11620 ¶3 ("Defendants admit that Fidelity Investments served as recordkeeper for the Plan.").
[84] Ex. P2, Poehler Dep., at 153:7–164:10.
[85] Doc. 250-16, Ex. 16, Bursic Decl. ¶ 3.

his declaration that Cornell hired him in May 1997.[86] Because of this, he lacks personal knowledge of events related to the Plans prior to 1997 and his testimony is inadmissible. Fed. R. of Evid. 602. Plaintiffs dispute the second sentence of paragraph 21. Why Cornell purportedly retained Fidelity as an additional recordkeeper is not material to whether the Cornell Defendants breached their fiduciary duties to Plan participants to ensure the Plans paid reasonable fees or to monitor the investments in the Plans. The Cornell Defendants cite only to the Declaration of Paul Bursic who states in his declaration that he was hired by Cornell in May 1997.[87] Because of this, he lacks personal knowledge of events related to the Plans prior to 1997 and his testimony is inadmissible. Fed. R. of Evid. 602.

22.     The services provided by TIAA and Fidelity were varied and included both "core" recordkeeping services (i.e. the basic suite of services minimally necessary to operate a plan) and a variety of additional administrative services:[88]

| Service Category | Services |
|---|---|
| **Administrative and Recordkeeping Services** | • Core Recordkeeping Services (e.g. tracking account balances, contributions and withdrawals) <br>• Hardship Services <br>• Online Enrollment <br>• QDIA Services |
| **Employee Services** | • CE&A Core Campaign <br>• Enrollment Communications <br>• Financial Education Seminars <br>• Individual Advice <br>• Online Planning Tools |

---

[86] Doc. 250-16, Busic Decl. ¶2.
[87] Doc. 250-16, Busic Decl. ¶2.
[88] Doc. 246-5, Ex. 24, TIAA/Cornell Recordkeeping Agreement and amendments, at 12-14; Doc. 246-7, Ex. 25, Fidelity/Cornell Recordkeeping Agreement and amendments, at 33-37; Doc. 246-8, Ex. 26, 2012 TIAA Service & Fee Disclosure Package, at 2-6 (CORNELL022070).

| | |
|---|---|
| | • Plan-Specific Change Communications<br>• Regulatory Communications<br>• Individual Advisory Services |
| **Plan Sponsor Services** | • Annual Plan Reviews<br>• Audit Support<br>• Fee Disclosure Delivery Service<br>• Fiduciary Education & Regulatory Updates<br>• Preparing Form 5500 Annual Reports and similar regulatory filings<br>• Investment Reviews and Monitoring<br>• Compliance Coordinator<br>• Non-Discrimination Testing<br>• Plan Financial Reporting Packages<br>• Tracking income tax withheld from distributions and withdrawals |
| **Plan Investments Services** | • Annuities and Lifetime Income Options<br>• Open Architecture Mutual Funds<br>• Brokerage Window<br>• Lifecycle Funds<br>• Target Date Funds<br>• Adding options to lineup, eliminating options, and mapping/transferring funds maintained in eliminated options |
| **Other Financial Services** | • Executive Compensation Plan Services |

**RESPONSE:** Plaintiffs dispute paragraph 22. Many of the services that the Cornell

Defendants list are not listed as services in the TIAA recordkeeping contract, the Fidelity Trust

Contract or the TIAA fee disclosure that the Cornell Defendants cite. For example, "Investment

Reviews and Monitoring" is not listed in any of these documents.[89] Additionally, the Plan Investment Services are not included in the recordkeeping and administrative or "plan service" expenses charged by the recordkeeper but part of the investment management expense.[90]  Some of the services listed, including the independent investment advisor services is not a plan expense paid for by "fees directly from participant retirement accounts for investment advisory services provided under agreements with each individual participant."[91] Additionally, standard industry practice refers to and prices all recordkeeping and administrative services as "recordkeeping services or fees" and does not separate out core recordkeeping services.[92]

23.     While TIAA and Fidelity provide many of the same services, they nevertheless differ in a number of important respects:  First, the two providers differ in their approach to service. TIAA is generally considered a "high touch" service provider: they provide more "one-on-one" service to participants, and unlike Fidelity, maintain an office on campus.  In 2014, for example, TIAA representatives had an estimated 2,159 one-on-one meetings.[93] Fidelity on the other hand is considered a "high tech" provider, and is the type of provider preferred by participants that are more comfortable managing their accounts independently using web-based services.[94]

---

[89] Doc.246-5, TIAA Recordkeeping Agreements, at 12-14; Doc. 246-6, Fidelity Custodial Agreements, at 33-37; Doc. 246-8, 2012 TIAA Service & Fee Disclosure Package, (CORNELL022070), at 2-6.
[90] Doc. 246-8, TIAA Service & Fee Disclosure Package, at 4 (CORNELL022070) ("The Plans Services Expense is the portion of the Annual Operating Net Expense Ratio paid to TIAA that is used to offset the cost of recordkeeping, employee services and other plan sponsor services necessary for administering your plan. The remainder of the Annual Operating Net Expense Ratio is retained by the fund advisor(s) or other entities, for providing services to the plans Investments.")
[91] *Id.*
[92] *See, e.g.,* Ex. P23, Strodel Dep. at 34:24–37:14.
[93] Doc. 246-10, Ex. 28, 2016 TIAA "Making the Most of Your Retirement Plan" Presentation, at 31-32 (CORNELL024582). *See also* Doc. 246-9, Ex. 27, 2014 TIAA/Cornell Year in Review (TIAA_CORNELL_00027623).
[94] Doc. 246-4, Ex. 23, Poehler Rpt. ¶ 53.

**RESPONSE:** Plaintiffs dispute the first sentence of paragraph 23. The Cornell Defendants fail to cite any record evidence to support the first sentence of paragraph 23. Moreover, the list of services the Cornell Defendants' expert lists for TIAA and Fidelity providing the Plans are nearly identical.[95] Additionally, while Fidelity did not provide an office on campus at Cornell, it did provide a staffed office in Pittsford, where participants could obtain one-on-one advice and service.[96] Plaintiffs dispute the second and third sentences of paragraph 23 because the number of one-on-one meeting TIAA provided is not material to whether the Cornell Defendants breached their fiduciary duties to participants in the Plans to ensure the Plans paid reasonable fees or to monitor the investments in the Plans. Many of these one-on-one meetings were related to services unrelated to the Plans and gave TIAA the opportunity to profit from the promotion of non-Plan products. In 2014 (the year the Cornell Defendants cite) the following services were provided at individual advisory service meetings: investment management and planning, estate and gift planning, charitable planning, education planning, cash flow analysis, stock options review, asset protection planning, investment review, executive compensation and benefits analysis, life insurance analysis, and career transition planning.[97] Moreover, in 2014, only 1,632 of 18,656 TIAA participants used the one-on-one meeting services.[98] In other words, less than 9% of Plan participants used these services in 2014, which is the highest usage for any year during the relevant period for which TIAA reported the data.[99] Plaintiffs dispute the fourth sentence of paragraph 23. The sole citation the Cornell Defendants rely upon for this sentence paragraph 23 of Glenn Poehler's report, does not support their

---

[95] Doc. 246-4, Expert Report of Glenn Poehler, ¶¶55, 57.
[96] Ex. P8, Bursic Tr.at 120:2–122:3.
[97] Ex. P24, 2015 Business Planning for Cornell University Presentation, (CORNELL006365) at 421.
[98] *Id.* at 383, 419.
[99] Ex. P21, Expert Rebuttal Report of Al Otto ¶41.

assertion that Fidelity is a "high-tech" provider.[100] In fact, nowhere in his report does Mr.

Poehler refer to Fidelity as a "high-tech" provider and the list of services he notes that TIAA and

Fidelity provided the Plans are nearly identical.[101]

24.      Second, Fidelity and TIAA offer different investment options: TIAA's

investment lineup includes a number of fixed and variable annuities popular among participants

in higher education plans; Fidelity does not offer any annuities and has instead focused on

developing a wide variety of mutual fund options.[102]

**RESPONSE:** Plaintiffs dispute paragraph 24. The type of investments in the lineup on a

recordkeepers' platform is not material to whether the Cornell Defendants breached their

fiduciary duties to Plan participants to ensure the Plans paid reasonable fees or to monitor the

investments in the Plans. Ty Minnich, who worked as an executive in the recordkeeping

divisions of Transamerica, Metlife, and CitiStreet, opined that in his experience it is no more

costly to recordkeep an annuity than a mutual fund.[103]



.[104]

.[105]

[106] Moreover, TIAA collected

---

[100] Doc. 246-4, Expert Report of Glenn Poehler, ¶53.
[101] *Id.* ¶¶ 55, 57.
[102] Doc. 250-14, Ex. 14, July 2017 TDA Plan Summary and Investment Notice (TIAA_CORNELL_00020211); Doc. 250-15, Ex. 15, July 2017 CURP Plan Summary and Investment Notice (TIAA_CORNELL_00044502).
[103] Doc. 246-19, Minnich Report, ¶132.
[104] Ex. P25, Polacek Dep. at 167:20-23.
[105] Ex.P26, 2011 TIAA Service & Fee Disclosure Package for Plan Fiduciaries (TIAA_CORNELL_00012726) at 726-727 (plan service expense column).
[106] *Id.*

more in total fees for its variable annuity options than the TIAA Traditional.[107] Additionally, the evidence cited does not demonstrate that "Fidelity does not offer any annuities and has instead focused on developing a wide variety of mutual fund options," but rather only demonstrates that Fidelity does not offer annuities in the Plans.[108]

25.      Finally, the administrative costs of the two providers are different, primarily because of differences in the types of services provided and the investment options offered: TIAA is generally considered a higher cost provider because of the "high touch" services and the additional cost associated with managing annuities.[109]

**RESPONSE:** Plaintiffs dispute paragraph 25. The Cornell Defendants cite no record evidence to support this factual assertion, so it is improper under Rule 56.1. The Cornell Defendants cite only their recordkeeping expert's list of services that TIAA and Fidelity provide which are nearly identical.[110] Additionally, nowhere in his report does he state that Fidelity does not provide "high touch" services.[111] In fact, Fidelity provided one-on-one meetings for participants in the Plans in a nearby town.[112]



,[113]

.[114]

---

[107] *Id.*
[108] Doc. 250-15, 2017 TDA Plan Notice (TIAA_CORNELL_00020211); Doc. 250-15, 2017 CURP Plan Notice (TIAA_CORNELL_00044502).
[109] Doc. 246-4, Ex. 23, Poehler Rpt. ¶ 53; Doc. 246-11, Ex. 29, Polacek Dep. 123:3-125 :23 (discussing various complexities associated with administration and recordkeeping annuity contracts versus mutual funds).
.[110] Doc. 246-4, Expert Report of Glenn Poehler, ¶¶55, 57.
[111] *Id.*
[112] Ex. P8, Bursic Tr.at 120:2–122:3
[113] Ex. P25, Polacek Dep. at 123:3–125:23.
[114] Ex. P25, Polacek Dep. at 167:20-23



.[118] Moreover, TIAA collected more in total fees for its variable annuity options than the TIAA Traditional.[119] If it were truly more expense to recordkeep a fixed annuity, one would expect it to have the highest plan expense ratio rather than the lowest. Finally, Ty Minnich, who worked as an executive in the recordkeeping divisions of Transamerica, Metlife, and CitiStreet, opined that in his experience it is no more costly to recordkeep an annuity than a mutual fund.[120]

26.      Throughout the time period at issue and to the present day, it was and remains common for Section 403(b) plans generally, and higher education plans in particular, to offer multiple recordkeepers. The majority of TIAA's largest 200 clients with at least one 403(b) plan use multiple recordkeepers.  For the period of 2010 through 2016, between 110 and 147 of TIAA's largest 200 clients with at least one 403(b) plan employed a multi-vendor approach to recordkeeping.[121] And of the 23 private universities that have plan assets in excess of $1 billion

---

[115] Ex. P25, Polacek Dep. at 123:3–125:23
[116] Ex. P25, Polacek Dep. at 94:19–96:12.
[117] Ex. P26, 2011 TIAA Service & Fee Disclosure Package for Plan Fiduciaries (TIAA_CORNELL_00012726) at 726-727 (plan service expense column).
[118] *Id.*
[119] *Id.*
[120] Doc. 246-19, Minnich Report, ¶132.
[121] Doc. 246-12, Ex. 30, Declaration of Douglas Chittenden, in *Sacerdote v. New York University*, 16-cv-6284 (KBF) (S.D.N.Y.) ("Chittenden *Sacerdote* Decl.") ¶ 45.

and are included among the U.S. News & World Report list of top universities, 20 relied on multiple recordkeepers as of 2015.[122]  Moreover, of those universities that relied on multiple vendors, many have historically relied on more than just two recordkeepers: Vanderbilt University, University of Southern California, and Duke University retained 4 different recordkeepers; Johns Hopkins' University and Purdue University offered participants 5 recordkeepers; and Stanford University allowed participants to open accounts with 6 different vendors.[123]

      **RESPONSE:** Plaintiffs dispute the first three sentences of paragraph 26. The only evidence cited by Plaintiffs is testimony of a Douglas Chittenden, a TIAA executive, in another case. Mr. Chittenden's testimony in another case is inadmissible hearsay. *See* Fed. R. of Evid. 801, 802. Mr. Chittenden's testimony is not an admissible prior statement by a witness because it is not inconsistent with any testimony he has given in this case or for identification. *See* Fed. R. of Evid. 801(a)(1). Additionally, Mr. Chittenden's testimony in another case is not admissible under Rule 804, because he is not unavailable given that he offered a declaration in support of the Cornell Defendants' motion.[124] Finally, Mr. Chittenden's testimony is inadmissible under the rule of completeness, because the Cornell Defendants only offered his trial declaration and not his actual live testimony, including testimony that he was not involved with TIAA's defined contribution business for much of the relevant period[125] and that he was not aware of numerous relevant facts related to TIAA's top 200 clients.[126] Plaintiffs dispute the fourth and fifth sentence of paragraph 26. The sole document cited to support these sentences is paragraph 29 of the

---

[122] Doc. 246-4, Ex. 23, Poehler Rpt. ¶ 40, Ex. 1.

[123] Doc. 247-1, Ex. 31, 2016 Fidelity Master Administrator Presentation, at 9 (CORNELL021851).

[124] Doc. 249-024, Declaration of Douglass Chittenden.

[125] Ex. P27, *Sacerdote v. New York University*, No. 16-6284, Tr. of Trial at 560:7–562:13

[126] *Id.* at 649:4-655:20

Poheler Report which says nothing about TIAA. Mr. Poehler testified at his deposition that the industry sector of a plan sponsor was not a factor he considered in evaluating the reasonableness of a Plans' recordkeeping fees while he was advising clients.[127] Additionally, the cited portion of Poehler's Report even if admissible does not support that all of the top 20 of the 23 private colleges and universities with over $1 billion in assets used multiple recordkeepers. Mr. Poehler excluded from his analysis MIT, Boston College, and Princeton because of the tax section under which they offered their Plans and provides no evidence on what entity provides recordkeeping and administrative services for those Plans.[128] In fact, MIT does not use multiple recordkeepers but only Fidelity as a recordkeeper for its plan and Boston University moved to a master recordkeeper agreement with Fidelity in 2013.[129] Additionally, Mr. Poehler admitted in his deposition that a number of those universities have consolidated to a single recordkeeper other than TIAA.[130] Moreover, how many of the top 30 private universities use multiple recordkeepers is not material to the Cornell Defendants' motion. Plaintiffs dispute the sixth sentence of paragraph 26. The Fidelity Master Recordkeeper Presentation that the Cornell Defendants cite actually demonstrates that Vanderbilt, Stanford, Purdue, and Johns Hopkins consolidated between 2009 and 2015 to a single record-keeper or to a master administrator or lead recordkeeper agreement.[131] Further, that presentation demonstrates that between 2009 and 2015 there were at least 108 colleges or universities that consolidated to a single recordkeeper and 49 recordkeeper consolidations with over $500 million in assets.[132] Additionally, the Fidelity Master

---

[127] Ex. P2, Poehler Dep., at 37:5-23
[128] Doc. 246-4, Expert Report of Glenn Poehler, at n.81.
[129] Ex. P22, Answer to Amended Complaint (Doc. 80), *Tracey, et al, v. Massachusetts Institute of Technology, et al.*, 16-11620 ¶3 ("Defendants admit that Fidelity Investments served as recordkeeper for the Plan."); Doc. 247-1, 2016 Fidelity Master Administrator Presentation (CORNELL021851)., at 9
[130] Ex. P2, Poehler Dep., at 153:7–164:10.
[131] Doc. 247-1, 2016 Fidelity Master Administrator Presentation (CORNELL021851), at 9
[132] *Id.*

Recordkeeper presentation identifies California Institute of Technology, Purdue, Notre Dame, University of Rochester, Nevada System of Higher Education, Vanderbilt, Colorado and California State University as consolidating to a single recordkeeping agreement with TIAA or Fidelity despite previously having TIAA and Fidelity assets in the plan.[133]

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████[135] ████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████[136]

27.     Even among those plan sponsors that desire to consolidate recordkeeping services with a single provider, there are often limitations on their ability to do so because of contractual restrictions associated with 403(b) plans' investment options.  TIAA "legacy" contracts account for a significant percentage of 403(b) plan assets.[137]  Plan sponsors have no

---

[133] *Id.*
[134] Ex. P28, August 16, 2011 Tower Watson Finalist Presentation (CORNELL015395) at 10.
[135] *Id.*
[136] Ex. P3, May 16, 2011 Hewitt ennisknupp Response to Request for Proposal (CORNELL024180), at 12, 17, 26.
[137] Doc. 246-4, Ex. 23, Poehler Rpt. ¶¶ 5-6. *See also, infra,* at SOF ¶ 43.

right or ability to eliminate, transfer, or "map" these investments to any other recordkeeper without participant authorization.[138]  Moreover, many firms, such as Fidelity, do not permit other firms to offer and provide recordkeeping services for their investment options.[139]  These restrictions make it difficult, and in some cases impossible, to consolidate all investment options with a single recordkeeper.

**RESPONSE:** Plaintiffs dispute the first sentence of paragraph 27. The Cornell Defendants do not cite to any record evidence to support this sentence. Additionally, the Fidelity Master Recordkeeper Presentation shows that the Vanderbilt, Stanford, Purdue, and Johns Hopkins plans consolidated between 2009 and 2015 to a single record-keeper or to a master administrator or lead record-keeper agreement.[140] Further, the presentation demonstrates that between 2009 and 2015 there were at least 108 colleges or universities that consolidated to a single recordkeeper and 49 recordkeeper consolidations with over $500 million in assets. Additionally, the Fidelity Master Recordkeeper presentation identifies California Institute of Technology, Purdue, Notre Dame, University of Rochester, Nevada System of Higher Education, Vanderbilt, Colorado and California State University as consolidating to a single recordkeeping agreement with TIAA or Fidelity despite previously having TIAA and Fidelity assets in their Plans.[141] █████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[138] Doc. 249-24, Ex. 112, Chittenden *Cunningham* Decl. ¶¶ 7-8.
[139] Doc. 249-24, Ex. 112, Chittenden *Cunningham* Decl. ¶ 27.
[140] Doc. 247-1, 2016 Fidelity Master Administrator Presentation ((CORNELL021851), at 9.
[141] *Id.*



.[143] In

[144] Plaintiffs dispute
the second sentence of paragraph 27. Whether a "significant percentage of 403(b) plan assets"
are in TIAA "legacy" contracts is not a material fact regarding whether the Cornell Defendants
breached their fiduciary duties by failing to ensure the participants in the Plans paid reasonable
fees and the Cornell Defendants' failure to monitor and retention of imprudent investment
options in the Plans. Moreover, the evidence cited by the Cornell Defendants do not support this
"fact." Paragraphs 5-6 of the Poehler report does not state anything about the percentage of
assets in TIAA "legacy" contracts, but relate to his experience advising 403(b) plans. [145]
Paragraph 43 of the Cornell Defendants' statement of material facts discusses the assets of a
single plan, Pepperdine, and does not even state that the percentage of Pepperdine's assets that
are in legacy contracts. Plaintiffs dispute sentence 3 of paragraph 27. The only evidence that the
Cornell Defendants cite in support of this "fact" is a declaration from TIAA executive Douglas
Chittenden. In contrast to Mr. Chittenden's declaration, he has previously testified under oath

---

[142] Ex. P28, August 16, 2011 Tower Watson Finalist Presentation (CORNELL015395) at 10.
[143] *Id.*
[144] Ex. P3, May 16, 2011 Hewitt ennisknupp Response to Request for Proposal (CORNELL024180), at 12, 17, 26.
[145] Doc. 246-4, Expert Report of Glenn Poehler, ¶¶5-6

that plan sponsors were able to map legacy assets in the CREF Money Market Account.[146] Both plan documents expressly provide "[t]he Employer in its sole discretion will designate from time to time the specific Funding Vehicles which are available as Plan investments. The Employer may change such designation at anytime."[147] The Plans used the Retirement Annuity ("RA"), Group Retirement Annuity ("GRA"), Supplement Retirement Annuity ("SRA") Group Retirement Supplement Annuity ("GRSA") contracts.[148] No provision of the RA, GRA, SRA, or GSRA contracts addresses transfers by plan sponsors, yet alone prohibits it.[149]  The RA and GSRA contracts expressly provide "[t]he contract is subject to the provisions, terms and conditions of the employer Plan. Any payment, distribution, transfer, or other rights exercised under the contract shall comply with any applicable terms, provisions, and conditions of the employer plan as determined by the plan administrator, trustee, or other plan designated fiduciary."[150] The RA and GRA contracts also expressly state that:



---

[146] Ex. P27, *Sacerdote v. New York University*, 16-cv-6284 (S.D.N.Y.), Tr. of Trial at 677:19–678:9; *see also id.* at 678:12-679:7. Mr. Chittenden's prior testimony from *Sacerdote* is admissible in this instance as a prior inconsistent statement under Federal Rule of Evidence 801(d)(1)(A).

[147] Doc. 250-4, 2008 CURP Plan Document (CORNELL015526), at 100; Doc. 250-6, 2008 TDA Plan Document (CORNELL015535), at 100.

[148] Doc. 247-7, Ex. 37, Dec. 31, 2009 Fee and Expense Disclosure for TDA Plan (TIAA_CORNELL_00002094) at 95 (listing RA, GRA, GSRA, SRA contracts); Ex. P29, Dec. 31, 2017 Fee and Expense Disclosure for TDA Plan (TIAA_CORNELL_00009808) at 09 (listing RA, GRA, GSRA, SRA and RCP contracts); Doc. 247-8, Ex. 38, Dec. 31, 2009 Fee and Expense Disclosure for CURP (TIAA_CORNELL_00011306) at 07 (listing RA and GRA contracts); Ex. P30, Dec. 31, 2017 Fee and Expense Disclosure for CURP (TIAA_CORNELL_00018669) at 70 (listing RA, GRA and RCP contracts).  The RCP contracts are used for the Plans' revenue credit account and not offered to Plan Participants. Ex. P31, CORNELL013913. Ex. P9, Gallagher Dep. at 364:24–365:10.

[149] *See, e.g.,* Ex. P32, PLTF-Cornell-000340; Ex. P33, PLTF-Cornell-000356.

[150] *See, e.g.,* Ex. P32, PLTF-Cornell-000340 at p. E1; Ex. P33, PLTF-Cornell000356at p. E1.

[151] *See, e.g.,* Ex. P34, GRA Contract (TIAA_CORNELL_00020571) at 598; Ex. P35, CREF Stock RA Certification (TIAA_CORNELL_00001451) at 1474; Ex. P36, TIAA_CORNELL_00001517, at 1535; Ex. P37, TIAA_CORNELL_00001481 at 1508.

The TIAA Annuity contracts also contain a provision stating it will administer the contract with all laws and regulations and if the contract conflicts with the law, the law or regulation prevails.[152] Thus, the terms of the RA, GRA, SRA, and GSRA contracts did not prevent plan sponsors from mapping or transferring the assets in such annuities to other investments. Plaintiffs dispute the fourth sentence of paragraph 27. The cited record evidence does not provide that "many firms, such as Fidelity, do not permit other firms to offer and provide recordkeeping services for their investment options." Rather, the Declaration from Douglas Chittenden provides "[t]o date, TIAA and Fidelity have not entered into an agreement that would permit TIAA to directly recordkeep Fidelity's mutual funds or Fidelity to directly recordkeep TIAA's mutual funds." ██████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████ ████████████████████

███████████████████████████████████████████

██████.[154] The Fidelity Master Recordkeeper Presentation demonstrates numerous higher education institutions using both TIAA and Fidelity consolidated or moved to a master administrator recordkeeping arrangement between 2009 and 2015.[155] Plaintiffs dispute the fifth sentence of paragraph 28. The Cornell Defendants fail to cite to any record evidence that support this "fact." Moreover, it is disputed for all of the reasons stated earlier in this response.

      28.      Under ERISA, plan sponsors are permitted to use plan assets to pay the costs incurred in connection with administering their plans, including the costs charged by outside

---

[152] *See, e.g.*, Ex. P36, TIAA_CORNELL_00001517 at 1534; Ex. P37, TIAA_CORNELL_00001481 at 1501, 1507; Ex. P35, TIAA_CORNELL_00001451 at 1471.
[153] Ex. P38, June 25, 2015 Email from P. Bursic to M. Opperman (CORNELL002493); Ex. P8, Bursic Tr.at 162:22-165:19.
[154] *Id.*
[155] Doc. 247-1, 2016 Fidelity Master Administrator Presentation ((CORNELL021851), at 9.

vendors that provide administrative services.  TIAA and Fidelity are compensated for the services they provide to the Plans through "revenue sharing" arrangements between them and the firms responsible for managing the Plans' investment options.[156]  Under such an arrangement, the investment managers charge investors asset-based fees at the fund level (i.e. the investments' "expense ratio") and then share a portion of those fees with TIAA or Fidelity.[157]  TIAA and Fidelity retain these fees as compensation for the administrative and recordkeeping services provided to the Plans.[158]

**RESPONSE:** The first sentence of Paragraph 28 is not a statement of fact but a description of law and thus is improper under Local Rule 56.1. Additionally, the first sentence is not supported by a citation to any record evidence. Plaintiffs do not dispute the remaining sentences of paragraph 28.

29.       In an asset-based or "revenue sharing" arrangement, the percentage of assets shared with the recordkeeper or allocated to administrative expenses is determined by the investment option offered.  One investment option may provide for 30 bps of revenue sharing whereas another investment option will provide for 10 bps.  Additionally, in some instances, an investment manager will introduce different "share classes" of the same investment option.  Each share class will have a different fee arrangement, and a potentially higher or lower revenue sharing component, but the same underlying investment portfolio and investment management team.  By adding and removing different investment options, and if available, different share

---

[156] Doc. 250-1, Ex. 1, Am. Compl. ¶ 127.
[157] Doc. 246-10, Ex. 28, 2016 TIAA "Making the Most of Your Retirement Plan" Presentation, at 11-16, 26-27 (CORNELL024582); Doc. 247-3, Ex. 33, 2011 Fidelity "Fee Disclosure and Higher Ed Trends" Presentation, at 19, 34 (CORNELL021716).
[158] Doc. 246-10, Ex. 28, 2016 TIAA "Making the Most of Your Retirement Plan" Presentation, at 11-16, 26-27 (CORNELL024582); Doc. 247-3, Ex. 33, 2011 Fidelity "Fee Disclosure and Higher Ed Trends" Presentation, at 19, 34 (CORNELL021716).

classes for those options, a plan can exercise some degree of control over the amount of revenue sharing collected by the recordkeeper.[159]

**RESPONSE:** Plaintiffs dispute paragraph 29. The sole piece of record evidence that the Cornell Defendants cite is the report of its expert, Glenn Poehler. An expert cannot be use as a conduit to establish facts. *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) ("a party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony.") (quoting *Malletier v. Dooney & Bourke, Inc.*, 525 F.Supp.2d 558, 666 (S.D.N.Y.2007)). Moreover, the paragraphs of Mr. Poehler's report do not support many of the "facts" in paragraph 29.

30.     Although TIAA and Fidelity recently began to offer alternative payment arrangements, such as "flat fee" or "per participant" arrangements, the asset-based revenue sharing model remains the industry standard, particularly among large 403(b) plans.  According to a recent survey by the Plan Sponsor Council of America, over 60% of 403(b) plans with more than 1,000 participants continue to rely on revenue-sharing to pay administrative expenses.[160] Patrick Warner, Fidelity's Managing Director responsible for the Cornell relationship, testified that as of 2011, none of his clients had entered into a flat fee recordkeeping arrangement and that today, over 90% of Fidelity's tax-exempt clients are in an asset based "bundled arrangement."[161] Warner testified that he did not believe Fidelity even offered flat fee arrangements as of 2011.[162] Likewise, TIAA's general business practice is to contract with plans using an asset based approach.[163]

---

[159] Doc. 246-4, Ex. 23, Poehler Rpt. ¶¶ 59-60.
[160] Doc. 246-4, Ex. 23, Poehler Rpt. ¶ 58, (*citing* Ex. 34, 2017 PSCA Fee Structure and Evaluation Survey in 403(b) Plans, at 7 *available at* https://www.psca.org/403b_2017_snapshot).
[161] Doc. 247-5, Ex. 35, Warner Dep. 102:6-104:14.
[162] Doc. 247-5, Ex. 35, Warner Dep. 103 :13-104 :14.
[163] Doc. 246-4, Ex. 23, Poehler Rpt. ¶ 58 (discussing various TIAA fee arrangements).

**RESPONSE:** Plaintiffs dispute the first sentence of paragraph 30. The Cornell Defendants do not cite any record evidence to support this fact and it is inappropriate under Rule 56.1. In fact, industry standard among experts has been to price recordkeeping and administrative services on a per-participant basis for years. As even the Cornell Defendants' expert on recordkeeping testified there are "economies of scale in providing recordkeeping and administrative services" based on the number of participants.[164]  Based on these economies of scale, generally plans with more participants pay a lower fee on a per-participant basis than plans with less participants.[165] Additionally, as the Cornell Defendants' recordkeeping expert admitted, the amount of assets in a plan are unrelated to the cost of providing recordkeeping services to a plan.[166] Based on these economies of scale and the fact that recordkeeping costs have nothing to do with asset size, the Cornell Defendants' recordkeeping expert advised clients in practice that they should negotiate a per-participant recordkeeping fee.[167] In practice, Mr. Poehler advised the asset based or "revenue approach" "allows vendors to widen profit margins more quickly through asset growth than would be possible by increasing revenues based on the increase in the number of participants."[168] Further, consistent with industry standards, Mr. Poehler advised "[h]ard dollar fees do not generally increase at the same rate as asset based fees since they are not tied to the growth in the market value of the plan's investments."[169] Because of this, Mr. Poehler ultimately concluded that "[f]rom a plan sponsor's governance perspective, hard-dollar, per participant fees are generally *more transparent* and *more accurately reflect the 'true' cost of*

---

[164] Ex. P2, Poehler Dep. at 51:23–52:7
[165] *Id.* at 52:18–53:5.
[166] Id. at 55:18–56:11.
[167] *See* Ex P39., Glenn Poehler and Lanae Pranger, ICCFO Conference 403(B) Plan, April 26, 2012 at p. 5; Ex. P2, Poehler Dep. at 88:7–89:4 (authenticating Ex. __),
[168] Ex P39, Glenn Poehler and Lanae Pranger, ICCFO Conference 403(B) Plan, April 26, 2012 at p. 5; Ex. P2, Poehler Dep. at 182:23–183:12
[169] Ex. P39, Glenn Poehler and Lanae Pranger, ICCFO Conference 403(B) Plan, April 26, 2012 at p. 5

*providing administration*."[170] Consistent with Mr. Poehler's own advice his colleagues at

Mercer also generally advised clients that best practice was to price recordkeeping and

administrative services on a per-participant rather than an asset basis because it is a better

method to control costs and asset-based fees build in artificial fee increases.[171] One of Mercer's

fiduciary best practices during Mr. Poehler's tenure was to "[p]rice administrative fees on a per-

participant basis."[172] Mr. Poehler's colleagues told Plan Sponsors to::

> *Negotiate a fixed-rate recordkeeping fee based on the number of participants* with
> account balances in the plan, that is independent of the investment structure (referred to
> as an 'open architecture' model). This approach unlike an 'asset-based' or 'bundled'
> model, provides fee transparency and affords fiduciaries a sound basis for documenting
> the 'reasonableness' of recordkeeping fees. Conversely, *utilizing a pricing model that is
> dependent on the market value of plan assets arbitrarily 'builds in' fee increases that
> are not linked to the level or quality of the recordkeepers services.*[173]

Plaintiffs' experts, Ty Minnich and Al Otto, both opine that industry standard practice is to price

or monitor recordkeeping and administrative fees on a per-participant basis.[174] Plaintiffs dispute

the second sentence of paragraph 30. The Cornell Defendants do not cite admissible evidence

supporting the purported fact in the second sentence of paragraph 30, but cite to a purported

2017 Plan Sponsor 403(b) Recordkeeping Survey that is hearsay and Cornell has not

authenticated. *See* Fed. R. Evid. 801, 802, 901. For the reasons stated in Plaintiffs' response to

the first sentence of paragraph 30, per-participant pricing has been the accepted practice by

industry experts for years. Plaintiffs dispute the third sentence of paragraph 30. While Mr.

Warner did testify that 90% of Fidelity's tax exempt clients had bundled fee arrangements, he

---

[170] Ex. P39, Glenn Poehler and Lanae Pranger, ICCFO Conference 403(B) Plan, April 26, 2012 at p. 5; Ex. P2, Poehler Dep. at 181:4–182:1 (testifying that he agreed with that statement).
[171] Ex. P2, Poehler Dep. at 169:20–170:4.
[172] Ex. P40, Amy Reynolds and Sabrina Bailey, DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance", Ex. P2, Poehler Dep. at 170:9–171:19, 173:4-22.
[173] Ex. P40, Amy Reynolds and Sabrina Bailey, DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance (emphasis added); Ex. P2, Poehler Dep. at 173:23–174:10.
[174] Doc. 249-20, Expert Report of Ty Minnich, ¶¶33–39; Doc. 249-19, Expert Report of Al Otto, ¶¶20–25. 41-43.

admitted that he does not "know the pricing of other clients outside [his] own book.[175] Plaintiffs dispute the fourth sentence of paragraph 30. Warner did not testify that he did not believe Fidelity offered flat fee arrangements in 2011, Warner testified that "I honestly don't know the exact date when -- when -- when our -- when fixed pricing became available' but "[i]t was in the las – it was at least five years ago" if not more.[176] As discussed above and incorporated herein, standard practice among industry experts has been to price recordkeeping and administrative fees on a per-participant basis for years. Plaintiffs dispute the fifth sentence of paragraph 30. Whether it was TIAA's standard business practice to price recordkeeping fees on an asset basis is not material to whether the Cornell Defendants breached their fiduciary duty by failing to ensure the fees were reasonable. It is not surprising that TIAA's standard practice was to price on an asset basis given that Cornell Defendants' own expert testified an asset-based fee "allows vendors to widen profit margins more quickly through asset growth than would be possible by increasing revenues based on the increase in the number of participants."[177]

31.     Prior to 2010, plan sponsors had very little bargaining power and were unable to practically negotiate the administrative fees paid by the plans to recordkeepers.[178]  In late 2010, however, 403(b) plan recordkeepers began to compete based on price by offering plans "revenue credit accounts," which enabled them to refund revenue above a certain negotiated rate, and "institutional" or "premier" share classes, which were special investment classes with lower administrative expense ratios.[179]  Prior to 2010, few plans, if any, were offered either revenue credit accounts or institutional class shares.

---

[175] Doc. 247-5, Warner Dep., at 102:23 –103:6.
[176] Doc. 247-5, Warner Dep,, at 103:13-19.
[177] Ex. P39, Glenn Poehler and Lanae Pranger, ICCFO Conference 403(B) Plan, April 26, 2012 at p. 5; Ex. P2, Poehler Dep. at 182:23–183:12.
[178] Doc 250-16, Ex. 16, Bursic Decl. ¶¶ 6-7.
[179] Doc. 246-4, Ex. 23, Chittenden *Cunningham* Decl. ¶ 23 (noting that as of December 31, 2009, just "three TIAA clients" out of the 15,000 plan sponsors it serves had transitioned to either Premier or Institutional class shares).

**RESPONSE:** Plaintiffs dispute the first sentence of paragraph 31. Contrary to his declaration that the Cornell Defendants cite, Bursic repeatedly testified at his deposition that prior to the retention of CAPTRUST in December 2011, the Cornell Defendants were not aware what the Plans were paying for recordkeeping and administrative services, the Cornell Defendants did not know how to determine the recordkeeping and administrative fees the Plans were paying, and the Cornell Defendants made no attempt to benchmark or even negotiate their recordkeeping and administrative fees with TIAA or Fidelity prior to the retention of CAPTRUST.[180] Moreover, the Cornell Defendants' own expert testified that he negotiated recordkeeping and administrative fees for plan sponsors, including institutes of higher education,

---

[180] Ex. P8, Bursic Tr. at 92:7-17 ("Q. So the fees are charged as a percentage of the assets held by the participants? A. We've been through this before. The fees used to be kind of covered. *We really couldn't see what they were, so the best way of saying it was that it was a percentage of the assets held in the plan. When CAPTRUST came, by that time things had evolved that CAPTRUST was able to pull the veil off of that and make the vendors state what their costs were for all the different things that they did and how that added up, so what they really needed to cover.*") emphasis added); *id.* at 92:21–95:14 ("Q. What did CAPTRUST pull the veil off of then? A. Let me restate what I said. Prior to CAPTRUST being there, the vendors were very reluctant to release any information whatsoever about the various things that went into the sum of the investment advisory fee or expense ratio or whatever you want to call it. They all called it different things and according to what the subject was they called it different things. That doesn't mean that we didn't know what it was. *We knew what the total was. It was there. We've asked them to report it. Remember the vendor performance summary. We always asked for the expense ratio. That's the same thing. So the expense ratio was there. We knew what it was. What I said, and I'll say it again, is that we couldn't see the detail because the companies refused to let us. CAPTRUST though had the ability to come in, lift that veil and say, okay, TIAA-CREF and Fidelity in our case, what's all this about? Tell me what it really costs to do all of these things because we're here to make sure that we're doing the best job for Cornell and getting the lowest possible fees.* They lifted that cover, my metaphor. I'm sorry if it confused you. We lifted the cover and they looked at it and we were able to get much closer to the actual accounting of the costs of the plan and that's the value that RPOC set up by getting CAPTRUST or if we had picked any of the other companies, they were all doing it at that point. Our peers let us know that they were all sitting down with TIAA-CREF, Fidelity, T. Rowe Price, Vanguard, everybody, whatever your group of vendors were, they were all doing it and the vendors were forced by market forces to lift that veil and give us an opportunity to look at it. *So did we know what the expense ratio was before? Of course. Did we know more about the constituent elements of that? Yes, after the veil was lifted and we were able to get in there and the vendor started to cooperate with us. Q. Okay. So you're saying you understood the expense ratio but not the underlying components of the expense ratio? A. We were prohibited from finding out. They wouldn't give it to us.*") (emphasis added); *id.* at 99:2-102:1 (" . . . You keep coming back to this because I know you've got an agenda around this, and I'm going to have to keep answering you the same way over and over again. We're not splitting out record-keeping fees because it is intimately tied, like your right arm and your left arm. It's tied to the middle. And the middle is important. It's the entire slate of services that happen with this. If you want to talk about splitting out record-keeping fees, you've already done it. Stop asking questions about it because I keep giving you the same answer over and over again. The fee is the fee. *We didn't know what it was before. CAPTRUST came in; they discovered what the fee is.* They made it as low as possible for all of the categories, including record keeping, bundle it back up . . .") (emphasis added).



for decades prior to 2010.[181] █████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████9.[182]

Plaintiffs dispute the second sentence of paragraph 31. The cited evidence, the Declaration of

Douglass Chittenden, does not speak to all 403(b) plan recordkepers but only TIAA.[183]

███████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████.[184]█████

█████████████████████████████████████████████████████████

████████████████████████████████████████████9.[185] Moreover, the Cornell

Defendants' own expert testified that he negotiated recordkeeping and administrative fees for

plan sponsors, including institutes of higher education, for decades prior to 2010.[186] Plaintiffs

dispute the third sentence of paragraph 31. The Cornell Defendants cite no record evidence to

support this fact.

     32.     Section 403(b) plans are similar to 401(k) plans in the type of recordkeeping

services required, but the cost of providing these administrative services is typically higher in the

case of the former.[187] The higher administrative costs associated with 403(b) plans is related in

part to the type of investments held by 401(k) and 403(b) plans. Annuities, which make up a

larger percentage of 403(b) plan assets than 401(k) assets, are more complicated to administer

than mutual funds, and are therefore more costly.[188]

---

[181] Ex. P2, Poehler Dep., at 30:17-34:20.
[182] Doc. 249-24, Declaration of Douglas Chittenden, ¶¶17(" ████████████████████████████
████████.")
[183] Doc. 249-24 ¶23 (discussing how many TIAA clients had Premier or Institutional class shares).
[184] *Id.*
[185] Doc. 249-24, Declaration of Douglas Chittenden, ¶¶17(" █████████████████████████
████████")
[186] Ex. P2, Poehler Dep., at 30:17-34:20.
[187] Doc. 246-4, Ex. 23, Poehler Rpt. ¶ 35.
[188] Doc. 246-11, Ex. 29, Polacek Dep. 123:3-125:23; Doc. 246-4, Ex. 23, Poehler Rep. ¶ 35.

**RESPONSE:** Plaintiffs dispute the first sentence of paragraph 32. Plaintiffs do not dispute that 403(b) plans are similar to 401(k) plans in the type of recordkeeping services required. Plaintiffs dispute that the cost of providing the recordkeeping and administrative fees to 403(b) plans is "typically higher." The sole source of evidence the Cornell Defendants cite for this fact is the Expert Report of Glenn Poehler.  Mr. Poehler does not state that recordkeeping 403(b) plans is more expensive than 401(k) plans, but that "annuities are more difficult to recordkeep than mutual funds and separate account . . . resulting in relatively higher recordkeeping expenses for 403(b) plans."[189] However, Mr. Poehler testified in his deposition that he had never recordkept a fixed annuity and had no personal knowledge on the cost of recordkeeping a fixed annuity.[190] ████████████████████████████████████

████████████████████████████████.[191] ███████████████████████████████████

█████████████████████████████████████████████████████████████████████

████████████████████████████████.[192] ██████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████.[193] Moreover, TIAA collected more in total fees for its variable annuity options than the TIAA Traditional.[194] If it were truly more expense to recordkeep a fixed annuity, one would expect it to have the highest plan expense ratio, not the lowest. Finally, Ty Minnich, who worked as an executive in the recordkeeping divisions of Transamerica, Metlife, and CitiStreet, opined that in his experience it

---

[189] Doc. 246-4, Expert Report of Glenn Poehler, ¶35
[190] Ex. P2, Poehler Dep., at 185:20-22.
[191] Ex. P25, Polacek Dep. at 167:20-23
[192] Ex.P26, 2011 TIAA Service & Fee Disclosure Package for Plan Fiduciaries (TIAA_CORNELL_00012726) at 726-727 (plan service expense column).
[193] *Id.*
[194] *Id.*

is no more costly to recordkeep an annuity than a mutual fund.[195] Plaintiffs dispute the second

and third sentence of paragraph 32. For the reasons stated in the Plaintiffs' response to the first

sentence, it is no more costly to recordkeep a fixed annuity than a mutual fund.

33.    At all relevant times, Defendants monitored the recordkeeping arrangements

between Cornell and the Plans' recordkeepers.

**RESPONSE:** Plaintiffs dispute paragraph 33. The Cornell Defendants cite no record

evidence to support this fact so it is improper under Rule 56.1. Moreover, as discussed below, the

record evidence demonstrates that the Cornell Defendants did nothing to monitor recordkeeping

and administrative fees prior to 2012 and followed an inadequate process thereafter.[196]

34.    Prior to the creation of RPOC and the retention of CAPTRUST in 2011,

Cornell's Benefits Services department assumed primary responsibility for monitoring the

arrangements with TIAA and Fidelity. Throughout this period, Benefits Services closely

monitored the recordkeeping arrangements, including the amount of revenue sharing collected by

TIAA and Fidelity.[197]

**RESPONSE:** Plaintiffs dispute the first sentence of paragraph 34. The Cornell

Defendants cite no record evidence to support this fact, so it is improper under Rule 56.1.

Moreover, the record evidence demonstrates that while Benefit Services may have been

responsible for monitoring the fees, they did not even know how much the Plans paid for

recordkeeping and administrative fees prior to 2012. [198] Plaintiffs dispute the second sentence of

---

[195] Doc. 246-19, Minnich Report, ¶132.
[196] *See infra* ¶¶162-165.
[197] Doc. 250-16, Ex. 16, Bursic Decl. ¶ 5; Ex. 112, TIAA Decl. ¶ 26.
[198] Ex. P8, Bursic Tr.at 92:7-17 ("Q. So the fees are charged as a percentage of the assets held by the participants?
A. We've been through this before. The fees used to be kind of covered. *We really couldn't see what they were, so
the best way of saying it was that it was a percentage of the assets held in the plan. When CAPTRUST came, by that
time things had evolved that CAPTRUST was able to pull the veil off of that and make the vendors state what their
costs were for all the different things that they did and how that added up, so what they really needed to cover.*")
(emphasis added); *id.* at 93:21–95:14 ("Q. What did CAPTRUST pull the veil off of then? A. Let me restate what I

paragraph 34. The only evidence that the Cornell Defendants cite to support this statement is a

declaration from Bursic.[199] Contrary to his declaration, Bursic repeatedly testified that Benefits

Services could not determine what the recordkeeping and administrative fees were prior to the

retention of CAPTRUST. [200] Moreover, any review Bursic did conduct would have pertained to

_____

said. Prior to CAPTRUST being there, the vendors were very reluctant to release any information whatsoever about the various things that went into the sum of the investment advisory fee or expense ratio or whatever you want to call it. They all called it different things and according to what the subject was they called it different things. That doesn't mean that we didn't know what it was. *We knew what the total was. It was there. We've asked them to report it. Remember the vendor performance summary. We always asked for the expense ratio. That's the same thing. So the expense ratio was there. We knew what it was. What I said, and I'll say it again, is that we couldn't see the detail because the companies refused to let us. CAPTRUST though had the ability to come in, lift that veil and say, okay, TIAA-CREF and Fidelity in our case, what's all this about? Tell me what it really costs to do all of these things because we're here to make sure that we're doing the best job for Cornell and getting the lowest possible fees.* They lifted that cover, my metaphor. I'm sorry if it confused you. We lifted the cover and they looked at it and we were able to get much closer to the actual accounting of the costs of the plan and that's the value that RPOC set up by getting CAPTRUST or if we had picked any of the other companies, they were all doing it at that point. Our peers let us know that they were all sitting down with TIAA-CREF, Fidelity, T. Rowe Price, Vanguard, everybody, whatever your group of vendors were, they were all doing it and the vendors were forced by market forces to lift that veil and give us an opportunity to look at it. *So did we know what the expense ratio was before? Of course. Did we know more about the constituent elements of that? Yes, after the veil was lifted and we were able to get in there and the vendor started to cooperate with us. Q. Okay. So you're saying you understood the expense ratio but not the underlying components of the expense ratio? A. We were prohibited from finding out. They wouldn't give it to us.*") (emphasis added); *id.* at 100:10-102:1 ("You keep coming back to this because I know you've got an agenda around this, and I'm going to have to keep answering you the same way over and over again. We're not splitting out record-keeping fees because it is intimately tied, like your right arm and your left arm. It's tied to the middle. And the middle is important. It's the entire slate of services that happen with this. If you want to talk about splitting out record-keeping fees, you've already done it. Stop asking questions about it because I keep giving you the same answer over and over again. The fee is the fee. *We didn't know what it was before. CAPTRUST came in; they discovered what the fee is.* They made it as low as possible for all of the categories, including record keeping, bundle it back up . . .") (emphasis added).

[199] The Cornell Defendants also cite the declaration of Douglas Chittenden but the cited portion merely provides that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Doc. 249-24, Declaration of D. Chittenden, ¶24.

[200] Ex. P8, Bursic Tr. at 92:7-17 ("Q. So the fees are charged as a percentage of the assets held by the participants? A. We've been through this before. The fees used to be kind of covered. *We really couldn't see what they were, so the best way of saying it was that it was a percentage of the assets held in the plan. When CAPTRUST came, by that time things had evolved that CAPTRUST was able to pull the veil off of that and make the vendors state what their costs were for all the different things that they did and how that added up, so what they really needed to cover.*") emphasis added); *id.* at 92:21–95:14 ("Q. What did CAPTRUST pull the veil off of then? A. Let me restate what I said. Prior to CAPTRUST being there, the vendors were very reluctant to release any information whatsoever about the various things that went into the sum of the investment advisory fee or expense ratio or whatever you want to call it. They all called it different things and according to what the subject was they called it different things. That doesn't mean that we didn't know what it was. *We knew what the total was. It was there. We've asked them to report it. Remember the vendor performance summary. We always asked for the expense ratio. That's the same thing. So the expense ratio was there. We knew what it was. What I said, and I'll say it again, is that we couldn't see the detail because the companies refused to let us. CAPTRUST though had the ability to come in, lift that veil and say, okay, TIAA-CREF and Fidelity in our case, what's all this about? Tell me what it really costs to do all of these things because we're here to make sure that we're doing the best job for Cornell and getting the lowest possible fees.* They

the total expense ratio for the fund and not for the recordkeeping and administrative fees because Bursic believed it was "imprudent" to review or analyze recordkeeping and administrative fees alone.[201] In contrast to Bursic's practices, the Department of Labor and all the proffered recordkeeping experts, including the Cornell Defendants' expert, agree that recordkeeping and administrative fees need to be evaluated unbundled from the other services offered to a plan.[202]

35.     Prior to 2010, higher education plan sponsors were limited in their ability to accurately benchmark the administrative fee portion of the fees paid by participants.[203]  Robust

---

[201] lifted that cover, my metaphor. I'm sorry if it confused you. We lifted the cover and they looked at it and we were able to get much closer to the actual accounting of the costs of the plan and that's the value that RPOC set up by getting CAPTRUST or if we had picked any of the other companies, they were all doing it at that point. Our peers let us know that they were all sitting down with TIAA-CREF, Fidelity, T. Rowe Price, Vanguard, everybody, whatever your group of vendors were, they were all doing it and the vendors were forced by market forces to lift that veil and give us an opportunity to look at it. *So did we know what the expense ratio was before? Of course. Did we know more about the constituent elements of that? Yes, after the veil was lifted and we were able to get in there and the vendor started to cooperate with us. Q. Okay. So you're saying you understood the expense ratio but not the underlying components of the expense ratio? A. We were prohibited from finding out. They wouldn't give it to us.*") (emphasis added) id. at 99:2-102:1 (" . . . You keep coming back to this because I know you've got an agenda around this, and I'm going to have to keep answering you the same way over and over again. We're not splitting out record-keeping fees because it is intimately tied, like your right arm and your left arm. It's tied to the middle. And the middle is important. It's the entire slate of services that happen with this. If you want to talk about splitting out record-keeping fees, you've already done it. Stop asking questions about it because I keep giving you the same answer over and over again. The fee is the fee. *We didn't know what it was before. CAPTRUST came in; they discovered what the fee is.* They made it as low as possible for all of the categories, including record keeping, bundle it back up . . .") (emphasis added).

[201] Ex. P8, Bursic Dep., at 99:21–102:1 ("You keep coming back to this because I know you've got an agenda around this, and I'm going to have to keep answering you the same way over and over again. *We're not splitting out record-keeping fees because it is intimately tied, like your right arm and your left arm*. It's tied to the middle. And the middle is important. It's the entire slate of services that happen with this. If you want to talk about splitting out record-keeping fees, you've already done it. Stop asking questions about it because I keep giving you the same answer over and over again. The fee is the fee. We didn't know what it was before. CAPTRUST came in; they discovered what the fee is. They made it as low as possible for all of the categories, including record keeping, bundle it back up."), 44:7-20 "Q. During your time at Cornell has Cornell ever done an RFP for record-keeping services? A. That is a very difficult approach and I will say, no, we did not, and there's a lot of reasons for that. Record-keeping services only, separated from the fund parent and from the services that are provided by the fund parent is not something that we would do. *It would not be prudent to issue an RFP, asking some company to do a specific task that's much more efficiently and effective -- accurately delivered as a bundle of services. So your specific question was on record-keeping services only? Frankly, I think that would be a crazy idea*.") (emphasis added).

[202] Ex. P41, DOL Advisory Op. 2013-03A, (July 3, 2013); Ex. P42., DOL Adv. Op. 97-15A (May 22, 1997); Ex. P43, DOL Adv. Op. 97-16A (May 22, 1997); Ex. P44, DOL Adv. Op. 97-19A (Aug. 28, 1997); Doc. 249-20, Expert Report of Ty Minnich, ¶127; Doc. 249-19, Expert Report of Al Otto, ¶¶ 35-36; Ex. P2, Poehler Dep., at 91:8–92:11, 174:11-23.

[203] Doc. 246-4, Ex. 23, Poehler Rpt. ¶ 79.

benchmarking databases containing complete and accurate data on the administrative fees paid by 403(b) plans did not exist,[204] and while Benefits Services collaborated with its counterparts at peer institutions on plan administration issues, higher education institutions were unwilling or unable to freely share fee information.[205]

 **RESPONSE:** Plaintiffs dispute the first sentence of paragraph 35. The cited record evidence does not provide that "[p]rior to 2010, higher education plan sponsors were limited in their ability to accurately benchmark the administrative fee portion of the fees paid by participants."[206] Rather, Mr. Poehler's Report states "prior to 2010, few plan fiduciaries were attempting to engage TIAA directly in fee negotiation."[207] However, even Mr. Poehler testified that he negotiated recordkeeping and administrative fees for plan sponsors, including higher education 403(b) plans, for decades prior to 2010.[208] Plaintiffs dispute the second sentence of paragraph 35. The Cornell Defendants' own expert, Mr. Poehler, admitted he conducted RFPs and RFIs for plan sponsors, including higher education 403(b) plans, to benchmark or assess the reasonableness of their recordkeeping and administrative fees for decades prior to 2010.[209]

 36. However, throughout the time period at issue, Benefits Services received annual reports from the Plans' recordkeepers that disclosed the administrative fees charged for each investment and the revenue sharing amounts collected.[210]  Benefits Services identified any

---

[204] Doc. 247-6, Ex. 36, Strodel Dep. 226:17-23 (noting that higher education institutions did not begin retaining consultants until 2012 so there were few data points and benchmarking databases available).
[205] Doc. 248-1, Ex. 41, Bursic Tr.51:15-52:21 (explaining proprietary nature of fee information and potential anti-trust concerns).
[206] Doc. 246-4, Expert Report of Glenn Poehler, ¶79.
[207] *Id.*
[208] Ex. P2, Poehler Dep., at 30:09-35:5.
[209] *Id.*
[210] Doc. 250-16, Ex. 16, Bursic Decl. ¶ 5;  Doc. 249-24, Ex. 112, Chittenden *Cunningham* Decl. ¶ 26; Doc. 247-8, Ex. 38, 2009 CURP TIAA Investment Fee & Expense Disclosure (TIAA_CORNELL_00011306); Doc. 247-7, Ex. 37, 2009 TDA Plan TIAA Investment Fee & Expense Disclosure (TIAA_CORNELL_00004094); Doc. 247-3, Ex. 33, 2011 Fidelity "Fee Disclosure and Higher Ed Trends" Presentation, at 19, 34 (CORNELL021716).

year-to-year changes in these fees as part of their regular due diligence on behalf of plan participants.[211]

  **RESPONSE:** Plaintiffs do not dispute the first sentence of paragraph 36. Plaintiffs dispute the second sentence of paragraph 36. The only record evidence cited in support of this statement is a declaration from Bursic. Contrary to his declaration, Bursic repeatedly testified at his deposition that Benefits Services could not determine what the recordkeeping and administrative fees were prior to the retention of CAPTRUST. [212] Moreover, any review Bursic did conduct would have been as to the total expense ratio for the fund and not for the recordkeeping and administrative fees because Bursic believed it was "imprudent" to review or

---

[211] Doc. 250-16, Ex. 16, Bursic Decl. ¶¶ 5-6.

[212] Ex. P8, Bursic Tr.at 92:7-17 ("Q. So the fees are charged as a percentage of the assets held by the participants? A. We've been through this before. The fees used to be kind of covered. *We really couldn't see what they were, so the best way of saying it was that it was a percentage of the assets held in the plan. When CAPTRUST came, by that time things had evolved that CAPTRUST was able to pull the veil off of that and make the vendors state what their costs were for all the different things that they did and how that added up, so what they really needed to cover.*") emphasis added); *id.* at 92:21–95:14 ("Q. What did CAPTRUST pull the veil off of then? A. Let me restate what I said. Prior to CAPTRUST being there, the vendors were very reluctant to release any information whatsoever about the various things that went into the sum of the investment advisory fee or expense ratio or whatever you want to call it. They all called it different things and according to what the subject was they called it different things. That doesn't mean that we didn't know what it was. *We knew what the total was. It was there. We've asked them to report it. Remember the vendor performance summary. We always asked for the expense ratio. That's the same thing. So the expense ratio was there. We knew what it was. What I said, and I'll say it again, is that we couldn't see the detail because the companies refused to let us. CAPTRUST though had the ability to come in, lift that veil and say, okay, TIAA-CREF and Fidelity in our case, what's all this about? Tell me what it really costs to do all of these things because we're here to make sure that we're doing the best job for Cornell and getting the lowest possible fees.* They lifted that cover, my metaphor. I'm sorry if it confused you. We lifted the cover and they looked at it and we were able to get much closer to the actual accounting of the costs of the plan and that's the value that RPOC set up by getting CAPTRUST or if we had picked any of the other companies, they were all doing it at that point. Our peers let us know that they were all sitting down with TIAA-CREF, Fidelity, T. Rowe Price, Vanguard, everybody, whatever your group of vendors were, they were all doing it and the vendors were forced by market forces to lift that veil and give us an opportunity to look at it. *So did we know what the expense ratio was before? Of course. Did we know more about the constituent elements of that? Yes, after the veil was lifted and we were able to get in there and the vendor started to cooperate with us. Q. Okay. So you're saying you understood the expense ratio but not the underlying components of the expense ratio? A. We were prohibited from finding out. They wouldn't give it to us.*") (emphasis added); *id.* at 99:2-102:1 (" . . . You keep coming back to this because I know you've got an agenda around this, and I'm going to have to keep answering you the same way over and over again. We're not splitting out record-keeping fees because it is intimately tied, like your right arm and your left arm. It's tied to the middle. And the middle is important. It's the entire slate of services that happen with this. If you want to talk about splitting out record-keeping fees, you've already done it. Stop asking questions about it because I keep giving you the same answer over and over again. The fee is the fee. *We didn't know what it was before. CAPTRUST came in; they discovered what the fee is.* They made it as low as possible for all of the categories, including record keeping, bundle it back up . . .") (emphasis added).

analyze recordkeeping and administrative fees alone.[213] In contrast to Bursic's practices, the Department of Labor and all the proffered recordkeeping experts, including the Cornell Defendants' expert, agree that recordkeeping and administrative fees need to be evaluated unbundled from the other services offered to a plan.[214]

      37.      Benefits Services also attempted to leverage the size of the Plans to negotiate lower administrative fees prior to the formation of RPOC, but TIAA and Fidelity did not fully transition to so-called "plan based economics" until approximately 2009-2010.[215]  As Bursic noted at his deposition, he lobbied TIAA for discounts on multiple occasions, but was told "very clearly and very firmly that TIAA offers the same price to everybody because all of their participants are valuable to them and they want to treat everyone the same[.]"[216]

      **RESPONSE:** Plaintiffs dispute the first sentence of paragraph 37. First, none of the cited documents say anything about when Fidelity transitioned to "plan-based economics."[217] Second,

---

[213] Ex. P8, Bursic Dep., at 99:21–102:1 ("You keep coming back to this because I know you've got an agenda around this, and I'm going to have to keep answering you the same way over and over again. *We're not splitting out record-keeping fees because it is intimately tied, like your right arm and your leftarm.* It's tied to the middle. And the middle is important. It's the entire slate of services that happen with this. If you want to talk about splitting out record-keeping fees, you've already done it. Stop asking questions about it because I keep giving you the same answer over and over again. The fee is the fee. We didn't know what it was before. CAPTRUST came in; they discovered what the fee is. They made it as low as possible for all of the categories, including record keeping, bundle it back up."), *id.* at 44:7-20 ("Q. During your time at Cornell has Cornell ever done an RFP for record-keeping services? A. That is a very difficult approach and I will say, no, we did not, and there's a lot of reasons for that. Record-keeping services only, separated from the fund parent and from the services that are provided by the fund parent is not something that we would do. *It would not be prudent to issue an RFP, asking some company to do a specific task that's much more efficiently and effective -- accurately delivered as a bundle of services. So your specific question was on record-keeping services only? Frankly, I think that would be a crazy idea.*") (emphasis added).

[214] Ex. P41, DOL Advisory Op. 2013-03A, at 4 (July 3, 2013); Ex. P42., DOL Adv. Op. 97-15A (May 22, 1997); Ex. P43, DOL Adv. Op. 97-16A (May 22, 1997); Ex. P44, DOL Adv. Op. 97-19A (Aug. 28, 1997); Doc. 249-20, Expert Report of Ty Minnich, ¶127; Doc. 249-19, Expert Report of Al Otto, ¶¶ 35-36; Ex. P2, Poehler Dep., at 91:8–92:11, 174:11-23.

[215] Doc. 247-9, Ex. 39, 2014 CREF Multi-Class Structure Presentation, at 8 (CORNELL023646) (noting that "[r]egulatory and legislative changes . . .triggered TIAA-CREF's evolution toward plan-based economics several years ago"); Doc. 250-16, Ex. 16,  Bursic Decl. ¶ 7;  Doc. 248-1, Ex. 41, Bursic Tr.at 36:20-38:2 (describing unsuccessful efforts to obtain plan-based pricing prior to 2010 and TIAA's refusal to provide certain plans, regardless of size, discounts not afforded to other TIAA clients); Doc. 249-24, Ex. 112, Chittenden *Cunningham* Decl. ¶¶  17, 22-23.

[216] Doc. 248-1, Ex. 41, Bursic Tr.36:6-37:14.

[217] Doc. 232, n.71 (citing sources that only discuss TIAA).

one of the sources the Cornell Defendants cite, the Chittenden Declaration, explicitly states that

TIAA began negotiating recordkeeping prices with individual clients in 2009 if not earlier.[218]

The paragraphs of Mr. Chittenden's declaration cited by the Cornell Defendants relate to how

many higher education clients used Premier and Institutional share classes in 2010 and states

nothing of when TIAA began negotiating recordkeeping and administrative fees.[219] Moreover,

the Cornell Defendants' own expert testified that he negotiated recordkeeping and administrative

fees for plan sponsors, including institutes of higher education, for decades prior to 2010.[220]

Plaintiffs dispute the second sentence of paragraph 37. The portions of Bursic's testimony cited

by the Cornell Defendants do not relate to negotiating recordkeeping and administrative fees but

rather requesting share classes for TIAA-CREF annuities.[221] Moreover, Plaintiffs incorporate

their response to sentence 1 of paragraph 37, which demonstrates that plan sponsors negotiated

recordkeeping and administrative long prior to 2010.

38.     Since Benefits Services was limited in its ability to control administrative fees

prior to 2010, Benefits Services demanded that the recordkeepers provide additional services

commensurate with the amount they were earning in fees. These additional services included the

creation of a customized call center for Cornell participants and the creation of a local office in

Ithaca at the request of Benefits Services.[222] Benefits Services also took steps to eliminate

individual service fees charged in addition to the asset-based fees.[223]

**RESPONSE:** Plaintiffs dispute the first sentence of paragraph 38. The Cornell

Defendants do not cite any record evidence to support that fact, so it is improper under Rule

---

[218] Doc. 294-24, Declaration of D. Chittenden, ¶17.

[219] *Id.* ¶¶22-23.

[220] Ex. P2, Poehler Dep., at 30:17-34:20.

[221] Doc. 248-1, Bursic Dep., at 36:20-22 ("I personally lobbied the president of TIAA on a couple of occasions, asking for a break in *share values* . . .") (emphasis added)

[222] Doc. 250-16, Ex. 16, Bursic Decl. ¶ 6.

[223] Doc. 250-16, Ex. 16, Bursic Decl. ¶ 6.

56.1. Moreover, the declaration of TIAA executive, Douglas Chittenden, explicitly states that

TIAA began negotiating recordkeeping prices with individual clients in 2009 if not earlier.[224]

Moreover, the Cornell Defendants' own expert testified that he negotiated recordkeeping and

administrative fees for plan sponsors, including institutes of higher education, for decades prior

to 2010.[225] Plaintiffs do not dispute that TIAA provided the services detailed in second and third

sentence of paragraph 38. Plaintiffs dispute that Cornell negotiated these services in an attempt

to control or make sure the recordkeeping and administrative fees paid were reasonable. Contrary

to Bursic's declaration (the sole source the Cornell Defendants cite to support this paragraph)

Bursic repeatedly testified at his deposition that Benefits Services could not determine what the

recordkeeping and administrative fees were prior to the retention of CAPTRUST.[226] Moreover,

---

[224] Doc. 294-24, Declaration of D. Chittenden, ¶17.

[225] Ex. P2, Poehler Dep., at 30:09-35:5.

[226] Ex. P8, Bursic Tr.at 92:7-17 ("Q. So the fees are charged as a percentage of the assets held by the participants? A. We've been through this before. The fees used to be kind of covered. *We really couldn't see what they were, so the best way of saying it was that it was a percentage of the assets held in the plan. When CAPTRUST came, by that time things had evolved that CAPTRUST was able to pull the veil off of that and make the vendors state what their costs were for all the different things that they did and how that added up, so what they really needed to cover.*") emphasis added); *id.* at 92:21–95:14 ("Q. What did CAPTRUST pull the veil off of then? A. Let me restate what I said. Prior to CAPTRUST being there, the vendors were very reluctant to release any information whatsoever about the various things that went into the sum of the investment advisory fee or expense ratio or whatever you want to call it. They all called it different things and according to what the subject was they called it different things. That doesn't mean that we didn't know what it was. *We knew what the total was. It was there. We've asked them to report it. Remember the vendor performance summary. We always asked for the expense ratio. That's the same thing. So the expense ratio was there. We knew what it was. What I said, and I'll say it again, is that we couldn't see the detail because the companies refused to let us. CAPTRUST though had the ability to come in, lift that veil and say, okay, TIAA-CREF and Fidelity in our case, what's all this about? Tell me what it really costs to do all of these things because we're here to make sure that we're doing the best job for Cornell and getting the lowest possible fees.* They lifted that cover, my metaphor. I'm sorry if it confused you. We lifted the cover and they looked at it and we were able to get much closer to the actual accounting of the costs of the plan and that's the value that RPOC set up by getting CAPTRUST or if we had picked any of the other companies, they were all doing it at that point. Our peers let us know that they were all sitting down with TIAA-CREF, Fidelity, T. Rowe Price, Vanguard, everybody, whatever your group of vendors were, they were all doing it and the vendors were forced by market forces to lift that veil and give us an opportunity to look at it. *So did we know what the expense ratio was before? Of course. Did we know more about the constituent elements of that? Yes, after the veil was lifted and we were able to get in there and the vendor started to cooperate with us. Q. Okay. So you're saying you understood the expense ratio but not the underlying components of the expense ratio? A. We were prohibited from finding out. They wouldn't give it to us.*") (emphasis added); *id.* at 99:2-102:1 (" . . . You keep coming back to this because I know you've got an agenda around this, and I'm going to have to keep answering you the same way over and over again. We're not splitting out record-keeping fees because it is intimately tied, like your right arm and your left arm. It's tied to the middle. And the middle is important. It's the entire slate of services that happen with this. If you want to talk about splitting out record-keeping fees, you've already done it. Stop asking questions about it because I keep giving you the same

any review Bursic did conduct would have pertained to the total expense ratio for the fund and

not for the recordkeeping and administrative fees because Bursic believed it was "imprudent" to

review or analyze recordkeeping and administrative fees alone.[227] In contrast to Bursic's

practices, the Department of Labor and all the proffered recordkeeping experts, including the

Cornell Defendants' expert, agree that recordkeeping and administrative fees need to be

evaluated unbundled from the other services offered to a plan.[228]

    39.      After RPOC was formed, Cornell and Benefits Services identified reviewing

the vendor arrangement and recordkeeping fees as a primary focus.  At RPOC's first meeting in

November 2011, the committee noted that Cornell's peers were in the process of reviewing their

recordkeeping arrangements; RPOC also noted that some higher education plan sponsors, such

as Johns Hopkins' University, had retained consultants to assist them with evaluating potentially

consolidating recordkeepers.[229]

---

answer over and over again. The fee is the fee. *We didn't know what it was before. CAPTRUST came in; they discovered what the fee is.* They made it as low as possible for all of the categories, including record keeping, bundle it back up . . .") (emphasis added).

[227] Ex. P8, Bursic Dep., at 99:21–102:1 ("You keep coming back to this because I know you've got an agenda around this, and I'm going to have to keep answering you the same way over and over again. *We're not splitting out record-keeping fees because it is intimately tied, like your right arm and your left arm.* It's tied to the middle. And the middle is important. It's the entire slate of services that happen with this. If you want to talk about splitting out record-keeping fees, you've already done it. Stop asking questions about it because I keep giving you the same answer over and over again. The fee is the fee. We didn't know what it was before. CAPTRUST came in; they discovered what the fee is. They made it as low as possible for all of the categories, including record keeping, bundle it back up."), *id.* at 44:7-20 ("Q. During your time at Cornell has Cornell ever done an RFP for record-keeping services? A. That is a very difficult approach and I will say, no, we did not, and there's a lot of reasons for that. Record-keeping services only, separated from the fund parent and from the services that are provided by the fund parent is not something that we would do. *It would not be prudent to issue an RFP, asking some company to do a specific task that's much more efficiently and effective -- accurately delivered as a bundle of services. So your specific question was on record-keeping services only? Frankly, I think that would be a crazy idea.*") (emphasis added).

[228] Ex. P41, DOL Advisory Op. 2013-03A, at 4 (July 3, 2013); Ex. P42., DOL Adv. Op. 97-15A (May 22, 1997); Ex. P43. DOL Adv. Op. 97-16A (May 22, 1997); Ex. P44 DOL Adv. Op. 97-19A (Aug. 28, 1997); Doc. 249-20, Expert Report of Ty Minnich, ¶127; Doc. 249-19, Expert Report of Al Otto, ¶¶ 35-36; Ex. P2, Poehler Dep., at 91:8–92:11, 174:11-23.

[229] Doc. 250-19, Ex. 19, November 2010 RPOC Minutes, at 2 (CORNELL021932); Doc. 248-2, Ex. 42, 2010 Johns Hopkins 403(b) Plan Design Presentation, at 36-37 (CORNELL029094).

**RESPONSE:** Plaintiffs dispute the first sentence of paragraph 39. The Cornell Defendants cite to no record evidence to support this fact, so it is improper under Rule 56.1. Plaintiffs dispute the second sentence of paragraph 39. The meeting minutes cited are dated November 29, 2010, not November 2011.[230] Additionally, RPOC was not created until April 7, 2011, so the November 29, 2010 meeting was not a meeting of RPOC.[231] Plaintiffs do not dispute that many of Cornell's peers began monitoring and negotiating their recordkeeping and administrative fees prior to the Cornell Defendants. The Cornell Defendants' own expert testified that he negotiated recordkeeping and administrative fees for plan sponsors, including institutes of higher education, for decades prior to 2010.[232]

40.     Cornell and RPOC similarly decided to retain a consultant to assist them with reviewing the Plans' recordkeeping arrangement and administrative fee structure.  The RFP prepared by Benefits Services and approved by RPOC expressly stated that Cornell was seeking a consultant that was capable of assisting it with the development of a "fully compliant retirement plan operation," as well as "the administrative set up of custodial accounts, recordkeeping, [and] retail-level customer service for plan participants[.]"[233] The agreement between Cornell and CAPTRUST expressly provided that CAPTRUST would provide "Vendor Analysis," which included vendor analysis, benchmarking, and scoring, plan administration and investment cost comparisons, and overall recommendations and ongoing due diligence with respect to the vendors.[234]

---

[230] Doc. 250-19, November 29, 2010 CURP Oversight Committee Meeting Minutes (CORNELL021932).
[231] Doc. 250-17, April 7, 2011 RPOC Charter (CORNELL015812).
[232] Ex. P2, Poehler Dep., at 30:09-35:5.
[233] Doc. 246-1, Ex. 20, April 2011 RPOC Consultant RFP, at 1, 6 (CORNELL024129).
[234] Doc. 246-2, Ex. 21, April 2011 Retirement Plan Advisory Services Agreement between Capfinancial Partners, LLC ("CAPTRUST") and Cornell University, at 1 (CORNELL021910).

**RESPONSE:** Plaintiffs do not dispute paragraph 40. In fact, the Cornell Defendant improperly delegated entirely the responsibility to monitor and negotiate the Plans' recordkeeping fees to CAPTRUST despite CAPTRUST's assertion that it was not a fiduciary.[235] Multiple members of RPOC testified that RPOC did not ever review any benchmarking CAPTRUST conducted regarding the Plans' recordkeeping and administrative fees or participate in or monitor their negotiations with TIAA or Fidelity.[236] Rather, the Cornell Defendants relied entirely upon CAPTRUST to "to do their professional job" and CAPTRUST's "strong assurances that this is a good deal."[237] Bursic went was far as testifying "I don't think anyone on RPOC, including me, but I may be wrong. You may find out otherwise in your other depositions, really knows how CAPTRUST is conducting those negotiations and what the terms are of the agreements that they draw up . . ."[238] Additionally, the Cornell Defendants complete deferral of their fiduciary duties to CAPTRUST is demonstrated by testimony that they did not know basic details regarding the Plans' recordkeeping and administrative fees or that if someone wanted those details they would have to ask CAPTRUST.[239]

41.     At the January 2012 RPOC meeting, which was the first RPOC meeting attended by CAPTRUST, CAPTRUST provided a holistic review of the recordkeeping arrangement.  This review included an analysis of the costs and benefits associated with various

---

[235] *See infra* ¶¶ 184-185.
[236] Ex. P8, Bursic Dep., at 52:16–54:13; *see also* Ex. P9, Gallagher Dep., at 62:11-63:15; Ex. P45, DeStefano Dep., at 129:16-21, 131:4-14; Ex. P46, Edwards Dep. at 107:14-109:6; Ex. P47, Schwartz Dep. at 78:8-80:12; Ex. P48, Prasad Dep., at 67:22-68:16.
[237] Ex. P8, Bursic Dep., at 52:16–54:13.
[238] Ex. P8, Bursic Tr.at 119:1-13 ("Q. Okay. So you don't know if there's a cap on the fees within the TIAA plan? A. Right. Q. Has RPOC ever discussed a fee structure like that with a cap, with a set dollar cap? A. I don't think anyone on RPOC, including me, but I may be wrong. You may find out otherwise in your other depositions, really knows how CAPTRUST is conducting those negotiations and what the terms are of the agreements that they draw up, whether or not they include what you've just questioned about a cap on one particular activity that TIAA does, a cap on the cost, that is, of that activity.")
[239] *See, e.g., Id.*

alternative recordkeeping arrangements.[240]  RPOC discussed these various alternatives, noting in particular that: "TIAA-CREF and Fidelity are unwilling/unable to provide administration and recordkeeping services for the others' funds," that there were difficulties associated with "the individual contracts at TIAA," and that there were "inherent problems with portability amongst vendors."[241]  Ultimately, RPOC opted for a "middle-ground approach" recommended by CAPTRUST of maintaining two recordkeepers, aligning the investment options available on each platform as much as possible, and renegotiating the respective fees charged by each recordkeeper.[242]

**RESPONSE:** Plaintiffs dispute the first sentence of paragraph 41. The Cornell Defendants fail to cite to any record evidence to support this fact, so it is improper under Rule 56.1. Plaintiffs dispute the second, third and fourth sentences of paragraph 41. Plaintiffs do not dispute that CAPTRUST presented information to RPOC regarding recordkeeper consolidation in January 2012. In fact, CAPTRUST advised the Cornell Defendants that consolidation results in the "best cost structure" for Plan participants.[243]  However, there does not appear to be any serious discussion balancing the cost savings that could be achieved from recordkeeping consolidation versus other interests at that meeting or any meeting thereafter.[244]  Rather, RPOC

---

[240] Doc. 248-3, Ex. 43, January 2012 RPOC Meeting Materials, at 11 (CAPTR_0009098) (recommending a "streamlined fund line up across three vendors using 'best in class' structure").
[241] Doc. 248-3, Ex. 43, January 2012 RPOC Meeting Minutes (CAPTR_0047903).
[242] Doc. 248-9, Ex. 45, July 2012 RPOC Meeting Minutes, at 3 (CAPTR_0047911) (noting that "RPOC validated the current multi-vendor arrangement" and discussing a tiered approach to "menu design [that] provides symmetry among the three vendors."); Doc. 248-3, Ex. 43, January 2012 RPOC Meeting Materials, at 11-12 (CAPTR_0009098) (recommending a "streamlined fund line up across three vendors using 'best in class' structure").
[243] Doc. 248-43, Jan. 11, 2012 RPOC Meeting Materials (CAPTR_0009067), at 38.
[244] Doc. 248-8, Jan. 11, 2012 RPOC Meeting Minutes; Ex. P10, February 3, 2011 CURP Meeting Minutes (CORNELL021930); Ex. P11, June 23, 2011 CURP Meeting Minutes (CORNELL021931); Doc. 248-8, January 11, 2012 RPOC Meeting Minutes (CAPTR_0047903); Doc 248-14, April 13, 2012 RPOC Meeting Minutes (CAPTR_0047907); Doc. 248-9, July 24, 2012 RPOC Meeting Minutes (CAPTR_0047911); Doc. 252-5, November 19, 2012 RPOC Meeting Minutes (CAPTR_0047924); Ex. P12, July 31, 2013 RPOC Meeting Minutes (CAPTR_0047921); Doc. 252-8, September 30, 2013 RPOC Meeting Minutes (CAPTR_0047918); Ex. P13, December 4, 2013 RPOC Meeting Minutes (CAPTR_0047915); Ex. P14, March 21, 2014 RPOC Meeting Minutes

"validated" the multi vendor arrangement, without any discussion of the scope of the fees reductions, when discussing "Investment Menu Design."[245] Despite repeated requests from the vendors that they consider consolidation to reduce fees,[246] the Cornell Defendants never received a quote from TIAA or Fidelity for consolidation.[247] Despite attempts from CAPTRUST to discuss consolidation with RPOC, benefits staff unilaterally decided to remove it from the agenda.[248] The limited nature of the Cornell Defendants' consideration of consolidation is demonstrated by the lack of knowledge of the RPOC committee members, For example, founding committee member, Joanne DeStefano, did not know if TIAA, Fidelity or Vanguard could recordkeep other vendor's funds.[249]

42.     RPOC determined that because of restrictions imposed by both Fidelity and TIAA on other providers' ability to administer many of their proprietary investment options, it was not possible or practical to consolidate the then-current investment lineup with any single-provider.[250]   In particular, RPOC and CAPTRUST noted that TIAA did not allow Fidelity (or

---

(CAPTR_0004284); Ex. P15, September 17, 2014 RPOC Meeting Minutes (CAPTR_0004286); Ex. 63, Doc. 239-4, Ex. 63, December 3, 2014 RPOC Meeting Minutes (CAPTR_00013586); Ex. P16, June 2, 2015 RPOC Meeting Minutes (CAPTR_0013598); Ex. P17, September 9, 2015 RPOC Meeting Minutes (CAPTR_0013573); Ex. P18, December 16, 2015 RPOC Meeting Minutes (CAPTR_0013594); Doc. 238-9, March 31, 2016 RPOC Meeting Minutes (CAPTR_0013568); Ex. P19, June 29, 2016 RPOC Meeting Minutes (CAPTR_0013565); Ex. P20, September 28, 2016 RPOC Meeting Minutes (CAPTR_0013580); Doc. 252-10, December 12, 2016 RPOC Meeting Minutes, (CAPTR_0013590); Ex. P49, April 14, 2017 RPOC Meeting Minutes (CAPTR_0013583); Ex. P50, June 23, 2017 RPOC Meeting Minutes (CAPTR_0013561); Ex. P51, September 27, 2017 RPOC Meeting Minutes (CAPTR_0013939); Ex. P52, December 11, 2017 RPOC Meeting Minutes (CAPTR_0015281).
[245] Doc. 248-9, July 2012 RPOC Meeting Minutes, at 3 (CAPTR_0047911).
[246] Ex. P53, March 28, 2016 email from P. Gallagher (CORNELL016201) ("TIAA has been pushing us on this[sole recordkeeper] on us for years")
[247] Ex. P8, Bursic Tr.at 160:14-20.
[248] Ex. P53, March 28, 2016 email from P. Gallagher (CORNELL016201)
[249] Ex. P45, DeStefano Dep. at 137-138:6
[250] Doc. 248-1, Ex. 41, Bursic Tr.148:16-151:2; Doc. 248-8, Ex. 44, January 2012 RPOC Meeting Minutes, at 2-3 (CAPTR_0047903) (noting TIAA and Fidelity inability to offer each other's investments, "individual contracts at TIAA," and "inherent problems with portability"); Doc. 248-9, Ex. 45, July 2012 RPOC Meeting Minutes, at 3 (CAPTR_0047907) (noting that "RPOC validated the current multi-vendor arrangement" and discussing a tiered approach to "menu design [that] provides symmetry among the three vendors.").

any other provider) to administer its annuity products and that Fidelity did not allow TIAA to administer its mutual funds.[251]

  **RESPONSE:** Plaintiffs dispute paragraph 42. The Cornell Defendants' belief that TIAA and Fidelity could not or would not explore recordkeeping each other funds is untrue. ████

████████████████████████████████████████████████████

████████████████████████████████████

████████.[252] Additionally, a presentation that Fidelity made to the Cornell Defendants demonstrates that between 2009 and 2015 multiple institutions with TIAA and Fidelity as recordkeepers consolidated to a single recordkeeping arrangement with either TIAA or Fidelity.[253]

  43.  Moreover, as of December 2012, over 30% of the Plans' assets were invested in TIAA Traditional Annuity contracts.[254]  Because the TIAA Traditional Annuity contracts offered by the Plans are individual contracts, Cornell has no right to transfer these contracts to another recordkeeper, map the invested amounts to a different investment option, or withdraw the investments without the consent of the individual participant that holds the contract.[255]  If

---

[251] Doc. 248-1, Ex. 41, Bursic Tr.148:16-151:2; Doc. 248-8, Ex. 44, January 2012 RPOC Meeting Minutes, at 2-3 (CAPTR_0047903) (noting TIAA and Fidelity inability to offer each other's investments, "individual contracts at TIAA," and "inherent problems with portability"); Doc. 248-7, Ex. 43, January 2012 RPOC Meeting Materials, at 13 (CAPTR_0009100) (noting that "TIAA-CREF is an individual contract based structure while Fidelity and Vanguard are plan based which creates some challenges [related to] lack of portability").

[252] Ex. P38, June 25, 2015 Email from P. Bursic  to M. Opperman (CORNELL002493); Ex. P8, Bursic Tr.at 162:22-165:19

[253] Doc. 247-1, 2016 Fidelity Master Administrator Presentation ((CORNELL021851), at 9 (noting that Purdue, Notre Dame, Vanderbilt, and California State University consolidated from a multiple recordkeeper arrangement with TIAA and Fidelity to Fidelity and California Institute of Technology and University of Rochester consolidated from a multiple recordkeeper arraignment with TIAA and Fidelity to TIAA)

[254] Doc. 250-13, Ex. 13, 2012 TDA Plan Form 5500, at 48 (noting $255,647,312 of $975,473,176 invested in TIAA Traditional); Doc. 250-12, Ex. 12, 2012 CURP Form 5500, at 44 (noting $527,427,866 of $1,576,642,402 invested in TIAA Traditional).

[255] Doc. 246-12, Ex. 30,  Chittenden *Sacerdote* Decl. ¶¶ 23, 27, 31, 35; Doc. 248-3, Ex. 43, January 2012 RPOC Meeting Materials Presentation (noting that "TIAA-CREF is an individual contract based structure while Fidelity and Vanguard are plan based which creates some challenges [related to] lack of portability") (CAPTR_0009100).

Cornell decided to consolidate recordkeeping with any vendor other than TIAA going forward, TIAA would continue to serve as the recordkeeper for the 30% of the Plans' assets invested in the TIAA Traditional Annuity (unless participants took the affirmative step of moving their investments out of those options) and would continue to collect asset based fees as compensation for its services.[256]

     **RESPONSE:** Plaintiffs dispute the first sentence of paragraph 43. The percentage of assets in the TIAA Traditional is not material to whether the Cornell Defendants breached their fiduciary duties to ensure the fees participants in Plans paid were reasonable or by retaining imprudent investment options in the Plans. Plaintiffs dispute the second and third sentences paragraph 43. The Cornell Defendants primarily rely upon the trial declaration from TIAA Executive, Douglas Chittenden, in *Sacerdote v. New York University*, No. 16-2684 (S.D.N.Y.), to support this paragraph. Mr. Chittenden's testimony in another case is inadmissible hearsay. *See* Fed. R. of Evid. 801, 802. Mr. Chittenden's testimony is not an admissible prior statement by a witness because it is not inconsistent with any testimony he has given in this case or for identification. *See* Fed. R. of Evid. 801(a)(1). Additionally, Mr. Chittenden's testimony in another case is not admissible under Rule 804, because he is not unavailable given that he offered a declaration in support of the Cornell Defendants' motion.[257] Finally, Mr. Chittenden's testimony is inadmissible under the rule of completeness, because the Cornell Defendants only offered his trial declaration and not his actual live testimony which is necessary to provide context. In contrast to Mr. Chittenden's declaration that Cornell Defendants cite in support of

---

[256] Doc. 246-12, Ex. 30, Chittenden *Sacerdote* Decl. ¶ 46 ("When a plan sponsor opts to eliminate TIAA as a recordkeeper, TIAA Traditional may cease to be available for new contributions.  TIAA continues to recordkeep plan assets and charge recordkeeping fees for the individually-held contracts for employees who elect to maintain their investments in TIAA Traditional.").
[257] Doc. 249-024, Declaration of Douglass Chittenden.

this paragraph, he also testified under oath that plan sponsor were able to map legacy asset in the CREF Money Market Account.[258] Both plan documents expressly provide "[t]he Employer in its sole discretion will designate from time to time the specific Funding Vehicles which are available as Plan investments. The Employer may change such designation at anytime."[259] The Plans used the Retirement Annuity ("RA"), Group Retirement Annuity ("GRA"), Supplement Retirement Annuity ("SRA") Group Retirement Supplement Annuity ("GRSA") contracts.[260] No provision of the RA, GRA, SRA, or GSRA contracts addresses transfers by plan sponsors, let alone prohibits it.[261]   The RA and GSRA contracts expressly provide "[t]he contract is subject to the provisions, terms and conditions of the employer Plan. Any payment, distribution, transfer, or other rights exercised under the contract shall comply with any applicable terms, provisions, and conditions of the employer plan as determined by the plan administrator, trustee, or other plan designated fiduciary."[262]   The RA and GRA contracts also expressly state that:



---

[258] Ex. P27, *Sacerdote v. New York University*, 16-cv-6284 (S.D.N.Y.), Tr. of Trial at 677:19–678:9; *see also id.* at 678:12-679:7. Mr. Chittenden's prior testimony from *Sacerdote* is admissible in this instance as a prior inconsistent statement under Federal Rule of Evidence 801(d)(1)(A).

[259] Doc. 250-4, 2008 CURP Plan Document (CORNELL015526), at 100; Doc. 250-6, 2008 TDA Plan Document (CORNELL015535), at 100.

[260] Doc. 247-7, Ex. 37, Dec. 31, 2009 Fee and Expense Disclosure for TDA Plan (TIAA_CORNELL_00002094) at 95 (listing RA, GRA, GSRA, SRA contracts); Ex. P29, Dec. 31, 2017 Fee and Expense Disclosure for TDA Plan (TIAA_CORNELL_00009808) at 09 (listing RA, GRA, GSRA, SRA and RCP contracts); Doc. 247-8, Ex. 38, Dec. 31, 2009 Fee and Expense Disclosure for CURP (TIAA_CORNELL_00011306) at 07 (listing RA and GRA contracts); Ex. P30, Dec. 31, 2017 Fee and Expense Disclosure for CURP (TIAA_CORNELL_00018669) at 70 (listing RA, GRA and RCP contracts).  The RCP contracts are used for the Plans' revenue credit account and not offered to Plan Participants. Ex. P31, CORNELL013913. Ex. P9, Gallagher Dep. at 364:24–365:10.

[261] *See, e.g.,* Ex. P32, PLTF-Cornell-0000340; Ex. P33, PLTF-Cornell-0000356.

[262] *See, e.g.,* Ex. P32, PLTF-Cornell-0000340 at p. E1; Ex. P33, PLTF-Cornell-0000356 at p. E1.

[263] *See, e.g.,* Ex. P34, GRA Contract (TIAA_CORNELL_00020571) at 598; Ex. P35, CREF Stock RA Certification (TIAA_CORNELL_00001451) at 1474; Ex. P36, TIAA_CORNELL_00001517, at 1535; Ex. P37, TIAA_CORNELL_00001481 at 1508.

The TIAA Annuity contracts also contain provisions stating they will administer the contract to comply with all prevailing laws and regulations.[264] Thus, the terms of the RA, GRA, SRA, and GSRA contracts did not prevent plan sponsors from mapping or transferring the assets in such annuities to other investments.

44.       When a plan sponsor eliminates TIAA as a recordkeeper and does not permit future investments into TIAA products, TIAA does not continue to provide revenue credits to the plan.  TIAA will continue to provide recordkeeping services for frozen investments and will collect the full administrative fee permitted under the agreement without providing any revenue credits.[265]

**RESPONSE:** Plaintiffs dispute paragraph 44. In contrast to Mr. Chittenden's declaration that Cornell Defendants cite in support of this paragraph, he has previously testified under oath that plan sponsor were able to map legacy asset in the CREF Money Market Account.[266] Both plan documents expressly provide "[t]he Employer in its sole discretion will designate from time to time the specific Funding Vehicles which are available as Plan investments. The Employer may change such designation at anytime."[267] The Plans used the Retirement Annuity (RA), Group Retirement Annuity (GRA), Supplement Retirement Annuity (SRA) Group Retirement Supplement Annuity (GRSA) contracts.[268] No provision of the RA, GRA, SRA, or GSRA

---

[264] *See, e.g.*, Ex. P36, TIAA_CORNELL_00001517 at 1534; Ex. P37, TIAA_CORNELL_00001481 at 1501, 1507; Ex. P35, TIAA_CORNELL_00001451 at 1471.

[265] Ex. 112, Chittenden *Cunningham* Decl. ¶¶ 12, 18.

[266] Ex. P27, *Sacerdote v. New York University*, 16-6284 (S.D.N.Y.), Tr. of Trial at 677:19–678:9; *see also id.* at 678:12-679:7. Mr. Chittenden's prior testimony from *Sacerdote* is admissible in this instance as a prior inconsistent statement under Federal Rule of Evidence 801(d)(1)(A).

[267] Doc. 250-4, 2008 CURP Plan Document (CORNELL015526), at 100; Doc. 250-6, 2008 TDA Plan Document (CORNELL015535), at 100.

[268] Doc. 247-7, Ex. 37, Dec. 31, 2009 Fee and Expense Disclosure for TDA Plan (TIAA_CORNELL_00002094) at 95 (listing RA, GRA, GSRA, SRA contracts); Ex. P29, Dec. 31, 2017 Fee and Expense Disclosure for TDA Plan (TIAA_CORNELL_00009808) at 09 (listing RA, GRA, GSRA, SRA and RCP contracts); Doc. 247-8, Ex. 38, Dec. 31, 2009 Fee and Expense Disclosure for CURP (TIAA_CORNELL_00011306) at 07 (listing RA and GRA contracts); Ex. P30, Dec. 31, 2017 Fee and Expense Disclosure for CURP (TIAA_CORNELL_00018669) at 70

contracts addresses transfers by plan sponsors, let alone prohibits it.[269]  The RA and GSRA

contracts expressly provide "[t]he contract is subject to the provisions, terms and conditions of

the employer Plan. Any payment, distribution, transfer, or other rights exercised under the

contract shall comply with any applicable terms, provisions, and conditions of the employer plan

as determined by the plan administrator, trustee, or other plan designated fiduciary."[270]  The RA

and GRA contracts also expressly state that:



The TIAA Annuity contracts also contain a provision stating it will administer the compliance

with all laws and regulations and if the contract conflicts with the law, the law or regulation

prevails.[272] Thus, the terms of the RA, GRA, SRA, and GSRA contracts did not prevent plan

sponsors from mapping or transferring the assets in such annuities to other investments.

          45.     In 2009, Pepperdine selected Transamerica as sole recordkeeper to its 403(b)

plan.[273]  In doing so, Pepperdine eliminated three of its recordkeepers, including TIAA.

However, despite eliminating TIAA as a recordkeeper, Pepperdine could not map or transfer

amounts invested in the TIAA Traditional annuities to Transamerica for recordkeeping.  Instead,

TIAA continued to serve as recordkeeper for these assets and continued to collect the full

---

(listing RA, GRA and RCP contracts).  The RCP contracts are used for the Plans' revenue credit account and not
offered to Plan Participants. Ex. P31, CORNELL013913. Ex. P9, Gallagher Dep. at 364:24–365:10.
[269] *See, e.g.,* Ex. P32, PLTF-Cornell-0000340; Ex. P33, PLTF-Cornell-0000356.

[270] *See, e.g.,* Ex. P32, PLTF-Cornell-0000340 at p. E1; Ex. P33, PLTF-Cornell-0000356 at p. E1.

[271] *See, e.g.,* Ex. P34, GRA Contract (TIAA_CORNELL_00020571) at 598; Ex. P35, CREF Stock RA Certification
(TIAA_CORNELL_00001451) at 1474; Ex. P36, TIAA_CORNELL_00001517, at 1535; Ex. P37,
TIAA_CORNELL_00001481 at 1508.

[272] *See, e.g.,* Ex. P36, TIAA_CORNELL_00001517 at 1534; Ex. P37, TIAA_CORNELL_00001481 at 1501, 1507;
Ex. P35, TIAA_CORNELL_00001451 at 1471.

[273] Doc. 250-1, Ex. 1, Am. Compl. ¶ 84.

administrative fee for recordkeeping these investment options.  Although TIAA can provide revenue credits for excess revenue derived from assets invested in TIAA Traditional, it does not negotiate those credits when the TIAA investments are "frozen" and closed to any additional contributions.[274] In the case of Pepperdine, TIAA offered to negotiate a lower required revenue rate but only if Pepperdine was willing to "open a TIAA-CREF portion of the plan to new investments."[275]

**RESPONSE:** Plaintiffs do not dispute the first and second sentences in paragraph 45. Plaintiffs dispute the third and fourth sentences of paragraphs 45. The Cornell Defendants fail to cite any record evidence supporting these facts, so they are improper under Rule 56.1. To the extent the Cornell Defendants intended to cite to Mr. Otto's testimony regarding the purported February 2013 Pepperdine Administrative Committee Minutes, the facts in the third and fourth sentence are not based on admissible evidence because those minutes have not been authenticated, any statement within them would be inadmissible hearsay and Mr. Otto's testimony regarding them would be hearsay within hearsay. Fed. R. of Evid. 801, 802, 805, 901. Plaintiffs dispute that the fifth sentence of paragraph 47 is material to whether the Cornell Defendants breached their fiduciary duties by failing to ensure the participants in the Plans only paid reasonable fees and their retention of imprudent investment options in the Plans. Plaintiffs dispute the sixth sentence of paragraph 47. The Cornell Defendants fail to cite admissible evidence to support these fact, so they are improper under Rule 56.1. The Cornell Defendants cite primarily to the purported February 2013 Pepperdine Administrative Committee Minutes and Mr. Otto's testimony regarding those minutes. The Cornell Defendants do not authenticate

---

[274] Doc. 249-24, Ex. 112, Chittenden *Cunningham* Decl. ¶¶ 12, 18.

[275] Doc. 248-10, Ex. 46, Otto Dep. 149:6-150:10 (discussing Ex. 47, February 2013 Pepperdine Administrative Committee Minutes, at 1 *available at* https://www.trsretire.com/webportal/pepperdine/page.html?page_0); Doc. 252-2, Ex. 72, Minnich Dep. 107:2-9, 151:1-8.

those minutes, any statement within them would be inadmissible hearsay and Mr. Otto's

testimony regarding them would be hearsay within hearsay.[276] Fed. R. of Evid. 801, 802, 805,

901. The Cornell Defendants also cite testimony from Mr. Minnich, but this testimony does not

relate to any fee negotiation between TIAA and Pepperdine.[277]

46.      Nor was it practical to consolidate all of the Fidelity assets with TIAA. Fidelity

has not agreed to allow TIAA to provide recordkeeping services for any Fidelity investment

options.[278]  If RPOC wanted to consolidate with TIAA, it needed to first take control of the

participants' investments in Fidelity funds, unilaterally sell those investments, and then map the

assets to funds that TIAA could administer.  As of December 2012, over 25% of the Plans' assets

were invested with Fidelity.[279]  Ultimately, RPOC determined that consolidation was either

impossible, or at a minimum extremely disruptive and impractical, given the individual nature of

the TIAA contracts and TIAA's inability to administer Fidelity mutual funds.[280]

**RESPONSE:** Plaintiffs dispute the first sentence of paragraph 46. The Cornell

Defendants do not cite any record evidence to support this fact, so it is improper under Rule 56.1.

Additionally, a presentation that Fidelity made to the Cornell Defendants demonstrates that

between 2009 and 2015 multiple institutions with TIAA and Fidelity as recordkeepers

consolidated to a single recordkeeping arrangement with either TIAA or Fidelity, so it was not

---

[276] Mr. Otto did not review the fees of Pepperdine and has not personal knowledge of them. Ex. P54, Otto Dep., at 145:20-22.

[277] Doc. 252-02, Minnich Dep., at 107:2-9, 151:1-8.

[278] Doc. 246-11, Ex. 29, Polacek Dep. 104:6-105 :23 (discussing lack of an agreement between TIAA and Fidelity to provide recordkeeping for other's investment options).

[279] Doc. 250-13, Ex. 13, 2012 TDA Plan Form 5500, at 48 (noting $315,433,184 of $975,473,176 invested with Fidelity); Doc. 250-12, Ex. 12, 2012 CURP Form 5500, at 44 (noting $342,184,015 of $1,576,642,402 invested with Fidelity).

[280] Doc. 248-1, Ex. 41, Bursic Tr.147:21-151:2 (discussing inability to consolidate and noting that "RPOC has decided that there is no prudent course to getting rid of either one of these vendors (TIAA or Fidelity) at this point"); Doc. 250-18, Ex. 18, Opperman Dep. 86:18-89:7 (detailing the RPOC's concern for participant choice and desire to limit disruption of participants' investment decisions).

impractical but common.[281] Plaintiffs dispute the second sentence of paragraph 46. The Cornell

Defendants' belief that TIAA and Fidelity could not or would not explore recordkeeping each

other's funds is untrue. ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

██████████████████████████████████.[282] Additionally, a presentation that Fidelity made to

the Cornell Defendants demonstrates that between 2009 and 2015 multiple institutions with

TIAA and Fidelity as recordkeepers consolidated to a single recordkeeping arrangement with

either TIAA or Fidelity.[283] Plaintiffs dispute the third sentence of paragraph 46. Whether it

would be necessary for RPOC to map investments to consolidate to a single recordkeeper is not

material to whether the Cornell Defendants breached their fiduciary duties by failing to ensure

the fees charged to participants in the Plans were reasonable and retention of imprudent

investment options in the Plans. Additionally, the Cornell Defendants do not cite to any record

evidence to support this fact, so it is improper under Rule 56.1. Plaintiffs dispute the fourth

sentence of paragraph 46. The percentage of assets in Fidelity funds is not material to whether

the Cornell Defendants breached their fiduciary duties by failing to ensure the fees charged to

participants in the Plans were reasonable and retention of imprudent investment options in the

Plans. Plaintiffs dispute the fifth sentence of paragraph 46. In January 2012, CAPTRUST

advised the Cornell Defendants that consolidation results in the "best cost structure" for Plan

---

[281] Doc. 247-1, 2016 Fidelity Master Administrator Presentation ((CORNELL021851), at 9 (noting that Purdue, Notre Dame, Vanderbilt, and California State University consolidated from a multiple recordkeeper arrangement with TIAA and Fidelity to Fidelity and California Institute of Technology, University of Rochester and Colorado consolidated from a multiple recordkeeper arraignment with TIAA and Fidelity to TIAA)

[282] Ex. P38, June 25, 2015 Email from P. Bursic  to M. Opperman (CORNELL002493); P8, Bursic Dep.at 162:19-165:18

[283] Doc. 247-1, 2016 Fidelity Master Administrator Presentation ((CORNELL021851), at 9 (noting that Purduent, Notre Dame, Arizona, Vanderbilt, DePaul, and California State University consolidated from a multiple recordkeeper arrangement with TIAA and Fidelity to Fidelity and California Institute of Technology and University of Rochester consolidated from a multiple recordkeeper arraignment with TIAA and Fidelity to TIAA)

participants.[284] However, there does not appear to be any serious discussion balancing the cost savings that the Plans could achieve from recordkeeping consolidation versus other interests at that meeting or any meeting thereafter.[285] Rather, RPOC "validated" the multi-vendor arrangement, without any discussion of the scope of the fee reductions, when discussing "Investment Menu Design."[286] Despite repeated requests from the vendors that they consider consolidation to reduce fees,[287] the Cornell Defendants never received a quote from TIAA or Fidelity for consolidation.[288] Despite attempts from CAPTRUST to discuss consolidation with RPOC, benefits staff unilaterally decided to remove it from the agenda.[289] The limited nature of the Cornell Defendants' consideration of consolidation is demonstrated by the lack of knowledge of an RPOC founding committee member, Joanne DeStefano, who did not know if TIAA, Fidelity or Vanguard could recordkeep other vendor's funds.[290]

47.     In making its decision to continue to retain both TIAA and Fidelity, RPOC also recognized that there were different strengths and weaknesses associated with the two vendors

---

[284] Doc. 248-43, Jan. 11, 2012 RPOC Meeting Materials (CAPTR_0009067), at 38.
[285] Doc. 248-8, Jan. 11, 2012 RPOC Meeting Minutes; Ex. P10, February 3, 2011 CURP Meeting Minutes (CORNELL021930); Ex. P11, June 23, 2011 CURP Meeting Minutes (CORNELL021931); Doc. 248-8, January 11, 2012 RPOC Meeting Minutes (CAPTR_0047903); Doc 248-14, April 13, 2012 RPOC Meeting Minutes (CAPTR_0047907); Doc. 248-9, July 24, 2012 RPOC Meeting Minutes (CAPTR_0047911); Doc. 252-5, November 19, 2012 RPOC Meeting Minutes (CAPTR_0047924); Ex. P12, July 31, 2013 RPOC Meeting Minutes (CAPTR_0047921); Doc. 252-8, September 30, 2013 RPOC Meeting Minutes (CAPTR_0047918); Ex. P13, December 4, 2013 RPOC Meeting Minutes (CAPTR_0047915); Ex. P14, March 21, 2014 RPOC Meeting Minutes (CAPTR_0004284); Ex. P15, September 17, 2014 RPOC Meeting Minutes (CAPTR_0004286); Ex. 63, Doc. 239-4, December 3, 2014 RPOC Meeting Minutes (CAPTR_00013586); Ex. P16, June 2, 2015 RPOC Meeting Minutes (CAPTR_0013598); Ex. P17, September 9, 2015 RPOC Meeting Minutes (CAPTR_0013573); Ex. P18, December 16, 2015 RPOC Meeting Minutes (CAPTR_0013594); Doc. 238-9, March 31, 2016 RPOC Meeting Minutes (CAPTR_0013568); Ex. P19, June 29, 2016 RPOC Meeting Minutes (CAPTR_0013565); Ex. P20, September 28, 2016 RPOC Meeting Minutes (CAPTR_0013580); Doc. 252-10, December 12, 2016 RPOC Meeting Minutes, (CAPTR_0013590); Ex. P49, April 14, 2017 RPOC Meeting Minutes (CAPTR_0013583); Ex. P50, June 23, 2017 RPOC Meeting Minutes (CAPTR_0013561); Ex. P51, September 27, 2017 RPOC Meeting Minutes (CAPTR_0013939); Ex. P52, December 11, 2017 RPOC Meeting Minutes (CAPTR_0015281).
[286] Doc. 248-9, July 2012 RPOC Meeting Minutes, at 3 (CAPTR_0047911).
[287] Ex. P53, March 28, 2016 email from P. Gallagher (CORNELL016201) ("TIAA has been pushing us on this[sole recordkeeper] for years")
[288] Ex. P8, Bursic Tr.at 160:14-20.
[289] Ex. P53, March 28, 2016 email from P. Gallagher (CORNELL016201)
[290] Ex. P45, DeStefano Dep. at 137:1-138:6

and that different segments of the participant population had developed long-term relationships with one vendor or the other.[291] Accordingly, RPOC was justifiably concerned about the amount of disruption associated with any attempt to consolidate assets. RPOC feared that consolidation would have a negative effect on participants' investment behavior and their willingness to continue to contribute toward their retirement accounts.[292]

**RESPONSE:** Plaintiffs dispute the first sentence of paragraph 47. The Cornell Defendants rely upon the declaration of CAPTRUST employee, Scott Matheson, to support this fact, but Mr. Matheson's declaration is not admissible because he was not properly disclosed as a witness in either the Cornell Defendants' or the CAPTRUST's Rule 26(a)(1) disclosures.[293] Moreover, Mr. Matheson's testimony on the Cornell Defendant's motives would be inadmissible hearsay or speculation. Fed. R. of Evid. 801, 602. In January 2012, CAPTRUST advised the Cornell Defendants that consolidation results in the "best cost structure" for Plan participants.[294] However, there does not appear to be any serious discussion balancing the cost savings that the Plans could achieve from recordkeeping consolidation versus other interests at that meeting or any meeting thereafter.[295] Rather, RPOC "validated" the multi-vendor arrangement, without any

---

[291] Doc. 248-3, Ex. 43, January 2012 RPOC Meeting Materials, at 15-16 (CAPTR_0009067) (noting that the three vendors have "different approaches to investments, fee structures, investment platforms, and communication and education philosophy"); Doc. 248-12, Ex. 48, Matheson Decl. ¶ 3 (describing RPOC decision with respect to continuing to maintain two vendors).

[292] Doc. 248-12, Ex. 48, Matheson Decl. ¶ 3 (identifying factors affecting decision to retain two recordkeepers); Doc. 250-18, Ex. 18, Opperman Dep. 86:18-89:7 (detailing the RPOC's concern for participant choice and desire to limit disruption of participants' investment decisions).

[293] *See* Doc. 278.

[294] Doc. 248-43, Jan. 11, 2012 RPOC Meeting Materials (CAPTR_0009067), at 38.

[295] Doc. 248-8, Jan. 11, 2012 RPOC Meeting Minutes; Doc 248-14, April 13, 2012 RPOC Meeting Minutes (CAPTR_0047907); Doc. 248-9, July 24, 2012 RPOC Meeting Minutes (CAPTR_0047911); Doc. 252-5, November 19, 2012 RPOC Meeting Minutes (CAPTR_0047924); Ex. P12, July 31, 2013 RPOC Meeting Minutes (CAPTR_0047921); Doc. 252-8, September 30, 2013 RPOC Meeting Minutes (CAPTR_0047918); Ex. P13, December 4, 2013 RPOC Meeting Minutes (CAPTR_0047915); Ex. P14, March 21, 2014 RPOC Meeting Minutes (CAPTR_0004284)

); Ex. P15, September 17, 2014 RPOC Meeting Minutes (CAPTR_0004286); Ex. 63, Doc. 239-4, December 3, 2014 RPOC Meeting Minutes (CAPTR_0013586); Ex. P16, June 2, 2015 RPOC Meeting Minutes (CAPTR_0013598); Ex. P17, September 9, 2015 RPOC Meeting Minutes (CAPTR_0013573); Ex. P18, December 16, 2015 RPOC Meeting Minutes (CAPTR_0013594); Doc. 238-9, March 31, 2016 RPOC Meeting Minutes (CAPTR_0013568);

discussion of the scope of the fee reductions, when discussing "Investment Menu Design."[296] Despite repeated requests from the vendors that they consider consolidation to reduce fees,[297] the Cornell Defendants never received a quote from TIAA or Fidelity for consolidation.[298] Despite attempts from CAPTRUST to discuss consolidation with RPOC, benefits staff unilaterally decided to remove it from the agenda.[299] The limited nature of the Cornell Defendants' consideration of consolidation is demonstrated by the lack of knowledge of an RPOC founding committee member, Joanne DeStefano, who did not know if TIAA, Fidelity or Vanguard could recordkeep other vendor's funds.[300] Additionally, the Cornell Defendants' belief that participants in the Plans preferred a multiple recordkeeper arrangement with TIAA and Fidelity is not based on fact but assumptions of RPOC. The Cornell Defendants admitted that they were not aware of any fact that actually supported their assumption that participants would be dissatisfied with recordkeeper consolidation, preferred any vendor, or would not be satisfied with a similar low cost investments on another platform.[301] Additionally, the Cornell Defendants' experience with recordkeeper consolidation at the Weill Cornell Plans has not resulted in any dissatisfaction among participants in those plans.[302] While there is no evidence that participants preferred a multi-vendor arrangement with TIAA and Fidelity, some participants (including most of Cornell's Economics department) did request a more efficient provider with a lower cost

---

Ex. P19, June 29, 2016 RPOC Meeting Minutes (CAPTR_0013565); Ex. P20, September 28, 2016 RPOC Meeting Minutes (CAPTR_0013580); Doc. 252-10, December 12, 2016 RPOC Meeting Minutes, (CAPTR_0013590); Ex. P49, April 14, 2017 RPOC Meeting Minutes (CAPTR_0013583); Ex. P50, June 23, 2017 RPOC Meeting Minutes (CAPTR_0013561); Ex. P51, September 27, 2017 RPOC Meeting Minutes (CAPTR_0013939); Ex. P52, December 11, 2017 RPOC Meeting Minutes (CAPTR_0015281).

[296] Doc. 248-9, July 2012 RPOC Meeting Minutes, at 3 (CAPTR_0047911)

[297] Ex. P53, March 28, 2016 email from P. Gallagher (CORNELL016201) ("TIAA has been pushing us on this[sole recordkeeper] on us for years")

[298] Ex. P8, Bursic Tr.at 160:14-20.

[299] Ex. P53, March 28, 2016 email from P. Gallagher (CORNELL016201)

[300] Ex. P45, DeStefano Dep. at 137:1-138:6

[301] Ex. P9, Gallagher Dep. at 135:14-136:5

[302] Id. at 140:22-141:2.

structure. For example, on September 21, 2013, Throne Professor of Economics, Karl Shell, sent

a memo to a number of RPOC members and members of a Faculty Advisory Committee to

RPOC.[303] In that memo, Dr. Shell writes that "Cornell Ithaca should consider adding the

Vanguard platform, even if this requires dropping one or both of the existing platforms . . .

Vanguard provides the lowest-cost index funds. Index funds provide the most efficient

diversification of risk. Because of the miracle of compound interest, even very small difference

in fees matter a lot over time. Vanguard provides excellent service."[304] Mr. Shell also offered an

informal poll of "the greater economic community at Cornell" where every respondent preferred

Vanguard and one stated "'Hire Vanguard, fire the other two'."[305] Plaintiffs dispute the second

sentence of paragraph 47. The Cornell Defendants fail to cite any record evidence in support of

this fact, so it is improper under Rule 56.1. Additionally, Plaintiffs incorporate their response to

the first sentence of paragraph 47 in their response to the second sentence. Plaintiffs dispute the

third sentence of paragraph 47. The Cornell Defendants rely upon the declaration of CAPTRUST

employee, Scott Matheson, to support this fact, but Mr. Matheson's declaration is not admissible

because he was not properly disclosed as a witness in either the Cornell Defendants' or the

CAPTRUST's Rule 26(a)(1) disclosures.[306] Additionally, any testimony from Mr. Matheson on

the Cornell Defendants' motives would be inadmissible hearsay or speculation. Fed. R. of Evid.

801, 602. Additionally, Plaintiffs incorporate their response to the first sentence of paragraph 47

in their response to the third sentence.

---

[303] Ex. P55, September 21, 2013 Memorandum from Karl Shell regarding "Notes for the 23 September 2013 meeting of the RPOC advisory committee" (CORNELL016400).
[304] *Id.*
[305] *Id.*
[306] *See* Doc. 278

48.     Notwithstanding the thorough decision-making process outlined above, the RPOC did not write-off the possibility of consolidating recordkeepers.  In 2016, the Benefits Services revisited the issue of consolidating recordkeepers or otherwise simplifying Cornell's administrative environment. CAPTRUST worked with TIAA and Fidelity to evaluate alternatives, including each recordkeepers' "master" recordkeeper services.[307]  However, Benefits Services again concluded that consolidating vendors on the Ithaca campus was not in the participants' best interests.

**RESPONSE:** Plaintiffs dispute the first and second sentences of paragraph 48. The Cornell Defendants fail to cite to any record evidence to support these facts, so they are improper under Rule 56.1. There is no evidence of any discussion of consolidating recordkeepers by RPOC after 2012.[308] Despite attempts from CAPTRUST to discuss consolidation with the RPOC, Benefits Services unilaterally decided to remove it from the agenda.[309] Plaintiffs do not dispute the third sentence of paragraph 48. CAPTRUST attempted to get recordkeeper consolidation and master recordkeeping services on RPOC's agenda multiple times,[310] but ultimately the RPOC never considered it after 2012.[311] The Plaintiffs dispute the fourth sentence

---

[307] Doc. 247-2, Ex. 32, March 3, 2016 Email Regarding Master Administrator/Multivendor Coordinator Discussion (CAPTR_0005385).

[308] Ex. P12, July 31, 2013 RPOC Meeting Minutes (CAPTR_0047921); Doc. 252-8, September 30, 2013 RPOC Meeting Minutes (CAPTR_0047918); Ex. P13, December 4, 2013 RPOC Meeting Minutes (CAPTR_0047915); Ex. P14, March 21, 2014 RPOC Meeting Minutes (CAPTR_0004284); Ex. P15, September 17, 2014 RPOC Meeting Minutes (CAPTR_0004286); Ex. 63, Doc. 239-4, December 3, 2014 RPOC Meeting Minutes (CAPTR_00013586); Ex. P16, June 2, 2015 RPOC Meeting Minutes (CAPTR_0013598); Ex. P17, September 9, 2015 RPOC Meeting Minutes (CAPTR_0013573); Ex. P18, December 16, 2015 RPOC Meeting Minutes (CAPTR_0013594); Doc. 238-9, March 31, 2016 RPOC Meeting Minutes (CAPTR_0013568); Ex. P19, June 29, 2016 RPOC Meeting Minutes (CAPTR_0013565); Ex. P20, September 28, 2016 RPOC Meeting Minutes (CAPTR_0013580); Doc. 252-10, December 12, 2016 RPOC Meeting Minutes, (CAPTR_0013590); Ex. P49, April 14, 2017 RPOC Meeting Minutes (CAPTR_0013583); Ex. P50, June 23, 2017 RPOC Meeting Minutes (CAPTR_0013561); Ex. P51, September 27, 2017 RPOC Meeting Minutes (CAPTR_0013939); Ex. P52, December 11, 2017 RPOC Meeting Minutes (CAPTR_0015281).

[309] Ex. P53, March 28, 2016 email from P. Gallagher (CORNELL016201).

[310] *Id.*; Doc. 247-2, March 3, 2016 Email from Jim Strodel, (CAPTR_0005385).

[311] Ex. P12, July 31, 2013 RPOC Meeting Minutes (CAPTR_0047921); Doc. 252-8, September 30, 2013 RPOC Meeting Minutes (CAPTR_0047918); Ex. P13, December 4, 2013 RPOC Meeting Minutes (CAPTR_0047915); Ex. P14, March 21, 2014 RPOC Meeting Minutes (CAPTR_0004284); Ex. P15, September 17, 2014 RPOC Meeting

of paragraph 48. The Cornell Defendants cite to no record evidence to support this fact, so it is improper under Rule 56.1.

49.     While RPOC decided it was not practical to attempt to consolidate recordkeepers, it nevertheless took steps to reduce the recordkeeping fees charged by the two incumbent vendors.  Through these efforts, the fees charged by TIAA and Fidelity fell significantly over the time period at issue and at all times were within the range of reasonable fees paid by Cornell's peers for their similarly sized plans.

**RESPONSE:** Plaintiffs dispute paragraph 49. The Cornell Defendants fail to cite any record evidence to support these facts, so they are improper under Rule 56.1. In January 2012, CAPTRUST advised the Cornell Defendants that consolidation results in the "best cost structure" for Plan participants.[312] However, there does not appear to be any serious discussion balancing the cost savings that the Plans could achieve from recordkeeping consolidation versus other interests at that meeting or any meeting thereafter.[313] Rather, RPOC "validated" the multi-

---

Minutes (CAPTR_0004286); Ex. 63, Doc. 239-4, December 3, 2014 RPOC Meeting Minutes (CAPTR_00013586); Ex. P16, June 2, 2015 RPOC Meeting Minutes (CAPTR_0013598); Ex. P17, September 9, 2015 RPOC Meeting Minutes (CAPTR_0013573); Ex. P18, December 16, 2015 RPOC Meeting Minutes (CAPTR_0013594); Doc. 238-9, March 31, 2016 RPOC Meeting Minutes (CAPTR_0013568); Ex. P19, June 29, 2016 RPOC Meeting Minutes (CAPTR_0013565); Ex. P20, September 28, 2016 RPOC Meeting Minutes (CAPTR_0013580); Doc. 252-10, December 12, 2016 RPOC Meeting Minutes, (CAPTR_0013590); Ex. P49, April 14, 2017 RPOC Meeting Minutes (CAPTR_0013583); Ex. P50, June 23, 2017 RPOC Meeting Minutes (CAPTR_0013561); Ex. P51, September 27, 2017 RPOC Meeting Minutes (CAPTR_0013939); Ex. P52, December 11, 2017 RPOC Meeting Minutes (CAPTR_0015281).

[312] Doc.  248-43, Jan. 11, 2012 RPOC Meeting Materials (CAPTR_0009067), at 38.

[313] Doc. 248-8, Jan. 11, 2012 RPOC Meeting Minutes; Doc 248-14, April 13, 2012 RPOC Meeting Minutes (CAPTR_0047907); Doc. 248-9, July 24, 2012 RPOC Meeting Minutes (CAPTR_0047911); Doc. 252-5, November 19, 2012 RPOC Meeting Minutes (CAPTR_0047924); Ex. P12, July 31, 2013 RPOC Meeting Minutes (CAPTR_0047921); Doc. 252-8, September 30, 2013 RPOC Meeting Minutes (CAPTR_0047918); Ex. P13, December 4, 2013 RPOC Meeting Minutes (CAPTR_0047915); Ex. P14, March 21, 2014 RPOC Meeting Minutes (CAPTR_0004284); Ex. P15, September 17, 2014 RPOC Meeting Minutes (CAPTR_0004286); Ex. 63, Doc. 239-4, December 3, 2014 RPOC Meeting Minutes (CAPTR_00013586); Ex. P16, June 2, 2015 RPOC Meeting Minutes (CAPTR_0013598); Ex. P17, September 9, 2015 RPOC Meeting Minutes (CAPTR_0013573); Ex. P18, December 16, 2015 RPOC Meeting Minutes (CAPTR_0013594); Doc. 238-9, March 31, 2016 RPOC Meeting Minutes (CAPTR_0013568); Ex. P19, June 29, 2016 RPOC Meeting Minutes (CAPTR_0013565); Ex. P20, September 28, 2016 RPOC Meeting Minutes (CAPTR_0013580); Doc. 252-10, December 12, 2016 RPOC Meeting Minutes, (CAPTR_0013590); Ex. P49, April 14, 2017 RPOC Meeting Minutes (CAPTR_0013583); Ex. P50, June 23, 2017

vendor arrangement, without any discussion of the scope of the fees reductions, when discussing

"Investment Menu Design."[314] Despite repeated requests from the vendors that they consider

consolidation to reduce fees,[315] The Cornell Defendants never received a quote from TIAA or

Fidelity for consolidation.[316] Despite attempts from CAPTRUST to discuss consolidation with

RPOC, benefits staff unilaterally decided to remove it from the agenda.[317] The limited nature of

the Cornell Defendants' consideration of consolidation is demonstrated by the lack of knowledge

of the RPOC committee members. For example, founding committee member, Joanne

DeStefano, did not know if TIAA, Fidelity or Vanguard could recordkeep other vendor's

funds.[318] Additionally, the Cornell Defendants belief that participants in the Plans preferred a

multiple recordkeeper arrangement with TIAA and Fidelity is not based on fact but assumptions

of RPOC. The Cornell Defendants admitted that they were not aware of any fact that actually

supported their assumption that participants would be dissatisfied with recordkeeper

consolidation, preferred any vendor, or would not be satisfied with similar low cost investments

on another platform.[319] Additionally, the Cornell Defendants experience with recordkeeper

consolidation at the Weill Cornell Plans has not resulted in any dissatisfaction among

participants in those plans.[320] While there is no evidence that participants preferred a multi-

vendor arrangement with TIAA and Fidelity, some participants (including most of Cornell's

Economics department) did request a more efficient provider with a lower cost structure. For

---

RPOC Meeting Minutes (CAPTR_0013561); Ex. P51, September 27, 2017 RPOC Meeting Minutes
(CAPTR_0013939); Ex. P52, December 11, 2017 RPOC Meeting Minutes (CAPTR_0015281).
[314] Doc. 248-9, July 2012 RPOC Meeting Minutes, at 3 (CAPTR_0047911).
[315] Ex. P53, March 28, 2016 email from P. Gallagher (CORNELL016201) ("TIAA has been pushing us on this[sole recordkeeper] on us for years")
[316] Ex. P8, Bursic Tr.at 160:14-20.
[317] Ex. P53, March 28, 2016 email from P. Gallagher (CORNELL016201)
[318] Ex. P45, DeStefano Dep. at 137:1-138:6
[319] Ex. P9, Gallagher Dep. at 135:14-136:5
[320] *Id.* at 140;22-141:2.

example, on September 21, 2013, Throne Professor of Economics, Karl Shell, sent a memo to a number of RPOC members and members of a Faculty Advisory Committee to RPOC.[321] In that memo, Dr. Shell writes that "Cornell Ithaca should consider adding the Vanguard platform, even if this requires dropping one or both of the existing platforms . . . Vanguard provides the lowest-cost index funds. Index funds provide the most efficient diversification of risk. Because of the miracle of compound interest, even very small difference in fees matter a lot over time. Vanguard provides excellent service."[322] Mr. Shell also offered an informal poll of "the greater economic community at Cornell" where every respondent preferred Vanguard and one stated "'Hire Vanguard, fire the other two'."[323]

50.     Between the first and second meetings attended by CAPTRUST, they renegotiated the recordkeeping fees with both TIAA and Fidelity and obtained significant fee reductions.[324]  Upon re-negotiation, TIAA reduced its fees from 20 basis points (bps)[325] to 15 bps and Fidelity reduced their fees from 21 bps to 11 bps.[326]  According to CAPTRUST, these fee reductions represented cost savings of $1.5 million per year going forward.[327]  In addition to these substantial savings going forward, CAPTRUST convinced TIAA and Fidelity to refund over $1.2 million in fees paid the *prior* year,[328] thereby reducing the effective fee charged by TIAA and Fidelity for 2011 to 15 bps and 16 bps, respectively.[329]

---

[321] Ex. P55, September 21, 2013 Memorandum from Karl Shell regarding "Notes for the 23 September 2013 meeting of the RPOC advisory committee" (CORNELL016400).

[322] *Id.*

[323] *Id.*

[324] Doc. 248-13, Ex. 49, April 2012 RPOC Meeting Materials, at 6-8 (CORNELL022014) (discussing results of fee renegotiations).

[325] One basis point is 0.01%.

[326] Doc. 248-14, Ex. 50, April 2012 RPOC Meeting Minutes, at 2 (CORNELL028891).

[327] Doc. 248-13, Ex. 49, April 2012 RPOC Meeting Materials, at 14-15 (CORNELL022014) (noting savings going forward of $913,533 and $579,000 for TIAA and Fidelity, respectively).

[328] Doc. 248-13, Ex. 49, April 2012 RPOC Meeting Materials, at 14-15 (CORNELL022014) (noting one time revenue credits).

[329] Doc. 246-4, Ex. 23, Poehler Rpt. ¶ 76 & SJ Exhibit Page 105-110 (calculating 2011 effective fee rate for Fidelity of 16 bps and TIAA of 15 bps).

**RESPONSE:** Plaintiffs dispute the first sentence of paragraph 50. Rather than engaging in back and forth negotiations with the recordkeepers to bargain for a reasonable price for the services requested, CAPTURST merely periodically requested a new price quote from the recordkeeper and always accepted the first price offered.[330] ███████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████.[331] Plaintiffs dispute the second sentence of paragraph 50. Plaintiffs do not dispute that the asset-based fees the Plans paid were reduced as described. Plaintiffs dispute that this was a result of negotiations and incorporate their response to the first sentence of paragraph 50. Plaintiffs dispute the third sentence of paragraph 50. The document cited by the Cornell Defendants actually demonstrates that the fee savings going forward were projected to be $913,533 for TIAA and $579,000 from Fidelity based on December 31, 2011 asset levels. In fact, due to asset growth and other factors, the total recordkeeping and administrative fees the Plans paid only reduced $142,617 for Fidelity.[332] The total recordkeeping fees the Plans paid TIAA actually decreased $1,398,637, which included $918,675 retroactive rebate for 2011 mentioned in the CAPTRUST presentation.[333] Taking out the $918,675 retroactive rebates for 2011, the TIAA recordkeeping and administrative fees only decreased $479,962 between 2011 and 2012 due to increases of assets and other factors.[334] Plaintiffs

---

[330] Ex. P23, Strodel Dep., at 230:23-231:7
[331] Ex. P56, Weber Dep., at 164:13-165:5; 198:23-199:5; 199:24-201:9; Ex. P57, Warner Dep., at 43:19-44:6, 52:1-7, 71:24-72:6, 171:20-173:20.
[332] Doc. 248-13, April 13, 2012 Meeting Materials Presentation (CORNELL022014), at 13-14; Doc. 246-4, Poehler Report, at 106 (calculating the total recordkeeping and administrative fees paid to Fidelity to be $934,780 and total for 2012 to be $792,163)
[333] Doc. 246-4, Poehler Report, at 105 (calculating the total recordkeeping fees CURP paid TIAA in 2011 to be 2,285,472 and total fees the TDA Plan paid TIAA in 2011 to be $1,2121,392 while the total fees CURP paid TIAA in 2012 to be $1,373,875 and the total fees the TDA Plan paid TIAA to be $725,352).
[334] Doc. 248-13, April 13, 2012 Meeting Materials Presentation (CORNELL022014), at 13-14; Ex. P58, Otto Recordkeeping Damage Analysis (calculating the total recordkeeping fees CURP paid TIAA in 2011 to be

dispute the fourth sentence of paragraph 4. So for the reasons stated in its response to the first sentence, the retroactive rebates were not the result of negotiations. Plaintiffs do not dispute the amounts of the retroactive rebates. Plaintiffs dispute that "the effective fee charged by TIAA and Fidelity for 2011 [was reduced] to 15 bps and 16 bps, respectively." Even the Cornell Defendants' experts' analysis demonstrates that participants in the Plans paid an actual rate of 20 bps to TIAA and 16 bps to Fidelity in 2011.[335] Even if they were given retroactive rebates, participants in the Plans lost investment gains from 2011 until 2012 on the excess fees paid in 2011.

51.      In the years following the initial renegotiation of the recordkeeping fees in early-2012 described above, CAPTRUST and RPOC would renegotiate the recordkeeping fees charged by TIAA and Fidelity approximately every 2 years.[336]  Specifically, RPOC renegotiated the TIAA fees in June 2012, April 2014, April 2016, and January 2018; RPOC renegotiated Fidelity fees in June 2012, August 2015, August 2017, and January 2018[337]  The fee negotiations and the associated fee reductions were as follows:[338]

| Year | TIAA Fee | Fidelity Fee |
|------|----------|--------------|
| 2010 | 20.8 bps<br>$155 per participant | 19.8 bps<br>$82 per participant |
| 2011 | 15 bps<br>$152 per participant | 16.1 bps<br>$66 per participant |
| 2012 | 15 bps<br>$91 per participant | 11 bps<br>$55 per participant |
| 2013 | 15 bps<br>$128 per participant | 11 bps<br>$73 per participant |

2,285,472 and total fees the TDA Plan paid TIAA in 2011 to be $1,2121,392 while the total fees CURP paid TIAA in 2012 to be $1,373,875 and the total fees the TDA Plan paid TIAA to be $725,352); Doc. 246-4, Ex. 23, Poehler Report, at 108.

[335] Doc. 246-4, Poehler Report, at 105

[336] Doc. 246-4, Ex. 23, Poehler Rpt. ¶ 82 (identifying fee reductions).

[337] Doc. 246-5, Ex. 24, TIAA/Cornell Recordkeeping Agreement and amendments (*see* Amendment 5, Amendment 6, Amendment 10, and Amendment 14); Ex. 25, Fidelity/Cornell Recordkeeping Agreement and amendments (*see* Amendment 1, Amendment 3, Amendment 4, and Amendment 5).

[338] Doc. 246-4, Ex. 23, Poehler Rpt. ¶ 82 (*citing* Poehler Rpt. SJ Exhibit Page 105 (TIAA Fee Analysis), SJ Exhibit Page 108 (Fidelity Fee Analysis)).

| 2014 | 13 bps<br>$136 per participant | 11 bps<br>$77 per participant |
|---|---|---|
| 2015 | 10 bps<br>$83 per participant | 8 bps<br>$40 per participant |
| 2016 | 10 bps<br>$95 per participant | 8 bps<br>$43 per participant |
| 2017 | 10 bps<br>$97 per participant | 8 bps<br>$49 per participant |
| 2018 | 5.7 bps<br>$59 per participant | 6 bps<br>$38 per participant |

**RESPONSE**: Plaintiffs dispute the first sentence of paragraph 51. RPOC was not involved in fee negotiations and the Cornell Defendants deferred entirely to CAPTRUST to monitor and negotiate the Plans' recordkeeping fees with little to no oversight. For example, multiple members of RPOC testified that RPOC did not ever review any benchmarking CAPTRUST conducted regarding the Plans' recordkeeping and administrative fees or participate in or monitor their negotiations with TIAA or Fidelity.[339] Rather, the Cornell Defendants relied entirely upon CAPTRUST to "to do their professional job" and CAPTRUST's "strong assurances that this is a good deal."[340] Bursic went as far as testifying, "I don't think anyone on RPOC, including me, but I may be wrong. You may find out otherwise in your other depositions, really knows how CAPTRUST is conducting those negotiations and what the terms are of the agreements that they draw up . . ."[341] Rather than engaging in back and forth negotiations with the recordkeepers to bargain for a reasonable price for the services requested, CAPTRUST merely periodically requested a new price quote from the recordkeeper and always accepted the

---

[339] Ex. P8, Bursic Dep., at 52:16–54:13; *see also* Ex. P9, Gallagher Dep., at 62:11-63:15; Ex. P45, DeStefano Dep., at 129:16-21, 131:4-14; Ex. P46, Edwards Dep. at 107:14-109:6; Ex. P47, Schwartz Dep. at 78:8-80:12; Ex. P48, Prasad Dep., at 67:22-68:16.

[340] Ex. P8, Bursic Dep., at 52:16–54:13

[341] Ex. P8, Bursic Tr.at 119:1-13 ("Q. Okay. So you don't know if there's a cap on the fees within the TIAA plan? A. Right. Q. Has RPOC ever discussed a fee structure like that with a cap, with a set dollar cap? A. I don't think anyone on RPOC, including me, but I may be wrong. You may find out otherwise in your other depositions, really knows how CAPTRUST is conducting those negotiations and what the terms are of the agreements that they draw up, whether or not they include what you've just questioned about a cap on one particular activity that TIAA does, a cap on the cost, that is, of that activity.")

first price offered.[342] █████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████.[343] Plaintiffs dispute the

second sentence of paragraph 51. While Plaintiffs do not dispute that amendments to the

recordkeeping agreements were executed on the listed dates, for the reasons stated in their

response to the first sentence, the Plaintiffs dispute that those amendments were the result of true

negotiations or that RPOC played any role in those negotiations. Plaintiffs dispute the third

sentence of paragraph 3. First, the numbers in the table are inconsistent with the sole document

that the Cornell Defendants cite to support this sentence. For example, Mr. Poehler calculated

TIAA's asset based charge to be 20 bps in 2011 and not 15 bps.[344] While Mr. Poehler lists the

negotiated rate as 15 bps in 2011, the Cornell Defendants admit in paragraph 50 that that rate

was not negotiated until 2012. Similarly, many of the asset-based rate listed in the table are

inconsistent with what Mr. Poehler calculated the plans actually paid.[345] Mr. Poehler's numbers

are not per-participant fees but per-participant account fees.[346] Finally, Mr. Poehler's numbers

are not accurate because the data he relies upon from Mr. Otto's report to determine the number

of participant accounts with balances includes active accounts and all terminated accounts for

TIAA and not just terminated accounts with balances.[347] This inflates the participant count and

lowers the per-participant fees because accounts without balances would not be paying any

---

[342] Ex. P23, Strodel Dep., at 230:23-231:7
[343] Ex. P56, Weber Dep., at 164:13-165:5; 198:23-199:5; 199:24-201:9; Ex. P57, Warner Dep., at 43:19-44:6, 52:1-7, 71:24-72:6, 171:20-173:20.
[344] Doc. 246-4, Poehler Report, at 105
[345] *Id.* at 105, 108
[346] *Id.*
[347] Ex. P21, Rebuttal Report of Al Otto ¶59.

recordkeeping fees, which is why Mr. Otto relied upon only active account in his initial analysis.[348]

52.      All told, as a result of the above negotiations, Cornell and CAPTRUST successfully lowered the recordkeeping fees paid by TIAA to 5.7 bps (71.5% lower than the fee paid in 2010) and the fees paid by Fidelity to 6 bps (71% lower than the 2010 fee).[349]

**RESPONSE**: Plaintiffs dispute paragraph 52. The Cornell Defendants rely upon the declaration of CAPTRUST employee, Scott Matheson, to support this fact, but Mr. Matheson's declaration is not admissible because he was not properly disclosed as a witness in either the Cornell Defendants' or the CAPTRUST's Rule 26(a)(1) disclosures.[350] Additionally, the decrease in the basis point rate participants in the Plans paid for recordkeeping and administrative fees is not material to determining whether the Cornell Defendants breached their fiduciary duties by failing to ensure the fees participants in the Plans paid were reasonable or by retaining imprudent investment options. The Cornell Defendants' expert, Mr. Poehler, advised plan sponsors that "[h]ard dollar fees do not generally increase at the same rate as asset based fees since they are not tied to the growth in the market value of the plan's investments." As even the inaccurate calculations of Mr. Poehler demonstrate, the growth in the market value in the Plans' assets often increased more than the fees were reduced, so Plan participants actually paid higher per-participant fees than before the reduction.[351] The chart below shows the recordkeeping and administrative fees did not consistently go down over time as the Cornell

---

[348] *Id.*
[349] Doc. 238-2, Ex. 51, Strodel Decl. ¶ 10; Doc. 248-12, Ex. 48, Matheson Decl. ¶ 5.
[350] *See* Doc. 278.
[351] Doc. 246-4, Poehler Report, at 105, 108.

Defendants suggest when they are viewed on an actual dollar per participant paid rather than a

basis point:[352]



53.    CAPTRUST and Cornell's success in renegotiating the was attributable to

industry-wide changes, competitive pressures, and the industry-wide introduction of "revenue

credit accounts."[353]  In particular, revenue credit accounts introduced by TIAA and Fidelity in

2011 provided recordkeepers a means by which they could effectively reduce the administrative

expenses paid by participants by refunding some portion of those expenses back to participants

---

[352] Ex. P21, Rebuttal Report of Al Otto ¶51.
[353] Doc. 248-1, Ex. 41, Bursic Tr.37:15-39:3 (explaining pressure exerted by higher education clients and consultants in 2010-2011); Doc. 238-3, Ex. 52, Schmitt Dep. 150:2-22 ("[T]his is the time (2012) where TIAA was becoming more plan level fee driven.  In the past, you had socialized pricing. So whether you were Cornell or you were Wake Medical Community College locally, you had the same fee structure. It was socialized pricing."); Doc. 250-16, Ex. 16, Bursic Decl. ¶ 6; Doc. 249-24, Ex. 112, TIAA Decl. ¶ 17.

after they were collected by the fund manager and paid to the plans' recordkeeper.  Revenue credit accounts were not common among 403(b) plans prior to 2011 and Cornell's early adoption and effective use of revenue credits was industry leading.[354]

**RESPONSE:** Plaintiffs dispute the first sentence of paragraph 53. Cornell was not involved in fee negotiations, and the Cornell Defendants deferred entirely to CAPTRUST to monitor and negotiate the Plans' recordkeeping fees with little to no oversight. For example, multiple members of RPOC testified that RPOC did not ever review any benchmarking CAPTRUST conducted regarding the Plans' recordkeeping and administrative fees or participate in or monitor their negotiations with TIAA or Fidelity.[355] Rather, the Cornell Defendants relied entirely upon CAPTRUST to "to do their professional job" and CAPTRUST's "strong assurances that this is a good deal."[356] Mr. Bursic went as far as testifying, "I don't think anyone on RPOC, including me, but I may be wrong. You may find out otherwise in your other depositions, really knows how CAPTRUST is conducting those negotiations and what the terms are of the agreements that they draw up . . ."[357] Rather than engaging in back and forth negotiations with the recordkeepers to bargain for a reasonable price for the services requested, CAPTURST merely periodically requested a new price quote from the recordkeeper and always

---

[354] Doc. 246-4, Ex. 23, Poehler Rpt. ¶ 75 (citing Ex. 53, Deloitte 2015 Annual Defined Contribution Benchmarking Survey, at 46 (noting that as of 2012 only 28% of plan sponsors had established revenue credit accounts to recover excess revenue)); Doc. 250-16, Ex. 16, Bursic Decl. ¶ 7; Doc. 249-24, Ex. 112, TIAA Decl. ¶ 17 (noting that just eight of TIAA's 15,000 clients had revenue credit accounts prior to December 31, 2010).

[355] Ex. P8, Bursic Dep., at 52:16–54:13; *see also* Ex. P9, Gallagher Dep., at 62:11-63:15; Ex. P45, DeStefano Dep., at 129:16-21, 131:4-14; Ex. P46, Edwards Dep. at 107:14-109:6; Ex. P47, Schwartz Dep. at 78:8-80:12; Ex. P48, Prasad Dep., at 67:22-68:16.

[356] Ex. P8, Bursic Dep., at 52:16–54:13

[357] Ex. P8, Bursic Tr.at 119:1-13 ("Q. Okay. So you don't know if there's a cap on the fees within the TIAA plan? A. Right. Q. Has RPOC ever discussed a fee structure like that with a cap, with a set dollar cap? A. I don't think anyone on RPOC, including me, but I may be wrong. You may find out otherwise in your other depositions, really knows how CAPTRUST is conducting those negotiations and what the terms are of the agreements that they draw up, whether or not they include what you've just questioned about a cap on one particular activity that TIAA does, a cap on the cost, that is, of that activity.")

accepted the first price offered.[358] ██████████████████████████

████████████████████████████████████████

████████████████████████████████████ .[359]

Plaintiffs do not dispute that the competitive environment of the recordkeeping business has led

to large decreases of fees not only from 2010 to present but over the last 15 years.[360] Plaintiffs

dispute the second sentence of paragraph 53. The Cornell Defendants cite no record evidence to

support this fact, so it is improper under Rule 56.1. Revenue credit accounts were not added to

the recordkeeping and administrative agreements for the Plans until 2012.[361] TIAA and Fidelity

offered revenue credit to their accounts prior to 2011.[362] The practice of offering revenue credit

accounts has been common in the industry since at least 2007.[363] Plaintiffs dispute the third

sentence of paragraph 53. The practice of offering revenue credit accounts has been well known

in the industry since at least 2007.[364] In 2007, the ERISA Advisory Council's Working Group on

Fiduciary Responsibilities and Revenue Sharing Practices advised the Secretary of Labor that

"there appears to be nothing in ERISA that prevents a plan fiduciary from negotiating with a

service provider for the return to the plan of any revenue sharing payments that the provider may

---

[358] Ex. P23, Strodel Dep., at 230:23-231:7

[359] Ex. P56, Weber Dep., at 164:13-165:5; 198:23-199:5; 199:24-201:9; Ex. P57, Warner Dep., at 43:19-44:6, 52:1-52:7, 71:24-72:6, 171:20-173:20.

[360] Doc. 249-19, Expert Report of Al Otto ¶19.

[361] Doc. 246-5, TIAA Recordkeeping Agreements (Part 1), at 38-39 (Amendment 5 dated June 2012 and creating a revenue credit account); Doc. 246-07, Fidelity Custodial Account Agreements, at 68-70 (First Amendment dated June 2012 and creating a revenue credit account).

[362] Doc. 249-24, Declaration of Douglass Chittenden ¶17 (██████████████████████████ ██████████ ).

[363] Doc. 249-19, Expert Report of Al Otto ¶¶44-46; Ex. P59, Department of Labor, Advisory Council Report of the Working Group on Fiduciary Responsibilities and Revenue Sharing Practices (2007), https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/erisa-advisory-council/fiduciary-responsibilitiesand-revenue-sharing-practices.

[364] Doc. 249-19, Expert Report of Al Otto ¶¶44-46; Ex. P59, Department of Labor, Advisory Council Report of the Working Group on Fiduciary Responsibilities and Revenue Sharing Practices (2007), https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/erisa-advisory-council/fiduciary-responsibilitiesand-revenue-sharing-practices.

receive."[365] In that same ERISA Advisory Council's Working Group on Fiduciary Responsibilities and Revenue Sharing Practices numerous prominent experts on recordkeeping and administrative fees testified that revenue credit accounts were common prior to 2007.[366]

54.     Not only were fees renegotiated frequently, but the agreements and fee reductions were the result of thorough, arms-length bargaining.[367] In assessing the ongoing reasonableness of fees, the opportunities for fee reductions, and the strength of TIAA's or Fidelity's fee proposals, CAPTRUST compared Cornell's fees against those paid by other higher education clients, evaluated the fees in light of market trends and changes in provider pricing models, and used its proprietary database of administrative expense information to benchmark Plans' administrative costs against comparable plans.[368]  As CAPTRUST's benchmarking database has grown between 2012 and the present, its ability to assess the reasonableness of fees by way of comparison to a greater variety of comparable plans has improved. These more recent comparisons establish that Cornell's fees are not only reasonable, but are in fact below average for plans of similar size and with similar features.[369]

---

[365] Id.

[366] Id.

[367] Doc. 238-3, Ex. 52, Schmitt Dep. 150:23-151:18 (explaining that the negotiation process was "driven" by CAPTRUST, not TIAA).

[368] Doc. 248-12, Ex. 48, Matheson Decl. ¶¶ 5-6; Doc. 238-3, Ex. 52, Schmitt Dep. 108:23-110:7 (discussing fee analysis approach), 153:15-23 (discussing benchmarking), 154:23-155:7 (discussing counteroffers and efforts to obtain further reductions), 159:24-160:6 (discussing the "normal course" of comparing TIAA fee proposals to benchmark data); Doc. 247-6, Ex. 36, Strodel Dep. 114:12-22 (discussing "ongoing negotiations" with Fidelity and "drumbeat towards reducing fees whenever we can" that resulted in additional fee concessions), 224:2-16 ("[W]e have a database of CAPTRUST clients that contains their recordkeeping fees, and it's a dynamic database that we build out over time, and we compare what the prices are versus what our database suggest they could be."); Doc. 238-5, Ex. 54, 2017 Vendor Fee Benchmarking Presentation, at 19 (CAPTR_0046963) ("CAPTRUST maintains expense data in a central proprietary database for evaluating administrative fees, derived from over 1,300 institutional client relationships which spread across an extensive range of retirement plan service providers."); Doc. 248-13, Ex 49, April 2012 RPOC Meeting Materials, at 23-25 (discussing fee analysis and benchmarking database) (CORNELL022014).

[369] Doc. 248-12, Ex. 48, Matheson Decl. ¶ 6 ("The fees implemented in 2015 at both Fidelity and TIAA were in the best 5% (i.e. among the lowest price) of all CAPTRUST university clients for which our centralized team had current pricing information."); Doc. 247-6, Ex. 36, Strodel Dep. 224:2-226:14 (discussing expansion of database).

**RESPONSE:** Plaintiffs dispute the first sentence of paragraph 54. Rather than engaging in back and forth negotiations with the recordkeepers to bargain for a reasonable price for the services requested, CAPTURST merely periodically requested a new price quote from the recordkeeper and always accepted the first price offered.[370] ███████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████.[371] Plaintiffs dispute the second sentence of paragraph 54. The Cornell Defendants rely upon the declaration of CAPTRUST employee, Scott Matheson, to support this fact, but Mr. Matheson's declaration is not admissible because he was not properly disclosed as a witness in either the Cornell Defendants' or the CAPTRUST's Rule 26(a)(1) disclosures.[372] CAPTRUST Senior Vice President James Strodel only recalled conducting a benchmarking to the fees paid by other CAPTRUST clients in 2012.[373] CAPTRUST Senior Vice President Barron Schmitt did not recall benchmarking of TIAA's fees when TIAA offered new prices in 2012, 2014, or 2017.[374] The only fee benchmarking that Schmitt recalled was after this lawsuit, but he could not recall how Cornell's fees compared to the 10 to 20 similar CAPTRUST clients.[375] Schmitt had no recollection of ever benchmarking the fees the Plans paid to Fidelity after 2012.[376] Any benchmarking conducted in 2012 consisted only of a "fairly limited" set of "maybe" five comparable clients.[377] Additionally, Schmitt admitted that any benchmarking would have only compared the fees the Plans paid to TIAA to fees paid to TIAA by other

---

[370] Ex. P23, Strodel Dep., at 230:23-231:7
[371] Ex. P56, Weber Dep., at 164:13-165:5; 198:23-199:5; 199:24-201:9; Ex. P57, Warner Dep., at 43:19-44:6, 52:1-52:7, 71:24-72:6, 171:20-173:20.
[372] *See* Doc. 278.
[373] Ex. P23, Strodel Dep., at 223:12-16.
[374] Ex. P59, Schmitt Dep. at 156:13-157:5, 157:19-158:1, 159:12-160:11, 162:22-163:10, 166:14-167:3.
[375] *Id.* at 169:21–170:4.
[376] *Id.* at 176:22–178:24.
[377] Ex. P23, Strodel Dep. at 223:13-227:10.

CAPTRUST clients and the fees the Plans paid to Fidelity to what other clients paid Fidelity.[378]

CAPTRUST made no comparison to what prices other vendors were charging similar plans.[379]

Plaintiffs dispute the third sentence of paragraph 54. To the extent that the Cornell Defendants

are citing to the portions to Mr. Strodel's deposition cited in support of the fourth sentence,

Plaintiffs do not dispute that Mr. Strodel testified that there were "maybe" 5 comparable plans to

the Plans in CAPTRUST's database in 2012 and it later became more "robust."[380] The Cornell

Defendants cite to no record evidence to support this fact, so it is improper under Rule 56.1.

Plaintiffs dispute the fourth sentence of paragraph 54. The Cornell Defendants rely primarily on

the declaration of CAPTRUST employee Scott Matheson to support this fact. Mr. Matheson's

declaration is not admissible because he was not properly disclosed as a witness in either the

Cornell Defendants' or the CAPTRUST's Rule 26(a)(1) disclosures.[381]

55.     Relying on benchmark data is among the most common and effective means

for regularly assessing administrative fees.  For example, a 2017 Callan survey found that among

those plan sponsors that performed a formal assessment of the administrative fees paid by their

plans, over half relied on a consulting database or benchmarking data similar to that maintained

by CAPTRUST. In assessing the reasonableness of Cornell's fees, CAPTRUST determined that

a "request for proposals" to multiple recordkeepers would not provide useful market information

because the two incumbent recordkeepers (TIAA and Fidelity) were the only two recordkeepers

in the market capable of providing the services necessary.[382]

---

[378] Ex. P60, Schmitt Dep., at 179:12-21.
[379] *Id.*
[380] Ex. P23, Strodel Dep., at 223:13-227:10
[381] *See* Doc. 278.
[382] Doc. 248-12, Ex. 48, Matheson Decl. ¶ 3.

**RESPONSE:** Plaintiffs dispute the first two sentences of paragraph 55. The Cornell Defendants do not cite to any record evidence to support these fact, so they are improper under Rule 56.1. Conducting a request for proposal (RFP) every three to five years has been the accepted industry practice to evaluate the reasonableness of recordkeeping fees for years. For example, ███████████████████████████████████████████████████ ██████████████████████████████████████████"[383]. ████████████████████████████████ ██████████████████████████l.[384] The principle that conducting an RFP every three to five years is industry practice is similarly consistent with statements of the Department of Labor. In 2010 proposed regulations, the Department of Labor specifically noted "plans normally conduct requests for proposal (RFPs) from service providers at least once every three to five years."[385] Similarly, periodically conducting an RFP or an RFI to evaluate the reasonableness of recordkeeping fees was the Cornell Defendants' expert, Poehler's, practice when he advised defined contribution plans on the reasonableness of the recordkeeping fees. Mr. Poehler testified that the method he used to assess recordkeeping prior to the mid-2000s was to conduct an RFP.[386] In the mid-2000s, Mr. Poehler began using requests for information (RFIs) to evaluate the reasonableness of recordkeeping fees.[387] Mr. Poehler never used database benchmarking, like what CAPTRUST conducted for Cornell, during his time advising clients.[388] Mr. Poehler and his colleagues at Mercer used RFIs because their clients were "larger, more complicated plans, so the feeling was to get quotes that were as close as possible to the specific services that were needed for that plan, that an RFI process gave the client the information they needed to

---

[383] Ex. P61, Cammack LaRhette RFP Response (CORNELL006753) at 766.
[384] Ex. P62, Segal Advisors RFP Response (CORNELL006782), at 810-11.
[385] Ex. P63, Reasonable Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure, 75 FR 41600, 41625 (July 16, 2010).
[386] Ex. P2, Poehler Tr., at 31:17–32:5, 34:5-20,
[387] Ex. P2, Poehler Tr., at 38:23–39:10.
[388] *Id.* at 39:16-19.

determine whether or not the fees were still reasonable."[389]  Mr. Poehler admitted that the

Cornell Plans were "large and complicated" that in practice he believed that an RFP or RFI was

necessary to give "the client the information they needed to determine whether or not the fees

were still reasonable."[390] Plaintiffs' experts, Ty Minnich, who worked in providing

recordkeeping and administrative services for CitiStreet, MetLife and Transamerica for over

thirty years, and Al Otto, who advised fiduciaries or was a co-fiduciary for numerous plans

regarding recordkeeping fees for over 20 years, opined that standard industry practice is to

conduct an RFP for recordkeeping and administrative service every three to five years.[391] In a

declaration in this case, a Fidelity executive testified that recordkeeping "pricing is often

determined through a blind bidding process."[392] Additionally, Plaintiffs dispute the third

sentence of paragraph 55. The Cornell Defendants rely entirely on the declaration of

CAPTRUST employee Scott Matheson to support this fact. Mr. Matheson's declaration is not

admissible because he was not properly disclosed as a witness in either the Cornell Defendants'

or the CAPTRUST's Rule 26(a)(1) disclosures.[393] Additionally, as discussed in the response to

the first two sentences of paragraph 55, conducting periodic RFPs has been industry-accepted

practice for years.

     56.     Third and finally, where RPOC believed that the fee reductions proposed by

the recordkeepers did not represent their best-and-final offers or that the fees were higher than

those paid by Cornell's peers, Benefits Services and RPOC met with the recordkeeper and

---

[389] *Id.* at 87:16–88:3.
[390] *Id.* at 87:16–88:6.
[391] Doc. 249-19, Expert Report of Al Otto, ¶27-34; Doc. 249-20, Expert Report of Ty Minnich ¶68.
[392] Doc. 271. Declaration of Scott Sensseney, ¶3.
[393] *See* Doc. 278.

demanded either further reductions or explanations for what was driving the recordkeeping costs. This occurred on at least two occasions: once in 2012 and again in 2016.

**RESPONSE:** Plaintiffs dispute paragraph 56. The Cornell Defendants do not cite to any record evidence to support these facts, so they are improper under Rule 56.1. Cornell was not involved in fee negotiations, and Cornell Defendants deferred entirely to CAPTRUST to monitor and negotiate the Plans' recordkeeping fees with little to no oversight. For example, multiple members of RPOC testified that RPOC never reviewed any benchmarking CAPTRUST conducted regarding the Plans' recordkeeping and administrative fees or participate in or monitor their negotiations with TIAA or Fidelity.[394] Rather, the Cornell Defendants relied entirely on CAPTRUST "to do their professional job" and upon CAPTRUST's "strong assurances that this is a good deal."[395] Bursic went was far as testifying "I don't think anyone on RPOC, including me, but I may be wrong. You may find out otherwise in your other depositions, really knows how CAPTRUST is conducting those negotiations and what the terms are of the agreements that they draw up . . ."[396] Rather than engaging in back and forth negotiations with the recordkeepers to bargain for a reasonable price for the services requested, CAPTRUST merely periodically requested a new price quote from the recordkeeper and always accepted the first price offered.[397]

███████████████████████████████████████████████

---

[394] Ex. P8, Bursic Dep., at 52:16–54:13; *see also* Ex. P9, Gallagher Dep., at 62:11-63:15; Ex. P45, DeStefano Dep., at 129:16-21, 131:4-14; Ex. P46, Edwards Dep. at 107:14-109:6; Ex. P47, Schwartz Dep. at 78:8-80:12; Ex. P48, Prasad Dep., at 67:22-68:16.

[395] Ex. P8, Bursic Dep., at 52:16–54:13.

[396] Ex. P8, Bursic Tr.at 119:1-13 ("Q. Okay. So you don't know if there's a cap on the fees within the TIAA plan? A. Right. Q. Has RPOC ever discussed a fee structure like that with a cap, with a set dollar cap? A. I don't think anyone on RPOC, including me, but I may be wrong. You may find out otherwise in your other depositions, really knows how CAPTRUST is conducting those negotiations and what the terms are of the agreements that they draw up, whether or not they include what you've just questioned about a cap on one particular activity that TIAA does, a cap on the cost, that is, of that activity.")

[397] Ex. P8, Strodel Dep., at 230:23-231:7

██████████████████████████████████████████████████████████

████████████████████████████████.[398]

57.      After receiving TIAA's reduced fee offer in 2012, Cornell noted that the TIAA

fee charged to Cornell was higher than the fee charged to the Weill Cornell Medical Center,

whose plans are also governed by RPOC and are similar in size and number of participants.

Cornell requested that TIAA either lower its fees to match those offered to Weill or provide an

explanation for the different. Reflecting the different levels and types of services offered to each

of its clients, TIAA explained that Cornell's higher fee was attributable to maintaining a premier

call center, offering onsite counseling to employees, and addressing Cornell employees who

participate in SUNY's retirement plan, which added complexity.[399] (Portions of Cornell are

affiliated with the SUNY system.)

**RESPONSE:** Plaintiffs dispute the first and second sentences of paragraph 57. No record

evidence is cited in support of this fact, so they are improper under Rule 56.1. Plaintiffs do not

dispute the third sentence of paragraph 57 to the extent that TIAA attributed the difference

between the fees of Weill Cornell and Cornell to the "Premier Call Center," "Onsite Counseling"

and "SUNY Relationship" as part of its "2013 Strategy."[400] Additionally, TIAA offered to

reduce its fees by 10% if Cornell agreed to "standardiz[ing] the call center across all Cornell-

---

[398] Ex. P56, Weber Dep., at 164:13-165:5; 198:23-199:5; 199:24-201:9; Ex. P57, Warner Dep., at 43:19-44:6, 52:1-52:7, 71:24-72:6, 171:20-173:20.
[399] Doc. 238-7, Ex. 56, 2012 TIAA Revenue Requirement Executive Summary, at 2 (CORNELL024262) (noting that explanatory memorandum was prepare "to ensure the revenue requirement for Cornell and Weill Cornell Medical College is both reasonable and as low as possible under the current service model"); Doc. 238-8, Ex. 57, TIAA Side-By-Side Comparison of Cornell/Weill Services (CORNELL021554).
[400] Doc. 238-7, Executive Summary - Cornell University and Weill Cornell Medical College November Retirement Plan Oversight Committee Meeting (CORNELL021554) at 3

sponsored plans and implementing the efficiencies we have identified."[401] The Cornell

Defendants do not appear to have acted upon this fee reduction offer.[402]

      58.    In 2016, Cornell requested a similar fee reduction or explanation after noting

that TIAA's fee offer to Cornell was higher than the fee charged to comparable CAPTRUST

clients. TIAA provided a memorandum that explained that Cornell participants used certain

high cost services far more than comparable universities.[403] TIAA provided Cornell the

following usage comparisons relative to five multi-vendor peer plans:

- Highest usage of TIAA Financial Consulting Group (FCG)

- Highest usage of TIAA IAS advisors (high net-worth advice)

- Highest number of plan participant seminars

- Highest cost for plan compliance/advisory services

- Highest number of lump sum transactions

- Highest number of manual systemic withdrawals

- Highest number of Minimum Distribution Option elections

- Second highest phone center costs

- Second highest number of custom communications

After reviewing these statistics and noting that Cornell's participants were taking advantage of

the various service offerings provided by TIAA, RPOC decided to accept TIAA's fee offer.[404]

---

[401] *Id.* at 4
[402] Doc. 232 ¶51 (admitting their required revenue rate until 2014 was 15 bps).
[403] Doc. 238-6, Ex. 55, January 2016 TIAA Revenue Requirement Executive Summary
(TIAA_CORNELL_00041890) (explaining that Cornell participants used many "high cost" TIAA services more
than peer institutions).
[404] Doc. 238-9, Ex. 58, March 2016 RPOC Meeting Minutes, at 5 (CAPTR_0013568) (noting agreement on lower
required revenue rate following "further negotiations" with TIAA).

**RESPONSE:** Plaintiffs dispute the first two sentences of paragraph 58. The Cornell Defendants fail to cite any record evidence demonstrating that "Cornell requested" a fee reduction in 2016 "or explanation after noting that TIAA's fee offer to Cornell was higher than the fee charged to comparable CAPTRUST clients." The only source cited in support of this sentence is a January 26, 2016 letter from TIAA providing that "[t]his summary was prepared for Jim Strodel and Barry Schmitt of CAPTRUST to address their request and provide them with a better understanding behind factors which influenced the revenue requirement of 10 basis points for Cornell University and Weill Cornell Medical College."[405] Cornell was not involved in fee negotiations, and Cornell Defendants deferred entirely to CAPTRUST to monitor and negotiate the Plans' recordkeeping fees with little to no oversight. For example, multiple members of RPOC testified that RPOC never reviewed any benchmarking CAPTRUST conducted regarding the Plans' recordkeeping and administrative fees, nor participated in or monitored their negotiations with TIAA or Fidelity.[406] Rather, the Cornell Defendants relied entirely on CAPTRUST to "to do their professional job" and upon CAPTRUST's "strong assurances that this is a good deal."[407] Bursic went as far as testifying "I don't think anyone on RPOC, including me, but I may be wrong. You may find out otherwise in your other depositions, really knows how CAPTRUST is conducting those negotiations and what the terms are of the agreements that they draw up . . ."[408] Rather than engaging in back and forth negotiations with the recordkeepers

---

[405] Doc. 238-6, Jan. 26, 2016 Letter from E. McKay. Re: Cornell University and Weill Cornell Medical College Revenue Requirement (TIAA_CORNELL_00041890), at 2.
[406] Ex. P8, Bursic Dep., at 52:16–54:13; *see also* Ex. P9, Gallagher Dep., at 62:11-63:15; Ex. P45, DeStefano Dep., at 129:16-21, 131:4-14; Ex. P46, Edwards Dep. at 107:14-109:6; Ex. P47, Schwartz Dep. at 78:8-80:12; Ex. P48, Prasad Dep., at 67:22-68:16.
[407] Ex. P8, Bursic Dep., at 52:16–54:13.
[408] Ex. P8, Bursic Tr.at 119:1-13 ("Q. Okay. So you don't know if there's a cap on the fees within the TIAA plan? A. Right. Q. Has RPOC ever discussed a fee structure like that with a cap, with a set dollar cap? A. I don't think anyone on RPOC, including me, but I may be wrong. You may find out otherwise in your other depositions, really knows how CAPTRUST is conducting those negotiations and what the terms are of the agreements that they draw up,

to bargain for a reasonable price for the services requested, CAPTRUST merely requested a new

price quote from the recordkeeper periodically and always accepted the first price offered.[409]

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████.[410] Additionally, the January 26, 2016 letter

merely notes that Cornell utilized certain services more than five multiple vendor clients with

similar assets and average balances hand-picked by TIAA.[411] It does not relate that these services

were "high cost" as the Cornell Defendants characterize them or that Cornell utilizes these

services more than any client other than those five hand-picked by TIAA.[412] Plaintiffs dispute the

third sentence of paragraph 58. The Plans' usage of certain services compared to five plans hand-

picked by TIAA is not material to whether the Cornell Defendants breached their fiduciary duty

by failing to ensure the participants in the Plans paid reasonable fees or by retaining imprudent

investment options in the Plans. Plaintiffs dispute the fourth sentence of paragraph 58. Plaintiffs

do not dispute that RPOC accepted TIAA's 10 bps revenue requirement at the March 31, 2016

RPOC meeting.[413] However, the Cornell Defendants cite to no record evidence demonstrating

that RPOC reviewed, let alone considered, the January 2016 letter from TIAA.  In fact, the

meeting materials for the March 31, 2016 RPOC meeting do not include the January 2016 letter

from TIAA or any discussion of the statistics therein.[414]

---

whether or not they include what you've just questioned about a cap on one particular activity that TIAA does, a cap on the cost, that is, of that activity.")

[409] Ex. P8, Strodel Dep., at 230:23-231:7.

[410] Ex. P56, Weber Dep. at 164:13-165:5; 198:23-199:5; 199:24-201:9; Ex. P57, Warner Dep. at 43:19-44:6, 52:1-52:7, 71:24-72:6, 171:20-173:20.

[411] Doc. 238-6, Jan. 26, 2016 Letter from E. McKay. Re: Cornell University and Weill Cornell Medical College Revenue Requirement (TIAA_CORNELL_00041890), at 2-3.

[412] *Id.*

[413] Doc. 238-9, March 31, 2016 RPOC Meeting Minutes, at 5 (CAPTR_0013568).

[414] Ex. P91, Mar. 31, 2016 RPOC Meeting Materials (CORNELL011359-361).

59.     In addition to the above steps taken to renegotiate Cornell's fees and obtain revenue credits, Cornell also took steps to reduce the fees charged at the fund level (i.e. the gross expense ratio charged by investment managers for specific investments) by transitioning to lower-cost share classes when possible.  Cornell's actions in this regard began as early as 2010 and included the following share class changes:

| Date | Change |
|---|---|
| September 2010[415] | • Replace 29 Fidelity mutual funds with lower cost Institutional K Share Class<br>• Replace all Fidelity Freedom Funds (Target Date Funds) with lower cost Institutional K Share Class |
| December 2010[416] | • Replace three Vanguard "Investor Class" index funds with lower cost "Signal Class" funds on Fidelity platform. |
| May 2011[417] | • Replace Fidelity Bond Index Fund and Index Fund with Spartan Institutional Class Shares. |
| October 2011[418] | • Replace Fidelity Spartan Total Market Index Fund "Investor Class" with "Institutional Class" shares. |
| February 2012[419] | • Replaced all TIAA-CREF Lifecycle Funds (Target Date Funds) with Institutional Class funds<br>• Replaced all TIAA Mutual Funds with Institutional Class funds<br>• Replaced two mutual fund options managed by third-party American Funds with share classes without revenue sharing |
| December 2014[420] | • Replaced all CREF variable annuities with lowest cost "R3" class shares. |

**RESPONSE:** Plaintiffs dispute the first sentence of paragraph 59. The Cornell

Defendants do not cite to any record evidence to support this fact, so it is improper under Rule

---

[415] Doc. 238-10, Ex. 59, September 7, 2010 Email and Attachment Regarding Fidelity K Shares (CORNELL021638).
[416] Doc. 239-1, Ex. 60, December 2010 Vanguard Signal Share Class Conversion Letter-of-Direction (CORNELL021662).
[417] Doc. 239-2, Ex. 61, May 2011 Letter-of-Direction for Spartan Share Replacement (CORNELL025524).
[418] Doc. 239-3, Ex. 62, October 2011 Fidelity Letter of Direction for Spartan Fund Replacement (CORNELL021736).
[419] Doc. 246-2, Ex. 24, TIAA/Cornell Recordkeeping Agreement and amendments, at 34-36 (adding "Institutional" mutual funds), 46-47 (adding Institutional third-party funds), 62-65 (adding "R3" share class of variable annuities).
[420] Doc. 247-9, Ex. 39, 2014 CREF Multi-Class Structure Presentation, at 7 (CORNELL023649).

56.1. In fact, the Cornell Defendants did not transition to the lowest-cost share classes that were available. For example, TIAA offered institutional share classes for all its mutual funds as early as February 2009.[421] All defined contribution plans were eligible for institutional share classes if they had over $2 million invested in the funds (certain defined contributions plans were eligible for institutional shares without any threshold).[422] The Plans had over $2 million of assets in TIAA Lifecycle Funds on December 31, 2009 at the latest.[423] Despite being unquestionably eligible for institutional share classes of the TIAA Lifecycle funds, the Plans retained retirement class shares of the TIAA Lifecycle funds at the end of 2009.[424] The Cornell Defendants did not adopt the lower cost institutional share classes for the TIAA mutual funds until February 22,

---

[421] Ex. P64, TIAA-CREF Funds, Lifecycle funds (Inst), Prospectus at pp. 719-20 (485BPOS) (Jan. 28, 2009) (available at https://www.sec.gov/Archives/edgar/data/1084380/000093041309000523/c56137_485bpos.htm). Ex. P65, TIAA-CREF Funds, Money Market (Inst) fund (TCIXX), Prospectus at pp. 106-107 (485BPOS) (Jan. 28, 2009) (available at https://www.sec.gov/Archives/edgar/data/1084380/000093041309000523/c56137_485bpos.htm); Ex. P66, TIAA-CREF Funds, International Equity Index (Inst) fund (TCIEX), Prospectus at pp. 106-107 (485BPOS) (Jan. 28, 2009) (available at https://www.sec.gov/Archives/edgar/data/1084380/000093041309000523/c56137_485bpos.htm); Ex. P67, TIAA-CREF Funds, Mid-Cap Value (Inst) fund (TIMVX), Prospectus at pp. 106-107 (485BPOS) (Jan. 28, 2009) (available at https://www.sec.gov/Archives/edgar/data/1084380/000093041309000523/c56137_485bpos.htm); Ex. P68, TIAA-CREF Funds, Growth & Income (Inst) fund (TIGRX), Prospectus at pp. 106-107 (485BPOS) (Jan. 28, 2009) (available at https://www.sec.gov/Archives/edgar/data/1084380/000093041309000523/c56137_485bpos.htm); Ex. P69, TIAA-CREF Funds, International Equity (Inst) fund (TIIEX), Prospectus at pp. 106-107 (485BPOS) (Jan. 28, 2009) (available at https://www.sec.gov/Archives/edgar/data/1084380/000093041309000523/c56137_485bpos.htm); Ex. P70, TIAA-CREF Funds, Small-Cap Blend Index (Inst) fund (TISBX), Prospectus at pp. 106-107 (485BPOS) (Jan. 28, 2009) (available at https://www.sec.gov/Archives/edgar/data/1084380/000093041309000523/c56137_485bpos.htm); Ex. P71, TIAA-CREF Funds, Short-Term Bond (Inst) fund (TISIX), Prospectus at pp. 106-107 (485BPOS) (Jan. 28, 2009) (available at https://www.sec.gov/Archives/edgar/data/1084380/000093041309000523/c56137_485bpos.htm). Ex. P72, TIAA-CREF Funds, Large-Cap Value (Inst) fund (TRLIX), Prospectus at pp. 106-107 (485BPOS) (Jan. 28, 2009); (available at https://www.sec.gov/Archives/edgar/data/1084380/000093041309000523/c56137_485bpos.htm); Ex. P73, TIAA-CREF Funds, Equity Index (Inst) fund (TIEIX), Prospectus at pp. 106-107 (485BPOS) (Jan. 28, 2009) (available at https://www.sec.gov/Archives/edgar/data/1084380/000093041309000523/c56137_485bpos.htm

[422] *See supra* n. 424.

[423] Doc. 247-8, Ex. 38, December 31, 2009 TIAA CURP Investment Expense and Fee Disclosure (TIAA_CORNELL_00011306), at 307.; Doc. 247-7, Ex. 37, Dec. 31, 2009 TIAA TDA Plan Investment Expenses and Fee Disclosure (TIAA_CORNELL_00002094) at 095.

[424] Doc. 247-8, Ex. 38, December 31, 2009 TIAA CURP Investment Expense and Fee Disclosure (TIAA_CORNELL_00011306), at 307.; Doc. 247-7, Ex. 37, Dec. 31, 2009 TIAA TDA Plan Investment Expenses and Fee Disclosure (TIAA_CORNELL_00002094) at 095.

2012.[425] The failure to adopt the lower institutional share classes of the TIAA-CREF Lifecycle funds alone caused $336,577 in damages to Plan participants between August 17, 2010, and December 31, 2011.[426] Plaintiffs dispute the second sentence of paragraph 59. The table of share class changes offered by the Cornell Defendants in this sentence contains a number of misstatements of fact. The Plans did not shift to K share classes of Fidelity Funds in September 2010, but rather Fidelity unilaterally offered to move 29 funds to K share classes effective December 2010 in an email in September 2010.[427] Institutional share classes were available to the Plans with no minimum asset levels in many Fidelity funds prior to December 2010.[428] The document cited by Cornell Defendants to support that the R3 share classes of CREF variable annuities were added to the Plans in December 2014 does not state that these share classes were adopted in December 2014, but that "more information" would be provided in December 2014 and "the actual change will occur in the 2nd Quarter of 2015."[429] This is consistent with TIAA's own documents related to the share class change stating it took effect April 24, 2015.[430]

---

[425] Doc. 246-005, TIAA/ Recordkeeping Agreements, at 34-36 (adding "Institutional" mutual funds)

[426] Doc. 249-18, Expert Report of Wendy Dominguez, ¶123.

[427] Doc. 238-10, Sept. 7, 2010 email from P. Warner to P. Bursic and M. Zielnisk (CORNELL021638) ("We will be making all K Share Funds available to Cornell University employees on 12/8/2010")

[428] See, e.g., Ex. P74, Fid. Investments, Fid. Freedom K funds, Prospectus at p. 241 (485BPOS) (May 28, 2010) (available at https://www.sec.gov/Archives/edgar/data/880195/000088019510000114/main.htm); Ex. P75, Fid. Investments, Fid. Contrafund (K) (FCNKX), Prospectus at p. 133 (485BPOS) (Feb. 27, 2009) (available at https://www.sec.gov/Archives/edgar/data/24238/000002423809000002/main.htm); Ex. P76, Fid. Investments, Fid. Magellan (K) fund (FMGKX), Prospectus at p. 49 (485BPOS) (May 29, 2009) (available at https://www.sec.gov/Archives/edgar/data/61397/000006139709000002/main.htm); Ex. P77, Fid. Investments, Fid. Blue Chip Growth (K) fund (FBGKX), Prospectus at p. 361 (485BPOS) (Oct. 8, 2009) (available at https://www.sec.gov/Archives/edgar/data/754510/000031570009000021/main.htm); Ex. P78, Fid. Investments, Fid. Growth & Income (K) fund (FGIKX), Prospectus at p. 385 (485BPOS) (Oct. 8, 2009) (available at https://www.sec.gov/Archives/edgar/data/754510/000031570009000021/main.htm); Ex. P79, Fid. Investments, Fid. Dividend Growth (K) fund (FDGKX), Prospectus at p. 373 (485BPOS) (Oct. 8, 2009) (available at https://www.sec.gov/Archives/edgar/data/754510/000031570009000021/main.htm); Ex. P80, Fid. Investments, Fid. OTC (K) fund (FOCKX), Prospectus at p. 408 (485BPOS) (Oct. 8, 2009) (available at https://www.sec.gov/Archives/edgar/data/754510/000031570009000021/main.htm); Ex. P81, Fid. Investments, Fid. Leveraged Co. Stock (K) fund (FLCKX), Prospectus at p. 396 (485BPOS) (Oct. 8, 2009) (available at https://www.sec.gov/Archives/edgar/data/754510/000031570009000021/main.htm).

[429] Doc. 447-9 Oct. 24, 2014 Email for M. Zielinski to P. Bursic (CORNELL023646).

[430] Ex. P82, Frequently Asked Questions about the College Retirement Equities Fund (CREF) Multi-Class Structure, TIAA, 2015, p. 1, available at,  https://www.tiaa.org/public/pdf/intermediary_faq_crefrea.pdf.

Moreover, as stated above many of these funds were eligible for share classes for years prior to the Cornell Defendants adopting the lower share class for the Plans.

60.      While this shift to lower-cost share classes began prior to the retention of CAPTRUST and the negotiation of the revenue credit accounts, Cornell's ability to reduce fees through lower-cost share classes was limited because lower-cost share classes were only available for some of the Plans' investments prior to the negotiation of the revenue credits.[431] Defendants that TIAA has never offered additional share classes for the TIAA Traditional Annuity or the TIAA Real Estate Account and did not introduce lower cost shares for the CREF Stock Account until 2014.[432]

**RESPONSE:** Plaintiffs dispute the first sentence of paragraph 60.



.[433] TIAA offered institutional share classes for all its mutual funds as early as February 2009.[434] All defined contribution plans were eligible

---

[431] Doc. 250-16, Ex. 16, Bursic Decl. ¶¶ 6-7; Ex. 112, Chittenden *Cunningham* Decl. ¶ .

[432] Doc. 247-9, Ex. 39, 2014 CREF Multi-Class Structure Presentation, at 7 (CORNELL023649); Doc. 247-10, Ex. 40, 2015 TIAA Business Planning Presentation, at 64 (CORNELL006362) ("Under the single-class structure CREF has used to date, expense ratios have been the same across employer sponsored and individual plans of all sizes. Based on the changing marketplace, evolving regulatory environment, and varying needs of plan sponsors, we are creating a new, multi-class structure to better reflect the actual costs of serving our wide range of clients. The progression from a 'one-size fits all' approach for CREF will provide greater equity in pricing and help relieve the challenge plan fiduciaries face assessing fees given CREF's single-class structure.").

[433] Doc. 249-24, Declaration of D. Chittenden, ¶¶22-23.

[434] Ex. P64, TIAA-CREF Funds, Lifecycle funds (Inst), Prospectus at pp. 719-20 (485BPOS) (Jan. 28, 2009) (available at https://www.sec.gov/Archives/edgar/data/1084380/000093041309000523/c56137_485bpos.htm). Ex. P65, TIAA-CREF Funds, Money Market (Inst) fund (TCIXX), Prospectus at pp. 106-107 (485BPOS) (Jan. 28, 2009) (available at https://www.sec.gov/Archives/edgar/data/1084380/000093041309000523/c56137_485bpos.htm); Ex. P66, TIAA-CREF Funds, International Equity Index (Inst) fund (TCIEX), Prospectus at pp. 106-107 (485BPOS) (Jan. 28, 2009) (available at https://www.sec.gov/Archives/edgar/data/1084380/000093041309000523/c56137_485bpos.htm); Ex. P67, TIAA-CREF Funds, Mid-Cap Value (Inst) fund (TIMVX), Prospectus at pp. 106-107 (485BPOS) (Jan. 28, 2009) (available at https://www.sec.gov/Archives/edgar/data/1084380/000093041309000523/c56137_485bpos.htm); Ex. P68, TIAA-CREF Funds, Growth & Income (Inst) fund (TIGRX), Prospectus at pp. 106-107 (485BPOS) (Jan. 28, 2009) (available at https://www.sec.gov/Archives/edgar/data/1084380/000093041309000523/c56137_485bpos.htm); Ex. P69, TIAA-CREF Funds, International Equity (Inst) fund (TIIEX), Prospectus at pp. 106-107 (485BPOS) (Jan. 28, 2009) (available at

for institutional share classes if they had over $2 million invested in most of the funds (certain

defined contributions plans were eligible for institutional shares without any threshold).[435] The

Plans had over $2 million of assets in TIAA Lifecycle Funds on December 31, 2009 at the

latest.[436] Despite being unquestionably eligible for Institutional share classes of the TIAA

Lifecycle funds, the Plans had identical, higher-cost retirement class shares of the TIAA

Lifecycle funds at the end of 2009.[437] The Cornell Defendants did not adopt the lower cost

institutional share classes for the TIAA mutual funds until February 22, 2012.[438] The failure to

adopt the identical lower-cost institutional share classes of the TIAA-CREF Lifecyles funds

alone caused $336,577 in damages to Plan participants between August 17, 2010 and December

31, 2011.[439] Plaintiffs dispute the second sentence of paragraph 60. Share classes for CREF

variable annuities became available the second quarter of 2015.[440]

       61.      Moreover, once the required revenue rates and revenue credit accounts were

implemented in 2011, the types of share classes available through the Plans became irrelevant

---

https://www.sec.gov/Archives/edgar/data/1084380/000093041309000523/c56137_485bpos.htm); Ex. P70, TIAA-CREF Funds, Small-Cap Blend Index (Inst) fund (TISBX), Prospectus at pp. 106-107 (485BPOS) (Jan. 28, 2009) (available at https://www.sec.gov/Archives/edgar/data/1084380/000093041309000523/c56137_485bpos.htm); Ex. P71, TIAA-CREF Funds, Short-Term Bond (Inst) fund (TISIX), Prospectus at pp. 106-107 (485BPOS) (Jan. 28, 2009) (available at
https://www.sec.gov/Archives/edgar/data/1084380/000093041309000523/c56137_485bpos.htm). Ex. P72, TIAA-CREF Funds, Large-Cap Value (Inst) fund (TRLIX), Prospectus at pp. 106-107 (485BPOS) (Jan. 28, 2009); (available at https://www.sec.gov/Archives/edgar/data/1084380/000093041309000523/c56137_485bpos.htm); Ex. P73, TIAA-CREF Funds, Equity Index (Inst) fund (TIEIX), Prospectus at pp. 106-107 (485BPOS) (Jan. 28, 2009) (available at https://www.sec.gov/Archives/edgar/data/1084380/000093041309000523/c56137_485bpos.htm.
[435] *See supra* n. 437.
[436] Doc. 247-8, Ex. 38, December 31, 2009 TIAA CURP Investment Expense and Fee Disclosure (TIAA_CORNELL_00011306), at 307; Doc. 247-7, Ex. 37, Dec. 31, 2009 TIAA TDA Plan Investment Expenses and Fee Disclosure (TIAA_CORNELL_00002094) at 095.
[437] Doc. 247-8, Ex. 38, December 31, 2009 TIAA CURP Investment Expense and Fee Disclosure (TIAA_CORNELL_00011306), at 307.; Doc. 247-7, Ex. 37, Dec. 31, 2009 TIAA TDA Plan Investment Expenses and Fee Disclosure (TIAA_CORNELL_00002094) at 095.
[438] Doc. 246-005, TIAA/ Recordkeeping Agreements, at 34-36 (adding "Institutional" mutual funds)
[439] Doc. 249-18, Expert Report of Wendy Dominguez, ¶123.
[440] Doc. 447-9 Oct. 24, 2014 Email for M. Zielinski to P. Bursic (CORNELL023646); Ex. P82, Frequently Asked Questions about the College Retirement Equities Fund (CREF) Multi-Class Structure, TIAA, 2015, p. 1, available at,  https://www.tiaa.org/public/pdf/intermediary_faq_crefrea.pdf.

and did not affect the net administrative fee amounts.  This is because after the negotiation of the revenue credits, both TIAA and Fidelity were required to return any revenue generated by higher cost share classes in excess of the negotiated revenue rate.[441]  For example, when Cornell transitioned to the new low-cost CREF Stock shares introduced in 2014, CAPTRUST explained at the subsequent RPOC meeting that while the change would "result in lower overall fees at the fund level," it would also "dramatically reduce the amount of revenue being generated" by CREF Stock and returned to the Plans.[442]

     **RESPONSE:** Plaintiffs dispute the first sentence of paragraph 61. The Cornell Defendants do not cite to any record evidence to support this fact, so it is improper under Rule 56.1. Additionally, the Cornell Defendants did not adopt required revenue rates and revenue credits until June 2012, not in 2011 as the Cornell Defendants state.[443] Plaintiffs dispute the second sentence of paragraph 61. The sole source that the Cornell Defendants cite to support this fact is a declaration from TIAA executive, Douglas Chittenden. Mr. Chittenden only discusses TIAA's practices and states nothing regarding Fidelity's practices.[444] Additionally, Mr. Chittenden's declaration does not say TIAA rebates all excess revenue from higher cost share classes back to the Plans but that from the total "recordkeeping offsets."[445] Plaintiffs dispute the third sentence of paragraph 61. The effect of changing share classes for the CREF Stock account is not material to whether the Cornell Defendants breached their fiduciary duties by failing to

---

[441] Doc. 249-24, Ex. 112, TIAA Decl. ¶ 22 ("The total amount paid to TIAA for the provision of recordkeeping services does not vary based on mutual fund share class because any revenue generated by the recordkeeping offsets across the investment options on the plan menu in excess of the negotiated plan price are refunded to the plan through the Revenue Credit Account.");

[442] Ex. 63, Doc. 239-4, December 2014 RPOC Meeting Minutes, at 2 (CAPTR_0013586).

[443] Doc, 246-5, TIAA Recordkeeping Agreements (Part 1), at 38-39 (Amendment 5 dated June 2012 and creating a revenue credit account); Doc. 246-07, Fidelity Custodial Account Agreements, at 68-70 (First Amendment dated June 2012 and creating a revenue credit account.

[444] Doc. 249-24, Declaration of D. Chittenden, ¶¶22-23.

[445] *Id.*

obtain reasonable fees for participants in the Plans because Plaintiffs have not alleged that the Cornell Defendants failed to adopt lower share classes of the CREF Stock Account.[446]

62.　　　The TIAA fees Cornell paid were consistent with or lower than those paid by comparable plans for comparable services. The available comparator data establishing that Cornell's fees were reasonable compared to peers include the following:

- Between 2010 and 2016, Cornell's asset-based fees closely tracked those paid by New York University (to the extent Cornell's fees exceeded those paid by NYU, the difference was a mere 1 or 2 basis points).[447]  On a per participant basis, Cornell's fees compare even more favorably: in each year at issue, Cornell's per participant fees were lower than those paid by NYU participants by between $25 and $100 per participant.[448]

- Data regarding the fees paid by various other clients of CAPTRUST and Cammack (another advisor that assisted some of Cornell's peers with the oversight of their plans), further demonstrates that Cornell's TIAA fees were within a reasonable range for each of the three years analyzed (2012, 2014, and 2017).[449]

---

[446] *See* Doc. 81 ¶¶148 (not including the CREF Stock Account).

[447] Doc. 246-4, Ex. 23, Poehler Rpt. ¶ 85, Ex. 4 (*citing* Poehler Fee Analysis Worksheet appended to report at SJ Exhibit Page 105-110, Doc. 246-12, Ex. 30, Chittenden *Sacerdote* Decl. ¶¶ 74-83 (identifying fees paid by NYU over relevant time period), Doc. 239-5, Ex. 64, Wagner Rpt. ¶ 39 (identifying fees paid by NYU Faculty Plan and Medical Plan over relevant time period)).

[448] Doc. 246-4, Ex. 23, Poehler Rpt. ¶ 87, Ex. 6 (*citing* Poehler Fee Analysis Worksheet appended to report at SJ Exhibit Page 105-110).

[449] Doc. 246-4, Ex. 23, Poehler Rpt. ¶¶ 89-91 Ex. 8 (*citing* Ex. 65, 2012 Columbia Fee Proposal, at 3 (CORNELL029338); Doc. 239-7, Ex. 66, CAPTRUST Required Revenue Spreadsheet (CAPTR_0022939) ; Doc. 239-8, Ex. 67, CAPTRUST TIAA Clients and Fees Spreadsheet dated May 2017 (CAPTR_0045959)).

- The TIAA fees Cornell negotiated compared favorably to the fees TIAA charged its 200 largest clients.  On a per participant basis, between 2011 and 2018, Cornell participants paid on average $16 less than participants in the median plan.[450]

**RESPONSE:** Plaintiffs dispute the first sentence of paragraph 62. The Cornell Defendants do not cite to any record evidence to support this fact, so it is improper under Rule 56.1. Even using the data that the Cornell Defendants include in this paragraph, Plan participants suffered significant losses as a result of the Cornell Defendants' imprudent conduct. As the Cornell Defendants' recordkeeping expert, Poehler admits, participant count is the primary driving factor in the cost of recordkeeping fees.[451] ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████t.[452] However, Cornell paid significantly higher fees the top 25th percentile of fee among TIAA clients for every year in the chart after 2011:

---

[450] Doc. 246-4, Ex. 23, Poehler Rpt. ¶ 88 Ex. 7 (*citing* Ex. 68, TIAA Top-200 Client Fee Data (CORNELL029335)). *See also*, Doc. 249-21, Ex. 109, Podzinski Decl.  ¶ 4, Table 1.

[451] Ex. P2, Poehler Dep. at 52:18–53:5. Mr. Poehler qualified his answer by stating it was assuming that the services were obtain, (*id.*), However, he admitted that he did not know the services that were being provided to any of the plans he used for benchmarking and upon which the Cornell Defendants reply upon in their pleadings. Poehler Dep. at 98:24–100:6, 207:22—208:3, 218:17-19, 222:4-6, 223:7-8. 224:19-21, 228:14-16, 249:13-17, 253:15–254:8, 278:25–279:4, 283:9-12.

[452] 249-21, Declaration of Erich Podzinski, ¶4

In sum, even using the TIAA top 200 client data that the Cornell Defendants relied upon the

Plans paid nearly $2 million in excess fees (without accounting for lost investment opportunity)

between 2012 and 2017 alone. Similarly, the 2014 CAPTRUST data that the Cornell Defendants

cite and Mr. Poehler relies upon to prove that the Plans were paying TIAA reasonable fees

demonstrates that the Plans were paying excessive fees to TIAA. Mr. Poehler admitted in his

deposition the 2014 CAPTRUST data included mostly Plans that were smaller than the Cornell

Plans by over ten thousand participants and were not appropriate benchmarks, and that he

included these plans merely to show the "range of fees."[454] Mr. Poehler also admitted during his

deposition that those Plans over 10,000 participants in the 2014 CAPTRUST data he and the

Cornell Defendants cite all paid basis-point recordkeeping fees to TIAA that were lower than

those Cornell paid at that time.[455]  Similarly, the 2017 CAPTRUST data that the Cornell

Defendants and Mr. Poehler rely upon to demonstrate that the Plans TIAA fees were reasonable

actually demonstrates that they were paying excessive fees. Mr. Poehler admitted in his

deposition that most of the Plans in the 2017 CAPTRUST data were actually much smaller than

---

[453] All per-unique participant fees are from Doc 249-21, the Declaration of Erick Podzinski. Excess fees are calculated by subtracting 25th percentile fee from Cornell's fees. Total excess fees are calculated by taking the excess fees multiplied by the number of unique participants in CURP from Poehler's Fee Analysis Worksheet, TIAA CURP Tab, line 14. Doc. 246-4, Expert Report of Glenn Poehler, at 106.
[454] Ex. P2, Poehler Dep. at 210:6–234:11
[455] Ex. P2, Poehler Dep. at 232:4-233:22.

the Cornell Plans and not appropriate benchmarks – one as small as 637 participants.[456] Further,

Mr. Poehler admitted that most of the Plans in the 2017 data that were similar in size to the

Cornell plans were paying lower per-participant fees than Cornell.[457] Ty Minnich, who worked

for decades as an executive in the recordkeeping units of Transamerica, Metlife and CitiStreet,

opined, based on his experience, that reasonable fees for the Plans if the Defendants had

followed prudent practices were $40 per-participant from 2010-2012, $38 per-participant from

2013-2015 and $36 per-participant from 2016-present.[458] Similarly, Al Otto, who advised and

acted as a co-fiduciary for defined contribution plans (including both 401(k) and 403(b) plans)

for more than 20 years, opined that the Plans could have achieved fees of $40 per participant

from 2010 to 2014 and $35 per participant from 2015 to 2018.[459] Plaintiffs dispute the second

sentence of paragraph 62. The rates that the Cornell Defendants claim that New York University

was paying for recordkeeping and administrative fees are not based on admissible evidence and

therefore improper under Rule 56.1 The Cornell Defendants cite to the Declaration of Douglass

Chittenden from *Sacerdote v. New York University*, 16-6284 and Expert Report of Marcia

Wagner from that same case. Mr. Chittenden's testimony in another case is inadmissible hearsay.

*See* Fed. R. of Evid. 801, 802. Mr. Chittenden's testimony is not an admissible prior statement by

a witness because he has not been subject to cross-examination in this case nor is it inconsistent

with any testimony he has given in this case or for identification. *See* Fed. R. of Evid. 801(a)(1).

Additionally, Mr. Chittenden's testimony in another case is not admissible under Rule 804,

because he is not unavailable given that he offered a declaration in support of the Cornell

---

[456] Ex. P2, Poehler Dep. at 243:12–249:8.
[457] Ex. P2, Poehler Dep,. at 235:12–243:11.
[458] Doc. 249-20, Expert Report of Ty Minnich, ¶¶157.
[459] Doc. 249-19, Expert Report of Al Otto, ¶80.

Defendants' motion.[460] Similarly, Ms. Wagner's expert report from another case is inadmissible hearsay. *See* Fed. R. of Evid. 801, 802. Ms. Wagner's report is not an admissible prior statement by a witness because she has not been subject to cross-examination in this case nor is it inconsistent with any testimony she has given in this case or for identification. *See* Fed. R. of Evid. 801(a)(1). Additionally, Ms, Wagner's report in another case is not admissible under Rule 804, because the Cornell Defendants have not demonstrated that she is unavailable. To the extent the Cornell Defendants rely upon that fact that Mr. Poehler discusses the numbers from Mr. Chittenden's declaration and Ms. Wagner's report in his expert report, an expert witness cannot be used as conduit to admit inadmissible hearsay. *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) ("a party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony.") (quoting *Malletier v. Dooney & Bourke, Inc.*, 525 F.Supp.2d 558, 666 (S.D.N.Y.2007)). The per-participant number for New York University that Mr. Poehler relies upon are from the Expert Report of Michael Geist in *Sacerdote v. New York University*, 16-6284. Mr. Geist's expert report from another case is inadmissible hearsay. *See* Fed. R. of Evid. 801, 802. Mr. Geist's report is not an admissible prior statement by a witness because he has not been subject to cross-examination in this case nor is it inconsistent with any testimony he has given in this case or for identification. *See* Fed. R. of Evid. 801(a)(1). Additionally, Mr. Geist's report in another case is not admissible under Rule 804, because the Cornell Defendants have not demonstrated that he is unavailable. To the extent the Cornell Defendants rely upon that fact that Mr. Poehler discusses the numbers from Mr. Geist's report in his expert report, an expert witness cannot be used as conduit to admit inadmissible hearsay. *Marvel Characters, Inc.* 726 F.3d at 136 (2d Cir. 2013)

---

[460] Doc. 249-24, Declaration of Douglass Chittenden.

("a party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony.") (quoting *Malletier v. Dooney.*, 525 F.Supp.2d at 666). Additionally, Mr. Poehler's comparison in Exhibit 6 to his report is misleading because it compares the per-account fees he calculated in this case to per-participant fees calculated by Mr. Geist in the New York University case.[461] As discussed above, the CAPTRUST data from 2014 and 2017 Mr. Poehler relies upon actually demonstrates that the Plans paid higher fees than those plans with similar participant counts. The 2012 Columbia fee proposal[462] that the Cornell Defendants rely upon is not admissible because Cornell has not authenticated it, and it is hearsay. Fed. R. of Evid. 801, 802, 901. As discussed above, when the Plans are properly compared to the top quartile of TIAA's top 200 clients, the Cornell Defendants paid millions of dollars of excess fees.

63.      The Fidelity fees Cornell negotiated were similarly competitive. While there is no comprehensive database containing all Fidelity fee information for peer institutions, each one of the comparisons performed both during the time period at issue and since the lawsuit has been filed demonstrates that Cornell's fee was comparable to, or lower than, its peers. These comparisons include the following:

- In 2010, two of Cornell's peers—New York University and Johns Hopkins University—conducted requests for proposals that resulted in the disclosure of the fees charged by Fidelity.  Cornell's fee was only 2 basis points higher than NYU's fees and 12 basis points lower than the fee paid by Johns Hopkins.[463]

---

[461] Doc. 246-4, Expert Report of Glenn Poehler, ¶87.
[462] Doc. 239-7, 2012 Columbia Fee Proposal, at 3 (CORNELL029338).
[463] Doc. 246-4, Ex. 23, Poehler Rpt. ¶¶ 94-95, Doc. 250-10, Ex. 10 (*citing* Doc. 239-10, Ex. 69, *Sacerdote* Opinion & Order, at n. 54 (discussing bids submitted in response to 2009 NYU recordkeeper RFP); Ex. 42, 2010 Johns Hopkins 403(b) Plan Design Presentation, at 49 (CORNELL029094) (comparing fees for five different vendors)).

- In 2015, materials produced by CAPTRUST indicated that the fee offered to Cornell by Fidelity during negotiations was between 2 and 6 basis points lower than the fees paid by four of CAPTRUST's similar clients— ███████████████████ ████████████████████████████████████████████ ██████████████████.[464]

- In 2017, CAPTRUST prepared a presentation that compared Cornell's fees to those paid by three of CAPTRUST's clients of similar size. Cornell's fees were either equal to or lower than those paid by those clients on both an asset-based fee basis and a per participant fee basis.[465]

- Finally, Fidelity data as of 2018 indicates that on a per participant basis the fees paid by Cornell were $7 lower than the median for plans with a similar amount of assets and $9 lower than the median for plans with a similar number of participants.[466]

**RESPONSE:** Plaintiffs dispute paragraph 63. The Cornell Defendants do not cite any record evidence to support these fact, so they are improper under Rule 56.1 Whether the fees paid to Fidelity alone were "competitive" is not material to whether the Cornell Defendants breached their fiduciary duties by failing to obtain reasonable fees for the Plans. Even if the fees paid to Fidelity alone (rather than in combination with TIAA) were material, Ty Minnich, who worked for decades as an executive in the recordkeeping units of Transamerica, Metlife and CitiStreet, opined, based on his experience, that reasonable fees for the Plans if the Defendants had followed prudent practices were $40 per-participant from 2010-2012, $38 per-participant

---

[464] Doc. 246-4, Ex. 23, Poehler Rpt. ¶ 96, Ex. 11 (*citing* Ex. 70, June 9, 2015 Battle/Schmitt Email Regarding Fidelity Fees, at 1 (CAPTR_0031257)).

[465] Doc. 246-4, Ex. 23, Poehler Rpt. ¶ 97 (*citing* Ex. 54, 2017 CAPTRUST Vendor Fee Benchmark Presentation (CAPTR_0046963)).

[466] Doc. 246-4, Ex. 23, Poehler Rpt. ¶¶ 98-99, Ex. 13 (*citing* Ex. 71, Fidelity "Value Deck" Prepared for Cornell University, at 1-2 (CORNELL029333)).

from 2013-2015 and $36 per-participant from 2016-present.[467] Similarly, Al Otto, who advised

and acted as a co-fiduciary for defined contribution plans (including both 401(k) and 403(b)

plans) for more than 20 years, opined that the Plans could have achieved fees of $40 per

participant from 2010 to 2014 and $35 per participant from 2015 to 2018 if the Cornell

Defendants had followed a prudent process for monitoring and negotiating recordkeeping and

administrative fees.[468] Even by Mr. Poehler's calculations, the Cornell Defendants paid higher

fees to Fidelity than Mr. Minnich and Otto opine are reasonable throughout the relevant

period.[469] Plaintiffs dispute the third sentence of paragraph 63. The Cornell Defendants rely

entirely upon inadmissible evidence to support the New York University fees they cite. For the

New York University fees, the Cornell Defendants cite to the Opinion and Order from *Sacerdote

v. New York University*, 16-0628. Even if the order itself is not hearsay, the portions Cornell

Defendants cite are inadmissible hearsay within hearsay and inadmissible because the Judge is

characterizing testimony from two witnesses in that case, Jan Rezler and Douglas Chittenden.[470]

Testimony from another case is inadmissible hearsay. *See* Fed. R. of Evid. 801, 802. The

testimony is not an admissible prior statement by a witness because Mr. Chiittenden and Mr.

Rezler have not been subject to cross-examination in this case nor is it inconsistent with any

testimony either one has given has given in this case or for identification. *See* Fed. R. of Evid.

801(a)(1). Additionally, the testimony from another case is not admissible under Rule 804,

because the Cornell Defendants have not established that Mr. Chittenden or Mr. Rezler are

unavailable. Even if it was admissible, the *Sacerdote* Opinion and Order discusses a 2009 RFP

---

[467] Doc. 249-20, Expert Report of Ty Minnich, ¶¶157.
[468] Doc. 249-19, Expert Report of Al Otto, ¶80.
[469] 246-4, Expert Report of Glenn Poehler, p. 108.
[470] Doc. 239-10, Opinion and Order, *Sacerdote v. New York University*, 16-06268, n.54 (citing the declarations of Douglas Chittenden and Jan Rezler).

Response and not what New York was charged by Fidelity in 2010 as the Cornell Defendants represent.[471] Additionally, the Cornell Defendants ignore that Fidelity made an initial offer as low as $80 per participant to New York University in 2009, while the Cornell Defendants were paying an estimated $112 per participant to Fidelity three years later in 2012.[472] The Johns Hopkins presentation that the Cornell Defendants cite to support the Fidelity fees is also inadmissible hearsay and has not been authenticated. Fed. R. Evid. 801, 802, 901. Even if it was admissible, the cited basis point rate is not a price resulting from an RFP as the Cornell Defendants represent but an "estimate" because "implementation" was "in process."[473] Additionally, the Cornell Defendants cite to the administrative cost for the "Current Investment Structure" of 32 bps for Fidelity.[474] The estimated administrative cost for the "Revise[d] Investment Structure" is 2 bps, significantly lower than what the Cornell Defendants were paying in 2010.[475] The 2015 data from CAPTRUST that the Cornell Defendants rely upon is not a benchmarking. The 2015 numbers from CAPTRUST for Fidelity that the Cornell Defendants rely upon in this paragraph appear to be from an email from Barry Schmitt relating fee reduction for a select group of his clients.[476] The data does not provide any participant counts, which is necessary to determine if they are appropriate comparators for the Plans.[477] Additionally, the data does not include per-participant fees for any Plan other than "█████"[478] The 2017 CAPTRUST data, compiled after this lawsuit was filed is undated, appears to be a draft report, and it is

---

[471] *Id.* ("The 2009 RFP resulted in a range of price proposals . . ")
[472] *Id.*; Doc. 248-13, April 13, 2012 Meeting Material, at 14.
[473] Doc 248-2, 2010 Johns Hopkins 403(b) Plan Design Presentation, (CORNELL029094) at 46, 51.
[474] *Id.* at 51.
[475] *Id.*
[476] Doc. 239-11, (June 9, 2-015 Email from A. Battle to B. Schmitt (CAPTR_0031257).
[477] *Id.;* Ex. P2, Poehler Dep. at 210:6–231:21, 233:23-234:11 (admitting small plans would not be appropriate comparisons)
[478] Doc. 239-11, (June 9, 2-015 Email from A. Battle to B. Schmitt (CAPTR_0031257)

unclear whether it is reliable.[479] Additionally, it only compares the basis point fees the plans were paying to the Plans' asset based fees and does not properly analyze the per-participant or total fees.[480] Moreover, two of the three comparator plans are more than 3,000 participants smaller than the Plans and the single plan that is similar in size pays a rate two basis points lower than the Cornell Defendants.[481]

64.      Neither Plaintiffs nor their experts have identified any higher education institution that has paid administrative fees anywhere near the $35-$40 per participant administrative fee they claim Cornell could have paid between 2010 and 2016.[482]

**RESPONSE**: Plaintiffs dispute paragraph 64. The only record evidence cited by the Cornell Defendants to support this statement is deposition testimony from Plaintiffs' expert Ty Minnich. Mr. Minnich's testimony was not that he could not identify any higher education plan paying $35-$40 per-participant between 2010 and 2016 but that he could not identify any client of his paying that rate "without looking at the particular facts on a particular case."[483] In fact, Mr. Minnich and Mr. Otto identified a number of plans paying similar rates in their reports.[484] Additionally, the Cornell Defendants' expert, Mr. Poehler, admitted that numerous hospital 403(b) Plans and 401(k) plans, which he ignored in his report, were paying rates in this range from 2010 until 2016.[485]

---

[479] Doc. 238-5, 2017 Vendor Fee Benchmark, at 2.
[480] *Id.* at 21.
[481] *Id.*
[482] Doc. 252-2, Ex. 72, Minnich Dep. 300:19-23.
[483] Doc. 252-2, Ex. 72, Minnich Dep., at 300:19-23.
[484] Doc. 249-00, Expert Report of Ty Minnich, ¶¶137–156; Doc. 249-19, Expert Report of Al Otto, ¶¶85-88.
[485] Ex. P2, Poehler Dep., at 279:14–308:24.

65.      Contributions to plan participants' individual accounts are invested in one or more of the investment options available to participants on the recordkeepers' respective platforms.

**RESPONSE:** Plaintiffs do not dispute that the Plans' participants invest in one or more of the investment options available to the Plans. Plaintiffs dispute Paragraph 65 in that the Cornell Defendants fail to present any facts that are material to the Cornell Defendants' Motion for Summary Judgment as required by Local Rule 56.1.

66.      The investment options available through the Plans include both TIAA variable and fixed annuities, as well as mutual funds offered by both TIAA and Fidelity.  The number of investment options has varied in response to both regulatory changes and participant demands. In particular, until the adoption of ERISA in 1974, Section 403(b) provided that in order for participant assets to receive such favorable treatment, all assets had to be invested in individual insurance company annuity contracts.[486]  However, the Internal Revenue Code was amended in 1974 to provide that Section 403(b) plan assets could also be invested in mutual funds held in custodial accounts.[487]  However, at the time, many plan recordkeepers that serviced 403(b) plans, such as TIAA, did not offer mutual funds as investment options.  As a result, annuities continued to be the investment of choice for most plan participants.

**RESPONSE:** Plaintiffs do not dispute that investment options available through the Plans include both TIAA variable and fixed annuities, as well as mutual funds offered by both TIAA and Fidelity. Plaintiffs dispute the second sentence of paragraph 66.  The Cornell Defendants cite no evidence to support this sentence and it is not a fact that is material to the Cornell Defendants' Motion for Summary Judgment as required by Local Rule 56.1.  Plaintiffs

---

[486] Doc. 250-1, Ex. 1, Am. Compl., Doc.  81, at ¶ 66.
[487] Doc. 250-1, Ex. 1, Am. Compl. Doc.  81, at ¶ 66.

state that Section 403(b) of the Internal Revenue Code speaks for itself.  Plaintiffs dispute the fourth and fifth sentences of paragraph 66.  Cornell cites no evidence to support this sentence and it is not a fact that is material to the Cornell's Motion for Summary Judgment as required by Local Rule 56.1.

67.     During the mid-1990s, mutual funds became an increasingly popular investment option for individual investors.  As a result, many 403(b) plan participants desired the ability to invest in such funds through their employer sponsored retirement plans.  However, because 403(b) plan recordkeepers had yet to introduce their own mutual fund offerings, plan sponsors retained recordkeepers that did offer mutual funds, such as Fidelity. Cornell was one such plan sponsor: when Cornell added Fidelity as a recordkeeper in 1993, TIAA did not offer *any* mutual funds on its platform.[488]

**RESPONSE:**  Plaintiffs do not dispute that mutual funds became an increasingly popular investment in the 1990s. The Cornell Defendants cite no evidence to support this sentence and it is not a fact that is material to the Cornell Defendants' Motion for Summary Judgment as required by Local Rule 56.1.  Plaintiffs dispute the second sentence because Cornell Defendants cite no evidence to support this sentence and it is not a fact that is material to the Cornell Defendants' Motion for Summary Judgment as required by Local Rule 56.1.  Plaintiffs dispute the third sentence as it contradicts itself, i.e., Fidelity is a recordkeeper and offers mutual funds. Cornell Defendants cite no evidence to support this sentence and it is not a fact that is material to the Cornell Defendants' Motion for Summary Judgment as required by Local Rule 56.1.

68.     The number of investment options offered to participants over the relevant time period was consistent with the number of options offered by large higher education institutions.

---

[488] Doc. 25-16, Ex. 16, Bursic Decl. ¶ 3.

For example, as of 2010, the median higher education plan administered by Fidelity with assets in excess of $100 million offered 156 different investment options and 84% of such plans offered at least 75 funds.[489]  In some instances, the number of investment options was much higher— Johns Hopkins University, for example, offered participants *414* options as of 2010.[490]

    **RESPONSE:** The first sentence of paragraph 68 is disputed. The Cornell Defendants do not cite to admissible evidence to support the purported fact in the first sentence of paragraph 69 and it is not a fact that is material to the Cornell Defendants' Motion for Summary Judgment as required by Local Rule 56.1 because higher education plans are not the only entities that offer ERISA retirement plans.

    Plaintiffs dispute the second sentence of paragraph 68. In January 2012, Cornell itself observed that the Fidelity platform had "too many choices in general."[491]  CAPTRUST noted that if Cornell stayed with the "status quo" there would be continued participant confusion, disparate fund structure, complex and inefficient investment due diligence, fiduciary oversight would be more difficult, and continued disjointed administration.[492]  For another one of its clients, CAPTRUST noted that a "multiple vendor, unconstrained fund line-up environment makes it nearly impossible for plan fiduciaries to fulfill fiduciary obligations."[493]  The document Cornell cites shows that Cornell offered many more options that the "peer" group identified by Fidelity of solely Fidelity clients.[494]

    Plaintiffs dispute that the third sentence supports Cornell Defendants' proposition in paragraph 68.  The presentation cited by Cornell Defendants contradicts paragraph 68.  The

---

[489] Doc. 252-3, Ex. 73, 2012 Fidelity Investment Review (CAPTR_0038110).
[490] Doc. 248-2, Ex. 42, Johns Hopkins' University 403(b) Plan Design Presentation, at 49 (CORNELL029094) (comparing fees for five different vendors).
[491] Doc. 248-8, Ex. 44, RPOC Meeting Minutes January 11, 2012 (CAPTR_0047903) at 3.
[492] Ex. P83, RPOC Presentation January 11, 2012 (CORNELL015581) at 15.
[493] Ex. P84, CAPTRUST presentation to the University System of Maine, July 15, 2013 at 7.
[494] Ex. P85, 2012 Fidelity Investment Review (CAPTR_0038110) at 3.

presentation indicated that plan sponsors of retirement plans that actually performed their fiduciary duties had "10-30 investment options" in their plans.[495]  The investment advisor giving the presentation was concerned that Johns Hopkins University ("JHU") could not "monitor and track 400+ investment funds[,]" and that "too much choice is very challenging for participants[.]"[496]  Aon Hewitt (a retirement plan investment advisor) also noted that the "complexity of monitoring across recordkeepers leaves opportunity for error."[497]  The presentation indicates that a fund consolidation process to reduce the number of investments would be completed by July 2011 if Aon Hewitt was hired by JHU.[498]  Aon Hewitt noted that the common theme among retirement plan sponsors was to "reduce investment menu to a reasonable and understandable number of investment options[.]"[499] Aon Hewitt noted that participants "in plans with more than 20 investment fund were less diversified (i.e., held slightly fewer funds on average.)"[500] and that too many funds also negatively affected participation rates, providing the following chart based on its knowledge as an investment advisor to retirement plans:[501]

---

[495] Doc. 248-2, Johns Hopkins' University 403(b) Plan Design Presentation, at 5 (CORNELL029094)
[496] Doc. 248-2, Johns Hopkins' University 403(b) Plan Design Presentation, at 6 and 9 (CORNELL029094)
[497] Doc. 248-2, Johns Hopkins' University 403(b) Plan Design Presentation, at 7 (CORNELL029094)
[498] Doc. 248-2, Johns Hopkins' University 403(b) Plan Design Presentation, at 16-19 (CORNELL029094)
[499] Doc. 248-2, Johns Hopkins' University 403(b) Plan Design Presentation, at 23 (CORNELL029094)
[500] Doc. 248-2, Johns Hopkins' University 403(b) Plan Design Presentation, at 27 (CORNELL029094)
[501] Doc. 248-2, Johns Hopkins' University 403(b) Plan Design Presentation, at 28 (CORNELL029094)



Prior to 2011, the trend was to reduce the number of investments in higher education

retirement plans; for example, an investment advisor responding to Cornell's RFP in 2011 told

Cornell that it had already ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████▌"[502] ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████████."[503]  Mercer stated that

"participant decision-making [is] clearer when there is a single fund for each asset class role."[504]

68. 69.     At all relevant times, defendants monitored the Plans' investment options and

removed any investment options that were objectively imprudent. Defendants' efforts in this

regard extended to both the overall plan line-up as well as the two specific investment options at

issue in this case, the TIAA Real Estate Account and the CREF Stock Account.

---

[502] Ex. P61, Cammack LaRhette response to Cornell's RFP for investment advisor May 13, 2011 (CORNELL006753) at 18.
[503] Ex. P4, Mercer response to Cornell's RFP for investment advisors (CORNELL015325) at 1.
[504] *Id.*

**RESPONSE:** The first sentence of Paragraph 69 is not a statement of fact but a description of law and thus is improper under Local Rule 56.1. Paragraph 69 is otherwise disputed. The Cornell Defendants do not cite to admissible evidence to support paragraph 69.

Plaintiffs dispute the second sentence of Paragraph 69.  Prior to CAPTRUST's July 2013 investment scorecard presentation, the Cornell Defendants did not monitor funds in the Plans in any way.[505]  CAPTRUST made this observation in its first meeting with the RPOC, noting that "currently there is a limited process in place to make investment decisions."[506]  CAPTRUST then informed Cornell Defendants that there were "many underperforming funds" in the Plans, which were not identified.[507]  After acknowledging that there were "many underperforming funds" whose identities were unknown in the Plans, no identification or monitoring occurred on these underperforming fund for 18 months.[508]  In the analysis, CAPTRUST identified 85 investments that ranked below the 50th percentile of the peer group for Annualized Risk Adjusted Performance and/or Annualized Peer Relative Performance for the 3 and/or 5 year annualized

---

[505] Ex. P7, Opperman Tr. at 57:20-59:24; Ex. P8, Bursic Tr. at 78:4-85:18; Ex. P86, Internal CAPTRUST e-mail exchange July 1, 2013 to July 3, 2013 (CAPTR_0053254) at PDF 3 ("2nd deliverable is an interim Fiduciary review on the entire platform of funds. . . . To put this in perspective, we were hired in December 2011 and we have yet to do a review[.]") and PDF 6 ("Is this the meeting we need to have some sort of quant review on their 5,000 funds?"); Ex. P87, e-mail between Cornell and outside counsel dated October 3, 2012 (CORNELL013947) at PDF 2 ("You had mentioned that at a recent RPOC meeting, it was unclear whether CAPTRUST was providing investment performance information to the RPOC."); Ex. P45, DeStefano Tr. at 124:2-16.

[506] Doc.  248-43, Jan. 11, 2012 RPOC Meeting Materials (CAPTR_0009067) at 6.

[507] Ex. P83, RPOC Retirement Plan Meeting – Executive Summary, January 11, 2012 (CORNELL015581) at 1 (listing date of meeting), 8 (acknowledging underperforming TIAA-CREF investments), 9 (acknowledging underperforming Fidelity investments); Doc. 248-8, Ex. 44, Meeting Minutes from January 11, 2012 RPOC meeting (CAPTR_0047903) at 3 ("TIAA-CREF has several redundant asset classes as well as underperforming accounts. Fidelity currently offering (180+ funds) has significant redundancy, many underperforming accounts and too many choices in general."); Ex. P7, Opperman Tr. 60:14-61:9; 63:8-24.

[508] Ex. P86, Internal CAPTRUST e-mail exchange July 1, 2013 to July 3, 2013 (CAPTR_0053254) at PDF 3 ("2nd deliverable is an interim Fiduciary review on the entire platform of funds. . . .  To put this in perspective, we were hired in December 2011 and we have yet to do a review[.]") and PDF 6 ("Is this the meeting we need to have some sort of quant review on their 5,000 funds?"); Ex. P87, e-mail between Cornell and outside counsel dated October 3, 2012 (CORNELL013947) at PDF 2 ("You had mentioned that at a recent RPOC meeting, it was unclear whether CAPTRUST was providing investment performance information to the RPOC."); Ex. P88, Ciccotello Tr. at 103:3-105:2.

periods, all of which violated Cornell's Investment Policy Statement.[509] Several funds failed

screening criteria so badly in 2013 they were designated with a red diamond.[510] The Cornell

Defendants did not obtain any further quantitative investment due diligence until 14 months

later, on September 17, 2014.[511] Funds identified with the red diamond should have been given

more attention or been eliminated from the Plans.[512] These underperforming investments

remained in the Plan prior to this lawsuit because prior to 2016, there was no process to remove

an underperforming fund from the Plans. [513] At the June 29, 2016 RPOC meeting, Ms.

Opperman asked "what may cause a fund to be consider[ed] by RPOC for replacement[?]"[514]

In the first investment scorecard CAPTRUST provided to Cornell, there was no review

for 19 funds including the TIAA Real Estate Account.[515]

| Asset Class | Investment Name | Ticker | 3 yr RAP | 5 yr RAP | 3 yr Peer | 5 yr Peer | 3 yr Style | 5 yr Style | Expense | Total Quant | Total Quant |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Direct Real Estate**** | TIAA Real Estate | - | - | - | - | - | - | - | - | - | - |

For the funds with entries on the investment scorecard, the Cornell Defendants

did not have the information necessary to interpret its scoring system, including the yellow,

---

[509] Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 40-48; Ex. P89, Quarterly Review for 3rd Quarter, 2014 (CORNELL015005) at 134; Doc. 252-6, Investment Policy Statement Cornell University (CORNELL013763) at 6.

[510] Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 40-48.

[511] Ex. P90, e-mail attaching materials for September 17, 2014 RPOC meeting (CORNELL013566); Doc. 241-3, Ex. 92, RPOC Presentation September 17, 2014 at 39-47 (CORNELL013567).

[512] Ex. P88, Ciccotello Tr. at 144:8-149:8; Doc. 248-13, Ex. 49, RPOC Presentation April 13, 2012 (CORNELL022014) at 21 (score of "69 or below Consider termination of fund"); Doc. 249-18, Ex. 106, Expert Report of W. Dominguez, ¶¶ 52, 81, 117-121.

[513] Ex. P23, Strodel Tr. at 163:24-165:25; Ex. P7, Opperman Tr. at 175:16-176:6 (prior to December 2016, the RPOC did not know how to remove a fund that was underperforming from the Plans); Ex. 63, Doc. 239-4, RPOC Meeting Minutes dated December 3, 2014 (CAPTR_0013586) at 4 ("RPOC and CAPTRUST will work on defining a process to make decisions on the funds currently found in the Tier III menu of funds."); Ex. P19, RPOC Meeting Minutes dated June 29, 2016 (CAPTR_0013565) at 2 ("The Chair, Ms. Opperman asked what may cause a fund to be consider[ed] by RPOC for replacement[?]").

[514] Ex. P19, RPOC Meeting Minutes dated June 29, 2016 (CAPTR_0013565) at 3.

[515] Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 40-48; Doc. 241-3, Ex. 92, RPOC Presentation September 17, 2014 (CORNELL013567) at 39-47; Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 48; Ex. P88, Ciccotello Tr. at 110:24-113:9 ("Q. Sure. Do you see any appropriate performance-related information for the TIAA Real Estate Account in this presentation? A. So in this presentation I just – I see nothing but dashes.") ; Ex. P23, Strodel Tr. at 185:18-25; Ex. P8, Bursic Tr. at 223:6-225:1; Ex. P7, Opperman Tr. at 250:2-4; Doc. 249-18, Ex. 106, Expert Report of W. Dominguez, ¶¶ 103-105.

"Marked For Review" triangle, within the quantitative criteria categories until December 2014.[516]

In July 2013, the CREF Stock Account ranked below the 50th percentile of its Annualized Risk Adjusted Performance peer group and its Annualized Peer Relative Performance group for the 3 and 5 year periods.[517]

| Asset Class | Investment Name | Ticker | 3 yr RAP | 5 yr RAP | 3 yr Peer | 5 yr Peer | 3 yr Style | 5 yr Style | Expense | Total Quant | Total Quant |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Large Company Blend**** | CREF Stock | - | ⚠ | ⚠ | ⚠ | ⚠ | 🟢 | 🟢 | 🟢 | 45 | ⚠ |

CAPTRUST described its evaluation of the CREF Stock Account to the RPOC as an "estimation."[518] The RPOC believed that CAPTRUST's yellow triangle scoring for the CREF Stock Account was "fundamentally unreliable," and they could not determine whether the yellow triangles on the July 2013 report reflected the performance of the CREF Stock Account or the inadequacy of CAPTRUST's selection of measurement.[519]  As a result of CAPTRUST's self-described unreliable evaluation, Cornell decided to keep the CREF Stock Account on Tier II solely because it had been offered at Cornell since the 1950s.[520]  Cornell Defendants did not review the underlying performance data for the CREF Stock Account until December 2014, after it was implemented in the best-of-class core line-up.[521]  Paragraph 69 is contradicted by

---

[516] Ex. 63, Doc. 239-4, RPOC Meeting Minutes dated December 3, 2014 (CAPTR_0013586) at 3-4 ("Mr. Schmitt focused on the key components of the review and the manner in which CAPTRUST evaluates/"scores" an investment vehicle."); Ex. P89, Quarterly Review for 3rd Quarter, 2014 (CORNELL015005) at 134; E-mail attaching Quarterly Review for 3rd Quarter, 2014 (CORNELL15001); Doc. 252-10, Ex. 80, RPOC Meeting Minutes dated December 12, 2016 (CAPTR_0013590) at 2 ("Ms. Opperman requested that CAPTRUST provide historical investment scoring in future reports.").

[517] Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 49; Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 48; Ex. P89, Quarterly Review for 3rd Quarter, 2014 (CORNELL015005) at 28.

[518] Ex. P8, Bursic Tr. at 217:18-25.

[519] Ex. P8, Bursic Tr. at 218:2-9; 218:25-219:4; 222:4-9.

[520] Ex. P8, Bursic Tr. at 218:9-11.

[521] Ex. P89, Quarterly Review for Period Ending September 30, 2014 (CORNEL015005) at 39.

paragraph 72, which indicates the RPOC was created in 2011 to "establish criteria to review and monitor the investment performance of the [Plans'] investment options."

70.      Both prior to and throughout the time period at issue, Benefits Services, with the assistance of TIAA and Fidelity, regularly received and reviewed investment performance and fee information for each of the investment options available through the Plan.[522]  These investment and fee disclosures were distributed to participants to enable them to assess the various alternatives in light of their individual investment objectives, risk tolerance, and retirement goals.[523]

**RESPONSE:** Plaintiffs dispute that paragraph 70 is a material fact.  Sending raw performance and fee information to plan participants does not satisfy a plan sponsor's duties under ERISA.

Plaintiffs otherwise dispute the first sentence of Paragraph 70. Prior to CAPTRUST's July 2013 investment scorecard presentation, the Cornell Defendants did not monitor funds in the Plans.[524]  Prior to hiring CAPTRUST, Cornell had "no experience to do this analysis."[525]  The Cornell Defendants had no process in place to remove a fund from the Plans until 2016.[526]

---

[522] Doc. 250-16, Ex. 16, Bursic Decl. ¶ 4.

[523] Doc. 248-1, Ex. 41, Bursic Tr.70:16-74:5 (explaining monitoring process prior to retention of CAPTRUST); Doc. 250-16, Ex. 16, Bursic Decl. ¶ 4.

[524] Ex. P7, Opperman Tr. at 59:20-60:2; Ex. P8, Bursic Tr. at 78:4-85:18; Ex. P86, Internal CAPTRUST e-mail exchange July 1, 2013 to July 3, 2013 (CAPTR_0053254) at PDF 2-3 ("2nd deliverable is an interim Fiduciary review on the entire platform of funds. … To put this in perspective, we were hired in December 2011 and we have yet to do a review[.]") and PDF 6 ("Is this the meeting we need to have some sort of quant review on their 5,000 funds?); Ex. P87, e-mail between Cornell and outside counsel dated October 3, 2012 (CORNELL013947) at PDF 2 ("You had mentioned that at a recent RPOC meeting, it was unclear whether CAPTRUST was providing investment performance information to the RPOC."); Cornell Defendants' Rule 56.1 Statement of Undisputed Material Facts *infra* at ¶ 74 (CAPTRUST's initial goals and objective included "adopting a methodology for ongoing plan monitoring.").

[525] Ex P8, Bursic Tr. at 79:25:-80:7.

[526] Ex. P23, Strodel Tr. at 163:24-165:1; Ex. P7, Opperman Tr. at 175:16-176:6 (prior to December 2016, the RPOC did not know how to remove a fund that was underperforming from the Plans); Ex. 63, Doc. 239-4, RPOC Meeting Minutes dated December 3, 2014 (CAPTR_0013586) at 4 ("RPOC and CAPTRUST will work on defining a process to make decisions on the funds currently found in the Tier III menu of funds.").

Plaintiffs dispute that the second sentence of paragraph 70 is a material fact.  Sending raw performance and fee information to plan participants does not satisfy a plan sponsor's duties under ERISA  Plan participants are not charged with fiduciary duties, nor could they themselves change the share class structure of plan investments.  Prior to hiring CAPTRUST, Cornell had "no experience to do this analysis."[527]

71.      Following the implementation of the 2009 IRS rule changes, Cornell decided to review the investment menu and to develop a more formal process for actively monitoring and managing the Plans' investment options.

**RESPONSE:** Plaintiffs dispute paragraph 71.  The Cornell Defendants cite no evidence to support this sentence and the undefined 2009 IRS rule changes are not facts that are material to the Cornell Defendants' Motion for Summary Judgment as required by Local Rule 56.1. Plaintiffs further dispute paragraph 71 because it is an attempt to characterize IRS "rules" and the impact on ERISA and is therefore not a statement of fact. This statement is further contradicted by Exhibit 77 to Cornell's Motion for Summary Judgment, which states that a "new law passed in 2006" has placed significantly greater responsibility on "plan sponsors to prudently select and communicate plan investment funds to the participants."[528]

72.      Cornell's first step in this process was to create RPOC, the express purpose of which is to "provide policy oversight for the selection of investment options for the Plans" and "establish criteria to review and monitor the investment performance of the [Plans'] investment options."[529]

---

[527] Ex P8, Bursic Tr. at 79:25:-80:7.
[528] Doc. 252-07 at 1.
[529] Doc. 250-17, Ex. 17, April 2011 RPOC Charter (CORNELL015812).

**RESPONSE:** Plaintiffs dispute paragraph 72.  Prior to formation of the RPOC, the Board of Trustees retained all fiduciary responsibility for the review, selection and retention of investment options in the Plans.[530]  Cornell disregarded warnings that its Plans were not being administered prudently. By at least May 2010, the Plans' auditors described the lack of an Investment Policy Statement for the Plans as an internal control deficiency that needed to be corrected.[531] The Board of Trustees then took nearly a year to create the RPOC after this notification.[532] Moreover, it took more than two years to create the RPOC after the alleged "2009 IRS rule changes"[533] and five years after the "law passed in 2006"[534] After the RPOC was created, it met for a total of 2 hours and 12 minutes in 2011.[535] This was in stark contrast to the committee responsible for the endowment, with a professional staff of 20, who met for four hours quarterly to discuss investment performance "without fail."[536]

73.     RPOC retained CAPTRUST to assist it with managing and monitoring the Plans' investment menu.  Pursuant to the consulting agreement, CAPTRUST agreed to provide "plan level advice, investment menu development, and ongoing investment due diligence." Moreover, as a condition precedent to its retention as an investment consultant, RPOC required that CAPTRUST agree to provide investment advice as a fiduciary under ERISA, rather than as a mere consultant.[537]

---

[530] Doc. 250-17, April 2011 RPOC Charter (CORNELL015812).
[531] Ex. P92, CURP Plan Report to the Plan Administrator May 28, 2010 (CORNELL025340) at 9-10; Ex. P45, DeStefano Tr. at 75:14-86:18.
[532] Doc. 250-17, Ex. 17, April 2011 RPOC Charter (CORNELL015812).
[533] *Supra*, ¶ 71; Doc. 250-17, Ex. 17, April 2011 RPOC Charter (CORNELL015812).
[534] Doc. 252-07 at 1.
[535] Ex. P45, DeStefano Tr. at 117:23-118:22.
[536] Ex. P45, DeStefano Tr. at 41:30-43:25.
[537] Doc. 246-2, Ex. 21, April 2011 Retirement Plan Advisory Services Agreement between Capfinancial Partners, LLC ("CAPTRUST") and Cornell University, at 1 (CORNELL021910) ("CAPTRUST will serve as a fiduciary as defined by ERISA § 3(21)(A)(ii) with regard to the selection of investment managers or mutual funds available to the Plans within the [recordkeeping] platforms provided by the Plan's administrator").

**RESPONSE:**  Plaintiffs do not dispute Paragraph 73. Cornell hired CAPTRUST to provide investment advisory services to Cornell for a fee including ongoing investment due diligence, plan level advice, investment menu development, overall vendor recommendation and ongoing due diligence, plan administration and investment costs comparison, vendor analysis, vendor benchmarking, vendor scoring and real-time access to industry research.[538]

74.      At the first meeting it attended, CAPTRUST and RPOC discussed the Plans' investment menu and the monitoring process in place.  As a result of this discussion, CAPTRUST and RPOC identified the following initial goals and objectives: (1) finalizing an Investment Policy Statement (IPS), (2) redesigning (and potentially streamlining) the Plans' investment menu, (3) and adopting a methodology for ongoing plan monitoring.[539]

**RESPONSE:** The first sentence of paragraph 74 is disputed to the extent it implies investment due diligence was conducted at the meeting. The Cornell Defendants cite no evidence to support this sentence and it is not a fact that is material to the Cornell Defendants' Motion for Summary Judgment as required by Local Rule 56.1.  In its first meeting, CAPTRUST observed that "currently there is a limited process in place to make investment decisions."[540]  On January 11, 2012, CAPTRUST told the Cornell Defendants that there were "many underperforming funds" in the Plans.[541]  CAPTRUST did not identify these underperforming funds.[542]  After

---

[538] Doc. 224-12, CAPTRUST Retirement Plan Advisory Services Agreement (EX. CAPTRUST001) at 1 (providing services for the Plan) and 6 (reflecting the date of acceptance by CAPTRUST).

[539] Doc. 248-8, Ex. 44, January 2012 RPOC Meeting Minutes, at 2 (CAPTR_0047903).

[540] Doc.  248-43, Jan. 11, 2012 RPOC Meeting Materials (CAPTR_0009067), at 6.

[541] Ex. P83, RPOC Retirement Plan Meeting – Executive Summary, January 11, 2012 (CORNELL015581), at 1 (listing date of meeting), 8 (acknowledging underperforming TIAA-CREF investments), 9 (acknowledging underperforming Fidelity investments); Doc. 248-8, Ex. 44, Meeting Minutes from January 11, 2012 RPOC meeting (CAPTR_0047903) at 3 ("TIAA-CREF has several redundant asset classes as well as underperforming accounts. Fidelity currently offering (180+ funds) has significant redundancy, many underperforming accounts and too many choices in general."); Ex. P7, Opperman Tr. 60:14-61:9; 63:8-63:24.

[542] Ex. P83, RPOC Retirement Plan Meeting – Executive Summary, January 11, 2012 (CORNELL015581); Ex. P86, Internal CAPTRUST e-mail exchange July 1, 2013 to July 3, 2013 (CAPTR_0053254).

acknowledging that there were "many underperforming funds" in the Plans, no monitoring occurred on the underperforming funds for 18 months.[543]  In January 2012, Cornell itself observed that the Fidelity platform had "too many choices in general."[544]  CAPTRUST noted that if Cornell stayed with the "status quo" there would be continued participant confusion, disparate fund structure, complex and inefficient investment due diligence, fiduciary oversight would be more difficult, and continued disjointed administration.[545]  Plaintiffs do not dispute that CAPTRUST identified goals of creating an IPS, redesigning the investment menu to reduce and eliminate funds, and identifying a methodology for monitoring plan investments (which did not exist).

75.     Although not required by ERISA, RPOC began to craft a formal investment policy statement prior to the retention of CAPTRUST. Upon the advice of counsel, RPOC did not execute a final IPS until after it had retained an investment advisor with experience preparing such documents.[546]  CAPTRUST prepared a draft IPS soon after the first meeting it attended. This draft was reviewed and edited by both Benefits Services and Cornell's investment office before it was presented to RPOC for review at the April 2012 meeting[547]  Over the following months, the IPS was discussed and revised at length before being ratified at the November 2012 meeting.[548]

---

[543] Ex. P86, Internal CAPTRUST e-mail exchange July 1, 2013 to July 3, 2013 (CAPTR_0053254) at PDF 2-3 ("2nd deliverable is an interim Fiduciary review on the entire platform of funds. … To put this in perspective, we were hired in December 2011 and we have yet to do a review[.]") and PDF 6 ("Is this the meeting we need to have some sort of quant review on their 5,000 funds?); Ex. P87, e-mail between Cornell and outside counsel dated October 3, 2012 (CORNELL013947) at PDF 2 ("You had mentioned that at a recent RPOC meeting, it was unclear whether CAPTRUST was providing investment performance information to the RPOC."); Ex. P88, Ciccotello Tr. at 103:3-105:2.

[544] Doc. 248-8, Ex. 44, RPOC Meeting Minutes January 11, 2012 (CAPTR_0047903) at 3.

[545] Ex. P83, RPOC Presentation January 11, 2012 (CORNELL015581) at 15.

[546] Doc. 250-19, Ex. 19, November 2010 RPOC Minutes, at 2-3 (CORNELL021932) (discussing need for investment policy statement and reviewing draft prepared by counsel, but noting counsel recommendation that RPOC first hire an independent consultant before executing an IPS).

[547] Doc. 252-4, Ex. 74, April 12, 2012 AJ Edwards Email and Comments on IPS Draft (CORNELL029202).

[548] Doc. 252-5, Ex. 75, November 2012 RPOC Meeting Minutes (CORNELL013805).

**RESPONSE:** Plaintiffs dispute paragraph 75. The Cornell Defendants cite no evidence to support the first sentence and it is a legal conclusion about what ERISA requires and therefore not a fact that is material to the Cornell Defendants' Motion for Summary Judgment as required by Local Rule 56.1. The remaining sentences are not material facts. To the extent a response is required, Plaintiffs dispute that the creation of the IPS was completed in a prudent or timely manner as described in sentences two through four.

Prior to formation of the RPOC, the Board of Trustees retained all fiduciary responsibility for the review, selection and retention of investment options in the Plans.[549] Cornell disregarded warnings that its Plans were not being administered prudently. By at least May 2010, the Plans' auditors described the lack of an Investment Policy Statement for the Plans as an internal control deficiency that needed to be corrected.[550] The Board of Trustees then took nearly a year to create the RPOC.[551] After the RPOC was created, it met for a total of 2 hours and 12 minutes in 2011.[552] This was in stark contrast to the committee responsible for the endowment, with a professional staff of 20, who met for four hours quarterly to discuss investment performance "without fail."[553] The RPOC hired CAPTRUST in December 2011.[554] Cornell was years behind even non-ERISA plans in hiring an investment advisor for its Plans.[555] The Investment Policy Statement was not completed until November 28, 2012.[556]

---

[549] Doc. 250-17, Ex. 17, April 2011 RPOC Charter (CORNELL015812).
[550] Ex. P92, CURP Plan Report to the Plan Administrator May 28, 2010 (CORNELL025340) at 9-10; Ex. P45, DeStefano Tr. at 75:14-86:18.
[551] Doc. 250-17, Ex. 17, April 2011 RPOC Charter (CORNELL015812).
[552] Ex. P45, DeStefano Tr. at 117:23-118:22.
[553] Ex. P45, DeStefano Tr. at 41:30-43:25.
[554] CAPTRUST's Rule 56.1 Statement of Undisputed Material Fact at ¶ 4.
[555] Ex. P93, CAPTRUST's Response to RFP (CORNELL011415) at 2; Ex. P94, CAPTRUST Reference Check Summary (CORNELL027635) at 1; Ex. P3, Hewitt Response to RFP (CORNELL024180) at 4-5; Ex. P62, Segal Advisors Response to RFP (CORNELL006782) at 12-13.
[556] Doc. 252-6, Ex. 76, Cornell Investment Policy Statement (CORNELL013763) at 9.

76.      These IPS provided a general process for monitoring and managing the Plans'
investment lineup. This process involved: (1) identifying desired investment asset classes; (2)
selecting investments that correspond to those assets classes; (3) evaluating the investments
included in the Plans using the proprietary scoring system developed by CAPTRUST; and (4) if
necessary, replacing investment alternatives deemed inappropriate.[557]

**RESPONSE:** Plaintiffs state that the Investment Policy Statement speaks for itself.[558]
Plaintiffs object to Cornell's characterization of CAPTRUST's scoring system as proprietary.
Cornell's IPS demonstrates that a majority of the funds in Cornell's Plan were imprudent, as they
violated the principles for retention set forth in the IPS.[559] Cornell and CAPTRUST's Investment
Policy Statement provides that "all actively managed investments should rank in the top 50% of
their given peer group for the 3 or 5 year annualized period[.]"[560]  In the July 2013 analysis, a
yellow triangle within the risk adjusted performance (RAP) metric in CAPTRUST's report
meant that the investment's "Annualized Risk Adjusted Performance falls below the 50th
percentile of the peer group."[561]  A yellow triangle within the peer metric meant that the
"Annualized Peer Relative Performance falls below the 50th percentile of the peer group."[562]
Red diamonds indicated that the funds should be considered for termination.[563] In the analysis,
CAPTRUST identified 85 investments that ranked below the 50th percentile of the peer group
for Annualized Risk Adjusted Performance and/or Annualized Peer Relative Performance for the
3 and/or 5 year annualized periods.[564]  Cornell and CAPTRUST's December 5, 2012 Investment

---

[557] Doc. 252-6, Ex. 76, RPOC Investment Policy Statement, at 5-8 (CORNELL013763).
[558] Doc. 252-6, Ex. 76, RPOC Investment Policy Statement (CORNELL013763).
[559] Doc. 252-6, Ex. 76, RPOC Investment Policy Statement, at 6-7 (CORNELL013763).
[560] Doc. 252-6, Ex. 76, Investment Policy Statement Cornell University (CORNELL013763) at 6.
[561] Ex. P89, Quarterly Review for 3rd Quarter, 2014 (CORNELL015005) at 134.
[562] Ex. P89, Quarterly Review for 3rd Quarter, 2014 (CORNELL015005) at 134.
[563] Doc. 248-13, Ex. 49, RPOC Presentation April 13, 2012 (CORNELL022014) at 21.
[564] Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 40-48; Ex. P89, Quarterly Review
for 3rd Quarter, 2014 (CORNELL015005) at 134.

Policy Statement provides that "investment managers will be expected to maintain a broadly diversified portfolio and will be expected to avoid unreasonable overweighting in a given investment, industry or sector."[565] On February 26, 2015, CAPTRUST identified 62 sector funds—fund that invest in on specific sector of the economy or industry—and 36 funds that were failing the Investment Policy Statement scoring system.[566]

77.     The IPS provides that it does not impose any duties not imposed by ERISA, that it is not binding, and that deviations from its guidelines may be warranted The IPS was thus meant to serve as a "general framework" subject to modification.[567]

**RESPONSE:** Plaintiffs state that the Investment Policy Statement speaks for itself.[568] Plaintiffs dispute that the IPS was not binding and served as a "general framework." Whether the IPS is binding and imposes duties beyond ERISA is a legal conclusion, not a fact, and is improper under Rule 56.1 At the June 29, 2016 RPOC meeting, Ms. Opperman asked "what may cause a fund to be consider[ed]  by RPOC for replacement" and CAPTRUST responded that it was "determined by the Investment Policy Statement[.]"[569]

78.     Once it had finalized and adopted the IPS, RPOC and CAPTRUST turned their focus to redesigning and streamlining the Plans' investment menu.  RPOC recognized that the potential changes to the Plans' investment lineup would have a significant effect on large numbers of plan participants.[570]

---

[565] Doc. 252-6, Ex. 76,Investment Policy Statement Cornell University (CORNELL013763) at 6.
[566] Ex. P95, Tier 3 Fund Selection Overview (CORNELL015019).
[567] Doc. 252-6, Ex. 76,RPOC Investment Policy Statement (CORNELL013763).
[568] Doc. 252-6, Ex. 76, RPOC Investment Policy Statement (CORNELL013763).
[569] Ex. P19, RPOC Meeting Minutes June 29, 2016 (CAPTR_0013565) at 2.
[570] Doc. 248-14, Ex. 50, April 2012 RPOC Meeting Minutes, at 2 (CORNELL028891) ("RPOC and CAPTRUST acknowledged the significant participant communication challenges of reducing investment menus on all platforms.").

**RESPONSE:** Plaintiffs dispute paragraph 78. The Cornell Defendants cite no evidence to support the first sentence and it is not a fact that is material to the Cornell Defendants' Motion for Summary Judgment as required by Local Rule 56.1.  Plaintiffs otherwise dispute that once the IPS was adopted, the RPOC acted prudently. Once the IPS was created, the RPOC did not meet for 8 months.[571] Cornell conducted no investment due diligence until July 31, 2013.[572] CAPTRUST failed to recommend specific investments for a consolidated fund line-up to Cornell until June 2013.[573]  Plaintiffs dispute the second sentence of paragraph 78. The fact is not material to the Cornell Defendants' Motion for Summary Judgment as required by Local Rule 56.1. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████."[574] No disruption analysis occurred prior to CAPTRUST's July 2013

---

[571] Doc. 252-5, November 19, 2012 RPOC Meeting Minutes (CAPTR_0047924); Ex. P12, July 31, 2013 RPOC Meeting Minutes (CAPTR_0047921).

[572] Ex. P7, Opperman Tr. at 59:20-60:2; Ex. P8, Bursic Tr. at 78:4-85:18; Ex. P86, Internal CAPTRUST e-mail exchange July 1, 2013 to July 3, 2013 (CAPTR_0053254) at PDF 2-3 ("2nd deliverable is an interim Fiduciary review on the entire platform of funds. … To put this in perspective, we were hired in December 2011 and we have yet to do a review[.]") and PDF 6 ("Is this the meeting we need to have some sort of quant review on their 5,000 funds?); Ex. P87, e-mail between Cornell and outside counsel dated October 3, 2012 (CORNELL013947) at PDF 2 ("You had mentioned that at a recent RPOC meeting, it was unclear whether CAPTRUST was providing investment performance information to the RPOC."); Cornell Defendants' Rule 56.1 Statement of Undisputed Material Facts *infra* at ¶ 74 (CAPTRUST's initial goals and objective included "adopting a methodology for ongoing plan monitoring.").

[573] Ex. P86, Internal CAPTRUST e-mail exchange July 1, 2013 to July 3, 2013 (CAPTR_0053254) at PDF 3 ("1st deliverable is the comps for the asset classes that the RPOC has approved in order to fulfill those asset classes. … the recommended fund menu that will be delivered at the end of July may not be implemented until mid-2014 (or later).") and PDF 1 ("A general question though- we fall on this recommended line up at the end of July and the implementation doesn't take place until mid-2014, do we still have 'fiduciary exposure'? How do we mitigate this exposure?"); Ex. P96, E-mail from B. Schmitt to TIAA-CREF dated August 14, 2013 (CAPTR_0035670); Ex. P97, Attachment to CAPTR_0035670, initial draft of recommended core line-up (CAPTR_0035671); Ex. P12, RPOC Meeting Minutes dated July 31, 2013 (CAPTR_0047921) at 2 ("CAPTRUST then provided the Committee with a listing of asset classes and funds for the RPOC's initial reaction.").

[574] Ex. P61, Cammack LaRhette response to Cornell's RFP for investment advisor May 13, 2011 (CORNELL006753) at 18.

identification of underperforming funds and those violating the IPS.[575] This "disruption analysis" was flawed and over-inclusive, contributing to a complete lack of process related to removing underperforming funds.[576]

79.        In an effort to gauge participant sentiment and to obtain additional input regarding participant preferences, RPOC established a faculty investment menu advisory committee in July 2012.[577]  The committee's chair explained to the faculty members that RPOC sought "an informal group of plan participants to advise it regarding its choices [related to the] investment options."[578]  The faculty committee was consulted and voiced its opinions throughout the menu redesign process.[579]

**RESPONSE:** Plaintiffs dispute paragraph 79.  The first sentence is not a fact that is material to the Cornell Defendants' Motion for Summary Judgment as required by Local Rule 56.1.  The fact demonstrates the failure of Cornell to act in the best interest of all of the Plans' participants as the "faculty committee" only included faculty. The Plans included employees from a wide range of positions: administrative jobs, staff management, clerical work, restaurant work, bookstore sales, graphic design, public relations, IT jobs, accountants, building and facility maintenance, security and construction.[580] Cornell viewed the Plans as only for faculty members.

---

[575] Ex. P98, Internal CAPTRUST e-mail dated October 2013 (CAPTR_0051798) at 2 ("I called yesterday to discuss the disruption analysis Cornell would like us to complete"); Ex. P99, e-mail from D. Schwartz to RPOC dated November 15, 2013 (CORNELL020006); Ex. P100, Internal CAPTRUST e-mail dated December 2013 (CAPTR_0052091); Ex. P23, Strodel Tr. at 164:2-13, 206:11-207:6.

[576] Ex. P98, Internal CAPTRUST e-mail dated October 2013 (CAPTR_0051798) at 1 ("if a participant has 99% of their assets not disrupted but 1% disrupted, then we will be treating this person as being disrupted. … I agree with the definition of disruption being either yes or no."); Ex. P23, Strodel Tr. at 209:20-23.

[577] Doc. 252-7, Ex. 77, June 17, 2012 Hass/Schwarz Email Regarding Formation of Faculty Committee (CORNELL020166) ("A new law passed in 2006 and the regulations that have followed have placed significantly greater responsibility on employers/plan sponsors to prudently select and communicate plan funds to the participants. In fulfilling its fiduciary duties . . . the RPOC would [] like to establish an informal group of plan participants to also advise it regarding its choices of investment options.").

[578] Doc. 252-7, Ex. 77, June 17, 2012 Hass/Schwarz Email Regarding Formation of Faculty Committee (CORNELL020166)

[579] Doc. 250-16, Ex. 16, Bursic Decl. ¶ 11.

[580] https://hr.cornell.edu/jobs/how-we-hire/career-areas.

Plaintiffs dispute the second and third sentence of paragraph 79. These facts are not material to the Cornell Defendants' Motion for Summary Judgment as required by Local Rule 56.1. Plan sponsors cannot defer to plan participants' choices in a previously unconstrained and unmonitored menu of historically underperforming investment option.

80.     As a first step in redesigning the investment menu, RPOC and CAPTRUST discussed the broad principles that would drive the redesign process. While CAPTRUST discussed various approaches, it explained that "Cornell w[ould] need to decide upon the structure best suited to their faculty and staff."[581] RPOC decided that its objectives were to maintain symmetry across all of the recordkeepers, to offer an appropriate number of choices, to strive to retain current investment options that were widely held, and to avoid unnecessary disruption to participant investment choices.[582] Notably, "RPOC and CAPTRUST acknowledged the significant participant communication challenge of reducing investment menus," especially since eliminating or mapping funds "had never been done before.[583]

**RESPONSE:** The first sentence of paragraph 80 is disputed. The Cornell Defendants do not cite to admissible evidence to support the purported fact in the first sentence of paragraph 80. Plaintiffs otherwise dispute the first sentence because investment advisors that responded to Cornell's RFP in 2011 indicated Cornell should reduce the number of funds in the Plans.[584] CAPTRUST completed the same process in six months with the University System of Maine, including conducting an RFI for recordkeepers.[585] CAPTRUST's expert's only involvement

---

[581] Doc. 248-13, Ex. 49, April 2012 RPOC Meeting Materials, at 14-15 (CORNELL022014).
[582] Doc. 252-5, Ex. 75, November 2012 Meeting Minutes (CAPTR_047924).
[583] Doc. 248-13, Ex. 49, April 2012 RPOC Meeting Materials (CORNELL022014).
[584] Doc. 248-2, Johns Hopkins' University 403(b) Plan Design Presentation, at 16-19 (CORNELL029094); Ex. P4, Mercer response to Cornell's RFP for investment advisors (CORNELL015325) at 16-18; Ex. P61, Cammack LaRhette response to Cornell's RFP for investment advisor May 13, 2011 (CORNELL006753) at 18.
[585] Ex. P101, p at 1 ("CAPTRUST … was hired in January 2013 to provide investment consulting services to the DC Plan."); Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 20-27; 30-72;

with a consolidation to a best in class, tiered line up that CAPTRUST was not involved in took place in a complex university setting and only took 12-18 months from inception to implementation including closing a mapping investment options.[586]

Plaintiffs dispute that the second and third sentences support Defendants' process. CAPTRUST recommended that Cornell create a best-in-class fund line up and remove underperforming funds in its first meeting.[587]  Cornell did not even have fund recommendations for the line-up until July 2013.

Plaintiffs dispute the fourth sentence of paragraph 80.  CAPTRUST internally noted that it had "experience with our other university clients who have made huge changes with little push back from participants."[588] ███████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████ ███████████████████████████████████████ █████ "[589]

81.     CAPTRUST proposed that RPOC begin by reorganizing the Plans' investments into various "tiers."  CAPTRUST presented a variety of alternative tier systems and explained that tiered investment menus were common among higher education plans with large numbers of investment options.[590]  RPOC evaluated the alternatives and decided to create four

---

[586] Ex. P88, Ciccotello Tr. at 56:20-57:10; 68:4-6; 125:12-126:17; 129:23-130:7; Ex. P102, The University System of Georgia Optional Retirement Plan Transition Guide at 5.
[587] Ex. P83, January 11, 2012 RPOC Meeting Material (CORNELL015581).
[588] Ex. P103, Internal CAPTRUST e-mail dated May 26, 2015 (CAPTR_0030324) at 1.
[589] Ex. P61, Cammack LaRhette response to Cornell's RFP for investment advisor May 13, 2011 (CORNELL006753) at 18.
[590] Doc. 248-13, Ex. 49, April 2012 RPOC Meeting Materials (CORNELL022014) (surveying tier systems in place at Stanford, Harvard, Purdue, Rochester, and other universities).

tiers that differed based on the investment type, their suitability for certain investors, and the degree to which the investments would be monitored by RPOC.[591]

**RESPONSE:**  The first sentence of paragraph 81 is disputed. The Cornell Defendants do not cite to admissible evidence to support the purported fact in the first sentence of paragraph 80. Plaintiffs dispute characterization of the document cited in sentence two. The document does not indicate that tiered investment menus contain an unmonitored and unconstrained tier of mutual funds.  The document indicates that a retirement plan should have 12-20 investments and potentially a brokerage window.[592] Plaintiffs dispute sentence three. Cornell was notified that its Plans' investment menus had "multiple redundancies, sector funds and boutique asset[s] classes" and that there were many underperforming funds.[593]  CAPTRUST also indicated in 2014, that Cornell should remove all funds it would not monitor in the "unmonitored Tier 3[.]"[594]

82.       RPOC determined that Tier I would include TIAA's and Fidelity's respective target-date funds or lifecycle funds, which RPOC identified as the Plans' default investment alternatives under ERISA § 404(c)(5).

**RESPONSE:**  Plaintiffs object to paragraph 82 as vague as to time. The Cornell Defendants do not cite to any evidence to support the purported fact. Whether the target date funds were properly designed as default investment alternatives under ERISA is a question of law and not of fact.

83.       Tier II would include a "core" lineup of approximately 25-30 investment options across approximately 20 different asset classes.  The mix of asset classes included in Tier

---

[591] Ex. 63, Doc. 239-4, December 2014 RPOC Meeting Materials (CAPTR_0013586); Doc. 241-1, Ex. 90, July 2013 RPOC Meeting Presentation (CORNELL020122), at 7.
[592] Doc. 248-13, Ex. 49, April 2012 RPOC Meeting Materials (CORNELL022014) at 4.
[593] Doc. 241-1, Ex. 90, July 2013 RPOC Meeting Presentation (CORNELL020122), at 16, 40-48.
[594] Ex. 63, Doc. 239-4, December 2014 RPOC Meeting Materials (CAPTR_0013586) at 8.

II was intended to satisfy the diversification requirements of ERISA Section 404(c). Each asset

class was represented by one or two investment options selected by RPOC and CAPTRUST as

an appropriate investment option for investors seeking exposure to that asset class.  This tier of

approximately 25-30 core investment options would be subject to more frequent monitoring than

the "non-core" options and would remain available unless RPOC determined that the investment

was no longer prudent.

     **RESPONSE:**  Plaintiffs object to paragraph 83 as vague as to time. Whether Cornell

complied with the diversification requirements of ERISA section 404(c) is a question of law and

not of fact and improper under Rule 56.1.The Cornell Defendants do not cite to any evidence to

support any of the four separate purported facts in this paragraph. Plaintiffs dispute that any

investment options were removed when they were imprudent prior to Plaintiffs filing this

lawsuit.

     Prior to CAPTRUST's July 2013 investment scorecard presentation, the Cornell

Defendants did not monitor funds in the Plans in any way.[595]  CAPTRUST made this observation

in its first meeting with the RPOC, noting that "currently there is a limited process in place to

make investment decisions."[596]  CAPTRUST then informed Cornell Defendants that there were

"many underperforming funds" in the Plans, which were not identified.[597]  After acknowledging

---

[595] Ex. P7, Opperman Tr. at 59:20-60:2; Ex. P8, Bursic Tr. at 78:4-85:18; Ex. P86, Internal CAPTRUST e-mail exchange July 1, 2013 to July 3, 2013 (CAPTR_0053254) at PDF 2-3 ("2nd deliverable is an interim Fiduciary review on the entire platform of funds. … To put this in perspective, we were hired in December 2011 and we have yet to do a review[.]") and PDF 6 ("Is this the meeting we need to have some sort of quant review on their 5,000 funds?); Ex. P87, e-mail between Cornell and outside counsel dated October 3, 2012 (CORNELL013947) at PDF 2 ("You had mentioned that at a recent RPOC meeting, it was unclear whether CAPTRUST was providing investment performance information to the RPOC."); Ex. P45, DeStefano Tr. at 124:2-16.
[596] Doc.  248-43, Jan. 11, 2012 RPOC Meeting Materials (CAPTR_0009067), at 6.
[597] Ex. P83, RPOC Retirement Plan Meeting – Executive Summary, January 11, 2012 (CORNELL015581), at 1 (listing date of meeting), 8 (acknowledging underperforming TIAA-CREF investments), 9 (acknowledging underperforming Fidelity investments); Doc. 248-8, Ex. 44, Meeting Minutes from January 11, 2012 RPOC meeting (CAPTR_0047903) at 3 ("TIAA-CREF has several redundant asset classes as well as underperforming accounts. Fidelity currently offering (180+ funds) has significant redundancy, many underperforming accounts and too many choices in general."); Ex. P7, Opperman Tr. 60:14-61:9; 63:8-63:24.

that there were "many underperforming funds" whose identities were unknown in the Plans, no

identification or monitoring occurred on these underperforming fund for 18 months.[598]  In the

analysis, CAPTRUST identified 85 investments that ranked below the 50th percentile of the peer

group for Annualized Risk Adjusted Performance and/or Annualized Peer Relative Performance

for the 3 and/or 5 year annualized periods, all of which violated Cornell's Investment Policy

Statement.[599]  Several funds failed screening criteria so badly in 2013 they were designated with

a red diamond.[600] The Cornell Defendants did not obtain any further quantitative investment due

diligence until 14 months later, on September 17, 2014.[601]  Funds identified with the red

diamond should have been given more attention or been eliminated from the Plans.[602]

On February 26, 2015, CAPTRUST identified 62 sectors funds—fund that invest in on

specific sector of the economy or industry—and 36 funds that were failing the Investment Policy

Statement scoring system.[603]

CAPTRUST recommended against adding the PIMCO fund in 2014 as PIMCO's founder

and long-time manager left PIMCO in September 2014—not September 2015.[604] In 2014, the

---

[598] Ex. P86, Internal CAPTRUST e-mail exchange July 1, 2013 to July 3, 2013 (CAPTR_0053254) at PDF 2-3 ("2nd deliverable is an interim Fiduciary review on the entire platform of funds. … To put this in perspective, we were hired in December 2011 and we have yet to do a review[.]") and PDF 6 ("Is this the meeting we need to have some sort of quant review on their 5,000 funds?); Ex. P87, e-mail between Cornell and outside counsel dated October 3, 2012 (CORNELL013947) at PDF 2 ("You had mentioned that at a recent RPOC meeting, it was unclear whether CAPTRUST was providing investment performance information to the RPOC."); Ex. P88, Ciccotello Tr. at 103:3-105:2.
[599] Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 40-48; Ex. P89, Quarterly Review for 3rd Quarter, 2014 (CORNELL015005) at 134; Doc. 252-6, Ex. 76, Investment Policy Statement Cornell University (CORNELL013763) at 6.
[600] Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 40-48.
[601] Ex. P90, e-mail attaching materials for September 17, 2014 RPOC meeting (CORNELL013566); Doc. 241-3, Ex. 92 RPOC Presentation September 17, 2014 at 39-47 (CORNELL013567).
[602] Ex. P88, Ciccotello Tr. at 144:8-149:8; Doc. 248-13, Ex. 49, RPOC Presentation April 13, 2012 (CORNELL022014) at 21 (score of "69 or below Consider termination of fund"); Doc. 249-18, Ex. 106, Expert Report of W. Dominguez, ¶¶ 52, 81, 117-121.
[603] Ex. P95, Tier 3 Fund Selection Overview (CORNELL015019).
[604] Ex. P104, RPOC Presentation December 3, 2014 (CORNELL015004) at 1 ("December 3, 2014") and 34 ("Bill Gross, left PIMCO in September [2014]").

fund was marked as "consider for termination."[605]  PIMCO remained on CAPTRUST's report as "consider for termination" at the next meeting with RPOC on December 3, 2014.[606] PIMCO remained on CAPTRUST's report as "consider for termination" at the next meeting with RPOC on June 6, 2015.[607]

All of these underperforming or inappropriate investments remained in the Plan prior to this lawsuit because prior to 2016, there was no process to remove an underperforming fund from the Plans. [608] At the June 29, 2016 RPOC meeting, Ms. Opperman asked "what may cause a fund to be consider[ed]  by RPOC for replacement[?]"[609]

84.      The remaining plan investment options (i.e. those that were not included in Tier II and were not "Target Date" funds) comprised Tier III.   RPOC's goal with respect to these options was to reduce the number of non-core funds offered directly through the Plans by eliminating them over time. Finally, Tier IV referred to the investments available through TIAA's and Fidelity's respective brokerage windows which enable participants to invest in any publicly traded security offered on a major stock exchange.

**RESPONSE:**  Plaintiffs object to paragraph 84 as vague as to time.  The Cornell Defendants do not cite to any evidence to support any of the three separate purported facts in this paragraph. Plaintiffs dispute that the RPOC removed any non-core funds prior to Plaintiffs filing this lawsuit.

---

[605] Ex. P104, RPOC Presentation December 3, 2014 (CORNELL015004) at 27 (scoring PIMCO as "consider for termination").
[606] Ex. P104, RPOC Presentation dated December 3, 2014 (CORNELL015004) at 27.
[607] Doc. 241-5, Ex. 94, RPOC Presentation dated June 2, 2015 (CORNELL013289) at 25.
[608] Ex. P23, Strodel Tr. at 163:24-165:1; Ex. P7, Opperman Tr. at 175:16-176:6 (prior to December 2016, the RPOC did not know how to remove a fund that was underperforming from the Plans); Ex. 63, Doc. 239-4, RPOC Meeting Minutes dated December 3, 2014 (CAPTR_0013586) at 4 ("RPOC and CAPTRUST will work on defining a process to make decisions on the funds currently found in the Tier III menu of funds."); Ex. P19, RPOC Meeting Minutes dated June 29, 2016 (CAPTR_0013565) at 2 ("The Chair, Ms. Opperman asked what may cause a fund to be considered by RPOC for replacement.").
[609] Ex. P19, RPOC Meeting Minutes dated June 29, 2016 (CAPTR_0013565) at 2.

Prior to CAPTRUST's July 2013 investment scorecard presentation, the Cornell

Defendants did not monitor funds in the Plans in any way.[610]  CAPTRUST made this observation

in its first meeting with the RPOC, noting that "currently there is a limited process in place to

make investment decisions."[611]  CAPTRUST then informed Cornell Defendants that there were

"many underperforming funds" in the Plans, which were not identified.[612]  After acknowledging

that there were "many underperforming funds" whose identities were unknown in the Plans, no

identification or monitoring occurred on these underperforming fund for 18 months.[613]  In the

analysis, CAPTRUST identified 85 investments that ranked below the 50th percentile of the peer

group for Annualized Risk Adjusted Performance and/or Annualized Peer Relative Performance

for the 3 and/or 5 year annualized periods, all of which violated Cornell's Investment Policy

Statement.[614]  Several funds failed screening criteria so badly in 2013 they were designated with

a red diamond.[615]  The Cornell Defendants did not obtain any further quantitative investment due

---

[610] Ex. P7, Opperman Tr. at 59:20-60:2; Ex. P8, Bursic Tr. at 78:4-85:18; Ex. P86, Internal CAPTRUST e-mail exchange July 1, 2013 to July 3, 2013 (CAPTR_0053254) at PDF 2-3 ("2nd deliverable is an interim Fiduciary review on the entire platform of funds. … To put this in perspective, we were hired in December 2011 and we have yet to do a review[.]") and PDF 6 ("Is this the meeting we need to have some sort of quant review on their 5,000 funds?); Ex. P87, e-mail between Cornell and outside counsel dated October 3, 2012 (CORNELL013947) at PDF 2 ("You had mentioned that at a recent RPOC meeting, it was unclear whether CAPTRUST was providing investment performance information to the RPOC."); Ex. P45, DeStefano Tr. at 124:2-16.

[611] Doc. 248-43, Jan. 11, 2012 RPOC Meeting Materials (CAPTR_0009067), at 6.

[612] Ex. P83, RPOC Retirement Plan Meeting – Executive Summary, January 11, 2012 (CORNELL015581), at 1 (listing date of meeting), 8 (acknowledging underperforming TIAA-CREF investments), 9 (acknowledging underperforming Fidelity investments); Doc. 248-8, Ex. 44, Meeting Minutes from January 11, 2012 RPOC meeting (CAPTR_0047903) at 3 ("TIAA-CREF has several redundant asset classes as well as underperforming accounts. Fidelity currently offering (180+ funds) has significant redundancy, many underperforming accounts and too many choices in general."); Ex. P7, Opperman Tr. 60:14-61:9; 63:8-63:24.

[613] Ex. P86, Internal CAPTRUST e-mail exchange July 1, 2013 to July 3, 2013 (CAPTR_0053254) at PDF 2-3 ("2nd deliverable is an interim Fiduciary review on the entire platform of funds. … To put this in perspective, we were hired in December 2011 and we have yet to do a review[.]") and PDF 6 ("Is this the meeting we need to have some sort of quant review on their 5,000 funds?); Ex. P87, e-mail between Cornell and outside counsel dated October 3, 2012 (CORNELL013947) at PDF 2 ("You had mentioned that at a recent RPOC meeting, it was unclear whether CAPTRUST was providing investment performance information to the RPOC."); Ex. P88, Ciccotello Tr. at 103:3-105:2.

[614] Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 40-48; Ex. P89, Quarterly Review for 3rd Quarter, 2014 (CORNELL015005) at 134; Doc. 252-6, Ex. 76, Investment Policy Statement Cornell University (CORNELL013763) at 6.

[615] Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 40-48.

diligence until 14 months later, on September 17, 2014.[616]  Funds identified with the red diamond should have been given more attention or been eliminated from the Plans.[617]

On February 26, 2015, CAPTRUST identified 62 sector funds—fund that invest in a specific sector of the economy or industry—and 36 funds that were failing the Investment Policy Statement scoring system.[618]

CAPTRUST recommended against adding the PIMCO fund in 2014 as PIMCO's founder and long-time manager left PIMCO in September 2014—not September 2015.[619] In 2014, the fund was marked as "consider for termination."[620]  PIMCO remained on CAPTRUST's report as "consider for termination" at the next meeting with RPOC on December 3, 2014.[621] PIMCO remained on CAPTRUST's report as "consider for termination" at the next meeting with RPOC on June 6, 2015.[622]

All of these underperforming or inappropriate investments remained in the Plan prior to this lawsuit, because prior to 2016, there was no process to remove an underperforming fund from the Plans. [623] At the June 29, 2016 RPOC meeting, Ms. Opperman (the Committee Chair) asked "what may cause a fund to be consider[ed]  by RPOC for replacement[?]"[624]

---

[616] Ex. P90, e-mail attaching materials for September 17, 2014 RPOC meeting (CORNELL013566); Doc. 241-3, Ex. 92, RPOC Presentation September 17, 2014 at 39-47 (CORNELL013567).

[617] Ex. P88, Ciccotello Tr. at 144:8-149:8; Doc. 248-13, Ex. 49, RPOC Presentation April 13, 2012 (CORNELL022014) at 21 (score of "69 or below Consider termination of fund"); Doc. 249-18, Ex. 106, Expert Report of W. Dominguez, ¶¶ 52, 81, 117-121.

[618] Ex. P95, Tier 3 Fund Selection Overview (CORNELL015019).

[619] Ex. P104, RPOC Presentation December 3, 2014 (CORNELL015004) at 1 ("December 3, 2014") and 34 ("Bill Gross, left PIMCO in September [2014]").

[620] Ex. P104, RPOC Presentation December 3, 2014 (CORNELL015004) at 27 (scoring PIMCO as "consider for termination").

[621] Ex. P104, RPOC Presentation dated December 3, 2014 (CORNELL015004) at 27.

[622] Doc. 241-5, Ex. 94, RPOC Presentation dated June 2, 2015 (CORNELL013289) at 25.

[623] Ex. P23, Strodel Tr. at 163:24-165:1; Ex. P7, Opperman Tr. at 175:16-176:6 (prior to December 2016, the RPOC did not know how to remove a fund that was underperforming from the Plans); Ex. 63, Doc. 239-4, RPOC Meeting Minutes dated December 3, 2014 (CAPTR_0013586) at 4 ("RPOC and CAPTRUST will work on defining a process to make decisions on the funds currently found in the Tier III menu of funds."); Ex. P19, RPOC Meeting Minutes dated June 29, 2016 (CAPTR_0013565) at 2 ("The Chair, Ms. Opperman asked what may cause a fund to be considered by RPOC for replacement.").

[624] Ex. P19, RPOC Meeting Minutes dated June 29, 2016 (CAPTR_0013565) at 2.

85.      After RPOC agreed to implement the four tier investment menu and had identified the asset classes that would be included in Tier II's "core" fund lineup, CAPTRUST submitted an initial proposed list of funds that would be included in Tier II for each asset class and the identified a large number of funds that would be eliminated from the Plans.  Notably, this list of core funds included both the TIAA Real Estate Account and the CREF Stock Account.[625]

**RESPONSE:**  Plaintiffs dispute that the first sentence of paragraph 85 is a material fact. An initial list of funds to include in a best-in-class tier, with no analysis, does not mean an investment is prudent.  Plaintiffs do not dispute that CAPTRUST included TIAA Real Estate and the CREF Stock Account in its first list of "core funds."  Plaintiffs dispute that these funds were prudent or that a proper analysis of these funds occurred prior to placing them on the recommended "core funds" line up.

CAPTRUST recommended that Cornell include the TIAA Real Estate Fund in its recommended line-up without conducting any evaluation.[626]

| Asset Class | Investment Name | Ticker | 3 yr RAP | 5 yr RAP | 3 yr Peer | 5 yr Peer | 3 yr Style | 5 yr Style | Expense | Total Quant | Total Quant |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Direct Real Estate**** | TIAA Real Estate | | - | - | - | - | - | - | - | - | - |

Historical performance data for the TIAA Real Estate Account was available in July 2013, but not utilized by CAPTRUST.[627] For the University System of Maine in July 2013 CAPTRUST compared the TIAA Real Estate Account to the Dow Jones US Select REIT and Morningstar Specialty-Real Estate benchmarks.[628] CAPTRUST's evaluation showed that the

---

[625] Doc. 252-8, Ex. 78, September 2013 RPOC Meeting Minutes (CAPTR_047918).
[626] Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 48; Ex. P88, Ciccotello Tr. at 110:24-113:9 ("Q. Sure. Do you see any appropriate performance-related information for the TIAA Real Estate Account in this presentation? A. So in this presentation I just – I see nothing but dashes.") ; Ex. P23, Strodel Tr. at 185:18-25; Ex. P8, Bursic Tr. at 223:6-225:1; Ex. P7, Opperman Tr. at 250:2-4; Doc. 249-18, Ex. 106, Expert Report of W. Dominguez, ¶¶ 103-105.
[627] Ex. P105, TIAA Real Estate Account's Quarterly 8-K (TIAA_CORNELL_00026051) at 4.
[628] Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 68.

TIAA Real Estate Account underperformed significantly against both indexes over the year to date, one, three, five and ten-year periods.[629]



By December 2014, CAPTRUST evaluated the TIAA Real Estate Account's unadjusted returns against the NACREIF Property Index and Morningstar Specialty-Real Estate Universe.[630] The Cornell Defendants relied on information provided by CAPTRUST using unadjusted returns to measure the performance of the TIAA Real Estate Account that they now contend was inappropriate.[631] Plaintiffs' expert explains that using the unadjusted returns the TIAA Real Estate Account had significant underperformance.[632] Cornell takes the position that what CAPTRUST did, comparing the TIAA Real Estate Accounts unadjusted returns, is a "flat-out

---

[629] Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 68.
[630] Ex. P89, Quarterly Review for Period Ending September 30, 2014 (CORNELL015005) at 28, 51; Ex. P23, Strodel Tr. at 145:8-24; Ex. P106, TIAA Real Estate Account 8-K dated March 10, 2015 ("adjusted performance figures are designed for the use of Account investors for comparison purposes only, and do not reflect the true returns experienced by holders of interests in the Account.").
[631] Doc. 240-7–240-12, Expert Report of John Chalmers at ¶¶ 57-58.
[632] Ex. P89, Quarterly Review for Period Ending September 30, 2014 (CORNELL015005) at 28, 51; Doc. 249-18, Ex. 106, Expert Report of W. Dominguez at ¶¶ 102-105, 107; Ex. P106, TIAA Real Estate Account 8-K dated March 10, 2015 ("adjusted performance figures are designed for the use of Account investors for comparison purposes only, and do not reflect the true returns experienced by holders of interests in the Account.").

mischaracterization" of how the TIAA Real Estate Account should be compared against an

NCREIF index.[633]

Compare unadjusted number used by CAPTRUST:

| INVESTMENT NAME | Q3 '14 | YTD '14 | 2013 | 2012 | 2011 | 2010 | 2009 | 1 YEAR* | 3 YEAR* | 5 YEAR* | 10 YEAR* |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **SPECIALTY-REAL ESTATE** | | | | | | | | | | | |
| **TIAA Real Estate Account** | 2.32% | 8.19% | 9.65% | 10.06% | 13.00% | 13.30% | -27.64% | 9.94% | 10.22% | 9.68% | 4.74% |
| NACREIF Property Index | 2.63% | 8.51% | 10.99% | 10.54% | 14.26% | 13.11% | -16.86% | 11.26% | 11.08% | 10.99% | 8.55% |
| Morningstar Specialty-Real Estate Universe | -3.01% | 13.09% | 1.65% | 17.52% | 7.61% | 27.36% | 30.57% | 12.77% | 15.84% | 14.89% | 7.69% |

CAPTRUST 2014 presentation to the RPOC.[634]

With the unadjusted number listed in TIAA Real Estate Account's Quarterly Analysis for

the same period:

### Return and Adjusted Total Return for the Quarter Ended September 30, 2014

| TIAA Real Estate Account | | | | | | |
|---|---|---|---|---|---|---|
| | Quarterly | 1 Year | 3 Year | 5 Year | 10 Year | Since Inception |
| Total Return[1] | 2.32% | 9.94% | 10.22% | 9.68% | 4.74% | 6.30% |
| Adjusted Total Return[2] | 2.81% | 12.20% | 12.41% | 12.11% | 6.40% | 7.78% |
| NCREIF Fund Index - ODCE[3] | 3.24% | 11.44% | 11.20% | 11.11% | 5.84% | 7.60% |

TIAA Real Estate Account Quarterly Performance Analysis for the period ending

September 30, 2014.[635] ███████████████████████████

███████████████████████████████████████████████

████████████.[636]

[633] Doc. 227 at 21.
[634] Ex. P89, Quarterly Review for 3rd Quarter, 2014 (CORNELL015005) at 28; Ex. P23, Strodel Tr. at 145:8-24.
[635] Ex. P107, TIAA Real Estate Account Quarterly Performance Analysis September 30, 2014, exhibit 99.1 to 8-K, at 4.
[636] Ex. P62, Segal Advisors Response to Cornell's RFP for an investment advisor May 4, 2011, (CORNELL006782) at PDF 54-55.

132

In July 2013, CAPTRUST reported that the CREF Stock Account ranked below the 50th percentile of its Annualized Risk Adjusted Performance peer group and its Annualized Peer Relative Performance group for the 3 and 5 year periods.[637]

| Asset Class | Investment Name | Ticker | 3 yr RAP | 5 yr RAP | 3 yr Peer | 5 yr Peer | 3 yr Style | 5 yr Style | Expense | Total Quant | Total Quant |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Large Company Blend**** | CREF Stock | - | ⚠ | ⚠ | ⚠ | ⚠ | 🟢 | 🟢 | 🟢 | 45 | ⚠ |

CAPTRUST described its evaluation of the CREF Stock Account to the RPOC as an "estimation."[638] The RPOC believed that CAPTRUST's yellow triangle scoring for the CREF Stock Account was "fundamentally unreliable," and they could not determine whether the yellow triangles on the July 2013 report reflected the performance of the CREF Stock Account or the inadequacy of CAPTRUST's selection of measurement.[639] CAPTRUST did not provide the RPOC with information necessary to interpret its scoring system, including the yellow, "Marked For Review" within the quantitative criteria categories until December 2014.[640] CAPTRUST did not provide underlying performance data for the CREF Stock Account until December 2014.[641]

CAPTRUST categorized the CREF Stock Account in Large Company Blend asset class in the Plans.[642] CAPTRUST's expert also classified the CREF Stock Account in the Large Blend asset class during his fiduciary service to the University System of Georgia Optional Retirement

---

[637] Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 49; Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 48; Ex. P89, Quarterly Review for 3rd Quarter, 2014 (CORNELL015005) at 28.

[638] Ex. P8, Bursic Tr. at 217:18-25.

[639] Ex. P8, Bursic Tr. at 218:2-9; 218:25-219:4.

[640] Ex. 63, Doc. 239-4, RPOC Meeting Minutes dated December 3, 2014 (CAPTR_0013586) at 3-4 ("Mr. Schmitt focused on the key components of the review and the manner in which CAPTRUST evaluates/"scores" an investment vehicle."); Ex. P89, Quarterly Review for 3rd Quarter, 2014 (CORNELL015005) at 134; E-mail attaching Quarterly Review for 3rd Quarter, 2014 (CORNELL015001).

[641] Ex. P89, Quarterly Review for Period Ending September 30, 2014 (CORNEL015005) at 39.

[642] Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 12, 35, 38; Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 21, 25-27; Ex. P108, University of Maine System Quarterly Review for 3rd Quarter, 2014 at 14, 17, 35 and 43; Ex. P60, Schmitt Tr. at 80:1-19; Ex. P101, University of Maine System Quarterly Review for 1st Quarter, 2015 at 472, 501; Ex. P60, Schmitt Tr. at 81:18-20.

Plan.[643]  For the University System of Maine in July 2013 CAPTRUST compared the CREF

Stock Account against the S&P 500 Index and Morningstar Large Blend Index.[644] CAPTRUST's

evaluation showed that the CREF Stock Account underperformed both indexes over the 3 and 5

year period and that there was major style exposure overlap between the CREF Stock Account

and the Morningstar Large Blend Average.[645]

CAPTRUST's evaluation showed major similarity in annualized standard deviation

between the CREF Stock Account and the Morningstar Large Blend Average.[646]



As a result of CAPTRUST's self-described unreliable evaluation, Cornell decided to keep

the CREF Stock Account on Tier II solely because it had been offered at Cornell since the

1950s.[647]

---

[643] Ex. P88, Ciccotello Tr. at 56:20-58:11; 67:6-73:13; Ex. P102, The University System of Georgia Optional
Retirement Plan Transition Guide at 13.
[644] Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 49.
[645] Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 49.
[646] Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 49.
[647] Ex. P8, Bursic Tr. at 218:9-11.

After 2014, Cornell relied on CAPTRUST's evaluation of the CREF Stock Account using a benchmark of 70% domestic equity and 30% international equity, with 7-8% of the 30% in emerging markets, that Cornell now described as materially different than CREF Stock Account.[648]  Cornell Defendants believe CAPTRUST's custom index is an inappropriate comparison for the CREF Stock Account because it is "materially different from that of CREF Stock."[649]

|  | CREF Stock Benchmark[3] | Dominguez's Benchmark[4] |
|---|---|---|
| **Russell 3000** (U.S. Stocks) | 70.1% | 70.0% |
| **MSCI EAFE+Canada** (Stocks from Europe, Australasia, Far East, and Canada) | 21.9% | 0.0% |
| **MSCI Emerging Markets** (Stocks from emerging markets) | 5.4% | 7.0% |
| **MSCI EAFE+Canada Small Cap** (Small-cap stocks from Europe, Australasia, Far East, and Canada) | 2.6% | 0.0% |
| **MSCI EAFE** (Stocks from Europe, Australasia, and Far East) | 0.0% | 23.0% |

When compared to this benchmark, the CREF Stock Account underperformed from 2000 through June 2010.[650]

86.    However, at this meeting RPOC's members raised a number of concerns regarding the amount of disruption involved in CAPTRUST's proposed fund changes.  RPOC created a subcommittee to assist CAPTRUST with the identification of Tier II funds and reiterated that in an effort to avoid unnecessary disruption, "adequate consideration should be given to funds already being utilized."[651]

---

[648] Ex. P23, Strodel Tr. at 144:21-145:6; Ex. P60, Schmitt Tr. at 116:19-118:12; Doc. 240-7–240-12, Expert Report of John Chalmers at ¶ 55; Doc. 249-18, Ex. 106, Expert Report of Wendy Dominguez at ¶ 95, Exhibit 5 (comparing the CREF Stock Account to a 70% U.S., 23% Int'l, 7% EM Index and demonstrating historic underperformance).
[649] Doc. 227 at p. 13-14; Doc. 233 at 16-18.
[650] Doc. 249-18, Ex. 106, Expert Report of Wendy Dominguez at ¶ 95, Exhibit 5.
[651] Doc. 252-8, Ex. 78, September 2013 RPOC Meeting Minutes (CAPTR_047918).

**RESPONSE:**  Plaintiffs dispute that the first paragraph 86 is a material fact. Plan participants are not charged with the duty to act as an investment professional.  Plan sponsors cannot defer to plan participants' choices in a previously unconstrained and unmonitored menu of investment option. This defeats the entire purpose of having a prudent investment professional curating the fund line-up.  Plaintiffs dispute Cornell's characterization of the document.  No investment due diligence was conducted until July 2013.[652] No disruption analysis occurred prior to this analysis.[653] This "disruption analysis" was flawed and over-inclusive, contributing to a complete lack of process related to removing underperforming funds.[654]

87.     The investment design subcommittee met on multiple occasions between the July 2013 and September 2013 meetings to analyze fund options to be included in Tier II's "core" lineup.  CAPTRUST and the subcommittee presented their recommendations to RPOC at the September 2013 meeting.  In connection with this meeting, CAPTRUST reviewed the thorough investment selection process employed to identify the most appropriate core funds for Tier II. This process included consideration of the priorities previously identified by RPOC (i.e. disruptions concerns and preference for funds currently available), the quantitative screening criteria and qualitative assessments described in the IPS, and their reliance on various investment research databases (e.g. Morningstar ratings) to augment the process.[655]  The TIAA Real Estate

---

[652] Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 40-48; Ex. P86, Internal CAPTRUST e-mail exchange July 1, 2013 to July 3, 2013 (CAPTR_0053254) at PDF 3.
[653] Ex. P98, Internal CAPTRUST e-mail exchange October 24, 2013, to November 6, 2013 (CAPTR_0051798) at 2 ("I had a chance yesterday to discuss the disruption analysis Cornell would like us to complete."); Ex. P99, e-mail from D. Schwartz to RPOC dated November 15, 2013 (CORNELL020006); Ex. P100, Internal CAPTRUST e-mail dated December 2, 2013 (CAPTR_0052091); Ex. P23, Strodel Tr. at 164:2-13, 206:11-207:6.
[654] Ex. P98, Internal CAPTRUST e-mail exchange October 24, 2013, to November 6, 2013 (CAPTR_0051798) at 1 ("if a participant has 99% of their assets not disrupted but 1% disrupted, then we will be treating this person as being disrupted. … I agree with the definition of disruption being either yes or no."); Ex. P23, Strodel Tr. at 209:20-23.
[655] Doc. 252-8, Ex. 78, September 2013 RPOC Meeting Minutes (CAPTR_047918).

Account and CREF Stock Account were both included among the Tier II "core" investment options approved by RPOC as this meeting.[656]

**RESPONSE:** Plaintiffs dispute sentences one through three. The Cornell Defendants do not cite to any evidence to support any of the three separate purported facts in this paragraph. Plaintiffs dispute the fourth sentence of paragraph 87. The materials cited shows that it took nearly three years to even begin discussing a new fund menu. Plaintiffs dispute the fifth sentence of paragraph 87. CAPTRUST recommended that Cornell include the TIAA Real Estate Fund in its recommended line-up without conducting any evaluation.[657]

| Asset Class | Investment Name | Ticker | 3 yr RAP | 5 yr RAP | 3 yr Peer | 5 yr Peer | 3 yr Style | 5 yr Style | Expense | Total Quant | Total Quant |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Direct Real Estate**** | TIAA Real Estate | | - | - | - | - | - | - | - | - | - | - |

Historical performance data for the TIAA Real Estate Account was available in July 2013, but not utilized by CAPTRUST.[658] For the University System of Maine in July 2013 CAPTRUST compared the TIAA Real Estate Account to the Dow Jones US Select REIT and Morningstar Specialty-Real Estate benchmarks.[659] CAPTRUST's evaluation showed that the TIAA Real Estate Account underperformed significantly against both indexes over the year to date, one, three, five and ten-year periods.[660]

---

[656] Doc. 252-8, Ex. 78, September 2013 RPOC Meeting Minutes (CAPTR_047918).
[657] Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 48; Ex. P88, Ciccotello Tr. at 110:24-113:9 ("Q. Sure. Do you see any appropriate performance-related information for the TIAA Real Estate Account in this presentation? A. So in this presentation I just – I see nothing but dashes.") ; Ex. P23, Strodel Tr. at 185:18-25; Ex. P8, Bursic Tr. at 223:6-225:1; Ex. P7, Opperman Tr. at 250:2-4; Doc. 249-18, Ex. 106, Expert Report of W. Dominguez, ¶¶ 103-105.
[658] Ex. P105, TIAA Real Estate Account's Quarterly 8-K (TIAA_CORNELL_00026051) at 4.
[659] Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 68.
[660] Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 68.



By December 2014, CAPTRUST evaluated the TIAA Real Estate Account's unadjusted returns against the NACREIF Property Index and Morningstar Specialty-Real Estate Universe.[661] The Cornell Defendants relied on information provided by CAPTRUST using unadjusted returns to measure the performance of the TIAA Real Estate Account that they now contend was inappropriate.[662] Plaintiffs' expert explains that using the unadjusted returns the TIAA Real Estate Account had significant underperformance.[663] Cornell takes the position that what CAPTRUST did, comparing the TIAA Real Estate Accounts unadjusted returns, is a "flat-out mischaracterization" of how the TIAA Real Estate Account should be compared against an NCREIF index.[664]

Compare unadjusted number used by CAPTRUST:



| INVESTMENT NAME | Q3 '14 | YTD '14 | 2013 | 2012 | 2011 | 2010 | 2009 | 1 YEAR* | 3 YEAR* | 5 YEAR* | 10 YEAR* |
|---|---|---|---|---|---|---|---|---|---|---|---|

---

[661] Ex. P89, Quarterly Review for Period Ending September 30, 2014 (CORNELL015005) at 28, 51; Ex. P23, Strodel Tr. at 145:8-24; Ex. P106, TIAA Real Estate Account 8-K dated March 10, 2015 ("adjusted performance figures are designed for the use of Account investors for comparison purposes only, and do not reflect the true returns experienced by holders of interests in the Account.").

[662] Doc. 240-7–240-12, Expert Report of John Chalmers at ¶¶ 57-58.

[663] Ex. P89, Quarterly Review for Period Ending September 30, 2014 (CORNELL015005) at 28, 51; Doc. 249-18, Ex. 106, Expert Report of Wendy Dominguez at ¶¶ 102-105, 107; Ex. P106, TIAA Real Estate Account 8-K dated March 10, 2015, at PDF 2 ("adjusted performance figures are designed for the use of Account investors for comparison purposes only, and do not reflect the true returns experienced by holders of interests in the Account.").

[664] Doc. 227 at 21.

| SPECIALTY-REAL ESTATE | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| TIAA Real Estate Account | 2.32% | 8.19% | 9.65% | 10.06% | 13.00% | 13.30% | -27.64% | 9.94% | 10.22% | 9.68% | 4.74% |
| NACREIF Property Index | 2.63% | 8.51% | 10.99% | 10.54% | 14.26% | 13.11% | -16.86% | 11.26% | 11.08% | 10.99% | 8.55% |
| Morningstar Specialty-Real Estate Universe | -3.01% | 13.09% | 1.65% | 17.52% | 7.61% | 27.36% | 30.57% | 12.77% | 15.84% | 14.89% | 7.69% |

CAPTRUST 2014 presentation to the RPOC.[665]

With the matching unadjusted number listed in TIAA Real Estate Account's Quarterly

Analysis for the same period:

### Return and Adjusted Total Return for the Quarter Ended September 30, 2014

**TIAA Real Estate Account**

| | Quarterly | 1 Year | 3 Year | 5 Year | 10 Year | Since Inception |
|---|---|---|---|---|---|---|
| Total Return[1] | 2.32% | 9.94% | 10.22% | 9.68% | 4.74% | 6.30% |
| Adjusted Total Return[2] | 2.81% | 12.20% | 12.41% | 12.11% | 6.40% | 7.78% |
| NCREIF Fund Index - ODCE[3] | 3.24% | 11.44% | 11.20% | 11.11% | 5.84% | 7.60% |

TIAA Real Estate Account Quarterly Performance Analysis for the period ending

September 30, 2014.[666] ███████████████████████████████

█████████████████████████████████████████████████████

█████████ .[667]

In July 2013, CAPTRUST reported that the CREF Stock Account ranked below the 50th

percentile of its Annualized Risk Adjusted Performance peer group and its Annualized Peer

Relative Performance group for the 3 and 5 year periods.[668]



| Asset Class | Investment Name | Ticker | 3 yr RAP | 5 yr RAP | 3 yr Peer | 5 yr Peer | 3 yr Style | 5 yr Style | Expense | Total Quant | Total Quant |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Large Company Blend**** | CREF Stock | - | ⚠ | ⚠ | ⚠ | ⚠ | 🟢 | 🟢 | 🟢 | 45 | ⚠ |

---

[665] Ex. P89, Quarterly Review for 3rd Quarter, 2014 (CORNELL015005) at 28; Ex. P23, Strodel Tr. at 145:8-24.
[666] Ex. P107, TIAA Real Estate Account Quarterly Performance Analysis September 30, 2014, exhibit 99.1 to 8-K, at 4.
[667] Ex. P62, Segal Advisors Response to Cornell's RFP for an investment advisor May 4, 2011, (CORNELL006782) at PDF 54-55.
[668] Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 49; Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 48; Ex. P89, Quarterly Review for 3rd Quarter, 2014 (CORNELL015005) at 134.

CAPTRUST described its evaluation of the CREF Stock Account to the RPOC as an "estimation."[669] The RPOC believed that CAPTRUST's yellow triangle scoring for the CREF Stock Account was "fundamentally unreliable," and they could not determine whether the yellow triangles on the July 2013 report reflected the performance of the CREF Stock Account or the inadequacy of CAPTRUST's selection of measurement.[670] CAPTRUST did not provide the RPOC with information necessary to interpret its scoring system, including the yellow, "Marked For Review" within the quantitative criteria categories until December 2014.[671] CAPTRUST did not provide underlying performance data for the CREF Stock Account until December 2014.[672]

88.        RPOC began to gradually phase out investments in Tier III, beginning with those investments that triggered certain screening criteria. RPOC also agreed to close funds to new contributions if they were available through the Tier IV brokerage window at no additional cost.[673] Through this process RPOC eliminated dozens of funds and to this day continues to analyze the Tier III fund menu to identify additional funds that can be eliminated.[674]

**RESPONSE:** Plaintiffs dispute the first sentence of paragraph 88. The Cornell Defendants do not cite to any evidence to support the purported fact in this sentence. Plaintiffs dispute the second sentence of paragraph 88. The RPOC did not actually take the action cited because it violated nondiscrimination rules under ERISA.[675] Plaintiffs dispute the third sentence in paragraph 88. Prior to 2016, there was no process to remove an underperforming fund from

---

[669] Ex. P8, Bursic Tr. at 217:18-25.
[670] Ex. P8, Bursic Tr. at 218:2-9; 218:25-219:4.
[671] Ex. 63, Doc. 239-4, RPOC Meeting Minutes dated December 3, 2014 (CAPTR_0013586) at 3-4 ("Mr. Schmitt focused on the key components of the review and the manner in which CAPTRUST evaluates/"scores" an investment vehicle."); Ex. P89, Quarterly Review for 3rd Quarter, 2014 (CORNELL015005) at 134; E-mail attaching Quarterly Review for 3rd Quarter, 2014 (CORNELL15001).
[672] Ex. P89, Quarterly Review for Period Ending September 30, 2014 (CORNEL015005) at 39.
[673] Doc. 238-9, Ex. 58, March 2016 RPOC Meeting Minutes (CAPTR_0013568).
[674] Doc. 252-10, Ex. 80, December 2016 RPOC Meeting Minutes, at 3-4 (CAPTR_013590) (discussing ongoing process for eliminating funds).
[675] Ex. P49, April 14, 2017 RPOC Meeting Minutes (CAPTR_0013583).

the Plans.[676] At the June 29, 2016 RPOC meeting, RPOC Chair, Ms. Opperman asked "what may

cause a fund to be consider[ed] by RPOC for replacement[?]"[677]

89.         While RPOC and CAPTRUST worked to redesign the investment menu and to

eliminate or consolidate many of the non-core investment options, they simultaneously

monitored all the Plans' investments, including the "non-core" investments in Tier III.

**RESPONSE:**  Plaintiffs dispute paragraph 89.  The Cornell Defendants do not cite to any

evidence to support this purported fact.  Prior to CAPTRUST's July 2013 investment scorecard

presentation, the Cornell Defendants did not monitor funds in the Plans.[678]  Prior to hiring

CAPTRUST, Cornell had "no experience to do this analysis."[679]  The Cornell Defendants had no

process in place to remove a fund from the Plans until 2016.[680] Cornell never monitored all "non-

core" investments in Tier III.[681] CAPTRUST also indicated in 2014, that Cornell should remove

all funds it would not monitor in the "unmonitored Tier 3[.]"[682]

---

[676] Ex. P23, Strodel Tr. at 163:24-165:1; Ex. P7, Opperman Tr. at 175:16-176:6 (prior to December 2016, the RPOC did not know how to remove a fund that was underperforming from the Plans); Ex. 63, Doc. 239-4, RPOC Meeting Minutes dated December 3, 2014 (CAPTR_0013586) at 4 ("RPOC and CAPTRUST will work on defining a process to make decisions on the funds currently found in the Tier III menu of funds."); Ex. P19, RPOC Meeting Minutes dated June 29, 2016 (CAPTR_0013565) at 3 ("The Chair, Ms. Opperman asked what may cause a fund to be consider[ed] by RPOC for replacement.").

[677] Ex. P19, RPOC Meeting Minutes dated June 29, 2016 (CAPTR_0013565) at 3.

[678] Ex. P7, Opperman Tr. at 59:20-60:2; Ex. P8, Bursic Tr. at 78:4-85:18; Ex. P86, Internal CAPTRUST e-mail exchange July 1, 2013 to July 3, 2013 (CAPTR_0053254) at PDF 2-3 ("2nd deliverable is an interim Fiduciary review on the entire platform of funds. … To put this in perspective, we were hired in December 2011 and we have yet to do a review[.]") and PDF 6 ("Is this the meeting we need to have some sort of quant review on their 5,000 funds?"); Ex. P87, e-mail between Cornell and outside counsel dated October 3, 2012 (CORNELL013947) at PDF 2 ("You had mentioned that at a recent RPOC meeting, it was unclear whether CAPTRUST was providing investment performance information to the RPOC."); Cornell Defendants' Rule 56.1 Statement of Undisputed Material Facts *infra* at ¶ 74 (CAPTRUST's initial goals and objective included "adopting a methodology for ongoing plan monitoring.").

[679] Ex P8, Bursic Tr. at 79:25:-80:7.

[680] Ex. P23, Strodel Tr. at 163:24-165:25; Ex. P7, Opperman Tr. at 175:16-176:6 (prior to December 2016, the RPOC did not know how to remove a fund that was underperforming from the Plans); Ex. 63, Doc. 239-4, RPOC Meeting Minutes dated December 3, 2014 (CAPTR_0013586) at 4 ("RPOC and CAPTRUST will work on defining a process to make decisions on the funds currently found in the Tier III menu of funds.").

[681] Ex. P7, Opperman Tr. at 59:20-60:2; 123:21-24; 161:6-22; Ex. P8, Bursic Tr. at 16:3-25, 78:4-85:18, 176:3-177:3, 178:9-20; Ex. P9, Gallagher Tr. at 152:23-153:6, 56:10-22.

[682] Ex. 63, Doc. 239-4, December 2014 RPOC Meeting Materials (CAPTR_0013586) at 8; Ex. P8, Bursic Tr. at 173:5-175:1.

90.    The RPOC's regular monitoring process resulted in certain investments being flagged for further review. These investments were evaluated for removal or replacement by RPOC and closely monitored at subsequent meetings.

**RESPONSE:**  Plaintiffs dispute paragraph 90.  The Cornell Defendants do not cite to any evidence to support this purported fact.

91.    At the September 9, 2015 RPOC meeting, CAPTRUST informed the committee that it had flagged the Blackrock Investment Grade Bond Fund and the PIMCO Total Return Fund for review because of performance issues that impacted the funds' quantitative score under the IPS scoring system.  CAPTRUST also explained that the PIMCO fund had been assigned a lower qualitative score because the fund's founder and long-time manager had unexpectedly resigned.[683]

**RESPONSE**: Plaintiffs do not dispute that the Blackrock Investment Grade Bond and PIMCO Total Return Fund were marked for review in the September 9, 2015 meeting.  Plaintiffs dispute the second sentence of paragraph 91. CAPTRUST recommended against adding the PIMCO fund in 2014 as PIMCO's founder and long-time manager left PIMCO in September 2014—not September 2015 as Paragraph 91 indicates.[684]

92.    These funds were discussed at subsequent RPOC meetings. At each meeting while these two funds were on the IPS watchlist, CAPTRUST provided RPOC detailed investment information that tracked the investments' ratings and performance.[685] While the

---

[683] Doc. 252-9, Ex. 79, September 2015 RPOC Meeting Materials (CORNELL020930).
[684] Ex. P104, RPOC Presentation December 3, 2014 (CORNELL015004) at 1 ("December 3, 2014") and 34 ("Bill Gross, left PIMCO in September [2014]").
[685] Doc. 252-9, Ex. 79, September 2015 RPOC Meeting Materials (CORNELL020930).

Blackrock fund's performance improved, the PIMCO fund continued to perform poorly and it was replaced with a peer fund in the same asset class.[686]

**RESPONSE**: Plaintiffs dispute the first and second sentences of paragraph 92. Cornell cites the same September 2015 meeting it cited in paragraph 91 for the proposition that Cornell discussed the same funds in subsequent meetings.

Plaintiffs dispute that the BlackRock fund's performance improved.[687] Plaintiffs do not dispute that the PIMCO fund was eventually removed from the Plans. Plaintiffs dispute that this implies Cornell had any process. CAPTRUST recommended against adding the PIMCO fund in 2014 as PIMCO's founder and long-time manager left PIMCO in September 2014.[688] In December 2014, the fund was then marked as "consider for termination."[689] PIMCO remained on CAPTRUST's report as "consider for termination" at the next meeting with RPOC on June 6, 2015.[690] At the June 29, 2016 RPOC meeting, Ms. Opperman asked "what may cause a fund to be consider[ed] by RPOC for replacement[?]"[691] The quarterly analysis for the period ending June 30, 2016 shows the PIMCO fund remained in the Plans.[692] The PIMCO fund still showed it was failing IPS criteria and should be "considered for termination."[693] Cornell did not vote to remove the PIMCO fund until November 2016, after this lawsuit was filed.[694] Cornell left the fund marked "consider for termination," which CAPTRUST recommended against adding to the

---

[686] Doc. 252-10, Ex. 80, December 2016 RPOC Meeting Minutes, at 1 (CAPTR_0010109).

[687] Ex. P109, RPOC Quarterly Review for period ending December 31, 2016 (CAPTR_0010618) at 19 (BlackRock marked "consider for termination") and 24

[688] Ex. P104, RPOC Presentation December 3, 2014 (CORNELL015004) at 1 ("December 3, 2014") and 34 ("Bill Gross, left PIMCO in September [2014]").

[689] Ex. P104, RPOC Presentation December 3, 2014 (CORNELL015004) at 27 (scoring PIMCO as "consider for termination").

[690] Doc. 241-5, Ex. 94, RPOC Presentation dated June 2, 2015 (CORNELL013289) at 25.

[691] Ex. P19, RPOC Meeting Minutes dated June 29, 2016 (CAPTR_0013565) at 2.

[692] Doc. 249-1, Ex. 96, RPOC Quarterly Review for period ending June 30, 2016 (CORNELL013413) at 31.

[693] Doc. 249-1, Ex. 96, RPOC Quarterly Review for period ending June 30, 2016 (CORNELL013413) at 31.

[694] Ex. P110, RPOC Presentation December 12, 2016 (CAPTR_008486) at 4 ("Action decided in November 16, via email").

core lineup in the Plans for over two years.[695]  Prior to 2016, there was no process to remove an

underperforming fund from the Plans. [696]

> 93.      The CREF Stock Account and the TIAA Real Estate Account are objectively

prudent investment options and were appropriately monitored throughout the relevant time

period.

**RESPONSE:** Plaintiffs dispute paragraph 93.  The Cornell Defendants fail to cite any

specific reference to support paragraph 93.  Plaintiffs otherwise dispute that the CREF Stock

Account and TIAA Real Estate Account were "objectively prudent" which is a legal conclusion,

or that they were "appropriately monitored throughout the relevant time period."

The CREF Stock Account underperformed against its prospectus listed benchmarks the

entire time CAPTRUST served as an investment advisor until the Complaint was filed.[697] The

---

[695] Ex. P104, RPOC Presentation December 3, 2014 (CORNELL015004) at 27 (scoring PIMCO as "consider for termination"); Ex. P110, RPOC Presentation December 12, 2016 (CAPTR_008486) at 4 ("Action decided in November 16, via email. Implementation recommendation to follow").

[696] Ex. P23, Strodel Tr. at 163:24-165:1; Ex. P7, Opperman Tr. at 175:16-176:6 (prior to December 2016, the RPOC did not know how to remove a fund that was underperforming from the Plans); Ex. 63, Doc. 239-4, RPOC Meeting Minutes dated December 3, 2014 (CAPTR_0013586) at 4 ("RPOC and CAPTRUST will work on defining a process to make decisions on the funds currently found in the Tier III menu of funds."); Ex. P19, RPOC Meeting Minutes dated June 29, 2016 (CAPTR_0013565) at 2 ("The Chair, Ms. Opperman asked what may cause a fund to be considered by RPOC for replacement.").

[697] Ex. P111, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, December 31, 2011 at 7 (underperformed against both benchmarks for all periods)(TIAA_CORNELL_00021841); Ex. P112, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, June 30, 2012 at 7 (underperformed against both benchmarks for 1-, 5- and 10-year periods); Ex. P113, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, December 31, 2012 at 8 (underperformed against both benchmarks for 5- and 10-year periods); Ex. P114, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, June 30, 2013 at 8 (underperformed against both benchmarks for 6-month, 1-, 5- and 10-year periods); Ex. P115, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, December 31, 2013 at 8 (underperformed against both benchmarks for 1-, 5- and 10-year periods); Ex. P116, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, June 30, 2014 at 8 (underperformed against both benchmarks for 6-month, 1-, 5- and 10-year periods); Ex. P117, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, December 31, 2014 at 8 (underperformed against both benchmarks for 1-, 5- and 10-year periods); Ex. P118, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, June 30, 2015 at 8 (underperformed against both benchmarks for 5- and 10-year periods); Ex. P119, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, December 31, 2015 at 8 (underperformed against both benchmarks for 5- and 10-year periods); Ex. P120, College Retirement Equities Fund, Certified Shareholder Report of Registered Management

---

CREF Stock Account underperformed against a variety of benchmarks prior to 2010.[698]  As of June 30, 2013, the date of CAPTRUST's first evaluation of the CREF Stock Account for the Plans, it underperformed both benchmarks listed in its semi-annual shareholder report over the 6-month, one, three, five and ten-year periods.[699] In July 2013, CAPTRUST reported that the CREF Stock Account ranked below the 50th percentile of its Annualized Risk Adjusted Performance peer group and its Annualized Peer Relative Performance group for the 3 and 5 year periods.[700]

For the University System of Maine in July 2013 CAPTRUST compared the CREF Stock Account against S&P 500 Index and Morningstar Large Blend Index.[701] CAPTRUST's evaluation showed that the CREF Stock Account underperformed both indexes over the 3 and 5 year period and that there was major style exposure overlap between the CREF Stock Account and the Morningstar Large Blend Average.[702] CAPTRUST's evaluation showed major similarity in annualized standard deviation between the CREF Stock Account and the Morningstar Large Blend Average.[703]

By the end of 2013, $10,000 invested in the CREF Stock Account over 10 years was worth $1,158 less than the Russell 3000 Index, which was listed in the CREF Stock Account's Annual Report and prospectus as a benchmark.[704]

---

Investment Companies, June 30, 2016 at 8 (underperformed against both benchmarks for 6-month, 1-, 5- and 10-year periods).

[698] Doc. 249-18, Ex. 106, Expert Report of W. Dominguez, ¶ 95, Exhibit 5.

[699] Ex. P114, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, June 30, 2013 at 9.

[700] Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 49; Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 48; Ex. P89, Quarterly Review for 3rd Quarter, 2014 (CORNELL015005) at 134.

[701] Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 49.

[702] Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 49.

[703] Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 49.

[704] Ex. P115, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, December 31, 2013 at 8.

The CREF Stock Accoun's own annual report shows that by year end 2016, an investor with $10,000 that would have taken advantage of an alternative Large Company Blend mimicking the Russell 3000 Index over the rolling 10 year-period would have $3,577 more in retirement savings than an investor that chose the CREF Stock Account listed in the Large Company Blend asset class in Cornell's Plans:[705]



The average account balance for the Plans' participants was around $200,000, which would translate into $71,540 less in retirement savings over a 10-year period for an individual investing in only the CREF Stock Account within Cornell's Large Blend asset class.[706]

Cornell and CAPTRUST held out the TIAA Real Estate Account in the real estate asset class, along with the Cohen & Steers Realty Shares.[707]  Consistent with its assignment in the real estate asset class, in 2013, CAPTRUST compared the TIAA Real Estate Account to the same benchmarks it compared the Cohen & Steers Realty shares against—the Dow Jones US Select

---

[705] Ex. P121, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, December 31, 2016 at 12; Doc. 249-18, Ex. 106, Expert Report of W. Dominguez, ¶ 96.
[706] Ex. P122, TIAA-CREF Plan Outcome Assessment December 2015 (CORNELL029168) at 8.
[707] Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 12; Ex. P89, Quarterly Review for Period Ending September 30, 2014 (CORNELL015005) at 53; *Supra* at ¶ 80, ("RPOC decided that its objectives were to maintain symmetry").

REIT and Morningstar Specialty-Real Estate Universe.[708]  From 2009 to 2016 the TIAA Real

Estate Account underperformed against the alternative Cohen & Steers Realty Shares investment,

recommended in the real estate asset class for the Fidelity platform in the Plans by 83.37%.[709]

From 2009 to 2016 TIAA Real Estate Account underperformed against the alternative Vanguard

REIT Index by 82.95%.[710]



**TIAA REAL ESTATE ACCOUNT ANNUAL RETURNS**

| Year | Return |
|------|--------|
| 2009 | -27.64 |
| 2010 | 13.29 |
| 2011 | 12.99 |
| 2012 | 10.06 |
| 2013 | 9.65 |
| 2014 | 12.22 |
| 2015 | 8.16 |
| 2016 | 5.20 |

Cohen & Steers Institutional Realty Shares, Inc. Annual Total Returns

Annual Total Returns — Vanguard REIT Index Fund Investor Shares

---

[708] Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 68; Ex. P89, Quarterly Review for Period Ending September 30, 2014 (CORNELL015005) at 69.
[709] Ex. P123, Cohen & Steers Realty Shares, Inc. Prospectus dated May 1, 2017 at 5; Ex. P124, TIAA Real Estate Account Quarterly Performance Analysis December 31, 2016, exhibit 99.1 to 8-k, at 15.
[710] Ex. P125, Vanguard Specialized Funds Prospectus dated September 26, 2017 at 4; Ex. P124, TIAA Real Estate Account Quarterly Performance Analysis December 31, 2016, exhibit 99.1 to 8-k, at 15; Doc. 249-18, Ex. 106, Expert Report of W. Dominguez, ¶¶ 106-108.



The TIAA Real Estate Account underperformed prior to CAPTRUST's analysis.[711] For the University System of Maine in July 2013 CAPTRUST compared the TIAA Real Estate Account to the Dow Jones US Select REIT and Morningstar Specialty-Real Estate benchmarks.[712] The TIAA Real Estate Account underperformed significantly against both indexes over the year to date, one, three, five and ten-year periods.[713] By December 2014, CAPTRUST evaluated the TIAA Real Estate Account's unadjusted returns against the NACREIF Property Index and Morningstar Specialty-Real Estate Universe.[714] Using the unadjusted returns the TIAA Real Estate Account had significant underperformance.[715] The Cornell Defendants' expert opines that using unadjusted returns to measure the performance of the TIAA Real Estate Account was inappropriate.[716] The Cornell Defendants take the position that CAPTRUST's evaluation was a "flat-out mischaracterization" of how the TIAA Real Estate Account should be compared against an NCREIF index.[717]

94.      The CREF Stock Account is a variable annuity managed by TIAA that seeks a long-term rate of return through capital appreciation and investment income by investing in a

---

[711] Doc. 249-18, Ex. 106,  Expert Report of W. Dominguez, ¶ 96-108, Exhibit 3.

[712] Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 68.

[713] Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 68.

[714] Ex. P89, Quarterly Review for Period Ending September 30, 2014 (CORNELL015005) at 28, 51; Ex. P23, Strodel Tr. at 145:8-24; Ex. P106, TIAA Real Estate Account 8-K dated March 10, 2015 ("adjusted performance figures are designed for use of Account investors for comparison purposes only, and do not reflect the true returns experienced by holders of interests in the Account.").

[715] Ex. P89, Quarterly Review for Period Ending September 30, 2014 (CORNELL015005) at 28, 51; Doc. 249-18, Ex. 106, Expert Report of Wendy Dominguez at ¶¶ 102-105, 107; Ex. P106, TIAA Real Estate Account 8-K dated March 10, 2015 ("adjusted performance figures are designed for use of Account investors for comparison purposes only, and do not reflect the true returns experienced by holders of interests in the Account."); Doc. 249-18, Ex. 106, Expert Report of Wendy Dominguez at ¶¶ 102-108; Ex. P45, DeStefano Tr. at 54:21-55:14.

[716] Doc. 240-7–240-12, Expert Report of John Chalmers at ¶¶ 57-58.

[717] Doc. 227 at 21.

broadly diversified portfolio of common stocks.[718] Under normal circumstances, the Stock

Account seeks to hold approximately 70-75% domestic equities and 25-30% foreign equities,

some percentage of which may be invested in emerging markets.[719] The Stock Account is unique

in that its holdings are diversified across domestic and foreign markets, all market

capitalizations, and each market sector.[720]  Moreover, while most funds are either actively or

passively managed, the CREF Stock Account employs a diversified investment management

strategy that combines active management, quantitative analysis, and passive indexing.[721]

     **RESPONSE:** Plaintiffs do not dispute that the first and second sentence appears in the

CREF Stock Account's 2016 Prospectus.  Plaintiffs dispute that the CREF Stock Account is

"unique."[722]  Plaintiffs do not dispute that the CREF Stock Account includes passive

management.  During the time the CREF Stock Account has been in the Plans, up to 64.71

percent of its portfolio was a passive index tracking the Russell 3000.[723]  While the Plans'

participants were investing the CREF Stock Account, more than 83% of the portfolio was

invested in domestic markets similar to the Russell 3000.[724]

     95.     Pursuant to the contract terms of the RA, GRA, SRA, and GSRA versions of

the TIAA Traditional Annuity (collectively, "the TIAA legacy contracts"), plans must also offer

---

[718] Doc. 240-1, Ex. 81, 2016 CREF Prospectus, at 27 (TIAA_CORNELL_00024810).

[719] Doc. 240-1, Ex. 81, 2016 CREF Prospectus, at 28 (TIAA_CORNELL_00024810).

[720] Doc. 246-11, Ex. 29, Polacek Dep. 186:12-187:18 (explaining design and portfolio construction intended to "offer the opportunity for singular and very well-diversified exposure to the breadth of equities globally").

[721] Doc. 240-1, Ex. 81, 2016 CREF Prospectus, at 28 (TIAA_CORNELL_00024810); Doc. 246-11, Ex. 29 Polacek Dep. 187:5-9.

[722] Ex. P126, 2016 Vanguard Total World Stock Index Funds Prospectus at 2 (diversified holdings across domestic and foreign markets, all market capitalizations, and each market sector).

[723] Ex. P127, College Retirement Equities Fund Prospectus May 1, 1996 at 12-13 (A segment of the Stock Account "is designed to track the U.S. equity market as a whole. … the Russell 3000 segment of the Stock Account made up 64.71 percent of the portfolio.")

[724] Ex. P127, College Retirement Equities Fund Prospectus May 1, 1996 at 12-13; Ex. P128, College Retirement Equities Fund Prospectus May 1, 1997 at 13-15; Ex. P129, College Retirement Equities Fund Prospectus May 1, 1998 at 18-20;

participants the opportunity to also invest in CREF Stock.[725]  In order to eliminate CREF Stock,

Cornell would have had to eliminate the TIAA legacy fixed annuity contracts as an available

investment option as well.[726]  Eliminating the TIAA legacy contracts would have involved a

significant amount of disruption because over 30% of all of the Plans' assets were invested in

those contract types.[727]

> **RESPONSE:**  Plaintiffs do not dispute that TIAA-CREF included such language in its
>
> Retirement Annuity (RA), Group Retirement Annuity (GRA), Supplemental Retirement Annuity
>
> (SRA), and Group Supplemental Retirement Annuity (GRSA) contracts (collectively, "legacy
>
> contracts").  Plaintiffs dispute that this paragraph is a material fact.  The fact does not touch on
>
> whether Cornell breached its fiduciary duty by failing to properly monitor the funds in the Plans
>
> and retaining imprudent investment options, or designating CREF Stock as a best-in-class option.
>
> Plaintiffs dispute the second sentence of paragraph 95.  Plaintiffs dispute that Cornell was
>
> required to leave Plan assets in the CREF Stock Account, select the CREF Stock Account for
>
> inclusion in the core best-in-class line-up, or leave the CREF Stock Accounts in the Plans. The
>
> Plans are governed by the their respective plan documents.[728] Both plan documents expressly
>
> provide "[t]he Employer in its sole discretion will designate from time to time the specific
>
> Funding Vehicles which are available as Plan investments. The Employer may change such
>
> designation at anytime."[729] No provision of the RA, GRA, SRA, or GSRA contracts addresses

---

[725] Doc. 240-2, Ex. 82, TIAA and CREF Contract Comparison *available at*
https://www.tiaa.org/public/pdf/RC_ComparisonGrid_8_fin.pdf (explaining that for TIAA Traditional RA, SRA,
GRA, and GSRA contract types "TIAA Traditional, CREF Stock and CREF Money Market must be available for
both contributions and transfers").
[726] Doc. 249-24, Ex. 112, Chittenden *Cunningham* Decl. ¶ 9.
[727] *Supra*, at ¶ 43.
[728] Doc. 250-4, CURP Plan Document (CORNELL015526); Doc. 250-6, TDA Plan Document (CORNELL015535).
[729] Doc. 250-4, 2008 CURP Plan Document (CORNELL015526), at 100; Doc. 250-6, 2008 TDA Plan Document
(CORNELL015535), at 100.

transfers by plan sponsors, yet alone prohibits it.[730] The RA and GSRA contracts expressly provide "[t]he contract is subject to the provisions, terms and conditions of the employer Plan. Any payment, distribution, transfer, or other rights exercised under the contract shall comply with any applicable terms, provisions, and conditions of the employer plan as determined by the plan administrator, trustee, or other plan designated fiduciary."[731] The RA and GRA contracts also expressly state that:



The TIAA Annuity contracts also contain a provision stating it will administer the contract with all laws and regulations and if the contract conflicts with the law, the law or regulation prevails.[733] Thus, the terms of the RA, GRA, SRA, and GSRA contracts did not prevent plan sponsors from mapping or transferring the assets in such annuities to other investments. Consistent with this interpretation, TIAA executives have admitted that they facilitated plan sponsors mapping of funds in the CREF Money Market Account, a variable annuity with RA, SRA and GRA contracts, without participant consent.[734] █████████████████

---

[730] *See, e.g.,* Ex. P32, PLTF-Cornell-000340; Ex. P33, PLTF-Cornell-000356.

[731] *See, e.g.,* Ex. P32, PLTF-Cornell-000340 at p. E1; Ex. P33, PLTF-Cornell-000356 at p. E1.

[732] *See, e.g.,* Ex. P34, GRA Contract (TIAA_CORNELL_00020571) at 598; Ex. P35, CREF Stock RA Certification (TIAA_CORNELL_00001451) at 1474; Ex. P36 TIAA_CORNELL_00001517, at 1535; Ex. P37, TIAA_CORNELL_00001481 at 1508.

[733] *See, e.g.,* Ex. P36, TIAA_CORNELL_00001517 at 1534; Ex. P37, TIAA_CORNELL_00001481 at 1501, 1507; Ex. P35, TIAA_CORNELL_00001451 at 1471.

[734] Ex. P27, Tr. of Trial, *Sacerdote v. New York University*, No. 16-6284, Tr. 677:19–678:9; *see also id*. at 678:12-679:7  (Q. And you also have, TIAA has also mapped assets that were in the money market account for a one-time opportunity, a one-time occasion, correct? A. Yes.  We did offer -- I'm not expert on that, but there was an opportunity because of the very low interest rates to do things with the money market account when needed, if applicable. Q. And TIAA and the employers map those money market accounts into some other fund in the plan. Right? A. Correct. Q. Without the permission or voluntary participation by investors. A. There's a one-time opportunity, yes. Q. So TIAA did map assets from annuity accounts out of those accounts without participant

█████████████████████████████████████████████████████████████.[735]

Even TIAA agrees that Retirement Choice and Retirement Choice Plus contracts are fully mappable by the plan sponsor, do not require inclusion of the CREF Stock Account and provide greater liquidity for the plan participant.[736] TIAA has encouraged the Cornell Defendants to move to Retirement Choice and Retirement Choice Plus contracts for among other reasons to "[i]mprove overall plan management," and to provide "[i]nstitutional ownership and greater institutional control."[737] Cornell never even considered moving to Retirement Choice or Retirement Choice Plus contracts in 2005 or anytime thereafter.[738]

Plaintiffs dispute that the third sentence of paragraph 95 is a material fact. Plaintiffs otherwise dispute the third sentence of paragraph 95. ██████████████████████████

████████████████████████████████████████████████████████████-

---

agreement.  Correct? A. Money market balances only.) As discussed above, Plaintiffs believe that Mr. Chittenden's testimony from *Sacerdote* is admissible as a prior inconsistent statement in this case. *See supra* n. __.

[735] Ex. P25, Polacek Dep., at 23:15–24:18."

[736] *Id.* at 51:1–52:16.

[737] Ex. P138, July 19, 2017 TIAA Driving Better Outcomes for Your Plan (CAPTR_0046852), at 854.

[738] Ex. P8, Bursic Tr.at 233:3–234:4 (testifying he "never really had a long discussion with them about that, to my recollection.  I may have had some introductory things involved there by I can't quite remember."); Prasad Dep. at 219:7–220:13 (testifying he did not recall any discussion of the Retirement Choice or Retirement Choice Plus Contracts if it was not in the RPOC meeting materials); Gallagher Dep. at 365:2-11 (testifying he recalled some discussion but was not sure "how seriously the committee considered it."); Doc. 250-19, November 29, 2010, CURP Meeting Minutes (CORNELL0021932); Ex.P10, February 3, 2011 CURP Meeting Minutes (CORNELL021930); Ex. P11, June 23, 2011 CURP Meeting Minutes (CORNELL021931); Doc. 248-8, Jan. 11, 2012 RPOC Meeting Minutes; Ex. P10, February 3, 2011 CURP Meeting Minutes (CORNELL021930); Ex. P11, June 23, 2011 CURP Meeting Minutes (CORNELL021931); Doc. 248-8, January 11, 2012 RPOC Meeting Minutes (CAPTR_0047903); Doc 248-14, April 13, 2012 RPOC Meeting Minutes (CAPTR_0047907); Doc. 248-9, July 24, 2012 RPOC Meeting Minutes (CAPTR_0047911); Doc. 252-5, November 19, 2012 RPOC Meeting Minutes (CAPTR_0047924); Ex. P12, July 31, 2013 RPOC Meeting Minutes (CAPTR_0047921); Doc. 252-8, September 30, 2013 RPOC Meeting Minutes (CAPTR_0047918); Ex. P13, December 4, 2013 RPOC Meeting Minutes (CAPTR_0047915); Ex. P14, March 21, 2014 RPOC Meeting Minutes (CAPTR_004284); Ex. P15, September 17, 2014 RPOC Meeting Minutes (CAPTR_0004286); Ex. 63, Doc. 239-4, December 3, 2014 RPOC Meeting Minutes (CAPTR_00013586); Ex. P16, June 2, 2015 RPOC Meeting Minutes (CAPTR_0013573); Ex. P17, September 9, 2015 RPOC Meeting Minutes (CAPTR_0013573); Ex. P18, December 16, 2015 RPOC Meeting Minutes (CAPTR_0013594); Doc. 238-9, March 31, 2016 RPOC Meeting Minutes (CAPTR_0013568); Ex. P19, June 29, 2016 RPOC Meeting Minutes (CAPTR_0013565); Ex. P20, September 28, 2016 RPOC Meeting Minutes (CAPTR_0013580); Doc. 252-10, December 12, 2016 RPOC Meeting Minutes, (CAPTR_0013590); Ex. P49, April 14, 2017 RPOC Meeting Minutes (CAPTR_0013583); Ex. P50, June 23, 2017 RPOC Meeting Minutes (CAPTR_0013561); Ex. P51, September 27, 2017 RPOC Meeting Minutes (CAPTR_0013939); Ex. P52, December 11, 2017 RPOC Meeting Minutes (CAPTR_0015281).

██ ."[739] CAPTRUST internally noted that it had "experience with our other university clients who have made huge changes with little push back from participants."[740]  Multiple other 403(b) plan sponsors removed the CREF Stock Account from their Plans during the class period.[741]

96.     Because of its broad diversification and its unique investment management style, TIAA developed a custom benchmark called the CREF Stock Account Composite Index ("the Composite Index"), which it identifies as the official prospectus benchmark.[742]  Since July 2011,[743] the Composite Index has been comprised of two separate passive indices: the Russell 3000 Index, which is 70% of the Composite Index, and the MSCI ACWI ex-USA Investable Market Index, which represents the remaining 30%.[744]

**RESPONSE:**  Plaintiffs dispute the first sentence.  There is nothing that allows a company to identify an "official prospectus benchmark" in the SEC regulations governing the information placed in a prospectus.  The SEC *allows* for the use of additional indexes, so long as the required appropriate broad-based index is used.[745]  Plaintiffs do not dispute that the additional index used by the CREF Stock Account since 2011 is the Composite Index.[746]

---

[739] Ex. P61, Cammack LaRhette response to Cornell's RFP for investment advisor May 13, 2011 (CORNELL006753) at 18.

[740] Ex. P103, Internal CAPTRUST e-mail dated May 26, 2015 (CAPTR_0030234) at 1.

[741] Ex. P132, Expert Rebuttal Report of Wendy Dominguez, ¶ 27.

[742] Doc. 240-1, Ex. 81, 2016 CREF Prospectus, at 28-29, 70 (TIAA_CORNELL_00024810); Doc. 246-11, Ex. 29 Polacek Dep. 195:8-196:5 (identifying the "CREF Composite" as the official CREF Stock benchmark).

[743] Prior to July 2011, the Composite Index included four different indices: the Russell 3000, the MSCI EAFE+Canada Index, the MSCI Emerging Markets Index, and the MSCI EAFE+Canada Small Cap Index. *See* Doc. 240-4, Ex. 83, 2011 CREF Prospectus, at 19 (TIAA_CORNELL_00021950).

[744] Doc. 240-1, Ex. 81, 2016 CREF Prospectus, at 28-29, 70 (TIAA_CORNELL_00024810); Doc. 246-11, Ex. 29 Polacek Dep. 195:8-196:20.

[745] Ex. P130, SEC Form N-1A at 7, ¶ 3, b, at 22, ¶ 2 (b), at 70, ¶ 7 (ii) (A), at 71, ¶ 5 *available at* https://www.sec.gov/about/forms/formn-1a.pdf.

[746] Ex. P130, SEC Form N-1A at 71, ¶ 5 *available at* https://www.sec.gov/about/forms/formn-1a.pdf

97.      The Russell 3000 Index is comprised entirely of domestic securities,[747]

whereas the MSCI ACWI ex-USA IMI is comprised entirely of foreign securities.[748] TIAA

considers the Composite Index the most appropriate benchmark index for evaluating the Stock

Account because it best reflects the Stock Account's underlying components, its allocation

between foreign and domestic stocks, and investment profile.[749]

**RESPONSE:** Plaintiffs do not dispute the general description of the Russell 3000 Index

and the MSCI ACWI ex-USA IMI index.  Plaintiffs dispute that TIAA's consideration of the

Composite Index as the "most appropriate benchmark" is material or accurate.  At any time

during the class period, TIAA could have used the MSCI World Index as the designated

appropriate broad-based market index for the CREF Stock Account if it believed such a world

index was a more "appropriate broad-based index" than the Russell 3000.[750]  The MSCI World

Index is approximately 62% domestic equities and 38% foreign equities.[751]



COUNTRY WEIGHTS

---

[747] Doc. 240-5, Ex. 84, Russell U.S. Equity Index Methodology, at 12, 14 *available at*
https://www.ftse.com/products/downloads/Russell-US-indexes.pdf?490; Doc. 239-10, Ex. 69, *Sacerdote* Opinion &
Order, at 77 n. 120 (holding that "the Russell 3000 Index is not necessarily sufficient, on its own, to help
participants understand whether the CREF Stock Fund is performing well vis-à-vis comparable stock funds because
it is comprised entirely of domestic holdings (and the CREF Stock Fund has 30% international holdings).
[748] Doc. 240-6, Ex. 85, MSCI ACWI Ex-USA IMI Index Fact Sheet, at 1 *available at*
https://www.msci.com/documents/10199/f24204d8-3fba-46b7-95e7-5b7dcc44536c.
[749] Doc. 246-11, Ex. 29, Polacek Dep. 198:18-201:03.
[750] Ex. P130, SEC Form N-1A at 71, ¶ 5.
[751] *Available at* https://www.msci.com/documents/10199/149ed7bc-316e-4b4c-8ea4-43fcb5bd6523.

Instead, TIAA designated the Russell 3000 Index as its "appropriate" comparator for the CREF Stock Account pursuant to SEC regulations requiring TIAA at that time to identify the most "appropriate broad-based index."[752]

In fact, TIAA used the MSCI World Index as the only "appropriate" comparator for the CREF Global Equities Account in its 2011 prospectus.[753] Although the CREF Global Equities Account holds emerging markets, TIAA did not deem it necessary to include a composite index with an emerging markets component in order to evaluate the CREF Global Equities Account.[754] The MSCI World Index "does not offer exposure to emerging markets."[755] Cornell Defendants now take the position that using such a benchmark without precise exposure to the underlying holdings, here TIAA comparing the CREF Global Equities Account to the MSCI World Index, would be an inappropriate comparator.[756]

98.     Although TIAA considers the Composite Index the most appropriate benchmark index for assessing performance, Department of Labor regulations require plan fiduciaries to provide participants information comparing the Plans' investments to "an appropriate broad-based securities market index" and prohibits the use of custom benchmarks that are "administered by an affiliate of the investment issuer, its investment advisor, or a principal underwriter."  29 C.F.R. 2550.404a-5(d)(iii).  Accordingly, for purposes of these required disclosures, TIAA has used the Russell 3000.[757]

---

[752] Doc. 240-3–240-4, Ex. 83, CREF Prospectus (TIAA_CORNELL_00021950) at 45.

[753] Doc. 240-3–240-4, Ex. 83, CREF Prospectus (TIAA_CORNELL_00021950) at 45.

[754] Doc. 240-3–240-4, Ex. 83, CREF Prospectus (TIAA_CORNELL_00021950) at 19-20 (CREF Global Equities holds 55.6% United States, 41.3% Foreign – Developed, 3.1% Foreign – Emerging); *Available at* https://www.msci.com/documents/10199/149ed7bc-316e-4b4c-8ea4-43fcb5bd6523.

[755] *Available at* https://www.msci.com/world

[756] Doc. 227 at p. 13-14; Doc. 233 at 16-18.

[757] Doc. 246-11, Ex. 29, Polacek Dep. 205:23-206:24, 210:10-211:14 (explaining that DOL requirements prohibit the use of custom benchmarks, such as the CREF Composite, in investment disclosures); Doc. 239-10, Ex. 69, *Sacerdote* Opinion & Order, at 77 n. 120 ("As required by the Department of Labor Regulations, in the 404a5 disclosures TIAA shows the performance of the CREF Stock Account versus a broad-based securities market index,

**RESPONSE:** Plaintiffs dispute paragraph 98. The SEC requires that investments filing a prospectus identify an "appropriate broad-based securities market index."[758] TIAA chose the Russell 3000 as the appropriate index in all of its SEC filings (prospectuses, annual reports, semi-annual reports) from 2010 until this lawsuit was filed.[759] Consistent with the Russell 3000 as the appropriate index, Cornell and CAPTRUST held out the CREF Stock Account as a Large Company Blend type of investment to the Plans participants.[760] CAPTRUST's expert testified that a large domestic blend asset class was "probably the closest you can – you can find" for the CREF Stock Account.[761]

---

the Russell 3000 Index, as opposed to using the account's composite benchmark stated in its prospectus because the Department of Labor Regulations do not permit the use of composite benchmarks or customized benchmarks in the 404a5 disclosures and only permits the use of one benchmark for each investment option.").

[758] Ex. P130, SEC Form N-1A at 61, ¶ 5.

[759] Ex. P111, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, December 31, 2011 at 7 (underperformed against both benchmarks for all periods)(TIAA_CORNELL_00021841); Ex. P112, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, June 30, 2012 at 7 (underperformed against both benchmarks for 1-, 5- and 10-year periods); Ex. P113, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, December 31, 2012 at 8 (underperformed against both benchmarks for 5- and 10-year periods); Ex. P114, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, June 30, 2013 at 8 (underperformed against both benchmarks for 6-month, 1-, 5- and 10-year periods); Ex. P115, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, December 31, 2013 at 8 (underperformed against both benchmarks for 1-, 5- and 10-year periods); Ex. P116, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, June 30, 2014 at 8 (underperformed against both benchmarks for 6-month, 1-, 5- and 10-year periods); Ex. P117, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, December 31, 2014 at 8 (underperformed against both benchmarks for 1-, 5- and 10-year periods); Ex. P118, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, June 30, 2015 at 8 (underperformed against both benchmarks for 5- and 10-year periods); Ex. P119, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, December 31, 2015 at 8 (underperformed against both benchmarks for 5- and 10-year periods); Ex. P120, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, June 30, 2016 at 8 (underperformed against both benchmarks for 6-month, 1-, 5- and 10-year periods).

[760] Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 12, 39 and 40; Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 21, 25-27; Ex. P108, University of Maine System Quarterly Review for 3rd Quarter, 2014 at 14, 17, 35 and 43; Ex. P60, Schmitt Tr. at 80:1-19; Ex. P101, University of Maine System Quarterly Review for 1st Quarter, 2015 at 472, 501; Ex. P60, Schmitt Tr. at 81:18-20; *Infra* at ¶ 104 ("RPOC and the Faculty Advisory Committee adopted the subcommittee's recommendation that CREF Stock be included in the Tier II lineup as a core "large company blend" investment option")

[761] Ex. P88, Ciccotello Tr. at 72:2-17, 179:3-15; Ex. P102, The University System of Georgia Optional Retirement Plan Transition Guide at 13.

99.     The Stock Account is a popular investment option among both higher education plans generally and Cornell plan participants specifically.  As of 2016, 99% of TIAA's 200 largest clients had some portion of their defined contribution plans' assets invested in CREF Stock.[762]   The Stock Account is also one of the most common investment options offered by higher education 403(b) plans comparable in size to the CURP and TDA Plan: of the 37 higher education 403(b) plans with over $1 billion in assets, 28 currently offer CREF Stock as an investment option and over $14 billion is currently invested in CREF Stock by participants in these 37 plans.[763] Finally, with respect to the Cornell Plans specifically, the CREF Stock Account is among the most popular investment options available. As of December 2012, over $500 million dollars were invested in CREF Stock by participants in the CURP and TDA Plan.[764]

**RESPONSE:**  Plaintiffs dispute the first two sentences of paragraph 99. The only evidence cited by Plaintiffs is testimony of a Douglas Chittenden, a TIAA executive, in another case. Mr. Chittenden's testimony in another case is inadmissible hearsay. *See* Fed. R. of Evid. 801, 802, Mr. Chittenden's testimony is not an admissible prior statement by a witness because he has not been subject to cross-examination in this case nor is it inconsistent with any testimony he has given in this case or for identification. *See* Fed. R. of Evid. 801(a)(1). Additionally, Mr. Chittenden's testimony in another case is not admissible under Rule 804, because he is not unavailable given that he offered a declaration in support of the Cornell Defendants' motion.[765] Finally, Mr. Chittenden's testimony is inadmissible under the rule of completeness, because the Cornell Defendants only offered his trial declaration and not his actual live testimony, including

---

[762] Doc. 246-12, Ex. 30, Chittenden *Sacerdote* Decl. ¶¶ 53-54.
[763] Doc. 240-7–240-12, Chalmers Rpt. ¶ 34, Ex. 3a.
[764] Doc. 240-13, Ex. 87, 2012 TIAA 5500 Reportable – Schedule of Assets (TIAA_CORNELL_00004332) ($163,655,937 invested in CREF Stock in TDA Plan); Doc. 240-14, Ex. 88, 2012 TIAA 5500 Reportable Schedule of Assets (TIAA_CORNELL_00013494) ($343,608,490 invested in CREF Stock in CURP).
[765] Doc. 249-024, Declaration of Douglass Chittenden.

testimony that he was not involved with TIAA's defined contribution business for much of the relevant period[766] and that he was not aware of numerous relevant facts related to TIAA's top 200 clients.[767]

Plaintiffs dispute the third sentence of paragraph 99. Mr. Chalmers merely reviewed Form 5500 reports in his expert report; an expert witness cannot be used as conduit to admit inadmissible hearsay. *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013)("a party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony.") (quoting *Malletier v. Dooney & Bourke, Inc.*, 525 F.Supp.2d 558, 666 (S.D.N.Y.2007)). Further, Mr. Chalmers impermissibly attempts to limit the universe of peer ERISA plans, a legal question.[768] Mr. Chalmers did no investigation into the process used by any of these universities when they allegedly included the CREF Stock Account and TIAA Real Estate Account in their Plans.[769]

Plaintiffs dispute that the fourth sentence of paragraph 99 is a material fact. Popularity is not a factor in fulfilling a fiduciary duty if a fund is imprudent. The enrollment process and how plan choices are presented to participants has a large impact on how plan participants allocate their funds; because the CREF Stock Account was prominently displayed to participants making an election it impacted their decisions.[770] Additionally, the CREF Stock Account was one of three options available to participants in the Plans for many years and TIAA advised participants to invest 50% in the CREF Stock Account likely accounting for percentage of assets invested in the fund rather than popularity.[771]

---

[766] Ex. P27, *Sacerdote v. New York University*, 16-6284 Tr. of Trial at 560:7–562:13
[767] *Id.* at 649:4-655:20
[768] Ex. P131, Chalmers Tr. at 37:22-41:9.
[769] Ex. P131, Chalmers Tr. at 48:18-49:1, 50:5-15.
[770] Ex. P132, Expert Rebuttal Report of Wendy Dominguez at ¶ 32-33.
[771] Ex. P8, Bursic Dep, at 217:15–.219:8

100.    The Stock Account's popularity is attributable to its strong performance and low fees compared to peers. According to Lipper Investments, the Stock Account's total expense ratio was lower than 95% of all funds in its peer group of Global Multi-Cap Core Funds.[772]

**RESPONSE:** Plaintiffs dispute paragraph 100.  The Cornell Defendants fail to cite any specific reference to support its claim that the Stock Account's popularity was attributable to strong performance and low fees. Plaintiffs otherwise dispute the first sentence of paragraph 100. The CREF Stock Account underperformed against its prospectus listed benchmarks the entire time CAPTRUST served as an investment advisor until the Complaint was filed.[773] The CREF Stock Account underperformed against a variety of benchmarks prior to 2010.[774]  As of June 30, 2013, the date of CAPTRUST's first evaluation of the CREF Stock Account for the Plans, it underperformed both benchmarks listed in its semi-annual shareholder report over the 6-month, one, three, five and ten-year periods.[775] In July 2013, CAPTRUST reported that the CREF Stock

---

[772] Doc. 240-7–240-12, Chalmers Rpt. ¶ 41, Ex. 5a.

[773] Ex. P111, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, December 31, 2011 at 7 (underperformed against both benchmarks for all periods)(TIAA_CORNELL_00021841); Ex. P112, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, June 30, 2012 at 7 (underperformed against both benchmarks for 1-, 5- and 10-year periods); Ex. P113, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, December 31, 2012 at 8 (underperformed against both benchmarks for 5- and 10-year periods); Ex. P114, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, June 30, 2013 at 8 (underperformed against both benchmarks for 6-month, 1-, 5- and 10-year periods); Ex. P115, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, December 31, 2013 at 8 (underperformed against both benchmarks for 1-, 5- and 10-year periods); Ex. P116, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, June 30, 2014 at 8 (underperformed against both benchmarks for 6-month, 1-, 5- and 10-year periods); Ex. P117, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, December 31, 2014 at 8 (underperformed against both benchmarks for 1-, 5- and 10-year periods); Ex. P118, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, June 30, 2015 at 8 (underperformed against both benchmarks for 5- and 10-year periods); Ex. P119, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, December 31, 2015 at 8 (underperformed against both benchmarks for 5- and 10-year periods); Ex. P120, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, June 30, 2016 at 8 (underperformed against both benchmarks for 6-month, 1-, 5- and 10-year periods).

[774] Doc. 249-18, Ex. 106, Expert Report of W. Dominguez, ¶ 95, Exhibit 5.

[775] Ex. P114, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, June 30, 2013 at 9.

Account ranked below the 50th percentile of its Annualized Risk Adjusted Performance peer group and its Annualized Peer Relative Performance group for the 3 and 5 year periods.[776]

For the University System of Maine in July 2013 CAPTRUST compared the CREF Stock Account against The S&P 500 Index and The Morningstar Large Blend Index.[777] CAPTRUST's evaluation showed that the CREF Stock Account underperformed both indexes over the 3 and 5 year period and that there was major style exposure overlap between the CREF Stock Account and the Morningstar Large Blend Average.[778] CAPTRUST's evaluation showed major similarity in annualized standard deviation between the CREF Stock Account and the Morningstar Large Blend Average.[779] By the end of 2013, $10,000 invested in the CREF Stock Account over 10 years was worth $1,158 less than the Russell 3000 Index, which was listed in the CREF Stock Account's Annual Report and prospectus as a benchmark.[780]

By year end 2016, an investor with $10,000 that would have taken advantage of an alternative Large Company Blend mimicking the Russell 3000 Index over 10 years would have $3,577 more in retirement savings than an investor that chose the CREF Stock Account listed in the Large Company Blend asset class in Cornell's Plans.[781] The average account balance for the Plans was around $200,000, which would translate into $71,540 less in retirement savings over a 10-year period for an individual investing in only the CREF Stock Account within Cornell's Large Blend asset class.[782]

---

[776] Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 49; Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 48; Ex. P89, Quarterly Review for 3rd Quarter, 2014 (CORNELL015005) at 134.
[777] Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 49.
[778] Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 49.
[779] Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 49.
[780] Ex. P115, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, December 31, 2013 at 8.
[781] Ex. P121, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, December 31, 2016 at 12; Doc. 249-18, Ex. 106, Expert Report of W. Dominguez, ¶ 96.
[782] Ex. P122, TIAA-CREF Plan Outcome Assessment December 2015 (CORNELL029168) at 8.

Plaintiffs dispute the second sentence of paragraph 100. Cornell uses a different broad-based index other than the one TIAA designated as the appropriate index in its SEC filings.[783] The CREF Stock Account carried a much higher expense than other funds offered in the Large Company Blend asset class at Cornell.[784]

101.      Since its inception in 1952, the CREF Stock Account has achieved annualized returns of 9.90%, which tracks the long term historical annualized return of the S&P 500 Index and exceeds that of the Russell 3000 Index.[785]  The Stock Account also closely tracked the returns of its prospectus benchmark, the Composite Index, over the relevant time period: Between 2010 and 2017, the Stock Account's ten-year annualized returns remained within 34 basis points of the Composite Index returns.[786]  Thus, any apparent underperformance compared

---

[783] Ex. P130, SEC Form N-1A at 61, ¶ 5; Ex. P111, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, December 31, 2011 at 7 (underperformed against both benchmarks for all periods)(TIAA_CORNELL_00021841); Ex. P112, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, June 30, 2012 at 7 (underperformed against both benchmarks for 1-, 5- and 10-year periods); Ex. P113, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, December 31, 2012 at 8 (underperformed against both benchmarks for 5- and 10-year periods); Ex. P114, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, June 30, 2013 at 8 (underperformed against both benchmarks for 6-month, 1-, 5- and 10-year periods); Ex. P115, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, December 31, 2013 at 8 (underperformed against both benchmarks for 1-, 5- and 10-year periods); Ex. P116, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, June 30, 2014 at 8 (underperformed against both benchmarks for 6-month, 1-, 5- and 10-year periods); Ex. P117, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, December 31, 2014 at 8 (underperformed against both benchmarks for 1-, 5- and 10-year periods); Ex. P118, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, June 30, 2015 at 8 (underperformed against both benchmarks for 5- and 10-year periods); Ex. P119, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, December 31, 2015 at 8 (underperformed against both benchmarks for 5- and 10-year periods); Ex. P120, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, June 30, 2016 at 8 (underperformed against both benchmarks for 6-month, 1-, 5- and 10-year periods).

[784] Doc. 249-18, Ex. 106, Expert Report of Wendy Dominguez at ¶¶ 94 and 97.

[785] Ex. 89, 2018 CREF Stock Account Fact Sheet, at 1 *available at* https://www.tiaa.org/public/pdf/ffs/194408126.pdf.

[786] Doc. 240-7–240-12, Ex. 86, Chalmers Rpt. ¶ 54, Ex. 8 (analyzing CREF Stock returns against the CREF Composite prospectus benchmark between 2010-2017).

to the Russell 3000 Index can be attributed to differences in the performance of domestic and foreign markets over the relevant time period.[787]

    **RESPONSE**:  Plaintiffs dispute the first sentence of paragraph 101 is a material fact. Plaintiffs otherwise agree that the S&P 500 and Russell 3000 are appropriate comparators for the CREF Stock Account. During the time the CREF Stock Account has been in the Plans, up to 64.71 percent of its portfolio was an index tracking the Russell 3000.[788]  While the Plans' participants were investing the CREF Stock Account, more than 83% of the portfolio was invested in domestic markets.[789]

    Plaintiffs do not dispute that the CREF Stock Account underperformed for each year from 2010 to 2017 against the 10-year annualized returns of the Composite Index.

    Plaintiffs dispute the third sentence of paragraph 101. When evaluating investment performance, "it is common and appropriate to consider a variety of … benchmarks[.]"[790] The CREF Stock Account underperformed against a variety of comparators.[791]  Prior to 2014, CAPTRUST and by extension Cornell, compared the CREF Stock Account to a variety of domestic large blend benchmarks like the Russell 3000.[792]  CAPTRUST's evaluation showed that the CREF Stock Account underperformed both indexes over the 3 and 5 year period and that there was major style exposure overlap between the CREF Stock Account and the Morningstar

---

[787] Doc. 240-7–240-12, Ex. 86, Chalmers Rpt. ¶¶ 53-55.

[788] Ex. P127, College Retirement Equities Fund Prospectus May 1, 1996 at 12-13 (A segment of the Stock Account "is designed to track the U.S. equity market as a whole. … the Russell 3000 segment of the Stock Account made up 64.71 percent of the portfolio.")

[789] Ex. P127, College Retirement Equities Fund Prospectus May 1, 1996 at 12-13; Ex. __, College Retirement Equities Fund Prospectus May 1, 1997 at 13-15; Ex. P129, College Retirement Equities Fund Prospectus May 1, 1998 at 18-20;

[790] Doc. 240-7–240-12, Ex. 86, Chalmers Rpt, ¶49.

[791] Ex. P132, Expert Rebuttal Report of Wendy Dominguez at 40-45.

[792] Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 12, 35 and 38; Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 21, 25-27; Ex. P108, University of Maine System Quarterly Review for 3rd Quarter, 2014 at 14, 17, 35 and 43; Ex. P60, Schmitt Tr. at 80:1-19; Ex. P101, University of Maine System Quarterly Review for 1st Quarter, 2015 at 472, 501; Ex. P60, Schmitt Tr. at 81:18-20.

Large Blend Average.[793] CAPTRUST's evaluation showed major similarity in annualized standard deviation between the CREF Stock Account and the Morningstar Large Blend Average.[794] The CREF Stock Account underperformed against a 70%/30% mix of domestic and foreign equities from 2000 through June 2010.[795]

Cornell never compared the CREF Stock Account to the Composite Index during the class period.

102.       Over the relevant time period, the CREF Stock Account was subject to frequent, in-depth assessments in the context of both the investment menu redesign process as well as the periodic investment reviews led by CAPTRUST.

**RESPONSE:** Plaintiffs dispute paragraph 102. The Cornell Defendants do not cite to admissible evidence to support the purported fact. Prior to CAPTRUST's July 2013 investment scorecard presentation, the Cornell Defendants did not monitor funds in the Plans.[796]  In July 2013, the CREF Stock Account ranked below the 50th percentile of its Annualized Risk Adjusted Performance peer group and its Annualized Peer Relative Performance group for the 3 and 5 year periods.[797]

| Asset Class | Investment Name | Ticker | 3 yr RAP | 5 yr RAP | 3 yr Peer | 5 yr Peer | 3 yr Style | 5 yr Style | Expense | Total Quant | Total Quant |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Large Company Blend**** | CREF Stock | - | ⚠ | ⚠ | ⚠ | ⚠ | 🟢 | 🟢 | 🟢 | 45 | ⚠ |

---

[793] Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 49.

[794] Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 49; Doc. 240-7–240-12, Expert Report of John Chalmers, ¶ 84, n. 142 (standard deviation "is commonly used as a measure of investment risk"), 85.

[795] Doc. 249-18, Ex. 106, Expert Report of Wendy Dominguez at ¶ 95, Exhibit 5.

[796] Ex. P7, Opperman Tr. at 59:20-60:2; Ex. P8, Bursic Tr. at 78:4-85:18; Ex. P86, Internal CAPTRUST e-mail exchange July 1, 2013 to July 3, 2013 (CAPTR_0053254) at PDF 2-3 ("2nd deliverable is an interim Fiduciary review on the entire platform of funds. … To put this in perspective, we were hired in December 2011 and we have yet to do a review[.]") and PDF 6 ("Is this the meeting we need to have some sort of quant review on their 5,000 funds?); Ex. P87, e-mail between Cornell and outside counsel dated October 3, 2012 (CORNELL013947) at PDF 2 ("You had mentioned that at a recent RPOC meeting, it was unclear whether CAPTRUST was providing investment performance information to the RPOC."); Ex. P45, DeStefano Tr. at 124:2-16.

[797] Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 49; Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 48; Ex. P89, Quarterly Review for 3rd Quarter, 2014 (CORNELL015005) at 28.

CAPTRUST described its evaluation of the CREF Stock Account to the RPOC as an "estimation."[798] The RPOC believed that CAPTRUST's yellow triangle scoring for the CREF Stock Account was "fundamentally unreliable," and they could not determine whether the yellow triangles on the July 2013 report reflected the performance of the CREF Stock Account or the inadequacy of CAPTRUST's selection of measurement.[799]  As a result of CAPTRUST's self-described unreliable evaluation, Cornell decided to keep the CREF Stock Account on Tier II solely because it had been offered at Cornell since the 1950s.[800]  The Cornell Defendants did not review the underlying performance data for the CREF Stock Account until December 2014, after it was implemented in the best-of-class core line-up.[801]  Plaintiffs dispute the second sentence of paragraph 103. There is no one reference to the CREF Stock Account's prevalence among higher educational institutions or internal diversification in any of the meeting minutes or materials during the class period.[802]

---

[798] Ex. P8, Bursic Tr. at 217:18-25.

[799] Ex. P8, Bursic Tr. at 218:2-9; 218:25-219:4; 222:4-9.

[800] Ex. P8, Bursic Tr. at 218:9-11.

[801] Ex. P89, Quarterly Review for Period Ending September 30, 2014 (CORNEL015005) at 39.

[802] Doc. 250-19, November 29, 2010, CURP Meeting Minutes (CORNELL0021932); Ex. P10, February 3, 2011 CURP Meeting Minutes (CORNELL021930); Ex. P11, June 23, 2011 CURP Meeting Minutes (CORNELL021931); Doc. 248-8, Jan. 11, 2012 RPOC Meeting Minutes; Ex. P10, February 3, 2011 CURP Meeting Minutes (CORNELL021930); Ex. P11, June 23, 2011 CURP Meeting Minutes (CORNELL021931); Doc. 248-8, January 11, 2012 RPOC Meeting Minutes (CAPTR_0047903); Doc 248-14, April 13, 2012 RPOC Meeting Minutes (CAPTR_0047907); Doc. 248-9, July 24, 2012 RPOC Meeting Minutes (CAPTR_0047911); Doc. 252-5, November 19, 2012 RPOC Meeting Minutes (CAPTR_0047924); Ex. P12, July 31, 2013 RPOC Meeting Minutes (CAPTR_0047921); Doc. 252-8, September 30, 2013 RPOC Meeting Minutes (CAPTR_0047918); Ex. P13, December 4, 2013 RPOC Meeting Minutes (CAPTR_0047915); Ex. P14, March 21, 2014 RPOC Meeting Minutes (CAPTR_0004284); Ex. P15, September 17, 2014 RPOC Meeting Minutes (CAPTR_0004286); Ex. 63, Doc. 239-4, December 3, 2014 RPOC Meeting Minutes (CAPTR_00013586); Ex. P16, June 2, 2015 RPOC Meeting Minutes (CAPTR_0013598); Ex. P17, September 9, 2015 RPOC Meeting Minutes (CAPTR_0013573); Ex. P18, December 16, 2015 RPOC Meeting Minutes (CAPTR_0013594); Doc. 238-9, March 31, 2016 RPOC Meeting Minutes (CAPTR_0013568); Ex. P19, June 29, 2016 RPOC Meeting Minutes (CAPTR_0013565); Ex. P20, September 28, 2016 RPOC Meeting Minutes (CAPTR_0013580); Doc. 252-10, December 12, 2016 RPOC Meeting Minutes, (CAPTR_0013590); Ex. P49, April 14, 2017 RPOC Meeting Minutes (CAPTR_0013583); Ex. P50, June 23, 2017 RPOC Meeting Minutes (CAPTR_0013561); Ex. P51, September 27, 2017 RPOC Meeting Minutes (CAPTR_0013939); Ex. P52, December 11, 2017 RPOC Meeting Minutes (CAPTR_0015281).

[802] Ex. 90, July 2013 RPOC Meeting Presentation, at 12, 16, 48 (CORNELL020103); Ex. 92, September 2014 RPOC Meeting Presentation, at 46 (noting "Passing" score for CREF Stock and TIAA Real Estate as "Distinct Investments").

103.    In compiling its recommended list of core funds, RPOC's investment menu redesign subcommittee assessed the appropriateness of the CREF Stock Account.[803]  It determined that the fund's strong historical performance, popularity among participants, prevalence among higher education institutions, and broad diversification made it an appropriate investment to include among the recommended list of "core" funds in Tier II.[804]

**RESPONSE:**  Plaintiffs dispute the first sentence of paragraph 102.  Plaintiffs cite to a vague declaration by Paul Bursic to support this fact with conclusory language. Contrary to these assertions, prior to CAPTRUST's July 2013 investment scorecard presentation, the Cornell Defendants did not monitor funds in the Plans.[805]  In July 2013, the CREF Stock Account ranked below the 50th percentile of its Annualized Risk Adjusted Performance peer group and its Annualized Peer Relative Performance group for the 3 and 5 year periods.[806]

| Asset Class | Investment Name | Ticker | 3 yr RAP | 5 yr RAP | 3 yr Peer | 5 yr Peer | 3 yr Style | 5 yr Style | Expense | Total Quant | Total Quant |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Large Company Blend**** | CREF Stock | - | ⚠️ | ⚠️ | ⚠️ | ⚠️ | 🟢 | 🟢 | 🟢 | 45 | ⚠️ |

CAPTRUST described its evaluation of the CREF Stock Account to the RPOC as an "estimation."[807] The RPOC believed that CAPTRUST's yellow triangle scoring for the CREF Stock Account was "fundamentally unreliable," and they could not determine whether the yellow triangles on the July 2013 report reflected the performance of the CREF Stock Account or the

---

[803] Ex. 16, Bursic Decl. ¶ 9-10.
[804] Ex. 16, Bursic Decl. ¶ 10.
[805] Ex. P7, Opperman Tr. at 59:14-60:2; Ex. P8, Bursic Tr. at 78:4-85:18; Ex. P86, Internal CAPTRUST e-mail exchange July 1, 2013 to July 3, 2013 (CAPTR_0053254) at PDF 2-3 ("2nd deliverable is an interim Fiduciary review on the entire platform of funds. … To put this in perspective, we were hired in December 2011 and we have yet to do a review[.]") and PDF 6 ("Is this the meeting we need to have some sort of quant review on their 5,000 funds?); Ex. P87, e-mail between Cornell and outside counsel dated October 3, 2012 (CORNELL013947) at PDF 2 ("You had mentioned that at a recent RPOC meeting, it was unclear whether CAPTRUST was providing investment performance information to the RPOC."); Ex. P45, DeStefano Tr. at 124:2-16.
[806] Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 48; Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 49; Ex. P89, Quarterly Review for 3rd Quarter, 2014 (CORNELL015005) at 27.
[807] Ex. P8, Bursic Tr. at 217:15-25.

inadequacy of CAPTRUST's selection of measurement.[808]  As a result of CAPTRUST's self-described unreliable evaluation, Cornell decided to keep the CREF Stock Account on Tier II solely because it had been offered at Cornell since the 1950s.[809]  The Cornell Defendants did not review the underlying performance data for the CREF Stock Account until December 2014, after it was implemented in the best-of-class core line-up.[810]  Plaintiffs dispute the second sentence of paragraph 103. There is no preference to the CREF Stock Account's prevalence among higher educational institutions or internal diversification in any of the meeting minutes or materials during the class period.[811]

104.     CREF Stock also satisfied the IPS scoring criteria for distinct asset classes.[812] RPOC and the Faculty Advisory Committee adopted the subcommittee's recommendation that CREF Stock be included in the Tier II lineup as a core "large company blend" investment option for participants with accounts on TIAA's platform.[813]

---

[808] Ex. P8, Bursic Tr. at 218:2-9; 218:25-219:4; 222:4-9.

[809] Ex. P8, Bursic Tr. at 218:9-11.

[810] Ex. P89, Quarterly Review for Period Ending September 30, 2014 (CORNEL015005) at 38.

[811] Doc. 250-19, November 29, 2010, CURP Meeting Minutes (CORNELL0021932); Ex. P10, February 3, 2011 CURP Meeting Minutes (CORNELL021930); Ex. P11, June 23, 2011 CURP Meeting Minutes (CORNELL021931); Doc. 248-8, Jan. 11, 2012 RPOC Meeting Minutes; Ex. P10, February 3, 2011 CURP Meeting Minutes (CORNELL021930); Ex. P11, June 23, 2011 CURP Meeting Minutes (CORNELL021931); Doc. 248-8, January 11, 2012 RPOC Meeting Minutes (CAPTR_0047903); Doc 248-14, April 13, 2012 RPOC Meeting Minutes (CAPTR_0047907); Doc. 248-9, July 24, 2012 RPOC Meeting Minutes (CAPTR_0047911); Doc. 252-5, November 19, 2012 RPOC Meeting Minutes (CAPTR_0047924); Ex. P12, July 31, 2013 RPOC Meeting Minutes (CAPTR_0047921); Doc. 252-8, September 30, 2013 RPOC Meeting Minutes (CAPTR_0047918); Ex. P13, December 4, 2013 RPOC Meeting Minutes (CAPTR_0047915); Ex. P14, March 21, 2014 RPOC Meeting Minutes (CAPTR_0004284); Ex. P15, September 17, 2014 RPOC Meeting Minutes (CAPTR_0004286); Ex. 63, Doc. 239-4, December 3, 2014 RPOC Meeting Minutes (CAPTR_00013586); Ex. P16, June 2, 2015 RPOC Meeting Minutes (CAPTR_0013598); Ex. P17, September 9, 2015 RPOC Meeting Minutes (CAPTR_0013573); Ex. P18, December 16, 2015 RPOC Meeting Minutes (CAPTR_0013594); Doc. 238-9, March 31, 2016 RPOC Meeting Minutes (CAPTR_0013568); Ex. P19, June 29, 2016 RPOC Meeting Minutes (CAPTR_0013565); Ex. P20, September 28, 2016 RPOC Meeting Minutes (CAPTR_0013580); Doc. 252-10, December 12, 2016 RPOC Meeting Minutes, (CAPTR_0013590); Ex. P49, April 14, 2017 RPOC Meeting Minutes (CAPTR_0013583); Ex. P50, June 23, 2017 RPOC Meeting Minutes (CAPTR_0013561); Ex. P51, September 27, 2017 RPOC Meeting Minutes (CAPTR_0013939); Ex. P52, December 11, 2017 RPOC Meeting Minutes (CAPTR_0015281).

[812] Ex. 90, July 2013 RPOC Meeting Presentation, at 12, 16, 48 (CORNELL020103); Ex. 92, September 2014 RPOC Meeting Presentation, at 46 (noting "Passing" score for CREF Stock and TIAA Real Estate as "Distinct Investments").

[813] Doc. 252-8, Ex. 78, September 2013 RPOC Meeting Minutes, at 2 (CAPTR_047918) (adopting investment lineup subcommittee recommendations); Ex. 91, September 2012 Proposed Core Fund Lineup for Faculty Review,

**RESPONSE:**  Plaintiffs dispute the first sentence of paragraph 104.  Cornell and CAPTRUST's Investment Policy Statement provides that "all actively managed investments should rank in the top 50% of their given peer group for the 3 or 5 year annualized period[.]"[814] In July 2013, the CREF Stock Account ranked below the 50th percentile of its Annualized Risk Adjusted Performance peer group and its Annualized Peer Relative Performance group for the 3 and 5 year periods.[815]

| Asset Class | Investment Name | Ticker | 3 yr RAP | 5 yr RAP | 3 yr Peer | 5 yr Peer | 3 yr Style | 5 yr Style | Expense | Total Quant | Total Quant |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Large Company Blend**** | CREF Stock | - | △ | △ | △ | △ | ● | ● | ● | 45 | △ |

The September 2014 meeting presentation cited by Cornell does not provide any performance data, just a green circle under one criteria entitled "score."  The underlying data provided in December 2014 provided that the CREF Stock Account's one, three, five and ten-year returns ranked in the bottom 50% of its CAPTRUST assigned peer group (1% is the best ranking).[816]

---

at 6 (CORNELL020055) (CAPTRUST providing a "strong recommendation" with respect to CREF Stock's inclusion in core lineup); Ex. 16, Bursic Decl. ¶ 11.
[814] Doc. 252-6, Ex. 76, Investment Policy Statement Cornell University (CORNELL013763) at 6.
[815] Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 49; Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 48; Ex. P89, Quarterly Review for 3rd Quarter, 2014 (CORNELL015005) at 28.
[816] Ex. P89, RPOC Quarterly Review for the Period Ending September 30, 2014 (CORNELL015005) at 39.

| KEY MEASURES / 5 YEAR | CREF Stock Account | Peer Group Rank |
|---|---|---|
| Standard Deviation | 14.60 | 77% |
| Sharpe Ratio | 0.85 | 85% |
| Alpha | -1.06 | 88% |
| Beta | 1.03 | 14% |
| R-Squared | 99.61 | 0% |
| Up Mkt Capture | 100.74 | 52% |
| Down Mkt Capture | 105.13 | 86% |
| Information Ratio | -0.60 | 95% |
| **TRAILING RETURNS** | | |
| Last Qtr. | -1.82 | -- |
| YTD | 3.96 | -- |
| 1 Year | 13.11 | 84% |
| 3 Years | 19.53 | 78% |
| 5 Years | 12.47 | 83% |
| 10 Years | 7.52 | 54% |
| **CALENDAR RETURNS** | | |
| 2013 | 27.83 | 84% |
| 2012 | 17.26 | 16% |
| 2011 | -4.94 | 85% |
| 2010 | 15.73 | 22% |
| 2009 | 32.04 | 22% |
| 2008 | -39.68 | 70% |

Plaintiffs do not dispute that Cornell and CAPTRUST held out the CREF Stock Account in the core line-up as a "large company blend" investment option. Plaintiffs dispute the characterization of Exhibit 91. The document speaks for itself and contains no analysis of the CREF Stock Account.

105.     While all plan investments were subject to periodic monitoring, the effect of including CREF Stock the Tier II lineup of "core" investment options was that it was reviewed more frequently and was subject to greater scrutiny to ensure that RPOC could continue to stand-by its "best-in-class" recommendation. As the meeting materials reflect, CREF Stock was reviewed on a quarterly basis once added to the Tier II lineup in 2013, and each time CAPTRUST advised RPOC that the account remained in good standing and met the IPS guidelines for distinct investments.[817]

---

[817] Doc. 241-1, Ex. 90, July 31, 2013 RPOC Meeting Presentation, at 48 (CORNELL020103).
Doc. 241-3, Ex. 92, September 2014 RPOC Meeting Presentation, at 46 (CORNELL013567); Ex. 93, December 2014 RPOC Meeting Presentation, at 20 (CORNELL028976); Ex. 94, June 2015 RPOC Meeting Presentation, at 18 (CORNELL019795); Doc. 252-9, Ex. 79, September 2015 RPOC Meeting Presentation, at 18 (CORNELL013700); Ex. 95, December 2015 RPOC Meeting Presentation, at 18 (CORNELL011357); Ex. 97, March 2016 RPOC Meeting Presentation, at 30 (CORNELL020909); Doc. 249-1, Ex. 96, June 2016 RPOC Meeting Presentation, at 27 (CORNELL013413); Ex. 98, September 2016 RPOC Meeting Presentation, at 23 (CAPTR_0006755).

**RESPONSE:** Plaintiffs dispute the first sentence of paragraph 105. The Cornell Defendants do not cite to admissible evidence support the purported fact in the first sentence of paragraph 105.

Plaintiffs dispute the second sentence of paragraph 105. Cornell and CAPTRUST's Investment Policy Statement provides that "all actively managed investments should rank in the top 50% of their given peer group for the 3 or 5 year annualized period[.]"[818] In July 2013, the CREF Stock Account ranked below the 50th percentile of its Annualized Risk Adjusted Performance peer group and its Annualized Peer Relative Performance group for the 3 and 5 year periods.[819]

| Asset Class | Investment Name | Ticker | 3 yr RAP | 5 yr RAP | 3 yr Peer | 5 yr Peer | 3 yr Style | 5 yr Style | Expense | Total Quant | Total Quant |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Large Company Blend**** | CREF Stock | - | ⚠ | ⚠ | ⚠ | ⚠ | 🟢 | 🟢 | 🟢 | 45 | ⚠ |

The CREF Stock Account was not reviewed quarterly in 2013.[820] The RPOC did not meet in the second quarter of 2014, so they could not have monitored the performance on a "quarterly basis."[821] The underlying data provided in December 2014 provided that the CREF Stock Account's one, three, five and ten-year returns ranked in the bottom 50% of its CAPTRUST assigned peer group.[822] Contrary to Cornell's assertion that "as the meeting material reflect CREF Stock was reviewed on a quarterly basis," Cornell does not cite *any* meeting materials from July 2013 until September 2014.

---

[818] Doc. 252-6, Ex. 76, Investment Policy Statement Cornell University (CORNELL013763) at 6.

[819] Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 49; Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 48; Ex. P89, Quarterly Review for 3rd Quarter, 2014 (CORNELL015005) at 28.

[820] Doc. 252-8, September 30, 2013 RPOC Meeting Minutes (CAPTR_0047918); Ex. P13, December 4, 2013 RPOC Meeting Minutes (CAPTR_0047915); Ex. P14, March 23, 2014 RPOC Meeting Minutes (CAPTR_0004284); Ex. P15, September 17, 2014 RPOC Meeting Minutes (CAPTR_0004286)

[821] Ex. P14, March 21, 2014 RPOC Meeting Minutes (CAPTR_0004284); Ex. P15, September 17, 2014 RPOC Meeting Minutes (CAPTR_0004286).

[822] Ex. P89, RPOC Quarterly Review for the Period Ending September 30, 2014 (CORNELL015005) at 39.

106.     In addition to the quarterly due diligence and reviews performed by CAPTRUST, the RPOC also received in-depth investment reports. These reports enabled them to independently evaluate a variety of metrics used to assess the core investment options, such as the investments' benchmarking information, sharpe-ratios, risk-adjusted returns, and other relevant quantitative and qualitative data.[823]  As indicated by these in-depth reviews, CREF Stock's fees were well below the peer group benchmark and its performance closely tracked that of the Composite Index.[824]

**RESPONSE:**  Plaintiffs dispute the first sentence of paragraph 106.  The Cornell Defendants do not cite to admissible evidence support the purported fact in the first sentence of paragraph 106.

Plaintiffs dispute the second sentence of paragraph 106. When CAPTRUST provided investment due diligence information to Cornell in July 2013, it only provided an "investment scorecard" (a/k/a the dashboard system) that provided an executive summary with no information (sharpe-ratios, risk-adjusted returns, and other relevant quantitative and qualitative data) about the actual underlying performance of specific investment options in the Plans.[825]

---

[823] Doc. 249-5–249-7, Ex. 99, December 2014 Core Fund "Full Review," at 39 (CAPTR_007213).

[824] Doc. 249-5–249-7, Ex. 99, December 2014 Core Fund "Full Review," at 39 (CAPTR_007213).

[825] Ex. P93, CAPTRUST Financial Advisors Formal RFP Response (CORNELL011415), at 12 (excerpt reproduced in body below); Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122); Ex. P12, July 31, 2013 RPOC Meeting Minutes (CAPTR_0047921) at 3 ("CAPTRUST provided the RPOC with a high level review of the current 250+ funds on the various platforms").

Shown below is an example of the investment scorecard which is reviewed on quarterly with the plan committee. It presents an executive summary of the performance of the investment funds relative to the evaluation criteria of the IPS. Our goal in all reporting and services to the plan committee is to provide executive summaries of meaningful specifics that allow the committee to make decisions and maintain strategic oversight of all plan functions.



CAPTRUST did not provide the RPOC with information necessary to interpret its scoring of the CREF Stock Account, including the yellow "Marked For Review" triangle, within the quantitative criteria categories until December 2014.[826]  While CAPTRUST did not provide underlying performance data to Cornell, it routinely provided the underlying performance data necessary to verify the entries in the investment scorecard to other retirement plan clients, referred to as "FUND FACTS SHEETS & COMPARISONS" as part of its normal process.[827]

---

[826] Ex. 63, Doc. 239-4, RPOC Meeting Minutes dated December 3, 2014 (CAPTR_0013586) at 3-4 ("Mr. Schmitt focused on the key components of the review and the manner in which CAPTRUST evaluates/"scores" an investment vehicle."); Ex. P89, Quarterly Review for 3rd Quarter, 2014 (CORNELL015005) at 134; E-mail attaching Quarterly Review for 3rd Quarter, 2014 (CORNELL15001); Doc. 252-10, Ex. 80,  RPOC Meeting Minutes dated December 12, 2016 (CAPTR_0013590) at 2 ("Ms. Opperman requested that CAPTRUST provide historical investment scoring in future reports.").

[827] Ex. P60, Schmitt Tr. at 71:20-73:3; Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 26, 39-70; Ex. P101, CAPTRUST Presentation for The University of Maine System 1st Quarter, 2015 at PDF 489, 564-609.



A fiduciary must have underlying performance data in order to verify or dispute information found in the investment scorecard.[828]  Cornell cites the December 2014 fund review to support the proposition that the CREF Stock Account was evaluated using a variety of metrics demonstrating that CAPTRUST did not provide any underlying performance data to the RPOC Committee that would allow the RPOC to evaluate, validate or dispute CAPTRUST's green, yellow, red investment scorecard entries until the RPOC's December 3, 2014 meeting, when it only provided underlying information for the core line-up.[829]  The underlying data provided in December 2014 showed that the CREF Stock Account's one, three, five and ten-year returns ranked in the bottom 50% of its CAPTRUST assigned peer group (1% is the best ranking).[830]

107.    The TIAA Real Estate Account is a tax-deferred variable annuity contract offered by TIAA that seeks favorable long-term returns primarily through rental income and

---

[828] Ex. P88, Ciccotello Tr. at 26:2-27:18; 66:13-67:5; 77:10-78:1; 78:13-79:19; 97:3-100:24; 118:21-121:1; Ex. P46, Edwards Tr. at 63:13-64:16; Ex. P87, e-mail between Cornell and outside counsel dated October 3, 2012 (CORNELL013947) at PDF 2 ("If CAPTRUST has not been providing the RPOC with information about the plans' investment options, then there is significant risk that the DOL or a Plan participant could question whether the RPOC has been satisfying its fiduciary responsibility."); Doc. 249-18, Ex. 106,  Expert Report of W. Dominguez, ¶¶ 68, 81.

[829] Ex. P89, Quarterly Review for 3rd Quarter, 2014 (CORNELL015005) at 16-93; Ex. P46, E-mail attaching Quarterly Review for 3rd Quarter, 2014 (CORNELL15001); Ex. P7, Opperman Tr. at 77:12-79:12.

[830] Ex. P89, RPOC Quarterly Review for the Period Ending September 30, 2014 (CORNELL015005) at 39.

appreciation of real estate and real estate related investments.[831]  TIAA Real Estate invests

between 75% and 85% of its assets directly in real estate or real estate related assets.[832]  These

real estate properties include income-producing real estate, such as office, industrial, retail, and

multi-family rental properties.[833]  The remaining 15% to 25% is invested in non-real-estate-

related publicly traded securities and short-term, higher-quality liquid investments that are easily

converted to cash.[834]  These non-real-estate investments are held to ensure that the account can

meet participant redemption requests, purchase properties, improve properties, or cover short

term expenses and liabilities.[835]

**RESPONSE:**  Plaintiffs do not dispute that the TIAA Real Estate Account's prospectus

contains the description in the first to fifth sentence.  Plaintiffs dispute that these are descriptions

are accurate descriptions of the precise underlying holdings.

108.     TIAA Real Estate is unique in that it gives investors the opportunity to invest

*directly* in real estate without the capital requirements necessary to purchase and manage real

estate.  Although investors may obtain *indirect* exposure to real estate and real estate related

securities through a publicly-traded real estate investment trust ("REIT"),[836] TIAA Real Estate

differs from REITs in a number of important respects.[837]

---

[831] Doc. 249-8–249-12, Ex. 100, 2016 TIAA Real Estate Account Prospectus, at 3 (TIAA_CORNELL_00024926).
[832] Doc. 249-8–249-12, Ex. 100, 2016 TIAA Real Estate Account Prospectus, at 3 (TIAA_CORNELL_00024926).
[833] Doc. 249-8–249-12, Ex. 100, 2016 TIAA Real Estate Account Prospectus, at 36 (TIAA_CORNELL_00024926).
[834] Doc. 249-8–249-12, Ex. 100, 2016 TIAA Real Estate Account Prospectus, at 3-4 (TIAA_CORNELL_00024926).
[835] Doc. 249-8–249-12, Ex. 100, 2016 TIAA Real Estate Account Prospectus, at 3 (TIAA_CORNELL_00024926).
*See also* September 2018 TIAA Real Estate Account Factsheet, at 1 *available at*
https://www.tiaa.org/public/pdf/ffs/878094200.pdf..
[836] Doc. 249-8–249-12, Ex. 100, 2016 TIAA Real Estate Account Prospectus, at 3-4 (TIAA_CORNELL_00024926)
(discussing "direct ownership" of real estate and "indirect" interests in real estate through real estate securities and
REITs).
[837] Doc. 249-14, Ex. 102, TIAA Real Estate Account Frequently Asked Questions, at 20
(TIAA_CORNELL_00025769) (explaining difference between REITs and the Real Estate Account).

**RESPONSE:**  Plaintiffs dispute the first sentence of paragraph 108.  The Cornell

Defendants do not cite to admissible evidence to support the purported fact in the first sentence

of paragraph 108.  Plaintiffs dispute the second sentence of paragraph 108.  Cornell's citation

does not support its proposition.  To the extent that Cornell relies on the Prospectus for the truth

of descriptions Cornell asserted about the difference between REITs and the TIAA Real Estate

Account, it is inadmissible hearsay and is a mischaracterization of the prospectus.  REITs and the

TIAA Real Estate Account are managed by the same type of real estate professionals throughout

the real estate industry.[838]  There are minimal, if any, differences between REITS and the TIAA

Real Estate Account.[839] Cornell recognized this when it held out the TIAA Real Estate Account

as a similar investment the Cohen & Steers Realty Shares.[840]

109.     A REIT, unlike TIAA Real Estate, invests primarily in securities of publicly-

traded companies that own and manage real estate or real estate investments, such as mortgage

backed securities.[841] Since REITs invest in and purchase real estate related securities, rather than

actual real estate properties, the performance of REITs is highly correlated with the performance

of the stock market.  The value of TIAA Real Estate, on the other hand, does not correspond to

general stock market fluctuations; instead, the TIAA Real Estate Account's value depends on the

value of the underlying properties it owns.[842]

---

[838] Ex. P132, Expert Rebuttal Report of Wendy Dominguez at ¶ 54.
[839] Ex. P88, Ciccotello Tr. at 28:1-31:15.
[840] Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 12; Ex. P89, Quarterly Review for Period Ending September 30, 2014 (CORNELL015005) at 53; *Supra* at ¶ 80, ("RPOC decided that its objectives were to maintain symmetry").
[841] Doc. 240-7–240-12, Ex. 86, Chalmers Rpt. ¶ 36 n. 51 (*citing* U.S. Securities and Exchange Commission, "Real Estate Investment Trusts (REITS)," *available at* https://www.investor.gov/introduction-investing/basics/investment-products/real-estate-investment-trusts-reits).
[842] Doc. 240-7–240-12, Ex. 86, Chalmers Rpt. ¶ 45, Exs. 7a, 7b, 11 (illustrating correlation between stock market, REITs, and the Real Estate Account); Doc. 246-12, Ex. 30, Chittenden *Sacerdote* Decl. ¶ 61.

**RESPONSE:**  Plaintiffs dispute the first sentence of paragraph 109 is a material fact. Plaintiffs otherwise dispute that a REIT's holding make it materially different that the TIAA Real Estate Account, which is one legal step away from becoming a REIT.[843]  REITs and the TIAA Real Estate Account are managed by the same type of real estate professionals throughout the real estate industry.[844] There are minimal, if any, differences between REITS and the TIAA Real Estate Account.[845] Plaintiffs dispute the second and third sentence of paragraph 109.  The TIAA Real Estate Account is not marked to market on a daily basis and leads to a misleading and distorted correlation profile, both the TIAA Real Estate Account and a REIT's value depends on the underlying assets—real estate holdings.[846]

110.    The unique investment opportunity presented by TIAA Real Estate combined with its low correlation to the performance of more traditional types of securities held in retirement accounts, such as stocks, bonds, and cash, makes the Real Estate Account valuable from a diversification standpoint.[847]

**RESPONSE:**  Plaintiffs dispute paragraph 110. The only evidence cited by Defendants is testimony of a Douglas Chittenden, a TIAA executive, in another case. Mr. Chittenden's testimony in another case is inadmissible hearsay. *See* Fed. R. of Evid. 801, 802. Mr. Chittenden's testimony is not an admissible prior statement by a witness because he has not been subject to cross-examination in this case nor is it inconsistent with any testimony he has given in this case or for identification. *See* Fed. R. of Evid. 801(a)(1). Additionally, Mr. Chittenden's testimony in another case is not admissible under Rule 804, because he is not unavailable given

---

[843] Ex. P88, Ciccotello Tr. at 28:1-31:15.
[844] Ex. P132, Expert Rebuttal Report of Wendy Dominguez at ¶ 54.
[845] Ex. P88, Ciccotello Tr. at 28:1-31:15.
[846] Ex. P88, Ciccotello Tr. at 28:1-31:15; Ex. P132, Expert Rebuttal Report of Wendy Dominguez at ¶¶52-53
[847] Doc. 246-12, Ex. 30, Chittenden *Sacerdote* Decl. ¶ 61.

that he offered a declaration in support of the Cornell Defendants' motion.[848] Finally, Mr.

Chittenden's testimony is inadmissible under the rule of completeness, because the Cornell

Defendants only offered his trial declaration and not his actual live testimony, including

testimony that he was not involved with TIAA's defined contribution business for much of the

relevant period.[849]

111.    Since TIAA Real Estate invests directly in real estate and does not track the

performance of the stock market, standard market indices and REIT investment options are not

by themselves appropriate benchmarks.[850] Instead of using these REIT indices, TIAA provides

investors performance comparisons for two indices developed by the National Council of Real

Estate Investment Fiduciaries ("NCREIF"): the NCREIF Fund Index Open End Diversified Core

Equity ("NFI-ODCE") and the NCREIF Property Index-Open End ("NPI").[851] When comparing

the Real Estate Account to the NFI-ODCE, TIAA calculates an "adjusted total return" that

accounts for the fact that the Real Estate Account, holds approximately 15% to 25% in cash or

liquid securities that the NFI-ODCE funds typically do not hold.[852]

**RESPONSE:**  Plaintiffs dispute that REITs are not appropriate benchmarks for the TIAA

Real Estate Account.  For the University System of Maine in July 2013 CAPTRUST compared

the TIAA Real Estate Account to the Dow Jones US Select REIT and Morningstar Specialty-

Real Estate benchmarks.[853] CAPTRUST's evaluation showed that the TIAA Real Estate Account

---

[848] Doc. 249-024, Declaration of Douglass Chittenden.

[849] Ex. __ *Sacerdote v. New York University*, 16-__ Tr. of Trial at 560:7–562:13

[850] Ex. 102, TIAA Real Estate Account Frequently Asked Questions, at 18 (TIAA_CORNELL_00025769) ("[M]anagement believes that a comparison of on the Account's Total Return performance to that of a broad-based index or benchmark does not allow for the Account to be fairly evaluated and compared to other real estate funds, given its unique liquidity guarantee feature."). *See also*, Ex. 102, TIAA Real Estate Account Frequently Asked Questions, at 20 (TIAA_CORNELL_00025769) ("Due to the unique nature of the Account, it does not fit perfectly in any of the existing Morningstar categories.").

[851] Ex. 102, TIAA Real Estate Account Frequently Asked Questions, at 18 (TIAA_CORNELL_00025769).

[852] Ex. 102, TIAA Real Estate Account Frequently Asked Questions, at 18 (TIAA_CORNELL_00025769).

[853] Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 68.

underperformed significantly against both indexes over the year to date, one, three, five and ten-year periods.[854]



Plaintiffs do not dispute that TIAA Real Estate Account lists the referenced indexes in the second sentence.

Plaintiffs dispute that using the adjusted returns for the TIAA Real Estate Account is appropriate in sentence three.[855]  By December 2014, CAPTRUST evaluated the TIAA Real Estate Account's unadjusted returns against the NACREIF Property Index and Morningstar Specialty-Real Estate Universe.[856] TIAA explains that the "adjusted performance figures" it lists in its prospectus "do not reflect the true returns experienced by holders of interests in the Account."[857]  Plaintiffs' expert explains that using the unadjusted returns the TIAA Real Estate

---

[854] Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 68.
[855] Ex. P132, Expert Rebuttal Report of Wendy Dominguez at ¶¶ 49-51.
[856] Ex. P89, Quarterly Review for Period Ending September 30, 2014 (CORNELL015005) at 28, 51; Ex. P23, Strodel Tr. at 145:8-24; Ex. P106, TIAA Real Estate Account 8-K dated March 10, 2015 ("adjusted performance figures are designed for use of Account investors for comparison purposes only, and do not reflect the true returns experienced by holders of interests in the Account.").
[857] Ex. P106, TIAA Real Estate Account 8-K dated March 10, 2015 ("adjusted performance figures are designed for use of Account investors for comparison purposes only, and do not reflect the true returns experienced by holders of interests in the Account.").

177

Account had significant underperformance.[858] After this litigation was commenced, Cornell now takes the position that what CAPTRUST did, and the data Cornell relied upon, comparing the TIAA Real Estate Accounts unadjusted returns, is a "flat-out mischaracterization" of how the TIAA Real Estate Account should be compared against an NCREIF index.[859] Additionally, Cornell's former Chief Investment Officer testified removing the lowest performing portion of a fund to compare it to benchmark "doesn't make sense."[860]

112.     The desirability of TIAA Real Estate is evident from the fact that although real estate investment options are not a standard asset class represented in defined contribution plans, 84% of TIAA's largest 200 clients nevertheless offered it as an investment option between 2010 and 2016.[861]  TIAA Real Estate is also one of the most common investment options offered by higher education 403(b) plans comparable to the two sponsored by Cornell. Of the 37 higher education 403(b) plans with over $1 billion in assets, 26 currently offer the Real Estate Account as an investment option and over $2.5 billion in assets is currently invested in the account by these large higher education plans' participants.[862] As of December 2015, 2478 participants had an invested over $95,000,000 in the TIAA Real Estate Account.[863]

**RESPONSE:**  Plaintiffs dispute the first sentence of paragraph 112. The only evidence cited by Plaintiffs is testimony of a Douglas Chittenden, a TIAA executive, in another case. Mr.

---

[858] Ex. P89, Quarterly Review for Period Ending September 30, 2014 (CORNELL015005) at 28, 51; Doc. 249-18, Ex. 106, Expert Report of Wendy Dominguez at ¶¶ 102-105, 107; Ex. P106, TIAA Real Estate Account 8-K dated March 10, 2015 ("adjusted performance figures are designed for use of Account investors for comparison purposes only, and do not reflect the true returns experienced by holders of interests in the Account.").

[859] Doc. 227 at 21.

[860] Ex. __, Edwards Dep. at 117:5-8

[861] Ex. 30, Chittenden *Sacerdote* Decl. ¶¶ 63-64.

[862] Doc. 240-7–240-12, Ex. 86, Chalmers Rpt. ¶ 34.

[863] Ex. 103, 2015 TDA Plan TIAA Fund Usage and Diversification Report (TIAA_CORNELL_00007284) ($43,133,964 invested in TIAA Real Estate by 2463 participants); Ex. 104 2015 CURP TIAA Fund Usage and Diversification Report (TIAA_CORNELL_00016355) ($52,492,965 invested in TIAA Real Estate by 2478 participants).

Chittenden's testimony in another case is inadmissible hearsay. *See* Fed. R. of Evid. 801, 802,

Mr. Chittenden's testimony is not an admissible prior statement by a witness because he has not

been subject to cross-examination in this case nor is it inconsistent with any testimony he has

given in this case or for identification. *See* Fed. R. of Evid. 801(a)(1). Additionally, Mr.

Chittenden's testimony in another case is not admissible under Rule 804, because he is not

unavailable given that he offered a declaration in support of the Cornell Defendants' motion.[864]

Finally, Mr. Chittenden's testimony is inadmissible under the rule of completeness, because the

Cornell Defendants only offered his trial declaration and not his actual live testimony, including

testimony that he was not involved with TIAA's defined contribution business for much of the

relevant period[865] and that he was not aware of numerous relevant facts related to TIAA's top

200 clients.[866]

Plaintiffs dispute the second sentence of paragraph 112.  Mr. Chalmers merely reviewed

Form 5500 reports in his expert report; an expert witness cannot be used as conduit to admit

inadmissible hearsay. *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013)("a

party cannot call an expert simply as a conduit for introducing hearsay under the guise that the

testifying expert used the hearsay as the basis of his testimony.") (quoting *Malletier v. Dooney &*

*Bourke, Inc.*, 525 F.Supp.2d 558, 666 (S.D.N.Y.2007)). Further, Mr. Chalmers impermissibly

attempts to limit the universe of peer ERISA plans, a legal question.[867] Mr. Chalmers did no

investigation into the process used by any of these universities when they allegedly included the

CREF Stock Account and TIAA Real Estate Account in their Plans.[868]

---

[864] Doc. 249-024, Declaration of Douglass Chittenden.
[865] Ex. __ *Sacerdote v. New York University*, 16-__ Tr. of Trial at 560:7–562:13
[866] *Id.* at 649:4-655:20
[867] Ex. P131, Chalmers Tr. at 37:22-41:9.
[868] Ex. P131, Chalmers Tr. at 48:18-49:1, 50:5-15; Ex. P132, Expert Rebuttal Report of Wendy Dominguez at ¶¶ 30-34.

Plaintiffs dispute that the third sentence of paragraph 112 is a material fact. Popularity is not a factor in fulfilling a fiduciary duty if a fund is imprudent. The enrollment process and how plan choices are presented to participants has a large impact on how plan participants allocate their funds. Because TIAA Real Estate was prominently displayed to participants making an election, it impacted their decisions.[869]

113.     TIAA Real Estate's fees are reasonable compared to fees charged by funds invested in similar asset classes. Between 2010 and 2017, TIAA Real Estate's fees were lower than the fees charged by between 40% and 68% of the funds in Lipper's Real Estate Fund category. In 6 of the 8 years between 2010 and 2017, its fees were below the median fee charged by funds in its Lipper category.[870]

**RESPONSE:**  Plaintiffs dispute the first sentence of paragraph 113.  Cornell cites no record evidence to support this fact, so it is improper under Rule 56.1

Plaintiffs dispute the second sentence of paragraph 113.  Cornell and CAPTRUST held out the TIAA Real Estate Account in the real estate asset class, along with the Cohen & Steers Realty Shares.[871]  Consistent with its assignment in the real estate asset class, in 2014, CAPTRUST compared the TIAA Real Estate Account's fees to the same benchmarks it compared the Cohen & Steers Realty shares fees against.[872]  The TIAA Real Estate Account's

---

[869] Ex. P132, Expert Rebuttal Report of Wendy Dominguez at ¶ 32-33.

[870] Doc. 240-7–240-12, Ex. 86, Chalmers Rpt. ¶ 42, Ex. 5b.

[871] Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 12; Ex. P89, Quarterly Review for Period Ending September 30, 2014 (CORNELL015005) at 53; *Supra* at ¶ 80, ("RPOC decided that its objectives were to maintain symmetry").

[872] Ex. P89, RPOC Quarterly Review for the Period Ending September 30, 2014 (CORNELL015005) at 51 (TIAA Real Estate Account 92 bps) and 92 (Cohen & Steers Instl Realty Shares 75 bps ratio)(both use the same expense ratio as comparators, 135 bps).

expense ratio was 17 basis points higher than the Cohen & Steers Realty Shares fund and 79 basis points higher than the Vanguard REIT Index Fund.[873]

114.    The TIAA Real Estate Account has provided strong performance. Throughout the relevant time period, TIAA Real Estate Account's ten-year adjusted total returns exceed benchmark returns for each 10 year period ending 2010-2017.[874]

**RESPONSE:**  Plaintiffs dispute that the TIAA Real Estate has provided "strong performance."  For the University System of Maine in July 2013 CAPTRUST compared the TIAA Real Estate Account to the Dow Jones US Select REIT and Morningstar Specialty-Real Estate benchmarks.[875] CAPTRUST's evaluation showed that the TIAA Real Estate Account underperformed significantly against both indexes over the year to date, one, three, five and ten-year periods.[876]



---

[873] Ex. P89, RPOC Quarterly Review for the Period Ending September 30, 2014 (CORNELL015005) at 51 (TIAA Real Estate Account 92 bps) and 92 (Cohen & Steers Instl Realty Shares 75 bps ratio)(both use the same expense ratio as comparators, 135 bps); Doc. 249-18, Ex. 106, Expert Report of Wendy Dominguez at ¶¶ 106, 108. .
[874] Doc. 240-7–240-12, Ex. 86, Chalmers Rpt. ¶ 58, Ex. 10.
[875] Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 68.
[876] Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 68.

By December 2014, CAPTRUST evaluated the TIAA Real Estate Account's unadjusted returns against the NACREIF Property Index and Morningstar Specialty-Real Estate Universe.[877] TIAA explains that the "adjusted performance figures" it lists in its prospectus "do not reflect the true returns experienced by holders of interests in the Account."[878]  Plaintiffs' expert explains that using the unadjusted returns the TIAA Real Estate Account had significant underperformance.[879] After this litigation was commenced, Cornell now takes the position that what CAPTRUST did, and the data Cornell relied upon, comparing the TIAA Real Estate Account's unadjusted returns, is a "flat-out mischaracterization" of how the TIAA Real Estate Account should be compared against an NCREIF index.[880] Additionally, Cornell's former Chief Investment Officer testified removing the lowest performing portion of a fund to compare it to a benchmark "doesn't make sense."[881]

115.    Like the CREF Stock Account, over the relevant time period TIAA Real Estate was subject to regular, in-depth assessments in the context of both the investment menu redesign process and as part of the regular investment review led by CAPTRUST.

**RESPONSE**: Plaintiffs dispute the first sentence of paragraph 115.  The Cornell Defendants do not cite to admissible evidence to support the purported fact in the first sentence of paragraph 115.  CAPTRUST recommended that Cornell include the TIAA Real Estate Fund

---

[877] Ex. P89, Quarterly Review for Period Ending September 30, 2014 (CORNELL015005) at 28, 51; Ex. P23, Strodel Tr. at 145:8-24; Ex. P106, TIAA Real Estate Account 8-K dated March 10, 2015 ("adjusted performance figures are designed for use of Account investors for comparison purposes only, and do not reflect the true returns experienced by holders of interests in the Account.").

[878] Ex. P106, TIAA Real Estate Account 8-K dated March 10, 2015 ("adjusted performance figures are designed for use of Account investors for comparison purposes only, and do not reflect the true returns experienced by holders of interests in the Account."); Ex. P132, Expert Rebuttal Report of Wendy Dominguez at ¶¶ 49-51.

[879] Ex. P89, Quarterly Review for Period Ending September 30, 2014 (CORNELL015005) at 28, 51; Doc. 249-18, Ex. 106, Expert Report of Wendy Dominguez at ¶¶ 102-105, 107; Ex. P106, TIAA Real Estate Account 8-K dated March 10, 2015 ("adjusted performance figures are designed for use of Account investors for comparison purposes only, and do not reflect the true returns experienced by holders of interests in the Account.").

[880] Doc. 227 at 21.

[881] Ex. P46,  Edwards Dep. at 117:5-8

in its recommended line-up without conducting any evaluation.[882]

| Asset Class | Investment Name | Ticker | 3 yr RAP | 5 yr RAP | 3 yr Peer | 5 yr Peer | 3 yr Style | 5 yr Style | Expense | Total Quant | Total Quant |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Direct Real Estate**** | TIAA Real Estate | | - | - | - | - | - | - | - | - | - |

Historical performance data for the TIAA Real Estate Account was available in July 2013, but not utilized by CAPTRUST.[883] For the University System of Maine in July 2013 CAPTRUST compared the TIAA Real Estate Account to the Dow Jones US Select REIT and Morningstar Specialty-Real Estate benchmarks.[884] CAPTRUST's evaluation showed that the TIAA Real Estate Account underperformed significantly against both indexes over the year to date, one, three, five and ten-year periods.[885]



By December 2014, CAPTRUST evaluated the TIAA Real Estate Account's unadjusted returns against the NACREIF Property Index and Morningstar Specialty-Real Estate Universe.[886]

---

[882] Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 48; Ex. P88, Ciccotello Tr. at 110:24-113:9 ("Q. Sure. Do you see any appropriate performance-related information for the TIAA Real Estate Account in this presentation? A. So in this presentation I just – I see nothing but dashes.") ; Ex. P23, Strodel Tr. at 185:18-25; Ex. P8, Bursic Tr. at 223:6-225:1; Ex. P7, Opperman Tr. at 250:2-4; Doc. 249-18, Ex. 106, Expert Report of W. Dominguez, ¶¶ 103-105.
[883] Ex. P105, TIAA Real Estate Account's Quarterly 8-K (TIAA_CORNELL_00026051) at 4.
[884] Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 68.
[885] Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 68.
[886] Ex. P89, Quarterly Review for Period Ending September 30, 2014 (CORNELL015005) at 28, 51; Ex. P23, Strodel Tr. at 145:8-24; Ex. P106, TIAA Real Estate Account 8-K dated March 10, 2015 ("adjusted performance

The Cornell Defendants' expert opines that using unadjusted returns to measure the performance of the TIAA Real Estate Account was inappropriate.[887]  Plaintiffs' expert explains that using the unadjusted returns, the TIAA Real Estate Account had significant underperformance.[888] After this litigation was commenced, Cornell now takes the position that what CAPTRUST did, and the data Cornell relied upon, comparing the TIAA Real Estate Account's unadjusted returns, is a "flat-out mischaracterization" of how the TIAA Real Estate Account should be compared against an NCREIF index.[889] Additionally, Cornell's former Chief Investment Officer testified removing the lowest performing portion of a fund to compare it to a benchmark "doesn't make sense."[890]

116.    In compiling its recommended list of core funds, the RPOC's investment menu subcommittee thoroughly assessed the appropriateness of the TIAA Real Estate Account.[891]  It determined that it was an appropriate investment to include among the recommended list of "core" funds in Tier II.[892]  TIAA Real Estate was recommended by CAPTRUST and satisfied the applicable standards for distinct investments.[893]  RPOC adopted the subcommittee's recommendation that TIAA Real Estate be included in the Tier II lineup as a core "real estate" investment option for participants with accounts on TIAA's platform.[894]

---

figures are designed for use of Account investors for comparison purposes only, and do not reflect the true returns experienced by holders of interests in the Account.").

[887] Doc. 240-7–240-12, Expert Report of John Chalmers at ¶¶ 57-58.

[888] Ex. P89, Quarterly Review for Period Ending September 30, 2014 (CORNELL015005) at 28, 51; Doc. 249-18, Ex. 106, Expert Report of Wendy Dominguez at ¶¶ 102-105, 107; Ex. P106, TIAA Real Estate Account 8-K dated March 10, 2015 ("adjusted performance figures are designed for use of Account investors for comparison purposes only, and do not reflect the true returns experienced by holders of interests in the Account.").

[889] Doc. 227 at 21.

[890] Ex. P46, Edwards Dep. at 117:5-8

[891] Doc. 250-16, Ex. 16, Bursic Decl. ¶ 9-10.

[892] Doc. 250-16, Ex. 16, Bursic Decl. ¶ 9-10.

[893] Doc. 241-1, Ex. 90, July 2013 RPOC Meeting Presentation, at 12, 16, 48 (CORNELL020103); doc. 241-3, Ex. 92, September 2014 RPOC Meeting Presentation, at 46 (noting "Passing" score for CREF Stock and TIAA Real Estate as "Distinct Investments").

[894] Doc. 252-8, Ex. 78, September 2013 RPOC Meeting Minutes, at 2 (CORNELL016457) (adopting investment lineup subcommittee recommendations); doc. 241-2, Ex. 91, September 2012 Proposed Core Fund Lineup for Faculty Review, at 2 (CORNELL020056) (providing a "strong recommendation" with respect to CREF Stock's inclusion in core lineup); Doc. 250-16, Ex. 16, Bursic Decl. ¶¶ 10-11.

**RESPONSE**: Plaintiffs dispute paragraph 116.  The Cornell Defendants do not cite to admissible evidence to support the purported fact in the first sentence of paragraph 116. Plaintiffs dispute the second through third sentences of paragraph 116.  CAPTRUST recommended that Cornell include the TIAA Real Estate Fund in its recommended line-up without conducting any evaluation.[895]

| Asset Class | Investment Name | Ticker | 3 yr RAP | 5 yr RAP | 3 yr Peer | 5 yr Peer | 3 yr Style | 5 yr Style | Expense | Total Quant | Total Quant |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Direct Real Estate**** | TIAA Real Estate | - | - | - | - | - | - | - | - | - | - |

Historical performance data for the TIAA Real Estate Account was available in July 2013, but not utilized by CAPTRUST.[896] For the University System of Maine in July 2013 CAPTRUST compared the TIAA Real Estate Account to the Dow Jones US Select REIT and Morningstar Specialty-Real Estate benchmarks.[897] CAPTRUST's evaluation showed that the TIAA Real Estate Account underperformed significantly against both indexes over the year to date, one, three, five and ten-year periods.[898]

---

[895] Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 48; Ex. P88, Ciccotello Tr. at 110:24-113:9 ("Q. Sure. Do you see any appropriate performance-related information for the TIAA Real Estate Account in this presentation? A. So in this presentation I just – I see nothing but dashes.") ; Ex. P23, Strodel Tr. at 185:18-25; Ex. P8, Bursic Tr. at 223:6-225:1; Ex. P7, Opperman Tr. at 250:2-4; Doc. 249-18, Ex. 106,  Expert Report of W. Dominguez, ¶¶ 103-105.

[896] Ex. P105, TIAA Real Estate Account's Quarterly 8-K (TIAA_CORNELL_00026051) at 4.

[897] Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 68.

[898] Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 68.



By December 2014, CAPTRUST evaluated the TIAA Real Estate Account's unadjusted returns against the NACREIF Property Index and Morningstar Specialty-Real Estate Universe.[899] The Cornell Defendants' expert opines that using unadjusted returns to measure the performance of the TIAA Real Estate Account was inappropriate.[900]  Plaintiffs' expert explains that using the unadjusted returns, the TIAA Real Estate Account had significant underperformance.[901] After this litigation was commenced, Cornell now takes the position that what CAPTRUST did, and the data Cornell relied upon, comparing the TIAA Real Estate Account's unadjusted returns to the NCREIF, is a "flat-out mischaracterization" of how the TIAA Real Estate Account should be compared against an NCREIF index.[902] Additionally, Cornell's former Chief Investment Officer

---

[899] Ex. P89, Quarterly Review for Period Ending September 30, 2014 (CORNELL015005) at 28, 51; Ex. P23, Strodel Tr. at 145:8-24; Ex. P106, TIAA Real Estate Account 8-K dated March 10, 2015 ("adjusted performance figures are designed for use of Account investors for comparison purposes only, and do not reflect the true returns experienced by holders of interests in the Account.").
[900] Doc. 240-7–240-12, Expert Report of John Chalmers at ¶¶ 57-58.
[901] Ex. P89, Quarterly Review for Period Ending September 30, 2014 (CORNELL015005) at 28, 51; Doc. 249-18, Ex. 106, Expert Report of Wendy Dominguez at ¶¶ 102-105, 107; Ex. P106, TIAA Real Estate Account 8-K dated March 10, 2015 ("adjusted performance figures are designed for use of Account investors for comparison purposes only, and do not reflect the true returns experienced by holders of interests in the Account.").
[902] Doc. 227 at 21.

testified removing the lowest performing portion of a fund to compare it to a benchmark "doesn't make sense."[903]

117.     While all plan investments were subject to periodic monitoring, the effect of including TIAA Real Estate in the Tier II lineup of "core" investment options was that it was reviewed more frequently and was subject to greater scrutiny to ensure that RPOC could continue to stand-by its "best-in-class" recommendation. As the meeting materials reflect, the Real Estate Account was reviewed on a quarterly basis once it was added to the core lineup in 2013 and each time CAPTRUST advised RPOC that the account remained in good standing and met the IPS guidelines for distinct investments.[904]

**RESPONSE**: Plaintiffs dispute paragraph 117.  The Cornell Defendants do not cite to admissible evidence to support the purported fact in the first sentence of paragraph 117. CAPTRUST recommended that Cornell include the TIAA Real Estate Fund in its recommended line-up without conducting any evaluation.[905]

| Asset Class | Investment Name | Ticker | 3 yr RAP | 5 yr RAP | 3 yr Peer | 5 yr Peer | 3 yr Style | 5 yr Style | Expense | Total Quant | Total Quant |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Direct Real Estate**** | TIAA Real Estate | | - | - | - | - | - | - | - | - | - |

---

[903] Ex. P46, Edwards Dep. at 117:5-8
[904] Doc. 241-1, Ex. 90, July 31, 2013 RPOC Meeting Presentation, at 48 (CORNELL020103). Doc. 241-3, Ex. 92, September 2014 RPOC Meeting Presentation, at 46 (CORNELL013567); Doc. 241-4, Ex. 93, December 2014 RPOC Meeting Presentation, at 20 (CORNELL028976); Doc. 241-5, Ex. 94, June 2015 RPOC Meeting Presentation, at 18 (CORNELL019795); Doc. 252-9, Ex. 79, September 2015 RPOC Meeting Presentation, at 18 (CORNELL013700); Doc. 241-6, Ex. 95, December 2015 RPOC Meeting Presentation, at 18 (CORNELL011357); Doc. 249-2, Ex. 97, March 2016 RPOC Meeting Presentation, at 30 (CORNELL020909); Doc. 249-1, Ex. 96, June 2016 RPOC Meeting Presentation, at 27 (CORNELL013413); Doc. 249-3, Ex. 98, September 2016 RPOC Meeting Presentation, at 23 (CAPTR_0006755).
[905] Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 48; Ex. P88, Ciccotello Tr. at 110:24-113:9 ("Q. Sure. Do you see any appropriate performance-related information for the TIAA Real Estate Account in this presentation? A. So in this presentation I just – I see nothing but dashes.") ; Ex. P23, Strodel Tr. at 185:18-25; Ex. P8, Bursic Tr. at 223:6-225:1; Ex. P7, Opperman Tr. at 250:2-4; Doc. 249-18, Ex. 106, Expert Report of W. Dominguez, ¶¶ 103-105.

The TIAA Real Estate Account was not reviewed at all in 2013.[906]  The RPOC did not meet in the second quarter of 2014, so they could not have monitored the performance on a "quarterly basis."[907]  The underlying data provided in December 2014 provided that the TIAA Real Estate Account's one, three, five and ten-year returns ranked in the bottom 90% to 100% (1% is best) of its CAPTRUST assigned peer group.[908]

| | TIAA Real Estate Account | Peer Group Rank | NACREIF Property Index |
|---|---|---|---|
| **KEY MEASURES / 5 YEAR** | | | |
| Standard Deviation | 4.64 | 0% | 2.71 |
| Sharpe Ratio | 2.06 | 0% | 4.01 |
| Alpha | -8.39 | 100% | 0.00 |
| Beta | 1.65 | 0% | 1.00 |
| R-Squared | 93.09 | 0% | 100.00 |
| Up Mkt Capture | 94.38 | 95% | 100.00 |
| Down Mkt Capture | 242.50 | 100% | 100.00 |
| Information Ratio | -0.56 | 100% | NA |
| **TRAILING RETURNS** | | | |
| Last Qtr. | 2.32 | -- | 2.63 |
| YTD | 8.19 | -- | 8.51 |
| 1 Year | 9.94 | 93% | 11.26 |
| 3 Years | 10.22 | 100% | 11.08 |
| 5 Years | 9.68 | 99% | 10.99 |
| 10 Years | 4.74 | 92% | 8.55 |

Contrary to Cornell's assertion that "as the meeting materials reflect, the Real Estate Account was reviewed on a quarterly basis once it was added to the core lineup in 2013" Cornell does not cite *any* meeting materials from July 2013 until September 2014.

118.     In addition to the quarterly due diligence reviews performed by CAPTRUST, RPOC also received in-depth investment reports for the TIAA Real Estate Account, which enabled them to independently evaluate a variety of metrics used to assess its performance and

---

[906] Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 48; Ex. P13, December 4, 2013 RPOC Meeting Minutes (CAPTR_0047915); Ex. P14, March 21, 2014 RPOC Meeting Minutes (CAPTR_0004284); Ex. P15, September 17, 2014 RPOC Meeting Minutes (CAPTR_0004286).
[907] Doc. 241-1, Ex. 90, July 31, 2013 RPOC Meeting Presentation, at 48 (CORNELL020103).; Ex. P14, March 21, 2014 RPOC Meeting Minutes (CAPTR_0004284); Ex. P15, September 17, 2014 RPOC Meeting Minutes (CAPTR_0004286).
[908] Ex. P89, RPOC Quarterly Review for the Period Ending September 30, 2014 (CORNELL015005) at 51.

strength as a "core" investment option.  These reports included benchmarking data, the

investment's Sharpe-ratio, risk-adjusted return data, and other relevant quantitative and

qualitative information.[909] As indicated by these in-depth reviews, the TIAA Real Estate's fees

were well below the peer group benchmark and its performance closely tracked that of its

benchmarks on an adjusted basis.[910]

      **RESPONSE:**  Plaintiffs dispute the first sentence of paragraph 118.  The Cornell

Defendants do not cite to admissible evidence support the purported fact in the first sentence of

paragraph 118.

      Plaintiffs dispute the second sentence of paragraph 118.  The TIAA Real Estate Account

was not reviewed at all in 2013.[911]  When CAPTRUST provided investment due diligence

information to Cornell in July 2013, it only provided an "investment scorecard" (a/k/a the

dashboard system) that provided an executive summary with no information (sharpe-ratios, risk-

adjusted returns, and other relevant quantitative and qualitative data) about the actual underlying

performance of specific investment options in the Plans.[912]

---

[909] Doc. 249-5, Ex. 99, December 2014 Core Fund "Full Review," at 51 (CAPTR_007213).

[910] Doc. 249-5, Ex. 99, December 2014 Core Fund "Full Review," at 51 (CAPTR_007213).

[911] Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 48; Ex. P13, December 4, 2013 RPOC Meeting Minutes (CAPTR_0047915); Ex. P14, March 21, 2014 RPOC Meeting Minutes (CAPTR_0004284); Ex. P15, September 17, 2014 RPOC Meeting Minutes (CAPTR_0004286).

[912] Ex. P93, CAPTRUST Financial Advisors Formal RFP Response (CORNELL011415), at 12 (excerpt reproduced in body below); Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122); Ex. P12, July 31, 2013 RPOC Meeting Minutes (CAPTR_0047921) at 3 ("CAPTRUST provided the RPOC with a high level review of the current 250+ funds on the various platforms").

Shown below is an example of the investment scorecard which is reviewed on quarterly with the plan committee. It presents an executive summary of the performance of the investment funds relative to the evaluation criteria of the IPS. Our goal in all reporting and services to the plan committee is to provide executive summaries of meaningful specifics that allow the committee to make decisions and maintain strategic oversight of all plan functions.

| INVESTMENT | QUANTITATIVE | | | | | | | QUALITATIVE | | | TOTALS |
| | Risk-Adjusted | | vs. Peers | | Style | | Exp. Ratio | Fund Mgmt | Fund Family | Overall | Total Score |
| | 3 yr | 5 yr | 3 yr | 5 yr | 3 yr | 5 yr | | | | | |
| Vanguard Short-Term Federal Adm | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | 93 |
| PIMCO Total Ret Inst | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | 97 |
| Oakmark Equity & Income I | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | 98 |
| T. Rowe Price Equity Income | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | 90 |
| Vanguard Windsor II Adm | ● | ● | ● | ● | ● | ● | ● | ▽ | ● | ● | 83 |
| Selected American Shares D | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | 86 |
| Amer Funds Grth Fund R5 | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | 86 |
| Fidelity Contrafund | ● | ● | ● | ● | ● | ● | ● | ● | ▽ | ● | 92 |
| Fidelity Low Priced Stock | ● | ● | ● | ● | ● | ● | ● | ● | ▽ | ● | 92 |
| Vanguard Ext Mkt Idx Signal | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | 89 |
| Fidelity Mid Cap Stock | ● | ● | ● | ▽ | ● | ● | ● | ● | ▽ | ● | 84 |
| Dodge & Cox Intl Stock | ● | ● | ● | ● | ● | ● | ● | ● | ▽ | ● | 97 |
| Amer Funds EuroPac R5 | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | 100 |

While CAPTRUST did not provide underlying performance data to Cornell, it routinely provided the underlying performance data necessary to verify the entries in the investment scorecard to other retirement plan clients, referred to as "FUND FACTS SHEETS & COMPARISONS" as part of its normal process.[913]

A fiduciary must have underlying performance data in order to verify or dispute information found in the investment scorecard.[914]  Cornell cites the December 2014 fund review to support the proposition that the TIAA Real Estate Account was evaluated using a variety of metrics demonstrating that CAPTRUST did not provide any underlying performance data to the RPOC Committee that would allow the RPOC to evaluate, validate or dispute CAPTRUST's

---

[913] Ex. P60, Schmitt Tr. at 71:20-73:3; Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 26, 39-70; Ex. P101, CAPTRUST Presentation for The University of Maine System 1st Quarter, 2015 at PDF 489, 564-609.

[914] Ex. P88, Ciccotello Tr. at 26:2-27:18; 66:13-67:5; 77:10-78:1; 78:13-79:19; 97:3-100:24; 118:21-121:1; Ex. P46, Edwards Tr. at 63:13-64:16; Ex. P87, e-mail between Cornell and outside counsel dated October 3, 2012 (CORNELL013947) at PDF 2 ("If CAPTRUST has not been providing the RPOC with information about the plans' investment options, then there is significant risk that the DOL or a Plan participant could question whether the RPOC has been satisfying its fiduciary responsibility."); Doc. 249-18, Ex. 106,  Expert Report of W. Dominguez, ¶¶ 68, 81.

green, yellow, red investment scorecard entries until the RPOC's December 3, 2014 meeting, when it only provided underlying information for the core line-up.[915]

Plaintiffs dispute the third sentence in paragraph 118. The underlying data provided in December 2014 provided that the TIAA Real Estate Account's one, three, five and ten-year returns ranked in the bottom 90% to 100% (1% is best) of its CAPTRUST assigned peer group.[916] The TIAA Real Estate Account's expense ratio was 17 basis points higher than the other actively managed real estate fund in the core line up.[917]

## PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACT

### I.   BACKGROUND

119.   The governing plan documents for the CURP and TDA name "the employer" as the Plan Administrator and named fiduciary for the Plans.[918]

120.   Cornell has recognized that CURP was subject to ERISA since at least 2004.[919]

121.   On April 7, 2011 Cornell has delegated some of its authority to the Retirement Plan Oversight Committee (RPOC).[920] "The primary duties and responsibilities of the RPOC shall be to provide policy oversight for the selection of investment options for the Plans by

---

[915] Ex. P89, Quarterly Review for 3rd Quarter, 2014 (CORNELL015005) at 16-93; Ex. P133, E-mail attaching Quarterly Review for 3rd Quarter, 2014 (CORNELL15001); Ex. P7, Opperman Tr. at 77:12-79:12.

[916] Ex. P89, RPOC Quarterly Review for the Period Ending September 30, 2014 (CORNELL015005) at 51.

[917] Ex. P89, RPOC Quarterly Review for the Period Ending September 30, 2014 (CORNELL015005) at 51 (TIAA Real Estate Account 92 bps) and 92 (Cohen & Steers Instl Realty Shares 75 bps ratio)(both use the same expense ratio as comparators, 135 bps).

[918] Doc. 250-3, 2008 CURP Plan Adoption Agreement (CORNELL015512) at 2 (providing Cornell is the employer); Doc. 250-4, 2008 CURP Plan Document (CORNELL015526) at 20 ("Plan Administrator means the Employer unless the Employer designates another person or person to held the position of Plan Administrator"); Doc. 250-5, 2008 TDA Plan Adoption Agreement (CORNELL015527) at 2 (providing Cornell is the employer); Doc. 250-6 2008 TDA Plan Document (CORNELL015535) at 20 20 ("Plan Administrator means the Employer unless the Employer designates another person or person to held the position of Plan Administrator"), Ex. P134 2017 TDA Plan Department of Labor Form 5500.

[919] Ex. P1, 2004 CURP Summary Plan Description (CORNELL0000725) at 736-37.

[920] Doc. 250-17, 2011 RPOC Committee Charter (CORNELL015812).

means of the IPS, and establish criteria to review and monitor the investment performance of the

investment options, and update the IPS as required.[921]

122.    The Chair of RPOC is the "Vice President for Human Resources of Cornell

University."[922] From RPOC's inception until at least the close of fact discovery Mary Opperman

has been the Chair of RPOC.[923] As Chair of RPOC, Ms. Opperman determines the number of

members of RPOC and appoints members of RPOC.

123.    From 2010 to 2017, the CURP's assets grew by approximately $747 million or

over 51% and the TDA Plans assets grew by approximately $645 million or over 74%.[924]

Specifically, between 2010 and 2017, the CURP grew in assets from $1.461 billion and 20,995

participants (2010) to $2.208 billion and 5,563 participants (2017). Over this same period, the

TDA Plan grew from $881 million and 12,427 participants (2010) to $1.536 billion and 11,746

participants (2017).[925]

## II.    THE CORNELL DEFENDANTS HAD CONTROL OVER AND THE ABILITY TO MAP PLAN ASSETS

124.    The CURP and the TDA Plan are governed by the their respective plan

documents.[926]

---

[921] *Id.* at 2.

[922] *Id.*

[923] Doc. 250-19, Nov. 29, 2010 RPOC Meeting Minutes [GET BATES NUMBER DEPO EX. 49] ("The first meeting of the Cornell University Retirement Plan Oversight Committee was called to order at 1:00 pm by the Committee Chair, Mary Opperman."); Ex. P135, April 30, 2018 RPOC Meeting Minutes (CORNELL029038) (listing Mary Opperman as Chair)

[924] Ex. P136, 2010 CURP Department of Labor Form 5500 (CORNELL022506) at line Schedule A, 6g, Schedule H, line 1i; Ex. P137 2017 CURP Department of Labor Form 5500, *available at* https://www.efast.dol.gov/portal/app/disseminatePublic?execution=e2s3# at Schedule C, line 6g, Schedule H, line 1i; Ex. P136, 2010 Department of Labor Form 5500 (CORNELL022536), at Schedule C, line 6g, Schedule H;

[925] Ex. P136, 2010 CURP Department of Labor Form 5500 (CORNELL022506) at line Schedule A, 6g, Schedule H, line 1i; Ex. P137, 2017 CURP Department of Labor Form 5500, *available at* https://www.efast.dol.gov/portal/app/disseminatePublic?execution=e2s3# at Schedule C, line 6g, Schedule H, line 1i.

[926] *See supra* ¶119.

125.     Both plan documents expressly provide "[t]he Employer in its sole discretion will designate from time to time the specific Funding Vehicles which are available as Plan investments. The Employer may change such designation at any[]time."[927]

126.     TIAA annuities with individual contracts are among the investments made available by Cornell under the Plans.

127.     ███████████████████████████████████████████████
███████████████.[928]

128.     The Plans used the Retirement Annuity ("RA"), Group Retirement Annuity ("GRA"), Supplement Retirement Annuity ("SRA") and Group Retirement Supplement Annuity ("GRSA") contracts.[929]

129.     No provision of the RA, GRA, SRA, or GSRA contracts addresses transfers by plan sponsors, let alone prohibits it.[930]

130.     The RA and GSRA contracts expressly provide "[t]he contract is subject to the provisions, terms and conditions of the employer Plan. Any payment, distribution, transfer, or other rights exercised under the contract shall comply with any applicable terms, provisions, and conditions of the employer plan as determined by the plan administrator, trustee, or other plan designated fiduciary."[931]

---

[927] Doc. 250-4, 2008 CURP Plan Document (CORNELL015526), at 100; Doc. 250-6, 2008 TDA Plan Document (CORNELL015535), at 100.

[928] Ex. P25, Polacek Dep., at 17:3-6, 22:9–23:2.

[929] Doc. 247-7, Ex. 37, Dec. 31, 2009 Fee and Expense Disclosure for TDA Plan (TIAA_CORNELL_00002094) at 95 (listing RA, GRA, GSRA, SRA contracts); Ex. P29, Dec. 31, 2017 Fee and Expense Disclosure for TDA Plan (TIAA_CORNELL_00009808) at 09 (listing RA, GRA, GSRA, SRA and RCP contracts); Ex. Doc. 247-8, Ex. 38, Dec. 31, 2009 Fee and Expense Disclosure for CURP (TIAA_CORNELL_00011306) at 07 (listing RA and GRA contracts); Ex. P30, Dec. 31, 2017 Fee and Expense Disclosure for CURP (TIAA_CORNELL_00018669) at 70 (listing RA, GRA and RCP contracts).  The RCP contracts are used for the Plans' revenue credit account and not offered to Plan Participants. Ex. P31, CORNELL013913; Ex. P9, Gallagher Dep. at 364:23–365:10.

[930] See, e.g., Ex. P32, PLTF-Cornell-000340; Ex. P33, PLTF-Cornell-000356.

[931] See, e.g., Ex. P32, PLTF-Cornell-000340 at p. E1; Ex. P33, PLTF-Cornell-000356 at p. E1.

131.    The RA and GRA contracts also expressly state that:



132.    The TIAA Annuity contracts also contain a provision stating it will administer the contract in compliance with all laws and regulations and if the contract conflicts with the law or regulation prevails.[933]

133.    Thus, the terms of the RA, GRA, SRA, and GSRA contracts did not prevent plan sponsors from mapping or transferring the assets in such annuities to other investments.

134.    Consistent with this interpretation, TIAA executives have admitted that they facilitated plan sponsors mapping of funds in the CREF Money Market Account, a variable annuity with RA, SRA and GRA contracts, without participant consent.[934]

135.    ███████████████████████████████████████

████████████████████[935]

---

[932] *See, e.g.*, Ex. P34, GRA Contract (TIAA_CORNELL_00020571) at 598; Ex. P35, CREF Stock RA Certification (TIAA_CORNELL_00001451) at 1474; Ex. P36 TIAA_CORNELL_00001517, at 1535; Ex. P37, TIAA_CORNELL_00001481 at 1508.

[933] *See, e.g.*, Ex. P36, TIAA_CORNELL_00001517 at 1534; Ex. P37, TIAA_CORNELL_00001481 at 1501, 1507; Ex. P35, TIAA_CORNELL_00001451 at 1471.

[934] Ex. P27, Tr. of Trial, *Sacerdote v. New York University*, No. 16-6284, Tr. 677:19–678:9; *see also id.* at 678:12–679:7  (Q. And you also have, TIAA has also mapped assets that were in the money market account for a one-time opportunity, a one-time occasion, correct? A. Yes.  We did offer -- I'm not expert on that, but there was an opportunity because of the very low interest rates to do things with the money market account when needed, if applicable. Q. And TIAA and the employers map those money market accounts into some other fund in the plan. Right? A. Correct. Q. Without the permission or voluntary participation by investors. A. There's a one-time opportunity, yes. Q. So TIAA did map assets from annuity accounts out of those accounts without participant agreement.  Correct? A. Money market balances only.) As discussed above, Plaintiffs believe that Mr. Chittenden's testimony from *Sacerdote* is admissible as a prior inconsistent statement in this case.

[935] Ex. P25, Polacek Dep., at 23:15–24:18."

136.    Even TIAA agrees that Retirement Choice and Retirement Choice Plus contracts are fully mappable by the plan sponsor and provide greater liquidity for the plan participant.[936]

137.    TIAA has encouraged the Cornell Defendants to move to Retirement Choice and Retirement Choice Plus contracts for among other reasons to "[i]mprove overall plan management," and to provide "[i]nstitutional ownership and greater institutional control."[937]

138.    Cornell never even considered moving to Retirement Choice or Retirement Choice Plus contracts in 2005 or anytime thereafter.[938]

139.    The only justification Cornell's experts provided for failing to move to the Retirement Choice or Retirement Choice Plus Contracts was that the RA, SRA and GRA contracts had higher minimum crediting ratings (there is no evidence the Defendants ever evaluated the benefits of the Retirement Choice contract themselves).[939]

---

[936] *Id.* at 51:1–52:16.

[937] Ex. P138, July 19, 2017 TIAA Driving Better Outcomes for Your Plan (CAPTR_0046852), at 854.

[938] Ex. P8, Bursic Tr.at 233:3–234:4 (testifying he "never really had a long discussion with them about that, to my recollection.  I may have had some introductory things involved there by I can't quite remember."); Prasad Dep. at 219:7–220:13 (testifying he did not recall any discussion of the Retirement Choice or Retirement Choice Plus Contracts if it was not in the RPOC meeting materials); Gallagher Dep. at 365:2-11 (testifying he recalled some discussion but was not sure "how seriously the committee considered it."); Doc. 250-19, November 29, 2010, CURP Meeting Minutes (CORNELL0021932); Ex.P10, February 3, 2011 CURP Meeting Minutes (CORNELL021930); Ex. P11, June 23, 2011 CURP Meeting Minutes (CORNELL021931); Doc. 248-8, Jan. 11, 2012 RPOC Meeting Minutes; Ex. P10, February 3, 2011 CURP Meeting Minutes (CORNELL021930); Ex. P11, June 23, 2011 CURP Meeting Minutes (CORNELL021931); Doc. 248-8, January 11, 2012 RPOC Meeting Minutes (CAPTR_0047903); Doc 248-14, April 13, 2012 RPOC Meeting Minutes (CAPTR_0047907); Doc. 248-9, July 24, 2012 RPOC Meeting Minutes (CAPTR_0047911); Doc. 252-5, November 19, 2012 RPOC Meeting Minutes (CAPTR_0047924); Ex. P12, July 31, 2013 RPOC Meeting Minutes (CAPTR_0047921); Doc. 252-8, September 30, 2013 RPOC Meeting Minutes (CAPTR_0047918); Ex. P13, December 4, 2013 RPOC Meeting Minutes (CAPTR_0047915); Ex. P14, March 21, 2014 RPOC Meeting Minutes (CAPTR_0004284); Ex. P15, September 17, 2014 RPOC Meeting Minutes (CAPTR_0004286); Ex. 63, Doc. 239-4, December 3, 2014 RPOC Meeting Minutes (CAPTR_00013586); Ex. P16, June 2, 2015 RPOC Meeting Minutes (CAPTR_0013598); Ex. P17, September 9, 2015 RPOC Meeting Minutes (CAPTR_0013573); Ex. P18, December 16, 2015 RPOC Meeting Minutes (CAPTR_0013594); Doc. 238-9, March 31, 2016 RPOC Meeting Minutes (CAPTR_0013568); Ex. P19, June 29, 2016 RPOC Meeting Minutes (CAPTR_0013565); Ex. P20, September 28, 2016 RPOC Meeting Minutes (CAPTR_0013580); Doc. 252-10, December 12, 2016 RPOC Meeting Minutes, (CAPTR_0013590); Ex. P49, April 14, 2017 RPOC Meeting Minutes (CAPTR_0013583); Ex. P50, June 23, 2017 RPOC Meeting Minutes (CAPTR_0013561); Ex. P51, September 27, 2017 RPOC Meeting Minutes (CAPTR_0013939); Ex. P52, December 11, 2017 RPOC Meeting Minutes (CAPTR_0015281).

[939] Doc. 246-4 (Expert Report of G. Poehler) ¶¶162-166.

140.     However, the minimum crediting rating only applies to the TIAA Traditional Annuity and does not apply to variable annuities like the TIAA Real Estate Account and the CREF Stock Account which do not have a crediting rating but whose returns are variable based on returns for the underlying assets of the variable annuity.[940]

141.     Therefore, the difference in minimum crediting rating had no effect on Cornell's decision not to move to Retirement Choice or Retirement Choice Plus Contracts for variable annuities such as the CREF Stock Account and TIAA Real Estate Account.[941]

142.     Moreover, the minimum crediting rating is merely a floor for the crediting rating that TIAA Traditional Annuity returns. Since they were created in 2005 and 2006, the actual returns for the Retirement Choice contracts have had a higher annual rate of return than the RA demonstrating that there is no economic benefit to the higher minimum crediting rating.[942] Additionally, the Retirement Choice contract has fallen below 3 percent minimum crediting rating for the RA, SRA and GRA contracts only for one single three-month period in its 13 year history.[943] Therefore, the difference in minimum crediting rating has never affected the return on the Retirement Choice and Retirement Choice Plus contracts. If Cornell had moved to Retirement Choice or Retirement Choice Plus Contracts in 2005 or the beginning of the class period, a significant portion of the Plans' assets would be in contracts the Defendants unquestionably controlled and could be mapped from imprudent investments or to obtain lower recordkeeping fees.

---

[940] Polacek Dep. at 81:19–83:8.
[941] *Id.*
[942] Ex. P139, RA Fund Fact Sheet, https://www.tiaa.org/public/pdf/ffs/878094101-RA.pdf; Ex. P140, RC Fund Fact Sheet;
https://www.tiaa.org/public/pdf/ffs/878094101-RC.pdf
[943] Ex. P138, July 19, 2017 TIAA Driving Better Outcomes for Your Plan (CAPTR_0046852) at 858.

143.     Even if the Defendants could not map or transfer investments from RA, GRA, SRA and GSRA contracts, the Cornell Defendants could have informed participants of their right to transfer assets invested in the CREF Stock Account and TIAA Real Estate Account to other investment options or group contracts to help lower costs for participants on a prospective basis by leveraging the Plans' size, as other universities have done.[944]

144.     When plan sponsors freeze assets and encourage participants to transfer their funds, most participants would transfer the assets.[945]

## III.     THE PLANS' UNREASONABLE RECORDKEEPING AND ADMINISTRATIVE EXPENSES

### A.     Prudent Practices for the Monitoring and Assessment of Recordkeeping Fees

#### 1.     Prudent fiduciaries conduct an RFP for recordkeeping and administrative services every three to five years

145.     Widely accepted industry practice in the defined contribution market is to conduct a request for proposal ("RFP") for recordkeeping and administrative services every three to five years to ensure that prices are reasonable. For example, in April 2011, the Cornell Defendants held an RFP for investment advisors for the Plan.[946] Among the services requested in that RFP was for "a consulting partner with proven expertise in advising plan sponsors on the administrative set up of . . . recordkeeping . . . for compliance and proper management of the plans."[947] Seven different investment advisors responded to this RFP and the three recordkeepers for the Plans and plans of Weill Cornell, TIAA, Fidelity and Vanguard, declined to respond.[948]

---

[944] Doc. 249-020, Expert Report of Ty. Minnich ¶¶96-98.
[945] *Id. see also* Ex. P8, Bursic Tr.at 220:10–222:19 (testifying that many participants at Duke completely transferred their money out of TIAA investments when Duke began offering other options without any encouragement).
[946] Doc. 246-1, April 1, 2011 Investment Consultant Request for Proposal (CORNELL021910).
[947] *Id.* at 2.
[948] Ex. P141, Retirement Plan Oversight Committee, Executive Summary of Request for Proposal (CORNELL019405) at 2-3.

██████████████████████████████████████████

███████████████████████████████████████████

████████████████[949]███████████████████████████████

███████████████[950]

146.     The principle that conducting an RFP every three to five years is industry practice is similarly consistent with statements of the Department of Labor. In 2010 proposed regulations the Department of Labor specifically noted "plans normally conduct requests for proposal (RFPs) from service providers at least once every three to five years."[951]

147.     Similarly, periodically conducting an RFP or an RFI to evaluate the reasonableness of recordkeeping fees was the Cornell Defendants' expert Glenn Poehler's practice when he advised defined contribution plans on the reasonableness of the recordkeeping fees. Mr. Poehler testified that the method he used to assess recordkeeping prior to the mid-2000s was to conduct an RFP.[952] In the mid-2000s, Mr. Poehler began using requests for information (RFIs) to evaluate the reasonableness of recordkeeping fees.[953] Mr. Poehler never used database benchmarking, like what CAPTRUST conducted for Cornell, during his time advising clients.[954] Mr. Poehler and his colleagues at Mercer used RFI's because their clients were "larger, more complicated plans, so the feeling was to get quotes that were as close as possible to the specific services that were needed for that plan, that an RFI process gave the client the information they needed to determine whether or not the fees were still  reasonable."[955]

---

[949] Ex. P61, Cammack LaRhette RFP Response (CORNELL006753) at 766.
[950] Ex. P62, Segal Advisors RFP Response (CORNELL006782), at 810-11.
[951] Ex. P63, Reasonable Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure, 75 FR 41600, 41625 (July 16, 2010).
[952] Ex. P2, Poehler Tr. at 31:17–32:5, 34:5-20,
[953] Ex. P2, Poehler Tr. at 38:23–39:10.
[954] Id. at 39:16-19.
[955] Id. at 87:16–88:3.

Mr. Poehler admitted that the Cornell Plans were so "large and complicated" that in practice he believed that an RFP or RFI was necessary to give "the client the information they needed to determine whether or not the fees were still reasonable."[956]

148.    Plaintiffs' Experts Ty Minnich, who worked in providing recordkeeping and administrative services for CitiStreet, MetLife and Transamerica for over thirty years, and Al Otto, who advised fiduciaries or was a co-fiduciary for numerous plans regarding recordkeeping fees for over 20 years, opined that standard industry practice is to conduct an RFP for recordkeeping and administrative service every three to five years.[957]

149.    As discussed below, the Cornell Defendants never conducted or seriously considered conducting an RFP or RFI for the Plans' recordkeeping and administrative services.[958]

### 2.    Prudent fiduciaries regularly monitor the total or per-participant fees that the plans pay for recordkeeping fees on a regular basis

150.    There are generally two primary methods by which the recordkeeping and administrative fees for a plan are assessed: asset-based fees (also called revenue sharing) and per-participant fees.[959] Asset-based fee arrangements charge fees based on a percentage of the assets investments.[960] Per-participant fees charge a fixed dollar amount per-participant (*e.g.*, $35 per-par participant).[961]

151.    As even the Cornell Defendants' expert on recordkeeping testified, there are "economies of scale in providing recordkeeping and administrative services" based on the

---

[956] *Id.* at 87:16–88:6
[957] Doc. 249-19, Expert Report of Al Otto, ¶27-34; Doc. 249-20, Expert Report of Ty Minnich ¶68.
[958] *See infra* at ¶¶ 166-169.
[959] Doc. 249-20, Expert Report of Ty Minnich ¶30; Ex. P9, Gallagher Dep. at 58:15-59:6.
[960] Doc. 249-20, Expert Report of Ty Minnich ¶35; Gallagher Dep. at 58:15-59:6.
[961] Doc. 249-20, Expert Report of Ty Minnich ¶36; Gallagher Dep. at 58:15-59:6.

number of participants.[962]  Based on these economies of scale, generally plans with more participants pay a lower fee on a per-participant basis than plans with fewer participants.[963] Additionally, as the Cornell Defendants' recordkeeping expert admitted, the amount of assets in a plan are unrelated to the cost of providing recordkeeping services to a plan.[964] Based on these economies of scale and the fact that recordkeeping costs have nothing to do with asset size, the Cornell Defendants' recordkeeping expert advised clients in practice that they should negotiate per-participant recordkeeping fees.[965] Mr. Poehler advised the asset based or "revenue approach" "allows vendors to widen profit margins more quickly through asset growth than would be possible by increasing revenues based on the increase in the number of participants."[966] Further, consistent with industry standards, Mr. Poehler advised "[h]ard dollar fee do not generally increase at the same rate as asset based fees since they are not tied to the growth in the market value of the plan's investments."[967] Because of this, Mr. Poehler ultimately concluded that "[f]rom a plan sponsor's governance perspective, hard-dollar, per participant fees are generally **more transparent** and **more accurately reflect the 'true' cost of providing administration**."[968]

152.    Consistent with Mr. Poehler's own advice his colleagues at Mercer also generally advised clients that best-practice was to price recordkeeping and administrative services on a per-participant rather than an asset basis because it is a better method to control costs and asset-based fees build in artificial fee increases.[969] One of Mercer's fiduciary best practices during Mr.

---

[962] Ex. P2, Poehler Dep. at 51:23–52:7
[963] *Id.* at 52:18–53:5.
[964] Id. at 55:18–56:11.
[965] *See* Ex P39, Glenn Poehler and Lanae Pranger, ICCFO Conference 403(B) Plan, April 26, 2012 at p. 5; Ex. P2, Poehler Dep. at 88:7–89:4 (authenticating Ex. ___),
[966] Ex P39, Glenn Poehler and Lanae Pranger, ICCFO Conference 403(B) Plan, April 26, 2012 at p. 5; Ex. P2, Poehler Dep. at 182:23–183:12
[967] Ex P39, Glenn Poehler and Lanae Pranger, ICCFO Conference 403(B) Plan, April 26, 2012 at p 5
[968] Ex P39, Glenn Poehler and Lanae Pranger, ICCFO Conference 403(B) Plan, April 26, 2012 at p. 5; Ex. P2, Poehler Dep. at 181:4–182:1 (testifying that he agreed with that statement)
[969] Ex. P2, Poehler Dep. at 169:20–170:4.

Poehler's tenure was to "[p]rice administrative fees on a per-participant basis."[970] Mr. Poehler's colleagues continued:

153.    ***"Negotiate a fixed-rate recordkeeping fee based on the number of participants*** with account balances in the plan, that is independent of the investment structure (referred to as an 'open architecture' model). This approach unlike an 'asset-based' or 'bundled' model, provides fee transparency and affords fiduciaries a sound basis for documenting the 'reasonableness' of recordkeeping fees. Conversely, ***utilizing a pricing model that is dependent on the market value of plan assets arbitrarily 'builds in' fee increases that are not linked to the level or quality of the recordkeepers services."***[971]

154.    Consistent with the advice that the Cornell Defendants received from the consultants that responded to their RFP and Mr. Poehler's advice when he advised clients at Mercer, Plaintiffs' experts, Ty Minnich and Al Otto, both opine that industry standard practice is to price or monitor recordkeeping and administrative fees on a per-participant basis.[972]

### 3.    Prudent fiduciaries leverage the size of the plans by consolidating to a single recordkeeper

155.    Widely accepted industry practice in the defined contribution market is that Plans should use a single recordkeeper in order to leverage plan size to achieve the lowest possible fee for the requested recordkeeping and administrative services. A number of the consultants who responded to the Cornell Defendants' 2011 RFP advised that they should consider consolidating to a single recordkeeper, noting that consolidation was a growing trend even among higher education 403(b) plans or discussing the cost savings that could be achieved through

---

[970] Ex. P40, Amy Reynolds and Sabrina Bailey, DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance", Ex. P2, Poehler Dep. at 170:9–171:19, 173:4-22.

[971] Ex. P40, Amy Reynolds and Sabrina Bailey, DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance (emphasis added); P2, Poehler Dep. at 173:23–174:10.

[972] Doc. 249-20, Expert Report of Ty Minnich, ¶¶33–39; Doc. 249-19, Expert Report of Al Otto, ¶¶20–25. 41-43.

consolidation. 

156.    Additionally, in January 2012, CAPTRUST advised the Cornell Defendants that consolidation to a single recordkeeper would result in the "best cost structure" for plan participants.[976]

157.

<hr />

[973] Ex. P28, August 16, 2011 Tower Watson Finalist Presentation (CORNELL015395) at 10.
[974] *Id.*
[975] Ex. P3, May 16, 2011 Hewitt ennisknupp Response to Request for Proposal (CORNELL024180), at 12, 17, 26.
[976] Doc. 248-43, Jan. 11, 2012 RPOC Meeting Materials (CAPTR_0009067), at 38.
[977] Ex. P4, May 13, 2011 Mercer Response to Request for Proposal (CORNELL015325), at 26-27.

158.     The Cornell Defendants' recordkeeping expert, Mr. Poehler, in practice advised

clients, including higher education 403(b) plans, to consolidate to a single recordkeeper. For

example, Mr. Poehler testified that his clients Cal Tech and Lehigh University consolidated to a

single recordkeeper in 2010 and 2014 based on his advice.[978] While Mr. Poehler could not recall

in his deposition if these consolidations resulted in reductions in fees,[979] his contemporaneous

presentation to Cornell in 2011 demonstrates that they likely did.[980]

159.     Additionally, the Cornell Defendants were aware that recordkeeper consolidation

would lead to significant fee reductions for participants because the Weill Cornell Medical

School plans consolidated to a single recordkeeper in 2017 leading to significant fee reductions

to participants.[981]

160.     Ty Minnich and Al Otto opine that consolidation to a single recordkeeper is an

industry recognized best practice because it leads to the lowest price structure and other

efficiencies.[982]

161.     As discussed below, the Cornell Defendants never seriously considered

consolidating to a single recordkeeper.[983]

**B.     The Cornell Defendants' Flawed Process for Evaluating Recordkeeping Fees**

**1.     The Cornell Defendants did nothing to monitor the Plans'
            recordkeeping and administrative fees prior to 2012**

162.     As the Cornell Defendants admit, prior to the creation of RPOC and the retention

of CAPTRUST, monitoring of the Plans' recordkeeping and administrative fees were delegated

---

[978] Ex. P2, Poehler Dep. at 131:11–133:123.
[979] *Id.*
[980] Ex. P4, May 13, 2011 Mercer Response to Request for Proposal (CORNELL015325), at 26-27
[981] Ex. P9, Gallagher Dep. at 61:3-13, 138:17-19; Ex. P48,  Prasad Dep. at 63:4-15; Ex. P135, April 30, 2018 RPOC
Meeting Minutes (CORNELL029038) at 2 (noting fee reductions from the Weill Cornell recordkeeper
consolidation).
[982] Doc. 249-20, Expert Report of Ty Minnich,  ¶¶72–73; Doc. 249-19, Expert Report of Al Otto,¶¶52–56.
[983] *See infra* at ¶¶174–179.

to Cornell's Benefits Services.[984] Cornell's Benefits Services from May 1997 until November

2016 was by Senor Director of Benefits Services, Paul Bursic.[985] Bursic testified that he would

have been "fully" involved in any "significant decisions."[986]

163.    Contrary to what is implied in his declaration for this motion, Bursic repeatedly

testified at his deposition that prior to the retention of CAPTRUST in December 2011, the

Cornell Defendants were not aware what the Plans were paying for recordkeeping and

administrative services, the Cornell Defendants did not know how to determine the

recordkeeping and administrative fees the Plans were paying, and the Cornell Defendants made

no attempt to benchmark or even negotiate their recordkeeping and administrative fees with

TIAA or Fidelity prior to the retention of CAPTRUST.[987]

---

[984] Doc. 233 ¶¶13-14

[985] Ex. P8, Bursic Tr.at 24:12-25:1. Bursic's original title at Cornell was Director of Benefit Services and Administration and he was later promoted to Senior Director prior to his retirement. *Id.*

[986] *Id.* at 26:1-15 ("Q. And what generally was your responsibility for Cornell's retirement plans. A. Oh, I think significant. I mean, I was the Director of Benefits, *so any time there were significant decisions, then I was certainly involved fully.* I won't deny that and I assert that, in fact, that that was part of it. Mostly what they did were customer service kinds of things: Publication of materials, communications, coordinating things with vendors and everything, but when it came around to important things like the formulation of -- formation of RPOC, for instance, that I'm sure you'll get to, that was something that I was one of the originators on.") (emphasis added).

[987] Ex. P8, Bursic Tr.at 92:7-17 ("Q. So the fees are charged as a percentage of the assets held by the participants? A. We've been through this before. The fees used to be kind of covered. *We really couldn't see what they were, so the best way of saying it was that it was a percentage of the assets held in the plan. When CAPTRUST came, by that time things had evolved that CAPTRUST was able to pull the veil off of that and make the vendors state what their costs were for all the different things that they did and how that added up, so what they really needed to cover.*") emphasis added); *id.* at 92:21–95:14 ("Q. What did CAPTRUST pull the veil off of then? A. Let me restate what I said. Prior to CAPTRUST being there, the vendors were very reluctant to release any information whatsoever about the various things that went into the sum of the investment advisory fee or expense ratio or whatever you want to call it. They all called it different things and according to what the subject was they called it different things. That doesn't mean that we didn't know what it was. *We knew what the total was. It was there. We've asked them to report it. Remember the vendor performance summary. We always asked for the expense ratio. That's the same thing. So the expense ratio was there. We knew what it was. What I said, and I'll say it again, is that we couldn't see the detail because the companies refused to let us. CAPTRUST though had the ability to come in, lift that veil and say, okay, TIAA-CREF and Fidelity in our case, what's all this about? Tell me what it really costs to do all of these things because we're here to make sure that we're doing the best job for Cornell and getting the lowest possible fees.* They lifted that cover, my metaphor. I'm sorry if it confused you. We lifted the cover and they looked at it and we were able to get much closer to the actual accounting of the costs of the plan and that's the value that RPOC set up by getting CAPTRUST or if we had picked any of the other companies, they were all doing it at that point. Our peers let us know that they were all sitting down with TIAA-CREF, Fidelity, T. Rowe Price, Vanguard, everybody, whatever your group of vendors were, they were all doing it and the vendors were forced by market forces to lift that veil and give us an opportunity to look at it. *So did we know what the expense ratio was before? Of course. Did we know more about the constituent elements of that? Yes, after the veil was lifted and we were able to get in there and*

164.    Additionally, any review of negotiations supervised by Mr. Bursic would have been limited to the total expense ratio of the funds in the Plans and would not have appropriately separately evaluated recordkeeping fees. In fact, Mr. Bursic testified that he believed that it was imprudent evaluate the Plans' fees other than on a bundled total expense ratio basis.[988] In contrast to Mr. Bursic's practices, the Department of Labor and all the proffered recordkeeping experts, including the Cornell Defendants' expert, agree that recordkeeping and administrative fees need to be evaluated unbundled from the other services offered to a plan.[989]

165.    Additionally and again in conflict with his declaration, Mr. Bursic testified at his deposition that negotiators regarding the share classes or administrative fees would have been conducted by CAPTRUST.[990]

---

*the vendor started to cooperate with us. Q. Okay. So you're saying you understood the expense ratio but not the underlying components of the expense ratio? A. We were prohibited from finding out. They wouldn't give it to us.*") (emphasis added); *id.* at 99:2-102:1 (" . . . You keep coming back to this because I know you've got an agenda around this, and I'm going to have to keep answering you the same way over and over again. We're not splitting out record-keeping fees because it is intimately tied, like your right arm and your left arm. It's tied to the middle. And the middle is important. It's the entire slate of services that happen with this. If you want to talk about splitting out record-keeping fees, you've already done it. Stop asking questions about it because I keep giving you the same answer over and over again. The fee is the fee. *We didn't know what it was before. CAPTRUST came in; they discovered what the fee is.* They made it as low as possible for all of the categories, including record keeping, bundle it back up . . .") (emphasis added).

[988] Ex. P8, Bursic Dep., at 99:21–102:1 ("You keep coming back to this because I know you've got an agenda around this, and I'm going to have to keep answering you the same way over and over again. We're not splitting out record-keeping fees because it is intimately tied, like your right arm and your left arm. It's tied to the middle. And the middle is important. It's the entire slate of services that happen with this. If you want to talk about splitting out record-keeping fees, you've already done it. Stop asking questions about it because I keep giving you the same answer over and over again. The fee is the fee. We didn't know what it was before. CAPTRUST came in; they discovered what the fee is. They made it as low as possible for all of the categories, including record keeping, bundle it back up."); *id.* at 44:7-20 "Q. During your time at Cornell has Cornell ever done an RFP for record-keeping services? A. That is a very difficult approach and I will say, no, we did not, and there's a lot of reasons for that. Record-keeping services only, separated from the fund parent and from the services that are provided by the fund parent is not something that we would do. *It would not be prudent to issue an RFP, asking some company to do a specific task that's much more efficiently and effective -- accurately delivered as a bundle of services. So your specific question was on record-keeping services only? Frankly, I think that would be a crazy idea.*") (emphasis added).

[989] Ex. P41, DOL Advisory Op. 2013-03A, at 4 (July 3, 2013); Ex. P42, DOL Adv. Op. 97-15A (May 22, 1997); Ex. P43, DOL Adv. Op. 97-16A (May 22, 1997); Ex. P44, DOL Adv. Op. 97-19A (Aug. 28, 1997); Doc. 249-20, Expert Report of Ty Minnich, ¶127; Doc. 249-19, Expert Report of Al Otto, ¶¶ 35-36; Ex. P2, Poehler Dep., at .91:–92:11, 174:11-23.

[990] Ex. P8, Bursic Dep., at 236:24-237:14

## 2.     The Cornell Defendants failed to conduct a single RFP or RFI for recordkeeping and administrative services

166.     While industry accepted practice is to conduct a periodic RFP,[991] Cornell never conducted a single RFP for recordkeeping and administrative services.[992]

167.     The Cornell Defendants also never conducted even the "lower lying cousin" to an RFP, an RFI, for the Plans' recordkeeping and administrative services.[993] Even the Cornell Defendants' expert, Mr. Poehler, testified that in practice he conducted RFIs because they were necessary to evaluate the reasonableness of fees of a large and complex plan, like Cornell.

168.     Members of RPOC believed that CAPTRUST may have benchmarked the Plans' fees but no one from Cornell recalled reviewing that benchmarking themselves.[994]

169.     The Cornell Defendants' failure to conduct an RFP, RFI or any benchmarking of the Plans' fees stands in stark contrast to their actions when Cornell's own funds were at stake. Cornell's procurement policy requires "competitive bidding" for purchases over $10,000 unless there is a "preferred supplier agreement" or an "appropriate justification.[995] Specifically, for

---

[991] *See supra* ¶¶145–149.

[992] Ex. P8, Bursic Tr.at 44:7-20 (Q. During your time at Cornell has Cornell ever done an RFP for record-keeping services? A. That is a very difficult approach and I will say, no, we did not, and there's a lot of reasons for that. Record-keeping services only, separated from the fund parent and from the services that are provided by the fund parent is not something that we would do. ***It would not be prudent to issue an RFP, asking some company to do a specific task that's much more efficiently and effective -- accurately delivered as a bundle of services. So your specific question was on record-keeping services only? Frankly, I think that would be a crazy idea.*)** (emphasis added); id. at 43:21-23 ("Q. Has Cornell ever done an RFP for the entire bundle of services provided to the plans? A. Ah, the answer to that is no."); Ex. P46, Edwards Dep,. at 109:22-110:3; Ex. P9, Gallagher Dep. at 26:19-24; Ex. P7, Opperman Dep. at 251:25–252:3; Ex. P45, DeStefano Dep., at 130:8-13; Ex. P48, Prasad Dep., at 38:20-14; Ex. P142, Walsh Dep., at 198:24-199:5; Ex. P23, Strodel Dep., at 239:7-13; Ex. P57, Warner Dep., at 343:14-344:7.

[993] Ex. P8, Bursic Dep., at 50:23–51:2 ("Q. Has Cornell ever done a request for information for record keeping and administrative services? A. No. I mean, it's a lower lying cousin to the RFP and we've not used an RFI in that circumstances.); *see also* Ex. P46, Edwards Dep., at 109:22-110; Ex. P9, Gallagher Dep., at 26:19-24; Ex. P7, Opperman Dep., at 252:5-12; Ex. P48, Prasad Dep. at 41:21-42:20.

[994] Ex. P8, Bursic Dep., at 51:3-14; Ex. P9, Gallagher Dep. at 79:5-8; Ex. P142, Walsh Dep. at 51:5-15; Ex. P7, Opperman Dep. at 252:13-253:11; Ex. P48, Prasad Dep., at 44L12-46:2.

[995] Ex. P143, Cornell University Policy 3.25, Procurement of Goods and Services, at p. 12, *available at* https://www.dfa.cornell.edu/sites/default/files/policy/vol3_25.pdf

contracts over $10,00 at least three formal bids are required.[996] Indeed Cornell "regularly" conducted RFPs for other benefits services including, healthcare plans and dental plans.[997]

### 3.    The Cornell Defendants failed to negotiate or analyze fees on a per-participant basis

170.    While industry practice is that recordkeeping and administrative fees need to be analyzed on a per-participant or total cost basis,[998] the Plans' recordkeeping fees have always been charged on a basis point or percentage of assets in the Plans.[999]

171.    Additionally, the Cornell Defendants only examined the Plans' per-participant rate in an April 13, 2012 presentation from CAPTRUST.[1000] In that presentation, the Plans were paying TIAA an estimated $214 per-participant for recordkeeping and administrative fees and Fidelity an estimated $112 per-participant in recordkeeping fees. The presentation also included an estimate of TIAA's fees as $145 per participant under a new arrangement and Fidelity's fees at $58 per participant under a new arrangement.[1001]

172.    Despite a disparity of $102 per participant between TIAA and Fidelity currently and $87 dollars per-participant under the new arrangement,[1002] no one on RPOC questioned why the Plans were paying TIAA two to three times higher fees than Fidelity.[1003]

173.    All other analysis or discussion of fees by the Cornell Defendants was on an asset basis.[1004]

---

[996] *Id.*
[997] Ex. P8, Bursic Dep., at 120:2–122:3, 124:24-125:19.
[998] *See supra* ¶¶150-154.
[999] Doc. 246-5, TIAA Recordkeeping Agreements (Part 1); Doc. 246-005, TIAA Recordkeeping Agreement (Part 2); Doc. 246-7, Fidelity Custodial Account Agreements; Ex. P9, Gallagher Dep. at 61:18-21, 65:16-22.
[1000] Doc. 248-13, April 13, 2012 RPOC Meeting Materials, at 14-16; *see also* Ex. P9, Gallagher Dep. at 57:11-23 (testifying that fees are discussed at RPOC on an asset basis rather than per-participant).
[1001] Doc. 248-13, April 13, 2012 RPOC Meeting Materials, at 14-16.
[1002] *Id.*
[1003] Ex. P8, Bursic Tr.at 131:9-132:14; Gallagher Dep. at 85:9-86:12.
[1004] Gallagher Dep. at 57:11-23 (testifying that fees are discussed at RPOC on an asset basis rather than per-participant); *see also* Doc. 250-19, November 29, 2010, CURP Meeting Minutes (CORNELL0021932); Doc. 248-8, Jan. 11, 2012 RPOC Meeting Minutes; Ex. P10, February 3, 2011 CURP Meeting Minutes (CORNELL021930); Ex.

174.     The fact that the Cornell Defendants never considered the per-participant fees that participants were paying is also demonstrated by RPOC members' lack of knowledge of the difference between a per-participant and asset-based fee. For example, Bursic, who was responsible for monitoring the Plans' fees prior to RPOC hiring CAPTRUST,[1005] repeatedly testified that the asset-based fees in the Plans' recordkeeping contracts with TIAA were per-participant fees.[1006] Mr. Bursic also did not know if TIAA or Fidelity allowed recordkeeping and administrative fees to be paid on a per-participant basis.[1007] When asked if there was any provider who "charges a set dollar amount per participant for recordkeeping/administrative fees versus a basis point," Mr. Bursic, who monitored fees prior to RPOC and has been on the Committee virtually the entire period, responded "I have no idea and no desire to find out."[1008]

---

P11, June 23, 2011 CURP Meeting Minutes (CORNELL021931); Doc. 248-8, January 11, 2012 RPOC Meeting Minutes (CAPTR_0047903); Doc 248-14, April 13, 2012 RPOC Meeting Minutes (CAPTR_0047907); Doc. 248-9, July 24, 2012 RPOC Meeting Minutes (CAPTR_0047911); Doc. 252-5, November 19, 2012 RPOC Meeting Minutes (CAPTR_0047924); Ex. P12, July 31, 2013 RPOC Meeting Minutes (CAPTR_0047921); Doc. 252-8, September 30, 2013 RPOC Meeting Minutes (CAPTR_0047918); Ex. P13, December 4, 2013 RPOC Meeting Minutes (CAPTR_0047915); Ex. P14, March 21, 2014 RPOC Meeting Minutes (CAPTR_0004284); Ex. P15, September 17, 2014 RPOC Meeting Minutes (CAPTR_0004286); Ex. 63, Doc. 239-4, December 3, 2014 RPOC Meeting Minutes (CAPTR_00013586); Ex. P16, June 2, 2015 RPOC Meeting Minutes (CAPTR_0013598); Ex. P17, September 9, 2015 RPOC Meeting Minutes (CAPTR_0013573); Ex. P18, December 16, 2015 RPOC Meeting Minutes (CAPTR_0013594); Doc. 238-9, March 31, 2016 RPOC Meeting Minutes (CAPTR_0013568); Ex. P19, June 29, 2016 RPOC Meeting Minutes (CAPTR_0013565); Ex. P20, September 28, 2016 RPOC Meeting Minutes (CAPTR_0013580); Doc. 252-10, December 12, 2016 RPOC Meeting Minutes, (CAPTR_0013590); Ex. P49, April 14, 2017 RPOC Meeting Minutes (CAPTR_0013583); Ex. P50, June 23, 2017 RPOC Meeting Minutes (CAPTR_0013561); Ex. P51, September 27, 2017 RPOC Meeting Minutes (CAPTR_0013939); Ex. P52, December 11, 2017 RPOC Meeting Minutes (CAPTR_0015281); Ex. P8, Bursic Dep., at 43:10-12 (testifying that any discussion of fees would be reflected in the meeting minutes).

[1005] *See supra* ¶¶155-160.

[1006] Ex. P8, Bursic Tr.at 99:16-102:21, 103:15-117:

[1007] *Id.* at 102:22–103:12 ("Q. Are there service providers that provide record-keeping services on a flat dollar per participant basis rather than on an asset basis? MS. ROSS: Objection, foundation. 1 A. I know reasonably well what TIAA and Fidelity do. I take your question to mean in the marketplace of mutual fund -- of the mutual fund business, is there out there someplace a record keeping firm, even outside of retirement plans, retail accounts, all kinds of different -- if you take the whole marketplace, I have no idea. I don't know about the whole marketplace. I know what TIAA and Fidelity do. *Q. Does Fidelity offer record-keeping services on a flat or plan participant basis?? A. To 403(b) retirement plans? Q. Yes. A. I don't know.*") (emphasis added); id at 118:15-25 ("Q. Bursic, do you know if TIAA will put a dollar cap on the amount of record-keeping fees paid, for example, like $142 per participant? A. You would have to talk to CAPTRUST about what level of the various fees they've negotiated with TIAA and if as part of that negotiation process they had some kind of a cap mechanism that would track the flexibility of cost fluctuations over time, they may or may not be doing that. I don't know.")

[1008] *Id.* at 117:10–118:3 ("Q. So you don't know anyone in the mutual fund industry that charges a set dollar amount per participant for record keeping/administrative fees versus a basis point? MS. ROSS: Objection, foundation. Q.

### 4. The Cornell Defendants failed consider the cost savings of consolidation to a single recordkeeper

175.    While industry practice is to consolidate to a single recordkeeper to reduce fees

and provide a more efficient administrative structure, the Cornell Defendants never seriously

considered recordkeeper consolidation.

176.    First, it is indisputable that the Plans used two recordkeepers, TIAA and Fidelity,

for the entire statutory period and continue to do so today.[1009]

177.    On January 11, 2012, CAPTRUST advised the Cornell Defendants that

consolidation results in the "best cost structure" for Plan participants.[1010] However, there does

not appear to be any serious discussion balancing the cost savings that the Plans could achieve

from recordkeeping consolidation versus other interests at that meeting or any meeting

thereafter.[1011] Rather, without an exploration of the fee implications or the impact on

---

You just said this is how the mutual fund industry works. So I want to know is there anyone in the mutual fund industry that you're aware of that charges record keeping and administrative fees on a set dollar amount per participant rather than a basis point like this? A. What I said was that I can only tell you in some detail what TIAA-CREF and Fidelity do and that this is the way they handle it, and I said that the mutual fund industry, as far as I know, does this – pretty uniformly charges an expense ratio. I can't tell you 1 that there may be other instances. I have no idea and I have no desire to find out. Why don't you look it up but, you know, it's just –").

[1009] Doc. 246-5, TIAA Recordkeeping Agreements (Part 1); Doc. 246-005, TIAA Recordkeeping Agreement (Part 2); Doc. 246-7, Fidelity Custodial Account Agreements.

[1010] Doc.  248-43, Jan. 11, 2012 RPOC Meeting Materials (CAPTR_0009067), at 38.

[1011] Doc. 248-8, January 11, 2012 RPOC Meeting Minutes (CAPTR_0047903); Doc 248-14, April 13, 2012 RPOC Meeting Minutes (CAPTR_0047907); Doc. 248-9, July 24, 2012 RPOC Meeting Minutes (CAPTR_0047911); Doc. 252-5, November 19, 2012 RPOC Meeting Minutes (CAPTR_0047924); Ex. P12, July 31, 2013 RPOC Meeting Minutes (CAPTR_0047921); Doc. 252-8, September 30, 2013 RPOC Meeting Minutes (CAPTR_0047918); Ex. P13, December 4, 2013 RPOC Meeting Minutes (CAPTR_0047915); Ex. P14, March 21, 2014 RPOC Meeting Minutes (CAPTR_0004284); Ex. P15, September 17, 2014 RPOC Meeting Minutes (CAPTR_0004286); Ex. 63, Doc. 239-4, December 3, 2014 RPOC Meeting Minutes (CAPTR_00013586); Ex. P16, June 2, 2015 RPOC Meeting Minutes (CAPTR_0013598); Ex. P17, September 9, 2015 RPOC Meeting Minutes (CAPTR_0013573); Ex. P18, December 16, 2015 RPOC Meeting Minutes (CAPTR_0013594); Doc. 238-9, March 31, 2016 RPOC Meeting Minutes (CAPTR_0013568); Ex. P19, June 29, 2016 RPOC Meeting Minutes (CAPTR_0013565); Ex. P20, September 28, 2016 RPOC Meeting Minutes (CAPTR_0013580); Doc. 252-10, December 12, 2016 RPOC Meeting Minutes, (CAPTR_0013590); Ex. P49, April 14, 2017 RPOC Meeting Minutes (CAPTR_0013583); Ex. P50, June 23, 2017 RPOC Meeting Minutes (CAPTR_0013561); Ex. P51, September 27, 2017 RPOC Meeting Minutes (CAPTR_0013939); Ex. P52, December 11, 2017 RPOC Meeting Minutes (CAPTR_0015281).

participants, CAPTRUST "validated" the multi-vendor arrangement, without any discussion of the scope of the fees reductions, when discussing "Investment Menu Design."[1012]

178.    Despite repeated requests from the vendors that they consider consolidation to reduce fees,[1013] the Cornell Defendants never received a quote from TIAA or Fidelity for consolidation.[1014] Despite attempts from CAPTRUST to discuss consolidation with RPOC, benefits staff unilaterally decided to remove it from the agenda.[1015]

179.    Again, the limited nature of the Cornell Defendants' consideration of consolidation is demonstrated by the lack of knowledge of the RPOC committee members. For example, founding committee member, Joanne DeStefano, who did not know if TIAA, Fidelity or Vanguard could recordkeep other vendor's funds.[1016]

### 5.    Plan participants did not prefer a multiple recordkeeper system with TIAA and Fidelity

180.    The Cornell Defendants claim they could not consolidate to a single recordkeeper because TIAA and Fidelity will not recordkeep each others funds, and they did not want to "disrupt" participants' choice. However, the Cornell Defendants admitted that they were not aware of any fact that actually supported their assumption that participants would be dissatisfied with recordkeeper consolidation, preferred any vendor, would be not be satisfied with similar low-cost investments on another platform.[1017] Additionally, the Cornell Defendants' experience with recordkeeper consolidation at the Weill Cornell Plans has not resulted in any dissatisfaction among participants in those plans.[1018]

---

[1012] Doc. 248-9, July 2012 RPOC Meeting Minutes, at 3 (CAPTR_0047911) (
[1013] Ex. P53, March 28, 2016 email from P. Gallagher (CORNELL016201) ("TIAA has been pushing us on this[sole recordkeeper] on us for years")
[1014] Ex. P8, Bursic Tr.at 160:14-20.
[1015] Ex. P53, March 28, 2016 email from P. Gallagher (CORNELL016201)
[1016] Ex. P45, DeStefano Dep. at 137-138:6
[1017] Ex. P9, Gallagher Dep. at 135:14-136:5
[1018] *Id.* at 140;22-141:2.

181.     While there is no evidence that participants preferred a multi-vendor arrangement with TIAA and Fidelity, some participants (including most of the Economics department) did request a more efficient provider with a lower cost structure. For example, on September 21, 2013, Throne Professor of Economics, Karl Shell, sent a memo to a number of RPOC members and members of a Faculty Advisory Committee to RPOC.[1019] In that memo, Dr. Shell writes that "Cornell Ithaca should consider adding the Vanguard platform, even if this requires dropping one or both the existing platforms . . . Vanguard provides the lowest-cost index funds. Index funds provide the most efficient diversification of risk. Because of the miracle of compound interest, even very small difference in fees matter a lot over time. Vanguard provides excellent service."[1020] Mr. Shell also offered an informal poll of "the greater economic community at Cornell" where every respondent preferred Vanguard and one stated "'Hire Vanguard, fire the other two'."[1021]

182.     Finally, the Cornell Defendants' claim that TIAA and Fidelity could not or would not explore recordkeeping each other funds is untrue. ██████████████████████

████████████████████████████████████████████████

██████████████████████████████████.[1022] SUNY demonstrates that large plans can exercise their leverage to force TIAA and Fidelity to cooperate and achieved lower fees by leveraging the size of plans. Additionally, a presentation that Fidelity made to the Cornell Defendants demonstrates that between 2009 and 2015 multiple institutions with TIAA

---

[1019] Ex. P55, September 21, 2013 Memorandum from Karl Shell regarding "Notes for the 23 September 2013 meeting of the RPOC advisory committee".
[1020] Id.
[1021] Id.
[1022] Ex. P38, June 25, 2015 Email from P. Bursic to Mary Operation (CORNELL002493); Ex. P8, Bursic Tr.at 162:22-165:19

and Fidelity as recordkeepers consolidated to a single recordkeepering arrangement with either TIAA or Fidelity.[1023]

183.    Additionally, Fidelity presented to Cornell on its Master Administrator program in 2016.[1024] That presentation related more than 108 higher education institutions, including 49 over $500 million in assets, had gone through consolidation from 2009 thru 2015.[1025] Specifically, it provided that California Institute of Technology, Purdue, University of Rochester, Notre Dame, Vanderbilt, Colorado and California State University had all gone from a multi-vendor relationship including TIAA and Fidelity to a single vendor platform.[1026]

### 6.    The Cornell Defendants improperly delegated its duty to monitor recordkeeping and administrative fees to CAPTRUST and did nothing to monitor CAPTRUST's process

184.    The evidence demonstrates that the Cornell Defendants deferred entirely to CAPTRUST to monitor and negotiate the Plans' recordkeeping fees with little to no oversight. For example, multiple members of RPOC testified that RPOC did not ever review any benchmarking CAPTRUST conducted regarding the Plans' recordkeeping and administrative fees or participate in or monitor their negotiations with TIAA or Fidelity.[1027] Rather, the Cornell Defendants relied entirely upon CAPTRUST to "to do their professional job" and CAPTRUST's "strong assurances that this is a good deal."[1028] Bursic went as far as testifying "I don't think anyone on RPOC, including me, but I may be wrong. You may find out otherwise in your other

---

[1023] Doc. 247-1, 2016 Fidelity Master Administrator Presentation ((CORNELL021851), at 9.
[1024] Doc. 247-1, Feb. 29, 2016 Master Administrator Offering Presentation (CORNELL021851).
[1025] *Id.* at 11.
[1026] *Id.*
[1027] Ex. P8, Bursic Dep., at 52:16–54:13; *see also* Ex. P9, Gallagher Dep., at 62:11-63:15; Ex. P45, DeStefano Dep., at 129:16-21, 131:4-14; Ex. P46, Edwards Dep. at 107:14-109:6; Ex. P47, Schwartz Dep. at 78:8-80:12; Ex. P48, Prasad Dep., at 67:22-68:16.
[1028] Ex. P8, Bursic Dep., at 52:16–54:13.

depositions, really knows how CAPTRUST is conducting those negotiations and what the terms are of the agreements that they draw up . . ."[1029]

185.    Additionally, the Cornell Defendants' complete deferral of their fiduciary duties to CAPTRUST is demonstrated by multiple committee members testifying that they did not know basic details regarding the Plans' recordkeeping and administrative fees or that if someone wanted those details they would have to ask CAPTRUST.[1030]

### 7.    CAPTRUST followed a flawed process in monitoring and negotiating the Plans' recordkeeping and administrative fees

186.    First, CAPTRUST, contrary to industry accepted practice, never conducted an RFP, or even an RFI, for the Plans' recordkeeping and administrative services.[1031]

187.    Moreover, even the database benchmarking that CAPTRUST provided was limited. CAPTRUST Senior Vice President James Strodel only recalled CAPTURST conducting benchmarking to the fees paid by other CAPTRUST clients in 2012.[1032] CAPTRUST Senior Vice President Barron Schmitt did not recall benchmarking of TIAA's fees when TIAA offered new prices in 2012, 2014, or 2017.[1033] The only fee benchmarking that Schmitt recalled was after this lawsuit, but he could not recall how Cornell's fees compared to the 10 to 20 similar CAPTRUST clients.[1034] Schmitt had no recollection of ever benchmarking the fees the Plans paid to Fidelity after 2012.[1035] Any benchmarking conducted in 2012 consisted only of a "fairly

---

[1029] Ex. P8, Bursic Tr.at 119:1-13 ("Q. Okay. So you don't know if there's a cap on the fees within the TIAA plan? A. Right. Q. Has RPOC ever discussed a fee structure like that with a cap, with a set dollar cap? A. I don't think anyone on RPOC, including me, but I may be wrong. You may find out otherwise in your other depositions, really knows how CAPTRUST is conducting those negotiations and what the terms are of the agreements that they draw up, whether or not they include what you've just questioned about a cap on one particular activity that TIAA does, a cap on the cost, that is, of that activity.")
[1030] *Id.*
[1031] Ex. P23, Strodel Dep., at 239:7-13.
[1032] Ex. P23, Strodel Dep., at 223:12-16.
[1033] Ex. P60,Schmitt Dep. at 156:13-157:5, 157:19-158:1, 159:12-160:11, 162:22-163:10, 166:14-167:3.
[1034] *Id.* at 169:21–170:4.
[1035] *Id.* at 176:22–178:24.

limited" set of "maybe" five comparable clients.[1036] Additionally, Schmitt admitted that any benchmarking would have only compared the fees the Plans paid to TIAA to fees paid to TIAA by other CAPTRUST clients and the fees the Plans paid to Fidelity to what other clients paid Fidelity.[1037] CAPTRUST made no comparison to what prices other vendors were charging similar plans.[1038]

188.    Additionally, rather than engaging in back and forth negotiations with the reocrdkeepers to bargain for a reasonable price for the services requested, CAPTURST merely periodically requested a new price quote from the recordkeeper and always accepted the first price offered.[1039] ██████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████.[1040]

### C.    As a Result of the Cornell Defendants' Imprudent Process, Plan Participants Paid Millions of Dollars of Excess Recordkeeping Fees and Lost Millions of Dollars in Lost Investment Opportunity

189.    Even using the data that the Cornell Defendants rely on, Plan participants suffered significant losses as a result of the Cornell Defendants' imprudent conduct. As the Cornell Defendants' recordkeeping expert, Poehler, admits, participant count is the primary driving factor in the cost of recordkeeping fees.[1041] ████████████████████████

███████████████████████████████████████████████████████████

---

[1036] Ex. P23, Strodel Dep. at 223:13-227:10.
[1037] Ex. P60,Schmitt Dep., at 179:12-21.
[1038] *Id.*
[1039] Ex. P23, Strodel Dep., at 230:23-231:7
[1040] Ex. P56, Weber Dep., at 164:13-165:5; 198:23-199:5; 199:24-201:9; Ex. P57, Warner Dep., at 43:19-44:6, 52:1-52:7, 71:24-72:6, 171:20-173:20.
[1041] Ex. P2, Poehler Dep. at 52:18–53:5. Mr. Poehler qualified his answer by stating it was assuming that the services were obtain, (*id.*), However, he admitted that he did not know the services that were being provided to any of the plans he used for benchmarking and upon which the Cornell Defendants reply upon in their pleadings. Ex. P2, Poehler Dep. at 98:24–100:6, 20-7:22—208:3, 218:17-19, 222:4-6, 223:7-8. 224:19-21, 228:14-16, 249:13-17. 2535:15—254:7, 278:25—279:4, 283:9-12.

████████████████████████████████████████

█████████.[1042] However, Cornell paid significantly higher fees than fees in the top 25th

percentile among TIAA clients for every year in the chart after 2011:

████████████████████████████████████████

In sum, even using the TIAA top 200 client data the Cornell Defendants relied upon, the Plans

paid nearly $2 million in excess fees (not including lost investment opportunity) between 2012

and 2017 alone.

190.     Similarly, the 2014 CAPTRUST data that the Cornell Defendants cite and Mr.

Poehler relies upon to prove that the Plans were paying TIAA reasonable fees demonstrates that

the Plans were paying excessive fees to TIAA. Mr. Poehler admitted the 2014 CAPTRUST data

included mostly Plans that were smaller than the Cornell Plans by over 10,000 participants, and

were not appropriate benchmarks, and that he included merely to show the "range of fees."[1044]

Mr. Poehler also admitted that those Plans over 10,000 participants in the 2014 CAPTRUST data

---

[1042] Doc. 249-21, Declaration of Erich Podzinski, ¶4.
[1043] All per-unique participant fees are from Doc 249-21, the Declaration of Erick Podzinski. Excess fees are calculated by subtracting 25th percential fee from Cornell's fees. Total excess fees are calculated by taking the excess fees multiplied by the number of unique participants in CURP from Poehler's Fee Analysis Worksheet, TIAA CURP Tab, line 14. Doc. 246-4, Expert Report of Glenn Poehler, at 106.
[1044] Ex. P2, Poehler Dep. at 210:6–231:24, 233:23-11.

all paid basis-point recordkeeping fees to TIAA that were lower than those the Plans paid at that time.[1045]

191.    Similarly, the 2017 CAPTRUST data that the Cornell Defendants and Mr. Poehler rely upon to demonstrate that the Plans' TIAA fees were reasonable actually demonstrates that they were paying excessive fees. Mr. Poehler admitted in his deposition that most of the Plans in the 2017 CAPTRUST data were actually much smaller than the Cornell Plans and not appropriate benchmarks – one as small as 637 participants.[1046] Further, Mr. Poehler admitted that most of the Plans in the 2017 data that were similar in size to the Cornell plans were paying lower per-participant fees than Cornell.[1047]

192.    Ty Minnich, who worked for decades as an executive in the recordkeeping units of Transamerica, Metlife and CitiStreet, opined, based on his experience, that reasonable fees for the Plans if the Defendants had followed prudent practices were $40 per-participant from 2010-2012, $38 per-participant from 2013-2015 and $36 per-participant from 2016-present.[1048] Based on these numbers, Mr. Minnich found that the plans paid $21,176,568.46 in unreasonable recordkeeping and administrative fee from 2010 until 2018.[1049] Taking into account the lost investment opportunity participants suffered from the payment of these excess fees, participants in the Plans lost $35,466,775.51.[1050]

193.    Similarly, Al Otto, who advised and acted as a co-fiduciary for defined contribution plans (including both 401(k) and 403(b) plans) for more than 20 years opined that the Plans could have achieved fees of $40 per participant from 2010 to 2014 and $35 per

---

[1045] Ex. P2, Poehler Dep. at 232:4-233:22.
[1046] Ex. P2, Poehler Dep. at 243:12–249:8.
[1047] Ex. P2, Poehler Dep,. at 235:12–243:11.
[1048] Doc. 249-20, Expert Report of Ty Minnich, ¶¶157.
[1049] *Id.* ¶159
[1050] *Id.* ¶163.

participant from 2015 to 2018.[1051] Using even Mr. Otto's most conservative calculations the Plans paid unreasonable fees resulting in $29,243,486 of losses (taking into account lost investment opportunity) to participants in the Plans[1052]

## II.    THE CORNELL DEFENDANTS RETAINED NUMEROUS IMPRUDENT INVESTMENT OPTIONS IN THE PLANS

### A.    The Cornell Defendants' Delayed and Flawed Investment Review Process

194.    Prior to formation of the RPOC, Cornell's Board of Trustees retained all fiduciary responsibility for the review, selection and retention of investment options in the Plans [1053]

195.    Cornell disregarded warnings from the Plans' auditors in May 2010 that the lack of an Investment Policy Statement for the Plans was an internal control deficiency that needed to be corrected.[1054]

196.    The Board of Trustees then took nearly a year after this warning to create the RPOC charter.[1055]

197.    In 2010, Cornell reviewed a presentation indicating that 401(k) retirement plans that actually performed their fiduciary duties had "10-30 investment options" in their plans.[1056]

198.    The presentation further noted that participants "in plans with more than 20 investment fund were less diversified (i.e., held slightly fewer funds on average.)"[1057] and that too many funds also negatively affected participation rates, providing the following chart based on its knowledge as an investment advisor to retirement plans:[1058]

---

[1051] Doc. 249-19, Expert Report of Al Otto, ¶80.
[1052] Ex. P21, Expert Rebuttal Report of Al Otto, ¶60
[1053] Doc. 250-17, April 2011 RPOC Charter (CORNELL015812).
[1054] Ex. P92, CURP Plan Report to the Plan Administrator May 28, 2010 (CORNELL025340) at 9-10; Ex. P45, DeStefano Tr. at 75:14-86:18.
[1055] Ex. 17, April 2011 RPOC Charter (CORNELL015812).
[1056] Doc. 248-2, Johns Hopkins' University 403(b) Plan Design Presentation, at 5 (CORNELL029094)
[1057] Doc. 248-2, Johns Hopkins' University 403(b) Plan Design Presentation, at 27 (CORNELL029094)
[1058] Doc. 248-2, Johns Hopkins' University 403(b) Plan Design Presentation, at 28 (CORNELL029094)



199. ███████████████████████████████████████████

████████████████████. [1059]

200.   Cornell was notified by other investment advisors that transitioning plan participants from an unconstrained fund line up was "a non-event." [1060]

201.   CAPTRUST internally noted that it had "experience with our other university clients who have made huge changes with little push back from participants." [1061]

202. ███████████████████████████████████████████



███████████████████████████. [1062]

203.   Cornell retained over 200 investments in the Plans through the class period. [1063]

[1059] Doc. 248-2, Johns Hopkins' University 403(b) Plan Design Presentation, at 23 (CORNELL029094); Ex. P61, Cammack LaRhette response to Cornell's RFP for investment advisor May 13, 2011 (CORNELL006753) at 18; Ex. P4, Mercer response to Cornell's RFP for investment advisors (CORNELL015325) at 16-18.
[1060] Ex. P61, Cammack LaRhette response to Cornell's RFP for investment advisor May 13, 2011 (CORNELL006753) at 18.
[1061] Ex. P103, Internal CAPTRUST e-mail dated May 26, 2015 (CAPTR_0030234) at 1.
[1062] Doc. 248-2, Johns Hopkins' University 403(b) Plan Design Presentation, at 16-19 (CORNELL029094); Ex. P4, Mercer response to Cornell's RFP for investment advisors (CORNELL015325) at 16-18; Ex. P61, Cammack LaRhette response to Cornell's RFP for investment advisor May 13, 2011 (CORNELL006753) at 18.
[1063] Ex. P144, 2016 Tier 3 Fund Selection Overview (CAPTR_0007501) at 2 and 10.

204.     At its first meeting, the Chair of the RPOC wanted the group to meet monthly

because they had "a lot to do," however, the RPOC failed to meet monthly because they could

not get members to attend meetings.[1064]

205.     After the RPOC was created, it met for a total of 2 hours and 12 minutes in

2011.[1065]

206.     During the same period the committee responsible for the endowment, with a

professional investment staff of 20 Cornell employees, met quarterly for at least four hours each

meeting to discuss investment performance "without fail."[1066]

207.     The RPOC hired CAPTRUST in December 2011.[1067]

208.     Cornell was years behind even non-ERISA plans in hiring an investment advisor

for its Plans.[1068]

### 1.     Prior to July 2013 the Cornell Defendants Did Nothing to Monitor and Review the Investment Options in the Plans

209.     In its first meeting with the RPOC in January 2012, CAPTRUST observed that

"currently there is a limited process in place to make investment decisions."[1069]

210.     At the same meeting CAPTRUST told the Cornell Defendants that there were

"many underperforming funds" in the Plans.[1070]

---

[1064] Ex. P7, Opperman Tr. at 56:14-59:13; Doc. 250-19, RPOC Meeting Minutes November 29, 2010 (CORNELL021932) at 3.
[1065] Ex. P7, DeStefano Tr. at 117:23-119:2.
[1066] Ex. P7, DeStefano Tr. at 41:3-44:2.
[1067] CAPTRUST's Rule 56.1 Statement of Undisputed Material Fact at ¶ 4.
[1068] Ex. P93, CAPTRUST's Response to RFP (CORNELL011415) at 2; Ex. P94, CAPTRUST Reference Check Summary (CORNELL027635) at 1; Ex. P3, Hewitt Response to RFP (CORNELL024180) at 4-5; Ex. P62, Segal Advisors Response to RFP (CORNELL006782) at 12-13.
[1069] Doc.  248-43, Jan. 11, 2012 RPOC Meeting Materials (CAPTR_0009067), at 6.
[1070] Ex. P83, RPOC Retirement Plan Meeting – Executive Summary, January 11, 2012 (CORNELL015581), at 1 (listing date of meeting), 8 (acknowledging underperforming TIAA-CREF investments), 9 (acknowledging underperforming Fidelity investments); Doc. 248-8, Ex. 44, Meeting Minutes from January 11, 2012 RPOC meeting (CAPTR_0047903) at 3 ("TIAA-CREF has several redundant asset classes as well as underperforming accounts. Fidelity currently offering (180+ funds) has significant redundancy, many underperforming accounts and too many choices in general."); Ex. P7, Opperman Tr. 60:14-61:9; 63:8-63:24.

211.    CAPTRUST did not identify these underperforming funds.[1071]

212.    In January 2012, Cornell itself observed that the Fidelity platform had "too many choices in general."[1072]

213.    CAPTRUST noted that if Cornell stayed with the "status quo" there would be continued participant confusion, disparate fund structure, complex and inefficient investment due diligence, fiduciary oversight would be more difficult, and continued disjointed administration.[1073]

214.    After acknowledging that there were "many underperforming funds" in the Plans, no investment due diligence occurred on the underperforming funds for 18 more months.[1074]

215.    An Investment Policy Statement was not completed until November 28, 2012.[1075]

216.    CAPTRUST approved and adopted Cornell's Investment Policy Statement on December 5, 2012.[1076]

217.    CAPTRUST proposed the Plans' Investment Policy Statement ("IPS") to Cornell in January 2102 and Cornell largely accepted the IPS with minimal changes.[1077]

---

[1071] Ex. P83, RPOC Retirement Plan Meeting – Executive Summary, January 11, 2012 (CORNELL015581); Ex. P86, Internal CAPTRUST e-mail exchange July 1, 2013 to July 3, 2013 (CAPTR_0053254).

[1072] Doc. 248-8, Ex. 44, RPOC Meeting Minutes January 11, 2012 (CAPTR_0047903) at 3.

[1073] Ex. P83, RPOC Presentation January 11, 2012 (CORNELL015581) at 15.

[1074] Ex. P86, Internal CAPTRUST e-mail exchange July 1, 2013 to July 3, 2013 (CAPTR_0053254) at PDF 2-3 ("2nd deliverable is an interim Fiduciary review on the entire platform of funds. … To put this in perspective, we were hired in December 2011 and we have yet to do a review[.]") and PDF 6 ("Is this the meeting we need to have some sort of quant review on their 5,000 funds?); Ex. P87, e-mail between Cornell and outside counsel dated October 3, 2012 (CORNELL013947) at PDF 2 ("You had mentioned that at a recent RPOC meeting, it was unclear whether CAPTRUST was providing investment performance information to the RPOC."); Ex. P88, Ciccotello Tr. at 103:3-105:2.

[1075] Doc. 252-6, Ex. 76, Cornell Investment Policy Statement (CORNELL013763) at 9.

[1076] Doc. 252-6, Ex. 76, Investment Policy Statement Cornell University (CORNELL013763) at 9; Ex. P23, Strodel Tr. at 130:9-131:19.

[1077] Ex. P145, Jan, 1, 2012 Draft IPS (CORNELL022008); Ex. P146, May 2, 2012 Draft IPS (CAPTR_0020302); Ex. P147,  Aug. 27, 2012 Draft IPS (CAPTR_0020262); Ex. P148, Oct. 18, 2012 Draft IPS (CAPTR_0020321);

218.    The appendix to the IPS providing the methodology for the review "is consistent" regardless of the client and CAPTRUST does not change its review process.[1078]

219.    Once the IPS was approved by Cornell, the RPOC did not meet for 8 more months.[1079]

220.    Cornell and CAPTRUST's Investment Policy Statement provides that "all actively managed investments should rank in the top 50% of their given peer group for the 3 or 5 year annualized period[.]"[1080]

221.    Prior to July 2013, the Cornell Defendants did not monitor funds in the Plans.[1081]

222.    Prior to hiring CAPTRUST, Cornell had "no experience to do this analysis."[1082]

223.    CAPTRUST panicked when it realized it had not conducted any investment due diligence prior to July 2013, when Barry Schmitt and colleagues in July 2013 discussed how CAPTRUST needed to conduct a quantitative only review of Cornell's "massive fund list" in order to provide "fiduciary cover" for CAPTRUST until Cornell consolidated its fund line-up.[1083]

---

[1078] Ex. P23, Strodel Dep., at 122:15-25.

[1079] Doc. 252-5, November 19, 2012 RPOC Meeting Minutes (CAPTR_0047924); Ex. P12 July 31, 2013 RPOC Meeting Minutes (CAPTR_0047921).

[1080] Doc. 252-6, Ex. 76, Investment Policy Statement Cornell University (CORNELL013763) at 6.

[1081] Ex. P7, Opperman Tr. at 59:20-60:2, 123:21-24, 161:6-22; Ex. P8, Bursic Tr. at 16:3-25, 78:4-85:18, 176:3-177:3, 178:9-20; Ex. P9, Gallagher Tr. at 152:23-153:6, 56:10-22; Ex. P86, Internal CAPTRUST e-mail exchange July 1, 2013 to July 3, 2013 (CAPTR_0053254) at PDF 2-3 ("2nd deliverable is an interim Fiduciary review on the entire platform of funds. … To put this in perspective, we were hired in December 2011 and we have yet to do a review[.]") and PDF 6 ("Is this the meeting we need to have some sort of quant review on their 5,000 funds?); Ex. P87, e-mail between Cornell and outside counsel dated October 3, 2012 (CORNELL013947) at PDF 2 ("You had mentioned that at a recent RPOC meeting, it was unclear whether CAPTRUST was providing investment performance information to the RPOC."); Cornell Defendants' Rule 56.1 Statement of Undisputed Material Facts *infra* at ¶ 74 (CAPTRUST's initial goals and objective included "adopting a methodology for ongoing plan monitoring.").

[1082] Ex P8, Bursic Tr. at 79:25:-80:7.

[1083] Ex. P86, Internal CAPTRUST e-mail exchange July 1, 2013 to July 3, 2013 (CAPTR_0053254) at PDF 2-3 ("2nd deliverable is an interim Fiduciary review on the entire platform of funds. We strongly believe that there needs to be something in the files until the fund changes actually occur. To put this in perspective, we were hired in December 2011 and we have yet to do a review[.]"), PDF 4 ("We are simply trying to provide some 'fiduciary cover' until the fund consolidation occurs."), and PDF 1 ("[d]o we still have 'fiduciary exposure'? How do we mitigate this exposure?"); Ex. P7, Opperman Tr. at 65:20-67:13.

224.    Mr. Schmitt proceeded to write, "[t]o put this in perspective, we were hired in December 2011 and we have yet to do a review AND the recommended fund menu that will be delivered at the end of July may not be implemented until mid-2014 (or later)."[1084]

225.    Prior to July 2013, CAPTRUST had not recommended the removal of any specific fund from the Plans and there was no process in place to remove a fund from the Plans.[1085]

226.    CAPTRUST failed to recommend specific investments for a consolidated fund line-up to Cornell until June 2013.[1086]

227.    Once CAPTRUST realized it needed to complete investment due diligence for all of the investments in the Plans to provide "fiduciary cover" for itself, CAPTRUST set an internal deadline of 20 days to complete the investment due diligence.[1087]

228.    CAPTRUST presented a quantitative only analysis of 293 funds on July 31, 2013.[1088]

---

[1084] Ex. P86, Internal CAPTRUST e-mail exchange July 1, 2013 to July 3, 2013 (CAPTR_0053254) at PDF 3
[1085] Ex. P23, Strodel Tr. at 163:24-165:1; Ex. P7, Opperman Tr. at 175:16-176:6 (prior to December 2016, the RPOC did not know how to remove a fund that was underperforming from the Plans); Ex. 63, Doc. 239-4, RPOC Meeting Minutes dated December 3, 2014 (CAPTR_0013586) at 4 ("RPOC and CAPTRUST will work on defining a process to make decisions on the funds currently found in the Tier III menu of funds.").
[1086] Ex. P86, Internal CAPTRUST e-mail exchange July 1, 2013 to July 3, 2013 (CAPTR_0053254) at PDF 3 ("1st deliverable is the comps for the asset classes that the RPOC has approved in order to fulfill those asset classes. … the recommended fund menu that will be delivered at the end of July may not be implemented until mid-2014 (or later).") and PDF 1 ("A general question though- we fall on this recommended line up at the end of July and the implementation doesn't take place until mid-2014, do we still have 'fiduciary exposure'? How do we mitigate this exposure?"); Ex. P96, E-mail from B. Schmitt to TIAA-CREF dated August 14, 2013 (CAPTR_0035670); Ex. P97, Attachment to CAPTR_0035670, initial draft of recommended core line-up (CAPTR_0035671); Ex. P12, RPOC Meeting Minutes dated July 31, 2013 (CAPTR_0047921) at 2 ("CAPTRUST then provided the Committee with a listing of asset classes and funds for the RPOC's initial reaction.").
[1087] Ex. P86, Internal CAPTRUST e-mail exchange July 1, 2013 to July 3, 2013 (CAPTR_0053254) at PDF 7.
[1088] Doc. 241-1, RPOC Presentation July 31, 2013 (CORNELL020122) at 40-48; Ex. P149, Internal CAPTRUST e-mail exchange June 28, 2013 (CAPTR_0053221).

229.    Prior to its engagement and in its initial meetings with Cornell CAPTRUST represented to Cornell that it would conduct quantitative and qualitative investment due diligence and that qualitative factors were important and a critical part of CAPTRUST's analysis.[1089]

230.    The Chair of the RPOC, Mary Opperman, did not even know what the terms quantitative and qualitative measures meant in the investment policy statement despite having heard them used in numerous RPOC meetings.[1090]

231.    In the July 31, 2013 report, CAPTRUST did not provide qualitative analysis for any fund in the Plans including for funds it recommended for the consolidated investment menu.[1091]

232.    CAPTRUST's July 31, 2013 quantitative-only analysis was not the same level of monitoring that would occur for a core line-up.[1092]

   **2.    In July 2013 the Cornell Defendants Are Informed That Numerous Specific Funds Had Serious Performance Issue or Failed the Plans' IPS But Cornell Did Not Remove a Single Fund Until 2017**

233.    When CAPTRUST provided investment due diligence information to Cornell in July 2013, it only provided an "investment scorecard" (a/k/a the dashboard system) that provided an executive summary with no information (sharpe-ratios, risk-adjusted returns, and other relevant quantitative and qualitative data) about the actual underlying performance of specific investment options in the Plans.[1093]

---

[1089] Ex. P93, CAPTRUST Financial Advisors Formal RFP Response (CORNELL011415), at 8 ("qualitative factors (4) play an important role in our analysis."); Doc. 248-13, RPOC Presentation April 13, 2012 (CORNELL022014) at 19 and 21 ("Methodology: each fund is evaluated by both quantitative and qualitative factors"); Ex. P23, Strodel Tr. at 133:25-134:8 ("Q. Why does CAPTRUST perform qualitative scoring on investments within the plans? A. We think it's a critical part of evaluating an investment option.").

[1090] Ex. P7, Opperman Tr. at 17:10–19:4.

[1091] Doc. 241-1, RPOC Presentation July 31, 2013 (CORNELL020122) at 40-48; Ex. P149, Internal CAPTRUST e-mail exchange June 28, 2013 (CAPTR_0053221); Ex. P23, Strodel Tr. at 162:9-24; 170:22-171:3.

[1092] Ex. P88, Ciccotello Tr. at 107:17-108:3 ("So this is not the same level of monitoring that was – that would occur for Tier 1 and 2, but if offered the committee some information about what would potentially be in Tier 3.").

[1093] Ex. P93, CAPTRUST Financial Advisors Formal RFP Response (CORNELL011415), at 12 (excerpt reproduced in body below); Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122); Ex. P12, July 31, 2013

Shown below is an example of the investment scorecard which is reviewed on quarterly with the plan committee. It presents an executive summary of the performance of the investment funds relative to the evaluation criteria of the IPS. Our goal in all reporting and services to the plan committee is to provide executive summaries of meaningful specifics that allow the committee to make decisions and maintain strategic oversight of all plan functions.



234.     While CAPTRUST did not provide underlying performance data to Cornell, it routinely provided the underlying performance data necessary to verify the entries in the investment scorecard to other retirement plan clients, referred to as "FUND FACTS SHEETS & COMPARISONS" as part of its normal process.[1094]

---

RPOC Meeting Minutes (CAPTR_0047921) at 3 ("CAPTRUST provided the RPOC with a high level review of the current 250+ funds on the various platforms").

[1094] Ex. P60, Schmitt Tr. at 71:20-73:3; Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 26, 39-70; Ex. P101, CAPTRUST Presentation for The University of Maine System 1st Quarter, 2015 at PDF 489, 564-609.

235.   A fiduciary must have underlying performance data in order to verify or dispute information found in the investment scorecard.[1095]

236.   CAPTRUST did not provide any underlying performance data to the RPOC Committee that would allow the RPOC to evaluate, validate or dispute CAPTRUST's green, yellow, red investment scorecard entries until the RPOC's December 3, 2014 meeting, when it only provided underlying information for the core line-up.[1096]

237.   The Chair of the RPOC, Mary Opperman, did not know what a sharpe ratio was, even though it was a measure of performance the RPOC eventually used.[1097]

238.   In the July 2013 analysis, a yellow triangle within the risk adjusted performance (RAP) metric in CAPTRUST's report meant that the investment's "Annualized Risk Adjusted Performance falls below the 50th percentile of the peer group."[1098]  A yellow triangle within the peer metric meant that the "Annualized Peer Relative Performance falls below the 50th percentile of the peer group."[1099] Red diamonds indicated that the funds should be considered for termination.[1100]

239.   CAPTRUST identified 85 investments in the Plans that ranked below the 50th percentile of the peer group for Annualized Risk Adjusted Performance and/or Annualized Peer

---

[1095] Ex. P88, Ciccotello Tr. at 26:2-27:18; 66:13-67:5; 77:10-78:1; 78:13-79:19; 97:3-100:24; 118:21-121:1; Ex. P46, Edwards Tr. at 63:13-64:16; Ex. P87, e-mail between Cornell and outside counsel dated October 3, 2012 (CORNELL013947) at PDF 2 ("If CAPTRUST has not been providing the RPOC with information about the plans' investment options, then there is significant risk that the DOL or a Plan participant could question whether the RPOC has been satisfying its fiduciary responsibility."); Doc. 249-18, Ex. 106, Expert Report of W. Dominguez, ¶¶ 68, 81.
[1096] Ex. P89, Quarterly Review for 3rd Quarter, 2014 (CORNELL015005) at 16-93; Ex. P133, E-mail attaching Quarterly Review for 3rd Quarter, 2014 (CORNELL15001); Ex. P7, Opperman Tr. at 77:12-79:12.
[1097] Ex. P7, Opperman Tr. at 49:22–50:8.
[1098] Ex. P89, Quarterly Review for 3rd Quarter, 2014 (CORNELL015005) at 134.
[1099] Ex. P89, Quarterly Review for 3rd Quarter, 2014 (CORNELL015005) at 134.
[1100] Doc. 248-13, Ex. 49, RPOC Presentation April 13, 2012 (CORNELL022014) at 21.

Relative Performance for the 3 and/or 5 year annualized periods, all of which violated Cornell's Investment Policy Statement.[1101]

240.   CAPTRUST identified 27 investment alternatives in the Large Cap Growth Fund asset class in the July 2013 review.[1102] Seven Large Cap Growth Funds ranked below the 50th percentile of the peer group for the 3 or 5 years annualized period, with three falling below the IPS standards for both periods.[1103]  Three of the Large Cap Growth Funds received a total quantitative score indicating they should be removed from the Plans.[1104]

241.   CAPTRUST identified 12 investment alternatives in the Large Cap Value Fund asset class in the July 2013 review, including the Fidelity Blue Chip Value Fund (FBCVX).[1105]

242.   The Fidelity Blue Chip Value Fund ranked below the 50th percentile of its peer group for the 3 and 5 year periods in CAPTRUST's 2013 quantitative analysis.[1106] The FBCVX received a total quantitative score indicating it should be removed from the Plans in 2013.[1107]

| Asset Class | Investment Name | Ticker | 3 yr RAP | 5 yr RAP | 3 yr Peer | 5 yr Peer | 3 yr Style | 5 yr Style | Expense | Total Quant | Total Quant |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Large Value | Fid Blue Chip Value | FBCVX | △ | △ | △ | △ | ● | ● | ● | 33 | ◆ |

---

[1101] Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 40-48; Ex. P89, Quarterly Review for 3rd Quarter, 2014 (CORNELL015005) at 134; Doc. 252-6, Ex. 76, Investment Policy Statement Cornell University (CORNELL013763) at 6.

[1102] Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 43-44; Ex. 150, Cornell University Retirement Plan for the Employees of the Endowed Colleges at Ithaca 2013 Form 5500 (CORNELL0000237) at 16-21.

[1103] Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 43-44.

[1104] Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 43-44; Ex. P23, Strodel Tr. at 135:12-24.

[1105] Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 44-45; Ex. 150, Cornell University Retirement Plan for the Employees of the Endowed Colleges at Ithaca 2013 Form 5500 (CORNELL0000237) at 16-21.

[1106] Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 44.

[1107] Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 44; Doc. 248-13, Ex. 49,  RPOC Presentation April 13, 2012 (CORNELL022014) at 21 (score of "69 or below Consider termination of fund"); Ex. P23, Strodel Tr. at 135:12-24.

243.     The next time CAPTRUST evaluated the Fidelity Blue Chip Value Fund in September 2014, it continued to rank below the 50th percentile of its peer group for the 3 and 5 year periods and received a total score indicating it should be removed from the Plans.[1108]

| Asset Class | Investment Name | Ticker | 3 yr RAP | 5 yr RAP | 3 yr Peer | 5 yr Peer | 3 yr Con | 5 yr Con | 3 yr Style | 5 yr Style | Fund Mgt | Fund Family | Total Score |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Large Value | Fid Blue Chip Value | FBCVX | ⚠ | ⚠ | ⚠ | ⚠ | ⚠ | ⚠ | 🟢 | 🟢 | 🟢 | 🟢 | 🔴 |

244.     The Fidelity Blue Chip Value Fund demonstrated significantl historical underperformance from the start of the class period through CAPTRUST's September 2014 evaluation.[1109]

245.     The Chair of the RPOC, Mary Opperman, did not know the difference between a fixed and variable annuity.[1110]

246.     In its first analysis of funds in July 2013, CAPTRUST failed to include any evaluation of the TIAA Real Estate Account.[1111]

| Asset Class | Investment Name | Ticker | 3 yr RAP | 5 yr RAP | 3 yr Peer | 5 yr Peer | 3 yr Style | 5 yr Style | Expense | Total Quant | Total Quant |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Direct Real Estate**** | TIAA Real Estate | - | - | - | - | - | - | - | - | - | - |

---

[1108] Ex.P90, e-mail attaching materials for September 17, 2014 RPOC meeting (CORNELL013566); Doc. 231-3, Ex. 92, RPOC Presentation September 17, 2014 at 43; Doc. 248-13, Ex. 49, RPOC Presentation April 13, 2012 (CORNELL022014) at 21 (score of "69 or below Consider termination of fund").

[1109] Doc. 249-18, Ex. 106, Expert Report of W. Dominguez, ¶ 115, Exhibit 6 at row 152 (Morningstar data ranking FBCVX in the bottom 15 percent of its peer group for the 3-year period and bottom 18 percent for the 5 year period); Ex. P150, Fidelity Blue Chip Value Fund (FBCVX) Prospectus dated September 29, 2010 at 4-6; Ex. P151, Fidelity Blue Chip Value Fund (FBCVX) Prospectus dated September 29, 2011 at 4-6; Ex. P152, Fidelity Blue Chip Value Fund (FBCVX) Prospectus dated September 29, 2012 at 190-192; Ex. P153, Fidelity Blue Chip Value Fund (FBCVX) Prospectus dated September 28, 2013 at 262-264; Ex. P83, RPOC Retirement Plan Meeting – Executive Summary, January 11, 2012 (CORNELL015581) at 9 (acknowledging underperforming Fidelity investments generally); Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 44 and 45 (duplicate pages listing FBCVX); Doc. 231-3, Ex. 92, RPOC Presentation September 17, 2014 (CORNELL013567) at 43.

[1110] Ex. P7, Opperman Tr. at 250:2-22.

[1111] Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 48; Ex. P88, Ciccotello Tr. at 110:24-113:9 ("Q. Sure. Do you see any appropriate performance-related information for the TIAA Real Estate Account in this presentation? A. So in this presentation I just – I see nothing but dashes.") ; Ex. P23, Strodel Tr. at 185:18-25; Ex. P8, Bursic Tr. at 223:6-225:1; Ex. P7, Opperman Tr. at 250:2-4; Doc. 249-18, Ex. 106, Expert Report of W. Dominguez, ¶¶ 103-105.

247.    Historical performance data for the TIAA Real Estate Account was available in July 2013.[1112]

248.    Despite not including any analysis of the TIAA Real Estate Fund in July 2013, CAPTRUST recommended to Cornell that it should be included in the consolidated investment line-up.[1113]

249.    In July 2013 CAPTRUST compared the TIAA Real Estate Account to the Dow Jones US Select REIT and Morningstar Specialty-Real Estate benchmarks.[1114] The TIAA Real Estate Account underperformed significantly against both indexes over the year-to-date, one, three, five and ten-year periods.[1115]



250.    The TIAA Real Estate Account underperformed prior to CAPTRUST's analysis.[1116]

---

[1112] Ex. P105, TIAA Real Estate Account's Quarterly 8-K (TIAA_CORNELL_00026051) at 6.
[1113] Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 12; Ex. P88, Cicotello Tr. at 112:4-113:16; 116:21-117:20.
[1114] Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 68.
[1115] Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 68.
[1116] Doc. 249-18, Ex. 106, Expert Report of W. Dominguez, ¶ 101-108, Exhibit 3.

251.     CAPTRUST did not provide an evaluation of the TIAA Real Estate Account to the Cornell Defendants until September 17, 2014, which solely included one green "score" dot and no underlying performance data.[1117]

| Distinct Funds | | | |
| --- | --- | --- | --- |
| **Distinct Fund Asset Class** | **Distinct Fund Name** | **Ticker** | **Score** |
| Direct Real Estate | TIAA Real Estate | - | 🟢 |

252.     CAPTRUST's investment advisors could not articulate the proprietary methodology for evaluating the TIAA Real Estate Account resulting in the green score.[1118]

253.     By December 2014, CAPTRUST evaluated the TIAA Real Estate Account's unadjusted returns against the NCREIF Property Index and Morningstar Specialty-Real Estate Universe.[1119]

254.     The data presented to the RPOC in December of 2014 showed that the TIAA Real Estate Account underperformed both of CAPTRUST's selected benchmarks over the one, three, five and ten-year periods.[1120]

| INVESTMENT NAME | Q3 '14 | YTD '14 | 2013 | 2012 | 2011 | 2010 | 2009 | 1 YEAR* | 3 YEAR* | 5 YEAR* | 10 YEAR* |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| SPECIALTY-REAL ESTATE | | | | | | | | | | | |
| TIAA Real Estate Account | 2.32% | 8.19% | 9.65% | 10.06% | 13.00% | 13.30% | -27.64% | 9.94% | 10.22% | 9.68% | 4.74% |
| NACREIF Property Index | 2.63% | 8.51% | 10.99% | 10.54% | 14.26% | 13.11% | -16.86% | 11.26% | 11.08% | 10.99% | 8.55% |
| Morningstar Specialty-Real Estate Universe | -3.01% | 13.09% | 1.65% | 17.52% | 7.61% | 27.36% | 30.57% | 12.77% | 15.84% | 14.89% | 7.69% |

255.     The TIAA Real Estate Account's June 30, 2013 Quarterly Report uses the NCREIF as its benchmark.[1121]

---

[1117] Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 40-48; Ex. P23, Strodel Tr. at 185:18-25; Doc. 231-3, Ex. 92, RPOC Presentation September 17, 2014 (CORNELL013567) at 39-47.
[1118] Ex. P60, Schmitt Tr. at 118:13-16; Ex. P23, Strodel Tr. at 143:24-145:144.
[1119] Ex. P89, Quarterly Review for Period Ending September 30, 2014 (CORNELL015005) at 28.
[1120] Ex. P89, Quarterly Review for Period Ending September 30, 2014 (CORNELL015005) at 28; Ex. P9, Gallagher Tr. at 354:4-356:13.
[1121] Ex. P107, TIAA Real Estate Account Quarterly Performance Analysis June 30, 2013, exhibit 99.1 to 8-k, at 4; Ex. P106, TIAA Real Estate Account 8-K dated March 10, 2015 (using adjusted returns does not reflect the true returns experienced by holders of interests in the Account).

256.     The TIAA Real Estate Account's adjusted performance figures listed in its prospectus do not reflect the true returns experienced by the Plans' participants.[1122]

257.     Removing the lowest performing portion of a fund to compare it to benchmark "doesn't make sense" when comparing investment performance within an asset class.[1123]

258.     By 2015, CAPTRUST was still comparing the unadjusted TIAA Real Estate Account returns to the Morningstar Specialty-Real Estate benchmark for another one of its clients serviced by Financial Advisor Barry Schmitt.[1124] TIAA Real Estate Account underperformed against the index for the year to date, one, three, five and ten-year periods.[1125]

259.     ███████████████████████████████████████████████
███████████████████████████████████████████████.[1126]

260.     Once selected for the core line-up, Cornell and CAPTRUST held out the TIAA Real Estate Account in the real estate asset class, along with the Cohen & Steers Realty Shares REIT investment.[1127]

261.     REITs and the TIAA Real Estate Account are managed by the same type of real estate professionals throughout the real estate industry.[1128]

262.     Consistent with its assignment in the real estate asset class, in 2013, CAPTRUST compared the TIAA Real Estate Account to the same benchmarks it compared the Cohen &

---

[1122] Ex. P106, TIAA Real Estate Account 8-K dated March 10, 2015 ("adjusted performance figures are designed for use of Account investors for comparison purposes only, and do not reflect the true returns experienced by holders of interests in the Account.").
[1123] Ex. P46, Edwards Dep. at 117:5-8
[1124] Ex. P101, University of Maine System Quarterly Review for 1st Quarter, 2015 at 604.
[1125] Ex. P101, University of Maine System Quarterly Review for 1st Quarter, 2015 at 604.
[1126] Ex. P62, Segal Advisors Response to Cornell's RFP for an investment advisor May 3, 2011, (CORNELL006782) at PDF 54-55.
[1127] Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 12; Ex. P89, Quarterly Review for Period Ending September 30, 2014 (CORNELL015005) at 53.
[1128] Ex. P132, Expert Rebuttal Report of Wendy Dominguez at ¶ 54.

Steers Realty shares against, the Dow Jones US Select REIT and Morningstar Specialty-Real Estate Universe.[1129]

263.    From 2009 to 2016 the TIAA Real Estate Account underperformed against the alternative Cohen & Steers Realty Shares investment, recommended in the real estate asset class for the Fidelity platform in the Plans, by 83.37%.[1130]



**TIAA REAL ESTATE ACCOUNT ANNUAL RETURNS**

| | |
|---|---|
| 2009 | -27.64 |
| 2010 | 13.29 |
| 2011 | 12.99 |
| 2012 | 10.06 |
| 2013 | 9.65 |
| 2014 | 12.22 |
| 2015 | 8.16 |
| 2016 | 5.20 |

**Cohen & Steers Institutional Realty Shares, Inc. Annual Total Returns**

| 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|
| 32.73% | 27.63% | 6.25% | 15.91% | 3.46% | 30.18% | 5.23% | 5.91% |

---

[1129] Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 68; Ex. P89, Quarterly Review for Period Ending September 30, 2014 (CORNELL015005) at 69.
[1130] Ex. P123, Cohen & Steers Realty Shares, Inc. Prospectus dated May 1, 2017 at 5; Ex. P124, TIAA Real Estate Account Quarterly Performance Analysis December 31, 2016, exhibit 99.1 to 8-k, at 15.

264.    From 2009 to 2016 the TIAA Real Estate Account underperformed against the

alternative Vanguard REIT Index by 82.95%.[1131]



265.    The TIAA Real Estate Account demonstrated significant underperformance prior

to and throughout the class period.[1132]

266.    The TIAA Real Estate Account's expense ratio was 17 basis points higher than

the Cohen & Steers Realty Shares fund and 79 basis points higher than the Vanguard REIT Index

Fund.[1133]

267.    Cornell takes the position that CAPTRUST's process, and the data Cornell relied

upon in reviewing the investment during the class period—comparing the TIAA Real Estate

---

[1131] Ex. P125,  Vanguard Specialized Funds Prospectus dates September 26, 2017 at 4; Ex. P124, TIAA Real Estate Account Quarterly Performance Analysis December 31, 2016, exhibit 99.1 to 8-k, at 15; Doc. 249-18, Ex. 106, Expert Report of W. Dominguez, ¶¶ 106-108.

[1132] Ex. P89, Quarterly Review for Period Ending September 30, 2014 (CORNELL015005) at 28, 51; Doc. 249-18, Ex. 106,  Expert Report of Wendy Dominguez at ¶¶ 102-105, 107; Ex. P106, TIAA Real Estate Account 8-K dated March 10, 2015 ("adjusted performance figures are designed for use of Account investors for comparison purposes only, and do not reflect the true returns experienced by holders of interests in the Account.").

[1133] Ex. P89, RPOC Quarterly Review for the Period Ending September 30, 2014 (CORNELL015005) at 51 (TIAA Real Estate Account 92 bps) and 92 (Cohen & Steers Instl Realty Shares 75 bps ratio)(both use the same expense ratio as comparators, 135 bps); Doc. 249-18, Ex. 106,  Expert Report of Wendy Dominguez at ¶¶ 106, 108.  .

Accounts unadjusted returns to the NCREIF—is a "flat-out mischaracterization" of how the TIAA Real Estate Account should be compared against an NCREIF index.[1134]

268.    In July 2013, CAPTRUST reported that the CREF Stock Account ranked below the 50th percentile of its Annualized Risk Adjusted Performance peer group and its Annualized Peer Relative Performance group for the 3 and 5 year periods.[1135]

| Asset Class | Investment Name | Ticker | 3 yr RAP | 5 yr RAP | 3 yr Peer | 5 yr Peer | 3 yr Style | 5 yr Style | Expense | Total Quant | Total Quant |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Large Company Blend**** | CREF Stock | - | ⚠ | ⚠ | ⚠ | ⚠ | ● | ● | ● | 45 | ⚠ |

269.    As of June 30, 2013, the date of CAPTRUST's first evaluation of the CREF Stock Account for the Plans, it underperformed both benchmarks listed in its semi-annual shareholder report over the 6-month, one, three, five and ten-year periods.[1136]

270.    The RPOC questioned the integrity of CAPTRUST's analysis of the CREF Stock Account.[1137]

271.    CAPTRUST told the RPOC that its evaluation was an "estimation" that there was "no reliable benchmark" for the CREF Stock Account.[1138]

272.    Members of the RPOC believed that CAPTRUST's yellow triangle scoring for the CREF Stock Account was "fundamentally unreliable," and they could not determine whether the yellow triangles on the July 2013 report reflected the performance of the CREF Stock Account or the inadequacy of CAPTRUST's selection of measurement.[1139]

---

[1134] Doc. 227 at 21.
[1135] Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 49; Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 48; Ex. P89, Quarterly Review for 3rd Quarter, 2014 (CORNELL015005) at 28.
[1136] Ex.P114, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, June 30, 2013 at 9.
[1137] Ex. P8, Bursic Tr. at 217:15-218:9; 218:25-219:4.
[1138] Ex. P8, Bursic Tr. at 217:18-25.
[1139] Ex. P8, Bursic Tr. at 218:2-9; 218:25-219:4.

273.     Despite the process issues and performance concerns with the CREF Stock Account, CAPTRUST recommended that Cornell keep the CREF Stock Account on the core line-up in the Large Company Blend asset class based on its July 2013 analysis without any explanation.[1140]

274.     CAPTRUST's next evaluation of the CREF Stock Account in September 17, 2014 solely included one green "score" dot and no underlying performance data.[1141]

| Distinct Funds | | | |
| --- | --- | --- | --- |
| Distinct Fund Asset Class | Distinct Fund Name | Ticker | Score |
| Large Company Blend | CREF Stock | - | 🟢 |

275.     CAPTRUST never provided Cornell with the analysis criteria for its alleged "proprietary methodology" that CAPTRUST used to score the CREF Stock Account as green.[1142]

276.     Cornell Defendants did not review the underlying performance data for the CREF Stock Account until December 2014, after it was implemented in the best-of-class core line-up.[1143]

277.     CAPTRUST's investment advisor, Barry Schmitt, could not articulate the proprietary methodology, could not identify the index's used in the "custom benchmark" and could not identify any document that would reveal the custom benchmark for the CREF Stock Account.[1144]

---

[1140] Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 12, 16, 35, 38 and 48.
[1141] Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 40-48; Ex. P23, Strodel Tr. at 185:18-25; Doc. 231-3, Ex. 92,  RPOC Presentation September 17, 2014 (CORNELL013567) at 39-47.
[1142] Ex. P60, Schmitt Tr. at 115:21-116:5.
[1143] Ex. P89, Quarterly Review for Period Ending September 30, 2014 (CORNEL015005) at 39.
[1144] Ex. P60, Schmitt Tr. at 116:19-117:11; 117:23-118:

278.    The underlying data provided in that December 2014 showed that the CREF

Stock Account's one, three, five and ten-year returns ranked in the bottom 50% of its

CAPTRUST assigned peer group (1% is the best ranking), violating the IPS.[1145]

| | CREF Stock Account | Peer Group Rank |
|---|---|---|
| **KEY MEASURES / 5 YEAR** | | |
| Standard Deviation | 14.60 | 77% |
| Sharpe Ratio | 0.85 | 85% |
| Alpha | -1.06 | 88% |
| Beta | 1.03 | 14% |
| R-Squared | 99.61 | 0% |
| Up Mkt Capture | 100.74 | 52% |
| Down Mkt Capture | 105.13 | 86% |
| Information Ratio | -0.60 | 95% |
| **TRAILING RETURNS** | | |
| Last Qtr. | -1.82 | -- |
| YTD | 3.96 | -- |
| 1 Year | 13.11 | 84% |
| 3 Years | 19.53 | 78% |
| 5 Years | 12.47 | 83% |
| 10 Years | 7.52 | 54% |
| **CALENDAR RETURNS** | | |
| 2013 | 27.83 | 84% |
| 2012 | 17.26 | 16% |
| 2011 | -4.94 | 85% |
| 2010 | 15.73 | 22% |
| 2009 | 32.04 | 22% |
| 2008 | -39.68 | 70% |

279.    The RPOC never considered removing the CREF Stock Account from the

Plans.[1146]

280.    From July 2013 through the class period, CAPTRUST categorized the CREF

Stock Account in Large Company Blend asset class for the Plans' participants.[1147]

281.    CAPTRUST's expert classified the CREF Stock Account in the Large Blend asset

class during his fiduciary service to the University System of Georgia Optional Retirement Plan,

[1145] Ex. P89, RPOC Quarterly Review for the Period Ending September 30, 2014 (CORNELL015005) at 39; Ex. P9, Gallagher Tr. at 348:17-351:6.
[1146] Ex. P9, Gallagher Tr. at 351:15-23.
[1147] Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 12, 35 and 38; Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 21, 25-27; Ex. P108, University of Maine System Quarterly Review for 3rd Quarter, 2014 at 14, 17, 35 and 43; Ex. P60, Schmitt Tr. at 80:1-19; Ex. P101, University of Maine System Quarterly Review for 1st Quarter, 2015 at 472, 501; Ex. P60, Schmitt Tr. at 81:18-20.

testifying that a large domestic blend asset class was "probably the closest you can – you can find" for the CREF Stock Account.[1148]

282.    Cornell and CAPTRUST's Investment Policy Statement provides that funds categorized as Large Company Blends in the Plans should be benchmarked against the S&P 500 and Russell 1000 indexes.[1149]

283.    An Investment Policy Statement sets forth the benchmark that the Plans' fiduciaries chose to monitor investments within a specific asset class.[1150]

284.    In July 2013 CAPTRUST used the S&P 500 Index and Morningstar Large Blend Index as benchmarks for the CREF Stock Account.[1151]   In July 2013, CAPTRUST reported that the CREF Stock Account underperformed against both indexes over the 3 and 5 year periods and ranked below the 50th percentile of its Annualized Risk Adjusted Performance peer group and its Annualized Peer Relative Performance group for the 3 and 5 year periods.[1152]

285.    CAPTRUST's evaluation showed major style exposure overlap between the CREF Stock Account and the Morningstar Large Blend Average.[1153]

286.    CAPTRUST's evaluation showed major similarity in annualized standard deviation between the CREF Stock Account and the Morningstar Large Blend Average.[1154]

---

[1148] Ex. P88, Ciccotello Tr. at 56:20-58:11, 67:6-73:13, 179:3-15; Ex. P102, The University System of Georgia Optional Retirement Plan Transition Guide at 13.

[1149] Doc. 252-6, Ex. 76, Cornell Investment Policy Statement (CORNELL013763) at 11.

[1150] Doc. 249-18, Ex. 106, Expert Report of Wendy Dominguez at ¶¶35-36.

[1151] Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 49.

[1152] Ex. P84,CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 49; Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 48; Ex. P89, Quarterly Review for 3rd Quarter, 2014 (CORNELL015005) at 134.

[1153] Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 49.

[1154] Ex. P84, CAPTRUST Presentation for The University of Maine System dated July 15, 2013 at PDF 49.

287.    The CREF Stock Account's June 30, 2013 Certified Shareholder Report uses the Russell 3000 Index as one of its benchmarks for the CREF Stock Account.[1155]

288.    During the time the CREF Stock Account has been in the Plans, up to 64.71 percent of its portfolio was a passive index tracking the Russell 3000.[1156]

289.    While the Plans' participants were invested in the CREF Stock Account, more than 83% of the portfolio was invested in domestic markets similar to the Russell 3000.[1157]

290.    TIAA chose the Russell 3000 as the most appropriate broad-based index in all of its SEC filings (prospectuses, annual reports, semi-annual reports) during the class period.[1158]

---

[1155] Ex. P114, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, June 30, 2013 at 8.

[1156] Ex. P127, College Retirement Equities Fund Prospectus May 1, 1996 at 12-13 (A segment of the Stock Account "is designed to track the U.S. equity market as a whole. … the Russell 3000 segment of the Stock Account made up 64.71 percent of the portfolio.")

[1157] Ex. P127, College Retirement Equities Fund Prospectus May 1, 1996 at 12-13; Ex. P128, College Retirement Equities Fund Prospectus May 1, 1997 at 13-15; Ex. P129, College Retirement Equities Fund Prospectus May 1, 1998 at 18-20;

[1158] Ex. P111, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, December 31, 2011 at 7 (underperformed against both benchmarks for all periods)(TIAA_CORNELL_00021841); Ex. P112, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, June 30, 2012 at 7 (underperformed against both benchmarks for 1-, 5- and 10-year periods); Ex. P113, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, December 31, 2012 at 8 (underperformed against both benchmarks for 5- and 10-year periods); Ex. P114, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, December 31, 2012 at 8 (underperformed against both benchmarks for 6-month, 1-, 5- and 10-year periods); Ex. P115, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, December 31, 2013 at 8 (underperformed against both benchmarks for 1-, 5- and 10-year periods); Ex. P116, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, June 30, 2014 at 8 (underperformed against both benchmarks for 6-month, 1-, 5- and 10-year periods); Ex. P117, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, December 31, 2014 at 8 (underperformed against both benchmarks for 1-, 5- and 10-year periods); Ex. P118, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, June 30, 2015 at 8 (underperformed against both benchmarks for 5- and 10-year periods); Ex. P119, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, December 31, 2015 at 8 (underperformed against both benchmarks for 5- and 10-year periods); Ex. P120, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, June 30, 2016 at 8 (underperformed against both benchmarks for 6-month, 1-, 5- and 10-year periods).

291.    The CREF Stock Account underperformed against its prospectus-listed benchmarks the entire time CAPTRUST served as an investment advisor until the Complaint was filed.[1159]

292.    There were numerous other Large Company Blend funds in the Plans that did not have any performance issues.[1160]

293.    After 2014, Cornell relied on CAPTRUST's evaluation of the CREF Stock Account using a benchmark of 70% domestic equity and 30% international equity, with 7-8% of the 30% in emerging markets.[1161]

294.    When compared to this benchmark, the CREF Stock Account underperformed from at least 2000 through June 2010.[1162]

295.    The CREF Stock Account underperformed against a variety of benchmarks prior to 2010.[1163]

---

[1159] Ex. P111, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, December 31, 2011 at 7 (underperformed against both benchmarks for all periods)(TIAA_CORNELL_00021841); Ex. P112, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, June 30, 2012 at 7 (underperformed against both benchmarks for 1-, 5- and 10-year periods); Ex. P113, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, December 31, 2012 at 8 (underperformed against both benchmarks for 5- and 10-year periods); Ex. P114, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, June 30, 2013 at 8 (underperformed against both benchmarks for 6-month, 1-, 5- and 10-year periods); Ex. P115, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, December 31, 2013 at 8 (underperformed against both benchmarks for 1-, 5- and 10-year periods); Ex. P116, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, June 30, 2014 at 8 (underperformed against both benchmarks for 6-month, 1-, 5- and 10-year periods); Ex. P117, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, December 31, 2014 at 8 (underperformed against both benchmarks for 1-, 5- and 10-year periods); Ex. P118, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, June 30, 2015 at 8 (underperformed against both benchmarks for 5- and 10-year periods); Ex. P119, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, December 31, 2015 at 8 (underperformed against both benchmarks for 5- and 10-year periods); Ex. P120, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, June 30, 2016 at 8 (underperformed against both benchmarks for 6-month, 1-, 5- and 10-year periods).
[1160] Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122).
[1161] Ex. P23, Strodel Tr. at 144:22-145:7; Ex. P60, Schmitt Tr. at 116:19-118:12.
[1162] Doc. 249-18, Ex. 106, Expert Report of Wendy Dominguez at ¶ 95, Exhibit 5.
[1163] Expert Report of W. Dominguez, ¶ 95, Exhibit 5.

296.    The benchmark CAPTRUST used in 2014 to evaluate the CREF Stock Account is the same benchmark used by Wendy Dominguez in her expert report.[1164]

297.    In 2015, the CREF Stock Account underperformed against the index assigned by CAPTRUST for the one, three, five and ten-year periods.[1165]

298.    The CREF Stock Account was one of three options available to participants in the Plans for many years and TIAA advised participants to invest 50% in the CREF Stock Account likely accounting for percentage of assets invested in the fund rather than popularity.[1166]

299.    The enrollment process and how plan choices are presented to participants has a large impact on how plan participants allocate their funds; because the CREF Stock Account and TIAA Real Estate Account were prominently displayed to participants making an election it impacted their decisions.[1167]

300.    Cornell decided to keep the CREF Stock Account on Tier II solely because it had been offered at Cornell since the 1950s.[1168]

301.    There is no reference to the CREF Stock Account's prevalence among higher educational institutions or internal diversification in any of the meeting minutes or materials during the class period.[1169]

---

[1164] Ex. P23, Strodel Tr. at 144:22-145:7; Ex. P60, Schmitt Tr. at 116:19-118:12; Doc. 249-18, Ex. 106, Expert Report of Wendy Dominguez at ¶ 95, Exhibit 5.

[1165] Ex. P101, University of Maine System Quarterly Review for 1st Quarter, 2015 at 501 and 515; Ex. P60, Schmitt Tr. at 81:18-20.

[1166] Ex. P8, Bursic Dep, at 217:15–.219:8

[1167] Ex. P132, Expert Rebuttal Report of Wendy Dominguez at ¶ 32-33.

[1168] Ex. P8, Bursic Tr. at 218:9-11.

[1169] Doc. 250-19, November 29, 2010, CURP Meeting Minutes (CORNELL0021932); Doc. 248-8, Jan. 11, 2012 RPOC Meeting Minutes; Ex. P10, February 3, 2011 CURP Meeting Minutes (CORNELL021930); Ex. P11, June 23, 2011 CURP Meeting Minutes (CORNELL021931); Doc. 248-8, January 11, 2012 RPOC Meeting Minutes (CAPTR_0047903); Doc 248-14, April 13, 2012 RPOC Meeting Minutes (CAPTR_0047907); Doc. 248-9, July 24, 2012 RPOC Meeting Minutes (CAPTR_0047911); Doc. 252-5, November 19, 2012 RPOC Meeting Minutes (CAPTR_0047924); Ex. P12, July 31, 2013 RPOC Meeting Minutes (CAPTR_0047921); Doc. 252-8, September 30, 2013 RPOC Meeting Minutes (CAPTR_0047918); Ex. P13, December 4, 2013 RPOC Meeting Minutes (CAPTR_0047915); Ex. P14, March 21, 2014 RPOC Meeting Minutes (CAPTR_0004284); Ex. P15, September 17, 2014 RPOC Meeting Minutes (CAPTR_0004286); Ex. 63, Doc. 239-4, December 3, 2014 RPOC Meeting Minutes

302.    By year-end 2016, an investor with $10,000 that would have taken advantage of an alternative Large Company Blend mimicking the Russell 3000 Index over 10 years would have $3,577 more in retirement savings than an investor that chose the CREF Stock Account listed in the Large Company Blend asset class in Cornell's Plans.[1170]



303.    The average account balance for the Plans' participants was around $200,000, which would translate into $71,540 less in retirement savings over a 10-year period for an individual investing in only the CREF Stock Account within Cornell's Large Blend asset class.[1171]

(CAPTR_00013586); Ex. P16, June 2, 2015 RPOC Meeting Minutes (CAPTR_0013598); Ex. P17, September 9, 2015 RPOC Meeting Minutes (CAPTR_0013573); Ex. P18, December 16, 2015 RPOC Meeting Minutes (CAPTR_0013594); Doc. 238-9, March 31, 2016 RPOC Meeting Minutes (CAPTR_0013568); Ex. P19, June 29, 2016 RPOC Meeting Minutes (CAPTR_0013565); Ex. P20, September 28, 2016 RPOC Meeting Minutes (CAPTR_0013580); Doc. 252-10, December 12, 2016 RPOC Meeting Minutes, (CAPTR_0013590); Ex. P49, April 14, 2017 RPOC Meeting Minutes (CAPTR_0013583); Ex. P50, June 23, 2017 RPOC Meeting Minutes (CAPTR_0013561); Ex. P51, September 27, 2017 RPOC Meeting Minutes (CAPTR_0013939); Ex. P52, December 11, 2017 RPOC Meeting Minutes (CAPTR_0015281).
[1170] Ex. P121, College Retirement Equities Fund, Certified Shareholder Report of Registered Management Investment Companies, December 31, 2016 at 12; Doc. 249-18, Ex. 106, Expert Report of W. Dominguez, ¶ 96.
[1171] Ex. P122, TIAA-CREF Plan Outcome Assessment December 2015 (CORNELL029168) at 8.

304.    The CREF Stock Account carried a much higher expense ratio than other funds offered in the Large Company Blend asset class at Cornell.[1172]

305.    TIAA used the MSCI World Index as the only "appropriate" comparator for the CREF Global Equities Account in its 2011 prospectus.[1173]

306.    The CREF Global Equities Account has exposure to emerging markets.[1174]

307.    The MSCI World Index "does not offer exposure to emerging markets."[1175]

308.    The complexity of CAPTRUST's hurried analysis across multiple recordkeepers resulted in additional errors.[1176]

309.    CAPTRUST's July 31, 2013 presentation erroneously included duplicates of pages in the hurried review.[1177]

310.    CAPTRUST represented in its RFP response that investment candidates were screened so that "[e]ach fund or manager has produced risk-adjusted returns in line or exceeding its respective index and peer group."[1178]

311.    Templeton Developing Markets Trust Class A (TEDMX) egregiously underperformed the benchmark listed in its prospectus prior to CAPTRUST's 2013 review and cost investors more than 168 basis points per year.[1179]   In its 2013 evaluation, CAPTRUST

---

[1172] Doc. 249-18, Ex. 106, Expert Report of Wendy Dominguez at ¶¶ 94 and 97.
[1173] Doc. 240-3, Ex. 83, CREF Prospectus (TIAA_CORNELL_00021950) at 45.
[1174] Doc. 240-3, Ex. 83, CREF Prospectus (TIAA_CORNELL_00021950) at 20 (holding approximately "4% in emerging market equities").
[1175] *Available at* https://www.msci.com/world
[1176] Doc. 248-2, Johns Hopkins' University 403(b) Plan Design Presentation, at 7 (CORNELL029094)
[1177] Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 44-45.
[1178] Ex. P93, CAPTRUST Financial Advisors Formal RFP Response (CORNELL011415), at 9.
[1179] Ex. P154, Templeton Developing Markets Trust Class A Fund (TEDMX) Prospectus dated May 1, 2006 at 9-10; Ex. P155, Templeton Developing Markets Trust Class A Fund (TEDMX) Prospectus dated May 1, 2007 at 7-8; Ex. P156, Templeton Developing Markets Trust Class A Fund (TEDMX) Prospectus dated May 1, 2008 at 7-8; Ex. P157, Templeton Developing Markets Trust Class A Fund (TEDMX) Prospectus dated May 1, 2009 at 7-8; Ex. P158, Templeton Developing Markets Trust Class A Fund (TEDMX) Prospectus dated May 1, 2010 at 3 and 6; Ex. P159, Templeton Developing Markets Trust Class A Fund (TEDMX) Prospectus dated May 1, 2011 at 3 and 6; Ex. P160, Templeton Developing Markets Trust Class A Fund (TEDMX) Prospectus dated May 1, 2012 at 3 and 5; Ex. P161, Templeton Developing Markets Trust Class A Fund (TEDMX) Prospectus dated May 1, 2013 at 3 and 5; Ex.

provided an erroneous evaluation of the Templeton Developing Markets Trust Class A

(TEDMX) as green (passing) in all quantitative categories.[1180]

312.    CAPTRUST corrected this error the next time it evaluated the fund a year later in

September 2014, evaluating the fund's performance with yellow triangles.[1181]

313.    As of November 2016, the Templeton Developing Markets Trust Class A

(TEDMX) remained in the Plans and still failed the IPS criteria for inclusion.[1182]

314.    In the analysis, several funds failed screening criteria so badly in 2013 they were

designated with a red diamond.[1183]

315.    Funds identified with the red diamond should have been given more attention or

been eliminated from the Plans.[1184]

316.    The Cornell Defendants did not obtain any further quantitative investment due

diligence until 14 months later, on September 17, 2014.[1185]

317.    On September 17, 2014, CAPTRUST identified over 90 investments in the Plans

that ranked below the 50th percentile of the peer group for Annualized Risk Adjusted

Performance and/or Annualized Peer Relative Performance for the 3 and/or 5 year annualized

periods, all of which violated Cornell's Investment Policy Statement.[1186]

P162, Templeton Developing Markets Trust Class A Fund (TEDMX) Prospectus dated May 1, 2014 at 3 and 5; Ex. P163, Templeton Developing Markets Trust Class A Fund (TEDMX) Prospectus dated May 1, 2015 at 3-4; Doc. 249-18, Ex. 106, Expert Report of W. Dominguez, ¶ 115, Exhibit 6 at row 342 (Morningstar data ranking TEDMX in the bottom 24 percent of its peer group for the 3-year period and bottom 6 percent for the 5 year period).
[1180] Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 40.
[1181] Doc. 231-3, Ex. 92, RPOC Presentation September 17, 2014 at 39.
[1182] Ex. P144, 2016 Tier 3 Fund Selection Overview (CAPTR_0007501) at 3.
[1183] Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 40-48.
[1184] Ex. P88, Ciccotello Tr. at 144:8-149:8; Doc. 248-13, Ex. 49, RPOC Presentation April 13, 2012 (CORNELL022014) at 21 (score of "69 or below Consider termination of fund"); Doc. 249-18, Ex. 106, Expert Report of W. Dominguez, ¶¶ 52, 81, 117-121.
[1185] Ex. P90, e-mail attaching materials for September 17, 2014 RPOC meeting (CORNELL13566); Doc. 231-3, Ex. 92, RPOC Presentation September 17, 2014 at 39-47.
[1186] E Doc. 231-3, Ex. 92, RPOC Presentation September 17, 2014 at 39-47.

318.     In the analysis, several funds failed screening criteria so badly in 2014 they were designated with a red diamond.[1187]

319.     Several investments that were designated with a red in the July 2013 quantitative review remained designated as red (failing) fourteen months later in the September 2014 review.[1188]

320.     One such investment, the Fidelity Small Cap Stock, was removed from a CAPTRUST client's retirement plan.[1189]

321.     Several investments that were previously unscored were identified as significantly failing performance criteria.[1190]

322.     Other investments that were previously failing IPS performance criteria, but not designated as "consider for termination" had deteriorated further to include a red "consider for termination" rating.[1191]

323.     These underperforming investments remained in the Plan past the filing of this lawsuit because prior to 2016, there was no process to remove an underperforming fund from the Plans. [1192]

---

[1187] *Id.*

[1188] Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 40-48; Doc. 231-3, Ex. 92,  RPOC Presentation September 17, 2014 at 39-47 (Fidelity Blue Chip Value, Fidelity Select Gold, Fidelity Select Medical Eq Sys, Fidelity Select Medical Del, Fidelity Select Env Alt Engy, Janus Twenty T, Fidelity Global Commodity Stock, Fidelity Small Cap Stock,

[1189] Virginia Tech Optional Retirement Plan meeting minutes December 5, 2014, available at *https://www.hr.vt.edu/content/dam/hr_vt_edu/benefits-perks/retirement/20143rdq.pdf*

[1190] Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 40-48; Doc. 231-3, Ex. 92,  RPOC Presentation September 17, 2014 at 39-47 (Fidelity Global High Income,

[1191] Doc. 241-1, Ex. 90, RPOC Presentation July 31, 2013 (CORNELL020122) at 40-48; Doc. 231-3, Ex. 92,  RPOC Presentation September 17, 2014 at 39-47 (Fidelity Equity Dividend Income Fund, Fidelity Export Multi K, JHancock Small Company A, Fidelity Global Strategy,

[1192] Ex. P23, Strodel Tr. at 163:24-165:1; Ex. P7, Opperman Tr. at 175:16-176:6 (prior to December 2016, the RPOC did not know how to remove a fund that was underperforming from the Plans); Ex. 63, Doc. 239-4, RPOC Meeting Minutes dated December 3, 2014 (CAPTR_0013586) at 4 ("RPOC and CAPTRUST will work on defining a process to make decisions on the funds currently found in the Tier III menu of funds."); Ex. P19, RPOC Meeting Minutes dated June 29, 2016 (CAPTR_0013565) at 2 ("The Chair, Ms. Opperman asked what may cause a fund to be considered by RPOC for replacement.").

324.    At the June 29, 2016 RPOC meeting, Ms. Opperman asked "what may cause a fund to be consider[ed]  by RPOC for replacement[?]"[1193]

325.    Cornell and CAPTRUST never evaluated at least eight funds with the Plans prior to moving the core line-up in October 2014 including: Fidelity Strategic Real Return Fund (FSRRX), Fidelity Emerging Markets Discovery Fund (FEDDX), Fidelity Total Emerging Markets Fund (FTEMX), Strategic Advisers Core Multi-Mgr (FLAUX), Fidelity Canada Fund (FICDX), Fidelity Nordic Fund (FNORX), Fidelity Global Credit Fund (FGBFX), Fidelity International Bond Fund (FINUX) and Fidelity Europe Capital Appreciation (FECAX).[1194]

326.    By November 2016, Fidelity Canada, Fidelity Strategic Real Return and Fidelity International Bond Fund remained in the Plans and were failing all IPS criteria.[1195]

| Fidelity Tier III Investment Options (Non-Approved) | | | | | | |
|---|---|---|---|---|---|---|
| Asset Class | Investment Name | Ticker | Asset Value | Total Participants | Total Score | Pass/Fail |
| Miscellaneous Region | Fidelity® Canada | FICDX | $ 1,947,088 | 150 | 65 | Fail |
| Conservative Allocation | Fidelity® Strategic Real Return | FSRRX | $ 1,343,644 | 18 | 54 | Fail |
| World Bond | Fidelity® International Bond | FINUX | $ 31,303 | 9 | 65 | Fail |

327.    No disruption analysis occurred prior to CAPTRUST's July 2013 identification of underperforming funds and those violating the IPS.[1196]

328.    This "disruption analysis" was flawed and over-inclusive, contributing to a complete lack of process related to removing underperforming funds.[1197]

###    3.    After October 1, 2014 Cornell Left Hundreds of Unmonitored, Underperforming Funds in the Plans

---

[1193] Ex. P19, RPOC Meeting Minutes dated June 29, 2016 (CAPTR_0013565) at 2.

[1194] Doc. 241-1, RPOC Presentation July 31, 2013 (CORNELL020122) at 40-48; Doc. 241-3, RPOC Presentation September 17, 2014 (CORNELL013567) at 39-47.

[1195] Ex. P144, 2016 Tier 3 Fund Selection Overview (CAPTR_0007501) at 3.

[1196] Ex. P98, Internal CAPTRUST e-mail dated October 2013 (CAPTR_0051798) at 2 ("I called yesterday to discuss the disruption analysis Cornell would like us to complete"); Ex. P99, e-mail from D. Schwartz to RPOC dated November 15, 2013 (CORNELL020006); Ex. P100, Internal CAPTRUST e-mail dated December 2013 (CAPTR_0052091); Ex. P23, Strodel Tr. at 164:2-13, 206:11-207:6.

[1197] Ex. P98, Internal CAPTRUST e-mail dated October 2013 (CAPTR_0051798) at 1 ("if a participant has 99% of their assets not disrupted but 1% disrupted, then we will be treating this person as being disrupted. … I agree with the definition of disruption being either yes or no."); Ex. P23, Strodel Tr. at 209:20-23.

329.     CAPTRUST recommended against adding the PIMCO fund to the core-line up in September 2014 as PIMCO's founder and long-time manager left PIMCO in September 2014.[1198]

330.     Contrary to CAPTRUST's recommendation, Cornell added the fund to the core-line up.[1199]

331.     In the first review of the core-line up in 2014, the PIMCO was marked as "consider for termination."[1200]

332.     PIMCO remained on CAPTRUST's report as "consider for termination" at the next meeting with RPOC on December 3, 2014.[1201]

333.     PIMCO remained on CAPTRUST's report as "consider for termination" at the next meeting with RPOC on June 6, 2015.[1202]

334.     Cornell did not vote to remove the PIMCO fund until November 2016, after this lawsuit was filed.[1203]

335.     Cornell left the PIMCO fund marked "consider for termination" in the Plans for over two years.[1204]

336.     CAPTRUST also indicated in 2014, that Cornell should remove all funds it would not monitor in the "unmonitored Tier 3[.]"[1205]

---

[1198] Ex. P104, RPOC Presentation December 3, 2014 (CORNELL015004) at 1 ("December 3, 2014") and 34 ("Bill Gross, left PIMCO in September [2014]").

[1199] Ex. P104, RPOC Presentation dated December 3, 2014 (CORNELL015004) at 27.

[1200] Ex. P104, RPOC Presentation December 3, 2014 (CORNELL015004) at 27 (scoring PIMCO as "consider for termination").

[1201] Ex. P104, RPOC Presentation dated December 3, 2014 (CORNELL015004) at 27.

[1202] Doc. 241-5, Ex. 94, RPOC Presentation dated June 2, 2015 (CORNELL013289) at 25.

[1203] Ex. P110, RPOC Presentation December 12, 2016 (CAPTR_0008486) at 4 ("Action decided in November 16, via email").

[1204] Ex. P104, RPOC Presentation December 3, 2014 (CORNELL015004) at 27 (scoring PIMCO as "consider for termination"); Ex. P110, RPOC Presentation December 12, 2016 (CAPTR_0008486) at 4 ("Action decided in November 16, via email. Implementation recommendation to follow").

[1205] Ex. 63, December 2014 RPOC Meeting Materials (CAPTR_0013586) at 8.

337.     After October 1, 2014, Cornell did not monitor the performance all funds that were not in the Tier I (target date funds) or Tier II (core line-up)—the "Tier 3" funds. [1206]

338.     In June 2016, Ms. Opperman asked "what may cause a fund to be consider[ed] by RPOC for replacement" and CAPTRUST responded that it was "determined by the Investment Policy Statement[.]"[1207]

339.     Prior to December 2016, there was no process to remove an underperforming fund from the Plans.[1208]

340.     The Chair of the RPOC, Mary Opperman, did not "really have a good working knowledge of investments."[1209]

341.     Cornell and CAPTRUST's December 5, 2012 Investment Policy Statement provides that "investment managers will be expected to maintain a broadly diversified portfolio and will be expected to avoid unreasonable overweighting in a given investment, industry or sector."[1210]

342.     On February 26, 2015, CAPTRUST identified 62 sector funds—funds that invest in a specific sector of the economy or industry—and 36 funds that were failing the Investment Policy Statement scoring system.[1211]

---

[1206] Ex. P16, e-mail dated July 20, 2016 (CORNELL019835).
[1207] Ex. P19, RPOC Meeting Minutes June 29, 2016 (CAPTR_0013565) at 3.
[1208] Ex. P23, Strodel Tr. at 163:24-165:1; Ex. P7, Opperman Tr. at 175:16-176:6 (prior to December 2016, the RPOC did not know how to remove a fund that was underperforming from the Plans); Ex. 63, Doc. 239-4, RPOC Meeting Minutes dated December 3, 2014 (CAPTR_0013586) at 4 ("RPOC and CAPTRUST will work on defining a process to make decisions on the funds currently found in the Tier III menu of funds."); Ex. P19, RPOC Meeting Minutes dated June 29, 2016 (CAPTR_0013565) at 3 ("The Chair, Ms. Opperman asked what may cause a fund to be considered by RPOC for replacement.").
[1209] Ex. P7, Opperman Tr. at 250:5-12.
[1210] Doc. 252-6, Ex. 76, Investment Policy Statement Cornell University (CORNELL013763) at 6.
[1211] Ex. P95, Tier 3 Fund Selection Overview (CORNELL015019).

343.     Funds found to be underperforming and failing the IPS for being sector or boutique asset classes were not removed from the Plans under April, 2017.[1212]

## III.    The Cornell Defendants Allowed the Plans to Include Retail Class Mutual Funds for Numerous Fund for Which Lower Fee Share Classes Were Available

344.     CAPTRUST advised Cornell that it should use the lower-cost institutional share classes in January 2012.[1213] However, CAPTRUST did not provide any analysis of the funds eligible for lower-cost share classes.[1214]

345.     TIAA offered institutional share classes for all its mutual funds as early as February 2009.[1215] All defined contribution plans were eligible for institutional share classes if they had over $2 million invested in most of the funds (certain defined contributions plans were eligible for institutional shares without any threshold).[1216]

---

[1212] Ex. P9, Gallagher Tr. at 294:17–299:22.

[1213] Doc. 224-7, Jan. 22, 2012 RPOC Presentation (CORNELL015581), at 19.

[1214] *Id.*

[1215] Ex. P64, TIAA-CREF Funds, Lifecycle funds (Inst), Prospectus at pp. 719-20 (485BPOS) (Jan. 28, 2009) (available at https://www.sec.gov/Archives/edgar/data/1084380/000093041309000523/c56137_485bpos.htm). Ex. P65, TIAA-CREF Funds, Money Market (Inst) fund (TCIXX), Prospectus at pp. 106-107 (485BPOS) (Jan. 28, 2009) (available at https://www.sec.gov/Archives/edgar/data/1084380/000093041309000523/c56137_485bpos.htm); Ex. P66, TIAA-CREF Funds, International Equity Index (Inst) fund (TCIEX), Prospectus at pp. 106-107 (485BPOS) (Jan. 28, 2009) (available at https://www.sec.gov/Archives/edgar/data/1084380/000093041309000523/c56137_485bpos.htm); Ex. P67, TIAA-CREF Funds, Mid-Cap Value (Inst) fund (TIMVX), Prospectus at pp. 106-107 (485BPOS) (Jan. 28, 2009) (available at https://www.sec.gov/Archives/edgar/data/1084380/000093041309000523/c56137_485bpos.htm); Ex. P68, TIAA-CREF Funds, Growth & Income (Inst) fund (TIGRX), Prospectus at pp. 106-107 (485BPOS) (Jan. 28, 2009) (available at https://www.sec.gov/Archives/edgar/data/1084380/000093041309000523/c56137_485bpos.htm); Ex. P69, TIAA-CREF Funds, International Equity (Inst) fund (TIIEX), Prospectus at pp. 106-107 (485BPOS) (Jan. 28, 2009) (available at https://www.sec.gov/Archives/edgar/data/1084380/000093041309000523/c56137_485bpos.htm); Ex. P70, TIAA-CREF Funds, Small-Cap Blend Index (Inst) fund (TISBX), Prospectus at pp. 106-107 (485BPOS) (Jan. 28, 2009) (available at https://www.sec.gov/Archives/edgar/data/1084380/000093041309000523/c56137_485bpos.htm); Ex. P71, TIAA-CREF Funds, Short-Term Bond (Inst) fund (TISIX), Prospectus at pp. 106-107 (485BPOS) (Jan. 28, 2009) (available at https://www.sec.gov/Archives/edgar/data/1084380/000093041309000523/c56137_485bpos.htm). Ex. P72, TIAA-CREF Funds, Large-Cap Value (Inst) fund (TRLIX), Prospectus at pp. 106-107 (485BPOS) (Jan. 28, 2009); (available at https://www.sec.gov/Archives/edgar/data/1084380/000093041309000523/c56137_485bpos.htm); Ex. P73, TIAA-CREF Funds, Equity Index (Inst) fund (TIEIX), Prospectus at pp. 106-107 (485BPOS) (Jan. 28, 2009) (available at https://www.sec.gov/Archives/edgar/data/1084380/000093041309000523/c56137_485bpos.htm.

[1216] *See supra* n. 1216.

346.    The Plans had over $2 million of assets invested in most of the TIAA mutual funds on December 31, 2009 at the latest.[1217]

347.    Despite being eligible for institutional share classes of many TIAA mutual funds, the Plans had retirement class shares of the TIAA mutual funds at the end of 2009.[1218]

348.    CAPTRUST and the Cornell Defendants did not adopt the lower cost institutional share classes for the TIAA mutual funds until February 22, 2012.[1219]

349.    The failure to adopt the lower institutional share classes of the TIAA-CREF Lifecycle funds alone caused $336,577 in damages to Plan participants.[1220]

350.    Institutional share classes were available to the Plans with no minimum asset levels in many Fidelity funds prior to August 2010 and through the period.[1221]

351.    Cornell did not monitor share classes in Tier III.[1222]

## IV. As a result of the Cornell Defendants' Imprudent Process, Plan Participants Lost Millions in Investment Gains.

---

[1217] Ex. Doc. 247-8, Ex. 38, December 31, 2009 TIAA CURP Investment Expense and Fee Disclosure (TIAA_CORNELL_00011306), at 307.; Doc. 247-7, Ex. 37, Dec. 31, 2009 TIAA TDA Plan Investment Expenses and Fee Disclosure (TIAA_CORNELL_00002094) at 095.

[1218] Doc. 247-8, Ex. 38, December 31, 2009 TIAA CURP Investment Expense and Fee Disclosure (TIAA_CORNELL_00011306), at 307.; Doc. 247-7, Ex. 37, Dec. 31, 2009 TIAA TDA Plan Investment Expenses and Fee Disclosure (TIAA_CORNELL_00002094) at 095.

[1219] Doc. 246-005, TIAA/ Recordkeeping Agreements, at 34-36 (adding "Institutional" mutual funds)

[1220] Doc. 249-18, Expert Report of Wendy Dominguez, ¶123.

[1221] See, e.g., Ex. P74, Fid. Investments, Fid. Freedom K funds, Prospectus at p. 241 (485BPOS) (May 28, 2010) (available at https://www.sec.gov/Archives/edgar/data/880195/000088019510000114/main.htm); Ex. P75, Fid. Investments, Fid. Contrafund (K) (FCNKX), Prospectus at p. 133 (485BPOS) (Feb. 27, 2009) (available at https://www.sec.gov/Archives/edgar/data/24238/000002423809000002/main.htm); Ex. P76, Fid. Investments, Fid. Magellan (K) fund (FMGKX), Prospectus at p. 49 (485BPOS) (May 29, 2009) (available at https://www.sec.gov/Archives/edgar/data/61397/000006139709000002/main.htm); Ex. P77, Fid. Investments, Fid. Blue Chip Growth (K) fund (FBGKX), Prospectus at p. 361 (485BPOS) (Oct. 8, 2009) (available at https://www.sec.gov/Archives/edgar/data/754510/000031570009000021/main.htm); Ex. P78, Fid. Investments, Fid. Growth & Income (K) fund (FGIKX), Prospectus at p. 385 (485BPOS) (Oct. 8, 2009) (available at https://www.sec.gov/Archives/edgar/data/754510/000031570009000021/main.htm); Ex. P79, Fid. Investments, Fid. Dividend Growth (K) fund (FDGKX), Prospectus at p. 373 (485BPOS) (Oct. 8, 2009) (available at https://www.sec.gov/Archives/edgar/data/754510/000031570009000021/main.htm); Ex. P80, Fid. Investments, Fid. OTC (K) fund (FOCKX), Prospectus at p. 408 (485BPOS) (Oct. 8, 2009) (available at https://www.sec.gov/Archives/edgar/data/754510/000031570009000021/main.htm); Ex. P81, Fid. Investments, Fid. Leveraged Co. Stock (K) fund (FLCKX), Prospectus at p. 396 (485BPOS) (Oct. 8, 2009) (available at https://www.sec.gov/Archives/edgar/data/754510/000031570009000021/main.htm).

[1222] Ex. P46, Edwards Tr. at 101:6-14.

352.    Cornell's failure to perform investment due diligence on the underperforming funds in the Plans, remove imprudent funds and follow a prudent process caused the Plans' participants millions of dollars in lost retirement income.[1223]

February 25, 2019                          Respectfully submitted,

                                           /s/ Joel D. Rohlf
                                           ───────────────────────────
                                           SCHLICHTER, BOGARD & DENTON, LLP
                                           Andrew D. Schlichter, Bar No. 4403267
                                           Jerome J. Schlichter (*pro hac vice*)
                                           Joel D. Rohlf (*pro hac vice*)
                                           Scott T. Apking (*pro hac vice*)
                                           100 South Fourth Street, Suite 1200
                                           St. Louis, MO 63102
                                           Phone: (314) 621-6115
                                           Fax: (314) 621-5934

                                           Counsel for Plaintiffs

---

[1223] Doc. 249-18, Ex. 106, Expert Report of Wendy Dominguez at ¶¶ 100, 109-110, 116, 121; Ex. P165, Expert Report of G. Buetow, ¶ 32, DamagesSummary.xlsx, TIAAdamagesProduction.xlsx, FidelitydamagesProduction.xlsx.

**CERTIFICATE OF SERVICE**

I hereby certify that, on February 25, 2019, a copy of the foregoing was filed electronically

using the Court's CM/ECF system, which will provide notice of the filing to all counsel of record.


By:    /s/ Joel D. Rohlf             
            Joel D. Rohlf