UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
CASEY CUNNINGHAM, CHARLES E.
LANCE, STANLEY T. MARCUS, LYDIA
PETTIS, and JOY VERONNEAU, individually
and as representatives of a class of participants
and beneficiaries on behalf of the Cornell
University Retirement Plan for the Employees of
the Endowed Colleges at Ithaca and the Cornell
University Tax Deferred Annuity Plan,

                    Plaintiffs,                              16-cv-6525 (PKC)

        -against-                                            OPINION
                                                             AND ORDER


CORNELL UNIVERSITY, THE RETIREMENT
PLAN OVERSIGHT COMMITTEE, MARY G.
OPPERMAN, and CAPFINANCIAL
PARTNERS, LLC d/b/a/ CAPTRUST
FINANCIAL ADVISORS,

                    Defendants.
-------------------------------------------------------------x

CASTEL, U.S.D.J.

        Plaintiffs are a certified class of participants and beneficiaries of certain benefit

plans associated with Cornell University ("Cornell").  In broad terms they allege that fiduciaries

of the plans have not managed the plans prudently and have allowed the plans to underperform

and accrue excessive administrative fees.  The plans at issue are the defined-contribution Cornell

University Retirement Plan for the Employees of the Endowed Colleges at Ithaca (the "Retirement

Plan") and the Cornell University Tax Deferred Annuity Plan (the "TDA Plan") (together, the

"Plans.")  Plaintiffs assert that defendants Cornell, the Retirement Plan Oversight Committee (the

"Committee"), the Committee's head Mary G. Opperman (collectively, "Cornell Defendants"),

and the investment advisory firm Capfinancial Partners, LLC d/b/a CAPTRUST Financial Advisors ("CAPTRUST"), have breached their duties as fiduciaries of the Plans.

In September 2017, the Court granted in part defendants' motions to dismiss claims in the Amended Complaint and determined that plaintiffs had plausibly alleged claims under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§1104, 1106 for breach of ERISA's fiduciary duty of prudence based on failure to monitor recordkeeping fees and underperforming funds. Cunningham v. Cornell Univ., 16 cv 6525 (PKC), 2017 WL 4358769, at *13 (S.D.N.Y. Sept. 29, 2017), upheld in part Counts III, V, and VII of the Amended Complaint.[1] Defendants now move for summary judgment on these remaining claims. (Docs 221, 233.) Both sides also move for exclusion of certain expert testimony. (Docs 225, 228, 278.) For the following reasons, the Court grants in part and denies in part defendants' motions for summary judgment and motions to exclude.[2]

BACKGROUND

The Court assumes familiarity with the facts of the case as discussed in the Court's previous decisions. See Cunningham v. Cornell Univ., 16 cv 6525, 2019 WL 275827 (S.D.N.Y. Jan. 22, 2019) (class certification opinion); Cunningham v. Cornell Univ., 16 cv 6525, 2018 WL 4279466 (S.D.N.Y. Sept. 6, 2018) (partial denial of motion to strike jury demand); Cunningham, 2017 WL 4358769 (partial denial of motion to dismiss). A brief overview is provided below. The

---

[1] Count III has been dismissed as to CAPTRUST. Cunningham, 2017 WL 4358769, at *13. Count VII was only plead against Cornell Defendants. (See Am. Compl. at 136; Doc 81.)

[2] Plaintiffs filed a motion in limine to exclude the Declaration of Scott Matheson, Managing Director of CAPTRUST (Doc 248-12) and to preclude Matheson from testifying at trial (see Doc 278). Defendants filed a motion in limine to exclude the testimony of Plaintiffs' experts Wendy Dominguez and Gerald Buetow. The Court does not rely on Matheson's declaration in its ruling on summary judgment and need not determine whether Matheson can testify at trial at this stage. Accordingly, plaintiffs' motion is denied without prejudice to renewal at the Final Pretrial Conference. The Court similarly need not decide the motion to exclude Dominguez and Buetow's testimony to rule on the summary judgment motion and denies this motion without prejudice to renewal. (Docs 225, 253.)

following facts are either undisputed or described in the light most favorable to plaintiffs as the non-moving party. See Costello v. City of Burlington, 632 F.3d 41, 45 (2d Cir. 2011).[3]

I.    The Parties

Plaintiffs are members of a certified class of employees or former employees of Cornell from August 17, 2010 through August 17, 2016 who were participants in the Plans. (Pls.' 56.1 ¶1; Doc 287; Cornell Defs.' 56.1 ¶1; Doc 232.) The Plans are organized under Section 403(b) of the Internal Revenue Code, 26 U.S.C. § 403(b). (Pls.' 56.1 ¶4; Cornell Defs.' 56.1 ¶4.) The Retirement Plan is funded through employer contributions of up to 10% of each participant's base pay up to $275,000. As of December 31, 2016, the Retirement Plan had over 19,000 participants and nearly $2 billion in net assets. (Pls.' 56.1 ¶8; Cornell Defs.' 56.1 ¶8.) The TDA Plan is funded entirely through employee contributions. As of December 31, 2016, the TDA plan had over 11,000 participants and $1.34 billion in net assets. (Pls.' 56.1 ¶9; Cornell Defs.' 56.1 ¶9.) Cornell is the named administrator for the Plans. (Pls.' 56.1 ¶13; Cornell Defs.' 56.1 ¶13.)

Prior to the formation of the Committee and the retention of CAPTRUST, review of the Plans fell to Cornell's Benefits Services and Administration Department. (Pls.' 56.1 ¶¶36-37; Defs' 56.1 ¶¶36-37.) In July 2007, the Internal Revenue Service published updated regulations governing plans organized under section 403(b), effective January 1, 2009. See Revised Regulations Concerning Section 403(b) Tax-Sheltered Annuity Contracts, 72 Fed. Reg. 41128, 41128-59 (July 26, 2007). In November 2010 the Committee had its first meeting. It was explained that the new committee was "needed [] to establish a formal committee with fiduciary

---

[3] Plaintiffs and Cornell Defendants engaged in improper Rule 56.1 practices. Cornell Defendants' Reply to the Response contains citations to material not cited in their original statement, and both the Reply and Plaintiffs' 56.1 Response are rife with legal argument improper in a Rule 56.1 Statement. See Sattar v. U.S. Dep't of Homeland Sec., 669 F. App'x 1, 3 (2d Cir. 2016). "Local Civil Rule 56.1 does not provide for a 'reply' in further support of a Rule 56.1 statement of undisputed facts." Capital Records, LLC v. Vimeo, LLC, 09 cv 10101 (RA), 2018 WL 4659475, at *1 (S.D.N.Y. Sept. 7, 2018). The Court will not consider legal argument in the 56.1 Statements or Defendants' Reply except to the extent it responds to new facts in Plaintiffs' Counterstatement.

responsibility for overseeing the retirement plans as required by the recent IRC Section 403(b) regulations." (Meeting Minutes November 29, 2010 at 1; Doc 250-19.) The Committee was formally chartered in April 2011 and listed as its primary duties "policy oversight for the selection of investment options for the Plans by means of [a to-be-created Investment Policy Statement], and establish[ment of] criteria to review and monitor the investment performance of the investment options." (Pls.' 56.1 ¶15; Cornell Defs.' 56.1 ¶15; Charter at 2; Doc 250-17.)

The Committee and Cornell solicited a Request for Proposal ("RFP") in April 2011 for outside consulting services. The RFP noted Cornell sought "professional assistance to determine the proper investment vehicles" and help with "recordkeeping." (RFP at 1; Doc 246-1.) Cornell retained CAPTRUST in December 2011 as its outside consultant. (Pls.' 56.1 ¶¶40, 73; Cornell Defs.' 56.1 ¶¶40, 73; CAPTRUST Services Agreement of December 8, 2011; Doc 246-2.) CAPTRUST agreed to serve as a fiduciary under ERISA "with regard to the selection of . . . mutual fund(s) available to the Plans within the platform provided by the Plan's Administrator." (See Doc 246-2.) CAPTRUST is an investment advisory firm that has "developed an expertise in working with colleges and universities . . . as well as the providers of 403(b) administrative services." (Doc 224-2 at 9). CAPTRUST gave its first presentation to the Committee regarding Cornell's investment lineup in January 2012. (Pls.' 56.1 ¶41; Cornell Defs.' 56.1 ¶41).

II.    Review of the Plans' Recordkeeping Fees

The Plans used two outside vendors for recordkeeping and administrative services: Teachers Insurance and Annuity Association of America-College Retirement Equities Fund ("TIAA-CREF" or "TIAA") and Fidelity Investments Inc. ("Fidelity"). (Pls.' 56.1 ¶¶10, 19-20; Cornell Defs.' 56.1 ¶¶10, 19-20.) The parties dispute whether it was common for section 403(b)

plans to employ more than one recordkeeper and the feasibility of consolidating to a single recordkeeper for plans that have historically employed multiple recordkeepers. (E.g., Pls.' 56.1 ¶¶26-27; Cornell Defs.' 56.1 ¶¶26-27.)

Recordkeepers may be compensated for their services with fees charged as a percent of assets in funds (a "revenue sharing" model)[4] or with fees charged on a per participant basis. (Pls.' 56.1 ¶¶28, 30; Cornell Defs.' 56.1 ¶¶28, 30.) In revenue sharing arrangements, fund managers collect asset-based fees known as an "expense ratio" and pass a portion of those fees on to vendors as compensation for administrative and recordkeeping services. (Pls.' 56.1 ¶28; Cornell Defs.' 56.1 ¶28.) Some investment managers will introduce different "share classes" of the same investment option that will have different revenue sharing percentages owed. (Pls.' 56.1 ¶29; Cornell Defs.' 56.1 ¶29.) During the relevant period, TIAA and Fidelity received fees based on a revenue sharing model. (Pls.' 56.1 ¶28; Cornell Defs.' 56.1 ¶28.)

At the January 2012 Committee meeting, CAPTRUST presented information regarding possible recordkeeper consolidation. (Pls.' 56.1 ¶41; Cornell Defs.' 56.1 ¶41; see January 2012 Meeting Materials at 38-39; Doc 248-3.) CAPTRUST presented to the Committee advantages and disadvantages of four possible recordkeeping approaches, including a single recordkeeper scenario. (Id.) Minutes from the July 2012 Committee meeting state that the Committee chose to "validate[] the current multi-vendor arrangement" and instead transition to a tiered approach to their investment lineup to "provide[] symmetry among the three vendors." (Id.; July 2012 Meeting Minutes at 3; Doc 248-9.)[5]

---

[4] These percentages are known as "basis points." One basis point is 0.01%. (Pls.' 56.1 ¶50; Cornell Defs.' 56.1 ¶50.)
[5] Weill Cornell Medical Center, whose plans are also governed by the Committee, maintained Vanguard as a third recordkeeper. (Pls.' 56.1 ¶¶57, 145; Cornell Defs.' 56.1 ¶¶57, 145; see Doc 246-1 at 3.)

In addition to considering recordkeeper consolidation, CAPTRUST requested and received fee reductions of 0.05% from TIAA and 0.10% from Fidelity in 2012. (Pls.' 56.1 ¶50; Cornell Defs.' 56.1 ¶50.) TIAA and Fidelity agreed to retroactively refund $1.2 million in fees paid for 2011 as one-time revenue credits. (Id.) CAPTRUST asked for and received fee reductions from TIAA or Fidelity eight additional times between 2012 and January 2018. (Pls.' 56.1 ¶51; Cornell Defs.' 56.1 ¶51.) The annual recordkeeping fee paid by the Plans to TIAA and Fidelity over the period of 2010–2016, whether measured in basis points or per participant, is disputed. (E.g., Pls.' 56.1 ¶¶50-51, 62-63; Defs.' 56.1 ¶¶50-51, 62-63.)

In 2016, the issue of possible recordkeeper consolidation briefly arose again. Some Committee members emailed CAPTRUST to evaluate alternative recordkeeping arrangements and place the issue on the Committee's agenda. (See Doc 247-2.) The issue was not placed on the agenda for the March 2016 meeting and was not discussed at subsequent Committee meetings. (See, e.g., Docs 238-9 (March 31, 2016 meeting minutes); 290-19 (June 29, 2016 meeting minutes); 290-20 (September 28, 2016 meeting minutes).)

III.  Review of the Plans' Investment Lineups

Prior to January 2012, Benefits Services was charged with reviewing the investment lineup and monitoring fund performance. (Pls.' 56.1 ¶¶36-37; Defs' 56.1 ¶¶36-37.) Benefits Services sent performance summaries developed by vendors to participants, developed a two-tier preferred fund lineup, and grouped funds into asset classes to help participants more easily make fund choices. (Bursic Dep. at 70-77; Doc 248-1.) Benefits Services did not engage in benchmarking fund performance. (Id. at 77:24-83:1.) In January 2012, at the first Committee meeting CAPTRUST attended, CAPTRUST reviewed its methodology for monitoring investments. (Pls.' 56.1 ¶74; Cornell Defs.' 56.1 ¶74; see Doc 248-8 at 3.) CAPTRUST noted for

TIAA-CREF and Fidelity that there were "[s]everal underperforming funds that we would eliminate on a go forward basis" and "[m]any funds in asset classes that we would not recommend the plan utilize." (Doc 248-3 at 30, 31.) They discussed objectives of adopting methodology for ongoing plan monitoring and redesigning the plans' investment lineups to create a "tiered" investment structure consisting of target date funds (Tier I), core investment options (Tier II), and non-core secondary asset classes (Tier III). (Doc 248-3 at 34; see Doc 248-13 at 6-9 (April 13, 2012 Presentation discussing tiered options).) This restructuring was approved by the Committee in July 2012. (Doc 248-9.)

CAPTRUST and Cornell also discussed creating an Investment Policy Statement ("IPS"), which was approved by the Committee in November 2012. (Pls.' 56.1 ¶¶74-75; Cornell Defs.' 56.1 ¶¶74-75; Docs 248-3 at 47, 252-5, 252-6.) The IPS contains policies "intended to serve as guidelines for the Investment Fiduciaries in fulfilling their responsibilities" under ERISA. (Doc 252-6 at 4.) It discusses criteria for evaluating and potentially replacing investments and states that, "[w]ith few exceptions, all actively managed investments should rank in the top 50% of their given peer group for the 3- or 5-year annualized period at the time of their selection." (Doc 252-6 at 7, 9; see Pls.' 56.1 ¶76; Cornell Defs.' 56.1 ¶76.) Under Investment Evaluation, the IPS states that CAPTRUST shall provide the Committee with "relative rankings [of investment alternatives] against appropriate indexes and within appropriate peer groups" and that the "Committee will review the Plans' investment alternatives" at least on an annual basis. (Doc 252-6 at 5, 8.)

In July 2013 CAPTRUST presented its first three and five-year benchmarking analysis of Plan investments. (July 2013 Meeting Presentation; Doc 241-1.) The presentation offered a "high level review" of performance using a series of green, yellow, or red signs to designate funds with average, below average, or severely-below average performance in

comparison to their peer groups. (July 31, 2013 Meeting Minutes at 3; Doc 290-12; see Doc 241-1.) The TIAA Real Estate Account, one of the two primary funds plaintiffs accuse defendants of imprudently retaining, did not have any comparative review and the CREF Stock Fund Account, the second main fund at issue, had yellow squares indicating it ranked below the 50th percentile of its peer group for the three and five-year periods. (Doc 241-1 at 49.) Neither fund was in the "failing criteria" category based on the quantitative review. (Pls.' 56.1 ¶¶238-39.) The presentation also offered recommended investment menus for the core lineup of Tier II funds, and included both the TIAA and CREF funds. (Doc 241-1 at 13.)

In September 2013 CAPTRUST and Cornell further discussed the new proposed investment lineup. They stated that minimization of disruption was a priority as was adequate consideration to funds already being used. (Doc 252-8 at 3.) Members of the Committee testified that Cornell was concerned with making overwhelming changes to the plan lineups regarding fund selection because in the years following the 2008-09 financial crisis Cornell had already begun restructuring compensation and retirement plans and worried about too much disruption for plan participants. (See Doc 224-2 at 11-12.)

In September 2014, CAPTRUST again benchmarked fund performance and included detailed performance data for all funds. (Doc 291-45.) The TIAA Real Estate Account and CREF Stock Fund Account's fund fact sheets showed underperformance based on metrics used by CAPTRUST for their one, three, five, and ten-year benchmarks (Doc 291-45 at 28, 29, 40, 52.) The fund sheets contained additional information related to returns, investment profile, style exposure, and performance versus risk. (Id.) CAPTRUST gave an overall "green dot" ranking to both funds and stated that the funds "meet[] the guidelines set forth by CAPTRUST for

distinct investments in the [IPS]" based on "qualitative and quantitative data." (Id. at 21.) The TIAA and CREF funds are still offered in the Plans.

Many other funds were identified in July 2013 as underperforming compared to peer groups based on three and five-year annual returns. (See Doc 241-1 at 41-49.) In December 2014, CAPTRUST advised Cornell Defendants to consider phasing out some of these funds. (December 3, 2014 Meeting Minutes at 4; Doc 239-4.) The Committee continued to discuss criteria to evaluate these funds at subsequent meetings such as meeting guidelines of the IPS and achieving minimal disruption. (Doc 252-9 at 4.) In March 2016 the Committee identified funds that failed the IPS and agreed to eliminate those funds from the investment lineup. (March 31, 2016 Meeting Minutes at 3; Doc 238-9.) The Committee continued to discuss elimination of funds failing IPS guidelines and freezing other funds throughout 2016. (E.g., Doc 290-19; Doc 292-11.) Funds were scheduled to be phased out in the spring of 2017. (June 29, 2016 Meeting Minutes at 3; Doc 290-19; see Committee Presentation of December 2016 at 9, 11, 15; Doc 292-11 (stating "[f]ailing funds must be closed"); Doc 252-10.)

CAPTRUST in its January 2012 presentation also recommended that Cornell consider the "[u]se of lowest priced share classes." (Doc 248-3 at 41.) Prior to CAPTRUST's engagement, the Committee replaced certain Fidelity funds with lower cost institutional shares beginning in September 2010. (Pls.' 56.1 ¶59; Cornell Defs.' 56.1 ¶59.) It replaced certain TIAA funds with their institutional share class versions in February 2012 and December 2014. (Id.)

SUMMARY JUDGMENT STANDARD

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed. R. Civ. P. A fact is material if it "might affect the outcome of the suit under the

governing law . . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). On a motion for summary judgment, the court must "construe the facts in the light most favorable to the non-moving party and resolve all ambiguities and draw all reasonable inferences against the movant." Delaney v. Bank of Am. Corp., 766 F.3d 163, 167 (2d Cir. 2014) (quotation marks omitted).

A court is not required to "scour the record on its own in a search for evidence" on a motion for summary judgment. CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP, 735 F.3d 114, 125 (2d Cir. 2013). It is the initial burden of the movant to come forward with evidence on each material element of his claim or defense, demonstrating that he is entitled to relief, and the evidence on each material element must be sufficient to entitle the movant to relief in its favor as a matter of law. Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." Jaramillo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d Cir. 2008). "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Anderson, 477 U.S. at 248).

DISCUSSION

ERISA imposes a duty on plan fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). It also requires fiduciaries to act "in accordance with the

documents and instruments governing the plan . . . insofar as such documents and provisions are consistent with the provisions" of ERISA. Id. § 1104(a)(1)(D).

"ERISA's central purpose is to protect beneficiaries of employee benefits plans." Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Retirement Plan v. Morgan Stanley Inv. Mgmt. Inc., 712 F.3d 705, 715 (2d Cir. 2013). Courts evaluate the duty of prudence under an objective standard by considering "a fiduciary's conduct in arriving at an investment decision, not on its results," and asking "whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment." Id. at 716 (quotations omitted). "[S]o long as the 'prudent person' standard is met, ERISA does not impose a duty to take any particular course of action if another approach seems preferable." Chao v. Merino, 452 F.3d 174, 182 (2d Cir. 2006) (internal quotations and citation omitted). The inquiry will "necessarily be context specific." Fifth Third Bancorp v. Dudenhoeffer, 573 U.S. 409, 425 (2014).

I.     The Administrative Fees and Recordkeeping Claim (Count III)

Plaintiffs first argue that the Cornell Defendants acted imprudently by failing to (1) determine whether the amount of revenue sharing with the recordkeepers was competitive or reasonable; (2) solicit bids from competing recordkeepers on a flat fee, or per participant, basis; and (3) engage in a reasoned decision-making process to determine whether the Plans should move to a single recordkeeper.

Material issues of fact remain with respect to whether the Cornell Defendants' process to monitor recordkeeping fees breached a duty of prudence. However, as explained below, because plaintiffs have not come forward with evidence that any breach resulted in loss, summary judgment will be granted on Count III to the extent monetary damages are requested.

While "nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund," Hecker v. Deere & Co., 556 F.3d 575, 586 (7th Cir. 2009), see Loomis v. Exelon Corp., 658 F.3d 667, 670 (7th Cir. 2011), fiduciaries are required to engage in a prudent review process which includes review of fees for reasonableness. In reviewing a fiduciary's monitoring of recordkeeping fees, courts have taken a "holistic approach." Sacerdote v. New York Univ., 16 cv 6284 (KBF), 2017 WL 3701482, at *9 (S.D.N.Y. Aug. 25, 2017); see White v. Chevron Corp., 16 cv 0793 (PJH), 2016 WL 4502808, at *15 (N.D. Cal. Aug. 29, 2016) (reviewing "indicia of imprudence").

For purposes of the summary judgment motion the Court accepts that one or more of plaintiffs' theories on recordkeeping states a material issue of fact as to breach. For example, while competitive bidding is not required under ERISA, summary judgment has been denied where fiduciaries failed to solicit competitive bidding over a fifteen-year period and there was evidence that such failure resulted in a monetary loss. George v. Kraft Foods Glob., Inc., 641 F.3d 786, 800 (7th Cir. 2011). Cornell Defendants admit they never issued an RFP or Request for Information ("RFI") that would have enabled them to evaluate recordkeeping fees for the Plans, either individually or as an assessment of a larger bundle of administrative services. (Pls.' 56.1 ¶167; Defs.' 56.1 ¶167.) Because an "expense ratio doesn't show whether there is a revenue sharing agreement with the recordkeeper or for how much," a reasonable trier of fact could conclude that evaluating fees only as a bundled expense ratio was imprudent. Tussey v. ABB, Inc., 06 cv 4305 (NKL), 2012 WL 1113291, at *16 (W.D. Mo. Mar. 31, 2012), aff'd in relevant part, 764 F.3d at 336-37 (8th Cir. 2014). Cornell Defendants did not know what the actual fees were before CAPTRUST performed a review, only the total bundled expense ratios. The head of Benefit Services, Paul Bursic, testified that: "The fee is the fee. We didn't know what it was

- 12 -

before. . . . CAPTRUST came in; they discovered what the fee is." (Bursic Dep. at 100:21-23; Doc 290-8.)

The Court must consider whether plaintiffs have come forward with evidence which would entitle a reasonable jury to conclude that the assumed breach caused a loss to the Plans. It concludes that they have not.

"Any person who is a fiduciary with respect to a plan who breaches any of the . . . duties imposed upon fiduciaries . . . shall . . . make good to such plan any losses to the plan resulting from each such breach." 29 U.S.C. § 1109(a). "If, but for the breach, the plan would have earned even more than it actually earned, there is a 'loss' for which the breaching fiduciary is responsible." Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt., 843 F.3d 561, 567 (2d Cir. 2016) (internal quotation marks and citation omitted). Where alternative strategies are possible, courts "presume that the funds would have been used in the most profitable of these." Donovan v. Bierwirth, 754 F.2d 1049, 1056 (2d Cir. 1985).

Because loss is a necessary element of an ERISA claim, the absence of a genuine issue of material fact on loss warrants grant of summary judgment in a defendant's favor. Bd. of Trs. of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A., 806 F. Supp. 2d 662, 681-82 (S.D.N.Y. 2011); see Severstal Wheeling, Inc. v. WPN Corp., 10 cv 954 (LTS)(GWG), 2012 WL 3561243, at *6 (S.D.N.Y. Aug. 17, 2012); Salovaara v. Eckert, 94 cv 3430 (KMW), 1998 WL 276186, at *4 (S.D.N.Y. May 28, 1998); see also Brotherston v. Putnam Invs., LLC, 907 F.3d 17, 39 n.17 (1st Cir. 2018); Kopp v. Klein, 894 F.3d 214, 221 (5th Cir. 2018) (assuming that a fiduciary is liable for breach, plaintiff must still identify losses resulting from breach).[6]

---

[6] The parties dispute whether the burden of proving (or disproving) causation of loss rests with the plaintiffs or defendants, citing Second Circuit cases they assert are in tension. Silverman v. Mutual Ben. Life Ins. Co., 138 F.3d 98, 106 (2d Cir. 1998); N.Y. Teamsters Council Health & Hosp., Fund v. Estate of DePerno, 18 F.3d 179, 182-83

To demonstrate loss plaintiffs rely on (1) TIAA's pricing data that shows the Plans paid higher fees than the top quartile of TIAA's Top 200 clients and (2) CAPTRUST's data that shows two plans in 2014 with over 10,000 participants had higher recordkeeping fees by basis point than Cornell and four plans in 2017 with over 10,000 participants had higher fees by per participant total than Cornell. (Pls.' 56.1 ¶¶189-91; Cornell Defs.' 56.1 ¶¶189-91.) Plaintiffs offer no expert testimony opining on why this data is based upon relevant comparators or would lead a reasonable juror to conclude that Cornell could have achieved lower fees based solely on these numbers.

Plaintiffs offer the expert testimony of Ty Minnich and Al Otto, claiming that defendants' failure to review reasonableness of fees caused approximately $35 million in losses. The Court considers below whether Minnich and Otto's testimony on recordkeeping fees is admissible. Finding that it is not, the Court will dismiss Count III's claim for monetary damages because plaintiffs have not demonstrated a material issue of fact on their loss as a result of recordkeeping fees.

Plaintiffs in their Complaint also sought equitable relief in the form of removal of fiduciaries of the Plans and reformation to "obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses." (Doc 81 at 139-40.) Breach of a fiduciary duty without proof of loss may warrant grant of equitable relief. Brock v. Robbins, 830 F.2d 640, 647-48 (7th Cir. 1987); Liss v. Smith, 991 F. Supp. 278, 295 (S.D.N.Y. 1998). But in response to Cornell's motion for summary judgment, in which Cornell sought dismissal of Count III based on the absence of evidence of a loss to the Plans, plaintiffs did not come forward in their opposition with

---

(2d Cir. 1994); see Brotherston, 907 F.3d at 35 n.15 (recognizing apparent tension in Second Circuit jurisprudence). Because plaintiffs have come forward with no evidence demonstrating a genuine issue with respect to loss, the Court need not consider who bears the burden of proving causation.

any argument that their equitable claims would survive even in the absence of evidence demonstrating fact of loss. Plaintiffs have abandoned the recordkeeping claim insofar as it sought equitable relief. Felix v. City of New York, 344 F. Supp. 3d 644, 654 (S.D.N.Y. 2018) ("[A court] may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed."); see also Jackson v. Fed. Exp., 766 F.3d 189, 196 (2d Cir. 2014) ("Where abandonment by a counseled party is not explicit but such an inference may be fairly drawn from the papers and circumstances viewed as a whole, district courts may conclude that abandonment was intended.").

1. Motion to Exclude Expert Testimony of Minnich and Otto (Doc 228)

Courts perform the same "gatekeeper" role at summary judgment as at trial. Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997); see Fed. R. Civ. P. 56(e) (requiring affidavits submitted on summary judgment "set forth such facts as would be admissible in evidence"). Rule 702, Fed. R. Evid., states "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 593-94 (1993), the Supreme Court ruled that factors relevant to determining reliability include a theory's "testability," the extent to which it has "been subject to peer review

and publication" and "standards controlling the technique's operation," the "known or potential rate of error," and the "degree of acceptance" within the "relevant scientific community."

When deciding whether to admit expert testimony under Rule 702, a district court may "consider the gap between the data and the conclusion drawn by the expert from that data, and exclude opinion evidence where the court conclude[s] that there is simply too great an analytical gap between the data and the opinion proffered." Restivo v. Hessemann, 846 F.3d 547, 577 (2d Cir. 2017) (internal quotation and citation omitted). A trial judge has "broad discretion" in the matter of including expert evidence. Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996). While testimony should be excluded if it is "based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison . . . other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." Id. (internal quotation marks and citations omitted). The Daubert inquiry is a "flexible one," and the Daubert factors "do *not* constitute a definitive checklist or test." Restivo, 846 F.3d at 576 (internal quotations omitted).[7]

### a. Challenges to Qualifications

Cornell Defendants' challenges to Otto and Minnich's qualifications do not provide a basis to exclude their testimony. Otto spent over twenty years in the retirement plan services industry. (Expert Report of Al Otto ("Otto Rep.") ¶6; Doc 327-1.) He has created or overseen RFPs and RFIs for hundreds of retirement plans including those with more than 15,000 participants. (Id.) He has served as a co-fiduciary to plans and has published articles on best fiduciary practices regarding recordkeeping and administrative fees. (Otto Dep. at 21:21-22:5; Doc 299-6.) While at Shepard Kaplan, an investment advisory firm, he served on an investment

---

[7] The Court in its discretion concluded that the "formality of a separate [Daubert] hearing [was] not required" based on the extensive briefing and record. United States v. Williams, 506 F.3d 151, 161 (2d Cir. 2007).

committee which consulted with non-university 403(b) plans (Otto Rep. ¶6; see Otto Dep. at 21:21-22:18; Doc 299-6.) He has been admitted as an expert and testified at trials regarding recordkeeping fees. (Otto Rep. at pp. 53-54.)

Cornell Defendants argue Otto is not qualified as an expert because he has no experience working on recordkeeping for university 403(b) plans, for plans with multiple recordkeepers, or for plans that conduct recordkeeping for TIAA annuities. Such specific experiences are not necessary for Otto to opine on best practices of a prudent fiduciary for large-scale retirement plans. See Katsaros v. Cody, 744 F.2d 270, 279 (2d Cir. 1984) ("A trustee's lack of familiarity with investments is no excuse: under an objective standard trustees are to be judged according to the standards of others acting in a like capacity and familiar with such matters." (internal quotations and citation omitted)); Arista Records LLC v. Lime Grp. LLC, 06 cv 5936 (KMW), 2011 WL 1674796, at *10 (S.D.N.Y. 2011) (explaining that courts allow expert testimony where individual does not have industry-specific knowledge but testifies to "broader economic principles"). Based on Otto's familiarity with negotiating recordkeeping fees for retirement plans, including 403(b) plans, and his own role serving as a fiduciary for 403(b) plans, his credentials are "certainly not so flawed as to require exclusion under Daubert." AFTRA Ret. Fund, 2011 WL 6288415, at *6.

Minnich has experience pricing recordkeeping agreements for vendors that offer financial products to medium to large scale 403(b) plans, including public and private university higher education plans. (Expert Report of Ty Minnich ("Minnich Rep.") ¶7; Doc 229-6.) He has experience with recordkeeping at vendors who served as single and co-recordkeepers for 403(b) plans and has experience participating in RFPs and RFIs. (Minnich Dep. at 24:1-18; Doc 299-1; Minnich Rep. ¶¶5-6.) Cornell Defendants argue that he has directly engaged in recordkeeping for

only three 403(b) plans of private universities with more than 5,000 participants and has no familiarity with how much TIAA charged as a recordkeeper. (Mot. to Exclude at 10; Doc 230.) To the extent defendants argue Minnich lacks expertise to testify based on the nature of his experience, the Court disagrees. Such requirements would destroy the "flexible" approach courts are instructed to take to qualifying experts. Restivo, 846 F.3d at 576.

> b. Challenges to Methodology

Cornell Defendants claim Otto and Minnich do not use a reliable methodology to determine what a prudent fiduciary would have secured as a recordkeeping fee for the Plans. The Court agrees and will grant defendants' motion to exclude their testimony concerning the fact or amount of loss as a result of a lack of monitoring of recordkeeping fees on this basis.

Expert opinions must have "a traceable, analytical basis in objective fact." Bragdon v. Abbott, 524 U.S. 624, 653 (1998). "[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). "[W]hen an expert opinion is based on data . . . that [is] simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony." Nimely v. City of New York, 414 F.3d 381, 396-97 (2d Cir. 2005) (quoting Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 266 (2d Cir. 2002)).

The Court will examine the methodologies of Otto and Minnich, which are similar, beginning with Otto. Otto states that "[b]ased on his knowledge of the recordkeeping industry," the Plans could have achieved fees of $40 per participant from 2010-2014 and $35 per participant from 2015-2018. (Otto Rep. ¶80.)

He achieved this range of fees "after evaluating relevant documents produced in this case" and "appl[ying his] knowledge and experience," assuming that the plans would have engaged in a competitive bidding process every five years and that a prudent fiduciary would have consolidated to a single vendor by August 2010. (Id. ¶¶78, 81; see Otto Dep. at 83:16-20, 84:6-8; Doc 299-6 (Q: "What is the basis for your opinion that the range of reasonable fees would have been 35 to $40?" A: "Well, there's my experience, just in the market place. . . . And that comes from the RFPs that I've done on, you know, larger plans in my experience.").) He does not detail how his knowledge and experience led him to calculate the fees for the time periods listed, or why those numbers are reasonable in light of any features of the Plans. Without more, this conclusory statement of applied knowledge of the industry's customs and practices is insufficient under Rule 702 because "general references" to an expert's "experience" "do not provide a reliable basis for his proposed testimony. Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 691 F. Supp. 2d 448, 475-76 (S.D.N.Y. 2010); cf. Snyder v. Wells Fargo Bank, N.A., 11 cv 4496 (SAS), 2012 WL 4876938, at *3 (S.D.N.Y. Oct. 15, 2012) (admitting similar expert testimony where expert "articulated how the specifics of his experiences led to his conclusions").

Otto includes a section of his report entitled "Multiple 403(b) plans paid lower recordkeeping expenses than the Plans" (Otto Rep. p.33), in which he offers five university plans that paid less than the Plans for recordkeeping (id. ¶¶85-89 (comparing fees of Harvard, Caltech, University of Pittsburgh Medical Center, North Carolina schools, and the Nevada System of Higher Education).) His commentary and analysis of other plans and comparison to the plans at issue are not grounded in a reliable methodology.[8] He concedes that he picked the plans only to

---

[8] His fifth paragraph of this section does not discuss other university retirement plans but alludes to the fact that 403(b) plans' negotiation based on per participant fees is similar to that of 401(k) plans. Despite opining on this similarity and offering that he is qualified as an expert based in part on his work with 401(k) plans, (see, e.g., Otto

support his numbers, rather than using any type of traceable methodology. (Otto Dep. at 85:8-14; Doc 299-6 (Q: "So to understand the order of operations here, did you [] identify the 35 to $40 range before reviewing the data from these 403(b) plans?" A: "My thought process was, as I say, influenced by my experience, and the information I already had. And then I went and looked at these plans and saw well, yeah, this is very possible.").)

Beyond this, the report offers no rationale for why or how the five universities were selected. Otto admits that Harvard University maintained multiple recordkeepers (Otto Rep. ¶85), despite assuming for purposes of his fee calculation that the Plans would have consolidated to a single recordkeeper by August 2010 (id. ¶78). Although Otto stated that recordkeeping costs are "primarily dependent on the number of plan participant accounts" (id. ¶20; see id. ¶48), he admits that Harvard has half the participants that the Cornell plans have (id. ¶85). Apart from Caltech, he does not give the size or number of assets of any of the other plans mentioned in his report.

Otto offers no explanation for how he arrived at the tiered pricing structure of $40 for 2010-2014 and $35 for 2015-2018 and makes no attempt to tie these numbers to his exemplary plans' fees. To put these fees in perspective, the per participant fees for the top 25th percentile of TIAA's top 200 clients with at least one 403(b) program, which Cornell Defendants rely on as evidence of the absence of loss, range from $122-$166 during the relevant period. (Decl. of Erich Podzinski at 4, Doc 249-21.) Otto cites one recordkeeping price for each of the five named plans over the eight-year time frame. (See id. ¶¶85-88 (Harvard (2018); Caltech (2016); University of Pittsburgh Medical Center (2016); North Carolina 403(b) (2016); Nevada System of Higher Education (2014).) Only one of these fees, that of the Nevada System of Higher Education, is in the time frame of 2010-2014. The record keeping fee listed is $31 (id. ¶88), less than the fee Otto

Dep. at 71:20-24; Doc 299-6), he does not offer any examples of 401(k) plans' reasonable record keeping fees during the relevant period to support his computation of fees for the Cornell Plans.

claims could be achieved by prudent fiduciaries for the Cornell Plans in either 2010-2014 or 2015-2018.

The absence of "some recognizable, describable methodology," In re LIBOR-Based Fin. Instrs. Antitrust Litig., 299 F. Supp. 3d 430, 502 (S.D.N.Y. 2018) is a flaw that is large enough to warrant exclusion of Otto's testimony, Nimely, 414 F.3d at 396; Amorgianos, 303 F.3d at 267. An expert must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999). Otto has not done so here, and his testimony is properly excluded.

Minnich's analysis of the fact and amount of loss is based on the same unreliable methodology. He opines that reasonable fees per participant would have been $40 between 2010-2012, $38 between 2013-2015, and $36 from 2016 to present day. (Minnich Rep. ¶¶18, 157; Doc 249-20.) Similar to Otto, he states in a conclusory fashion that these rates are "consistent with [his] own 30 years of experience," but does not explain how his experiences led to his conclusions. (Id. ¶158; see Minnich Dep. at 115:12-14; Doc 299-1 (stating his opinion is based on "30 years plus of experience and significant analytic analysis of recordkeeping define[d] contribution plans across multiple markets").)

Minnich offers six university plan rates that "happen to be indicative . . . of the analytic components" he "was looking at to come up with the reasonable fee." (Minnich Dep. at 116:13-14; see id. at 116:22-24 (Q: "How did you select these six institutions?" A: "Um, both on what I felt was comparable in analytically looking at what a reasonable fee would be and the timeline of the years in question."); Minnich Rep. ¶¶137-56.) But he too offers no explanation as to how the schools were chosen, no example for reasonable rates in the 2010-2012 time period, and only one rate per school to cover the entire time period at issue. To the extent he offers as

examples the same schools considered by Otto, such as Harvard, his methodology is unreliable for the reasons discussed above. (See Minnich Rep. ¶¶147-48.)[9]

Plaintiffs attempt to add additional comparator plans in their Opposition to the Motion to Exclude Otto and Minnich's Expert Testimony. (See Opp. Br. at 13; Doc 298 (discussing Aurora Health Care and Trinity Health Savings Plan).) Plaintiffs offer no evidence that Otto or Minnich considered these plans in their reports. Because this evidence would not be admissible at trial, it will not be considered on the summary judgment motions. The Court grants Cornell Defendants' motion to exclude Otto and Minnich's testimony regarding the fact or amount of losses attributable to recordkeeping fees.[10]

II.    The Review of Investment Options Claim Against
       the Cornell Defendants (Count V)

Plaintiffs claim the Cornell Defendants imprudently selected and retained specific investment options including the TIAA Real Estate Account and CREF Stock Fund Account with high fees and poor performance relative to other readily available investment options based on underperformance of funds over one, five and ten-year periods. Cunningham, 2017 WL 4358769, at *6-7. The TIAA Real Estate Account is a variable annuity contract offered by TIAA that seeks long-term returns through rental income and appreciation of real estate and real estate-related investments. (Pls.' 56.1 ¶107; Cornell Defs.' 56.1 ¶107.) It invests between 75-85% of its assets in real estate and the remaining 15-25% in non-real-estate publicly-traded securities and short-term liquid investments that are easily converted to cash. (Id.) A small portion of the fund is invested in real estate securities such as real estate investment trusts ("REITs") and commercial

---

[9] Evidence cited as to Harvard and North Carolina, moreover, is outside the class period. (See, e.g., Minnich Rep. ¶¶148, 154 (citing disclosure information as of January 1, 2018 and September 15, 2016).)
[10] Otto and Minnich's testimony regarding general characteristics of fund structure and 403(b) plans will likely be admissible.

mortgage-backed securities. (Id). As of September 2014, CAPTRUST noted that all Cornell retirement plans had nearly 4% of plan assets maintained by TIAA-CREF invested in this fund. (Doc 291-45 at 16.) The CREF Stock Fund Account is a variable annuity managed by TIAA that invests in a diversified portfolio of common stocks. (Pls.' 56.1 ¶94; Defs.' 56.1 ¶94.) It holds 70-75% domestic equities and 25-30% foreign equities, some of which may be in emerging markets. (Id.) It employs a diversified management strategy that combines active management, quantitative indexing, and passive indexing. (Id.) As of September 2014, CAPTRUST noted that all Cornell retirement plans had just over 28% of plan assets maintained by TIAA-CREF invested in this fund. (Doc 291-45 at 15.)

At the motion to dismiss stage, the combination of a historical record of underperformance and inaction was found to plausibly support a claim. Id. at *3 (adopting reasoning set forth in Sacerdote); see Sacerdote, 2017 WL 3701482, at *10. Plaintiffs' allegations include that fiduciaries imprudently chose specific retail funds over lower-cost but otherwise identical institutional funds. Cunningham, 2017 WL 4358769, at *6-7.[11]

The Cornell Defendants' now move for summary judgment on Count V on two bases. They argue plaintiffs have not demonstrated that any of the challenged funds underperformed appropriate benchmarks and, even if there is evidence of underperformance when measured against appropriate benchmarks, plaintiffs offer no evidence that Cornell's process for monitoring the underperforming funds and choosing to maintain funds in the investment lineups

---

[11] Plaintiffs argue Cornell followed a "flawed process" by failing to monitor before 2014 and reviewing only core investment options after September 2014. This claim has already been dismissed. Cunningham, 2017 WL 4358769, at *8 ("Plaintiffs' claim that defendants breached their fiduciary duties by failing to monitor any of the Plans' options before October 1, 2014, and monitoring only 'core' investment options after that date fails to plausibly allege a breach of fiduciary duty.").

was imprudent.  For the reasons stated below, Cornell Defendants' motion for summary judgment on Count V will be granted in part.

a.  Selection and Retention of the TIAA and CREF Funds

Plaintiffs claim related to selection and retention of the TIAA and CREF funds may be divided into two time periods.  Between August 2010 and at least July 2013,[12] Cornell Defendants did not conduct benchmarking on the TIAA or CREF funds to monitor their performance compared to peer groups.  (Doc 248-3 at 30, 31; see Doc 241-1 at 41-49 (July 2013 Presentation); Bursic Dep. at 79:18-80:11; Doc 290-8; Bursic Dep. at 83-85; Doc 248-1.)

Tibble v. Edison International determined that fiduciaries have a "continuing duty to monitor trust investments and remove imprudent ones" separate and apart from the duty to prudently select investment options.  135 S. Ct. 1823, 1828 (2015).  "Tibble does not stand for the proposition that ERISA provides an actionable claim based solely on a procedural duty to monitor, and instead includes the next step of removing imprudent investments."  In re SunEdison, Inc. ERISA Litig., 331 F. Supp. 3d 101, 114 (S.D.N.Y. 2018); see Kopp, 894 F.3d at 221.

Plaintiffs do not present evidence that gives rise to a triable issue of fact that a prudent fiduciary would have removed the TIAA and CREF funds before July 2013, even if the fiduciaries knew of alleged underperformance.  "Investment losses are not proof that an investor violated his duty of care."  Jenkins v. Yager, 444 F.3d 916, 926 (7th Cir. 2006) (citing DeBruyne v. Equitable Life Assurance Soc. of the United States, 920 F.2d 457, 465 (7th Cir. 1990)).  Long-term investment options, like those offered in a retirement plan, may have varying levels of performance over the course of time.  Id.  That is why it is not necessarily sufficient to show that at one point in time "better investment opportunities were available."  Pension Ben. Guar. Corp.,

---

[12] The TIAA Real Estate fund's performance was not compared to its relative peer group until sometime in late 2014.  (Doc 241-1 at 49.)

712 F.3d at 718; see Hecker, 556 F.3d at 586; Loomis, 658 F.3d at 670. Plaintiffs offer no evidence, affidavits, or testimony beyond the conclusory assertion of their expert Wendy Dominguez that the level of underperformance of the TIAA and CREF funds alone, as measured by the benchmarks listed above, would lead a prudent fiduciary to conclude the funds should be removed from the plans before July 2013. "An expert's opinions that are without factual basis" are "inappropriate material for consideration on a motion for summary judgment." Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 310 (2d Cir. 2008).

Plaintiffs do not offer evidence that other fiduciaries removed TIAA, CREF, or any other fund from their plan lineups based on the performance measures identified, and Dominguez herself states that prudent fiduciaries evaluate funds for inclusion in plans based on additional characteristics such as "peer group rankings," "historical performance," "risk metrics," "expenses," and "other quantitative and qualitative measures." (Dominguez Rep. ¶50.) The evidence shows not that fiduciaries at the time were removing the funds but rather that similarly sized plans continued to offer the TIAA and CREF funds. As of 2016, 99% of TIAA's 200 largest clients had a portion of their defined contribution plans' assets invested in the CREF fund and 84% in TIAA. (Pls.' 56.1 ¶¶99, 112; Defs.' 56.1 ¶¶99, 112.)[13] Measured another way, thirty-five of thirty-seven plan sponsors of ERISA higher educational plans with more than $1 billion in net

---

[13] Defendants offer a declaration from Sacerdote by a TIAA Executive Douglas Chittenden in support of this fact. Plaintiffs claim it is inadmissible. But Chittenden is a witness in this case as well (see Doc 249-24) and plaintiffs offer no persuasive reason why his testimony would be inadmissible in this case. The Court considers it on summary judgment. See Highland CDO Opportunity Master Fund, L.P. v. Citibank, N.A., 270 F. Supp. 3d 716, 720 n.3 (S.D.N.Y. 2017) (considering on summary judgment testimony offered by individuals in a separate case who were available to testify).

assets offered CREF fund to their participants in 2010 and 2013, and thirty-three of thirty-seven of those plan sponsors offered the TIAA fund. (Chalmers Expert Report, Doc 240-7 ¶34.)

In addition, plaintiffs do not offer evidence that the benchmarks they cite to demonstrate underperformance in the August 2010 to July 2013 period would have been used by prudent fiduciaries at the time or would have led a prudent fiduciary to remove the funds from the plans' lineups. See Pension Ben. Guar. Corp., 712 F.3d at 716 ("We judge a fiduciary's actions based upon information available to the fiduciary at the time of each investment decision . . . ."). They stated in their Complaint that the CREF fund did not rank in the top 50% of its peer group when measured by the Russell 3000 Index as of 2009. (Doc 81 at 101.) They offer evidence in their expert report that the CREF fund did not rank in the top 50% of its peer group when measured by a benchmark developed by their expert for the ten-year period before June 2010. (Expert Report of Wendy Dominguez ¶75; Doc 331-1.) For the TIAA Real Estate Account, plaintiffs offered evidence of underperformance of the fund relative to certain Vanguard funds, TIAA's own benchmarks, and benchmarks in a presentation by the investment advisory firm Cammack LaRhette to New York University that was offered for trial in Sacerdote, 328 F. Supp. 3d 273. (Doc 81 at 110-11; Doc 331-1 ¶¶103-04; see Sacerdote, 16 cv 2684, Doc 253-106.)

There is no evidence that any prudent fiduciary used the Russell 3000 Index as a benchmark for the CREF fund between 2010 and 2013. Even plaintiffs' expert does not rely on the Russell 3000 Index as a proper benchmark for the CREF fund. (See Doc 331-1.) There is no evidence that any prudent fiduciary would benchmark to the "70%/30% mix of domestic and internal [sic] equities" benchmark developed by plaintiffs' expert in her expert report. (Id. ¶95.) Cornell's IPS, which was in place during the latter portion of this time period, lists certain benchmarks in Appendix A as preferred peer group benchmarks; neither Russell 3000 nor

plaintiffs' expert's custom benchmark are listed for funds in CREF Stock's asset class (Large Cap U.S. Equity). (Doc 252-6 at 12; see id. at 11; Cornell Defs.' 56.1 ¶104 (identifying CREF Stock as a large cap asset).)

For TIAA Real Estate, plaintiffs have offered no evidence that prudent fiduciaries would benchmark against the Vanguard funds used as comparisons of underperformance in the Amended Complaint. (See Doc 81 at 110-11.) Instead, plaintiffs' expert analyzes TIAA's own benchmarks and those used by an investment advisor for a different university. (Doc 331-1 at ¶¶103-04.) While TIAA's custom benchmark could be used by prudent fiduciaries, no reasonable trier of fact would conclude that a fiduciary would consider the TIAA fund an imprudent investment based on TIAA's custom benchmark. Using this methodology, the TIAA Real Estate Account overperforms the custom index as of December 31, 2009 for five and ten-year periods but underperforms on the one-year return. (TIAA Real Estate Account Quarterly Performance Analysis of September 30, 2014 at 5; Doc 292-8.)

Cammack LaRhette's benchmark, as that used by an investment advisory firm to fiduciaries of ERISA plans (Pls.' 56.1 ¶80), may have been used by prudent fiduciaries at the time. Cammack's report specifically notes that the TIAA fund had "steep losses in 2009" and "[wa]s predicted to recover with [the] commercial real estate market." (Sacerdote, 16 cv 2684; Doc. 253-106 at 49.) It states that the fund should be placed on a "watch list" given its aberrational performance in 2009 but does not advocate for removal. (Id.)

Plaintiffs present evidence that, in July 2013, Cornell Defendants received their first quantitative review of TIAA and CREF fund performance from CAPTRUST. (Doc 241-1 at 49.) It showed the CREF fund underperformed three and five-year benchmarks compared to its peer group by more than 50% and gave the fund yellow triangles indicating below average

performance. (Id.) The report did not have performance data for the TIAA fund. (Doc 241-1 at

49.) CAPTRUST's September 2014 benchmarking presentation showed fund underperformance

of three and five-year benchmarks for both the TIAA and CREF funds. (Doc 291-45 at 40, 52.)[14]

Despite these results, Cornell Defendants kept the TIAA and CREF funds in the plans' core

lineups.

No reasonable trier of fact could conclude that Cornell Defendants' "conduct in

arriving at [their] investment decision" to keep the TIAA and CREF funds in the plans' lineups

despite evidence of fund underperformance relative to peer groups was imprudent. Pension Ben.

Guar. Corp., 712 F.3d at 716; see Tibble v. Edison Int'l, 729 F.3d 1110 (9th Cir. 2013), vacated

on other grounds by 135 S. Ct. 1823 (2015) (considering "the thoroughness of the investigation

into the merits of the transaction" for prudence of fiduciaries' fund selection). Cornell hired

CAPTRUST to review and select investments for a core lineup of funds. Appointment of an

independent investment advisor, while not alone sufficient, George, 641 F.3d at 799-800

(surveying case law), provides "evidence of a thorough investigation" and of "'procedural'

prudence and proper monitoring," DiFelice v. U.S. Airways, Inc., 49 F.3d 410, 421 (4th Cir. 2007)

(quoting Howard v. Shay, 100 F.3d 1484, 1489 (9th Cir. 1996)). In November 2012, CAPTRUST

recommended to maintain TIAA and CREF in the investment plan core lineups (Tier II) as

---

[14] The parties vigorously dispute what the appropriate benchmark is by which to measure performance of the TIAA and CREF funds. A party alleging imprudence based on retaining a specific fund must demonstrate that a comparator is an "equivalent investment vehicle." Taylor v. United Techs. Corp., 06 cv 1494 (WWE), 2009 WL 535779, at *10 (D. Conn. Mar. 3, 2009), aff'd, 354 F. App'x 525 (2d Cir. 2009); see Meiners v. Wells Fargo & Co., 898 F.3d 820, 823 (8th Cir. 2018). Benchmarks used by CAPTRUST as co-fiduciary in reports given to and relied on by Cornell to assess their investment line up are evidence of appropriate comparator benchmarks.

"existing fund[s] or strong recommendation[s]." (Doc 241-2 at 6.) A CAPTRUST representative explicitly stated CREF Stock "meet[s] selection criteria." (Id. at 2.)

CAPTRUST reviewed and recommended to select and retain both funds in the investment lineups in 2013 and 2014, stating that they "meet the guidelines set forth by CAPTRUST for distinct investments in the [IPS]." (Doc 291-45 at 21; see Doc 241-1 at 13.) These guidelines were not restricted to quantitative review of fund performance; CAPTRUST's commentary in its 2014 presentation stated that they included things like "quality of management" and "excess return." (E.g., Doc 291-45 at 21.) CAPTRUST and Cornell continued to monitor the CREF and TIAA funds after retaining them in the core investment lineup. (Doc 252-8; see, e.g., Doc 290-15 (discussing review of Tier II funds and fund lineup).)

Cornell Defendants did not "passively accept[]" the proposals provided by CAPTRUST." In re Unisys Sav. Plan Litig., 74 F.3d 420, 435 (3d Cir. 1996); see Donovan v. Bierwirth, 680 F.2d 263, 273 (2d Cir. 1982) (fiduciary must independently "ascertain[] the facts with respect to" funds). The undisputed evidence shows that the Committee reviewed the results of CAPTRUST's presentations, which included investment alternatives in the same asset classes of the TIAA and CREF funds, and asked questions related to the relative amount of "disruption" that would occur with the new fund menu for plan participants. (Doc 252-8 at 3.) Bursic testified that members of the Committee "express[ed] concern" at the underperformance of CREF but decided to keep it, recognizing that the benchmark used by CAPTRUST was "inadequa[te] . . . because there is no good benchmark for CREF stock" and recognizing a "legacy concern" given the large number of participants invested in the funds. (Bursic Dep. at 218 ll:1-24; 221 ll:1-19; Doc 290-8; see Doc 224-2 at 11-12 (discussing disruption concerns).) And CAPTRUST too later determined that the CREF fund's benchmarks were not reflective of its peer

group and began evaluating based on a custom benchmark to more accurately assess fund performance. (Pls.' & CAPTRUST's 56.1 ¶12; see id. ¶¶15-16.) A sub-committee of Cornell Defendants evaluated the funds and noted they both "provided strong historical returns, were valuable from a diversification perspective, and were popular among plan participants." (Bursic Decl. Doc 234-16 ¶10.)

Evidence of "discussions about the pros and cons" of investment alternatives is "fatal to" plaintiffs' claims. Tibble, 729 F.3d at 1136. Assessing fund lineup for "a reasonable range of investment options with a variety of risk profiles" satisfies the duty of a prudent fiduciary. Renfro v. Unisys Corp., 671 F.3d 314, 327 (3d Cir. 2011). On this record, no reasonable fact finder could conclude that the defendants breached their fiduciary duties in retaining the TIAA and CREF funds as investment options open to participants in the Plans. "[P]articipant choice is the centerpiece of what ERISA envisions for defined-contribution plans." Tibble, 729 F.3d at 1134-35.

Nor could a reasonable trier of fact conclude that fiduciaries failed to act in accordance with the IPS based on fund underperformance. Performance of a fund that "f[a]ll[s] below . . . benchmarks established by plan documents" or "some other metric or method used by prudent investors at the time" may signal an imprudent investment subject to additional review or monitoring. Pension Ben. Guar. Corp., 712 F.3d at 722 n.20; see Dardaganis v. Grace Capital Inc., 889 F.2d 1237, 1241-42 (2d Cir. 1989) (finding failure to act in accordance with plan documents is evidence of imprudent conduct); see also Cal. Ironworkers Field Pension Tr. v. Loomis Sayles & Co., 259 F.3d 1036, 1042 (9th Cir. 2001).

Cornell Defendants' IPS stated funds selected for the new plan lineups should "rank in the top 50% of their given peer group for the 3 or 5 year annualized period at the time of their

selection." (Doc 252-6 at 7.) Based on this language, plaintiffs contend evidence of underperformance in CAPTRUST presentations demonstrates a material issue whether Cornell Defendants' acted imprudently. The language of the IPS is not so circumscribed. It states that funds selected for the plans would be assessed based on additional criteria such as "fees," "style consistency," "volatility and diversification," "management and organization," and "additional factors" including "fund specific situations and anomalies in the capital markets of in the Plans' unique situations." (Doc 252-6 at 7-8.) With respect to performance, the IPS offers additional flexibility for fiduciaries to make investment decisions, stating performance in the top 50% of a peer group should be true "[w]ith few exceptions," and that the Committee should consider "other variables . . . in order to develop a holistic view about a strategy and its appropriateness within the Plans." (Id.) The IPS states that the Committee's goal is to "offer a set of diversified investment alternatives that represent a broad range of different asset classes with different risk and return characteristics." (Id. at 6.)

The IPS does not require Cornell to select only funds that meet the top 50% performance criteria for peer groups based on three and five-year performance. Funds are selected based on a holistic combination of factors of which performance is one factor. The IPS does not mandate removal of funds based on performance. It acknowledges that the funds are "long-term wealth management" strategies and "it is not expected that either the investment universe or specific investment alternatives normally will be changed or deleted frequently." (Id. at 9.)

The prudence of each investment is analyzed as it relates "to the portfolio as a whole." Pension Ben. Guar. Corp., 712 F.3d at 717. By 2014, TIAA and CREF were determined to be "distinct asset classes" (Doc 291-45 at 21) with portfolios that did not track standard benchmarks (see Schmitt Dep. at 113:15-114:10; Doc 238-3 (CREF Stock has no "true published

- 31 -

benchmark by which to evaluate" it); Strodel Dep. at 142:12-145:7; Doc 290-23.) Their retention tracked one of the goals of the IPS, to offer "diversified investment alternatives," and did not violate the terms of the IPS. (Doc 252-6 at 6.)

The motion for summary judgment of the Cornell Defendants dismissing Count V insofar as it alleges imprudence in retaining TIAA and CREF funds will be granted.

B. Additional Funds that Underperformed Their Benchmarks

Although briefing at all stages has focused on the TIAA and CREF funds, the Court granted plaintiffs leave to proceed with their theory based on underperformance as to hundreds of additional funds. (See Cunningham, 2017 WL 4358769, at *7 n.2 ("[P]laintiffs claim that as of June 30, 2016, over 66% of the funds with at least five years of performance history underperformed their respective benchmarks over the previous five years. (Compl. at 132.) This additional allegation does not materially affect the Court's analysis because plaintiffs' claim that defendants breached their fiduciary duties by retaining underperforming investment options survives the motions to dismiss."); Am. Compl. at 89-95 (listing additional 178 funds).)

On April 1, 2019, this Court held a hearing to discuss defendants' proposed motion to exclude evidence related to the additional funds under Rule 37(c)(1), Fed. R. Civ. P. Defendants argued that plaintiffs should be precluded from submitting evidence as to the underperformance of the 178 investment options in the Plans based on look-back periods before the June 2016 period disclosed in the Complaint or should be precluded from basing damages on anything other than performance of the CREF and TIAA funds based on late disclosure of damages in Dominguez report. (Tr. of April 1, 2019; Doc 332.) The Court ruled it would not preclude any evidence under Rule 37. (Id. at 34:15-18.) It further stated that when the expert reports were served and plaintiffs' Rule 26(a)(1) disclosure was supplemented in August 2018, defendants were placed on notice of

which accounts formed the basis for Count V. (Id. at 33:6-9.) In response, both parties submitted supplemental briefing on the issue of the remaining funds. (Docs 330, 336.)

While the Complaint listed 178 funds that allegedly underperformed in addition to TIAA Real Estate and CREF Stock, plaintiffs in their supplemental briefing now claim only 87 imprudently maintained funds. (Doc 336 at 6.) A list of the 87 funds is attached in a supplemental Rule 56.1 Statement. (Doc 337 at 4-11.)[15] Plaintiffs group the funds into three buckets. They claim funds should have been removed from the Plans' lineups that a) underperformed peer groups over the three and five-year periods beginning in August 2010 b) exhibited high performance volatility, lacked diversification, or had high expense ratios, and c) had short performance histories that would not have allowed for a prudent review in August 2010. (See Doc 336 at 6-9; Pls.' Suppl. 56.1 ¶¶353-55.) As explained, only the first theory related to imprudent retention based on underperformance was previously raised. The other two theories may not be raised for the first time on summary judgment. Greenidge v. Allstate Ins. Co., 446 F.3d 356, 361 (2d Cir. 2006).

There are 38 funds flagged for underperforming their respective peer groups by at least 50% over the three and five-year periods as of August 2010, based on data from 2009. (Dominguez Rep. ¶¶114-16; Doc 226-1; see Pls.' Suppl. 56.1 at 3-10 (listing funds marked with "X" in "Dominguez 2010" column as those underperforming benchmarks as of 2010).) Beyond the conclusory statement of Dominguez that prudent fiduciaries would have removed "at least 100 funds" by the end of 2009 (Dominguez Rep. ¶114), which is insufficient to raise a material issue of fact, see Major League Baseball, 542 F.3d at 310, plaintiffs have otherwise offered no evidence

---

[15] Only 63 of these were identified by name in the Amended Complaint (see Doc 336 at 6 n.4), but, as described in the Supplemental Rule 56.1 Statement, all 87 of them are referenced in Dominguez's expert report, (see Doc 337 at 4-11). The Court held on April 1, 2019 that Dominguez's expert report gave notice to defendants as to the allegedly imprudent funds, and will consider plaintiffs' evidence with respect to the funds not listed in the Amended Complaint. (Tr. of April 1, 2019 at 33:6-34:1; Doc 332.)

that this information alone would lead a prudent fiduciary to remove these funds. They offer no evidence that other fiduciaries were removing these funds from lineups in 2010, or that underperformance of certain percentages was considered at the time indicative of imprudence.

Plaintiffs cite to the IPS's language that actively managed funds should generally perform in the top 50% of their peer group categories for three and five-year periods, but the IPS was not adopted until 2012 and, for the reasons stated above, does not by itself mandate exclusion of funds based on past performance. That higher performing funds were available at the time does not without more create a triable issue of fact because "nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund." Hecker, 556 F.3d at 586; cf. Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 596 (8th Cir. 2009) (acknowledging that a fiduciary might "have chosen funds with higher fees for any number of reasons, including the potential for higher return, lower financial risk, more services offered, or greater management flexibility").

Plaintiffs alternatively look to July 2013 "at the latest" when prudent fiduciaries would have removed additional funds in Tier III from the investment lineup or conducted additional monitoring on these funds based on three and five-year underperformance identified in CAPTRUST's presentation. (See Doc 241-1 at 41-49.)[16] CAPTRUST reviewed these funds in December 2014 and proposed some funds for elimination based on whether they passed Cornell's IPS guidelines and whether they had more than 50 active participants (Doc 338-1.) In 2016, the Committee agreed to close over one hundred funds and they were removed and mapped to investment alternatives in the spring of 2017. (Doc 290-19 at 3; Doc 292-11; see Docs 338-3; 338-

---

[16] The July 2013 presentation does not review all 87 funds. Funds not reviewed are noted in plaintiffs' Second Rule 56.1 Statement. (See Doc 337 at 3-10.)

4.) Cornell admitted it did not have a process to remove underperforming funds from the Plans prior to December 2016. (Pls.' 56.1 ¶339; Defs.' 56.1 ¶339.)

To defeat the Cornell Defendants' summary judgment motion, plaintiffs must come forward with evidence which, if believed, would permit a reasonable fact finder to conclude that defendants acted imprudently in failing to remove these funds. They have not done so. Plaintiffs have not offered evidence that they failed to follow advice of CAPTRUST, failed to conduct review of the Tier III funds to determine which should be closed, violated their IPS, or failed to monitor or investigate the funds. Plaintiffs' argument is that the timeline over which Cornell Defendants eliminated underperforming funds was longer than a prudent fiduciary would take. They offer no evidence as to the timeline of a prudent fiduciary.

No reasonable fact finder could conclude that the defendant fiduciaries acted objectively imprudent by not eliminating underperforming funds the very day that CAPTRUST presented its results in July 2013. (Doc 241-1.) After being presented with this high-level overview, defendants continued to monitor and review the performance of these funds as part of a larger strategy to streamline the Plans' lineups. They reviewed proposals for a tiered structure, found investment alternatives for underperforming funds, and assessed participant disruption with eliminating funds in the Plans. These issues were important because the fiduciaries were not discussing removal of one or even a few funds. The proposed removal involved hundreds of funds that would significantly change the lineup of the Plan offerings. The obligation to investigate the merits of removing plan options is "not a general one, but rather must depend[] on the character and aim of the particular plan and decision at issue and the circumstances prevailing at the time." DiFelice, 497 F.3d at 20 (quoting Bussian v. RJR Nabisco, Inc. 223 F.3d 26, 299 (5th Cir. 2000)); see Katsaros, 744 F.2d at 279. Plaintiffs offer no evidence that the time defendants took to remove

the Tier III funds from the Plans was imprudent, particularly in light of the large-scale changes Cornell and CAPTRUST considered. CAPTRUST advocated what it considered to be a "preferable" approach based on a reasoned analysis; it was not required to take "any particular course of action." Chao, 452 F.3d at 183. Summary judgment will be granted on Count V as to these additional funds.

## C. Maintaining Retail-Class Mutual Funds Instead of Identical Institutional Share Funds

Plaintiffs proceeded on a theory that "defendants breached their fiduciary duties by selecting specific retail funds over lower-cost, but otherwise identical, institutional funds." Cunningham, 2017 WL 4358769, at *8. Plaintiffs present evidence that TIAA offered identical institutional share classes for its mutual funds in February 2009 to defined contribution plans with more than $2 million invested in most of the funds. (Pls.' 56.1 ¶345; Cornell Defs.' 56.1 ¶345.) Cornell did not transition any of its funds to institutional shares with TIAA until February 22, 2012. (Pls.' 56.1 ¶348; Cornell Defs.' 56.1 ¶348.) Plaintiffs have presented a material issue of fact on the prudence of Cornell fiduciaries in retaining higher-cost retails shares of funds in the Plans prior to the transition. There is no evidence in the form of affidavits or otherwise that anyone at Cornell attempted to transition to the institutional share class funds before February 22, 2012. And unlike for the TIAA and CREF funds, where the fact that comparable alternatives exist does not alone offer evidence of imprudent retention, a fiduciary would have no reason not to switch to an identical share class fund. See Braden, 588 F.3d at 596 (finding inference of flawed review process where specific identical institutional shares were available); Tibble v. Edison Int'l, 07 cv

5359 (SVW)(AGRx), 2017 WL 3523737, at *12-13 (C.D. Cal. Aug. 16, 2017) (determining a prudent fiduciary would switch to identical lower-cost share classes immediately).

Cornell's 2012 negotiations with TIAA included the Plans' receipt of revenue credits to be refunded across all TIAA mutual funds retroactive for the 2011 plan year. (Pls.' 56.1 ¶¶50, 53; Cornell Defs.' 56.1 ¶¶50, 53.) Cornell argues this, in combination with the fact that TIAA did not permit 403(b) plan clients to offer institutional shares in 2010, means that plaintiffs cannot prove they suffered a loss from any alleged breach. Defendants offer no evidence that the Plans could not have transitioned to institutional shares in 2010. Defendants state that "revenue credits . . . refund[ed] some portion of [administrative] expenses back to participants after they were collected by the fund manager." (Defs.' 56.1 ¶53; see id. ¶61.) There is still a dispute of material fact whether an earlier switch to institutional funds would have resulted in savings to the Plans that could have been reinvested in the Plans and whether the process (or lack thereof) up to CAPTRUST's 2012 negotiation of revenue credit was prudent.

To defeat summary judgment, plaintiffs must come forward with evidence which if believed would allow a reasonable fact-finder to conclude that there was some loss attributable to the failure to swap out a retail fund for an institutional fund. Plaintiffs contend that they suffered losses from the failure to swap out many funds, but they offer evidence only as to the TIAA-CREF Lifecycle target date funds. (Pls.' Suppl. 56.1 ¶349; Defs.' Suppl. 56.1 ¶349; Dominguez Rep. ¶¶122-24; see Pls.' Suppl. 56.1 ¶346-47; Defs.' Suppl. 56.1 ¶346-47 (stating Cornell had more than $2 million invested in the TIAA-CREF Lifecycle target date funds).)

Dominguez states that her methodology of calculating losses based on retaining higher cost shares should be applied to "each investment option in the Plans for which Defendants failed to provide the lower-cost version of the same mutual fund investment option." (Dominguez

Rep. ¶123.) Plaintiffs present no evidence as to which additional funds had lower-cost options available or whether Cornell had over $2 million invested in these funds, to the extent it was necessary to switch share classes. Nor is the determination of whether there was a fact of loss "simple arithmetic" not requiring expert testimony. Stratton v. Dep't for the Aging for the City of New York, 132 F.3d 869, 877 (2d Cir. 1997). Plaintiffs' claim will be limited to the TIAA-CREF Lifecycle target date funds. See CILP Assocs., 735 F.3d at 125 (the Court will not "scour the record" for evidence on summary judgment). Accordingly, Cornell Defendants' motion for summary judgment will be granted except insofar as plaintiffs allege that Cornell Defendants breached a duty of prudence by failing to swap out the TIAA-CREF Lifecycle target date funds for their identical institutional share class funds.[17]

D. Count V as to CAPTRUST

CAPTRUST was hired by Cornell in December 2011. (Pls.' 56.1 ¶4; CAPTRUST's 56.1 ¶4.) CAPTRUST agreed to serve as a fiduciary under ERISA "with regard to the selection of . . . mutual fund(s) available to the Plans within the platform provided by the Plan's Administrator." (Id. ¶5.)

For the same reasons discussed with respect to Cornell, CAPTRUST is entitled to summary judgment on the breach of prudence claim for monitoring and retaining funds with underperforming benchmarks. The initial absence of benchmarking until July 2013 does not provide evidence of imprudence on the current record given failure to demonstrate the TIAA and CREF funds would have been removed. The recognition that certain funds underperformed in relation to peer groups for three and five-year periods was not the only criteria used to evaluate

---

[17] As noted in the Opinion on the motion to dismiss, Count VII, violation of the Cornell Defendants' duty to monitor, is a "derivative" claim of Counts III and V. Cunningham, 2017 WL 4358769, at *11. It is "only as broad as the surviving prudence claims." Id.; see Pls.' 56.1 ¶3 n.5; Cornell Defs.' 56.1 ¶3 n.5 (acknowledging derivative nature of claim). Count VII survives to the extent it is based on the remaining allegations in Count V.

fund selection and retention, nor do plaintiffs argue it necessarily should have been. As discussed, the IPS does not mandate exclusion or removal of funds that do not meet the quantitative criteria of benchmarking relative to peer group. For those funds other than the TIAA Real Estate and CREF Stock funds, no reasonable trier of fact could conclude that the investigation and process leading to the eventual removal of funds was imprudent given the goals of the defendants and the major restructuring of the plans.

CAPTRUST is entitled to summary judgment on Count V with respect to allegations that it breached its duties with respect to retail share class funds. The institutional share class claim has been limited only to the TIAA-CREF Lifecycle Target Funds as to which there is some evidence of the fact of loss. See supra Discussion Section II.C. CAPTRUST was hired on December 8, 2011. (Pls.' 56.1 ¶4; CAPTRUST's 56.1 ¶4.) In its first presentation to Cornell in January 2012, CAPTRUST advised that Cornell consider the "[u]se of lowest priced share classes." (Id. ¶24.) No reasonable trier of fact could determine CAPTRUST breached a duty of prudence in failing to review the switch to institutional class funds that resulted in a loss to the Plans within the three weeks after it was retained.

CONCLUSION

For the reasons explained, Cornell Defendants' motion to exclude the expert testimony of Otto and Minnich is GRANTED in part, the motions to exclude the expert testimony of Buetow, Dominguez, and Matheson are DENIED, and the motion for summary judgment is GRANTED for all counts except for Count V insofar as it alleges imprudent retention of TIAA-CREF Lifecycle target date funds. CAPTRUST's motion for summary judgment is GRANTED. The Clerk is respectfully directed to terminate the motions (Docs 221,

225, 228, 278, 233.) An order addressing the parties' requests to seal parts of the summary judgment record will follow.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
        September 27, 2019